

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

USDC- GREENBELT
'25 OCT 16 PM4:22

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.** TDC25CR314 |
| | * | |
| **JOHN ROBERT BOLTON, II,** | * | **(Transmission of National Defense** |
| | * | **Information, 18 U.S.C. § 793(d); Retention** |
| **Defendant** | * | **of National Defense Information, 18 U.S.C.** |
| | * | **§ 793(e); Forfeiture, 18 U.S.C. § 793(h),** |
| | * | **18 U.S.C. § 981(a)(1)(C), 21 U.S.C.** |
| | * | **§ 853(p), 28 U.S.C. § 2461(c))** |
| | * | |

**\*\*\*\*\***

### INDICTMENT

The Grand Jury for the District of Maryland charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise indicated:

### Introduction

1.     The defendant, **JOHN ROBERT BOLTON, II ("BOLTON")**, resided in Montgomery County, Maryland, and, from the 1980s through 2019, served intermittently in a variety of senior U.S. Government positions, including as an Assistant Attorney General in the U.S. Department of Justice, an Under Secretary of State in the U.S. Department of State, U.S. Ambassador to the United Nations, and, in his last position of public service, from April 2018 to September 2019, as Assistant to the President for National Security Affairs, which was commonly known as the National Security Advisor.

2.     The role of the National Security Advisor varied by presidential administration, but generally the National Security Advisor assisted the President in managing the National Security Council ("NSC"). The National Security Act of 1947, as amended, established the NSC to advise

the President with respect to the integration of domestic, foreign, and military policies relating to the national security of the United States. Consistent with the direction of the President, the functions of the NSC included advising the President with respect to the integration of domestic, foreign, and military policies relating to national security; assessing and appraising the objectives, commitments, and risks of the United States in relation to the actual and potential military power of the United States; and making recommendations to the President concerning policies on matters of common interest to the departments and agencies of the U.S. Government concerned with national security. *See generally* Title 50, United States Code, Section 3021. Membership of the NSC included "the President, the Vice President, the Secretary of State, the Secretary of Defense, the Secretary of Energy, the Secretary of the Treasury, the Director of the Office of Pandemic Preparedness and Response Policy and such other officers of the United States Government as the President may designate." *Id.*

3. **BOLTON** was the National Security Advisor to the President of the United States between approximately April 9, 2018, and September 10, 2019. National Security Advisors typically advise the President on all exigent threats to the United States and other issues related to national security, including foreign relations, intelligence activities, and decisions regarding the use of military force. As the National Security Advisor, **BOLTON** had access to some of the U.S. Government's most sensitive and closely guarded national security secrets. In order to obtain a U.S. security clearance that granted him access to the highly classified information inherent in the job of National Security Advisor, **BOLTON** signed numerous non-disclosure agreements that acknowledged, among other things, that "the unauthorized disclosure . . . of classified information by [him] could cause damage or irreparable injury to the United States," that he would "never divulge classified information" without "prior written notice of authorization from" the relevant government agency, that he would "never divulge anything . . . that [he] kn[e]w to be [Sensitive

Compartmented Information ("SCI")][1] to anyone who is not authorized to receive it without prior written authorization," and that he understood that the unauthorized disclosure of national security information "may constitute a violation, or violations, of United States criminal laws."

4.     As the National Security Advisor, **BOLTON** was granted a TOP SECRET/SCI security clearance. Before being appointed as the National Security Advisor, **BOLTON** held a U.S. security clearance in some of his prior U.S. Government positions.

5.     As National Security Advisor, **BOLTON** directed and supervised the work of the NSC staff on behalf of the President of the United States. **BOLTON** had access to, and was responsible for the safeguarding of, the most sensitive national defense information, including classified information.

6.     Due to **BOLTON**'s need to have ready access to national defense information, including classified information, while serving as the National Security Advisor, in or about September 2018, the U.S. Government installed an accredited Sensitive Compartmented Information Facility ("SCIF") within **BOLTON**'s home located within the District of Maryland. The SCIF was approved for the processing and closed storage of classified information, including information classified up to the TOP SECRET level. After **BOLTON**'s term as National Security Advisor ended on or about September 10, 2019, the SCIF in **BOLTON**'s home was decertified by the U.S. Government on or about October 16, 2019, and from that date through the present, no location within **BOLTON**'s home was approved for the lawful storage of classified information. At no point, including the period when **BOLTON** had an accredited SCIF in his home, was **BOLTON** authorized to store or transmit classified information on unclassified systems such as an

---

[1] Classified information at any level can be further restricted through compartmentation in Sensitive Compartmented Information ("SCI") categories. Only individuals with the appropriate security clearance and additional SCI clearance(s) can have access to such classified information.

America Online ("AOL") email account, a Google email account, a non-governmental commercial messaging application, or other non-governmental systems.

7. While National Security Advisor, **BOLTON** learned national defense and classified information through a variety of means, including intelligence briefings, intelligence reports, and meetings with members of the U.S. intelligence community, including the National Security Agency ("NSA") and the Central Intelligence Agency ("CIA"), the U.S. military, and foreign government officials. In addition to having a home SCIF, while National Security Advisor, **BOLTON** also had access to a variety of secure telecommunication systems that he could use to discuss and communicate classified information. Moreover, **BOLTON** had access, as the National Security Advisor, to classified spaces in the White House, the Eisenhower Executive Office Building, and other locations, in the Washington, D.C., area and elsewhere, where he could readily learn, read, and discuss classified and sensitive information with others who were authorized to know, receive, discuss, and make decisions based on such information.

8. From on or about April 9, 2018, through at least on or about August 22, 2025, **BOLTON** abused his position as National Security Advisor by sharing more than a thousand pages of information about his day-to-day activities as the National Security Advisor—including information relating to the national defense which was classified up to the TOP SECRET/SCI level—with two unauthorized individuals, namely Individuals 1 and 2. **BOLTON** also unlawfully retained documents, writings, and notes relating to the national defense, including information classified up to the TOP SECRET/SCI level, in his home in Montgomery County, Maryland.

9. Individual 1, whose identity is known to the Grand Jury, was related to **BOLTON**, resided in the District of Maryland, never held a U.S. security clearance, and was not authorized to access, receive, or maintain the classified information that **BOLTON** shared related to his work as the National Security Advisor.

4

10.     Individual 2, whose identity is known to the Grand Jury, was related to **BOLTON**, never held a U.S. security clearance, and was not authorized to access, receive, or maintain the classified information that **BOLTON** shared related to his work as the National Security Advisor.

11.     From on or about April 9, 2018, through on or about September 15, 2019, on a regular basis, **BOLTON** sent diary-like entries to Individuals 1 and 2 that contained information classified up to the TOP SECRET/SCI level. **BOLTON** wrote many of these diary-like entries by transcribing his handwritten notes from his day's activities into word processing documents, which he then electronically sent to Individuals 1 and 2 through a commercial non-governmental messaging application. On other occasions, **BOLTON** used his personal non-governmental email accounts, such as email accounts hosted by AOL and Google, to email information classified up to the TOP SECRET/SCI level to Individuals 1 and/or 2 at their personal email accounts. At no point did **BOLTON** have authorization to store or transmit the classified information that he sent to Individuals 1 and 2 via his personal electronic devices and accounts. Nor did, at any time, Individuals 1 or 2 have authorization to know or store the classified information that **BOLTON** gave to them.

12.     At some unknown time, but no later than August 22, 2025, many of the diary-like entries from **BOLTON**'s time as the National Security Advisor, including entries that contained national defense information classified up to the TOP SECRET/SCI level, were printed and stored in **BOLTON**'s personal residence in Montgomery County, Maryland. Digital copies of some of the diary-like entries that contained national defense information classified up to the TOP SECRET/SCI level were also stored on personal electronic devices used by **BOLTON** and others located in **BOLTON**'s personal residence in Montgomery County, Maryland, on August 22, 2025.

13.     After **BOLTON**'s time as National Security Advisor ended on September 10, 2019, **BOLTON**'s personal residence was not authorized to store classified information in physical or

electronic format. On or about September 10, 2019, U.S. Government personnel retrieved all classified equipment and marked classified documents that were stored in **BOLTON**'s home SCIF. During that visit, **BOLTON** was told that he could no longer store classified information at his home. At no point during **BOLTON**'s time as the National Security Advisor or afterwards, including when his home SCIF was decommissioned in or about September 2019, did **BOLTON** tell the U.S. Government personnel that he had sent national defense and classified information to Individuals 1 and 2 over commercial email and messaging services or that such information was stored on personal electronic devices and in personal electronic accounts belonging to or accessible by himself and/or Individuals 1 and 2.

14. At some point between when **BOLTON** left government service in September 2019 and July 2021, a cyber actor believed to be associated with the Islamic Republic of Iran hacked **BOLTON**'s personal email account and gained unauthorized access to the classified and national defense information in that account, which **BOLTON** had previously emailed to Individuals 1 and 2 while he was the National Security Advisor. A representative for **BOLTON** notified the U.S. Government of the hack in or about July 2021, but did not tell the U.S. Government that the account contained national defense information, including classified information, that **BOLTON** had placed in the account from his time as National Security Advisor. Nor did **BOLTON**'s representative tell the U.S. Government that **BOLTON** had shared some of that national defense information, including classified information, with Individuals 1 and 2 via personal email and a non-governmental messaging application.

## Classified Information

15. Executive Order 13526 governed the classification of national security information. Information in any form may be classified if it: (1) is owned by, is produced by or for, or is under the control of the U.S. Government; (2) could, if disclosed, cause one or more specified levels of

6

harm to the United States; and (3) is classified by or under an Original Classification Authority

("OCA") who determines that its unauthorized disclosure reasonably could be expected to result in

damage to the national security. OCAs, also called original classifiers, were individuals authorized

to classify information and make classification decisions.

16.    Pursuant to Executive Order 12958 signed on April 17, 1995, as amended by

Executive Order 13292 on March 25, 2003, and Executive Order 13526 on December 29, 2009,

national security information was classified as "TOP SECRET," "SECRET," or

"CONFIDENTIAL." National security information was information owned by, produced by,

produced for, and under the control of the U.S. Government that was classified as follows:

a.    Information was classified as TOP SECRET if the unauthorized disclosure of that
       information reasonably could be expected to cause exceptionally grave damage to
       the national security that the original classification authority was able to identify and
       describe.

b.    Information was classified as SECRET if the unauthorized disclosure of that
       information reasonably could be expected to cause serious damage to the national
       security that the original classification authority was able to identify and describe.

c.    Information was classified as CONFIDENTIAL if the unauthorized disclosure of
       that information reasonably could be expected to cause damage to the national
       security that the original classification authority was able to identify and describe.

17.    Under Executive Order 13526, "damage to the national security" meant harm to the

national defense or foreign relations of the United States from the unauthorized disclosure of

information, taking into consideration such aspects of the information as the sensitivity, value,

utility, and provenance of that information.

18.    The classification marking "NOFORN" indicated that the information was "Not

Releasable to Foreign Nationals" and dissemination of that information was limited to United States

persons. The classification marking "REL TO" indicated that the information was releasable only

to foreign nationals of specified countries, international organizations, or multinational forces. The

7

classification marking "REL TO USA GBR" indicated that the information could only be released to nationals of the United States and Great Britain.

19.     The classification marking "ORCON" indicated that the dissemination and extraction of the classified information was controlled ("CON") by the originator ("OR").

20.     Classified information related to intelligence sources, methods, and analytical processes was designated as SCI and subject to additional controls, such as the SI and HCS controls described further below.

21.     The classification marking "SI" was an SCI control system that indicated that the information was "Special Intelligence" and that the intelligence information was derived from the monitoring of foreign communications signals by individuals other than the intended recipients. SI was intended to protect signals intelligence ("SIGINT") including communications and electronics intelligence. The National Security Agency ("NSA") was responsible for providing foreign SIGINT to U.S. policymakers and military forces.

22.     The classification marking "HCS" was an SCI control system that indicated that the information was from the most sensitive human intelligence ("HUMINT") operations and information acquired from clandestine and/or uniquely sensitive HUMINT sources, methods, and certain technical collection capabilities, technologies, and methods linked to or supportive of HUMINT.

23.     SCI was to be processed, stored, used, or discussed in an accredited SCIF, and only individuals with the appropriate security clearance and additional SCI permissions were authorized to have access to such national security information.

24.     The National Institute of Standards and Technology defined a SCIF as an area, room, group of rooms, buildings, or installation certified and accredited as meeting Director of National

Intelligence security standards for the processing, storage, and/or discussion of sensitive compartmented information.

25. Intelligence Community Directive 705, titled "Sensitive Compartmented Information Facilities," signed on May 26, 2010, by the Director of National Intelligence, provided that "all SCI must be processed, stored, used, or discussed in an accredited SCIF."

26. Pursuant to Executive Order 13526, information classified at any level could only be lawfully accessed by persons determined by an appropriate U.S. Government official to be eligible for access to classified information, who had signed an approved non-disclosure agreement, received a security clearance, and had a "need to know" the classified information. Classified information could only be stored in an approved facility and container.

## BOLTON's Transmission of National Defense Information to Individuals 1 and 2 While He Was National Security Advisor

27. As set forth above, between on or about April 9, 2018, and September 15, 2019, **BOLTON** sent Individuals 1 and 2 contemporaneous notes, on a regular basis, describing in detail his day-to-day activities as the National Security Advisor. **BOLTON** often referred to these notes as his "diary" and sent them to Individuals 1 and 2 over his personal non-governmental email accounts or a messaging application. The information contained in these notes included detailed information that **BOLTON** learned from meetings with senior members of the U.S. Government, intelligence briefings from members of the intelligence community and military, discussions with foreign leaders and foreign intelligence and military organizations, and intelligence products and reports, which **BOLTON** had access to because of his role as National Security Advisor. Portions of the information contained in the "diary" entries that **BOLTON** sent to Individuals 1 and 2 were national defense information, including information classified up to the TOP SECRET/SCI level.

28.     Throughout his time as National Security Advisor, **BOLTON** took detailed notes documenting his day-to-day meetings, activities, and briefings. Frequently, **BOLTON** handwrote these notes on yellow notepads throughout his day at the White House complex or in other secure locations, and then later re-wrote his notes in a word processing document on an electronic device.

29.     The notes that **BOLTON** sent to Individuals 1 and 2 using his non-governmental personal email accounts and messaging account described in detail **BOLTON**'s daily activities as the National Security Advisor, including national defense and classified information that he learned during his time as National Security Advisor. Often, **BOLTON**'s notes described the secure setting or environment in which he learned the national defense and classified information that he was memorializing in his notes. For example, a description of classified information related to a foreign government's activities might begin with "the intel briefer said..." Or a description of classified information learned during a military briefing might begin with "while in the Situation Room, I learned that..." The notes that **BOLTON** sent to Individuals 1 and 2 often began with the words, "[Individual 1's initials/Individual 2's initials] start here." In at least one communication, **BOLTON** also referred to Individuals 1 and 2 as his "editors."

30.     Some of the information related to the national defense that **BOLTON** communicated, delivered, and transmitted to Individuals 1 and 2 is described in further detail below and in Counts One through Eight.

31.     On or about April 8, 2018, the day before **BOLTON** officially began his duties as National Security Advisor, Individual 1 created a group chat with **BOLTON** and Individual 2 on a non-governmental messaging application. Individual 2 asked the group, "Why are we using this now? The encryption?" to which Individual 1 responded, "Yup. Why not?" **BOLTON** then responded, "For Diary in the future!!!"

10

32.     On or about April 22, 2018, **BOLTON** sent Individuals 1 and 2 via the non-governmental messaging application a 25-page document which described information that **BOLTON** learned while National Security Advisor.

33.     On or about April 22, 2018, Individual 2 sent **BOLTON** and Individual 1 a message that stated, "Diary finished. . . ." Individual 1 also asked Individual 2 whether Individual 2 was "going to call tonight," to which Individual 2 responded, "Am I supposed to?" Individual 1 then wrote, "Diaries take time to write, but phone conversations take less time. . . ."

34.     On or about July 15, 2018, Individual 2 sent **BOLTON** and Individual 1 a message that stated, "Do we get a diary today?" Individual 1 responded, "Don't think he can do it on this trip." **BOLTON** later added, "Too much going on!!! I've done much of Friday in London because I didn't take many notes and wanted to get it down before I forgot!!!"

35.     On or about July 23, 2018, **BOLTON** sent Individuals 1 and 2 a message that stated, "More stuff coming!!!" A few minutes later, **BOLTON** sent Individuals 1 and 2 a 24-page document which described information that **BOLTON** learned while National Security Advisor. Less than three hours later, **BOLTON** sent Individuals 1 and 2 a follow-up message that stated, "None of which we talk about!!!" In response, Individual 1 sent a message that stated, "Shhhhh." Individual 2 then sent a message that stated, "The only interesting thing is what [senior U.S. Government official] might have said from [foreign language] interpreter, which you didn't tell us…" Approximately two minutes later, Individual 1 sent a message in response that stated, "More to come with cloak and dagger…or something. So he says…."

36.     On or about September 23, 2018, **BOLTON** sent Individuals 1 and 2 a 10-page document ("Document A"), which contained information that **BOLTON** learned while National Security Advisor, including information classified up to the TOP SECRET/SCI level.

11

37. On or about November 23, 2018, **BOLTON** sent Individuals 1 and 2 a 29-page document ("Document B"), which contained information that **BOLTON** learned while National Security Advisor, including information classified up to the SECRET/NOFORN level.

38. On or about December 2, 2018, **BOLTON** sent Individuals 1 and 2 a 15-page document, which contained information that **BOLTON** learned while National Security Advisor. Individual 2 responded, "Diary arrived" and then sent a message that stated, "But no commentary on [Foreign Country 1] judicial system article I sent or administration sentiment on [arrest in Foreign Country 1]?" In response, **BOLTON** sent a message that stated, "I'm working on it!!!"

39. On or about December 4, 2018, Individual 2 sent additional messages to **BOLTON** and Individual 1 regarding the arrest of an individual in Foreign Country 1. Individual 2 told **BOLTON** and Individual 1 that the arrested individual in Foreign Country 1 was being interrogated and that a relative of the arrested individual would "be in DC . . . if useful to get him in front of [senior U.S. Government official] or anyone else." In response to Individual 2's message that law enforcement in Foreign Country 1 was interrogating the arrested individual, Individual 1 sent a message that stated, "Ye gods. Next thing they'll pull a Khashoggi[2] on him." In response, Individual 2 sent a message that asked, "But [nickname for **BOLTON**] has no feedback?"

40. On or about January 2, 2019, **BOLTON** sent Individuals 1 and 2 a 22-page document, which contained information that **BOLTON** learned while National Security Advisor. **BOLTON** also sent a message that stated, "Stuff coming!!! Hard copy at home for [nickname for Individual 1]!!!!"

---

[2] Jamal Khashoggi was a Saudi journalist who was murdered in 2018 in the Consulate of Saudi Arabia in Istanbul, Turkey.

41.     On or about January 13, 2019, **BOLTON** sent Individuals 1 and 2 a 24-page document ("Document C"), which contained information that **BOLTON** learned while National Security Advisor, including information classified up to the TOP SECRET/SCI level.

42.     About a week later, on or about January 21, 2019, **BOLTON** sent Individuals 1 and 2 a 20-page document, which contained information that **BOLTON** learned while National Security Advisor.  **BOLTON** sent an accompanying message that stated, "Stuff coming to cheer you . . . up!!!" and that Individual 1 "needs to figure out how to do corrections!!!"  In response, Individual 1 sent a message that stated, "Read [**BOLTON**'s] thing. I need to also." Individual 1 also stated, "I have edits. Para by para. Not sure how to send them. Mostly typos, caps, incomplete sentences." **BOLTON** then asked, "Did you print it out???" to which Individual 1 responded, "I read it on phone. . . . Took notes."

43.     On or about June 2, 2019, **BOLTON** sent Individuals 1 and 2 a 10-page document ("Document D"), which contained information that **BOLTON** learned while National Security Advisor, including information classified up to the TOP SECRET/SCI level.

44.     On or about July 6, 2019, **BOLTON** sent Individuals 1 and 2 a 77-page document ("Document E"), which contained information that **BOLTON** learned while National Security Advisor, including information classified up to the TOP SECRET/SCI level.

45.     On or about July 28, 2019, **BOLTON** sent Individuals 1 and 2 a message that stated, "STUFF COMING, BUT ONLY FOR [Individual 2]??? [Individual 1] TO READ HARD COPY WHEN [Individual 1] IS BACK IN US!!!!"

46.     On or about August 18, 2019, **BOLTON** sent Individuals 1 and 2 a 50-page document ("Document F"), which contained information that **BOLTON** learned while National Security Advisor, including information classified up to the TOP SECRET/SCI level.

13

47.    On or about September 8, 2019, **BOLTON** sent Individuals 1 and 2 a 47-page document ("Document G"), which contained information that **BOLTON** learned while National Security Advisor, including information classified up to the TOP SECRET/SCI level.

48.    On or about September 15, 2019, five days after he was no longer the National Security Advisor, **BOLTON** sent Individuals 1 and 2 a six-page document ("Document H"), which contained information that **BOLTON** learned while National Security Advisor, including information classified up to the TOP SECRET/SCI level. In a related message, **BOLTON** told Individuals 1 and 2, "Stuff coming!!!" Individual 2 responded, "Dramatic ending. But will there be a new diary," to which Individual 1 responded, "Nope on diary. Now bookwriting [sic]." **BOLTON** then sent a message that stated, "Talking with [book publisher] because they have a right of first refusal!!!"

49.    On or about September 24, 2019, fourteen days after he was no longer employed as the National Security Advisor, **BOLTON** left the messaging chat group with Individuals 1 and 2 that he had used to send them more than a thousand pages of notes memorializing his time as National Security Advisor.

## **Relevant Activities Before and After BOLTON's Tenure as National Security Advisor Ends**

### *BOLTON Publishes "The Room Where It Happened: A White House Memoir"*

50.    On or about September 11, 2019, the day after **BOLTON**'s tenure as National Security Advisor ended, a literary agent representing **BOLTON** sent an email to a book publisher describing a book about **BOLTON**'s time as the National Security Advisor that **BOLTON** intended to publish. In that email, the literary agent stated, among other things, that **BOLTON**'s forthcoming book would include **BOLTON**'s impressions of his time as National Security Advisor "in a meticulously observed manner with direct quotes from all parties based on contemporaneous notes." Two months earlier and while **BOLTON** was still the National Security Advisor, on or about July

14

19, 2019, the literary agent sent **BOLTON** a letter stating that it was "with enthusiasm" that the literary agent was "again exploring a book" with **BOLTON**. Ultimately, **BOLTON** earned more than a million dollars by selling the rights to publish his book about his time as National Security Advisor.

51.     On or about December 12, 2019, **BOLTON** began sending drafts of portions of his book to his publisher and literary agent for review and comments. **BOLTON** sent these drafts via a non-governmental messaging application. Over the winter holidays in 2019, **BOLTON** and his editors exchanged drafts and comments relating to his forthcoming book.

52.     On or about December 30, 2019, **BOLTON** submitted a manuscript of his book, titled *The Room Where It Happened: A White House Memoir* to the NSC for the required pre-publication review process. Based on an initial review of the manuscript by NSC staff, the U.S. Government concluded and told **BOLTON** that the initial manuscript contained significant amounts of highly classified information that needed to be removed.

53.     On or about June 23, 2020, **BOLTON**'s book, *The Room Where It Happened: A White House Memoir*, was published and became readily available to the public. None of the classified national defense information charged in Counts One through Eighteen, further described below, was published in **BOLTON**'s book.

54.     On or about June 16, 2021, the United States and **BOLTON** entered a settlement agreement resolving civil litigation relating to **BOLTON**'s book. As a condition of that settlement agreement, **BOLTON** agreed to "provide to the United States all materials in his possession, custody, or control that may contain any classified information." **BOLTON** also agreed that his obligation to return classified material "extends to any written or electronic drafts of the manuscript [of his book] regardless of whether those materials were received from the United States or generated by [**BOLTON**]."

*BOLTON's Representative Notifies the FBI that Iran Hacked His Personal Email Account*

55.     On or about July 6, 2021, a representative for **BOLTON** contacted the Federal Bureau of Investigation ("FBI") via email to alert the FBI that an entity, believed by **BOLTON**'s representative to be the Islamic Republic of Iran, had obtained unauthorized access to one of **BOLTON**'s personal email accounts. In the email to the FBI, **BOLTON**'s representative stated that "evidently someone has gotten into Amb. Bolton's" personal email account and that "it looks as though it is someone in Iran. . . ."

56.     On or about July 28, 2021, **BOLTON**'s representative emailed the FBI again to report that **BOLTON** and his representative had received the following email, on or about July 25, 2021, which the representative believed was associated with the hack of **BOLTON**'s account:

> I do not think you would be interested in the FBI being aware of the leaked content of John's email (some of which have been attached), especially after the recent acquittal.
>
> This could be the biggest scandal since Hillary's emails were leaked, but this time on the GOP side!
>
> Contact me before it's too late ...

**BOLTON**'s representative also told the FBI that the representative was "[j]ust sending you the text (not the documents [the hacker] attached since there might be sensitive information in them)."

57.     A day later, on or about July 29, 2021, **BOLTON**'s representative told the FBI that **BOLTON** would be deleting the contents of his personal email account that had been hacked.

58.     On or about August 5, 2021, **BOLTON** received another electronic message related to the hack of his personal email account which stated, "OK John ... As you want (apparently), we'll disseminate the expurgated sections of your book by reference to your leaked email..."

59.     At no point did **BOLTON** tell the FBI that, while he was the National Security Advisor, he had used the hacked email account to send Individuals 1 and 2 documents relating to

the national defense, including classified information. Nor did he tell the FBI that the hackers now had this information.

*The FBI Finds Documents Relating to the National Defense in **BOLTON**'s Home*

60.     On or about August 22, 2025, the FBI executed search warrants and seized material from **BOLTON**'s residence in Maryland and office in Washington, D.C. Part of the material seized from **BOLTON**'s Maryland home included electronic files showing that **BOLTON** transmitted his diary entries, many of which related to the national defense and contained classified information, to Individuals 1 and 2 through a non-governmental messaging application. During the court-authorized search of **BOLTON**'s home on August 22, 2025, the FBI also seized hard copy printed versions of many of **BOLTON**'s diary entries, including documents that related to the national defense and contained classified information. Some of the documents related to the national defense that the FBI found in **BOLTON**'s home on August 22, 2025, are described in further detail below in Counts Nine through Eighteen.

***BOLTON**'s Public Statements on the Handling of Classified Information*

61.     From at least on or about September 2, 2016, through on or about April 25, 2025, **BOLTON** has made numerous public statements demonstrating his understanding of how to properly handle classified information and the potential consequences of failing to do so.

62.     On or about January 16, 2017, in a media interview, **BOLTON** stated in response to a question about allegations that a senior U.S. Government official had communicated sensitive government information using a personal email account, "Look, as I've said before, I believe it still to this day, if I had done at the State Department what [senior U.S. Government official] did, I'd be [imprisoned] right now."

17

63.     On or about March 31, 2025, in a media interview, **BOLTON** stated in response to questions about allegations that a senior U.S. Government official had communicated sensitive government information using a non-governmental messaging application:

> Well, I don't, I mean, to me, I just can't even imagine opening a Signal chat group or a Telegram chat group or anything else. People say but the communications are encrypted. Well that's fine. We have the National Security Agency that has big computers chug-chug-chugging along trying to deencrypt [sic] any system that we want to try to get into and our adversaries do as well. . . . The damage that's done is that we've shown weakness in our operational security that our adversaries will try to exploit. . . . What did we build the world's most secure telecommunications capability for if not to use it on sensitive matters. And once you're on a secure telephone – a U.S. government secure telephone – you don't worry what the level of classification you're discussing. You're talking about an article in the morning newspaper or top secret code word items and you're secure. When you're on Signal, did no one in that conversation for days ever say you know maybe we ought to get off this and get back on a classified system. . . . It just. I'm just, without words, to understand how that could have happened.

64.     On or about April 18, 2025, in a media interview, **BOLTON** stated in response to a question about allegations that a senior U.S. Government official had communicated sensitive government information using a non-governmental messaging application:

> Initially, I was totally without words. I couldn't-I couldn't find-I couldn't find a way to express how stunned I was that anybody would do this. You simply don't use commercial means of communication, whether it's supposedly an encrypted app or not for for these kinds of discussions. You know, you don't know where they're gonna go. You could start off talking about a newspaper article, but but obviously you could get into classified material. I understand why you need to have group chats, but as I've been saying the place for the group chats are the Situation Room where everybody's in place some people may have to appear via secure video teleconference facilities, and and we've got great capacity to do that. But, but having chat groups where you're writing two or three sentences that this is not what you would call sophisticated national security analysis at work, and on an unsecured channel. It just, there's there's no excuse for it.

65.     In an interview on March 26, 2025, **BOLTON** discussed the damage to national security by using a non-governmental communication channel to discuss sensitive government information:

What were they doing off of secure government channels? That is the original sin here. That is the question neither one of them has yet answered. . . . I think actual damage is possible because of the way foreign intelligence services operate, the way our own intelligence services operate. You take everything you can get. You take every piece of information in this case about American military operations against the Houthis in Yemen. It tells you something that otherwise you wouldn't know about American capabilities, American tactics, American approaches to this kind of thing, and that is useful to the Russians, the Chinese, the Iranians, the North Koreans, and others as well. How that fits into the body of knowledge they already have is a question I can't answer, but it can't help, that's for sure.

66. On or about April 22, 2025, in a media interview, **BOLTON** addressed what he considered the impropriety of discussing sensitive government information with people who do not have a "need to know" that information (such as family and friends) using a non-governmental messaging application:

I think the second example of a Signal chat group . . . really shows a terrible lack of judgment communicating with the people in this group in particular who have absolutely no need to know about any upcoming U.S. military operation leads me to wonder what he's doing on the job on a minute to minute, hour by hour basis that he's got time to - to knock out Signal messages to - to friends and family which is what this group is.

## THE CHARGES

## COUNTS ONE THROUGH EIGHT
### (Transmission of National Defense Information)

67.     Paragraphs 1 through 66 of this Indictment are incorporated by reference as though fully set forth herein.

68.     On or about the dates indicated below, in the District of Maryland and elsewhere, the defendant,

## JOHN ROBERT BOLTON, II,

lawfully having possession of, access to, control over, and being entrusted with information relating to the national defense, which information the defendant had reason to believe could be used to the injury of the United States and to the advantage of any foreign nation, willfully communicated, delivered, and transmitted and caused to be communicated, delivered, and transmitted the same to a person not entitled to receive it, to wit: as indicated in the below counts, **BOLTON** sent via his personal non-governmental email account(s) and/or his personal non-governmental messaging application account the information relating to the national defense described below to Individuals 1 and 2:

| COUNT | APPROXIMATE DATE OF TRANSMISSION | DOCUMENT DESCRIPTION | HIGHEST CLASSIFICATION LEVEL OF INFORMATION IN DOCUMENT |
|---|---|---|---|
| 1 | Sept. 23, 2018 | Document A: Reveals intelligence about future attack by adversarial group in another country. | TOP SECRET//SI [redacted]/NOFORN |
| 2 | Nov. 23, 2018 | Document B: Reveals liaison partner sharing sensitive information with the U.S. intelligence community. | SECRET//NOFORN |

20

| COUNT | APPROXIMATE DATE OF TRANSMISSION | DOCUMENT DESCRIPTION | HIGHEST CLASSIFICATION LEVEL OF INFORMATION IN DOCUMENT |
|---|---|---|---|
| 3 | Jan. 13, 2019 | Document C: Reveals intelligence that a foreign adversary was planning a missile launch in the future; a covert action in a foreign country that is related to sensitive inter-governmental actions; sensitive sources and methods used to collect human intelligence. | TOP SECRET//HCS [redacted] [redacted]//ORCON/NOFORN |
| 4 | June 2, 2019 | Document D: Reveals intelligence about an adversary's knowledge of planned U.S. actions; intelligence about adversary's plans for attack conducted against U.S. Forces in another country; human intelligence using sensitive sources and methods; a covert action program; intelligence collected on the leader of an adversary nation's military group. | TOP SECRET//SI [redacted] [redacted]//HCS[redacted] [redacted]//ORCON/REL TO USA GBR |
| 5 | July 6, 2019 | Document E: Reveals intelligence on an adversary's leaders. | TOP SECRET//SI [redacted] [redacted]//HCS [redacted] [redacted]//ORCON/NOFORN |

| COUNT | APPROXIMATE DATE OF TRANSMISSION | DOCUMENT DESCRIPTION | HIGHEST CLASSIFICATION LEVEL OF INFORMATION IN DOCUMENT |
|---|---|---|---|
| 6 | Aug. 18, 2019 | Document F: Reveals intelligence concerning a foreign country's interactions with an adversary; in quotation marks direct statement collected via intelligence sources and methods on a foreign country; foreign country's intelligence describing an adversary's planned attack on a facility; sensitive sources and methods used to collect intelligence on a foreign country; a covert action and sources and methods used. | TOP SECRET//SI [redacted] [redacted]//HCS [redacted]//ORCON/NOFORN |
| 7 | Sept. 8, 2019 | Document G: Reveals covert action planned by the U.S. Government; intelligence confirming a foreign adversary was responsible for an attack. | TOP SECRET//SI [redacted] [redacted]//HCS [redacted]// ORCON/NOFORN |
| 8 | Sept. 15, 2019 | Document H: Reveals a covert action conducted by the U.S. Government, a liaison partner country, and specific information about the action. | TOP SECRET//HCS [redacted]//[redacted]// ORCON/NOFORN |

18 U.S.C. § 793(d).

## COUNTS NINE THROUGH EIGHTEEN
### (Retention of National Defense Information)

69.     Paragraphs 1 through 66 of this Indictment are incorporated by reference as though fully set forth herein.

70.     From an unknown date, but no earlier than April 9, 2018, through on or about August 22, 2025, in the District of Maryland and elsewhere, the defendant,

### JOHN ROBERT BOLTON, II,

having unauthorized possession of, access to, and control over a document, writing, and note relating to the national defense, willfully retained the document, writing, and note and failed to deliver it to the officer or employee of the United States entitled to receive it, to wit: as indicated in the below counts, **BOLTON** retained within his home in Montgomery County, Maryland the following documents, writings, and notes relating to the national defense:

| COUNT | DOCUMENT DESCRIPTION | HIGHEST CLASSIFICATION LEVEL OF INFORMATION IN DOCUMENT |
|---|---|---|
| 9 | Document Av2: Reveals intelligence about future attack by adversarial group in another country. | TOP SECRET//SI [redacted]/NOFORN |
| 10 | Document Bv2: Reveals liaison partner sharing sensitive information with the U.S. intelligence community. | SECRET//NOFORN |
| 11 | Document Cv2: Reveals intelligence that a foreign adversary was planning a missile launch in the future; a covert action in a foreign country that is related to sensitive inter-governmental actions; sensitive sources and methods used to collect human intelligence. | TOP SECRET//HCS [redacted] [redacted]//ORCON/NOFORN |

| COUNT | DOCUMENT DESCRIPTION | HIGHEST CLASSIFICATION LEVEL OF INFORMATION IN DOCUMENT |
|---|---|---|
| 12 | Document Dv2: Reveals intelligence about an adversary's knowledge of planned U.S. actions; intelligence about adversary's plans for attack conducted against U.S. Forces in another country; human intelligence using sensitive sources and methods; a covert action program; intelligence collected on the leader of an adversary nation's military group. | TOP SECRET//SI [redacted] [redacted]//ORCON/REL TO USA GBR |
| 13 | Document Ev2: Reveals intelligence on an adversary's leaders. | TOP SECRET//SI [redacted] [redacted]//HCS [redacted] [redacted]//ORCON/NOFORN |
| 14 | Document Fv2: Reveals intelligence concerning a foreign country's interactions with an adversary; in quotation marks direct statement collected via intelligence sources and methods on a foreign country; foreign country's intelligence describing an adversary's planned attack on a facility; sensitive sources and methods used to collect intelligence on a foreign country; a covert action and sources and methods used. | TOP SECRET/SI [redacted] [redacted]//HCS [redacted]//ORCON/NOFORN |
| 15 | Document Gv2: Reveals covert action planned by the U.S. Government; intelligence confirming a foreign adversary was responsible for an attack. | TOP SECRET//SI [redacted] [redacted]//HCS [redacted]// ORCON/NOFORN |
| 16 | Document Hv2: Reveals a covert action conducted by the U.S. Government, a liaison partner country, and specific information about the action. | TOP SECRET//HCS [redacted]// ORCON/NOFORN |
| 17 | Document I: Reveals sources and collection used to obtain statements of a foreign adversary; covert action conducted by the U.S. Government in a foreign country. | TOP SECRET//SI [redacted] [redacted]//ORCON/NOFORN |
| 18 | Document J: Reveals intelligence that a foreign country was considering specific force against another country. | TOP SECRET//SI [redacted] [redacted]// ORCON/NOFORN |

18 U.S.C. § 793(e).

## NOTICE OF FORFEITURE

The Grand Jury for the District of Maryland further finds that:

71.     Upon conviction of the offenses in violation of Title 18, United States Code, Sections 793(d) and (e) set forth in Counts One through Eighteen of this Indictment, the defendant,

### JOHN ROBERT BOLTON, II,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 793(h) and 981(a)(1)(C), Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeeds traceable to the offenses.

72.     If any of the property described above, as a result of any act or omission of the defendant:

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

18 U.S.C. § 793(h)
18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853
28 U.S.C. § 2461(c)

Kelly O. Hayes
United States Attorney

By:

Thomas M. Sullivan
Assistant United States Attorney

S. Derek Shugert
Trial Attorney

Scott Lara
Acting Chief
Counterintelligence and Export Control Section
Adam Barry
Acting Deputy Chief
Counterintelligence and Export Control Section
Tanner Kroeger
Trial Attorney
National Security Cyber Section
National Security Division
U.S. Department of Justice

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

October 16, 2025
Date

26