_____ FILED    _____ ENTERED
_____ LOGGED    _____ RECEIVED

JUN 2 6 2026

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

**ATTACHMENT A**
**STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the Prosecuting Offices would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

From an unknown date, but no earlier than April 9, 2018, through on or about August 22, 2025, in the District of Maryland and elsewhere, the defendant, **JOHN ROBERT BOLTON, II** (**"BOLTON"**), having unauthorized possession of, access to, and control over a document, writing, and note relating to the national defense, willfully retained the document, writing, and note and failed to deliver it to the officer or employee of the United States entitled to receive it, to wit: **BOLTON** retained within his home in Montgomery County, Maryland documents, writings, and notes relating to the national defense.

Between September 23, 2018, and September 15, 2019, **BOLTON** willfully communicated, delivered, and transmitted and caused to be communicated, delivered, and transmitted information relating to the national defense, to individuals who were not entitled to receive it. **BOLTON** sent this national defense information to unauthorized individuals using his personal non-governmental commercial email account(s) and/or his personal non-governmental messaging application account.

At all times relevant to the Indictment, **BOLTON** resided in Montgomery County, Maryland, and, from the 1980s through 2019, served intermittently in a variety of senior U.S. Government positions, including as an Assistant Attorney General in the U.S. Department of Justice, an Under Secretary of State in the U.S. Department of State, U.S. Ambassador to the United Nations, and, in his last position of public service, from April 2018 to September 2019, as Assistant to the President for National Security Affairs, which was commonly known as the National Security Advisor.

The role of the National Security Advisor varied by presidential administration, but generally the National Security Advisor assisted the President in managing the National Security Council ("NSC"). The National Security Act of 1947, as amended, established the NSC to advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security of the United States. Consistent with the direction of the President, the functions of the NSC included advising the President with respect to the integration of domestic, foreign, and military policies relating to national security; assessing and appraising the objectives, commitments, and risks of the United States in relation to the actual and potential military power of the United States; and making recommendations to the President concerning policies on matters of common interest to the departments and agencies of the U.S. Government concerned with national security. *See generally* Title 50, United States Code, Section 3021. Membership of the NSC included "the President, the Vice President, the Secretary of State, the Secretary of Defense, the Secretary of Energy, the Secretary of the Treasury, the Director of the Office of Pandemic Preparedness and Response Policy and such other officers of the United States Government as the President may designate." *Id.* As National Security Advisor, **BOLTON** directed and supervised

11

the work of the NSC staff on behalf of the President of the United States.  **BOLTON** had access to, and was responsible for the safeguarding of, the most sensitive national defense information, including classified information.

**BOLTON** was the National Security Advisor to the President of the United States between approximately April 9, 2018, and September 10, 2019.  National Security Advisors typically advise the President on all exigent threats to the United States and other issues related to national security, including foreign relations, intelligence activities, and decisions regarding the use of military force. As the National Security Advisor, **BOLTON** had access to some of the U.S. Government's most sensitive and closely guarded national security secrets.  In order to obtain a U.S. security clearance that granted him access to the highly classified information inherent in the job of National Security Advisor, **BOLTON** signed numerous non-disclosure agreements that acknowledged, among other things, that "the unauthorized disclosure . . . of classified information by [him] could cause damage or irreparable injury to the United States," that he would "never divulge classified information" without "prior written notice of authorization from" the relevant government agency, that he would "never divulge anything . . . that [he] kn[e]w to be [Sensitive Compartmented Information ("SCI")][1] to anyone who is not authorized to receive it without prior written authorization," and that he understood that the unauthorized disclosure of national security information "may constitute a violation, or violations, of United States criminal laws."

As the National Security Advisor, **BOLTON** was granted a TOP SECRET/SCI security clearance.  Before being appointed as the National Security Advisor, **BOLTON** held a U.S. security clearance in some of his prior U.S. Government positions.

Due to **BOLTON**'s need to have ready access to national defense information, including classified information, while serving as the National Security Advisor, in or about September 2018, the U.S. Government installed an accredited Sensitive Compartmented Information Facility ("SCIF") within **BOLTON**'s home located within the District of Maryland.  The SCIF was approved for the processing and closed storage of classified information, including information classified up to the TOP SECRET level.  After **BOLTON**'s term as National Security Advisor ended on or about September 10, 2019, the SCIF in **BOLTON**'s home was decertified on or about October 16, 2019, and from that date through the present, no location within **BOLTON**'s home was approved for the lawful storage of classified information.  At no point, including the period when **BOLTON** had an accredited SCIF in his home, was **BOLTON** authorized to store or transmit classified information on a non-governmental messaging application, non-governmental commercial email account (*i.e.*, America Online or Google), or other non-governmental systems.

While National Security Advisor, **BOLTON** learned national defense and classified information through a variety of means, including intelligence briefings, intelligence reports, and meetings with members of the U.S. intelligence community, including the National Security Agency ("NSA") and the Central Intelligence Agency ("CIA"), the U.S. military, and foreign government officials.  In addition to having a home SCIF, while National Security Advisor, **BOLTON** also had access to a variety of secure telecommunication systems that he could use to

---

[1] Classified information at any level can be further restricted through compartmentation in Sensitive Compartmented Information ("SCI") categories.  Only individuals with the appropriate security clearance and additional SCI clearance(s) can have access to such classified information.

discuss and communicate classified information. Moreover, **BOLTON** had access, as the National Security Advisor, to classified spaces in the White House, the Eisenhower Executive Office Building, and other locations, in the Washington, D.C., area and elsewhere, where he could readily learn, read, and discuss classified and sensitive information with others who were authorized to know, receive, discuss, and make decisions based on such information.

From on or about April 9, 2018, through at least on or about August 22, 2025, **BOLTON** abused his position as National Security Advisor by sharing more than a thousand pages of information about his day-to-day activities as the National Security Advisor—including information relating to the national defense which was classified up to the TOP SECRET/SCI level—in the form of diaries with two family members, namely Individuals 1 and 2, as alleged in the Indictment. Neither Individual 1 nor 2 was authorized to access, receive, or maintain the classified information that **BOLTON** shared related to his work as the National Security Advisor. **BOLTON** also unlawfully retained documents, writings, and notes, in the form of diaries, relating to the national defense, including information classified up to the TOP SECRET/SCI level, in his home in Montgomery County, Maryland.

Individual 1 was related to **BOLTON**, resided in the District of Maryland, and was not authorized to access, receive, or maintain the classified information that **BOLTON** shared related to his work as the National Security Advisor. Individual 2 was related to **BOLTON**, never held a U.S. security clearance, and was not authorized to access, receive, or maintain the classified information that **BOLTON** shared related to his work as the National Security Advisor.

From on or about April 9, 2018, through on or about September 15, 2019, on a regular basis, **BOLTON** sent what he referred to as diaries to Individuals 1 and 2 that contained information classified up to the TOP SECRET/SCI level. **BOLTON** wrote many of these diaries by referring to his handwritten notes from his day's activities into word processing documents, which he then electronically sent to Individuals 1 and 2 through a commercial non-governmental messaging application. On other occasions, **BOLTON** used his personal non-governmental email accounts to email information classified up to the TOP SECRET/SCI level to Individuals 1 and/or 2 at their personal email accounts. At no point did **BOLTON** have authorization to store or transmit the classified information that he sent to Individuals 1 and 2 via his personal electronic devices and accounts. Nor did, at any time, Individuals 1 or 2 have authorization to know or store the classified information that **BOLTON** gave to them. There is no evidence that Individual 1 or 2 copied, transmitted or disclosed the information **BOLTON** provided to anyone else.

At some unknown time, but no later than August 22, 2025, many of the diaries from **BOLTON**'s time as the National Security Advisor, including entries that contained national defense information classified up to the TOP SECRET/SCI level, were printed and stored in **BOLTON**'s personal residence in Montgomery County, Maryland. Digital copies of some of the diaries that contained national defense information classified up to the TOP SECRET/SCI level were also stored on personal electronic devices used by **BOLTON** and others located in **BOLTON**'s personal residence in Montgomery County, Maryland, on August 22, 2025.

After **BOLTON**'s time as National Security Advisor ended on September 10, 2019, **BOLTON**'s personal residence was not authorized to store classified information in physical or

13

electronic format. On or about September 10, 2019, U.S. Government personnel retrieved all classified equipment and marked classified documents that were stored in **BOLTON**'s home SCIF. During that visit, **BOLTON** was told that he could no longer store classified information at his home. At no point during **BOLTON**'s time as the National Security Advisor or afterwards, including when his home SCIF was decommissioned in or about September 2019, did **BOLTON** tell the U.S. Government personnel that he had sent national defense and classified information to Individuals 1 and 2 over commercial email and messaging services or that such information was stored on personal electronic devices and in personal electronic accounts belonging to or accessible by himself and/or Individuals 1 and 2.

At some point between when **BOLTON** left government service in September 2019 and July 2021, a cyber actor believed to be associated with the Islamic Republic of Iran hacked **BOLTON**'s personal email account and gained unauthorized access to some of the classified and national defense information in that account, which **BOLTON** had previously emailed to Individuals 1 and 2 while he was the National Security Advisor. At his direction, a representative for **BOLTON** notified the U.S. Government of the hack in or about July 2021. Following the notification, U.S. Government agents came to **BOLTON**'s office in Washington, D.C. and reviewed the security settings on the electronic device on which the personal email account information existed. **BOLTON** did not tell the agents or anyone else in the U.S. Government that the account contained some national defense information, including classified information, that **BOLTON** had placed in the account from his time as National Security Advisor or that **BOLTON** had shared some of that national defense information, including classified information, with Individuals 1 and 2 via personal email and a non-governmental messaging application.

## Classified Information

Executive Order 13526 governed the classification of national security information. Information in any form may be classified if it: (1) is owned by, is produced by or for, or is under the control of the U.S. Government; (2) could, if disclosed, cause one or more specified levels of harm to the United States; and (3) is classified by or under an Original Classification Authority ("OCA") who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security. OCAs, also called original classifiers, were individuals authorized to classify information and make classification decisions.

Pursuant to Executive Order 12958 signed on April 17, 1995, as amended by Executive Order 13292 on March 25, 2003, and Executive Order 13526 on December 29, 2009, national security information was classified as "TOP SECRET," "SECRET," or "CONFIDENTIAL." National security information was information owned by, produced by, produced for, and under the control of the U.S. Government that was classified as follows:

    a.    Information was classified as TOP SECRET if the unauthorized disclosure of that information reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority was able to identify and describe.

14

    b.    Information was classified as SECRET if the unauthorized disclosure of that information reasonably could be expected to cause serious damage to the national security that the original classification authority was able to identify and describe.

    c.    Information was classified as CONFIDENTIAL if the unauthorized disclosure of that information reasonably could be expected to cause damage to the national security that the original classification authority was able to identify and describe.

Under Executive Order 13526, "damage to the national security" meant harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information.

The classification marking "NOFORN" indicated that the information was "Not Releasable to Foreign Nationals" and dissemination of that information was limited to United States persons. The classification marking "REL TO" indicated that the information was releasable only to foreign nationals of specified countries, international organizations, or multinational forces. The classification marking "REL TO USA GBR" indicated that the information could only be released to nationals of the United States and Great Britain.

The classification marking "ORCON" indicated that the dissemination and extraction of the classified information was controlled ("CON") by the originator ("OR").

Classified information related to intelligence sources, methods, and analytical processes was designated as SCI and subject to additional controls, such as the SI and HCS controls described further below.

The classification marking "SI" was an SCI control system that indicated that the information was "Special Intelligence" and that the intelligence information was derived from the monitoring of foreign communications signals by individuals other than the intended recipients. SI was intended to protect signals intelligence ("SIGINT") including communications and electronics intelligence. The National Security Agency ("NSA") was responsible for providing foreign SIGINT to U.S. policymakers and military forces.

The classification marking "HCS" was an SCI control system that indicated that the information was from the most sensitive human intelligence ("HUMINT") operations and information acquired from clandestine and/or uniquely sensitive HUMINT sources, methods, and certain technical collection capabilities, technologies, and methods linked to or supportive of HUMINT.

SCI was to be processed, stored, used, or discussed in an accredited SCIF, and only individuals with the appropriate security clearance and additional SCI permissions were authorized to have access to such national security information.

The National Institute of Standards and Technology defined a SCIF as an area, room, group of rooms, buildings, or installation certified and accredited as meeting Director of National

15

Intelligence security standards for the processing, storage, and/or discussion of sensitive compartmented information.

Intelligence Community Directive 705, titled "Sensitive Compartmented Information Facilities," signed on May 26, 2010, by the Director of National Intelligence, provided that "all SCI must be processed, stored, used, or discussed in an accredited SCIF."

Pursuant to Executive Order 13526, information classified at any level could only be lawfully accessed by persons determined by an appropriate U.S. Government official to be eligible for access to classified information, who had signed an approved non-disclosure agreement, received a security clearance, and had a "need to know" the classified information. Classified information could only be stored in an approved facility and container.

### BOLTON's Transmission of National Defense Information to Individuals 1 and 2 While He Was National Security Advisor

As set forth above, between on or about April 9, 2018, and September 15, 2019, **BOLTON** sent Individuals 1 and 2 contemporaneous writings, on a regular basis, describing in detail his day-to-day activities as the National Security Advisor. **BOLTON** often referred to these writings as his "diary" and sent them to Individuals 1 and 2 over his personal non-governmental email accounts or a messaging application. The information contained in these writings included detailed information that **BOLTON** learned from meetings with senior members of the U.S. Government, intelligence briefings from members of the intelligence community and military, discussions with foreign leaders and foreign intelligence and military organizations, and intelligence products and reports, which **BOLTON** had access to because of his role as National Security Advisor. Portions of the information contained in the diary entries that **BOLTON** sent to Individuals 1 and 2 were national defense information, including information classified up to the TOP SECRET/SCI level.

Throughout his time as National Security Advisor, **BOLTON** took detailed notes documenting his day-to-day meetings, activities, and briefings. Frequently, **BOLTON** handwrote these notes on yellow notepads throughout his day at the White House complex or in other secure locations, and then later incorporated information from his notes into a word processing document on an electronic device.

The writings that **BOLTON** sent to Individuals 1 and 2 using his non-governmental personal email accounts and messaging account described in detail **BOLTON**'s daily activities as the National Security Advisor, including some national defense and classified information that he learned during his time as National Security Advisor. Often, in what **BOLTON** referred to as diaries, **BOLTON** described the secure setting or environment in which he learned the national defense and classified information that he was memorializing in his writings. For example, a description of classified information related to a foreign government's activities might begin with "the intel briefer said…" Or a description of classified information learned during a military briefing might begin with "while in the Situation Room, I learned that…"

16

On or about April 8, 2018, the day before **BOLTON** officially began his duties as National Security Advisor, Individual 1 created a group chat with **BOLTON** and Individual 2 on a non-governmental messaging application. In response to the question, "Why are we using this now?", **BOLTON** responded, "For Diary in the future!!!"

On or about April 22, 2018, **BOLTON** sent Individuals 1 and 2 via the non-governmental messaging application a 25-page document he wrote which described information that **BOLTON** learned while National Security Advisor.

On or about April 22, 2018, Individual 2 sent **BOLTON** and Individual 1 a message that stated, "Diary finished. . . ."

On or about July 15, 2018, Individual 2 sent **BOLTON** and Individual 1 a message that stated, "Do we get a diary today?" **BOLTON** later added, "Too much going on!!! I've done much of Friday in London because I didn't take many notes and wanted to get it down before I forgot!!!"

On or about July 23, 2018, **BOLTON** sent Individuals 1 and 2 a message that stated, "More stuff coming!!!" A few minutes later, **BOLTON** sent Individuals 1 and 2 a 24-page document he wrote which described information that **BOLTON** learned while National Security Advisor. Less than three hours later, **BOLTON** sent Individuals 1 and 2 a follow-up message that stated, "None of which we talk about!!!"

On or about and between September 23, 2018 and September 15, 2019, **BOLTON** used non-governmental email and messaging applications to send eight documents, referred to by **BOLTON** as diaries (identified in Counts One through Eight of the Indictment as Documents A through Document H), to Individuals 1 and 2. All eight documents contained information relating to the national defense information that **BOLTON** learned while National Security Advisor. Seven of those eight documents included information classified at the TOP SECRET/SCI level; one document ("Document B") was classified at the level of SECRET/NOFORN.

**Relevant Activities Before and After
BOLTON's Tenure as National Security Advisor Ends**

*BOLTON Publishes "The Room Where It Happened: A White House Memoir"*

On or about September 11, 2019, the day after **BOLTON**'s tenure as National Security Advisor ended, a literary agent representing **BOLTON** sent an email to a book publisher describing a book about **BOLTON**'s time as the National Security Advisor that **BOLTON** intended to publish. In that email, the literary agent stated, among other things, that **BOLTON**'s forthcoming book would include **BOLTON**'s impressions of his time as National Security Advisor "in a meticulously observed manner with direct quotes from all parties based on contemporaneous notes." Two months earlier and while **BOLTON** was still the National Security Advisor, on or about July 19, 2019, the literary agent sent **BOLTON** a letter stating that it was "with enthusiasm" that the literary agent was "again exploring a book" with **BOLTON**. **BOLTON** ultimately contracted with a publisher to write a book and was promised an advance of

17

$1.5 million to do so.  He ultimately earned in excess of that amount for writing and publishing the book.

On or about December 12, 2019, **BOLTON** began sending drafts of portions of his book to his publisher and literary agent for review and comments.  Over the winter holidays in 2019, **BOLTON** and his editors exchanged drafts and comments relating to his forthcoming book.

On or about December 30, 2019, pursuant to law and his nondisclosure agreements, **BOLTON** submitted a manuscript of his book, titled *The Room Where It Happened: A White House Memoir* to the NSC for the required pre-publication review process.  Based on an initial review of the manuscript by NSC staff, the U.S. Government concluded and told **BOLTON** that the initial manuscript contained significant amounts of highly classified information that needed to be removed.  **BOLTON** rewrote or removed any information that the pre-clearance officer requested that he change.

On or about June 23, 2020, **BOLTON**'s book, *The Room Where It Happened: A White House Memoir*, was published and became readily available to the public.  None of the classified national defense information charged in Counts One through Eighteen was published in **BOLTON**'s book.

On or about June 16, 2021, the United States and **BOLTON** entered a settlement agreement resolving civil litigation relating to **BOLTON**'s book, resulting in the U.S. Government dismissing the case with prejudice.  As a condition of that settlement agreement, **BOLTON** agreed to "provide to the United States all materials in his possession, custody, or control that may contain any classified information."  **BOLTON** also agreed that his obligation to return classified material "extends to any written or electronic drafts of the manuscript [of his book] regardless of whether those materials were received from the United States or generated by [**BOLTON**]."

*The FBI Finds Documents Relating to the National Defense in **BOLTON**'s Home*

On or about August 22, 2025, the FBI executed search warrants and seized material from **BOLTON**'s residence in Maryland and office in Washington, D.C.  During the court-authorized search of **BOLTON**'s home, the FBI seized hard copy printed versions of many of **BOLTON**'s

(cont'd)

18

diary entries, including documents that related to the national defense and contained classified information, including the documents described in Counts Nine through Eighteen of the Indictment.

SO STIPULATED:

Digitally signed by
THOMAS SULLIVAN
Date: 2026.06.01
16:50:50 -04'00'

6/1/26
Dated

Thomas M. Sullivan
Assistant United States Attorney

Tanner Kroeger
Acting Deputy Chief
National Security Division

6/1/26
Dated

John Robert Bolton, II
Defendant

6/1/26
Dated

Abbe David Lowell, Esquire
Counsel for Defendant

19