**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN ROBERT BOLTON, II,<br><br>Defendant. | Case No. 8:25-cr-0314-TDC |

**JOHN ROBERT BOLTON'S SENTENCING MEMORANDUM**

Abbe David Lowell (No. 11863)
David A. Kolansky (*admitted pro hac vice*)
Isabella M. Oishi (*admitted pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005

*Counsel for Ambassador John Robert Bolton, II*

# TABLE OF CONTENTS


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. AMBASSADOR BOLTON'S PERSONAL HISTORY AND CHARACTERISTICS ARE SIGNIFICANTLY MITIGATING ........ 2

A. Ambassador Bolton's Personal and Family History. ........ 3

B. Ambassador Bolton's Four Decades of Government Service. ........ 5

1. U.S. Agency for International Development ........ 5

2. Department of Justice ........ 6

3. Department of State ........ 8

4. U.S. Permanent Representative to the United Nations ........ 11

5. The White House (National Security Advisor) ........ 12

C. Ambassador Bolton's Leadership at Key Policy Institutes, His Longstanding Educational Efforts, and Extensive Public Works. ........ 15

1. Leadership at American Policy Institutes and Forums ........ 15

2. Ambassador Bolton's Commitment to Educational Efforts and Vast Contribution of Public Works and Expression ........ 17

D. Ambassador Bolton's Personal Characteristics of Integrity, Compassion, and Generosity. ........ 19

E. [redacted] ........ 21

II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT LENIENCY ........ 22

A. Section 3553(a) Warrants a Probationary Sentence. ........ 23

B. Ambassador Bolton's Record of Safely Handling Classified Information Reflects His Lifelong Commitment to National Security. ........ 26

C. Ambassador Bolton's Diaries Reflect His Effort to Create a Clear Record For History, Not an Effort to Subvert U.S. National Security. ........ 29

D. Ambassador Bolton Worked Cooperatively with the FBI to Disclose and Mitigate the Foreign Hack of His Email Account and In the Years Since Then. .... 33

E. Ambassador Bolton Did Not Disseminate National Defense Information to the Public at Large, the Press, or a Foreign Adversary. .... 36

1. No Dissemination to the Public or the Press .... 37

2. No Dissemination to Foreign Adversaries .... 38

F. Ambassador Bolton Has Accepted Responsibility for His Conduct and Worked Cooperatively With DOJ, the FBI, and the Intelligence Community Regarding Any Classified Information in this Case. .... 39

III. THE REMAINING SENTENCING FACTORS SUPPORT A SENTENCE OF PROBATION .... 40

A. A Sentence of Probation Would Not Create Unwarranted Sentence Disparities. .... 40

B. The Federal Bureau of Prisons Cannot Adequately Protect Ambassador Bolton from the Real, Ongoing Assassination Threats by Iran and Its Proxies. .... 46

C. The Bureau of Prison's New Regulation About Inmates' Place of Imprisonment Gives the Attorney General Unbridled Discretion to Over-Incarcerate Ambassador Bolton Should He Be So Sentenced. .... 48

D. A Sentence of Probation Allows Ambassador Bolton to Continue Being Available for His Wife and Other Family Members. .... 50

E. Just Punishment and Respect for the Law Would Not Be Served By Incarceration. .... 50

F. Incarceration Is Not Necessary for Adequate Deterrence or Public Protection. .... 53

G. Probation's Sentencing Recommendation and the Guidelines Provision for the Offense Are Inconsistent With the Plea Agreement and Are Non-Binding. .... 53

IV. CLASSIFIED SUPPLEMENT .... 54

CONCLUSION .... 55

## TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Gov't Emps. v. Skinner*,
885 F.2d 884 (D.C. Cir. 1989) ..................... 8

*Buckley v. Valeo*,
424 U.S. 1 (1976)..................... 6

*Dukakis v. U.S. Dep't of Defense*,
859 F.2d 1066 (1st Cir. 1988) ..................... 8

*Gall v. United States*,
552 U.S. 38 (2007)..................... 25, 52

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989) ..................... 8

*INS v. Chadha*,
462 U.S. 919 (1983)..................... 18

*Kimbrough v. United States*,
552 U.S. 85 (2007)..................... 22

*Koon v. United States*,
518 U.S. 81 (1996)..................... 1, 22

*Pepper v. United States*,
562 U.S. 476 (2011)..................... 1, 2, 25

*Perpich v. U.S. Dep't of Def.*,
880 F.2d 11 (8th Cir. 1989)..................... 8

*Perpich v. U.S. Dep't of Def.,*
496 U.S. 335 (1990)..................... 8

*Rita v. United States*,
551 U.S. 338 (2007)..................... 22

*Sealed Appellant v. Sealed Appellee*,
937 F.3d 392 (5th Cir. 2019)..................... 24

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ..................... 3, 26

*United States v. Bergersen*,
No. 1:08-cr-179 (E.D. Va. July 11, 2008)..................... 38

*United States v. Birchum*,
No. 8:23-cr-32-KKM-TGW (M.D. Fla. June 2, 2023) ........ 44

*United States v. Blake*,
841 F. App'x 535 (4th Cir. 2021) ........ 51

*United States v. Bolton*,
No. 1:20-cv-01580-RCL (D.D.C. June 16, 2021) ........ 49

*United States v. Davis*,
20 F.4th 1217 (8th Cir. 2021) ........ 24

*United States v. Franklin*,
No. 1:05-cr-00225-TSE (E.D. Va. May 26, 2010) ........ 45

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........ 26

*United States v. Howe*,
543 F.3d 128 (3d Cir. 2008) ........ 24

*United States v. Jackson*,
862 F.3d 365 (7th Cir. 2017) ........ 24

*United States v. Kingsbury*,
No. 4:21-cr-00101-SRB (W.D. Mo. 2021) ........ 44

*United States v. Leibowitz*,
No. 8:09-cr-632-AW (D. Md. May 25, 2010) ........ 44

*United States v. Martin*,
No. 1:17-cr-69-MJG (D. Md. July 19, 2019) ........ 42

*United States v. Petraeus*,
No. 3:15-cr-47-DCK (W.D.N.C. Apr. 29, 2015) ........ 40, 41

*United States v. Pho*,
No. 1:17-cr-631-GLR (D. Md. Dec. 1, 2017) ........ 43

*United States v. Poursafi*,
No. 1:22-mj-00176 (D.D.C. Aug. 23, 2022) ........ 35, 46

*United States v. Shirley*,
No. 3:20-cr-21 (N.D. W. Va. Jan. 25, 2021) ........ 38

*United States v. Smith*,
359 F. Supp. 2d 771 (E.D. Wis. 2005) ........ 25

*United States v. Spedden*,
917 F. Supp. 404 (E.D. Va. 1996) ........ 26

*United States v. Taffaro*,
919 F.3d 947 (5th Cir. 2019) ........ 25

*United States v. White*,
506 F.3d 635 (8th Cir. 2007) ........ 24

*Williams v. New York*,
337 U.S. 241 (1949) ........ 1

**Statutes**

18 U.S.C. § 793 ........ 37, 42, 43, 44, 45

18 U.S.C. § 1924 ........ 37, 40, 41, 42

18 U.S.C. § 3553(a) ........ 1, 2, 24, 36, 40, 50, 52, 53

18 U.S.C. § 3559(a)(4) ........ 40

18 U.S.C. § 3632(d)(4)(D)(xv) ........ 40

28 U.S.C. § 994(j) ........ 23

44 U.S.C. § 2201(3)(A) ........ 33

**Other Authorities**

Federal Rule of Criminal Procedure 11(c)(1)(C) ........ 53, 54

U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004) ........ 23

U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* (2016) ........ 23, 24

U.S.S.G. ch.1, pt. A(1)(4)(b) ........ 22

U.S.S.G. § 5G1.1(a) ........ 54

**INTRODUCTION**

For five decades John Bolton has lived an exemplary life—one dedicated to public service, family, honor, and love of country. He and his family have sacrificed their time together and even their security to support Ambassador Bolton's desire to serve his country and make it and the world a safer place. Ambassador Bolton has advised U.S. presidents, cabinet secretaries, and diplomats and has earned the respect of countless people in the United States and abroad. Against this backdrop and all Ambassador Bolton has done, he stands before the Court deeply remorseful and having taken full responsibility for his lapse in judgment in mishandling classified information kept in his personal diary, shared only with his wife and daughter.

Sentencing is perhaps the most sensitive and difficult task a judge must undertake. It requires a delicate balancing to fashion "a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth in the law. 18 U.S.C. § 3553(a). It is also essential, in arriving at a sentence the community will view as just, that the Court hear from and give serious weight to those in the community who know the individual best. As the Supreme Court explains: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). This sentencing memorandum, with its many letters of support, asks the Court to consider John Bolton's lifetime of distinguished and extraordinary work alongside the serious offense that is the subject of these proceedings, to put in the right perspective a lone mark on an

otherwise impeccable record. We address below Ambassador Bolton's lifetime of positive work, his acceptance of responsibility, his age, the collateral consequences of conviction, the agreed-upon financial penalty, serious security considerations, and many other factors that, taken together, support Ambassador Bolton's request for leniency and a probationary sentence.

## ARGUMENT

### I. AMBASSADOR BOLTON'S PERSONAL HISTORY AND CHARACTERISTICS ARE SIGNIFICANTLY MITIGATING

As Vice President Mike Pence describes, and the more than 135 letters submitted to the Court attest, Ambassador Bolton has lived an extraordinary life defined by "his patriotism, loyalty to this country, and his fierce commitment to our national security." Ex. B-103 (VP M. Pence Ltr.) Former Secretary of State James Baker III calls him "an honorable man" with "vast service to our country" whom he has "come to admire and greatly respect." Ex. B-6 (Sec. J. Baker Ltr.) "[H]is patriotism is genuine, his commitment to America's security is deeply held, and his years of public service reflect a profound devotion to this country." Ex. B-76 (Rep. A. Kinzinger Ltr.) Former Congresswoman Liz Cheney calls Ambassador Bolton "a tremendous public servant and patriot with a deep dedication to our Constitution," who in all her experiences, "has conducted himself with honor, honesty and high integrity." Ex. B-28 (Rep. L. Cheney Ltr.) The outpouring of support for Ambassador Bolton reflects his lasting impact on our national security and foreign policy, having served four American presidents and worked with countless U.S. officials, foreign leaders, members of Congress, military officers, and diplomats.

The Court applies 18 U.S.C. § 3553(a) to "impose a sentence sufficient, but not greater than necessary," to serve the ends of justice, considering, among other things, "the history and characteristics of the defendant." *Pepper*, 562 U.S. at 491. Accordingly, a non-custodial

sentence of probation would be sufficient to serve the ends of justice here. "[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006).

**A. Ambassador Bolton's Personal and Family History.**

Born in 1948, Ambassador Bolton grew up in a blue-collar family in the working-class neighborhood of Yale Heights, the son of a Baltimore firefighter (and union member) and a homemaker. Coming from a hardworking background, his upbringing laid the foundation for his decades of service to America.

Ambassador Bolton's academic drive earned him a scholarship to McDonogh School in Owings Mills, where he completed grades seven through twelve, graduating in 1966. PSR at 14. He then attended Yale College where, as an undergraduate, he joined student organizations, including the Yale Political Union. Ex. B-4 (Amb. V. Ashe Ltr.) ("He was actively involved and attended meetings on a regular basis.") He excelled academically, graduating *summa cum laude* and Phi Beta Kappa in 1970. Ambassador Bolton's younger sister recalls his "extraordinary hunger for knowledge" and "[h]is interest in foreign policy and public service beg[inning] long before adulthood." Ex. B-19 (J. Bolton Enos Ltr.)

After college, Ambassador Bolton attended Yale Law School, where he showcased, as a former roommate describes, his "rhetorical skills and exhaustive command of the facts underlying his arguments." Ex. B-82 (B. Krueger Ltr.) After graduating in 1974, Ambassador Bolton moved to Washington, DC to begin his legal career working at the law firm of Covington & Burling. As Tom Boyd, former Assistant Attorney General for DOJ's Office of Legislative Affairs, describes, "[h]is career has been the product of his upbringing, his

commitment to hard work, and his extraordinary intellect. In many ways, his is a quintessential American Dream success story." Ex. B-22 (AAG T. Boyd Ltr.)

A "lifelong Marylander," Ambassador Bolton enlisted in the Maryland Army National Guard in April 1970 and "served honorably" in the Guard for four years, Ex. B-66 (Gov. L. Hogan Ltr.), including completion of basic and advanced individual training at Fort Polk, Louisiana. PSR at 16. Ambassador Bolton reached the rank of sergeant (E-5), specializing in light weapons infantry, before his honorable discharge from the Army Reserve in 1976. *Id.*

A multitude of letters to the Court describe a devoted brother, husband, father, and grandfather. Married to his wife Gretchen for 40 years, they have a strong and successful marriage. They are proud parents to Jennifer Sarah, with whom he "share[s] a wonderful father-daughter relationship." Ex. B-19 (J. Bolton Enos Ltr.) As Jennifer Sarah attests, her childhood memories are forged around "books[,] reading and writing," and Ambassador Bolton, despite his demanding professional duties and constant international travel, "attended more [swim meets and orchestra concerts] than he missed and still knew the names of [his daughter's] teachers." Ex. B-18 (J.S. Bolton Ltr.) While he often "traveled the world in the interest of American security," he would come home with "dolls from places like Kyrgyzstan and an ostrich egg from the Western Sahara. These lessons taught me to be curious about the world and led me to live abroad two separate times in my career." *Id.* "I was proud that my dad was playing a role in defending our country," she writes, particularly in the hours after the September 11th attacks. *Id.* When his daughter attended Yale College, she and Ambassador Bolton "shared [] memories of the Yale Political Union" with one another. *Id.* His daughter's close friends, several of whom have written to the Court, describe a "gracious and respectful [father], treating [Jennifer Sarah's friends] with the same courtesy every time. That consistency

became part of [their] impression of him: a serious and accomplished person who was also a kind and present father." Ex. B-105 (R. Rao Ltr.); Ex. B-94 (S. Lynes Ltr.) ("Ambassador Bolton [i]s a devoted husband, father, grandfather, and father-in-law. . . . At his core, he is a family-centered, genuine, and deeply caring person.").

Ambassador Bolton and his wife are also first-time grandparents to Jennifer Sarah's daughter, who calls him "Grandpa." Ex. B-18 (J.S. Bolton Ltr.) A dedicated family man, when his sister suffered the devastating loss of her child last year, Ambassador Bolton "stood by [her] side through every moment. He was my rock[.]" Ex. B-19 (J. Bolton Enos Ltr.)

**B. Ambassador Bolton's Four Decades of Government Service.**

For over four decades, Ambassador Bolton has demonstrated a profound and unwavering commitment to the United States, serving at the highest levels of government across four presidencies. Throughout his distinguished career, he has consistently tackled complex national security, humanitarian, and foreign policy challenges, leaving an enduring legacy in American security, diplomacy, and arms control. As former Senator Mitt Romney writes, "[h]is service and writings on matters of foreign affairs have provided important and substantial benefits to the country—and continue to do so today." Ex. B-111 (Sen. M. Romney Ltr.)

**1. U.S. Agency for International Development**

Ambassador Bolton's first major federal government job was serving in the Reagan Administration as General Counsel for the U.S. Agency for International Development (USAID). In 1982, President Reagan appointed him as Assistant Administrator for Program and Policy Coordination, where, among other things, he "revamped how we spend our foreign assistance dollars and impacted the lives of women across the developing world." Ex. B-127 (S. Tinsley Ltr.) Ambassador Bolton spearheaded novel policies to increase the participation of

women in developmental programs, including advancing a "new Office of Women in Development [WID] policy" that championed "the economic contributions of women" which improved the overall success of USAID's projects. *Id.*

During his three years at USAID, Ambassador Bolton was unyielding in advancing and promoting the economic contributions of women. In the words of his former colleague, he "continued for his entire USAID tenure to champion the WID office and the new 1982 Women in Development Policy Paper in Washington and in our U.S. Missions abroad." *Id.* As a result, "the World Bank and other European foreign assistance agencies adopted critical parts of the new USAID WID policy" and included the requirement—begun under Ambassador Bolton—to disaggregate by gender all program and project data. *Id.* His steadfast efforts did not generate flashy headlines or public recognition but had a lasting impact on America's foreign aid programs. Ambassador Bolton "understood the critical role of sound policies if our development assistance dollars were to be spent effectively and if USAID's presence and programs overseas were going to be an effective tool for keeping our country safe." *Id.*

**2. Department of Justice**

Following his successful tenure at USAID, Ambassador Bolton returned to private legal practice in 1983, again at Covington & Burling as a Partner. Prior to becoming a Partner, as an Associate in 1974, Ambassador Bolton brought to the firm and subsequently worked on the landmark campaign-finance case *Buckley v. Valeo*. 424 U.S. 1 (1976). He worked alongside his former Yale Law School professor to represent twelve clients, including Senator James Buckley and Senator Eugene McCarthy, pro bono. Ex. B-55 (J. Gora Ltr.); Ex. B-109 (J. Roberts Ltr.) (describing Bolton as Covington's "point man on the suit"). As former ACLU lawyer and co-counsel Professor Joel Gora writes, Ambassador Bolton "provided so much of the analytical and

editorial glue that held our arguments together" and "made an enormous contribution to our victories" in the Supreme Court. Ex. B-55 (J. Gora Ltr.) The *New York Times* recently wrote that "[o]ne of the most instrumental supporters of the legal challenge was John Bolton . . . At the time, Mr. Bolton was only recently out of Yale Law School, and pushed Covington & Burling, where he'd joined as a new associate, to take on the Buckley case. . . . Mr. Bolton volunteered to join the Buckley legal team, successfully pitching it to Covington."[1]

His return as a Partner lasted two years. With his calling to serve and a strong desire to return to government service, he rejoined the Reagan administration in 1985, first as Assistant Attorney General for Legislative Affairs ("OLA") (1985 – 1988) and later Assistant Attorney General for the Civil Division (1988 – 1989) at the Justice Department. Ex. B-9 (C. Barnett Ltr.) At OLA, he worked with the Senate Judiciary Committee and "shepherded judicial and other nominations through Senate confirmation," *id.*, including Chief Justice Rehnquist and Associate Justices Scalia and Kennedy. *See* Ex. B-133 (P. Wallison Ltr.) A former colleague in the White House Counsel's office who worked closely with Ambassador Bolton during the Iran-Contra investigations tells the Court, "John was always professional, focused, and demonstrated an absolute commitment to getting the job done with integrity." Ex. B-95 (W. Lytton Ltr.) ("He was instrumental in making sure the process worked[.]"); Ex. B-39 (M. Dickman Ltr.)

As a leader of both OLA and then Civil, Ambassador Bolton "was always open to discussing our differences and sometimes incorporating them into his final recommendations." Ex. B-22 (AAG T. Boyd Ltr.) He enjoyed debating and hearing from colleagues with different policy or political views, always maintaining an "interest in and appreciation for views that differed from his own." *Id.* At Civil, he argued two D.C. Circuit cases on the constitutionality

[1] Danny Hakim, *A Look Inside the Case That Enshrined Political Power for Billionaires*, N.Y. TIMES (May 6, 2026), https://www.nytimes.com/2026/05/06/us/politics/buckley-case-supreme-court-billionaires.html.

of the government's mandatory random drug testing of federal employees, and two cases concerning presidential authority over foreign deployment of National Guard units.[2]

Through each appointment, as Tom Boyd describes, "[w]hether he remained a senior official at the Department of Justice . . . or moved to equally senior positions within the State Department, including becoming Ambassador to the United Nations, his commitment to public policy decisions aimed at cementing the safety and security of the United States continued in earnest." *Id.* During his years serving as an Assistant Attorney General, Ambassador Bolton demonstrated steadfast dedication to advancing the country's legal and policy objectives.

**3. Department of State**

In May 1989, Ambassador Bolton joined George H.W. Bush's administration, serving as Assistant Secretary of State for International Organization Affairs until 1993. In this post, he oversaw U.S. policy toward the entire United Nations system, including during the 1991 Gulf War and the Soviet Union's collapse. Ex. B-135 (Amb. J. Wolcott Ltr.) For example, Ambassador Bolton "worked closely with Secretary James Baker to secure passage of critical UN Security Council resolutions including to authorize the use of force to liberate Kuwait" and "to address[] the unfolding crisis of refugees and displaced people who were overwhelming the UN's ability to adequately feed and house them." *Id.*; *see also* Ex. B-6 (Sec. J. Baker Ltr.) ("Our U.N. efforts culminated in Security Council Resolution 678 . . . to oust Saddam's forces" from Kuwait); Ex. B-134 (State Dep't Legal Advisor E. Williamson Ltr.) In Ambassador Jackie Wolcott's words, "John had a real heart for these vulnerable populations and was as focused on solving this issue as he was on the political affairs of the Security Council." Ex. B-135 (Amb. J. Wolcott Ltr.)

---

[2] *Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989); *Am. Fed'n of Gov't Emps. v. Skinner*, 885 F.2d 884 (D.C. Cir. 1989); *Dukakis v. U.S. Dep't of Defense*, 859 F.2d 1066 (1st Cir. 1988); *Perpich v. U.S. Dep't of Def.*, 880 F.2d 11 (8th Cir. 1989) (en banc). The Supreme Court later unanimously affirmed *Perpich*. 496 U.S. 335 (1990).

One notable diplomatic achievement was his vital role in 1991 repealing the notorious 1975 General Assembly resolution that equated Zionism with racism. Ex. B-9 (C. Barnett Ltr.) Through "commitment to principle and moral fortitude," and "due to his leadership and dedication," Ambassador Bolton "persuaded delegation after delegation to vote to strike [the Resolution] down" (*id.*)—showcasing his ability to champion moral clarity and achieve lasting multilateral outcomes.

Ambassador Bolton returned to the State Department in 2001 under George W. Bush as Under Secretary of State for Arms Control and International Security Affairs until 2005. He distinguished himself as a persuasive negotiator and was "the chief architect of" the Proliferation Security Initiative—a voluntary global program ultimately joined by over 100 countries—to prevent the proliferation of nuclear weapons, including by Iran and North Korea. Ex. B-135 (Amb. J. Wolcott Ltr.); Ex. B-137 (Deputy Sec. of Def. P. Wolfowitz Ltr.) ("John had helped force the government to move from saying that proliferation was dangerous to asking what, concretely, we were prepared to do about it. That was very much John.") This highly effective global partnership successfully disrupted illicit trafficking of weapons of mass destruction, leading to notable victories like the 2003 interception of nuclear components bound for Libya. Ex. B-137 (Deputy Sec. of Def. P. Wolfowitz Ltr.) "As its driving force, John championed this coalition of the willing and more than 100 countries participated," including "long lasting partnerships in this field that made our country and our allies demonstrably safer and more secure." Ex. B-135 (Amb. J. Wolcott Ltr.)

As Under Secretary, he worked closely in 2001 with DOJ's Office of Legal Counsel "on important foreign affairs policies, such as U.S. withdrawal from the Anti-Ballistic Missile Treaty and the making of a new strategic arms agreement with Russia." Ex. B-139 (Prof. J. Yoo

Ltr.) In those roles and discussions, colleagues observed that Ambassador Bolton "carefully handled the most important and sensitive information – that related to our nuclear weapons arsenal and our national missile defense – with the utmost integrity." *Id.*

Former NATO ambassador Kurt Volker recalls Ambassador Bolton's unyielding efforts as Under Secretary "to ensure that U.S. service men and women and intelligence officers would not be subject to politically motivated prosecutions under the International Criminal Court (ICC)." Ex. B-130 (Amb. K. Volker Ltr.) Ambassador Bolton urged President Bush to unsign the treaty creating the ICC, arguing "that such an international bureaucracy would soon . . . become a platform for condemnations of the United States, its elected officials, military, and allies." Ex. B-107 (Amb. O. Reich Ltr.) Despite "public criticism and diplomatic push-back from European Allies for supposedly undermining the ICC, [Ambassador Bolton] determinedly sought to negotiate bilateral agreements with all other countries in the world to protect American personnel," leading others, including President Bush, to recognize "the wisdom of John's approach" and "his tenacity in pursuing it despite the criticism." Ex. B-130 (Amb. K. Volker Ltr.) Additionally, former CIA official Anne Gruner writes that Ambassador Bolton's deft diplomacy with foreign leaders was decisive in negotiating the 2002 Moscow Treaty ensuring nuclear stability with Russia, *see* Ex. B-59 (A. Gruner Ltr.) ("the negotiation succeeded due to Amb. Bolton's mastery of detail and diplomatic skill"), and leading to Security Council Resolution 1540, a landmark effort concluding that states should criminalize transfers of strategic-weapons-related goods by private parties—just one of his silent but enduring non-proliferation achievements.[3]

---

[3] Transcript, *Senate Committee Hearing on the Nomination of John Bolton to Be U.N. Ambassador*, N.Y. TIMES (Apr. 11, 2005), https://www.nytimes.com/2005/04/11/politics/senate-committee-hearing-on-the-nomination-of-john-bolton-to-be-un.html.

**4. U.S. Permanent Representative to the United Nations**

In 2005, President Bush appointed Ambassador Bolton as Ambassador to the United Nations. There, he distinguished himself as a principled, thoughtful, "straight-talking advocate for [American] values and interests," Ex. B-116 (K. Rove Ltr.), and aggressively promoted major institutional changes within the UN to improve its effectiveness and accountability. One former colleague recalls, "[u]pon his arrival at USUN, John made a commitment to meet all 192-member state Permanent Representatives at their individual missions to the UN." Ex. B-132 (Amb. M. Wallace Ltr.) Ambassador Bolton "personally negotiated resolutions on Iran, North Korea, and the unanimous Resolution 1701 ending the Lebanon War." Ex. B-135 (Amb. J. Wolcott Ltr.); *see also* Ex. B-14 (Amb. L. Bloomfield Ltr.) In Security Council meetings and in capitals around the world, he led "countless lengthy negotiations where his skills, intellect and persuasion as a staunch defender of American interests delivered and earned him respect and admiration from numerous diplomatic colleagues." *Id.* Ambassador Bolton repeatedly "warned about the danger of the Islamic Republic of Iran" and simultaneously advocated for LGBTQ rights and expressed "his unequivocal support of gay marriage at the state and federal levels." Ex. B-132 (Amb. M. Wallace Ltr.) As his former Deputy at the UN describes, Ambassador Bolton's "principled support for [U.S.] positions at the UN . . . set back North Korean and Iranian nuclear and missile programs that posed a threat to peace and stability" everywhere. Ex. B-136 (Amb. A. Wolff Ltr.) ("John is a patriot in the truest sense").

Throughout his tenure as Ambassador to the UN, "[w]ithout fanfare, John tried to show by his actions what America stood for." Ex. B-132 (Amb. M. Wallace Ltr.) A former colleague observed, "Ambassador Bolton was not about achieving 'diplomatic progress' negotiated behind closed doors and only vaguely revealed, but rather he focused on principled declarations and

arguments that clarified policy decisions made by our national leadership." Ex. B-88 (R. Lawless Ltr.) As another United Nations colleague writes:

> In all my time working with him and knowing him, I have never observed John compromise his commitment to what he believed was in the best interest of the United States and importantly, in service to all Americans. John has devoted his life to serving our nation in positions of huge responsibility. His record reflects a lifetime of dedication to the security of America and the faithful execution of his public responsibilities for the benefit of all Americans. My experience working alongside him confirmed that these commitments were deeply held. He is first and foremost an American patriot and devoted to all Americans.

Ex. B-132 (Amb. M. Wallace Ltr.) For Ambassador Bolton, "patriotism of service to our country" meant "service to all Americans," irrespective of political party or ideology. *Id.* That is what he stood for then, and in every government role he has held before and since.

**5. The White House (National Security Advisor)**

As a capstone to a lifelong career in foreign affairs, in 2018 President Trump appointed Ambassador Bolton as the National Security Advisor ("NSA"). In assuming one of the government's highest national security roles, he was tasked with overseeing and coordinating Administration responses to some of the world's most complex challenges. Drawing upon his decades of service, he advised the President on America's strategic posture regarding critical international flashpoints, including China, Russia, North Korea, Iran, and Venezuela—always dedicated to "putting America's interests first." Ex. B-130 (Amb. K. Volker Ltr.) According to his deputy, "[h]e managed the NSC process with professionalism" and with "a calm and steady" hand. Ex. B-83 (C. Kupperman Ltr.) He also advocated strengthening U.S. preparedness for biological threats, including pandemic influenza and other emerging infectious diseases, such as the 2018 Ebola outbreak in the DRC. Ex. B-20 (Dr. L. Borio Ltr.)

Ambassador Bolton worked tirelessly to do "everything he could" to advance the White House's agenda and "to modulate the President's rhetoric, to confer with Allies, to steer

discussions at NATO, and prevent real damage to the Alliance." Ex. B-130 (Amb. K. Volker Ltr.) Former Secretary of Defense Mark Esper writes that Ambassador Bolton took "important stands and advance[d] well developed recommendations on issues ranging from North Korea's nuclear program and Iran's use of foreign proxies . . . to China's illicit activities against the U.S. and Russia's aggressions against American allies in Europe, and from U.S. policies and programs in Afghanistan to defeat the Taliban[.]" Ex. B-44 (Sec. M. Esper Ltr.) During a critical 2018 heads-of-government NATO meeting, his "involvement was instrumental in avoiding a major blow-up at the summit" and required him to "stand up to the President" in difficult moments. Ex. B-130 (Amb. K. Volker Ltr.) His "unwavering support for providing military assistance to Ukraine in 2018 and 2019" was also "instrumental in keeping [U.S.] assistance [to Ukraine] on track" despite numerous obstacles. *Id.* Ambassador Volker writes, "[s]tanding up for America's long-term strategic interests in the face of all these headwinds was not for the faint of heart. John persisted and held off resigning from his post until he had ensured that U.S. assistance to Ukraine would not be disrupted any further." *Id.*; *see also* Ex. B-1 (E. Abrams Ltr.).

As NSA, he worked to deter "the world's largest state sponsor of terrorism, supported the President's decision to direct Armed Forces to take down the ISIS caliphate, and coordinated on many other issues to defend the American people and our national interests at home and abroad." Ex. B-103 (VP M. Pence Ltr.) In Vice President Pence's words, "John Bolton's counsel during the years of the first Trump Administration played an important role in advancing policies that made the American people safer and more secure." *Id.* He and others observed firsthand "Ambassador Bolton's willingness to stand on his principles, even when those views drew criticism from the public or those in power," as well as "his fierce

commitment to our national security." *Id.*; Ex. B-28 (Rep. L. Cheney Ltr.) ("John was dedicated to ensuring the President understood the impact of his decisions on America's men and women in uniform."); Ex. B-76 (Rep. A. Kinzinger Ltr.) As the NSC's then-Director for Medical and Biodefense Preparedness writes, Ambassador Bolton "approached difficult decisions with clarity, discipline, and a strong sense of responsibility" and "never hesitated to support doing what was necessary to save lives and protect the national security of the United States." Ex. B-20 (Dr. L. Borio Ltr.)

"Having seen the risks from the inside, [Ambassador Bolton] knew full well how dangerous the world is, with America often the target of that animus, and he wanted to be able to help minimize the impact of that danger on the American people." Ex. B-22 (AAG T. Boyd Ltr.) "He saw his job as protecting the nation's interests, not the President's." Ex. B-1 (E. Abrams Ltr.) When Ambassador Bolton opposed President Trump's plan to host Taliban and Afghan leaders at Camp David for peace talks near the anniversary of September 11th, he "understood that pressing his objections could cost him" his job and yet "[h]e gave his unvarnished judgment anyway and accepted the consequences." Ex. B-80 (B. Kovner Ltr.); *see* Ex. B-137 (Deputy Sec. of Def. P. Wolfowitz Ltr.) ("His example of speaking truth to power is one that others in public service should be encouraged to follow."). Ambassador Bolton served faithfully as NSA until September 10, 2019,[4] concluding an extraordinary career of distinguished federal service.

[4] On the day he resigned as NSA, President Trump summarily ended Ambassador Bolton's Secret Service protection, rather than follow the precautionary custom of retaining such protection for a period of time after leaving office. The President would do so again upon returning to office in January 2025. *See* Kaitlan Collins, *Trump Terminates John Bolton's Security Detail Within Hours of Taking Office*, CNN (Jan. 21, 2025), https://www.cnn.com/2025/01/21/politics/john-bolton-security-detail-trump. As described further in Section II.D, this has imposed significant security and financial burdens on the Bolton family and creates a concern for any custodial sentence.

### C. Ambassador Bolton's Leadership at Key Policy Institutes, His Longstanding Educational Efforts, and Extensive Public Works.

#### 1. Leadership at American Policy Institutes and Forums

When not serving in government, Ambassador Bolton's posts included key leadership roles at well-known U.S. policy institutes, including the Manhattan Institute (Senior Fellow, 1993), the National Policy Forum (President, 1995-1996), and the American Enterprise Institute (Senior Vice President, 1997-2001; Senior Fellow, 2007-2018). *See, e.g.*, Ex. B-21 (K. Bowman Ltr.); Ex. B-36 (C. DeMuth Ltr.) As Professor John Yoo writes, Ambassador Bolton "devoted his career outside of government to developing his ideas on sovereignty, debating foreign policy, and advancing the national interest." Ex. B-139 (Prof. J. Yoo Ltr.) There was a steady throughline in all these positions: despite the salary he could have earned practicing law, "[h]e chose instead to devote himself to understanding and clarifying public policy—work he pursued out of genuine public spirit rather than private gain or personal ambition." Ex. B-80 (B. Kovner Ltr.)

As AEI Senior Vice President, Ambassador Bolton honed his foreign policy views and skills and "t[ook] up questions that much of the foreign-policy establishment preferred to leave unasked." Ex. B-80 (B. Kovner Ltr.) "He developed these arguments carefully and at length—in his writing on the proposed International Criminal Court, in his examination of the legal claims advanced for the NATO action in Kosovo, and in a broader critique of what was then called 'global governance.'" *Id.* Ambassador Bolton launched "a series of research projects and conferences devoted to defining sovereignty and understanding how it should guide American foreign policy"—"a new and ambitious undertaking that has had a profound, long-term impact on foreign policy thinking, both inside and outside the government." Ex. B-139 (Prof. J. Yoo Ltr.) Ambassador Bolton's intellectual rigor and willingness to challenge orthodox

thinking caused "academics at the time to think about foreign policy from a fresh perspective, not in a didactic way, but by raising questions, making his own case, and bringing thinkers together to discuss in a spirit of free inquiry and rational discussion." *Id.* Colleagues recall a practitioner with a "remarkably consistent concern for constitutional accountability and for candor about the real sources and limits of international authority. He would not pretend a question was settled merely because saying so was easier." Ex. B-80 (B. Kovner Ltr.)

Former Secretary of State James Baker III attests that "during [his] 12 years working for Presidents Ronald Reagan and George H.W. Bush," he "repeatedly reached out to John" for assistance or advice. Ex. B-6 (Sec. J. Baker Ltr.) Even after government service, Secretary Baker recalls that Ambassador Bolton "was the first person" he recruited in 1996 to assist him in resolving a long-standing international dispute over a former Spanish colony, Western Sahara. *Id.* Later, during the Bush-Gore presidential election recount in 2000, Secretary Baker again called on Ambassador Bolton to assist then-Governor George W. Bush's legal team in Florida, where he "held a key position" for Secretary Baker in the recount effort. *Id.* In that role, former Deputy Attorney General George Terwilliger recalls Ambassador Bolton "stood out" for "volunteering to go anywhere his help might be needed," his "dedication and perseverance" to the mission, and that he "sought no credit" for the unglamorous work he performed. Ex. B-125 (G. Terwilliger III Ltr.)

In 2015, Ambassador Bolton established the Foundation for American Security and Freedom (FASF), which he currently heads. Ex. B-83 (C. Kupperman Ltr.) Under his leadership, FASF advocates a strong national defense and a robust national security and foreign policy. *Id.*

Additionally, Ambassador Bolton served as a member of the U.S. Commission on International Religious Freedom from 1999 to 2001. Ex. B-1 (E. Abrams Ltr.) He was among the inaugural commissioners appointed to advance religious freedom around the world. In that post, former Assistant Secretary of State Elliott Abrams recalls Ambassador Bolton "showed himself to be a committed champion of religious freedom, a powerful voice inside the Commission" who would not tolerate religious discrimination in any form—a cause he advocated in and out of government service. *Id.*

### 2. Ambassador Bolton's Commitment to Educational Efforts and Vast Contribution of Public Works and Expression

Over many decades, Ambassador Bolton has shared his insights and experiences with students, the press, government officials, and the public. A fierce advocate for a free Iran, Ambassador Bolton has travelled annually "to Paris to speak on behalf of Iran's organized resistance," despite the ongoing threats to his life,[5] "and to advocate support for the Iranian people in their quest to end fundamentalist rule." Ex. B-14 (Amb. L. Bloomfield Ltr.) His former Deputy NSA, Charlie Kupperman, recalls inviting Ambassador Bolton to speak to a group of students at Johns Hopkins University about foreign policy, which he readily accepted, engaging the students in a "lively discussion across the political spectrum." Ex. B-83 (C. Kupperman Ltr.) "It was just one of countless times that he shared his insights and knowledge with students and young people across this country." *Id.* Another colleague describes inviting Ambassador Bolton to lecture about foreign affairs, during which "he addressed significant security challenges taking place on the Korean Peninsula and Northeast Asia and enriched us with his insights and extraordinary expertise." Ex. B-75 (S. Joo Kim Ltr.) Ambassador Bolton has always endeavored to share his experiences, insights, and scholarly views with the public.

---

[5] *See* Editorial Bd., *Trump, Iran's Assassins and John Bolton*, WALL ST. J. (July 19, 2026), https://www.wsj.com/opinion/john-bolton-donald-trump-iran-list-security-secret-service-5294ef4c.

Journalists and government officials have also counted on Ambassador Bolton for his profound knowledge about U.S. national security. One journalist describes Ambassador Bolton's assistance with his book, *Assad: The Triumph of Tyranny* (2023). For the book, Ambassador Bolton "provided a unique and insightful analysis of U.S. policy towards the [Bashar al-]Assad regime in Syria over many years." Ex. B-34 (C. Coughlin Ltr.) Likewise, during America's current military conflict with Iran, Ambassador Bolton has shared his keen insights and profound knowledge of geo-political considerations with the press and public and authored op-eds on key issues.[6] Ex. B-95 (W. Lytton Ltr.) ("[O]ne thing that has always struck me is John's integrity and his absolute commitment to serving this nation, using his expertise to alert our citizens, our leaders and indeed the world to the opportunities and threats that we face.").

Ambassador Bolton has contributed extensively to America's political discourse by publishing written work on issues of national security, foreign policy, law, and his time serving in government. He published *The Hatch Act: A Civil Libertarian Defense* in 1976, defending the Hatch Act's constitutionality. In 1977, he published *The Legislative Veto: Unseparating the Powers*, warning of the unconstitutionality of the legislative veto and foreshadowing the Supreme Court's 1983 decision in *INS v. Chadha*, 462 U.S. 919 (1983). Following his service as UN Ambassador, he published *Surrender Is Not an Option: Defending America at the U.N. and Abroad* (2007), focusing on his experiences in federal service, particularly his defense of U.S. interests while at the United Nations. Finally, in 2020, after an extensive prepublication

[6] *See, e.g.*, Sarah Davis, *Bolton says US strikes on Iran 'justifiable and necessary'*, THE HILL (Feb. 28, 2026), https://thehill.com/policy/international/5760552-john-bolton-donald-trump-us-israel-iran-strikes/; *Former national security adviser John Bolton talks about the goals of the Iran war*, NPR (Mar. 31, 2026), https://www.npr.org/2026/03/31/nx-s1-5765411/former-national-security-adviser-john-bolton-talks-about-the-goals-of-the-iran-war; John Bolton, Op-Ed, *Iran Is Too Weak to Make Peace*, WALL ST. J. (July 12, 2026), https://www.wsj.com/opinion/iran-is-too-weak-to-make-peace-4aabb236; John Bolton, Op-Ed, *John Bolton: Trump's tit-for-tat with Iran ignores the larger reality*, WASH. POST (Aug. 4, 2026), https://www.washingtonpost.com/opinions/2026/08/04/iran-ukraine-wars-were-never-separate/.

review, *see infra* II.B, Ambassador Bolton published *The Room Where It Happened: A White House Memoir*, a highly acclaimed firsthand account of his tenure as National Security Advisor. The book offered a critical account of Trump's first presidency and detailed key foreign policy issues and decisions regarding North Korea, China, Venezuela, Iran, Israel, and many others.

His prolific contributions—in newspapers, electronic media, and in global forums—have all enriched the U.S. national security dialogue. As Deputy NSA Charles Kupperman writes, "[h]is books, articles, and media appearances are key elements of understanding Presidential decisions, the pressures of real time decision making at the highest levels of government, the multiplicity of threats facing America and its allies, and what actions America must take to safeguard our security." Ex. B-83 (C. Kupperman Ltr.) Today, Ambassador Bolton "continue[s] to play a significant role in U.S. debates over our foreign policy, . . . even while he has undergone the ordeal of federal prosecution"—reflecting his significant and lasting voice in America's foreign policy and national security dialogue. Ex. B-139 (Prof. J. Yoo Ltr.)

**D. Ambassador Bolton's Personal Characteristics of Integrity, Compassion, and Generosity.**

Letters submitted by Ambassador Bolton's colleagues, friends, and family describe a man of enormous integrity, with genuine compassion for his fellow citizens and deep generosity in both time and spirit. His then-NSC Director for Medical and Biodefense Preparedness recalls a particularly meaningful initiative Ambassador Bolton championed—"developing a protocol for the aeromedical evacuation of Americans serving overseas in epidemic response efforts." Ex. B-20 (Dr. L. Borio Ltr.) The program "ensured that those who became infected could be safely transported home for advanced medical care." *Id.* Ambassador Bolton "recognized that supporting those who place themselves at risk in service to others is both a practical necessity

and a moral obligation"—a conviction that reflected his "sound judgment and genuine compassion" for Americans at home and abroad. *Id.*

Dozens of letters capture similar sentiments, describing "a man of compassion, courage and great integrity – someone others look to as an example of how to live a principled life of honor." Ex. B-120 (R. Shelby Ltr.); Ex. B-20 (Dr. L. Borio Ltr.) ("He loves our country deeply and has demonstrated that love through earnest commitment, resolve and action rather than words."); Ex. B-59 (A. Gruner Ltr.) ("a man of great integrity, expertise, and experience who has unfailingly served his country"). Former colleagues describe a leader who they felt "always [] had [their] back" and instilled "trust" in those he worked with—as one colleague attests, "he made me feel I could fulfill challenging professional positions because of his mentorship and perpetual support." Ex. B-9 (C. Barnett Ltr.) An "unselfish" public servant, in the hours after the September 11th attacks, "John did not leave the [State] Department for more than 12 hours . . . and despite the dire concerns, John stayed to serve" into the morning of September 12. Ex. B-9 (C. Barnett Ltr.); Ex. B-95 (W. Lytton Ltr.) Other former colleagues describe Ambassador Bolton as "loyal to those who have worked for him and with him over the years"—a character trait that "deserves consideration alongside his long record of public service." Ex. B-110 (E. Rogers Ltr.)

Other colleagues describe Ambassador Bolton as a man "unfailingly generous with his time," who shares his policy ideas with others "as a reflection of the seriousness with which he viewed the exchange of ideas and his longstanding commitment to public service rather than personal gain." Ex. B-123 (T. Switzer Ltr.) Members of the military who worked with Ambassador Bolton describe his "moral courage," which "has inspired many young people on both sides of the Atlantic and further afield to themselves take up a life of public service. His

generosity of spirit has frequently led him to reach out to many such people with a helping hand." Ex. B-74 (Col. R. Kemp Ltr.) He regularly speaks with academics, colleagues, and students exploring foreign policy questions "about unlimited globalization" or "theories of international governance," or debating "the relationship between U.S. Constitutional war powers and international law," or critiquing drafts of forthcoming articles or books—"an example not just of John's generosity of thought and spirit, but also of his style of intellectual leadership." Ex. B-139 (Prof. J. Yoo Ltr.); Ex. B-36 (C. DeMuth Ltr.) (describing Bolton's "generosity of spirit").

He has also imparted his deep commitment to public service on others in his life, including his daughter Jennifer Sarah. As one of her friends describes, "[h]is commitment to service is something he has clearly passed on to his daughter, who now serves as the President of the Junior League of Nashville, leading an organization of more than 1,400 women," reflecting a "legacy of service that aligns with the values Ambassador Bolton has modeled throughout his life." Ex. B-94 (S. Lynes Ltr.)

**E.** [redacted]

[redacted]

## II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT LENIENCY

The Supreme Court has explained that sentencing courts have discretion to downward depart on any ground that takes a case *outside* the "heartland" of typical cases, and even unusual factors warrant a departure from the Guidelines in exceptional circumstances.[7] *Koon*, 518 U.S. at 93–95. The Court has observed that "a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case '*outside the "heartland"* to which the Commission intends individual Guidelines to apply.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (emphasis added) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)). This is such a case—where, in fashioning a just sentence, rather than being guided by the statute's title, the Court must weigh the actual conduct, intent, and harm involved, especially as compared to the heartland of Espionage Act cases for which the guidelines were intended. Diary-keeping is indeed far from that heartland.

The nature and circumstances of Ambassador Bolton's offense demonstrate a complete lack of malicious intent or harm, warranting significant leniency. Throughout his long career, he has demonstrated a consistent history of safely handling national defense information and strictly complying with classification protocols, reflecting his lifelong commitment to safeguarding U.S. national security. The retention of his personal diary was not an effort to mishandle intelligence or subvert the nation's security, but primarily an endeavor to maintain a clear, accurate historical record of U.S. foreign-policy decisions and help guide his future work.

Furthermore, as described below, Ambassador Bolton's actions prior to and throughout the investigation demonstrate his unwavering loyalty to the United States. He never disseminated NDI to the public, the press, or any foreign adversary. When he intended public

---

[7] The Guidelines are designed to account for offenses that fall in the "heartland" of the offense type, but conduct or circumstances may take a particular offense outside of that "heartland." U.S.S.G. ch.1, pt. A(1)(4)(b).

disclosure of his work, for example in *The Room Where It Happened*, he submitted his manuscript to the government for full prepublication review. *See* Ex. B-83 (C. Kupperman Ltr.); Ex. B-33 (C. Cooper Ltr.) And when he became aware of a cyber-intrusion into his personal email account in 2021, he immediately reported it to the FBI, and proactively cooperated to mitigate any potential damage. *See* Ex. B-117 (C. Samuelian Ltr.) He has continued to work collaboratively with the FBI and U.S. Intelligence Community, to mitigate any harm done by his diary.

**A. Section 3553(a) Warrants a Probationary Sentence.**

Because this is Ambassador Bolton's first offense and it did not involve a crime of violence, Congress has recognized "the general appropriateness of imposing a sentence other than imprisonment." 28 U.S.C. § 994(j). As a first-time offender, Ambassador Bolton poses no threat of recidivism, especially because he no longer possesses the material (*e.g.*, the diary) that could provide any likelihood of recidivism. The Sentencing Commission has found that defendants in Criminal History Category I, like Ambassador Bolton, have the lowest lifetime recidivism rate of all offenders. *See* U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview*, 19 (2016). The Commission noted that "[p]ossible sentence reductions for 'first offenders' are supported by the recidivism data and would recognize their lower re-offending rates." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, 15 (2004).[8] This finding strongly supports the Court's discretion to grant leniency in this case.

[8] Other factors suggest Ambassador Bolton is not likely to recidivate, including his age, stable home life, steady employment history, lack of illicit drug use, and education level. The Commission explains that "[r]ecidivism rates decline consistently as age increases," and suggests that if age and education level were incorporated into the criminal history score, it would strengthen the predictive power of the Guidelines in identifying risk of recidivism. U.S. Sent'g Comm'n (2016), *supra*, at 23–24 (finding only 14% of offenders sentenced after age 60 are rearrested after release, and only 19.1% of college graduates). The Sentencing Commission also found lower recidivism rates by defendants who, like Ambassador Bolton, have a stable employment history, are well-educated, and are first-

Additionally, under Section 3553(a), "the history and characteristics of the defendant, including his family ties, are pertinent to crafting an appropriate sentence." This mandate to consider a defendant's "history and characteristics" also "includes consideration of a defendant's age and medical condition." *United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007); *Sealed Appellant v. Sealed Appellee*, 937 F.3d 392, 398 (5th Cir. 2019) (affirming downward variance based on a defendant's age and medical condition). At the time of sentencing, Ambassador Bolton will be 78 years old, [redacted] PSR at 15.

Ambassador Bolton is a man of extraordinary character, and a sentence of probation is warranted given his distinguished service to the nation. Under Section 3553(a)(1), a defendant's record of service may be a relevant mitigating factor supporting a downward departure. *See, e.g.*, *United States v. Davis*, 20 F.4th 1217, 1221 (8th Cir. 2021) (affirming downward variance based in part upon defendant's "meritorious military career"); *United States v. Jackson*, 862 F.3d 365, 402 (7th Cir. 2017) (noting downward variance is proper "where military service is present to an 'unusual degree' and distinguishes the case from the typical cases"); *United States v. Howe*, 543 F.3d 128, 138–40 (3d Cir. 2008) (affirming downward variance based upon defendant's 20 years of military service, honorable discharge, and remorse). Ambassador Bolton's lifetime of distinguished service over four administrations is not merely a background detail; it is his life's defining characteristic. This extraordinary record of advancing and safeguarding America's national security shows that his conduct in this case was an aberration, negating the need for incarceration to provide deterrence or promote respect for the law.

---

time offenders with no history of illicit drug use. *Id.* at 29. Here, the statistical likelihood of recidivism for Ambassador Bolton could not be lower.

His devotion to his family also supports probation. In *Pepper*, the Supreme Court explained "[t]here is no question" that a defendant's relationship with his family is a "critical part" of his "history and characteristics" that should be considered at sentencing. 562 U.S. at 492. Similarly, in *Gall v. United States*, the Court affirmed a downward variance from a recommended guidelines range of 30 to 37 months in prison to a 36-month purely probationary sentence following a "small flood" of letters of support from the defendant's family and friends—support that decreases the likelihood of recidivism. 552 U.S. 38, 43–45 (2007) (explaining probation is a meaningfully punitive sentence). Although the government opposed that sentence, it conceded that probation would be appropriate if "there are compelling family circumstances where individuals will be very badly hurt in the defendant's family if no one is available to take care of them." *Id.* at 59. More recently, the Fifth Circuit upheld a below-guidelines sentence of 60 months' probation and a fine, where the guidelines range was 27 to 33 months in prison, due to the defendant's age, physical condition, family ties, and charitable acts, among other factors. *United States v. Taffaro*, 919 F.3d 947, 949 (5th Cir. 2019).

Courts have also departed downwards to shield a defendant's family from the harm that would result from incarcerating their family member. In *Gall*, as noted above, even the government conceded that probation would be appropriate if "there are compelling family circumstances where individuals will be very badly hurt in the defendant's family if no one is available to take care of them." 552 U.S. at 59. Courts have applied Section 3553 to reduce sentences for individuals like Ambassador Bolton who are relied upon by their families and others for support. *See, e.g.*, *United States v. Smith*, 359 F. Supp. 2d 771, 776–82 (E.D. Wis. 2005) (reducing defendant's sentence by half, even after a 15-level downward departure on other grounds, because he had been married several years, supported his children, cared for his

mother and obtained community letters describing his good character).

Thus, the Court would be within its discretion, legal precedent, and the Plea Agreement's terms (which permits a sentence ranging from 0 to 60 months imprisonment) to impose a probationary sentence here given that this is a first offense with no identified, tangible harm, plus his lifelong record of distinguished service, advanced age, and vital role in supporting his family. Ambassador Bolton's support to his family, which includes helping them navigate real and significant safety threats, *see infra* II.D (discussing threats on his life and personal safety), far exceeds "the normal, everyday course" of parenting. *United States v. Spedden*, 917 F. Supp. 404, 407–08 (E.D. Va. 1996). Courts have exercised discretion to impose non-Guidelines sentences based on the defendant's personal characteristics. *See, e.g.*, *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012) (premising below-guidelines sentence, in part, on defendant's "big heart and helping hand, which he extended without fanfare or self-promotion, to all with whom he came in contact"); *Adelson*, 441 F. Supp. 2d at 513 (premising downward variance, in part, on letters from "persons from all walks of life . . . attesting, from personal knowledge, to [defendant]'s good works and deep humanity," his "generosity of spirit," and his "integrity and generosity"). Similar considerations exist here for a man who has honorably served this nation for nearly forty years, and defended and safeguarded American interests and lives over that span. "For a half century of untiring, patriotic, principled duty, John deserves commendation, not condemnation." Ex. B-107 (Amb. O. Reich Ltr.)

### B. Ambassador Bolton's Record of Safely Handling Classified Information Reflects His Lifelong Commitment to National Security.

For more than four decades, Ambassador Bolton has been entrusted with the United States' most closely guarded secrets, serving at the highest levels of government during four

administrations. From his early tenures at USAID and the Justice Department to his critical roles as Under Secretary of State for Arms Control and International Security Affairs, Ambassador to the United Nations, and National Security Advisor, Ambassador Bolton has held the nation's highest security clearances. Throughout his career, he handled, analyzed, and protected Top Secret and Sensitive Compartmented Information (TS/SCI) on a daily basis. His decades-long track record of operating securely within these rigorous classification frameworks demonstrates a foundational respect for national defense information and a deep-seated commitment to this country's safety and security. As his longtime executive assistant attests, "[i]n my years working with Amb. Bolton at State Department and at the White House, he was always adamant that we follow the rules and instructions concerning policies that involved security and protecting classified information. There was no higher priority in our day to day operations than to protect intelligence and classified documents so our country was not compromised." Ex. B-117 (C. Samuelian Ltr.)

Ambassador Bolton's federal service has continually placed him at the center of the nation's most sensitive national-security operations. As Under Secretary of State, he spearheaded the Proliferation Security Initiative, President Bush's global effort that relied on highly classified, multilateral intelligence-sharing to intercept the illicit transit of weapons of mass destruction. Ex. B-60 (S. Hadley Ltr.) In that role, colleagues observed that he "properly and carefully handled the most important and sensitive information – that related to our nuclear weapons arsenal and our national missile defense – with the utmost integrity." Ex. B-139 (Prof. J. Yoo Ltr.) As one former senior DHS official explains,

> almost no one in America knows the true extent of Ambassador Bolton's commitment to our national security. There are programs, policies, and activities to which he has been privy that will remain unknown to Americans for decades, if not forever. You have *not* read about them in indictments, newspapers, or gossip, because Ambassador

> Bolton has been among the central figures protecting them — and, in turn, protecting the United States from its adversaries.

Ex. B-124 (M. Taylor Ltr.) In these and other roles, adhering to the strict procedures governing classified information was not merely an administrative duty, but central to his daily work.

His career in protecting sensitive information and criticizing others who were not careful make his lapse even more aberrational. Ambassador Bolton's letter addresses this disparity between his decades of care, his comments about others' mishandling, and his conduct at the heart of this case: "I spent much of my career enforcing and defending those procedures. I wince when I think of the criticisms I have made of others in senior positions for their actions akin to mine. I wince because hypocrisy, even inadvertent, is never defensible, and I have been guilty of it." Ex. A (J.R. Bolton Ltr.)

That Ambassador Bolton cared about protecting classified information is demonstrated by his adherence to the review procedures when he published *The Room Where It Happened*. After he left the Trump administration and sought to publish his firsthand account of working as National Security Advisor, he submitted—with the aid of counsel—his manuscript for prepublication review, "as required by regulations and agreements governing the employment of all officers with access to sensitive government information." Ex. B-33 (C. Cooper Ltr.) The review process was conducted, and ultimately approved, by the senior career official responsible for reviewing manuscripts of former NSC personnel. *Id.* As his counsel attests, "[o]ver the course of four months, John worked painstakingly and in good faith with Ms. [Ellen] Knight in revising the book to ensure that it contained no classified information." *Id.* Critically, Ambassador Bolton "did not authorize publication of the book until Ms. Knight had concluded that it did not contain classified information." *Id.* And *none* of the classified national defense information charged in this case was published in his book. *See* Plea SOF at 18. Throughout

the entire review process,[9] Ambassador Bolton exhibited "the highest standards of integrity." Ex. B-33 (C. Cooper Ltr.) In another colleague's "many years' experience working with Ambassador Bolton, [he] knew him to care about preserving the country's secrets. And in his many books and articles . . . he has show[n] the utmost fidelity to his oaths to protect national security information from unauthorized disclosure." Ex. B-115 (N. Rostow Ltr.)

Ambassador Bolton's history of doing things the right way and his long-standing stewardship of America's classified information support his "reputation for upright, law-abiding, and honorable character." Ex. B-33 (C. Cooper Ltr.) A lifelong commitment to protecting the United States and its intelligence is the truest reflection of his character—"a consummate national security professional." Ex. B-14 (Amb. L. Bloomfield Ltr.) His track record of safeguarding classified materials across his multiple federal and international posts offers important context for the Court, underscoring that his overarching intent and life's work have always been dedicated to the defense and security of America's interests. As Professor Yoo writes, "from everything I know of the man, he would never have intentionally harmed the security of the nation to which he has devoted his life." Ex. B-139 (Prof. J. Yoo Ltr.)

### C. Ambassador Bolton's Diaries Reflect His Effort to Create a Clear Record For History, Not an Effort to Subvert U.S. National Security.

This case is, to our knowledge, the first-ever classified information prosecution for keeping a private diary. Ambassador Bolton's diary had a distinct, important purpose: to create and keep a clear record for history and future historians. He has long been interested in the process of government decision-making, consistently believing that the best record comes from

[9] A full description of the prepublication review process can be found in a letter Ms. Knight's counsel submitted to the parties and filed with the court during that litigation. Ex. C (9/22/20 K. Wainstein Ltr.).

those who actually made the decisions. In fact, his senior essay at Yale focused on decision-making by the American, British, and French governments during the 1956 Suez Canal crisis.[10]

Ambassador Bolton intended his diary to be a personal record of his time as NSA for history's sake. He perceived his diary as his version of Secretary of War Henry Stimson's diaries (donated to Yale in 1948)[11]—a contemporaneous record of what actually happened throughout Stimson's public life. Memories fade, but recording what he did as it happened ensured that his actions would be protected against subsequent distortions, untruths, second-guessing or complete denial.

Additionally, because a diary reflects contemporaneous accounts of what actually transpired, it could serve as, in effect, a basis to inform subsequent manuscripts. That is the approach Ambassador Bolton followed with his first book, *Surrender Is Not an Option*, and then later with *The Room Where It Happened*. Although book writing, and the hoped-for but never certain financial results from it, served as one purpose, it was not Ambassador Bolton's primary (and certainly not only) reason for keeping a diary during his White House days.

As Ambassador Bolton knew well, there was ample precedent from other government officials who had kept diaries that they (or biographers) later relied upon to write their memoirs. For example, former National Security Advisor Zbigniew Brzezinski's memoir, *Power and Principle*, describes one of his book's sources as:

> my own notes on the more important events, which I dictated fresh, usually late the same night. Thus, all questions of verbatim remarks either by me or attributed to others that appear in this book are taken from the actual minutes of meetings or from

[10] John Bolton, *Cybernetics and Suez: A Case Study of Decision Making* (1970) (on file with Yale Univ. Library).

[11] *See* Henry Lewis Stimson papers, Yale Univ. Library, available at https://archives.yale.edu/repositories/12/resources/4819. Stimson's diaries span the years 1904 to 1945 and cover the entire period of his public career and include references to the early development of the atomic bomb.

> my notes dictated the same day. In no case have I used reconstructions attempted months or years later. In some cases, I quote my journal notes directly.[12]

Former Secretary of State George Shultz also kept personal diaries, noting that drafting his memoir required consulting "not just official papers that flowed in and out of my office, but *careful notes about my meetings* with key leaders and a *contemporaneous, on the spot record* of what went on in my office wherever I was, *my readouts of meetings* I attended elsewhere, *and my own musings* about what I thought there and then."[13] Shultz's diaries, as well as notes taken by his special assistant, Charles Hill, later aided historians in biographizing him:

> I had discovered in the archive materials an insider account [by Hill] of Shultz's first years as secretary of state. The voluminous diary . . . offered an unvarnished look at Shultz's protracted struggle to overcome his opponents, a brutal brawl that matched, and at times exceeded, other post-war White House power struggles.[14]

Similarly, former Secretary of State and National Security Advisor Henry Kissinger wrote in his memoir *The White House Years* that "[i]n writing this account I have tried to keep reliance on memory to a minimum; I have been able to refer to much documentary evidence and, for part of this period, *to a diary I kept*."[15]

Former presidents also kept private diaries during their administrations. For example, historian Douglas Brinkley's *The Reagan Diaries*[16] were President Reagan's contemporaneous presidential reflections. Brinkley writes that "[f]or several years after their return to California, the Reagans would often sit together after dinner, reading aloud from their

---

[12] Zbigniew Brzezinski, *Power and Principle: Memoirs of the National Security Adviser 1977-1981* at xv (Farrar Straus Giroux 1983).

[13] George P. Shultz, *Triumph and Turmoil: My Years as Secretary of State* at xi-xii (Charles Scribner's Sons 1993) (emphases added).

[14] Philip Taubman, *In the Nation's Service* at xiii (Stanford Univ. Press 2013); *see also* David Hoffman, *An Insider's View of Ronald Reagan's Dysfunctional Foreign Policy Team*, Wash. Post (Jan. 11, 2023), https://www.washingtonpost.com/books/2023/01/11/george-shultz-biography-philip-taubman/.

[15] Henry Kissinger, *The White House Years* at xxii (Little Brown & Co. 1979) (emphasis added).

[16] Douglas Brinkley, *The Reagan Diaries* (Harper Collins 2007).

*diaries* and reminiscing about their White House years."[17] Brinkley concludes, "[t]he power of the diaries is in their cumulative effect."[18] Published three years after President Reagan's death, his diaries recount, among other national-security topics, confidential National Security Council meetings concerning Soviet and Cuban activities in El Salvador; an intelligence report about Libyan leader Muammar Gaddafi; covert U.S. actions to block Cuban aid to Nicaragua and El Salvador; intelligence about Soviet activity in Poland; a CIA-led Situation Room briefing about El Salvador; and State Department requests to engage the Chinese about Taiwan.[19]

So, too, did President Carter rely on his diary for his memoir, *White House Diary*.[20] President Carter notes in the preface, "[d]uring my four years in the White House, I kept a personal diary by dictating my thoughts and observations several times each day. Some days I kept notes and dictated later. When time permitted, my secretary . . . would type the notes and file the pages in large binders." He added, "I seldom exercised any restraint on what I dictated because I did not contemplate the more personal entries ever being made public." Likewise, President Dwight Eisenhower kept a "private diary" of his time in the White House.[21]

These diaries and the many others written by high-ranking public officials reveal sensitive information and discussions about which they wrote. We cannot now say with certainty whether these writings did or did not contain classified information, nor are the references to other diaries intended to exculpate Ambassador Bolton. They are offered instead to help the Court understand his frame of reference in writing and sharing his diary solely with his wife and daughter. These numerous predecessors also inform Ambassador Bolton's intent to

[17] *Id.* at x (emphasis added).
[18] *Id.* at xii.
[19] *Id.* at 3, 36, 50, 55, 62, 69, 73, 83.
[20] Jimmy Carter, *White House Diary*, ix (Farrar, Straus and Giroux 2010).
[21] Douglas Waller, *The Determined Spy*, 337 (Dutton 2025).

record his reflections and accounts during his time as NSA for history's sake, as had many others before him. His keeping a personal diary was also informed by his misplaced view of the Presidential Records Act, 44 U.S.C. § 2201(3)(A), which expressly excludes personal "diaries" and "journals" from the definition of "Presidential records"—implicitly recognizing that presidents and their senior advisors have kept diaries throughout history (which is why government officials submit their writings to prepublication review). Ambassador Bolton kept a diary to recount his experiences and make a clear record for historical purposes, never to subvert or harm America's national security.[22]

### D. Ambassador Bolton Worked Cooperatively with the FBI to Disclose and Mitigate the Foreign Hack of His Email Account and In the Years Since Then.

In July 2021, Ambassador Bolton discovered that his AOL email account had been hacked by persons later determined to be Iranian operatives, posing as an office assistant to gain access after his password had been reset. *See* Plea SOF at 14. The hackers gained unauthorized access to a handful of diary entries (later deemed to contain some classified information). Ambassador Bolton directed his executive assistant to promptly report the incident to the FBI, *see* Ex. B-117 (C. Samuelian Ltr.), which occurred on July 6 and July 28, 2021. Indict. ¶¶ 55–56. FBI agents spoke with Ambassador Bolton, and on "at least ten different instances," his assistant recalls "the FBI asked to come to [the] office and speak with [them]," including "sitting down at both [her] and Amb. Bolton's computers" to examine their devices, "to see if anything looked suspicious," and review the security measures in place. Ex. B-117 (C. Samuelian Ltr.) ("we were in regular contact with the FBI concerning the hack.") Both he and his assistant made their devices (and their contents) available for inspection and review. His assistant recounts that Ambassador Bolton asked the FBI what he should do, "and one agent

[22] The impact of this purpose on Ambassador Bolton's requested sentence is further addressed in his supplemental classified submission provided to the Court.

suggested he delete all" personal emails during his tenure as National Security Advisor, "in case the hacker had not yet downloaded" them. *Id.* On July 29, 2021, Ambassador Bolton's assistant advised the FBI that he would delete the contents of the hacked email account. Indict. ¶ 57. As she tells the Court, "[i]t is [her] view that we cooperated fully with the FBI's requests then and that we did everything possible on our end to make sure our Office's computer and other systems were secure." Ex. B-117 (C. Samuelian Ltr.)

Shortly thereafter, Ambassador Bolton engaged a private IT security firm to assess existing security measures and any vulnerabilities and made security improvements following that review and after speaking with FBI, AOL, and Microsoft representatives. *Id.*

The hack of Ambassador Bolton's email account was part of Iran's efforts to assassinate him in retribution for the United States' successful strike against Qasem Soleimani, then-commander of the Islamic Revolutionary Guards Corps' ("IRGC") Quds Force, which occurred shortly after Ambassador Bolton had resigned as National Security Advisor. In response, Iran "issued a fatwa, a kill order on John Bolton" and other senior U.S. officials. Ex. B-102 (Amb. R. Pence Ltr.) As a result, President Biden then "placed [him] under Secret Service protection to guard against this threat," which was significant and real. Ex. B-14 (Amb. L. Bloomfield Ltr.) Even before the 2021 hack, Ambassador Bolton received a steady stream of "Duty to Warn" notifications[23] from the FBI of cyber and physical threats, beginning on October 30, 2020, followed by subsequent notices and warnings in 2020, 2021, and 2022, and continuing to the present. *See* Ex. D (2/20/26 DOJ Stipulations). Iran's threats to Ambassador Bolton remain active, evidenced by further communications with the FBI and its provision of duty to warn

---

[23] A "duty to warn" notice is a formal notification issued when an agency uncovers a specific and credible threat of imminent intentional harm, such as murder, kidnapping, or a violent attack, targeting a person, business, or organization. Office of the Dir. of Nat'l Intel., Intelligence Community Directive 191, *Duty to Warn* (July 21, 2015), https://irp.fas.org/dni/icd/icd-191.pdf. *See also Intelligence Agencies Have a "Duty to Warn" Endangered Persons*, FAS (Aug. 24, 2025), https://fas.org/publication/duty-to-warn/.

notices even during the pendency of *this case* on September 12, 2025 and May 13, 2026. In each interaction with the FBI, Ambassador Bolton did all that he was asked to do. *See* Ex. E (3/9/26 DOJ Stipulations). The threat level to him remains as it has been since late 2020, now perhaps even higher given the current U.S.-Iran conflict.

Because of his service to this country, Ambassador Bolton knows that he remains in danger from Iran's agents or proxies seeking to learn his "pattern of life." Ex. B-17 (G. Bolton Ltr.) In July 2021 when he voluntarily directed his assistant to contact the FBI about the email hack, he had every incentive and motivation to cooperate fully with them, to open up his computer files and email accounts, and ensure his safety and security had not been compromised by IRGC agents trying to learn his whereabouts or blackmail him. He continued to have direct contact with the FBI in the summer and fall of 2021, and until now, both at the office and by phone. Ex. B-117 (C. Samuelian Ltr.) During his cooperation, the FBI asked Ambassador Bolton to do or consider doing several things to aid their counterterrorism efforts against Iran, which he agreed to if they were needed or would be helpful. Ex. A (J.R. Bolton Ltr.) All told, Ambassador Bolton went to great lengths to disclose to law enforcement the Iranian hack and collaborated extensively for several years, with FBI counterintelligence and counterterrorism to help mitigate, detect, or thwart Iran-linked activities. *See* Ex. B-117 (C. Samuelian Ltr.)

DOJ revealed one manifestation of these threats in August 2022, when it unsealed criminal charges against an Iranian national for orchestrating an assassination plot against Ambassador Bolton. *United States v. Poursafi*, No. 1:22-mj-00176 (D.D.C. Aug. 23, 2022), ECF 1 at 28. DOJ charged Shahram Poursafi, a 45-year-old officer of Iran's IRGC, with a murder-for-hire plot in which he offered to pay a hitman $300,000 to "eliminate" Ambassador

Bolton in Washington, DC or Maryland.[24] The assassination plot was intended to retaliate for the January 2020 strike that killed Quds Force commander Qasem Soleimani.[25]

Despite these real threats to his and his family's life and safety, which had moved President Biden to restore Secret Service protection, President Trump terminated that protection on his Inauguration Day, January 20, 2025.[26] As the *Wall Street Journal*'s editors wrote, this decision "was raw vindictiveness, since we doubt Iran has given up on killing" Ambassador Bolton.[27] As a result, Ambassador Bolton must find ways to "bear the expense of around-the-clock private security" detail to protect himself and his family—a price he pays for his decades of federal service. Ex. B-33 (C. Cooper Ltr.); Ex. B-95 (W. Lytton Ltr.) ("The threat on his life is real and continues, requiring John to obtain, and pay for, his own private security simply to avoid being assassinated in retaliation for his service to this country.") That private security costs him and his family "upwards of seven figures annually." Ex. B-17 (G. Bolton Ltr.)

### E. Ambassador Bolton Did Not Disseminate National Defense Information to the Public at Large, the Press, or a Foreign Adversary.

Ambassador Bolton's conduct is significantly distinguishable from cases involving the willful dissemination of National Defense Information (NDI) to the public, the press, or foreign adversaries. *See* 18 U.S.C. § 3553(a)(6) (requiring the court to consider "the need to avoid unwarranted sentence disparities"). Ambassador Bolton pleaded guilty to one count of retaining classified information contained in his personal diary, which he shared with two people, his wife

[24] Press Release, Dep't of Just., *Member of Iran's Islamic Revolutionary Guard Corps (IRGC) Charged with Plot to Murder the Former National Security Advisor* (Aug. 10, 2022), https://www.justice.gov/archives/opa/pr/member-irans-islamic-revolutionary-guard-corps-irgc-charged-plot-murder-former-national.

[25] *Id.*; *see also* Editorial Bd., *The Brits Foil a Possible Terror Attack*, WALL ST. J. (Sept. 27, 2026), https://www.wsj.com/opinion/the-brits-foil-a-possible-terror-attack-f1c2d043 (stating the IRGC and its Quds Force "have plotted to kill former U.S. officials *John Bolton* and Mike Pompeo . . . . *The Tehran regime won't stop these attacks even if it signs a cease-fire deal to open the Strait of Hormuz*.") (emphases added).

[26] Kaitlan Collins, *Trump terminates John Bolton's security detail within hours of taking office*, CNN (Jan. 21, 2025), https://www.cnn.com/2025/01/21/politics/john-bolton-security-detail-trump.

[27] Editorial Bd., *Trump, Iran's Assassins and John Bolton*, WALL ST. J. (July 19, 2026), https://www.wsj.com/opinion/john-bolton-donald-trump-iran-list-security-secret-service-5294ef4c.

and his daughter. While this was a failure to adhere to the strict laws and regulations regarding classified materials, his actions were entirely devoid of malice, intent to harm America (or its allies), or a desire to compromise national security. When contrasted with notable cases of NDI mishandling or dissemination in this District or elsewhere, either under 18 U.S.C. § 793 or 18 U.S.C. § 1924 (Unauthorized Retention), Ambassador Bolton's case stands alone. His conduct lacks the profound culpability and devastating operational impact present in cases of intentional public or foreign disclosure.

**1. No Dissemination to the Public or the Press**

Ambassador Bolton did not declassify documents for the world, nor sell U.S. secrets. The disclosure of his personal diary was strictly intrafamilial, and the government does not allege that he shared the diary beyond those two individuals. Numerous recent and historical cases define what a true public compromise of NDI entails:

- ***Jack Teixeira*** (D. Mass. 2023): Deliberately uploaded hundreds of highly classified Pentagon documents to a public Discord server, exposing sensitive, real-time military assessments regarding the war in Ukraine—*sentenced to 15 years imprisonment*.

- ***Asia Janay Lavarello*** (D. Hawaii 2021): Retained documents classified at the Secret level in her hotel room where she hosted a dinner party with guests not authorized to see the NDI—*sentenced to 3 months imprisonment*.

- ***Reality Winner*** (S.D. Ga. 2017): Deliberately stole a classified intelligence report detailing Russian election interference and mailed it directly to a national news outlet for publication—*sentenced to 63 months imprisonment*.

- ***Edward Snowden*** (E.D. Va. 2013) and ***Chelsea Manning*** (2011): Each orchestrated the mass extraction and wholesale publication of hundreds of thousands of classified documents, exposing critical sources and methods to the global public.

Nor did Ambassador Bolton disclose sensitive materials to the media, as in these cases:

- ***Daniel Hale*** (E.D. Va. 2019): Downloaded and transmitted 17 Secret or Top Secret documents on U.S. military drone programs to a reporter or the reporter's outlet, which published the documents in whole or in part—*sentenced to 45 months imprisonment*.

- ***Henry Kyle Frese*** (E.D. Va. 2019): Leaked Top Secret/SCI NDI regarding a foreign country's weapons systems to two journalists; one reporter published several news stories based on the information provided—*sentenced to 30 months imprisonment*.

- ***Stephen Kim*** (D.D.C. 2010): Disclosed classified NDI about North Korea's nuclear missile capabilities to a member of the press—*sentenced to 13 months imprisonment*.

- ***Donald Sachtleben*** (S.D. Ind. 2012): Disclosed classified NDI to a member of the press (and distributed child pornography)—*sentenced to 140 months imprisonment*.

Unlike these individuals, Ambassador Bolton did not seek publicity, nor did he intend to publicize national secrets. Keeping his diary was strictly personal in nature, shared only with his immediate family, reflecting a lapse in information security rather than a deliberate betrayal of public trust or deliberate damage to our national security interests.[28]

**2. No Dissemination to Foreign Adversaries**

Equally critical is that Ambassador Bolton never harbored any intent to provide NDI to a foreign adversary, nor did he attempt to sell access to material later deemed classified. Cases involving transmitting NDI to foreign actors represent the most treacherous breaches of national security, driven by greed or ideological defection, none of which apply to Ambassador Bolton.[29]

In contrast, his entire career has been dedicated to *countering* foreign adversaries, not aiding them. Unique among computer hacking cases, Iran targeted Ambassador Bolton not seeking classified information but instead as part of malicious surveillance intended "to get hold

---

[28] In addition to the cases that were charged, there have also been disclosures to the media. For example, National Security Advisor Mike Waltz and Defense Secretary Pete Hegseth each shared sensitive operational and military plans about U.S. airstrikes in Yemen via Signal chatgroups (one of which reportedly included Secretary Hegseth's wife), but have never been charged. *See* Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, THE ATLANTIC (Mar. 24, 2025), https://www.theatlantic.com/politics/archive/2025/03/trump-administration-accidentally-texted-me-its-war-plans/682151; Greg Jaffe et al., *Hegseth Said to Have Shared Attack Details in Second Signal Chat*, N.Y. TIMES (Apr. 20, 2025), https://www.nytimes.com/2025/04/20/us/politics/hegseth-yemen-attack-second-signal-chat.html.

[29] *See, e.g.*, *United States v. Shirley*, No. 3:20-cr-21 (N.D. W. Va. Jan. 25, 2021) (offered Top Secret government documents to Russia in exchange for asylum—sentenced to 97 months); *United States v. Bergersen*, No. 1:08-cr-179 (E.D. Va. July 11, 2008) (passed Top Secret U.S. military material to a Chinese government official—sentenced to 57 months).

of his calendar for a potential murder hit."[30] *See supra* II.D. He never willfully transmitted, offered or intended for Iran or any other foreign actor to see his private diary. The extortion attempt made by these hackers (inaccurately described in their email to him as a threat to "disseminate the expurgated sections of [his] book," Indict. ¶ 58) underscores his status as a target of assassination or kidnapping, not a willing participant to sell out his country.

### F. Ambassador Bolton Has Accepted Responsibility for His Conduct and Worked Cooperatively With DOJ, the FBI, and the Intelligence Community Regarding Any Classified Information in this Case.

Pursuant to his Plea Agreement, Ambassador Bolton has worked cooperatively to debrief DOJ lawyers, the FBI, and the U.S. Intelligence Community ("IC") regarding the offense of conviction and all relevant conduct in this case. Plea Agreement ¶ 10. The purpose of that debrief was to review and mitigate any information deemed classified in this case—including how it was compiled, where it was held, and who it was shared with and when. That debrief occurred on August 12, 2026, and in a follow-up conversation with DOJ and the FBI on August 28, 2026. Ambassador Bolton will continue to work cooperatively with law enforcement and the IC to remediate any remaining issues.

Ambassador Bolton also agreed to provide the government with up to 100 hours of community service to assist in its efforts to identify and remediate issues related to the improper disclosure, handling, and/or retention of classified information by public officials. *See* Plea Agreement ¶ 11. Ambassador Bolton looks forward to contributing his insights as requested.

Both areas of law enforcement cooperation are relevant to the Court's consideration of Ambassador Bolton's conduct and justify a sentence of probation in this case.

---

[30] Editorial Bd., *Trump, Iran's Assassins and John Bolton*, WALL ST. J. (July 19, 2026), https://www.wsj.com/opinion/john-bolton-donald-trump-iran-list-security-secret-service-5294ef4c.

## III. THE REMAINING SENTENCING FACTORS SUPPORT A SENTENCE OF PROBATION

### A. A Sentence of Probation Would Not Create Unwarranted Sentence Disparities.

In fashioning any sentence, Courts shall "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In prior retention/mishandling cases of similar import, courts have imposed probation, often with far fewer mitigating circumstances. The Court should do the same here, especially because Ambassador Bolton, as part of his Plea, has already agreed to pay a significant penalty—a $2,250,000 fine, an amount far greater and more crippling to his family than similarly situated defendants in classified-information cases.[31]

In the case of former CIA Director David Petraeus, the court imposed a sentence of 2 years' probation and $100,000 fine for providing classified military information to a biographer with whom he was having an affair, pursuant to 18 U.S.C. § 1924—at the time, a misdemeanor offense with a 1-year maximum penalty.[32] *United States v. Petraeus*, No. 3:15-cr-47-DCK (W.D.N.C. Apr. 29, 2015), ECF 24 at 2. Petraeus retained eight "Black Books" that he had kept while serving as commander of U.S. forces in Afghanistan. The notebooks contained his daily schedules and classified and unclassified personal notes from his meetings, including identities of covert officers, war strategy, intelligence capabilities, and his notes of National Security Council meetings.[33] In both the Petraeus and Bolton cases, the retained classified material was

---

[31] In addition, if sentenced to incarceration, Ambassador Bolton would be ineligible for First Step Act earned time credits toward early transfer to pre-release custody or supervised release. 18 U.S.C. § 3632(d)(4)(D)(xv) explicitly excludes those convicted of espionage offenses—making Section 793 a disqualifying offense.

[32] At the time, 18 U.S.C. § 1924 (Unauthorized Removal and Retention of Classified Materials) was a misdemeanor offense with a 1-year maximum penalty. In 2018, Congress amended the statute, upgrading the offense to a felony with a maximum penalty of 5 years. FISA Amendments Reauthorization Act of 2017, Pub. L. No. 115-118, § 202, 132 Stat. 3, 19 (2018); *see* 18 U.S.C. § 3559(a)(4).

[33] Factual Basis at ¶¶ 17–18, *United States v. Petraeus*, No. 3:15-cr-47 (W.D.N.C. Mar. 3, 2015), ECF 3. Unlike in Ambassador Bolton's case where he has been forthright from the start, during an interview with the FBI, Director

not marked intelligence files, operational military plans, or stolen government databases. Rather, both officials retained personal records containing some classified information detailing their day-to-day experiences in top national security roles. Neither retained the material with malicious intent to do harm.

In both cases, the government acknowledged that the materials were never published to the broader public. *See* Plea SOF at 18 ("None of the classified national defense information charged in Counts One through Eighteen was published in BOLTON's book."); *Petraeus*, ECF 3 (Factual Basis) at ¶ 25 ("No classified information from the Black Books appeared in [Ms. Broadwell's] biography."). The transmission in both cases was limited to an exceptionally small circle of intimate, personal connections. In both instances, the retention was driven by a desire to chronicle their tenures for historical and/or biographical purposes. They both embody a highly uncharacteristic lapse in security by individuals whose careers were otherwise defined by protecting the United States. Given the factual similarities between the two cases, Ambassador Bolton should be treated proportionally for purposes of sentencing. And, he has agreed to a significantly larger financial penalty for his lapse than Director Petraeus.[34]

Similarly, the Court should consider former National Security Advisor Sandy Berger, who was sentenced to 2 years' probation, 100 hours of community service, and a $50,000 fine for unlawfully retaining and *removing* highly classified documents from the National Archives and deliberately *destroying* some of them, in violation of 18 U.S.C. § 1924.[35] The classified

Petraeus explicitly stated he had *never* provided any classified information to his biographer—a statement that was false. *Id.* at ¶¶ 31–32. Petraeus ultimately received a two-year probationary sentence for violating Section 1924.

[34] "Prison time would be especially unjust given the punishments for others who admitted to offenses dealing with classified information." Editorial Bd., *The John Bolton Plea Deal*, WALL ST. J. (June 4, 2026), https://www.wsj.com/opinion/john-bolton-plea-deal-classified-documents-donald-trump-0a24f831 (discussing the cases and sentences of David Petraeus, Sandy Berger, and John Deutch).

[35] *Sandy Berger fined $50,000 for taking documents*, CNN (Sept. 8, 2005), https://www.cnn.com/2005/POLITICS/09/08/berger.sentenced/.

documents retained in Berger's case, which related to the 9/11 Commission's investigation of the Al-Qaeda attacks, were ones he stole from the Archives after he left public office (in preparation for Congressional testimony). Recognizing the critical absence of malicious intent, the lack of any dissemination, and no tangible harm to America's security interests, the court resolved Berger's case with a non-custodial sentence of probation and a fine, establishing another key precedent for leniency here.[36]

Ambassador Bolton's conduct is also distinguishable from other cases in this District prosecuted under Section 793(e). In *United States v. Martin*, the defendant, an NSA contractor, was sentenced to 9 years in prison for systematically stealing an "astonishing quantity" of classified data over a two-decade period. No. 1:17-cr-69-MJG (D. Md. July 19, 2019), ECF 219.[37] Martin illicitly removed more than fifty terabytes of highly classified information (including TS/SCI material) and thousands of hard-copy Secret and Top Secret documents, including operational plans and targets, and stored it haphazardly in the trunk of his car, his home office, and even a garden shed.[38] At the time, it was reported to be "the largest case of mishandling classified documents in United States history[.]"[39] Ambassador Bolton, by contrast, did not engage in a decades-long campaign of bulk data theft, nor did he hoard raw intelligence files, marked classified documents, or operational military plans. The material here

[36] And while former CIA Director John Deutch was ultimately pardoned before any sentence could be imposed, he was set to be charged with a single Section 1924 misdemeanor for leaving classified information on an unsecured computer. *See* Carter Yang, *Congress Probes Pardon of Ex-CIA Chief*, ABC NEWS (Feb. 16, 2001), https://abcnews.com/Politics/story?id=121775.

[37] Martin pleaded guilty to one count of Willful Retention of National Defense Information, 18 U.S.C. § 793(e). He had a final adjusted offense level between 31 and 36. *See Martin*, No. 1:17-cr-69-MJG (D. Md. Jan. 3, 2018), ECF 72.

[38] Press Release, U.S. Dep't of Just., *Former Government Contractor Sentenced to Nine Years in Federal Prison for Willful Retention of National Defense Information* (July 19, 2019), https://www.justice.gov/archives/opa/pr/former-government-contractor-sentenced-nine-years-federal-prison-willful-retention-national.

[39] Scott Shane et al., *Trove of Stolen Data Is Said to Include Top-Secret U.S. Hacking Tools*, N.Y. Times (Oct. 19, 2016), https://www.nytimes.com/2016/10/20/us/harold-martin-nsa.html.

is a private diary regarding his day-to-day work as National Security Advisor, intended for historical record-keeping. The sheer volume and extraordinary scope of the intelligence material retained by Martin far eclipse that retained by Ambassador Bolton.

Furthermore, the nature of the retained information and resulting harm to national security sharply distinguish Ambassador Bolton's case from the conduct of Nghia Hoang Pho—a developer for the NSA's elite Tailored Access Operations (TAO) unit[40] sentenced to 66 months for downloading/saving highly classified U.S. cyber-weapons and hacking tools on his home computer between 2010 and 2015. *United States v. Pho*, No. 1:17-cr-631-GLR (D. Md. Dec. 1, 2017), ECF 9.[41] Because Pho's home network utilized a certain antivirus software, Russian-backed hackers were able to exploit his system and steal these elite cyber-tools. Then-NSA Director Mike Rogers told the Court that Pho's actions "resulted in *articulable harm* to intelligence-gathering initiatives used by NSA" and had a "*significant* negative impact" that put highly sophisticated intelligence methods at risk and cost the agency tremendous time and money to remediate.[42]

There are critical distinctions between Ambassador Bolton's case and Pho's conduct. Pho compromised the U.S. government's active, top-tier cyber arsenal, including materials and writings classified as Top Secret/SCI, with proven negative consequences for the government. Some of Ambassador Bolton's compromised emails contained excerpts from his diary regarding

[40] NSA's TAO involved intelligence collection from foreign information systems, as well as actions taken to prevent, detect and respond to unauthorized activity within DoD information systems and computer networks, for the U.S. and its allies. *See* Press Release, U.S. Dep't of Just., Former NSA Employee Sentenced to Prison for Willful Retention of Classified National Defense Information (Sept. 25, 2018), https://www.justice.gov/archives/opa/pr/former-nsa-employee-sentenced-prison-willful-retention-classified-national-defense.

[41] Pho pleaded guilty to one count of Willful Retention of National Defense Information, 18 U.S.C. § 793(e). He had a final adjusted offense level between 28 and 31. *Id.*

[42] *United States v. Pho*, No. 1:17-cr-631-GLR (D. Md. Sept. 18, 2018), ECF 20–21, available at https://static.politico.com/c6/f0/b5e202144eb681c25074550698f3/phonsaltr092018.pdf (letter dated Mar. 5, 2018) (emphases added).

his past executive branch discussions or deliberations. While his writings were later deemed to contain some classified information, the diary did not provide a foreign adversary with the operational means to attack U.S. networks or explicitly compromise U.S. intelligence sources. The profound difference in the operational sensitivity of the at-issue materials—and the different threat profiles presented by each—demonstrates why incarceration here, as compared to *Pho* and *Martin*, is entirely disproportionate. Ambassador Bolton's conduct, while a violation of classified information laws, lacks the sheer volume, operational sensitivity, and tangible harm to U.S. national security and intelligence methods warranting severe prison sentences.

Lastly, Shamai Leibowitz—an FBI linguist who pleaded guilty for leaking *classified FBI wiretap information* to an Internet blogger in violation of 18 U.S.C. § 798(a)—received a sentence of 20 months in prison.[43] *United States v. Leibowitz*, No. 8:09-cr-632-AW (D. Md. May 25, 2010), ECF 25. Unlike Ambassador Bolton, Leibowitz *disclosed* five Secret government documents. Critically, the recipient then published on his blog information derived from the classified material Leibowitz had provided—a key distinction compared to Ambassador Bolton's conduct. *See* Plea SOF at 18.

While recent prosecutions under Section 793(e) have resulted in significant terms of incarceration—such as a 46-month sentence for former FBI analyst Kendra Kingsbury and a 36-month sentence for retired Air Force Lieutenant Colonel Robert Birchum—Ambassador Bolton's conduct is fundamentally distinguishable in both the nature of the materials retained and the scope of the violation.[44] Both Kingsbury and Birchum systematically removed and

---

[43] Under the plea agreement, the government and Leibowitz agreed to a 20-month prison term as the appropriate sentence. Press Release, U.S. Dep't of Just., *Former FBI Contract Linguist Pleads Guilty to Leaking Classified Information to Blogger* (Dec. 17, 2009), https://www.justice.gov/archives/opa/pr/former-fbi-contract-linguist-pleads-guilty-leaking-classified-information-blogger.

[44] *See United States v. Kingsbury*, No. 4:21-cr-00101-SRB (W.D. Mo. 2021); *United States v. Birchum*, No. 8:23-cr-32-KKM-TGW (M.D. Fla. June 2, 2023), ECF 41. Birchum was also fined $25,000.

hoarded extensive amounts of classified national security documents and operational work product. Kingsbury took home hundreds of sensitive FBI intelligence reports over a decade, while Birchum unlawfully retained more than 300 highly classified Department of Defense and NSA documents—including TS/SCI materials detailing military operations and intelligence capabilities—storing them haphazardly in his home and other unsecure locations. Worse, the conduct of Kingsbury and Birchum to stockpile active defense materials represent a complete, years-long circumvention of the government's physical and electronic security procedures. By contrast, Ambassador Bolton did not steal or unlawfully remove raw intelligence files, operational blueprints, or agency databases—he retained a personal diary intended for historical record-keeping and other purposes.

Finally, the 2005 espionage case against Lawrence Franklin, a former Defense Department employee who pleaded guilty for passing classified documents to two employees of a pro-Israel lobbying group in violation of 18 U.S.C. § 793(d), is also distinguishable. Franklin was initially sentenced to nearly 13 years in prison and a $10,000 fine; however, after providing substantial cooperation to the government and other mitigating factors,[45] Judge T.S. Ellis reduced his sentence to probation, including ten months in community confinement, and 100 hours of community service (prosecutors had requested a reduced sentence of 8 years in light of his cooperation).[46] *United States v. Franklin*, No. 1:05-cr-00225-TSE (E.D. Va. May 26, 2010), ECF 906. In so doing, the court emphasized Franklin's community service should focus on "speak[ing] to young people about . . . the importance of the rule of law [], and how important it

[45] Two other individuals were indicted for illegally conspiring to gather and disclose classified national security information to Israel, in violation of 18 U.S.C. §§ 793(d), (e), and (g). In 2009, DOJ dropped all criminal charges against them, and the cases were dismissed.

[46] Josh Gerstein, *Leniency for AIPAC Leaker*, POLITICO (June 11, 2009), https://www.politico.com/story/2009/06/leniency-for-aipac-leaker-023671.

is . . . that public officials must obey the law," including "the importance of classified information."[47]

Ambassador Bolton's lack of taking or disclosing marked classified documents, his sharing his diary with only two family members, his submitting his book draft for prepublication review, his reporting the email hack to FBI, his decision to accept responsibility and plead guilty to save the government resources and the possible public revelation of sensitive information at trial, his truthfulness in dealing with the government's investigation, his cooperation since entering his plea, and his commitment to continue doing so, make his case unique and far different from those in which any sentence of incarceration was ordered.

**B. The Federal Bureau of Prisons Cannot Adequately Protect Ambassador Bolton from the Real, Ongoing Assassination Threats by Iran and Its Proxies.**

The Bureau of Prisons ("BOP") is structurally and operationally incapable of safeguarding Ambassador Bolton from the extraordinary, active threat to his life posed by Iran and its proxies. Federal correctional facilities are designed to manage routine penological discipline, inmate control and classification, and perimeter security, including standard correctional risks arising from prison dynamics, gang rivalries, or co-defendants. In stark contrast, the Iranian threat against Ambassador Bolton is an ongoing, well-documented, state-sponsored assassination campaign by the Tehran regime—as evidenced by DOJ's complaint in *United States v. Poursafi*.[48] It is also borne out by the "Duty to Warn" notifications Ambassador Bolton has received continuously from the FBI since 2020, including two recently. *See supra* II.D; Ex. D (2/20/26 Discovery Ltr.). BOP facilities are not security compounds built to counter foreign intelligence services with extensive financial resources, sophisticated intelligence

---

[47] Transcript of sentencing hearing, available at https://sgp.fas.org/jud/aipac/franklin061109.html (June 11, 2009).

[48] *Poursafi*, No. 1:22-mj-00176. The documented threat from Iran is captured in new reporting as recently as October 2026. *See* Edward Wong, *Iran in 'Advanced Stages' of Planning Attacks Against Americans, Officials Say*, N.Y. Times (Oct. 23, 2026), https://www.nytimes.com/2026/10/23/us/politics/security-warnings-iran-threats.html.

networks, long memories, and a proven track record of utilizing proxy operatives and domestic murder-for-hire schemes.

Within a fixed custodial setting, the routine operational vulnerabilities inherent to federal prisons create lethal exposure that BOP protocols cannot fully eliminate. Even in low- or medium-security facilities, persistent staffing shortages, the prevalence of illicit contraband, predictable inmate routines, and the vulnerability of facility personnel or others to external coercion render complete physical security impossible. A foreign adversary willing to offer hundreds of thousands of dollars for Ambassador Bolton's assassination can readily identify, recruit, or leverage individuals with access to his housing unit. *See* Ex. B-97 (Col. W. Martin Ltr.); Ex. B-48 (L. Freeh & R. Torricelli Ltr.) ("It is not beyond the reach of the IRGC to hire a federal inmate to execute the assassination. Prison security operations are not designed to prevent such a threat and would inevitably prove to be inadequate[.]") Moreover, placing Ambassador Bolton in protective custody or segregated housing would not only fail to address the systemic vulnerabilities of incarceration, but would also effectively subject him to the severe physical and psychological toll of prolonged solitary confinement. BOP lacks the specialized counter-surveillance, dedicated close-protection security details, and intelligence apparatus necessary to neutralize a persistent, state-sponsored assassination effort like the one against Ambassador Bolton. As the *Wall Street Journal* recently opined, "a jail term of any length runs the risk of assassination. It wouldn't take much for Iranians to bribe an inmate, or threaten relatives of an inmate or guard, to have Mr. Bolton killed while he's in custody. . . . If Mr. Bolton is killed in prison, the President and his Justice Department will be partly responsible."[49]

[49] Editorial Bd., *Trump, Iran's Assassins and John Bolton*, WALL ST. J. (July 19, 2026), https://www.wsj.com/opinion/john-bolton-donald-trump-iran-list-security-secret-service-5294ef4c.

### C. The Bureau of Prison's New Regulation About Inmates' Place of Imprisonment Gives the Attorney General Unbridled Discretion to Over-Incarcerate Ambassador Bolton Should He Be So Sentenced.

In May 2026, BOP quietly amended its internal guidelines (Program Statement 5100.08) to grant the U.S. Attorney General the unilateral authority to override BOP's prison facility assignments. Ex. F (5/6/26 BOP Change Notice: *Inmate Security Designation and Custody Classification*). Historically, BOP utilized a decentralized points system to determine where an inmate would go. Under the revised policy, the Attorney General may personally "designate or redesignate the place of a prisoner's imprisonment" at his exclusive discretion, bypassing the standard prison administrators. *Id.* at 1. Legal advocates and commentators warn that this shift in placement authority for federal inmates directly to the Attorney General risks politicizing the correctional system to favor political allies or penalize adversaries.[50]

BOP's change in inmate prison designation must be viewed in context here. President Trump's animosity toward Ambassador Bolton has been public since he left the administration and published his highly critical memoir. When Ambassador Bolton was initially indicted in October 2025, President Trump stated that he was unaware of the specific charges but summarily declared his former National Security Adviser a "bad guy."[51] When news broke that Ambassador Bolton would take responsibility for his conduct and plead guilty, President Trump expanded on his criticisms, attacking Ambassador Bolton's character and intellect, telling reporters, "I was never much of a fan of John Bolton. I never thought he was a smart

---

[50] Matteson Epstein, *Todd Blanche's New Grip on the Federal Prison System*, THE BULWARK (July 30, 2026), https://www.thebulwark.com/p/todd-blanche-ghislaine-maxwell-bureau-of-prisons-policy. This policy change has already drawn public and congressional scrutiny following the controversial transfer of Ghislaine Maxwell to a minimum-security facility following her interview with the DOJ. *See* Kevin Frey, *Democrats demand answers over DOJ's prison policy change tied to Ghislaine Maxwell*, MS NOW (June 12, 2026), https://www.ms.now/news/democrats-demand-answers-doj-prison-policy-ghislaine-maxwell.

[51] *Trump reacts to John Bolton indictment: 'He's a bad guy,'* NBC NEWS (Oct. 16, 2025, 4:50 PM), https://www.nbcwashington.com/video/news/national-international/trump-john-bolton-indictment-reaction/4003028/.

person[.]"[52] The President described Ambassador Bolton as "a bad guy," "a dirty guy," and "a very dishonest guy," adding that Ambassador Bolton is finally "paying the price" for being dishonest.[53] This is only the tip of the iceberg of what the President has said about Ambassador Bolton since he resigned on September 10, 2019, including in his legal efforts to suppress *The Room Where It Happened*. *See* Stipulation of Dismissal, *United States v. Bolton*, No. 1:20-cv-01580-RCL (D.D.C. June 16, 2021), ECF 72 (case dismissed with prejudice).

President Trump also mocked his policy record, claiming Ambassador Bolton "wanted to go to war with anybody that opened their mouth" and "always wanted to kill people in war, and that was okay for me, as long as I didn't listen to him, which I never did."[54] Following formal entry of his plea on June 26, 2026, the President publicly called for Ambassador Bolton to face severe punishment. Ex. G (6/26/26 *Truth Social* post). He stated his hope that Ambassador Bolton "will be dealt with harshly" by the justice system and escalated his personal attacks, calling Bolton "a very dumb, unbalanced, and unskilled former representative of the United States of America" and again framing him as a warmonger, calling him "a lunatic who only wanted to start trouble and wars, and who was a needless pusher of death and destruction wherever he went."[55] Needless to say, should Ambassador Bolton be sentenced to any incarceration, an Attorney General acting on the President's wish that he be "dealt with harshly" now has vested authority and full discretion to transfer the Ambassador to a harsher or more

---

[52] Steve Benen, *Trump Doesn't Do Himself Any Favors With New Comments On John Bolton's Criminal Case*, MS NOW (June 5, 2026), https://www.ms.now/rachel-maddow-show/maddowblog/trump-doesnt-do-himself-any-favors-with-new-comments-on-john-boltons-criminal-case.

[53] *Id.*; *see also* Donald J. Trump, Remarks and an Exchange with Reporters Aboard Air Force One En Route to Eau Claire, Wisconsin, Am. Presidency Project (June 5, 2026), https://www.presidency.ucsb.edu/documents/remarks-and-exchange-with-reporters-aboard-air-force-one-en-route-eau-claire-wisconsin.

[54] *Trump Doesn't Do Himself Any Favors, supra* n. 52.

[55] Sarah Davis, *Trump Rips Former National Security Adviser After Guilty Plea: "Hopefully, he will be dealt with harshly!"* THE HILL (June 26, 2026), https://thehill.com/homenews/administration/5943575-trump-rips-former-national-security-adviser-after-guilty-plea-hopefully-he-will-be-dealt-with-harshly/.

maximalist correctional facility, regardless of what the Court, BOP, or Probation may order or advise.

**D. A Sentence of Probation Allows Ambassador Bolton to Continue Being Available for His Wife and Other Family Members.**

Probation is also warranted under Section 3553(a)(1) to permit Ambassador Bolton to fulfill his essential responsibilities to his family, particularly his 81-year-old wife. At this stage of their lives, his presence at home is vital to his helping her navigate health and day-to-day household obligations. Ex. B-17 (G. Bolton Ltr.) Allowing Ambassador Bolton to live out his remaining days at home ensures he can continue to meet these indispensable family obligations while still subject to judicial supervision and full accountability.

Equally important, a non-custodial sentence allows him to continue to coordinate private security to protect his family from foreign threats ever since the President terminated his Secret Service protection. Ex. B-17 (G. Bolton Ltr.) ("This Administration has already imposed other hardships—punishments—on both John and [our] family even before levelling charges. . . . We now are forced to retain our own protection and to raise money to do so."); Ex. B-18 (J.S. Bolton Ltr.). Those threats will not go away if Ambassador Bolton sits in a federal prison.

**E. Just Punishment and Respect for the Law Would Not Be Served By Incarceration.**

A non-custodial sentence is consistent with Section 3553(a)'s mandate that a sentence be "sufficient, but not greater than necessary" to reflect the seriousness of an offense, promote respect for the law, and provide just punishment. In Ambassador Bolton's case, probation would best embody this foundational principle. "Just punishment" requires proportionality, both to the nature of the crime and the history and characteristics of the defendant. Ambassador Bolton's offense—retaining his personal diary containing some classified information—was a

breach in intelligence security, but it was completely devoid of the malicious intent, public exposure, or geopolitical betrayal that characterize the most serious lapses of national security. To incarcerate a man who has devoted over forty years across four administrations to defending the United States for keeping his diary would be a fundamentally disproportionate sentence. It would not take full account of a lifetime of exemplary public service.

Ambassador Bolton is not trying to avoid any punishment for his acts. Aside from the blot on his otherwise pristine record and attendant financial consequence, he agreed to pay a fine of $2,250,000—the highest fine ever agreed to for any similar offense. Plea Agreement ¶ 8. He has forfeited his forty-year government pension and his eligibility for government-sponsored healthcare for this offense. *Id.* ¶ 14. There has also been considerable negative impact on his family, including the search of his home last year. *See* Ex. B-18 (J.S. Bolton Ltr.) (during the home search, Ms. Bolton "was confronted by FBI agents in her bathrobe," "removed from her home," and "denied access . . . to contact anyone" for hours); Ex. B-17 (G. Bolton Ltr.) (same).

When a defendant suffers harsh collateral consequences from a conviction, the court may take account of those already being punished in fashioning a sufficient sentence. *See, e.g.*, *United States v. Blake*, 841 F. App'x 535, 539 (4th Cir. 2021). As John Martin, former U.S. Attorney and later District Judge for the Southern District of New York, observed in retiring from the bench:

> Every sentence imposed affects a human life and, in most cases, the lives of several innocent family members who suffer as a result of a defendant's incarceration. For a judge to be deprived of the ability to consider all of the factors that go into formulating a just sentence is completely at odds with the sentencing philosophy that has been a hallmark of the American system of justice.

John S. Martin Jr., *Let Judges Do Their Jobs*, N.Y. TIMES, A31 (June 24, 2003). Here, Ambassador Bolton's steep financial penalties, reputational damage, and the potential loss of

employment prospects are serious punishments that merit consideration under the Court's Section 3553(a) analysis. As former Congressman Adam Kinzinger writes,

> John has spent much of his adult life trying, according to his convictions, to make the United States safer and stronger. That service does not erase the circumstances that bring him before the Court, but . . . it should be an important part of the Court's consideration of the man who stands before it.

Ex. B-76 (Rep. A. Kinzinger Ltr.) Former Prime Minister of Spain, José María Aznar, tells the Court, "consider[ing] Ambassador Bolton's character, his years of service, and the positive impact he has had through his work . . . a sentence other than incarceration" is warranted. Ex. B-5 (J.M. Aznar Ltr.) And former Secretary of Defense Esper writes, "[c]onsidering the great and material service that Ambassador John Bolton has given to the country and the American people over many years and multiple administrations, I reiterate my request that you show [him] leniency in the form of a sentence other than incarceration." Ex. B-44 (Sec. M. Esper Ltr.)

Given Ambassador Bolton's age and other circumstances, a probationary sentence is a serious punishment, coupled with a significant fine of $2,250,000 and forfeiture of his government pension (contributed to over years of service) and federal healthcare program. The Supreme Court has recognized that a supervisory sentence imposes significant punishment. "Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty," including travel restrictions, reporting requirements, and regular home visits. *Gall*, 552 U.S. at 48–49. Ambassador Bolton will experience an adequately severe punishment if sentenced to probation and imposition of the agreed-to financial penalty. Additionally, as described *supra* III.B, BOP is structurally incapable of protecting him from Iran's active assassination efforts, or from opposing a custodial location designated by DOJ for reasons beyond sentencing factors. A non-custodial sentence is the only outcome that correctly balances strict accountability for his conduct with the extraordinary, real-world threats he faces.

### F. Incarceration Is Not Necessary for Adequate Deterrence or Public Protection.

The needs "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes," 18 U.S.C. § 3553(a)(2)(B)–(C), are served by a non-custodial sentence.

*First*, incarceration is not necessary either to protect the public or to deter Ambassador Bolton from committing future offenses. At age 78, the Ambassador is not a danger to society and has had a perfect pretrial services record since his arraignment. No one expects he will come before the bench a second time. Equally important, working with the prosecution team and the IC, Ambassador Bolton has already taken steps to debrief the issues of his improper retention and handling of classified information. *See supra* II.F. He has also agreed to work cooperatively with the government, for up to 100 hours, to assist with its law enforcement or intelligence efforts to identify and remediate similar issues of improper retention of NDI. *Id.*

*Second*, incarceration is not needed for general deterrence purposes. Ambassador Bolton has taken responsibility for his actions, and his case has garnered tremendous national attention. Imprisonment is not needed to send the community a message that public officials should not retain National Defense Information and must abide by strict information security protocols and handling rules. The large fine, collateral consequences of his plea, and the loss of public standing for such a revered and respected American patriot are powerful deterrents to any person who might find themselves similarly situated to Ambassador Bolton.

### G. Probation's Sentencing Recommendation and the Guidelines Provision for the Offense Are Inconsistent With the Plea Agreement and Are Non-Binding.

Ambassador Bolton objects to Probation's recommendation of 120 months incarceration, which is inconsistent with the terms of the Plea Agreement entered into between the government and Ambassador Bolton pursuant to Rule 11(c)(1)(C), and is an inaccurate reflection of

culpability and recidivism in this case. *See* PSR at 25–26; Ex. H (8/31/26 A. Lowell Ltr. to USPO). By its terms, the Plea Agreement stipulates a capped, non-guidelines sentence:

> Pursuant to written plea agreement and Rule 11(c)(1)(C), the parties stipulate and agree that a sentence of no greater than 60 months imprisonment in the custody of the Bureau of Prisons, and a criminal fine of $2,250,000 . . . is the appropriate disposition in this case. Under the plea agreement, the defendant may seek a non-custodial sentence. Such a recommendation or request binds the Court once the Court accepts the plea agreement. The Agreement does not affect the Court's discretion to impose any lawful term of supervised release or to set any lawful conditions of probation or supervised release.

PSR ¶ 4. Probation's recommended sentence of 120 months merely reflects the Guidelines' provision for the offense of conviction, *see* U.S.S.G. § 5G1.1(a), and is non-binding on the parties and the Court. The recommendation falls beyond the Agreement's terms, which caps the government from seeking a sentence of "no greater than 60 months imprisonment" and allows Ambassador Bolton to seek a non-custodial sentence. The Agreement's terms do not affect the Court's discretion to impose any term of supervised release or to set conditions for probation or supervised release. *Id.* Probation's recommendation of a $500,000 fine is also inconsistent with the Agreement's terms, which specifies a $2,250,000 fine here. *See* PSR at 25.

## IV. CLASSIFIED SUPPLEMENT

Ambassador Bolton's classified submission, filed contemporaneously, further describes the context for keeping his diary, written while in the White House, and why his resolving this case before trial prevented the risk of exposing sensitive material in the diary to defend himself and refute the government's allegations at trial, the contents of which could be embarrassing to the administration or damaging to current national policy. Because that pleading would cause the disclosure of limited information contained in his written diary which has been deemed to be classified, *see* ECF 88 (CIPA § 5 Notice), Ambassador Bolton submits that pleading in the appropriate manner via the Classified Information Security Officers.

## CONCLUSION

Vice President Pence tells the Court: "it is my fervent hope that you will see John Bolton as a patriot who has lived a life dedicated to our country and that the conduct for which [he] has taken responsibility will be significantly outweighed by a life of unwavering loyalty to the United States," meriting "leniency at sentencing so that John may live out his remaining days surrounded by family and friends and in continued service to the vital national interests and values of the United States." Ex. B-103 (VP M. Pence Ltr.) As Governor Hogan writes, "[i]t is my hope that Ambassador Bolton's strong history of public service and personal integrity will, on balance, prompt the Court to mitigate the sentence that the Court ultimately imposes." Ex. B-66 (Gov. L. Hogan Ltr.) Given Ambassador Bolton's acceptance of responsibility, and his distinguished and remarkable forty-year record of service to the nation, that sentiment comes across in each of the over 135 letters the Court has received. Their voices reflect the community's sense of justice. A probationary sentence would allow Ambassador Bolton to continue to serve the nation he loves, and that he has fought to defend and protect his entire life, while ensuring he is punished, but "not greater than necessary." After a lifetime of illustrious service and good works, Ambassador Bolton should never have to fear he will die in prison. After protecting this nation with such honor and distinction, surely this nation and our system of justice should protect him.

For all these reasons, a sentence of probation is sufficient to effectuate the purposes of sentencing in this case.

Dated: October 30, 2026

Respectfully submitted,

/s/ *Abbe David Lowell*
Abbe David Lowell (#11863)
David A. Kolansky (*admitted pro hac vice*)
Isabella M. Oishi (*admitted pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005
Tel: 202-964-6110
Fax: 202-964-6116
ALowellpublicoutreach@lowellandassociates.com
DKolansky@lowellandassociates.com
IOishi@lowellandassociates.com

*Counsel for Ambassador John Robert Bolton, II*