# Exhibit B, Part I

[B-1 through B-70]

**Exhibit B – Part 1 Index**


| Exhibit No. | Description | Page |
|---|---|---|
| **Exhibit B-1** | Abrams, Elliott Letter | 1 |
| **Exhibit B-2** | Agostinelli, Robert Letter | 4 |
| **Exhibit B-3** | Applegarth, Paul Vollmer Letter | 7 |
| **Exhibit B-4** | Ashe, Victor Henderson, II Letter | 10 |
| **Exhibit B-5** | Aznar, José María Letter | 12 |
| **Exhibit B-6** | Baker, James Addison, III Letter | 13 |
| **Exhibit B-7** | Barbour, Haley Reeves Letter | 15 |
| **Exhibit B-8** | Bardají, Rafael Luis Letter | 17 |
| **Exhibit B-9** | Barnett, Caroline Weil Letter | 18 |
| **Exhibit B-10** | Barry, John P., Jr. Letter | 25 |
| **Exhibit B-11** | Bernstein, Stuart A. Letter | 27 |
| **Exhibit B-12** | Bertini, Catherine Ann Letter | 29 |
| **Exhibit B-13** | Black, Charles Ray, Jr. Letter | 31 |
| **Exhibit B-14** | Bloomfield, Lincoln Palmer, Jr. Letter | 33 |
| **Exhibit B-15** | Blunt, Roy Dean Letter | 37 |
| **Exhibit B-16** | Bobbitt, Philip Chase Letter | 38 |
| **Exhibit B-17** | Bolton, Gretchen Letter | 41 |
| **Exhibit B-18** | Bolton, Jennifer Sarah Letter | 45 |
| **Exhibit B-19** | Bolton Enos, Joni Letter | 50 |
| **Exhibit B-20** | Borio, Luciana Letter | 52 |
| **Exhibit B-21** | Bowman, Karlyn Letter | 54 |
| **Exhibit B-22** | Boyd, Thomas M. Letter | 56 |
| **Exhibit B-23** | Bush, Charles G. Letter | 59 |

| Exhibit No. | Description | Page |
|---|---|---|
| **Exhibit B-24** | Carduner, Andrew S., II Letter | 60 |
| **Exhibit B-25** | Carson, Russell L. Letter | 61 |
| **Exhibit B-26** | Cash, William Nigel Paul Letter | 62 |
| **Exhibit B-27** | Chavez, Linda Letter | 63 |
| **Exhibit B-28** | Cheney, Elizabeth L. Letter | 65 |
| **Exhibit B-29** | Chikvaidze, David A. Letter | 66 |
| **Exhibit B-30** | Clark, Wesley K. Letter | 68 |
| **Exhibit B-31** | Cogman, Don V. Letter | 69 |
| **Exhibit B-32** | Comstock, Barbara J. Letter | 71 |
| **Exhibit B-33** | Cooper, Charles J. Letter | 73 |
| **Exhibit B-34** | Coughlin, Con Letter | 76 |
| **Exhibit B-35** | David, Jack Letter | 77 |
| **Exhibit B-36** | DeMuth, Christopher C. Letter | 79 |
| **Exhibit B-37** | Denysyk, Bo Letter | 82 |
| **Exhibit B-38** | DeSutter, Paula A. Letter | 85 |
| **Exhibit B-39** | Dickman, Murray Letter | 88 |
| **Exhibit B-40** | Diez, Andriana Letter | 92 |
| **Exhibit B-41** | Donatelli, Frank J. Letter | 93 |
| **Exhibit B-42** | Duncan Smith, Iain Letter | 95 |
| **Exhibit B-43** | Edelman, Eric S. Letter | 97 |
| **Exhibit B-44** | Esper, Mark T. Letter | 99 |
| **Exhibit B-45** | Fears, Douglas M. Letter | 101 |
| **Exhibit B-46** | Feith, Douglas J. Letter | 103 |

| Exhibit No. | Description | Page |
|---|---|---|
| **Exhibit B-47** | Forand, Edward J., Jr. Letter | 105 |
| **Exhibit B-48** | Freeh, Louis J. & Torricelli, Robert Joint Letter | 107 |
| **Exhibit B-49** | Fussner, Christopher Letter | 109 |
| **Exhibit B-50** | Galbraith, Peter Letter | 111 |
| **Exhibit B-51** | Gedmin, Jeffrey Letter | 113 |
| **Exhibit B-52** | Gillerman, Dan Letter | 116 |
| **Exhibit B-53** | Goldsmith, Jack L. Letter | 118 |
| **Exhibit B-54** | Golub, Harvey Letter | 120 |
| **Exhibit B-55** | Gora, Joel M. Letter | 121 |
| **Exhibit B-56** | Graham, William R. Letter | 123 |
| **Exhibit B-57** | Graham, Meredith Letter | 125 |
| **Exhibit B-58** | Grebow, Edward Letter | 127 |
| **Exhibit B-59** | Gruner, Anne C. Letter | 130 |
| **Exhibit B-60** | Hadley, Stephen J. Letter | 133 |
| **Exhibit B-61** | Hannah, John Letter | 135 |
| **Exhibit B-62** | Happer, William Letter | 137 |
| **Exhibit B-63** | Harris, David Letter | 139 |
| **Exhibit B-64** | Hertog, Roger Letter | 141 |
| **Exhibit B-65** | Hill, Elisabeth Letter | 143 |
| **Exhibit B-66** | Hogan, Lawrence J., Jr. Letter | 144 |
| **Exhibit B-67** | Holmes, Kim R. Letter | 145 |
| **Exhibit B-68** | Howarth, Gerald Letter | 147 |
| **Exhibit B-69** | Jenkin, Bernard Letter | 149 |

| Exhibit No. | Description | Page |
|---|---|---|
| **Exhibit B-70** | Joseph, Robert Letter | 151 |

**B - 1**

June 16, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I'm writing to you about the case of John Bolton, to urge that your sentence reflect the lifetime of public service that I have watched John perform.

Recently I had breakfast with John, something we've tried to do a few times a year since we both left the Bush administration in 2009. I simply drive over to the restaurant we choose. John cannot safely do that, because the Islamic Republic of Iran has threatened his life and like former Secretary of State Pompeo and former Chairman of the Joint Chiefs Gen. Mark Milley he needs 24/7 protection. Like Secretary Pompeo, he gets none from the federal government he served.

To me, that situation is in a way the culmination of the sacrifices he has made over the four decades we have known each other.

We met during the Reagan years, when my path at the State Department and his at State and other agencies crossed. In 1981 I was the assistant secretary of state handling UN affairs, and John was at the US Agency for International Development, USAID; the overlap wes the many development programs run by the United Nations.

He worked—whether it was for Secretary Shultz or Secretary Baker, Attorney General Meese or Attorney General Thornburgh, or President Trump— with the diligence for which he became well known. I remember well conversations with Secretary Powell about the

American Servicemembers Protection Act, because Secretary Powell said it was hopeless to think other countries could be signed up to agree to allow the United States, not the International Criminal Court, to try soldiers accused of crimes. Would they really sign "Article 98 Agreements" promising not to turn our people over to the ICC? John said he wanted to try; it was worth the candle to try protecting our troops. Powell thought it a waste of time but allowed John to try, so he put his shoulder (and his mind) into it, started flying to capital after capital—and as I recall it got an astonishing 70 countries to agree.

I cite this example because it shows John's willingness to do what he thought was best for our country even when higher officers disagreed. He did not curry favor, but tried to do what was right. Same thing at the United Nations, where it is easy to get along if you just go along. But his goal was not popularity at the UN or among his peers, nor was it favorable newspaper editorials. It was to protect the interests of the United States as in good conscience he saw them.

Where we worked together most closely was on the formation and launch of the U.S. Commission on International Religious Freedom. The Commission was established by the International Religious Freedom Act of 1998, and John and I were among the original Commissioners appointed. About this I would say two things. First, that John showed himself to be a committed champion of religious freedom, a powerful voice inside the Commission urging that we not succumb to pressures from the Administration, foreign embassies, or anywhere else in calling out religious discrimination. Second, he was the indispensable member because we were brand new. How does one start up a new commission? Get offices? Pay staff? Turn an authorization into an effective working institution? Those were legal and practical problems, and we all relied on John's judgment and dedication in getting the Commission off the ground.

Our last time working together was during the Trump first term, he as National Security Adviser and I as Special Representative for Venezuela and Iran at the State Department. We both knew how reluctant the President was to become involved in the struggle for democracy in Venezuela, but at every NSC meeting I attended John raised the issue and pressed it. He knew that he would meet resistance from CIA, DOD, and ultimately the President, but he felt it incumbent on him as a matter of national interest to keep raising the costs of inaction.

That is because he saw his job as protecting the nation's interests, not the President's. Indeed that is why he entered the administration, rather than turning down a position that he knew would not be easy and would be extremely unlikely to benefit him in reputational

or financial terms when it was over (given the longevity and difficulties of his predecessors in the previous 15 months). Saying yes was an act of patriotism, and when I would walk over to the White House to see John during that year, we would discuss the stresses and strains of these positions. I doubt he had one easy day.

But there is a reason John served every Republican president since Reagan, or perhaps better put why they all called upon him. He had a hard-earned reputation for integrity, patriotism, effectiveness, and dedication to the public interest. He was incorruptible—not only financially, but in the sense that he would not be swayed from principle by political or careerist advantage. Our executive branch functions well, when it does, because there are individuals of the highest talents who are willing to dedicate themselves to advancing the public interest. John did that when four presidents asked him to do so, and that is what I ask you to have in mind when sentencing him. Years after year after year of dedicated and conscientious public service has, I believe and urge, earned him that consideration.

Respectfully yours,

Elliott Abrams
Senior Fellow
Council on Foreign Relations

RHÔNE

B-2

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

Thank you for the opportunity to address the recent plea of Ambassador John Bolton in the case before your Court. I would like to appeal to the Court for the greatest leniency regarding the sentencing.

I felt impelled to provide you with personal knowledge and experience of the good Ambassador's conduct for over 25 years.

I have known him since his appointment as UN Ambassador by then President George W. Bush. During that time, despite frequent threats to his personal being, he was unyielding in his devotion to the national interest. You will recall this was a particularity difficult time post 9/11. Often when others of responsibility had the difficult task of defending our interests there was ambiguity. Not in his case.

Both in word and deed he stood tall on our nation's behalf.

Following his stint in office he became a senior adviser to our American-based international firm.

For two decades I've interacted with him as a fellow director on several operating company boards and in the conduct of our investor relationships, which included several of the largest sovereign wealth funds.

His conduct as a director was impeccable, responsible, and creative. His reasoned advice was always delivered and received with the highest weight, both by firm members and outsiders. Understandably given his prior decades of national service, he was often pressed for his advice, views, and sometimes information that might have been deemed sensitive. Never once in my experience did he ever remotely cross the line and was understood by others to never do so.

We travelled together extensively throughout Asia, including Japan, Korea, Taiwan, China and points south.

We meet not only senior officials on the investment side but heads of state, various ministers and government delegations. Here it was the same, he would offer guidance and support but always aligned to American interests.

The warmth and regard these leaders held him in was at times awe-inspiring. They frequently commented on his honour, integrity, and depth of nuanced knowledge of both global issues and the specific issues each of them faced, always putting the best foot of America first.

RHÔNE GROUP LIMITED [redacted] TEL [redacted]

AUTHORISED AND REGULATED BY FSA. REGISTERED OFFICE AS ABOVE. CO. N° OC323649

In our time together we met no less than 11 heads of state - he was esteemed by all for the same. Despite his obvious conservative leanings, it never mattered to anyone, for his was a principled approach, given due consideration by both sides of the divide.

The same held true throughout Europe, Great Britain, and the Gulf.

I have had the separate honour of joining him as a fellow founder of a group of national-interest leaders in the Friends of Israel Initiative. This has required beyond our business relationship a shared necessity to expose ourselves in defence of Israel.

Again, one would marvel how he was able to bring to bear the paramount interest of the nation while protecting the legitimacy of Israel, a role he similarly played in his defence of Taiwan and South Korea. In the latter cases, I witnessed leaders of both nations and their colleagues in tears of thanks to him.

Whether on issues of American alliances such as NATO, or national defence, he was routinely summarily called upon by these leaders for his counsel. It was a joy, and reassuring as an American citizen, to observe this in motion.

This of course was all before the Trump administration appointment. I have known President Trump since the early 1980s. A businessman of relentless energy and like all of us, a nature particular unto his own.

When it became clear that the Ambassador was to be considered for a post in the cabinet (at the time NSA, Defence or State). This was the ultimate achievement in a career dedicated to public service.

The Ambassador and I spoke about what this would mean as a day-to-day behavioural matter. He understood and firmly believed, no matter what, that he could be an important hand at the tiller, at the highest level of the executive branch, to ensure both our Constitutional priorities, and the decision-making would take on a balanced and rational perspective. Again, no one could be better placed to bring to bear that depth of experience and knowledge to offer up to a POTUS. He viewed this as his utmost sacred duty. And on my numerous trips to the West Wing, or to events in Europe while he was in office, you could observe this in the teeth of the moment.

This man is innately wholly incapable of violation of this trust.

He would anguish over anything that would wound the pride, glory, or ultimate interest of the United States, for he views his protection thereof with religious fervour.

The ultimate disgrace is that immediately after leaving his position as National Security Advisor, President Trump immediately removed his Secret Service protection, normally accorded for a reasonable period after leaving the government. While traveling with him as I did in periods of active business engagements, national government leaders offered him their personal security as a testimony of their high regard for him. In light of the Iranian threats to several former government officials, including President Trump, President Biden restored his protection in late 2021. Just when President Biden was doing so, I witnessed his being called at our New York office by the Secret service asking him his location, informing our staff to lock down office, and for him to remain there away from doors. They arrived shortly thereafter in full force and for a sustained

period, which I also experienced for a sustained period, since this level of attention was constant at home and abroad.

Then, on the inauguration day of the second Trump administration, his Secret Service was entirely removed for a second time, leaving him at boundless risk. At this very moment, he is not being given secret service security at a time that he is a known target of the fanatical Iranian regime. This is not supposition, but a real-time fact. This decision impaired his ability to maintain his livelihood in his role as senior adviser and on the speaking circuit, unless he paid for personal security, never as assured as the Secret Service.

Finally on a personal note as an illustration of the man's breadth of decency. In 2008, while attending my firm's annual general meeting in Paris, I learned that my 16-year-old son had perished in a school expedition in the Himalayan mountain range. Holding aside the depth of anguish for the family, the Ambassador calmly and assertively took control of every element of the process. His passion, care, and leadership were for me the ultimate example of his humanity, grace, and dignity.

Your honour, there is right and wrong in this world, and you no doubt see more of this in every nuance daily, and one appreciates the weight you bear.

I only urge you to consider this attestation to character and goodness in light of all the facts.

He is a patriot and a great American and has already made a substantial restitution to the government. Please consider this reasoning and determine to allow him to move forward with the modicum of dignity deserved.

Yours respectfully,

Robert F. Agostinelli
Chairman

RHÔNE GROUP LIMITED [redacted] TEL [redacted]

AUTHORISED AND REGULATED BY FSA. REGISTERED OFFICE AS ABOVE. CO. Nº 4054446

**B-3**

Honorable Paul V. Applegarth
[redacted]

July 5, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I have known John Bolton for 60 years. We met shortly after he entered Yale, when I was already a student there. We maintained a relationship during college, and following my graduation, service in Vietnam, and our subsequent careers. Unlike John, my career has been primarily in the private sector., but we both served in the Reagan and Bush 43 administrations.

During the sixty years we have known each other, we have agreed on many things but have disagreed on some. Importantly, at no time did I feel that John's position, expressed in direct conversations or in one of his prolific op-eds, was influenced by other than his view of what was best for the country, rather than what was best for him personally.

Much of my own career has been spent working in, helping to develop, and investing in emerging markets. During that career, I've had the opportunity to meet leaders such as Nelson Mandela, and to work with and in several cases become friends with some leaders of other countries who are less well known, but who also stood up for what they believed, fought oppression, and initiated transformative reforms of their countries. I have also had the opportunity to work with some ordinary

individuals with similar courage, including a Chinese woman who watched her grandfather tortured in the village square by the red guard, friends of people at Tiananmen Square, an environmental leader who led protests in a Soviet Republic during the years of USSR domination, and a woman smuggled out of East Germany in a car trunk.

Each of them was a patriot in their country and suffered for doing what they considered to be right. John Bolton reminds me of them in his willingness to put country above himself.

A specific example of this is a phone call we had the morning that President Trump asked him to be National Security Advisor. John was still considering whether to accept the offer. I reminded him that senior New York bankers had cut off lending to Trump in the early 1990's, and that several good people had already been fired from his new Administration. We agreed that his role in the Administration might end badly. However, he felt that he owed it to the country to accept the offer and try to do his best, notwithstanding the risks.

In closing, in addition to commenting on John's character, I feel compelled to comment on the proposed settlement's terms.

John and I were serving in the George W. Bush administration when former national security adviser, Sandy Berger took all of the physical copies of certain confidential documents from the National Archives and subsequently lied by denying he had done so. (In contrast, John simply made notes for his diary from some documents.)

Even though Mr. Berger was a Democrat, the punishment he received from the Republican Bush Administration was only a requirement that he plead to a misdemeanor violation, pay a fine of only $50,000, serve two years of probation, temporary loss of his security clearance, and community service.

John has already agreed to pay a large fine. Against the precedent of the Berger case and some other similar recent examples, the idea that John

Bolton might be sentenced to jail seems egregious. It would be out of proportionate to the punishments received by others in similar circumstances, and legitimize the campaign currently being pursued by the Trump administration, where retribution rather than justice seems to be the objective.

Finally, if it is within the Court's discretion and for similar reasons, I would encourage it to reject and reduce the terms of the financial settlement.

Yours very truly,

Paul V Applegarth

**B-4**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

July 20, 2026

Dear Judge Chuang,

I am writing to urge you to show leniency to Ambassador Bolton as you consider what sentence to impose on him. I hope it does not include incarceration.

John and I first met when we were both students at Yale University and members of the Yale Political Union. He was actively involved and attended meetings on a regular basis. Later on (many years later) I supported efforts to allow alumni to sign a petition to allow alumni to seek a seat on the Yale Corporation which process had been abolished by Yale. John, as a fellow alumnus, was supportive and active in making it possible for all alumni to be involved. In today's world this is especially important.

I got to know John again when I had been nominated by President George W. Bush to be Ambassador to Poland. During the confirmation process, I met with various leaders in the State Department to improve and add to my understanding of issues impacting Poland and the United States.

At that time he was under Secretary of State for arms control and international security affairs from 2001 to 2005. I met with him in 2004 when he took time to meet with me for long one on one session which brought me up to speed on missile defense issues involving Poland and Eastern Europe. Having not had a background in those issues but having been Mayor of Knoxville for 16 years, I needed as much background as possible not to prepare for my Senate hearing but also for my duties as Ambassador to Poland once I took up my post assuming confirmation.

What impressed me most was both the time he took with me as we had not known each other previously and his interest in making sure I was as well informed on the ramifications of the missile defense issues as possible.

Afterwards he would reach out to me after I went to Poland to see how I was doing and what questions I might have along with background. This above and beyond what other senior diplomats did with me and I found it most helpful and valuable.

He had nothing to gain by this, and I benefited immensely from the insights he provided. His character was most instructive to me.

I want to thank you for considering this letter.

Sincerely Yours,

Victor Ashe
Former Amb to Poland 2004-2009
Former Mayor of Knoxville 1988 to 2003

OFICINA DEL EXPRESIDENTE DEL GOBIERNO JOSÉ MARÍA AZNAR
OFFICE OF THE FORMER PRIME MINISTER OF THE SPANISH GOVERNMENT JOSÉ MARÍA AZNAR
**B-5**

June 25th, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to respectfully ask that you consider showing Ambassador John Bolton leniency and that, in determining his sentence, you consider an alternative to incarceration. I make this request based on my many years of knowing John, my respect for his character, and my appreciation for his long and dedicated service to public life.

I have known Ambassador Bolton for many years through our shared engagement in international affairs and through our work together on the International Advisory Board of the Atlantic Council. Over the years, we have had the opportunity to exchange views on major global challenges and to work alongside one another in support of strong transatlantic relations and international security. In our years of collaboration at the Atlantic Council and through our broader professional relationship, I have witnessed his commitment to public service, his dedication to the security of his country and its allies, and his willingness to engage with complex challenges with seriousness and determination.

Beyond his professional achievements, I have valued him as a person of integrity and loyalty. His decades of service represent a significant contribution to public life, and I believe that those who have worked with him understand the commitment and sacrifice that such a career requires.

I respectfully ask that you take into consideration Ambassador Bolton's character, his years of service, and the positive impact he has had through his work when determining his sentence. I believe that a sentence other than incarceration would be an appropriate consideration.

Thank you very much for your time and for considering my perspective.

Respectfully,

[redacted] Tel. [redacted]

JAMES A. BAKER, III
[redacted]

**B-6**

July 6, 2026

Dear Judge Chuang:

I am writing to express my support for Ambassador John Bolton, who I have come to admire and greatly respect during the almost five decades I have known him. I ask that you take my reflections upon John into account during the sentencing phase of his criminal trial because I believe he deserves leniency and certainly not incarceration.

John has played important policy and political roles for me since 1978, when he worked on a difficult legal matter for my losing campaign for Texas attorney general. Though we lost that legal case, I was impressed with both his immense legal skills and desire for a job well done. Along the way, I also learned that John is an indefatigable patriot with an unrivaled passion for our nation.

Knowing that success in any endeavor depends on the people who do the work, I repeatedly reached out to John during my 12 years working for Presidents Ronald Reagan and George H.W. Bush and later regarding other matters.

Shortly after becoming White House chief of staff to President Reagan, I brought John on board to serve in the White Houe Counsel's office right after The Gipper's first inauguration. Shortly thereafter, I approved his move to become General Counsel of the U.S. Agency for International Development, where he served in several positions.

John then accomplished a string of successes for President Reagan and Bush that culminated during the time he worked for me when I was U.S. Secretary of State after President Bush nominated him Assistant Secretary for International Organization Affairs, a position he held from 1989 to 1993. During that tumultuous period at the very end of the Cold War, John served his country admirably on matters ranging from the first Iraq war to the Arab-Israeli dispute to the conflict in Bosnia-Herzegovina.

Along the way, John always strived to find foreign policy solutions that both served the United States while considering the needs of both our allies and adversaries.

A highlight of John's time at the State Department came when Saddam Hussein invaded Kuwait in August 1990 and our unrelenting focus for the next ten months was in repelling this unprovoked aggression, restoring Kuwait's

independence, and peace and security in the Middle East. I collaborated closely with John as the U.N. Security Council turned out one resolution after another, condemning the invasion, imposing the most extensive economic sanctions in U.N. history on Iraq, and more. It was a difficult moment of diplomacy that required a deft touch, something John has demonstrated throughout his career in public service.

Our U.N. efforts culminated in Security Council Resolution 678, which authorized the use of force to oust Saddam's forces. This was the first Security Council resolution to authorize force since the 1950 Korean War, and an important moment in our efforts. The United States was president of the Security Council at the time, and I went to New York myself to chair the meeting that adopted the resolution, on which John expended so much effort.

Since then, John has played two critical roles for me after I left government service in 1993. In 1996, when then-UN Secretary General Kofi Annan asked me to help in resolving the long-standing dispute over the former Spanish colony of the Western Sahara, John was the first person I recruited to assist me. And he did so by meeting my requirement that we would not accept compensation from the United Nations. Then, in 2000, John held a key position for me when I headed Texas Gov. George W. Bush's legal case in Florida that helped him become president.

As you deliberate John's sentencing, I hope you will take into account his vast service to our country. He is an honorable man who has lived his long life according to his convictions.

Thank you for considerations. And I hope you will show John leniency.

With respect,

Sincerely,

James A. Baker, III

The Honorable Theodore D. Chuang
U.S. District Court
Districts of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

**B-7**

Dear Judge Chuang,

Your Honor, I have known Ambassador John Bolton since the early 1970s, when we both worked for Republican organizations. He was well regarded by his acquaintances and peers.

John Bolton had a good reputation because he earned it. He was known to speak in depth about public policy issues and to compare the opposing arguments in detail. He won most arguments on policy because he could explain the issues and the value of the competing positions.

In those early days, Bolton was not just a talker and explainer, he was a doer. He was a superior manager. In the '90s, when I was chairman of the Republican National Committee, I hired John to organize and then run the GOP's National Policy Forum. In the course of more than two years the organization conducted more than 60 forums on a variety of public policy issues around the country.

A myriad of GOP Governors, Senators, Congress members and other policy experts participated. Bolton did a masterful job of running not only the forums, but he oversaw the printing of the book, *Agenda for America*, which explain GOP policy positions on 13 different subjects, *Agenda for America* was an preface for the 1996 GOP National Convention Platform.

Whether Republicans had the White House or not, John Bolton was a strong voice on public policy. And he still is. His columns are widely published and well read.

Ambassador Bolton has had a life of public service. He could have chosen an easier and more financially remunerative career. Instead, he chose public service and made a real contribution to our country.

Those of us who have known and worked with John Bolton over the decades know he is a man of integrity and high intellect but also good hearted, generous man. He has strong convictions, but he doesn't try to force them on his fellow citizens. He makes his ideas known in a respectful way and does not try to ramrod his conclusions down listeners throats.

I have worked with hundreds of people in politics, government, and the media in the last 60 years. John Bolton is one of the very best: honorable, loyal brilliant but not overbearing, patriotic, talented in thinking but also a fine manager, He is an astounding American.

Sincerely,

**Haley Barbour**

Former Governor of Mississippi (2004-2012)

Chairman of the Republican National Committee (1993-1997)

Political Director of the White House (1985-1987)

Executive Director of the Mississippi Republican Party (1972-1977)

State Director of Census for Mississippi (1969-1970)

**B-8**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I´m writing to you to kindly ask you to consider showing leniency to Ambassador Bolton in determining his sentence and consider an alternative to incarceration. I´m making this request based on my personal relationship with John Bolton over the years in which we have collaborated in many fronts.

I met first time John in 2002 when he was serving under President George Bush, and I was National Security Advisor to the government of the Kingdom of Spain. After that, I met several times John and invited him to meetings in Spain and Europe when I was director of foreign policy to the FAES Foundation, at the time the official Foundation of the Popular Party in Spain. From 2010 I acted pro bono as executive director of the Friends of Israel Initiative, a charity based in the US with global outreach, joining non-Jewish leaders, former PM and ministers as well as businessmen and intellectuals, from places going from Colombia to Australia, and John was kind enough to accept being part of this organization as a founder member.

On that capacity, we have attended closed doors meetings with representatives from different governments, including Israel, but mainly in Europe and Latin America, and John Bolton participated in many of them. I have to say that he always showed the highest degree of professionalism and kept all confidentialities that were requested in many meetings. He always demonstrated his love for his country, promoted what he considered to be the best interests of the United States of America, and worked to make his country and the Western allies a safer place.

Not only I respected his opinions but above all the manners he conducted himself. John always proved to be not only a great professional, but well respected internationally, trustworthy, and extremely careful with the information we were presented during our close doors and private meetings.

In these 23 years I have been actively collaborating with John, including during his service as National Security Advisor to the President of the United States, I could observe firsthand his professionalism, his dedication to public service and his integrity. As a former National Security Advisor, I know how complex this kind of jobs are, and to what extend the works demands a high degree of personal sacrifice for the common good. In that respect I can only show admiration for John as a person and as professional.

It is because all of this that I respectfully ask that you take into consideration the long career, his years of service to the public in the US as well as the international role he achieved to play at the World stage when determining his sentence. I do sincerely believe that a sentence other than incarceration would be an appropriate alternative to consider.

Respectfully,

Rafael L. Bardají

**B-9**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

June 25, 2026

Dear Judge Chuang:

I write on behalf of John Bolton to urge you show compassion and leniency in sentencing for this honorable and patriotic man. His distinguished public service over his lifetime is most deserving of mercy. While his good deeds and professional accomplishments are well known, I write offering my perspective as his longtime aide of over 25 years. I worked directly for John from 1981-2006 and have known him for 45 years. Despite the circumstances, I admire and respect him and care deeply for his well-being.

My long association with John began in 1981 when he hired me as an assistant in the office of General Counsel at the US Agency for International Development (USAID.) This would be the first of eight appointments and advancements where I reported directly to John. In 1982 he promoted me to Special Assistant to the Assistant Administrator for Policy and Programs of USAID when he was confirmed by the Senate and assumed that role.

My third appointment with John came in 1983 when he hired me as his Deputy Executive Editor of the 1984 Republican National Convention Party Platform. This was a complex course in managing people with competing viewpoints. We worked to compile the Party Platform which culminated at the National Convention in 1984 and was ratified by the delegates.

In late 1985 John was confirmed as Assistant Attorney General for Legislative Affairs at the Department of Justice (DOJ). He appointed me as his Special Assistant. We traveled frequently to Judiciary Committee hearings and meetings with members of the Senate and House, shepherded judicial and other nominations through Senate confirmation, including four Supreme Court nominees. John later advanced within the DOJ to Assistant Attorney General of the Civil Division, and I followed as Special Assistant.

In 1989, John was confirmed as Assistant Secretary of State for International Organizations Affairs where I also followed as Special Assistant. I enumerate all these positions to emphasize I worked closely with him and knew him well. I witnessed the major moments, the minor ones and the day-to-day. I saw the standards by which he worked and interacted with people. I was proud, honored and privileged to serve with him. I held tremendous respect for John's character, his commitment, his work ethic, his political and diplomatic skills, his allegiance to the Administrations he served, and his loyalty towards his staff. He fostered my professional development, assigned me substantive and meaningful work, and I always felt he had my back.

Some years later, I recall that former Secretary of State Condoleeza Rice said of his staff, we would "walk through a wall for him." This was true of me.

One illustrative example of John's commitment to principle and moral fortitude, and a significant event from 1991, was the repeal of UN resolution 3379 in the General Assembly, the Zionism is racism resolution, originally passed in 1975. Through relentless effort to correct a wrong that many at the UN thought was simply a resolution "gathering dust" and not worthy of revisiting, John persuaded delegation after delegation to vote to strike it down. Due to his leadership and dedication, John led the all-hands-on deck effort, and the resolution was overturned by large margin.

In 1994-96, John served as president of the think tank, The National Policy Forum, and appointed me as Executive Editor of its policy journal Common Sense. The trust he put in me to fill a position I considered to be a reach was gratifying and uplifting. Time and again he made me feel I could fulfill challenging professional positions because of his mentorship and perpetual support. I should add, I got married in 1995 and had a baby in 1996, and John continued to support my work within the NPF. He allowed for me to bring my newborn to the office while I worked on the Journal. Years before remote work was practiced as it is today, this arrangement developed, with my great appreciation.

In 2001, I returned to the State Department as Special Assistant to John who was nominated and confirmed as Undersecretary of State for Arms Control and International Security. I was on call at all times and was given a broad portfolio. We held a relationship of trust.

On September 11, 2001, when we saw the fireball engulf the Pentagon and realized we were under terrorist attack, John did not leave the Department for more than 12 hours. Many of us went home to our families, and despite the dire concerns, John stayed to serve the Secretary of State. During the months and years that followed, our office had three shifts of staff assistants daily to advise and support John. His day in the office started at 6am after having already read news and email. He emailed often at 4:30 am, and at no time did a problem or issue I raised go unaddressed. He was fervent about his obligations to and role in serving the Administration. In 2005 John was appointed Ambassador to the UN and relocated to New York. While I stayed in Washington, he brought me to New York often, for the UN General Assembly and for assignments in protocol.

Noteworthy to add, in 2005 when John was nominated to be U.S. Permanent Representative to the United Nations, but was ultimately not confirmed by the Senate, though appointed by the President, I compiled and organized signatures to a letter to the then Chairman of Senate Foreign Relations Committee. The letter was drafted by a former colleague from USAID attesting John's courage and conviction, his leadership, his forceful policy advocacy, his personal honesty and integrity, intellectual clarity, and more. I maintain this letter as well a multitude of communications sent to me by a diverse group of career and non-career former colleagues from USAID, the DOJ and DOS who unequivocally supported John's nomination. I also maintain a 2-inch-thick file of letters of endorsements from 44 former colleagues from the American

Enterprise Institute and all manner of groups too numerous to list. The breadth and depth of the expressions is heartwarming and the volume staggering. Attached to this letter, please find one such example of a broad endorsement for John, dated May 6, 2005, sent to Senator Richard G. Lugar, Chairman of the Senate Foreign Relations Committee and signed by Former Secretary of State Lawrence S. Eagleburger.

In 2006 I retired from professional life to raise my children and care for my ailing parents. I have converted the professional relationship to a friend of John and his family. For the nearly 20 years since, my family and his gather traditionally on Christmas Eve. We attend each other's milestone events and continue to maintain a personal, family relationship that I treasure.

I conclude by reiterating my request for compassion and leniency at sentencing for this good and honorable man and allow him to live in the company and comfort of his family, writing, reflecting, and freely speaking on the important national security issues of the times.

Thank you for your kind consideration.

Respectfully,

Caroline Weil Barnett

Caroline Weil Barnett

Attachment: as stated
Letter from Former Secretary of State
Lawrence S. Eagleburger

May 6, 2005

Hon. Richard G. Lugar
Chairman,
Senate Foreign Relations Committee
Dirksen Senate Office Building
Washington, DC 20510

Dear Senator Lugar:

The attached letter is co-signed by former presidential appointees, career and non-career Civil Service and Foreign Service employees who knew and worked with John Bolton from 1989-1993. These people and many more have indicated their strong support for Secretary Bolton. For example, John's former supervisors including former Secretary of State James A. Baker III, former Under Secretary for Political Affairs Robert Kimmitt, and I, have publicly expressed our full confidence and support for John, and our belief that he will be a superb representative of the United States in the United Nations.

The attached letter demonstrates that many of those who worked for or with him share this belief. I personally know if others who now hold positions in the United Nations or the State Department who support John, but for "conflict of interest" reasons prefer to express that support through private letters to you and your colleagues.

Sincerely,

Lawrence S. Eagleburger

Hon. Richard G. Lugar
Chairman
Committee on Foreign Relations
United States Senate
Washington, D.C. 20510

May 6, 2005

Dear Mr. Chairman,

We are former presidential appointees, career and non-career Civil Service and Foreign Service employees who knew and worked with John Bolton in his capacity as Assistant Secretary of State for International Organization Affairs under the leadership of Secretaries James A. Baker III and Lawrence S. Eagleburger from 1989-1993. While we have followed John's nomination to serve as U.S. Ambassador to the United Nations with great interest and enthusiasm, the recent and unreasonable attacks on his character and integrity during his Senate confirmation process have precipitated this letter of support; we only regret that we did not act sooner in conveying our views and strong support for his nomination.

Despite what has been said and written in the last few weeks, John has never sought to damage the United Nations or its mission. Quite the contrary --under John's leadership the organization was properly challenged to fulfill its original charter. John's energy and innovation transformed IO from a State Department backwater into a highly appealing work place in which individuals could effectively articulate and advance U.S. policy and their own careers as well. During the Persian Gulf War, John played a significant and substantive role in achieving the numerous Security Council resolutions adopted during the first Bush administration. He was also deeply engaged in matters beyond the spotlight of the Security Council, including refugees, human rights, development, democracy, food aid, UN management and budgets. His call for a "unitary UN" guided and motivated the IO bureau to promote consistent and productive practices across the entire gamut of UN organizations. John championed this concept in order to fashion a more effective United Nations, and a signal achievement in this regard was his effort to repeal the execrable "Zionism is Racism" resolution, which was a stain on the credibility of that institution. It is this laudable record of professional achievement in IO that we were privileged to witness, as well as over three decades of public service to this country, which define his character and capabilities.

We are proud to have served with John, and grateful for his leadership, integrity, and vision. The allegations about his abuse of subordinates simply do not accord with our experience while he was Assistant Secretary for International Organization Affairs. His treatment now before the Committee on Foreign Relations is thus particularly disturbing and disheartening to those who have been fortunate enough to work for and with him. We hope this letter will help set the record straight and inform your committee's decision.

Sincerely yours,

**Letter to Senator Lugar supporting John Bolton, May 6, 2005 signed by:**

C. Craig Smith
Former Confidential Assistant to the DAS, International Organization Affairs

Frederick H. Fleitz
Intelligence Analyst, Central Intelligence Agency

Fran Westner
Former Director of Public Affairs, International Organization Affairs

Thomas A. Johnson
Counselor for Legal Affairs, U.S. Mission, Geneva

M. Deborah Wynes
Former Civil Service Employee U.S Department of State

Lena Murrell
Former Secretary to Deputy Assistant Secretary
International Organization Affairs

Sam Brock
Former Action Officer, Office of UN Political Affairs, Bureau for
International Organization Affairs

Antonio Gayoso
Former Agency Director, USAID

**Letter to Senator Lugar supporting John Bolton, May 6, 2005 signed by:**

Margaret D. Tutwiler
Former Assistant Secretary for Public Affairs and Spokesman

John F.W. Rogers
Former Under Secretary for Management

Ambassador Dennis Ross
Former Director of Policy Planning, Former Special Middle East Coordinator

Ambassador Jackie Wolcott Sanders
Former Deputy Assistant Secretary for International Organization Affairs

Sonia Landau
Former Assistant Secretary of State, rank of Ambassador

Richard Burt
Former Assistant Secretary of State

Randall M. Fort
Former Deputy Assistant Secretary of State for Analysis and Research

Richard Schifter
Former Assistant Secretary of State for Human Rights and Humanitarian Affairs

Catherine Bertini
Former Assistant Secretary, US Department of Agriculture

Richard T. Miller
Former US Observer to UNESCO

Caroline Weil Barnett
Former Special Assistant to Assistant Secretary John R. Bolton

Christine E. Samuelian
Former Confidential Assistant to Assistant Secretary John R. Bolton

David A. Schwarz
Former Special Assistant to US Permanent Representative
to the European Office of the United Nations

John M. Herzberg
Former Public Affairs Officer, Bureau for International Organization Affairs

**B-10**

John P. Barry, Jr.
[redacted]

October 21, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Re: United States v. John Robert Bolton II
No. 8:25-cr-00314-TDC

Dear Judge Chuang:

I respectfully write in support of John R. Bolton, and in anticipation of his sentencing currently scheduled for October 28. 2026. I am not a personal friend, and in truth, he may or may not even remember who I am – he knew me as "Jay." While I know he is guilty of a serious offense, I write because the man I know is the polar opposite of anyone who should be standing in your courtroom as a defendant.

I am an attorney, was an Assistant District Attorney in Brooklyn, and an Assistant Attorney General for the State of New York. I was subsequently commissioned as a Foreign Service Officer, and served in that capacity for nine years. It was in that role I had the opportunity to work for then Ambassador Bolton, and witnessed first-hand the kind of person he is.

I was Ambassador Bolton's Staff Assistant at the U.S. Mission to the UN in New York, and worked with him directly for approximately one year. The son of a fireman, he is self-made, and was never a typical silver-spoon diplomat. In his office, matching his direct, sometimes blunt personality, hung the photo of the Korean peninsula at night, with the North buried in darkness, and the South bathed in light. That sums up John Bolton. He is truly committed to democracy and freedom. While working for him, I watched him handle countless diplomatic issues at the UN with a tireless commitment to this country, treating his role as the President's representative with skill, dedication, and unfaltering loyalty. No one in the office worked harder than he did.

I also watched him handle numerous internal, political conflicts within the administration and the State Department, and even when he did not agree with a decision, swallow his pride and do what was asked. I can say without reservation after more than thirty years of government service, I have never worked for a more dedicated, professional, and patriotic American.

On a personal note, what doesn't come across in the many critiques of Ambassador Bolton, is that behind the bluster and the hawkish reputation is a genuinely kind human being. If I can share one brief anecdote: When I worked at the U.S. Mission, I was the Ambassador's Staff Assistant.

It was a job that at times required brutally long hours, including weekends. Regardless of who the Ambassador was, as is tradition in the Foreign Service, no one leaves before the Ambassador leaves. At the time, I had three children under five at home – It was not a well thought through position for me to have taken.

Needless to say, as Staff Assistant at the U.S. Mission, there were some very late nights. When working for his predecessors, many of those nights were work-related, but many were also spent just waiting, watching the ambassadors read personal mail, make personal phone calls, or just sit in their offices passing time waiting for a late-night dinner reservation. Some would leave and not bother to tell the staff they were finished for the evening. It is a poor reflection on the State Department, but in nine years in the Foreign Service, Ambassador Bolton was the only Ambassador to have ever taken the time to come out of his office and tell the staff they were free to go home. This seems like a small thing – it was not. It was so unusual and exceptional that twenty years later I still remember it.

In closing, I know the above has no legal relevance whatsoever, but I wanted you to be aware of what kind of person John Bolton is – the whole person, not the one the press loves to tear down. He has given decades of his life in service of the United States. He has worked tirelessly in support of Democracy and for the future of this country.

In sentencing, I respectfully ask that the Court consider the totality of John Bolton's life and career. I am not asking the Court for mercy, I am asking the Court for fairness. Please allow John Bolton to just go home.

Thank you for your consideration of this letter.

Respectfully,

John P. Barry, Jr.
[redacted]

**B-11**

7/13/2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

I am writing to respectfully ask that you consider extending leniency to Ambassador John Bolton and impose a sentence other than incarceration. I have known John for more than two decades, and I believe it is important that the Court hear from those who have had the privilege of knowing him personally and professionally over many years.

I first met Ambassador John Bolton while serving as the United States Ambassador to the Kingdom of Denmark under President George W. Bush from 2001 to 2005. John visited Denmark in his capacity as Under Secretary of State for Arms Control and International Security Affairs. During his visit, I accompanied him in meetings with the highest levels of the Danish government, including the Danish Foreign Minister. Throughout my tenure as Ambassador, I had the opportunity to host and work alongside many distinguished officials from the United States government. Of all those individuals, no one left a stronger impression on me than Ambassador John Bolton.

Spending several days together addressing important issues affecting the United States gave me a firsthand appreciation for John's exceptional commitment to our country, his depth of knowledge, his seriousness of purpose, and the passion he brought to his responsibilities. It was clear to me that he approached every discussion and every decision with careful thought and an unwavering commitment to advancing America's interests.

Following that visit, we remained in touch and have continued our friendship and professional relationship since the early 2000s, connected by our shared love of country and our longstanding interest in international affairs.

When you have known someone for as long as I have known John, you come to understand that person's true character. Over the years, I have known John to be a caring, dedicated, and honorable man. He is someone of strong principles who has devoted his life to public service and to what he sincerely believed was in the best interests of the United States. Based on my many years of knowing him, I have always found him to be a person of integrity who would not knowingly engage in conduct he believed to be wrong or unlawful.

For these reasons, I respectfully ask the Court to consider John's lifetime of service, his character, and the many positive contributions he has made to our nation when determining an appropriate sentence. I sincerely hope you will extend mercy by imposing a sentence that does not include incarceration.

Thank you for your time and thoughtful consideration.

Respectfully,

Stuart Bernstein

Stuart Bernstein

B-12

**CATHERINE BERTINI**
[redacted]

August 6, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

Fifty-one years ago, John Bolton and I met. We have been friends and sometimes colleagues since. In 1975, after the mid-term election voter rout of Republicans post-Watergate, President Ford's Republican National Committee chair, Mary Louise Smith, hired many '25-year-olds' to reinvigorate the party. I was one of those people – the youth director. In addition to those on staff, the RNC became a magnet for young activist Republicans. Attorney John Bolton, who was just out of law school and working in private practice, sometimes volunteered at the committee. His enthusiasm was infectious.

Inevitably, the young staff members left for other positions in and out of DC, but we had forged what became lifelong bonds. Later, John and I were colleagues during the administration of President George H W Bush. We were each senate confirmed assistant secretaries – John at State and me at USDA.

When USDA Secretary Yeutter successfully convinced President Bush and Secretary of State Baker that the USA should present a candidate to the UN to lead the World Food Program, I was named the candidate and John organized the campaign. Collaborating with John, I saw his creative capacity, his sense of strategy, his understanding of the UN and of broader geo-politics. He listened to guidance and to intelligence and acted accordingly. He knew it was in the best interest of the US for an American to lead an agency with operations in many strategic locations throughout the world.

Later when I taught at the Maxwell School at Syracuse University, Ambassador Bolton twice met with my students – at the UN and later in Syracuse. The Syracuse appearance was especially noteworthy because of the similarity of feedback whether from students, faculty, or community participants who said essentially: "I didn't agree with the ambassador before but now that I heard

his full arguments instead of just sound bites, I can appreciate the rationale for his positions and in some cases agree."

From my own interactions with John. I know that:

John thinks long term about what best interest is of the USA and acts accordingly. Always.

John is thoughtful and does his homework well.

John cares. He cares to do the right thing, even if that is difficult.

John is always trustworthy. One can count on the veracity of his statements.

John has strong opinions, based on facts, history, and his own views. However, he listens. For those who take the time to interact with him, he has patience, asks many questions, and is quite willing and able to change course if the arguments so dictate.

John is always ready to educate and especially to help students understand foreign policy and the US role within it.

John has a deep knowledge of history that informs him of knowledge and tactics. That, coupled with his commitment to America's best interests and his verbal and written articulation of same, make his arguments formidable.

I am forever grateful that we can count on the commitment, loyalty, energy, and intellect of dedicated public servants like John Bolton.

Sincerely,

Catherine Bertini

Catherine Bertini

Executive Director, UN World Food Program 1992-2002
UN Under Secretary General for Management 2003-05
Professor of Practice Emeritus, Maxwell School of Citizenship and Public Affairs,
Syracuse University

PRIME POLICY GROUP

Charlie Black
Founding Chairman

Prime Policy Group
[redacted]

B-13

July 10, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane Greenbelt, MD 20770

Dear Judge Chuang:

A have been in Washington for 59 years and have known John Bolton since he came here over 50 years ago. I have worked for the Republican Party and various right-of-center causes my whole adult life. I am mainly known as a political organizer.

So, I got to know John at social evets for conservative organizations and causes and immediately gained respect for his intelligence, knowledge, reason, and skills as an attorney and debater. He was not a political organizer like me, but a leader on public policy and an effective advocate.

What drives John is his belief in America, freedom, the need for the U.S. to have a strong leadership position in the world to advance freedom. He takes every opportunity to advocate and debate for a strong America. When given the chance to help implement these policies in government positions, John jumped at the chance.

Public service has comprised the majority of John's career, including some of the highest jobs in the federal government. He earned the respect and confidence of four presidents to become a national leader, U.N. Ambassador, National Security Advisor, and coordinator of nuclear weapons policy.

John is known for doing thorough research to get his facts straight, carefully developing them into support for public policy positions, and fearlessly advocating for these positions. He represented our country well on the international stage, an effective diplomat when he needed to be.

John has always held strong beliefs about public policy, but winning for his positions was not about him. His ego was invested in policy goals, not public recognition or popularity. Those with whom he worked will tell you that he was a tough fighter, but did not take these debates personally. If someone leaked an insult of John to the press, it did not bother him, and he would not think of responding. If someone leaked inaccurate information about a policy debate, John would call the press and set the record straight.

PRIME POLICY GROUP

Charlie Black
Founding Chairman

Prime Policy Group
[redacted]

It is time to mention the great personal sacrifice required of John Bolton and his family for him to serve in government these many years. He got by on federal salaries because of his zeal for service, but John is an excellent lawyer and could have done much better in the private sector, from a financial standpoint. Equally important is the sacrifices he made in time away from his family.

So, John always did his homework and always stood on principle, but he is good at one of the hardest things in government—speaking truth to power and being willing to be punished for it. The best example of this is his service to President Trump. Trump badly needed someone like John, with his knowledge and experience, to advise him on national security. Trump had no such experience and little interest in the subject matter.

As National Security Advisor, John consistently provided the President with good, well-reasoned advice in how to protect American interests and had to debunk many of these unsound ideas. The President often took John's advice.

Before joining the Trump White House, a friend warned John of the dangers of working in the Administration, saying, "If you push Trump to make good decisions, he will eventually fire you. Why go?" John answered, "He needs my help more than any President in our lifetime. I have to try." And John did a lot of good for the President, his Administration, and the American people.

Throughout his life, John has been unselfish with his time, when called on to serve in government. He also has devoted time to meeting with students and young political candidates to teach them the importance of integrity in government service and in life.

Some say that John is somewhat impatient and does not suffer fools easily. That is because he tells the fools the truth and is always anxious to move on with the next public policy goal he is pursuing. His integrity requires him to tell the truth directly to power, the uninformed, and to those of us who are friends. I trust John Bolton completely.

In light of the above, I respectfully ask the Court to exercise leniency in imposing any sentence against John.

Sincerely,

Charlie Black

Charles R. Black, Jr.

AMBASSADOR LINCOLN P. BLOOMFIELD, JR.

**B-14**

June 30, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write as a longtime professional associate of John R. Bolton. While I had only brief encounters with John during the 1990s, I was one of four Assistant Secretaries of State operating under his continuous policy guidance from 2001-2005 when he was Under Secretary of State for Arms Control and International Security. Since that period I have had many interactions with John as we have each participated in annual gatherings of the organized Iranian resistance in Paris, in support of the Iranian people's aspirations for self-government under the rule of law.

Throughout my years of interactions with John Bolton, I have found him at all times to be a consummate national security professional – fully versed in the processes of government deliberations and decisionmaking, impressively informed about events impacting America's alliance relationships and risk of conflict, and deeply committed to the U.S. national interest.

I hold this view irrespective of differences on policy or ideological leanings. I am a centrist who, after being appointed to positions in five Republican administrations, has maintained a non-partisan approach to issues. John's views on US sovereignty and international norms, and his positions on arms control agreements with Russia in particular are well-known; my own thinking is not always in full alignment with John's, yet I greatly respect the diligence and persuasiveness of his rationales for various positions. Permit me to share a few brief personal vignettes that have informed my high personal opinion of John as a dedicated American public servant.

<u>High-level disagreement over suspension of security assistance funds</u> - As Under Secretary of State, John withheld funds in the International Military Education and Training (IMET) program from some countries that had declined to negotiate so-called Article 98 bilateral agreements by which the other country would exempt US military and civilian personnel from the jurisdiction of the International Criminal Court, instead handling allegations of serious atrocity crimes outside of the Rome Statute framework. This action affected my organization, the Bureau of Political Military Affairs, which managed the IMET program funds; my deputies were very concerned that funds were being held back.

[redacted]

The reaction among other senior State Department officials, many overseeing the countries being impacted, was very negative. A petition expressing collective outrage and insisting that John be instructed to release the funds was circulated and presented to the Under Secretary for Political Affairs. At a meeting of all concerned in this Under Secretary's office, several officials pointedly complained to John, believing he had improperly impeded an important and highly-visible assistance program.

When it was John's turn to respond, he began explaining the issue in a measured and logical manner, calmly walking around the circle and handing out one document after another to his detractors as he methodically explained the appropriateness and necessity of his action. By the time he finished, the tone of the assembled senior policymakers had completely changed. He had won the argument. No further opposition was registered.

"Good cop – bad cop" path to successful multilateral negotiation - In July 2001 a major negotiation convened at the United Nations General Assembly for the expressed purpose of negotiating a new international agreement to control the spread of illicit Small Arms and Light Weapons (SALW). In New York, interested parties across the spectrum of views convened, from anti-war activists to supporters of the National Rifle Association, and from proponents of muscular multilateralism to critics of UN overreach. Royal family members, mostly from Europe, formed an Eminent Persons Group to meet with diplomats and perhaps help bridge negotiating differences. Major media outlets were well represented. My bureau sent a veteran diplomat to lead the US delegation; he was a steady professional who could be counted on to follow higher instruction and say as little as necessary to other delegates.

To accommodate our respective schedules, John led off the opening of this 11-day negotiation with a speech to all 140 delegations, and bluntly lowered expectations of a legally-binding international treaty that, in the case of the US, would override the prerogative of Congress. He then left the negotiation. His speech provoked strong reactions, and for over a week, countries lobbied the US delegation to issue a different position than John had articulated, only to find that the US representatives had no such authority and were generally uncommunicative. By the time I arrived in New York three days before the deadline, emotions inside the General Assembly were running high. The Colombian head of the negotiation skillfully built consensus around non-controversial provisions, leaving the hardest points for the end. I met with all interested parties, expressed support for countries like Cote D'Ivoire, which had suffered greatly from illicit flows of SALW, and explained why the US delegation needed to trust our own Constitutional system rather than impeding a President's discretion in favor of a multilateral instrument. The negotiations ran late, until 0600 AM on a day when President Bush and Secretary Powell were arriving in France for a G7 meeting.

The US succeeded at the UN, without breaching our negotiating "red lines", thanks in no small part to John's bold opening stance, which made this 140-nation collective more willing at the end to accept a politically-binding SALW Program of Action designed to help address the problem of illicit guns fueling conflicts, with commitments and undertakings framed in a manner consistent with the US national interest.

Contrasting Public Approaches to the Rome Statute – John received worldwide publicity, much of it unsympathetic, for being an avowed opponent of Europe's effort to win universal support for the Rome Statute, creating the International Criminal Court (ICC). President Clinton had signed the Statute, stating at the time that there was practically no chance that the US Senate would accept it as a US treaty obligation. President George W. Bush "unsigned" the Statute, and John Bolton was widely viewed as a key architect of the American effort to withhold support. John led the effort to gain bilateral agreements around the world that would exempt US citizens from the ICC's jurisdiction. John's public statements about the Rome Statute and the ICC provoked heated arguments from Europe in particular.

My view was that this heated personalization of the issue had distorted the reality that the Rome Statute had inherent flaws that American legislators on both sides of the political aisle would recognize if the arguments were presented without the unhelpful perception of ideology driving policy. With John's full support, I enlisted legal expertise from the State Department and spoke to Parliamentarians supporting the ICC at the UN. I traveled to the European Union in Brussels and explained the American objections in a non-ideological manner, and held a well-attended press conference there, where reporters seemed to think my mission was to "undo" the "damage" of John Bolton's stance. Instead I explained why the key criticisms were valid, and important enough that American support would likely not be forthcoming under any future administration. This was another case where John was fully supportive of my chosen role, even as it was clear that I was not echoing anything John had said, but offering my own perspective and showing that his conclusions were well-considered.

Support for a Free Iran – It is widely-known that John has been under threat from the regime in Tehran, which is known to seek revenge against President Trump and senior advisors at the time the attack was launched that killed General Qasem Soleimani, Iran's second most powerful figure. John was placed under Secret Service protection to guard against this threat. Despite this, John continued to travel each year to Paris to speak on behalf of Iran's organized resistance, and to advocate support for the Iranian people in their quest to end fundamentalist rule. Not every former official would continue speaking out for a cause in which he believes, knowing that it would elevate his profile in Tehran and thus perpetuate the burden of risk affecting John's daily life.

A final note about my daily work with John Bolton at the State Department. While media reports have often portrayed John as hard-line, as an ideologue, and thus as someone with whom one might not expect to be able to collaborate easily, I can attest that John was among the most prepared to collaborate of any official with whom I dealt in four years as an Assistant Secretary of State. He was always well-informed about issues, meaning there was no need to educate John on the background to a decision that might be called-for. On many occasions, with little more than a few words of update, I was able to reach satisfactory agreements with John on any number of issues that would arise, giving me approved guidance to take back for implementation. Not once did I perceive that John was advancing an agenda at odds with the facts, the national interest, or common sense.

His public service has, in my first-hand experience, been exemplary, informed by a deep knowledge of world affairs, and driven by a lifelong passion to contribute to the advancement of American interests and a better world. For all this, I am grateful to have had the opportunity to work with John, a man of high character, intellect, and unquestioned patriotism.

Thank you for your consideration.

Sincerely,

Lincoln Bloomfield, Jr.

# SENATOR ROY BLUNT

B-15

JULY 9, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

I'm writing today to add my personal experience to the things you will be considering as you make your decision regarding the sentencing of Ambassador John Bolton. I've known John for almost 25 years and have often relied on his advice and judgment during that time.

I first met John when he was asked to serve as our Ambassador to the United Nations by President George W. Bush. During that time, I was a member of the United States House of Representatives, and the Majority Whip. That job involved helping members get the information they needed to make the decisions required by the unique challenges we were facing after 9/11/01. No one was more effective than Ambassador Bolton at discussing our options and their potential impact. He was tireless and always managed to be available when I needed to bring a few members or all our members together to better understand what we were dealing with and why. His commitment to his responsibility as the UN Ambassador and to our country was always clear and inspirational.

A decade later, when I was elected to the Senate and then to Senate leadership, John was a private citizen when I frequently invited him to come to the Capitol for an open discussion with my colleagues about our worldwide challenges. It was always a packed room, no matter how often he came to DC to meet with us.

John's work as National Security Advisor in the first Trump Administration was an important addition. His presence made it more likely that all the options would be considered, and the impact of the decisions would be better understood.

As a result of his dedicated service to our country, John and his family have had their lives threatened and their feeling of safety taken away by the very public threats from our foreign adversaries. They have lived with these public threats for years.

The penalties that have already been determined in this case are substantial. I'm hopeful that, as you look at his lifetime of preparedness for and service to our country, your decision will be directed toward leniency by his many contributions to a safer and more resolute United States of America. The balance of justice and mercy matters.

Sincere regards,

Roy Blunt

Senator Roy Blunt
Missouri (2011-2023)

**B-16**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am Philip Bobbitt, a law professor and occasional government official.

I met John Bolton in New Haven in 1973. I was a 2nd year student at Yale Law School and he was a 3rd year there. We overlapped on the Law Journal but I believe I first made his acquaintance through Prof. Ralph Winter. Winter was an ardent conservative in a rather liberal institution but his buoyant sense of humor and self-deprecating style endeared him to his colleagues and students in spite of any ideological differences. I occasionally stopped by his office just for a chat or to go for a walk---I was never in one of his classes—and it was at Winter's that I ran into John. "Campaign Financing and Political Freedom" is a monograph written for AEI by Winter (later judge on the 2d Circuit) and Bolton when the latter was still a student. I heartily disagree with its call for less federal regulation of campaign finance but this collaboration speaks highly of John's early promise.

Indeed, my disagreements with John pre-date our even meeting: in the summer of 1964, I was an intern in the Johnson White House while John was head of his school's Students for Goldwater! When John was repelled by Yale demonstrations in favor of Black Panther Bobby Seale, I had quit college to work for two years in a poverty program in an all-Black area of Los Angeles. At age 78, my views are those of a Great-Society-loving Democrat; and I doubt that John's convictions have changed much either.

But neither have the commitments to public service that we both share changed. Although I am principally an academic (I currently teach at Columbia, Texas and Yale), I have spent a decade of life in the US government: in the State Department, at the US Senate, the Pentagon, the White House Counsel's Office and the NSC.

My service, however, pales before John's appointments as Assistant Secretary of State, Assistant Attorney General, Undersecretary of State, Ambassador to the UN and National Security Adviser. In all of these roles, he established a reputation for "straight-shooting": someone who was never deceptive or "two-faced", someone whose views were clearly defined and carefully articulated. I am certain that Ralph Winter would be proud of him, as I am proud of John's commitment to public service.

John is a man of principle and he is devoted to the national interest. His patriotism is unquestionable and it is inconceivable to me that he would ever intentionally compromise US national security.

For about 20 years, I have taught Legal Methods at Columbia Law School. This is an intense, Karl-Llewellyn-designed course for incoming 1st year students that meets daily for 3-4 hours in the weeks preceding the start of regular classes. Every year I bring in about 5 persons to talk and answer questions about their professional (and personal) lives. Each year one of the dates is reserved for a trip to Foley Square and a several-hour session with federal appeals judges. In the past I have welcomed a former head of Covington and Burling, the national legal director of the ACLU, a former partner at Arnold & Porter who left the practice of law to become a high school teacher, the general counsel for Samsung, the director of the CIA, a national security adviser, a legal journalist and a museum director, all graduates of law school. They candidly describe their lives in the law: why they made the career choices they did, what they got (if anything) out of law school, what professional regrets they have. These visitors are a remarkable lot and every year I read my Teacher Evaluations only to learn how inspiring the ***guest lecturers*** were (!)

I have observed these last few years a sharp decline in the number of law students who are interested in some form of public service. One of the reasons I teach Legal Methods is to combat this trend, as I strongly believe that American law offers many avenues---and implicitly asks of its lawyers many commitments—to serve the public welfare.

I can sum up my opinion of John Bolton by saying that next year I will implore him to speak to this class. It would be a travesty if he were to have been sentenced to any incarceration or made to pay a large fine.

I appreciate any consideration that you may give to my views. I assure you they are sincere.

Please do not hesitate to contact me if I can be of any service in this matter.

With many thanks—



Philip Bobbitt
Herbert Wechsler Professor of Federal Jurisprudence
Director of the Center for National Security
Columbia Law School

GRETCHEN S. BOLTON

[redacted]

[redacted]

**B-17**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

October 17, 2026

Dear Judge Chuang:

I am writing to express my support for John Bolton, who has been my husband for the last 40 years. I ask you to take my words into account during the sentencing phase of this proceeding. Being his wife and soulmate these many years, I trust I can provide you with a perspective no one else can have to show why he merits the greatest leniency and certainly not incarceration. My remarks will concern not only our personal and family life and his many years of service to the country, but also some things about his plea and agreement, questions about his intent, and how the investigation, search, and charges have affected me and my daughter.

1. I'm retired after a long but modest career as an investment advisor and financial planner. Earlier years were in international radio broadcasting, Radio Free Europe and Radio Liberty, when they were still under the umbrella of the CIA. (So yes, I had security clearances at that time.) Then I was briefly in the Foreign Service until I received an offer to be Chief of Mission in Washington for the International Organization for Migration, an intergovernmental organization founded in 1951. It has been largely funded by the US and like-minded governments to assist with refugee and migration situations where the UN could not, for example in Eastern Europe during the cold war. (It's had various name changes over the years and is now part of the UN.) I left that organization and went into finance when we had our daughter and I could no longer travel frequently far from home. Now, in retirement, I'm a volunteer Chief Judge for elections at our local polling place and on the Boards of several community organizations.
2. John and I have been together for 40 years. At the time of the sentencing hearing, I will be 81 years old. I'm still very active, but who knows how long that will last, considering my age. I love to come home to my dear husband and the cats. It's a horrible thought that this could all end so quickly. At home, John does the dishes, shops for the groceries, cuts the grass, and helps around the house. We cook together (he's the sous-chef) and sit down each night for quiet evenings together. Surely if and when we are ill, we will be each other's supporters in every way. We love each other and don't want to see the rest of our lives damaged by this case and its fallout. John should never go to jail, depriving us of our loving home and mutual support in our old age.
3. In addition, and perhaps even more important, we are proud and excited to be new grandparents late in life and are deeply involved with our daughter (our only child) and her family, who live in Nashville. John should not be deprived of this joy in his old age. Our granddaughter just turned 2 years old and is growing fast. Time with her once missed will be gone forever, a loss not only for Grandpa but also for our granddaughter.

She deserves to know her dear granddad, and not as someone who was incarcerated when that punishment was unnecessary.

4. A key question is why did John keep diaries? His goal was to record history by reflecting on what he did on a daily basis, thus making material available for historians that often never finds its way into media or any other permanent record. He wrote his first book, *Surrender Is Not an Option*, in part based on private diaries. He swore after that effort he would never write another book, at least about his own activities, because writing such a book is so hard.
5. He began keeping his Trump diary just after the 2016 election, not knowing when or if ever he might join the administration. When he became National Security Advisor, the diary helped keep us informed about what he was doing during his long, long days. We used our What's App group, just the two of us and our daughter, to make our conversations private, aware that we live in an intrusive world.
6. I understand that the government believes John's motives to keep track of all he was doing was to make money from a future book. The government's characterization is unfair and inaccurate. Of course, if a book came out of it, there would be some income, but that was not the primary purpose. John has written in the past and did so in this instance to make sure there was an accurate record at a time when there is so much spin and revisionist description of what happens. Our daughter and I were participants in John's writings only in the sense of correcting obvious mistakes like typographical errors and asking what unclear passages meant (John wrote very fast). Neither our daughter nor I ever discussed even the existence of the diary with anyone else, let alone anything that was in it.
7. John worked hard on a book to provide the public an insider's record about the first Trump administration and to explore executive decision-making at the highest level, a subject that has engrossed him since undergraduate days in college. He did not do it for profit—I'm the one who does family finances, and we did not know even if the book would be read, nor by how many people. John knew that others in his position or similar high-level positions who dealt with sensitive information wrote diaries and memoirs for the same reasons—to detail the truth. Biographies, autobiographies and published diaries are standard for public officials – President Ulysses S Grant's autobiography helped him support his family. No one ever accused him or other public servants of writing just to "get rich."
8. I believe that John had a misunderstanding, based on knowing others had written similar diaries, that doing so was allowed because keeping such records are defined as private papers in the Presidential Records Act, rather than presidential papers, and therefore not government property. The act doesn't say anything as to the contents of diaries and where they might be retained. So I suspect that led to the idea that these private papers could be kept securely at home. John's bookshelves are filled with biographies, autobiographies, memoirs and diaries of prominent leaders, from Roosevelt to Zbigniew Brezinski to Hilary Clinton, not to mention Grant and diaries of Ronald Reagan and Jimmy Carter. Contemporaneous diaries are the best source of information on what goes on in government. Reminiscences are rarely as reliable.
9. John is something of an expert on this--he has tabulated diaries and personal notes written, published or contributing to published books by or about significant public officials going back years, to Franklin Roosevelt's and President Nixon's notes which were shared with assistants, family and co-writers. Some of the resulting books had

prepublication review by the White House or other relevant departments; some did not. John's book was fully cleared by the National Security Council over four months in a rigorous pre-publication review process.

10. I too have become something of an aficionado of diary reading. Here's a quote from commentary in Ronald Reagan's diary, "For several years after their return to California, the Reagans would often sit together in their den after dinner reading aloud from their diaries and reminiscing about their White House years." Reagan's diary, published only in 2007, even at that late date was still redacted multiple times by the White House, but the fact that he and his wife had it with them in California all those years was never made an issue.
11. By making his plea to one count of the indictment now, John bears full responsibility for his possibly mistaken interpretation of the Presidential Records Act. John clearly had no espionage intent in writing the diary to damage our country through the release of information to an enemy, nor anyone else. Nor did he seek or accept any payments for releasing classified information.
12. I am sure John has also been concerned, as he is wont to be, because of the prosecutors' comments about looking into my and our daughter's having been sent John's diaries for the reasons I mentioned above. In addition to acknowledging his own possible mistake, I know John did not want to see any investigation or case continue in which we might be charged as well.
13. John is an honorable man who devoted much of his life to public service, in the best interests of the United States as he saw it. It is not an excuse or defense that others, even the President, have done what John has admitted to or even worse, and have not been charged, or have been allowed less onerous settlements, but I know judges are supposed to take into consideration comparable cases and disparate outcomes, and we are asking you to do so here, so that John (and by extension our family) is not disproportionately punished.
14. On a tangential matter brought into the case, the hack of John's personal emails and his assistant's, which John himself called to the attention of the FBI, was carried out by Iranians who were after information on his "pattern of life," his schedules, so that they could find an opportunity to kill him. They didn't know he had a diary, nor what was in it. But they then used the hack to threaten John with blackmail—there was never any follow-through that we know of.
15. This Administration has already imposed other hardships—punishments—on both John and his family even before levelling charges. During the Biden administration, John was provided Secret Service protection because of the Iranian threat on his life, which was due to actions they didn't like when he was in the first Trump administration. Secret Service protection was immediately cancelled, at the risk of John's life, on Inauguration Day 2025. Due to ongoing threats against him, we now are forced to retain our own security protection and to raise money to do so—costing us upwards of seven figures annually. Locking John up just makes him an easier target for the Iranian regime, and does not keep his family any safer either.
16. The FBI's early-morning search of our home last fall was particularly painful to me personally, but also to John. You can imagine how devastating it was to John that he could not protect his wife in that moment. The way the search took place was, to say the least, traumatic (and I believe unnecessary). At 7 am there was pounding on our front door that awoke me. (The media were already in place across the street.) John

had already gone to his office. Frightened, thinking that something had happened to John, I went to open the door only in my bathrobe and without even my contact lenses in. Dressed like that, I was immediately told, as if I were a criminal, to accompany an agent to sit in a car while our house was searched, in sight of the news media and cameras out-front. When I asked for the warrant, it was finally provided to me. I later insisted on returning to the house and getting dressed, where I found that my cellphone had been confiscated. I asked for my phone back so that I could contact the person with whom I had a lunch engagement that day, to which one agent replied, "You won't see that again." After some time had passed, another agent was able to get the phone for me briefly to write down important phone numbers and so that I could contact John.

17. I know, and the charges make clear, that John had no intention of releasing any confidential information to the public, media or foreign governments. His sharing of the diary was an act of love and trust within the family—and only his wife and daughter. Our daughter and I would never have released any possible classified information to anyone, and never did.
18. In addition to all else that has happened and the crushing blow any incarceration would have on the years we have left, we will also feel the financial penalties of the agreement. These will be a painful punitive obligation which limits how much we can pass on to our daughter's family and what help we can give with a college fund for our granddaughter. So again, not just John, but the whole family will be impacted by the punishments you decide upon.

Let me close the way I began by offering some information only I have after nearly 40 years with my husband. I wish to call attention to all John has done in his life to make America a better and safer country, to put in better perspective what John did (and did not do) in connection with this case and why, as well as to convey the punishment our family already has faced, and to ask Your Honor to treat John no more harshly than others who were charged with far more serious wrongdoing. I am with all my heart asking the Court to forego any incarceration for John and to let him live out his life, a life of honor that he has earned, to be able to continue his work and to spend time with his family in the years to come. Thank you for hearing me out and considering my plea.

Respectfully yours,

Gretchen S. Bolton

Jennifer Sarah Bolton

**B-18**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Judge Chuang,

I'm writing to tell you about my dad, known as "Daddoo" to me and as "Grandpa" to my almost two-year old daughter, but to the rest of the world as Ambassador John Bolton. I ask that you take this letter into consideration and consider leniency in sentencing given his patriotism, strength of character, and sacrifices already made for this country. He has a deep belief in the accuracy of the historical record and sees seeking and recording the truth as a part of public service. I hope this letter becomes part of that record of truth during this difficult time for our family and country.

My earliest memories associate my dad with books and reading and writing. When he was at home, he was either reading a large hardback nonfiction book and taking notes, or clipping articles from newspapers he wanted to save for reference later, or (referring to those notes and clippings), typing his own thoughts into the computer for his diary or an OpEd. One father's day school project, we were supposed to draw our father's favorite activity on a t-shirt, and mine was him sitting reading a book.

Getting the facts of history right always mattered in our family. This is why he cut newspaper clippings, and also why he devoted parenting time and attention to teaching me to be a student of the past and the present, and to understand that details matter. Because of the age of our daughter, my husband and I often discuss when children start remembering. I know I started by age three, because I remember my dad explaining Iraq invading Kuwait, what Iraq and Kuwait were, and why the radio kept talking about it in August 1990. I remember exactly where I was standing in our bookshelf-lined family room. I noted in the previous paragraph "when he was home," because he was not home much of the time. He traveled the world in the interest of American security, bringing me back dolls from places like Kyrgyzstan and an ostrich egg from the Western Sahara. These lessons taught me to be curious about the world and led me to live abroad two separate times in my career.

I have a few specific memories of his devotion to public service from when I was in high school. During the 2000 presidential election recount, we had purchased our turkey and fixings for Thanksgiving dinner and were excited for him to come home after being in Florida helping with the recount. He had just gotten back the day before Thanksgiving and laid down for a nap when the landline phone rang. I knew from an early age that certain callers were worth a wakeup, and Secretary Jim Baker was one of them. He asked my dad to fly down to Florida that night. My mom and I learned, fun fact, that you can return an uneaten nonfrozen turkey to the grocery store, and we ate take-out that Thanksgiving.

A few months later, I was thrilled to get to meet Colin Powell, a legend we studied in school, and Clarence Thomas, similarly a name we memorized for Government class, but also my dad's law school buddy, when my dad had the honor of being sworn in as an Under Secretary in the State Department. Shortly thereafter

came September 11th, where, at my school in suburban Maryland, we were told to not to call our parents because the cell phone might set off a bomb in a government building. That night, as my mom and I huddled on the couch watching the footage over and over again, we couldn't reach my dad and we didn't know where he was. He had spent the night at his "undisclosed location," which later turned out to just be his office at the State Department. I was proud that my dad was playing a role in defending our country at such a scary moment, even though we would have rather him be home with us.

While he missed some swim meets and orchestra concerts, he attended more than he missed and still knew the names of my teachers. We talked about my history classes. When I went to Yale, and, completely coincidentally, lived in the literal same dorm room that he had lived in, we had even more to talk about. He shared his memories of the Yale Political Union and when I got into leadership in one of its member political debating societies, he tolerated twenty college students crashing on the floor of his house in Maryland for a DC trip. Not only did he host, he helped us arrange meetings and visits we would find interesting. I didn't grow up with a "famous" father, since I was already well established at college when he was appointed Ambassador to the UN. His attitude and support didn't change before and after that publicity: he always said yes when student groups and professors asked him to speak on campus and was the same dad at parent's weekends taking my friends out for dinner.

I remember both before and during his UN service, my dad kept diaries and shared them with my mom. It was a sweet part of their communication and relationship, and a way for them to catch up among busy schedules and logistics. She was still running her business in Maryland, commuting to New York for obligatory diplomatic hosting and protocol. When he started drafting his first book, I got to share with the two of them as he printed out long form pages for each of us to read. For me, that was a summer in college; I remember reading them outside while trying to get a tan.

Our family has had a group text chain since, if I remember correctly, I lived in Hong Kong working for Morgan Stanley in 2010-2011. Because I was overseas on a different phone provider, we had to use whatsapp rather than imessage. Mom, dad, and I communicate constantly about lots of random things, often updates of who is going where and ensuring planes landed on time. Occasionally, when my dad was travelling and unable to share the printed diary with my mom, he would put it in the family whatsapp. I'll admit, I often didn't read or even opened his diary entries, but I always felt included in the family. If my mom made a particularly funny comment in reference to something, I would have to check to stay in the loop of the family jokes!

While he may have been disappointed I didn't follow in his footsteps and go to law school, he has never told me that. Instead, he supported my career in finance and then later going to MIT for an engineering masters and MBA focused on manufacturing. At my MIT graduation, one of my leadership and ethics professors, who fancied himself more liberal arts/political then the rest of the engineering types there, asked my dad whether it felt very different than Yale Law School graduation. My dad replied that all of us launching our careers rebuilding American manufacturing was similar service to the country that he had taken on as his life's work.

My career in factories has been far away from the spotlight of Washington and the foreign affairs chattering classes, and I frequently wonder how my parents have dealt with the negative pressure that

comes in that environment. Working in Tennessee and Mississippi, most of my colleagues don't know who my father is or what he does for work.

I am deeply patriotic and deeply loyal to both family and country. But I can't help thinking there was real reason to worry that the government would investigate and potentially charge my mother or me related to receiving my dad's diaries. Under no circumstances, in any world, would I have shared a word of what I read on the family group WhatsApp with anyone else, much less with anyone working for a foreign power that could possibly be construed as espionage. I learned this from my father – while there might have been more money for him pursuing a career in big law or for me staying in investment banking, both of us chose instead to do something we found meaningful and would never consider violating our values for monetary gain. One of his values is caring for his family, and I am concerned that fear for my mother and I being prosecuted weighed in his decision to plead guilty. Please note that by stating this, I'm not taking away from the fact he accepts responsibility.

Of course, my own actions and good character can't stop the internet trolls from writing despicable comments on Nashville nonprofit social media. On the Junior League of Nashville instagram account, someone wrote "shame on the Junior League... having a President so closely tied to a criminal and possibly under investigation herself is very dangerous to the health of an organization."

My 81-year-old mother has had a much more traumatic experience than just some barbed comments on the internet. She was confronted by FBI agents in her bathrobe without contact lenses in, removed from her home of almost forty years, and denied access to her cell phone to contact anyone including me for hours. I was scared that I couldn't reach her. She and my dad have been subjected to protesters outside the house, pizza delivery scams, and terrifying death threats from Iran, forcing us to hire private security. Neither she nor I have received our phones back, which, although small in the grand scheme, feels like pure spite and some form of theft/ harassment/ideological taxation from the government to make us spend a couple thousand to buy new phones.

When you are considering sentencing, I ask that you think about the message it gives to anyone entering public service that their family might have to suffer so much.

Much like my father, I am an avid reader (and sometimes writer) myself, and also, much like him, primarily of nonfiction. My topics are usually domestic US, unlike his focus on foreign policy. During my process of writing this letter this summer, I read *Empire of Pain* by Patrick Radden Keefe about the Sackler family of Purdue Pharma and OxyContin. In recounting the 2007 Virginia trial that named three top Purdue executives (although none of the family), Keefe describes colleagues, friends, and relatives writing character letters to the presiding judge. Perhaps this process was something I knew about in a vague sense prior to this summer but (clearly!) I am much more acquainted with it now than I ever was before. He writes,

> "There was an underlying theme in the letters that insinuated, without ever saying so explicitly, that wealthy white executives - men with families and impressive educational pedigrees, men who give to charity and play an important role in their local communities - were temperamentally incapable of committing the kinds of crimes that

Jennifer Sarah Bolton

> should land a person in prison. They weren't the types of people who belonged in prison, one letter after another suggested."

Reading this passage gave me a slimy feeling, and I'd like to say explicitly: I'm not asking for leniency because he's my dad, or because he has a granddaughter, or because he went to good schools, is a thoughtful, academically minded policy guy, or, although coming from a working class background in Baltimore was able to find his way into a life with some privileges. I give my perspective so that you have more reference points to consider when judging the appropriateness of prison as a sentence for documenting his days in a diary and occasionally sharing it with his wife and daughter. Neither in the 2007 criminal case nor the eventual 2021 settlement did any of the key architects or financial benefactors of the deadly and false marketing strategy of OxyContin receive prison time. This is a heartfelt parallel for our family since my cousin, his sister's daughter and his niece, passed away last year related to addiction.

I'd also like to address head-on the prosecution narrative that my dad was doing any of this to chase money. My parents live in the same suburban house they purchased in 1986; we didn't belong to country clubs; they drove Saturns my entire childhood. I live in a small duplex in a low cost-of-living state. Of course, when you write a book, you hope that it sells. It is financially and emotionally gratifying to be rewarded accordingly. However, if you read my dad's book, *The Room Where it Happened,* it wasn't written to be a popular bestseller. To quote from the *Wall Street Journal* review, "readers looking mainly for stories about Donald Trump's unorthodox behavior may find it tough to get through the author's detailed discussions of U.S. policy on Venezuela and the inner workings of America's withdrawal from the Iran nuclear deal." He probably could have sold more copies and made more money had he focused on salacious anecdotes rather than policy nuances. The *New York Times* review writes "in another book by another writer, such anecdotes might land with a stunning force, but Bolton fails to present them that way, leaving them to swim in a stew of superfluous detail." Writing style critique aside, this misses the point entirely, because knowing my dad, the "superfluous detail" and "inner workings" are the most important part for him – getting the historic record straight, exactly how did it all happen in real time, not what sells books.

Although the circumstances are clearly different, it has been interesting for me to read press around Fauci's diaries release. I particularly like this quote from the Atlantic's Gal Beckerman:

> Some personal diaries do become public, ideally long after the subject is dead. The great ones don't just provide private solace; they also reveal much about the times when they were written—precisely because their focus is on the personal. Think of what we learn about the plague in mid-17th-century London while we read Samuel Pepys detailing his many infidelities, or what Victor Klemperer exposes about creeping intimidation in Nazi Germany even as he is being petty and judgmental when it comes to other Jews. What makes those diaries such meaningful documents is that they are written by fallible people. They preserve consciousness before history has become history. They show what it was like to inhabit uncertainty.

Jennifer Sarah Bolton

My dad's diaries were never intended to become public, but the book he wrote was certainly intended to be as accurate as possible a depiction of exactly what he saw happen in the administration. I'm sure this will be documented elsewhere in his defense attorney's arguments, but any student of history knows that diaries are one of the best possible primary sources because they are written real time. Political figures for generations have kept detailed diaries. I'm currently reading former Tennessee Governor / Senator Lamar Alexander's new autobiography, and he specifically discusses his detailed daily diaries as a critical source for writing about his time in the Senate, including during foreign policy crises like the Iraq war surge. Alexander writes that he was inspired to keep the diaries from reading about President Polk's detailed diaries he kept during his presidency. I don't intend this letter to be a book report on my summer reading, I'm citing these examples to illustrate how very prevalent and normal keeping diaries is among those involved in big decisions in Washington. I didn't start reading Alexander's autobiography to look for something on diaries, it was just right there in the first few pages, as it probably is for most political memoirs. My dad is not an abnormal outlier in this regard.

My dad has taken ownership of his actions and pled guilty. I strenuously argued for him to take this case to trial and clear his good name, but the facts are that he did keep a diary and it contained information later determined to be classified. I've wracked my brain over and over again if there was a moment when I could have or should have said something and I hate that I didn't. In the end, the same historical record that we as a family value so much should clear his name eventually.

I believe that our family has felt the consequences of those actions to the merited degree already without adding prison time, going forward. I hope you will not misinterpret the light tone of this letter with jokes about returning turkeys and Instagram distract from the very serious subject matter and plea for leniency I'm making.

Thank you for your consideration of my dad's years of service to our country. I hope that giving a bit more color around who he was as a father will help you consider leniency in sentencing in this case,

Best,

Jennifer Sarah Bolton

[redacted]

**B-19**

June 17, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

My name is Joni Bolton Enos, and I am writing to you as the biological younger sister of John Bolton, whom I have known my entire life. I am grateful for the opportunity to share my perspective on his character and the values that have shaped him throughout his life.

Growing up, John was a loyal and protective big brother—steady, responsible, and deeply committed to the people he loved. He has always listened to others with respect, treated people with fairness, and stood firmly by his commitments. These qualities are not occasional traits; they reflect his true nature and the values our parents instilled in us from childhood. He has always lived by the strong principles our parents taught us, and those principles have guided him throughout his personal and professional life.

From a young age, John demonstrated an extraordinary hunger for knowledge. I vividly remember him sitting for hours reading books of every genre, always eager to learn more about the world. Even as a child, he spoke about wanting to become an attorney and serve his country. He always talked about one day being involved in our nation's national security. His interest in foreign policy and public service began long before adulthood and only grew stronger with time.

In high school at McDonogh School in Baltimore County, Maryland, John was dedicated to athletics—playing lacrosse and running track. During those years, he also solidified the conservative ideology that would guide his future career. Throughout my own journey to becoming a nurse, he was my biggest supporter and cheerleader, always encouraging me to pursue my goals.

John has consistently taken pride in doing what is right, even when it was difficult. He has demonstrated integrity, compassion, and accountability throughout his life. He has always taken full responsibility for his actions. When my family suffered the devastating loss of our daughter last year, John stood by my side through every moment. He was my rock during the funeral and the painful months that followed. His support extended to my husband, Charlie, John's brother-in-law, who has admired John for 42 years. Charlie often recalls laughing and joking with John around the dinner table, and he was deeply appreciative of the comfort and strength John provided our family during that heartbreaking time.

I have always admired John—both personally and professionally. He is a devoted family man: a loving son, brother, husband, father, grandfather, and uncle. He and his wife of 40 years, Gretchen, share a respectful and supportive marriage. He is strongly loyal to those he holds close. I have witnessed him interacting with his family on numerous occasions, most recently after the birth of his granddaughter, Bolton. He was so excited to become a first-time grandparent and could not wait to be called "Grandpa." He is very close with his only child, his daughter, and they share a wonderful father-daughter relationship.

John's professional life has been defined by decades of public service. He has served at USAID, the State Department, and the Justice Department, and he has provided service under four presidential administrations. He served as the 25th United States Ambassador to the United Nations and as the 26th United States National Security Advisor. He is also an attorney and the author of nine published books.

His lifelong career has been devoted to public service, and he and his family have made significant sacrifices in service to this country.

Despite his long career in politics and national security, John has always kept his personal life separate from his professional responsibilities. Our conversations have always centered on family, not politics. I have seen him interact with people from all walks of life—civil rights leaders, political figures, and others—such as at an art reception at the Waldorf Astoria in New York, where he engaged warmly and showed genuine interest in those in attendance. I have also seen his dedication to the Presidents he served, including during Christmas holiday dinners when he would graciously excuse himself to take calls from the White House.

John is more than the circumstances of this case. He is an honest, intelligent, and principled man. I cannot recall a single time in our lives when he was not truthful with me. Through many conversations with him, I know he understands the seriousness of the matter before the Court. He has approached the allegations with sincerity and humility, and nothing about this experience has been taken lightly. I believe wholeheartedly that he will move forward in a constructive and positive manner.

For these reasons, I respectfully ask the Court to consider a sentence other than incarceration. John has spent his life serving this nation, supporting his family, and living by the values of integrity, responsibility, and compassion. I hope the Court will take these qualities into account when determining his future.

Thank you for your time and consideration.

Respectfully,

Joni Bolton Enos
[redacted]

**B-20**

July 10, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to respectfully ask that you consider a sentence other than incarceration for Ambassador John Bolton. While I understand the seriousness of these proceedings, I hope to offer my perspective on Ambassador Bolton's character and public service based on my firsthand experience working with him.

I first met Ambassador Bolton while serving as Director for Medical and Biodefense Preparedness at the National Security Council from May 2017 through March 2019. After he became National Security Advisor in April 2018, I worked on several national security and public health initiatives under his leadership.

Ambassador Bolton was steady, direct, and intellectually rigorous. Whether or not others agreed with his views, he approached difficult decisions with clarity, discipline, and a strong sense of responsibility. His decisions were consistently guided by what he believed was in the best interests of the United States and its people.

He strongly supported efforts to strengthen the nation's preparedness for biological threats, including pandemic influenza and other emerging infectious diseases. During the 2018 Ebola outbreak in the Democratic Republic of the Congo, as policymakers considered options to contain the outbreak, including the potential need for additional vaccine resources, Ambassador Bolton never hesitated to support doing what was necessary to save lives and protect the national security of the United States. I came away convinced that he understood both the human and strategic dimensions of these challenges.

Another initiative that remains particularly meaningful to me was developing a protocol for the aeromedical evacuation of Americans serving overseas in epidemic response efforts. It ensured that those who became infected could be safely transported home for advanced medical care. Ambassador Bolton recognized that supporting those who place themselves at risk in service to others is both a practical necessity and a moral obligation. His support reflected sound judgment and genuine compassion.

My experience reinforced my view that Ambassador Bolton cares deeply about this country, takes his responsibilities seriously, and strives to do what he believes is right,

even when the issues are difficult or controversial. For these reasons, I respectfully ask that you consider his lifetime of public service, character, and contributions to the nation when determining an appropriate sentence.

Thank you for your time and consideration.

Respectfully,

Luciana Borio

Luciana Borio, M.D.
Former Director for Medical and Biodefense Preparedness
National Security Council (2017–2019)

**B-21**

July 9, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane Greenbelt, MD 20770

Dear Judge Chuang:

I write today as a long-time friend of John Bolton. I believe I bring a unique perspective for I knew John before he began his distinguished career in public service. We first met in the early 1970s when John was at Yale Law School. Later, John worked at the American Enterprise Institute (AEI) where I am a senior fellow emeritus.

When I first knew John, he was already carving out an impressive path in terms of bringing his law school training to public policy debates. In 1973, John, with coauthor Yale law professor (and later judge) Ralph Winter, wrote an influential monograph Campaign Financing and Political Freedom. I can't think of too many publications, if any, that AEI published by someone still in law school.

I sat in the courtroom a few seats away from John when the Court handed down its verdict in the campaign finance case, *Buckley v. Valeo*. John had been centrally involved in drafting the winning arguments in the case, and I was a Senator James Buckley staffer. To this non lawyer, it seems the court has continued to move in his direction of his arguments. John also wrote other AEI monographs in the 1970s on the Hatch Act and the creation of the Federal Elections Commission. He wrote for AEI's magazine *Regulation* on debates relating to deregulation. This early work showed an extraordinary range of interests supported by his vigorous, principled arguments.

Although I was not at AEI when John wrote the AEI monographs and articles, I was following his work as a friend. John was whip smart, of course, and he always

loved engaging with others. He was always generous with his time with me. We developed an easy friendship.

I joined AEI in 1979 and was delighted when he returned to active AEI service as a senior vice president in 1997. I edited several AEI magazines, and I ran the political group, and started in the early 1980s, the longest running election analysis program in Washington. I am emeritus now, but I keep up my work on public opinion. In all these areas, I interacted with John I was able to watch him take on a broad portfolio of demanding day-to-day responsibilities, including overseeing the Institute's finances. He had impressive organizational skills and handled all his new responsibilities well. While at AEI, he still managed to find time for his scholarly interests, writing many articles and continuing to deepen his foreign policy credentials. I sat in on many conferences and presentations John did during this time at AEI. He was always impressive, deeply knowledgeable and well-versed on the subject matter and exceedingly well prepared. He was always polite when his interlocutors took very different positions, and he was always professional

Although I did not see John often while he was in government service, I always watched him from afar and admired him. It would have been easy for John to assume a lucrative perch in a major law firm, yet he chose public service. He had prepared himself well for it, and continuous study was a hallmark of his service. I always found him honest and honorable. John has given great servicc to the country. With many others, I consider him a friend.

Sincerely,

Karlyn Bowman
Distinguished Senior Fellow Emeritus
American Enterprise Institute

**B-22**

July 27, 2026

The Honorable Theodore D. Chuang
United States District Court
6500 Cherrywood Lane
Greenbelt, MD 20770

**Re: Ambassador John Bolton**

Dear Judge Chuang:

My name is Thomas M. Boyd and I have known John Bolton since 1986, or for some forty years. I met him because a mutual friend brought us together. At the time, John was Assistant Attorney General in charge of the Department of Justice's Office of Legislative Affairs (OLA) and I was a Republican Counsel for the Judiciary Committee of the House of Representatives. I did not know him personally then but knew his reputation as a brilliant lawyer and someone who was self-made, something I highly respect. Unlike many others in Washington, John grew up in a middle-class family, the son of a Baltimore firefighter and his wife. His career has been the product of his upbringing, his commitment to hard work, and his extraordinary intellect. In many ways, his is a quintessential American Dream success story.

After eventually becoming John's Deputy Assistant Attorney General, it became clear to me that one of the features of John's belief system that appealed to me was his fervent conviction that creative conservatism is the bedrock of what has made the United States the unique nation it is, home to the widest range of disparate and motivated backgrounds in human history. Another component of his personality, which surprised me somewhat, was John's interest in and appreciation for views that differed from his own. For example, despite the fact that my upbringing was also middle class – my father was raised in Mississippi poverty but managed to be appointed to the United States Naval Academy, serve both at Normandy and off Okinawa, teach at the Academy and become War Plans Officer for the Admiral, 7th Fleet, during the Korea conflict – I held more moderately conservative views than John did. Yet it didn't seem to matter; he was always open to discussing our differences and sometimes incorporating them into his final recommendations.

In the years since we worked together – I succeeded him as Assistant Attorney General for OLA – we have remained friends. Whether he remained a senior official at the Department of Justice – he later became the Assistant Attorney General for the Civil Division – or moved to equally senior positions within the State Department, including becoming Ambassador to the United Nations, his commitment to public policy decisions aimed at cementing the safety and security of the United States continued in earnest. However, when he became President Trump's

Foreign Policy Advisor, the generally open approach to policy decision-making that he had enjoyed in previous Administrations in which he had served, became more hostile, eventually resulting in a mutual decision between him and President Trump to part ways.

During the many years we've known one another, John and I have consistently supported one another. When he ran into trouble with Democrats during his nomination to be the UN Ambassador, I wrote op eds of support. When I was recruited to become an equity partner at DLA Piper, he provided his valued advice and support. We have regularly shared lunch to catch up with one another, and my son and his daughter also became friends.

I have always known him to have immense integrity, telling those above him, whether the Attorney General, the Secretary of State, or the President of the United States (he worked with four of them) what he believed needed to be said. He felt that was his job, even when it differed from what the President wanted to hear. As I mentioned earlier, he also sought differing opinions from his own.

John's devotion to public service was a choice. His intellect and success in private practice could well have given him the wealth and success others have enjoyed in that realm, but he also believed that the ability to provide advice that contributed to the continued safety and prominence of the United States was of more value and impact – and was more personally satisfying -- than would be the case in private practice or an academic perspective. Having seen the risks from the inside, he knew full well how dangerous the world is, with America often the target of that animus, and he wanted to be able to help minimize the impact of that danger on the American people.

In sum, John is a dedicated person who reveres this country and the many opportunities it has provided to him throughout his life. He has helped me by selecting me to be his principal deputy and by incorporating me into his thinking on important matters like those I would deal with in my own life. He loves his family and they him, and his thinking on important issues with cabinet members and presidents alike was highly valued and sought.

Your Honor, I humbly ask that during your consideration of John's sentence, you reflect on his devotion to the senior positions he has held, as well as the high regard those of us who have worked with him and consider him our friend have for him.

Thank you, Judge Chuang, for your consideration of my thoughts. I hope they have been helpful.

Sincerely,

Tom Boyd

Thomas M. Boyd

# Charles Glen Bush III

**B-23**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Judge Chuang,

I'm writing to request leniency in the sentencing of my Father-in-law, Ambassador John Bolton. His daughter, Jennifer and I have been married for a bit over three years now and I have known the family for about four. Mr. Bolton or John is also the grandfather of my almost two-year-old daughter. Since I have known him, and I genuinely believe his whole career, he has been devoted to thinking about, working on, and doing everything within his power to further the security interests of the United States of America and its allies. The ambassador comes from modest beginnings in Baltimore and could easily have chosen to pursue a lucrative private legal career, but he conscientiously devoted his life to the service of our country, and I think his decades of public service should be taken into consideration in his sentencing. Undoubtedly, many of his law school colleagues went on to earn vastly more money in private legal practice but Mr. Bolton put the well-being of his country ahead of his and his family's financial interest for decades.

When my wife and I were dating, I asked her why she gave up a career on wall street to work in manufacturing? She mentioned that she learned from her father how gratifying working in the service of others is. Working for a company that offers its employees a good middle-class lifestyle with nothing more than a high school education is what drives her every day. Undoubtedly, she learned much of this by the example of her Father being in public service his whole career. The Bolton's are generous caring Americans who do everything that they can in the service of others and their Country. I 'd like to reiterate once more, Ambassador Bolton has spent his life in the service of his country, and I hope that you will consider this, and I again ask for leniency in his sentencing.

Best,

Charles Glen Bush

[redacted]

**B-24**

Andrew S. Carduner II
[redacted]

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

FILED ENTERED
LOGGED RECEIVED
JUL 27 2026
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY DEPUTY

Deer Judge Chuang:

I am respectfully writing to request your leniency in the upcoming sentencing of Ambassador John Bolton.

John is a resolute patriot who, over many years, has brought conviction and integrity to the various offices he has held while steadfastly upholding the guiding principles on which our country is based.

I, and a great many of his friends, are convinced that John's actions and motivation in the matters before you were generated by his deep desire to continue to contribute and serve his country and not for personal gain or self- aggrandizement.

Although one cannot, nor should not, ignore the seriousness of the issues decided by the court, I respectfully request that the court recognize John's long years of public service and total dedication to our country and its citizens.

Hopefully, you will find the attributes cited herein are deserving of your compassion and leniency to a man who has dedicated his life to the country he loves.

Sincerely yours,

Andrew Carduner

The Carson Family Charitable Trust

B-25

June 24, 2026

The Honorable Theodore D Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing this letter on behalf of my friend John Bolton to request that you consider leniency in the form of probation rather than incarceration. John is a good man who has suffered enough already for his alleged breach of the law and does not deserve to be punished further.
I've known John for more than five years and consider him a friend. I've respected and supported his journalism and political activities, in return for which he comes to see me several times a year at my office in New York City. My colleagues and I consider him one of the leading thinkers on the role the United States should be playing in international affairs; we always enjoy getting together with him and hearing his thoughts.

My professional career for more than 40 years was in leadership roles in the venture capital and private equity industries. For the past 20 years it has been in philanthropy and community service. I've had the opportunity to Chair several companies and non-profit organizations. In those capacities I have been required to assess the capabilities and character of numerous leaders in companies and non-profit organizations of all shapes and sizes. I believe that I'm a very good judge of an individual's competency, character and integrity.

My assessment of John Bolton is that he is highly intelligent, very thoughtful and unusually knowledgeable about our government and the role it plays as the leader of the free world. I believe he is a man of absolute integrity and that he has dedicated his life to the service of his county and to making a positive contribution to the world we live in. Any transgression John might have committed in the treatment of confidential government information was likely inadvertent or, in the worst case, naïve. He has already been severely punished in the form of the large fine he has agreed to pay, the necessity to incur legal expenses to defend himself against the government's accusations, and any damage he might have suffered to his impeccable reputation as a public servant.

For all of the above reasons, I request that you not confer additional punishment on him in the form of a jail sentence.

Sincerely,

Russell L. Carson, Chairman
The Carson Family Charitable Trust

[redacted]

[redacted]

B-26

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

20th July 2026

Dear Judge Chuang,

I am writing to you to request that you will show mercy on Ambassador John Bolton by way of a sentence other than prison.

I was a Member of the United Kingdom Parliament from 1984 to 2024. For several years I was Shadow Attorney General and Shadow Secretary of State for Constitutional Affairs and for 14 years was Chairman of the European Select Committee of the House of Commons.

I have known John Bolton since 1994 and as United States Ambassador to the United Nations, as National Security Adviser and during his time at the American Enterprise Institute.

I have great respect for his deep and wide knowledge of international foreign policy and defence and his patriotism for the benefit of the national interest both of the United States and the United Kingdom. He has always had a profound commitment to his country's interests, on issues such as state sponsored terrorism and the sovereignty of the United States and the United Kingdom. I know he has an exceptional understanding of these matters which has been essential and beneficial to global stability.

For all these reasons I would respectfully request leniency for John Bolton and that he would not be sentenced to prison.

I sincerely thank you for your kind consideration of this letter.

Respectfully

Sir William Cash

B-27

LINDA CHAVEZ
[redacted]

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

July 22, 2026

Dear Judge Chuang,

My name is Linda Chavez and I have known Amb. John Bolton for nearly 40 years, both in a professional capacity and personally. I first met him when I was director of public liaison in the White House in 1985 under President Ronald Reagan and have worked with him off and on since then. As it happened, John and his wife also lived in my Bethesda neighborhood in those years. I have always found him to be a man of principle and integrity. We have worked on many policy issues over the years, including on human rights. He has impressed me as someone who loves his country deeply, is dedicated to public service, and willing to accept responsibility for his actions.

I have worked for three presidents, run for public office, and been a media figure for several decades, which has allowed me to know many powerful figures with large egos. But John has always impressed me as someone who did not get caught up in the trappings of his offices.

In a town where ambition often trumps principle, John has never compromised what he believes to be right for personal advancement. Having watched his career in government and since, I think he stands out as someone who pursued truth even when it cost him personally. He was never afraid of saying what he believed, giving advice to the officials he served based on sound judgment and the facts—whether or not they wanted to hear or heed it—and giving up power rather than betraying his convictions. Those attributes did not always make him a favorite in Washington power circles, but it spoke to the core of the man.

That same commitment to principle has continued into the present day. Just recently, I had the honor of presenting John with the Renew Democracy Initiative's "Heroes of Democracy Award" in recognition of his unwavering support for Ukraine's sovereignty, at a time when that support has not necessarily been politically convenient. I have also seen his leadership firsthand at conferences in Paris supporting Iranian dissidents—another cause where he has spoken out consistently and courageously, often at the risk of controversy, because he believed it was right. I have had the opportunity to spend time with him at other conferences and on trips overseas over the years, and he has been consistent in these commitments throughout. These are not the actions of a man motivated by self-interest; they are the actions of someone who has spent a lifetime standing for the causes he believes in, no matter the pressure to shift his views.

He also impressed me as someone who was devoted to his family. Though I never visited the Bolton home directly, I recall seeing John and his wife Gretchen around our Bethesda neighborhood in those early years, and it has struck me over the decades that even amid the demands of high office, he remained rooted in the same ordinary community life that many in Washington abandon once they gain power.

John's plea with this court is testament to his willingness to accept consequences for what he has done. But I hope the court will measure his life in full—the contributions he has made to policy and civil discourse and the sacrifices he has made for his country—in assigning final judgment.

Sincerely,

Linda Chavez
Vice-Chair
Renew Democracy Initiative

Elizabeth L. Cheney

**B-28**

October 8, 2026

The Honorable Theodore D. Chuang
United States District Judge, District of Maryland
6500 Cherrywood Lane, Suite 245
Greenbelt, MD 20770

Dear Judge Chuang:

I write to share my personal experiences working with Ambassador John Bolton over the past two decades on issues critical to our country's national security. I hope that my observations from our years of working together will help the Court understand the person John has been in my experience. I have known John to be a tremendous public servant and patriot with a deep dedication to our Constitution. In all my experiences with him, John has conducted himself with honor, honesty and high integrity.

In the aftermath of 9/11, John served first as Undersecretary of State for Arms Control and International Security and subsequently as U.S. Ambassador to the United Nations. During this period, I served as Principal Deputy Assistant Secretary of State for the Near East and had the opportunity to work directly with John on matters relating to U.S./U.N. policy in the Middle East.

John and I worked together again during the first Trump Administration when John was National Security Advisor to the President, and I was a member of Congress serving on the Armed Services Committee. We worked on issues ranging from the U.S. defense budget to U.S. policy in Asia, Europe and the Middle East. In particular, John was dedicated to ensuring the President understood the impact of his decisions on America's men and women in uniform. He arranged for me to bring members of Congress who were military veterans to the White House to talk with the President about their personal experiences and the role of our forward-deployed forces.

Throughout his career in public service, John has been a steadfast advocate of our national security. This service has not been without risk, both to him and to his family, and, as the press has reported, John has been a target of America's foreign adversaries. In all my interactions with John, his willingness to stand for what is right – even in the face of these threats – has been unflagging and highly admirable.

In sum, in my own dealings with him over many years, I have known John Bolton to be a man of honesty, integrity, and dedication to our nation and Constitution.

Sincerely,

Liz Cheney

[redacted]

B-29

July 17, 2026

Your Honor:

I am taking the liberty of addressing this letter to Your Honor with my humble request for Your Honor to kindly show leniency in the form of a sentence other than incarceration for Amb. John R. Bolton.

As a recently retired United Nations Principal Officer with over thirty years of service to the international community, and overall, almost forty years of diplomatic and government service including five years as assistant to the Soviet Ambassador and chief of protocol at the USSR embassy in Washington, D.C. at the height of the Gorbachev years of openness and reengagement with America in the late 1980s, I had occasion to work on dossiers that were under the purview of Amb. Bolton and knew of his principled and firm stance on many issues that at the time frequently stumped the Soviets.

I first met Amb. Bolton in person twenty-nine years ago, in 1997, in the context of my work at the United Nations, when former Secretary of State James A. Baker III tapped me, a Georgian national at the UN, to assist him in his capacity as UN Secretary-General Kofi Annan's Personal Envoy for Western Sahara. Secretary Baker requested Amb. Bolton – a colleague he knew well and trusted for his professionalism and laser focus on American safety and security – to join his team as his closest senior adviser to help hammer out a deal between the Polisario Front supported by Algeria and the Kingdom of Morocco, with the nuanced participation of former combatant Mauritania as observer. A sensitive diplomatic mission over several years, this effort fully demonstrated yet again the depth and solidity of the professionalism of Amb. Bolton and the wisdom and value of his advice. For me, watching the interaction and teamwork between these two outstanding diplomats was unparalleled schooling in diplomacy, the art of negotiation and the importance of honesty, integrity and principled stances in politics and diplomacy.

I had occasion to again witness Amb. Bolton 'in action' when he took up his position as U.S. Permanent Representative to the United Nations in New York. Despite his reputation as a hard-liner regarding the United Nations Organization, Amb. Bolton provided essential leadership, 'tough love' integrity and rigor to improve the functioning of the Organization, streamline it, but without the destructive, gratuitous attacks on the UN, often perpetrated by lesser politicians, and passed off as leadership. During that time, Amb. Bolton proposed that I assist him from the UN Secretariat side to streamline management, something that I sincerely wanted to do, but since I had recently moved from UN Headquarters to its European Headquarters in Geneva and it was impractical to uproot my family again, I very reluctantly had to decline his kind offer.

Throughout the years of working together with John on Secretary Baker's team, and subsequently, we developed a healthy collegiality, mutual professional respect, and a personal close connection – if not friendship – that endures to this day. Ten years my senior, he has always been a valued, generous mentor, a source of wise advice and has extended invaluable help to me on several occasions, the latest being his personal recommendation for me to join the Washington Speakers' Bureau.

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

With Your Honor's indulgence, allow me to make one last point, this in the context of the current unsettled international scene. Barring President Trump deciding to extend a Presidential Pardon to Amb. Bolton, it falls to Your Honor's wisdom and judgement to kindly consider that a sentence other than incarceration is passed on Amb. Bolton. His incarceration would immensely facilitate implementation of the Iranian regime's long-held wish to physically eliminate Amb. Bolton for his principled and consistent position in defense of America's interests vis-à-vis the malign activities of this regime.

In closing, allow me to reiterate my humble request to Your Honor for leniency towards Amb. Bolton at sentencing, and to thank Your Honor for Your kind consideration of my request.

Yours sincerely,

David A. Chikvaidze

WESLEY K. CLARK
& ASSOCIATES

**B-30**

August 5, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing in support of Ambassador John Bolton as you consider an appropriate sentence in this matter. Having known John professionally for many years through our respective roles in national security and foreign policy, I have had numerous opportunities to observe both his professional conduct and his unwavering commitment to the service of our country.

John and I have not always agreed on every policy question, but I have never questioned his commitment to advancing what he believed were the best interests of the United States.

Over the course of his career, John accepted some of the most demanding responsibilities in government, serving under multiple presidents in positions requiring sound judgment, extraordinary preparation, and an unrelenting focus on America's security. Whether representing the United States abroad, helping shape foreign policy, or advising senior leaders during periods of international crisis, he approached those responsibilities with seriousness, discipline, and a remarkable command of the issues before him.

Our national security depends upon leaders who can be counted upon to provide candid advice, especially when that advice may be unpopular. John consistently demonstrated that courage. He is known and respected for this - and he has influenced countless public servants who followed him.

For these reasons, I respectfully ask the Court to consider John's decades of distinguished service, his character as I have observed it over many years, and the lasting contributions he has made to our country in determining an appropriate sentence. I hope those considerations will weigh in favor of extraordinary leniency.

Thank you for your consideration.

Respectfully,

Wes Clark

General (ret.) Wesley K. Clark
Supreme Allied Commander, Europe (1997-2000)

**B-31**

**Don V. Cogman**

[redacted]

June 15, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

Forty years ago, as a very young chief of staff to a freshman U.S. Senator, I met another young fellow Senate staffer who also worked for a freshman Senator advising him on various legislative and foreign affairs issues. That is how long I have known John Bolton.

Over the years as our careers took different paths – mine to the private sector and John to primarily public service – we kept in touch both in Washington and then New York (where I ultimately re-located) where we would occasionally meet during his tenure at the United Nations.

On occasion people would ask me if I knew anything about him from my days in Washington and I would always respond with the same answer: "John Bolton knows more about the world in which we live than any other living being in our country." It has been true for over thirty years.

I don't need to review his professional record of service, I'm certain you are well informed of the multiple roles he has played at the highest levels of public service. What so many people don't understand or fully appreciate is the sacrifice people make to fulfill this service.

In John's case, a brilliant highly educated lawyer with unmatched global experience, he could have gone into the private sector and been set financially for life, but he chose another path. His love of country, dedication to using his experience and knowledge of the world to impact the policy of our government to help insure our way of life, meant more to him than anything else.

In today's divisive world of ugly politics, extreme partisanship on both sides, a timidity in a willingness of so many to stand up and say and do the right thing no matter the consequences – John Bolton has always been a light in the darkness.

It takes courage to be a light in today's world. It takes courage to walk into the oval office and speak the truth. It takes courage to move on from various positions and roles in public service that you had always wanted to do your entire life. It takes courage to sacrifice certain comforts that come from serving your country rather than yourself.

I hope you will recognize these truths and the life and sacrifices that have been the hallmark of John's career as you make your sentencing decision. Thank you for your consideration of leniency and mercy towards a principled public servant.

Respectfully submitted,

Don V. Cogman

B-32

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to ask for leniency of a sentence other than incarceration for my friend, John Bolton. For decades, Ambassador Bolton has demonstrated his devotion to the United States and he and his family have made many sacrifices through his years of public service. I believe that service and sacrifice merits strong consideration in such leniency.

I have known John since the 1990s through various legal and political circles and knew of his distinguished service and extensive foreign service work before that. In 2000 I also worked on the Bush campaign and the Florida recount where John ended up in Florida with a senior role helping the campaign and we both had to work under very contentious conditions and be counted on to interact with our counterparts on the other side of the aisle professionally and keep the count progressing for days and weeks under difficult circumstances.

While John and I never directly worked together in an agency or at the White House, I knew him through professional and personal associations and knew we were generally aligned in our interests and always appreciated in particular his commitment to helping our country be safer and more secure from the most dangerous of regimes around the world through his extensive national security work through four Administrations.

When I served in Congress (2015-2019), some of that time he was serving as the White House National Security Advisor, and he was a key person that many of us relied upon for honest and sensible analysis and many of us could go to when we wanted to have the best understanding of threats around the world – whether it be in any Mideast country or in North Korea or elsewhere. He also would know all of the agencies and personalities involved and could explain ongoing dynamics of just about any ongoing situation. His decades of experience were a trusted source of information at a difficult time when some were afraid to voice candid views. I know myself and my colleagues always appreciated his factual and candid analysis he shared with us to inform our work.

John's honest analysis on the dangerous threats in Iran in particular and the work he has done for this country to protect us from those threats has even resulted in him becoming a

target of assassination – a reality that still threatens his life to this day since the security he was provided by the last Administration has now been removed. That reality also is another additional reason why I would hope he would not face any incarceration where he might be targeted again and can instead have a sentence that would not endanger him.

Given Ambassador Bolton has operated with a sustained and principled focus on American safety and security and from my perspective and experience, acted as a man of principle in the most challenging and high-stakes environments, I once again, would like to reiterate my request for leniency at sentencing and thank you for your consideration.

Respectfully,

Barbara Comstock
Former Member of Congress
Virginia 10th Congressional District

**B-33**

Cooper & Kirk
Lawyers
A Professional Limited Liability Company

Charles J. Cooper
[redacted]

[redacted]

[redacted]

Dated: August 1, 2026

Theodore D. Chuang
U.S. District Court Judge
6500 Cherrywood Lane
Suite 245
Greenbelt, MD 20770

Dear Judge Chuang:

I write to offer my perspective on the character of John Bolton, my close friend for over 40 years. I am intimately familiar with John's character from my experiences alongside him both as a colleague in the Department of Justice throughout the 1980s and, more recently, as his personal lawyer in connection with the first impeachment proceeding of President Trump and the publication of his book, "The Room Where It Happened." In each of these capacities—friend, colleague, and client—John consistently demonstrated himself to be a man of impeccable integrity and good faith, unfailingly civil, honest, and trustworthy in his dealings with others, whether ally or adversary. I urge you to consider his long and otherwise spotless record and reputation for honorable conduct and to sentence him to a term of probation at most, and certainly not incarceration.

I met John in 1985, when he joined the Department of Justice as the Assistant Attorney General for the Office of Legislative Affairs. I was the Assistant Attorney General for the Office of Legal Counsel, and our respective responsibilities brought us into nearly daily contact. We worked closely on countless matters, from assisting the Attorney General in developing the Department's positions and priorities, to preparing the Department's comments and congressional testimony on legislative proposals, to preparing President Reagan's nominees for confirmation hearings, including most notably the nominations to the United States Supreme Court of Justice William H. Rehnquist to become the Chief Justice and Judges Antonin Scalia, Robert Bork, and Anthony Kennedy to become Associate Justices. John also played a leading role in the Department's response to the so-called Iran-Contra Affair, especially with respect to the nationally televised congressional hearings into the matter.

Many of the most important matters on which we worked together, both internal and public, were enormously difficult, highly controversial, and intensely acrimonious. John's dealings with

everyone, however, whether friend or foe, were forthright, open, and scrupulously honest. To be sure, he often expressed his views in blunt terms, but he was always candid and forthright. If he said it, it was so; he never misled and never hid the ball. In short, he conducted himself honorably at all times and in all circumstances, and the friendship we forged in those often tumultuous days has lasted our lifetimes.

I left government service at the end of the Reagan Administration, but John's love of country and his abiding dedication to our Nation's safety and security compelled him to continue his service under President George H. W. Bush, this time in the State Department, where he served in several important capacities. In 2001 he again answered the call to service, as our Ambassador to the United Nations under President George W. Bush. And again in 2019, he returned to government service a fourth time, as President Trump's National Security Adviser. Our contact during these years was nonprofessional, until his departure from the Trump Administration.

When the House Judiciary Committee opened its impeachment investigation, it sought the testimony of John and his National Security Council deputy, Charles Kupperman. They both engaged me to represent them. The Judiciary Committee issued a subpoena, and President Trump expressly ordered both of his former advisers not to testify before the committee. Faced with the dilemma of conflicting commands by the Executive and Legislative Branches, and without controlling judicial authority on the difficult constitutional question raised by those conflicting commands, we filed a suit in the federal District Court for the District of Columbia, seeking a judicial declaration as to which command should prevail. John took no position as to which side should prevail; his only objective was to ensure that he obeyed the Constitution as interpreted by the Federal Judiciary. Although District Judge Richard Leon set an extraordinarily accelerated briefing schedule for resolution of the question on summary judgment, the case was mooted when the Judiciary Committee withdrew its subpoena. Throughout this intensely contentious, controversial case, John never wavered in his commitment to honoring his constitutional responsibility, however that might be judicially determined, nor to litigating the question according to the highest ethical standards.

John also engaged me to represent him in connection with the publication of "The Room Where It Happened," his memoir of his service as President Trump's National Security Advisor. He initially engaged me to assist in the process of prepublication review of the book, as required by regulations and agreements governing the employment of all officers with access to sensitive government information. That prepublication review was performed by Ellen Knight, the senior career official responsible for reviewing manuscripts by former NSC staff members and other White House personnel. Over the course of four months, John worked painstakingly and in good faith with Ms. Knight in revising the book to ensure that it contained no classified information. And although John did not authorize publication the book until Ms. Knight had concluded that it did not contain classified information, the Trump Administration nonetheless filed a lawsuit seeking to prevent publication of the book. John engaged me to represent him in defending against the suit. To make a long story short, the book was published, and the suit was settled and dismissed

with prejudice, shortly after the Biden Administration took office. And here again, John conducted himself in an open and forthright manner, both in the prepublication review process and in the ensuing litigation, in keeping with the highest standards of integrity.

The short of it is this: throughout my more than four decades of close personal and professional association with John Bolton, he has always conducted himself, in word and deed, in an upright, honorable, and trustworthy manner, adhering to the highest standards of ethical conduct and fair play. And my experience is entirely in keeping with his heretofore spotless record and reputation as a good, law-abiding man.

I firmly believe that John, who has selflessly devoted the bulk of his professional life to the service of our country, would never do anything that he believed might harm its interests. And his years of faithful government service have come at great cost to John and his family. Since the 2020 United States air strike that killed Qassem Soleimani, the terrorist leader of Iran's Quds Force, John and his family have lived under Iran's public vow to kill John in retaliation. He has been forced to bear the expense of around-the-clock private security since January 20, 2025, when his Secret Service protection was withdrawn. Few people have risked so much to serve our country.

As you deliberate concerning the sentence that should be imposed, I urge you to consider:

- his heretofore unblemished record and reputation for upright, law-abiding, and honorable character;
- his admission of guilt and acceptance of responsibility;
- his many years of faithful service to our country, in a variety of important offices under four different Presidents;
- his advanced age; and
- the ever-present threat of assassination that haunts him every day and that would be heightened were he to be incarcerated.

In light of these unusual and strong mitigating circumstances, I urge you to consider imposing a sentence of probation, under which he will continue to have the protection of private security.

Sincerely,

Charles J. Cooper

**B-34**

The Honourable Theodore D. Chuang

United States District Court

District of Maryland

6500 Cherrywood Lane,

Greenbelt, MD 20770 12th September 2026

Dear Judge Chuang,

I am writing in respect of Ambassador John Bolton to ask that you show him leniency during his forthcoming sentencing hearing and are able to impose a sentence other than incarceration.

I have known Ambassador Bolton in a professional capacity for more than twenty years, and have always had a high regard for his profound knowledge of global security issues, his expert analysis and his professionalism.

In my many dealings and meetings with Ambassador Bolton over the years, I have always found him to be extremely well-informed on the issues of the day, as well as being extremely generous and courteous on a personal level in his dealings with me. He has always shown the utmost regard for the United States of America and its security, and I regard him as a true patriot.

I am personally indebted to him for the expert knowledge he shared with me when I was writing my latest book, Assad: The Triumph of Tyranny (2023), a study of former Syrian President Bashar al-Assad, for which he provided a unique and insightful analysis of US policy towards the Assad regime in Syria over many years.

I would respectfully ask you to show leniency during sentencing, and I thank you most sincerely for taking the time to take my comments into account.

Yours respectfully,

Con Coughlin

Journalist and author

**B-35**

Jack David

[redacted]

Honorable Theodore D. Chuang
United States District Court
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to request and recommend that you act mercifully in sentencing my friend and former colleague John R. Bolton. I have known and respected John for more than 20 years and, even after the serious offence to which he has pleaded guilty, that respect is undiminished.

From the outset of my acquaintance with John, it was plain that his patriotism, his loyal support of the United States and his love and affection for his family were the prime inspirations for what he said and did. I first met John sometime in the 1990s at a function held by an organization we both esteemed, the Center for Security Policy.

Thereafter, in the years I served in the U.S. government, 2002-2006, I had a professional relationship with John which elevated my esteem for him and his values. On numerous occasions when I was Deputy Assistant Secretary of Defense for Combatting Weapons of Mass Destruction and Negotiations Policy (quite a mouthful but explainable by history) and John was Undersecretary of State for Arms Control at the State Department, we participated as colleagues at National Security Council meetings in the Situation Room. The purpose of our meetings (along with representatives of other Departments) were to discuss issues of importance to the security of the United States and make recommendations to the President about the specific policies being discussed. John's contributions in these meetings were formidable.

In the same time frame, I had the interesting and fortunate opportunity to travel to London with John for meetings with the government of Libya to discuss the specific terms and conditions of Libya implementing its decision to relinquish its weapons of mass destruction and its ambitions to acquire more of the same. Again, John made

formidable contributions to persuading the Libyans to agree to terms which we proposed. In all that he said, his devotion to the U.S. was evident. As you may remember, Libya and we came to agreement, partly as a result of John's efforts on that trip to London.

John is very smart, knowledgeable and direct. His words sometimes alienate people. But when that occurs, it is not because of any insult from John. Rather, it's because of the differences between John's substantive position on the subject under discussion and the conviction and eloquence with which he expresses it. Regrettably, he therefore has made some enemies along the way.

John is a patriot of the first order He strongly deserves your exercise of mercy in sentencing. I think it would be a travesty of justice were John to be sentenced to incarceration.

Respectfully,

Jack David

Jack David

***Christopher DeMuth***
[redacted]

**B-36**

July 30, 2026

The Honorable Theodore D. Chuang
United States District Court for the District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to urge clemency in your sentencing of John Bolton. I understand that I am to limit myself to his personal character and contributions, and am not to address the unusual circumstances of this case. In my view, considerations of his character and contributions to American politics and national welfare are themselves sufficient to reaching a just, lenient sentencing decision.

Like John Bolton, I am a lawyer who has practiced law, served in the federal government, worked at leading national think tanks, and studied and written on a variety of academic and political subjects (my CV is at https://ccdemuth.com/curriculum-vitae-2). And I have followed John's career and writings for many years. For these reasons, I believe I am in a good position to evaluate his contributions to legal scholarship and policy debate, which I will do in the first section below. I also worked closely with John at the American Enterprise Institute in the late 1990s and 2000s, which is the subject of the second section.

John's extraordinary public contributions in more than 16 years of government service and international diplomacy—in front-line positions at the Departments of Justice and State and at the White House, and as Ambassador to the United Nations—constitute a separate, powerful reason for leniency in the case before you. I'm sure that other submissions will emphasize his accomplishments in office, so I will focus on the two areas where I have special competence.

## I. John's Scholarly and Editorial Writings

John's writings are notable first of all for their sheer quantity and range—dozens of journal articles and monographs going back to the early 1970s, and more than 850 opinion articles on current events spanning 35 years and continuing unabated through his recent legal travails. Most impressive, in my view, is a distinctive feature of these writings. John is a studious man, with a distinguished record at Yale College and Law School and notable publications in top journals; he could surely have had a highly successful, influential academic career. But he is also a man of strong, well-honed policy principles—conservative-libertarian in politics, traditionalist-originalist in legal and constitutional matters, and a synthesis of realism and idealism in foreign and defense policy—which have led him out of the library into a career of political activism and government service.

In John's writings, these two features of his character have come together to singular effect. His scholarly essays and book reviews are much more pointed and practical than conventional academic writing. They are free of jargon and over-qualification, and they propound clear, bold positions—holding up big targets in the service of clear understanding and further debate. And his voluminous opinion pieces offer much more than his "opinions" (strong as these usually are) about the news of the day. They are replete with concrete historical analogies from ancient to modern times, careful logic and reasoning, rebuttals to opposing arguments, and proposals for specific actions that are often, he acknowledges, the best among poor or risky alternatives.

These attributes have placed John in the top tier of U.S. public intellectuals, continuing through a period of profound changes in domestic politics and in the foreign and security challenges that are his specialty. He is, moreover, unique among top policy commentators in his extensive, variegated career as a public official. As a result, his articles on contemporary issues frequently draw on his practical experience to illuminate the inside dynamics of policy formation or to reconstruct, with personal insight, instances of successful and unsuccessful diplomatic and military ventures. I am a seasoned consumer of policy research and writing from across the political spectrum, and have long made it my practice to read everything I see with John's byline—because I know that, whether I agree or disagree with his analysis and prescriptions, I am going to learn something.

I bring these points to your attention because they bear upon John's personal integrity and longstanding contributions to American policy dialogue. And there is an additional consideration you may regard as pertinent. In our era of partisan polarization and reckless social media diatribes, John stands out as an exemplar of responsible partisanship—someone who is comfortable with sharp political argument while remaining firmly attached to the endangered precepts of rational inquiry, evidence-based persuasion, and respect for the intelligence of readers. Our politics badly needs more of this. Bringing John's legal entanglement to a just and definitive conclusion would permit him to return undistracted to the intellectual engagements that are his calling.

## II. John at AEI

I got to know John intimately during my tenure as president of the American Enterprise Institute for Public Policy Research (1986–2008), where he served as senior vice president (1997–2001) and senior fellow (2007–2018). I had known John by reputation and through a few casual interactions (we both served in the Reagan administration, but in different fields of action), and was familiar with three excellent monographs he had written for AEI in the 1970s—on campaign finance (with senior author Ralph K. Winter Jr.), the legislative veto, and a civil libertarian defense of the Hatch Act. But what brought him immediately to my attention in 1996 was his work as president of the "National Policy Forum," an adjunct of the Republican Party that promoted the party's principles and policy proposals through publications, conferences, and grassroots dialogue. While I admired the gumption of a political party setting up a think tank to elaborate and promote its policy ideas, I was skeptical that it could be done well—because of a party's primary obligations to field political candidates, win elections, and compromise or paper-over policy differences among diverse constituencies. In contrast, a nonpartisan educational think tank such as AEI could pursue policy ideas on their own merits, including those that were novel or unpopular at the time. I approached John with these arguments and was pushing on an open door; he agreed to move to AEI as senior vice president.

For the next four years, John was one of my two top officials (along with David Gerson, executive vice president) responsible for directing all aspects of AEI research, publications, conferences, appointments, fundraising, governance, and public, media, and government relations. The three of us met at 7:30 a.m. for exactly one-half hour every morning to discuss current matters needing decision. And we collaborated continuously with each other, with AEI colleagues, and with outside supporters and audiences.

During these years I developed a tremendous regard for John's knowledge, energy, judgement, good humor, and generosity of spirit. He was a voracious reader and constructive critic of research proposals and works-in-progress. He was particularly good at identifying the best thinkers on all sides of a policy question for debates, seminars, and research initiatives. He managed to find time for his own research and writing, and was regarded throughout the Institute as an intellectual peer as well as management executive.

These were important "interlude" years in American government—after the collapse of the Soviet Union, before the arrival of a fraught new era on 9/11, and a period when hard partisan contention between the White House and Congress yielded some positive results in domestic policy. John's skills and insights were invaluable to AEI's growing prominence in that environment. In matters of management, he combined spirited advocacy on close decisions with energetic execution even when decisions had not gone his way. Best of all was when management and advocacy overlapped. As a man whose foreign policy views combined strategic realism with democratic idealism, he was especially effective in advancing AEI's collaborations with the surging democracies of East Asia and the fledgling democracies of Central Europe.

In early 2001, President George W. Bush approached John about joining his new administration, leading to his appointments as Under Secretary of State for Arms Control and International Security and later as Permanent U.S. Representative to the United Nations. At the time, my esteem for John had grown to the point that I made a special commitment to him—that as long as I was AEI's president, we would have a position waiting for him whenever he decided to return to private life. And we were indeed honored to have him back, this time as a senior fellow, when his tours—in retrospect, his most accomplished tours in national service—had run their course.

In summary, I know John Bolton to be a man of high character, strong principle, deep erudition, and singular accomplishment, deserving of great leniency in your sentencing decision. I am grateful for the opportunity to bring my views to your attention.

Respectfully,

Christopher DeMuth

**B-37**

June 22, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane Greenbelt, MD 20770

Dear Judge Chuang:

During the 1975 effort (the Court issued a decision in 1976), I developed a deep respect for the Ambassador's views on Constitutional law and protecting basic American values and rights. He has held true to these values for as long as I have known him.

Working together was not limited to Buckely v. Valeo. In 1979, the Ambassador, a few friends from the American Conservative Union and I formed the nucleus of a campaign organization that secured for then-Governor Reagan the 1980 Republican Presidential nomination and victory in November, 1980. After the 1980 election, the Ambassador took a position at the Department of Justice while I took the position of Assistant Secretary for Export Administration at the US Department of Commerce (DoC). During my tenure at DoC, I consulted with the Ambassador on numerous occasions, especially when my organization prosecuted several major violations of US export laws. In this capacity, the Ambassador helped ensure that all parties strictly followed US laws and regulations.

After my tenure at DoC, we stayed in close contact when the Ambassador was affiliated with the American Enterprise Institute (AEI). I had IBM support several projects at AEI and these projects were highly successful due to the Ambassador's focus on both broad policy and the details of implementing policy.

During the 2000 Presidential campaign, I held a senior campaign position with responsibility for several Mid-Atlantic states and was sent to Florida to support the counting of ballots after the election. The Ambassador was a leader in the effort to correctly tally Florida's votes. I observed at close quarters the Ambassador's dedication to do what is right and force others to obey our campaign laws and regulations.

When the Ambassador became the Under Secretary of State for Arms Control and International Security Affairs in 2001, I became a consultant to his office with a focus on supporting the Directorate for Defense Trade Controls, where I once again saw the Ambassador's deep commitment to upholding US laws and regulations.

With the Ambassador taking his position at the United Nations (UN), I interacted with him informally and marveled at his dedication, deep respect for American interests and strongly held patriotism. He also was an advocate for the other UN members to follow the UN's rules, instead of ignoring responsibilities.

When he left the UN, we stayed in contact both on personal and professional levels. For example, he provided advice to one of my Japanese clients to stop sales in Iran and reduce activity in Russia.

In 2016 I held a senior campaign position in the Trump-Pence campaign and observed the Ambassador as he became a foreign policy advisor to then-candidate Trump. He emerged as a leader of a team that provided invaluable assistance to the campaign and eventual victory. When the Ambassador became the President's National Security Adviser, he brought stability to the foreign policy team and managed several crucial national security matters for the White House. Unfortunately, having worked closely with the President, I know he can be volatile and "discards" people on a whim. The President is

also not fond of people who describe reality which is different from the President's views on "reality". In my view. the Ambassador left the White House simply because the President cannot handle the truth. Further, the President can be vindictive, and I believe that the extant legal difficulties arise from the President's vindictiveness.

In this context, I ask that you exhibit leniency and mercy for the Ambassador and avoid incarcerating him even for one second.

With deepest regards.

Bo Denysyk PhD
President and CEO
Global USA Inc.

Paula A. DeSutter
[redacted]

**B-38**

July 30, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am proud to say that I have known Ambassador John R. Bolton for 25 years, four of which I served as his Assistant Secretary of State for Verification and Compliance. He is undoubtedly the smartest person I know, someone of indefatigable energy and commitment to rigor in identifying and articulating the truth – always in service to principle. Therefore, I write to plead for your maximum leniency in your upcoming sentencing decision.

I first met Ambassador Bolton in 2001 during his confirmation process for Under Secretary of State for Arms Control and International Security. I was introduced by a colleague on the Senate Foreign Relations Committee as a possible selection to serve as John's Assistant Secretary of State for Verification and Compliance. This introduction was the beginning of a working relationship – and I flatter myself to say friendship -- that I count as a source of great personal and professional pride.

Under Secretary (U/S) Bolton swore me in as Assistant Secretary of State for Verification and Compliance (VC) in August 2002. This Bureau was created in law by Congress in 1999 (against the wishes of the Department of State) with a strong mandate to enhance US capabilities to strengthen verification of compliance with international arms control and nonproliferation agreements and to assess other nations compliance with them. To give you the flavor of the State Department's hostile attitudes toward our mission during which I always had John's support, I'll relay three anecdotes.

The first was shortly after my swearing in. I met for coffee in the State Department cafeteria with one of John's other three Assistant Secretaries, this one for Nonproliferation (NP). My intent was to discuss ways our Bureaus might work together. Within about 15 minutes of the start of our meeting, as I pointed out that the law directed that I and my Bureau assess other nations' compliance with nonproliferation agreements, so we should participate in the NP chaired interagency sanctions group meetings, I noticed that his face was turning red and his veins were starting to pop. Finally, he slammed his fist on the table and hissed that my Bureau was created as a criticism of his, and that he would ensure we did not interfere with how they had been doing business.

Later, after reviewing all appropriate Department guidelines, Under Secretary Bolton decided that representatives of my Bureau would indeed participate in the Sanctions groups. The day the memo reflecting John's decision was to be circulated, I went early to John's office. I said: "John,

do you see what I'm wearing?" He looked puzzled, struggled, and finally hesitantly said: "A *dress*?" I said, not any dress, but a *cream colored* dress, so if my counterpart loses it and actually hits me – which wasn't, given my experience with him, out of the question, my blood would show up spectacularly and I would go to the Deputy Secretary who, I speculated, would "break him in half." John chuckled and said he didn't think he would actually hit me, but added: "that's GOOD." Happily, I didn't get physically attacked, but I knew that John would have my back.

The second incident involved an accusation by a member of the Department's Intelligence and Research Bureau, INR, that a member of my staff had sent a memo around on the secret level State Department intranet that contained information at a much higher level of classification. The INR staffer sent an email directing all recipients to delete the memo from their systems since it contained codeword information. This would have been a major security violation.

This INR representative was aware I and my senior nuclear intelligence analyst had been reviewing all of the Codeword material on the DPRK's nuclear endeavors to assess their compliance and in preparation for developing a stringent verification regime. The VC staff member who wrote the memo, however, did not have access to any of that material. The INR staffer had called in the Intelligence Community (IC) representative to review the alleged breach.

I explained the situation to U/S Bolton, who made sure I was *absolutely certain* there was no codeword information in the memo. I was. He then trusted me to resolve the matter. I explained to the IC representative (as I had to Under Secretary Bolton) that while the memo sent on the Secret system contained only information at the Secret level, that information was *consistent* with information at the higher level of classification, but this did not mean that the memo was incorrectly classified. I assured the IC representative that my staff person wrote the memo without input from my senior nuclear analyst or me. The IC representative reviewed the sources used by my staff and the higher classification material and agreed with me. Unlike me, John, who had more experience with the petty, hostile machinations at the State Department, was not surprised at a bureaucratic effort to achieve a "gotcha" on myself and my bureau, and on John as our boss and advocate.

My third anecdote is also related to our efforts to develop a verification regime to ensure that any denuclearization agreement with North Korea was effectively verifiable. In arms control, negotiators consistently view the need to negotiate stringent verification measures as a royal pain since it makes their job more difficult. I expected that. But a new player at State had written a memo to the Secretary attacking the proposed measures that I and my Bureau believed were needed to have confidence in North Korean compliance. His memo called my proposed regime "a national proctology exam." He was joined in his condemnation of our rigorous approach by INR, the Nonproliferation Bureau, and the Regional Office lead for negotiations. So, a "split decision memo" was to be prepared for the Secretary.

After sending my memo to the Secretary, I had to leave for the Hague. The day I returned, John told me that the Secretary had not shut down the weak approach and that I had to go see him to apologize for a reference in my memo to my need to protect the Secretary should an agreement be reached and submitted to the Senate for advice and consent. I had noted that the Senate Foreign Relations Committee (SFRC), especially Senator Biden, then SFRC Chairman, and his key staffer, were very knowledgeable about verification matters. Thus, a weak verification

regime would open the Secretary to an attack from the Democrats that he had failed to gain a sufficient degree of verifiability. My State Department detractors had told the Secretary that this was a threat by me that unless my position was selected, I would leak the matter to the Senate and thus undermine him and any subsequent agreement with the DPRK.

After telling me that I needed to go straight to the Secretary's Office to apologize, John stayed calm while I huffed and puffed about how 'HE (the Secretary) should apologize to ME!" John just calmly said unless I apologized the Secretary was going to fire me, and John "like having me as his Assistant Secretary for Verification and Compliance." I calmed down and agreed that I would apologize 'that my language was apparently not clear enough, enabling people to give him the false interpretation that it was a threat on my part'. He had clearly persuaded the Secretary to give me a chance to apologize before deciding to fire me. Thanks to John, I kept my job.

Not all brilliant, influential people have a great sense of humor and are supportive of others. They are influential because they care about issues and principles and support others also pursuing these goals. John Bolton was a stellar example of this. Sadly, these qualities seem to enrage the small-minded and appropriately insecure who care more for self-interest than principle and resent and attack those that care more for principle than self-interest.

While I have retreated from the policy world, John, with the support of his family, has never abandoned the fight. I find John to be one of our nation's most remarkable people. The consistent watchful help and advice he gave to me and my beleaguered staff, and his humor in response to my foibles, lit up even the darkest places in the State Department – and there were many. The commitment to doing the right thing – whether on matters of national importance or matters trivial in the larger vista of life -- may not negate all a person's mistakes. But crucially, it guides those like John Bolton who pursue the truth.

John Bolton's brilliance and his lifetime devoted to informing and influencing America's policies in a dangerous world are invaluable. Beyond my personal experience with Ambassador Bolton, I believe his life of service to our nation's security, his service to four different US Presidents, his devotion to his family and friends, and his ability to continue in freedom to serve well justify your maximum leniency at sentencing to preclude this great man from incarceration.

Judge Chuang, thank you for considering my views and my request that your sentencing decision be guided by and reflect the leniency I hope and pray you grant to John Bolton.

Sincerely,

Paula A. DeSutter

Paula A. DeSutter

Murray Dickman

[redacted]

[redacted]

July 30, 2016

The Honorable Theodore D. Chuang

US District Court

6500 Cherrywood Lane

Greenbelt, MD 20770

Dear Judge Chuang

My name is Murray Dickman, and like you, I am a native Pennsylvanian and an alumnus of the Department of Justice under former Attorney General Thornburgh from 1988-1991. I served with him when he was Governor (1978-1986) and later advised him as Attorney General on a number of issues. Even though I am not a lawyer, he asked for my advice on numerous high level matters, including criminal as well as ethical matters usually involving the Inspector General and OPR. Though I had no line or decision making authority on Criminal matters or Supreme Court (or any Court ) matters, he asked me to review a number of cases and issues at DOJ and provide my perspective to him and other senior DOJ officials which I did often.

Much of my responsibility at DOJ was managing the “day to day” Federal Judiciary and US Attorney selection process as part of the White House decision making, my most high level success being the nomination and confirmation of Justice David Souter who remained a friend afterwards.

Maybe most relevant to this letter is that in the fifty years that I have been involved in public policy matters in both Pennsylvania and DOJ–mostly as a private citizen– I have never before communicated to a Judge (Federal or State) on a sentencing matter even though, as you would suspect, I have been approached often. Based on my experience at DOJ, I had always felt that given the pressure on a Judge, he or she did not need another voice from the outside. And when asked by others for advice or suggestions on writing letters such as this, I usually counseled against or declined to offer suggestions.

My decision to write to you is "sui generis"--I feel that strongly about John's situation.

I have known John Bolton since 1974 when he was a young lawyer working on Buckley v Valeo, and I was a young staffer at the RNC. His wife and my then girlfriend shared an office and I saw him quite often. Obviously his legal efforts were successful and even though I am not personally happy with the long term results of the case, he obviously handled his assignment well.

When Governor Thornburgh became Attorney General under President Reagan in the summer of 1988, I then re-met John at DOJ where he was heading the Civil Division and I saw or spoke to him a few times a week on DOJ matters and, as always professional, courteous, helpful and with a sense of humor.

VP Bush was elected President in November and I was managing the "transition" (as it were) between Reagan and Bush since AG Thornburgh had been asked to stay on. John informed me immediately —others didn't–that he had no interest in staying on and would help in any way with the transition and we should make plans accordingly– his was a class act and not necessarily repeated by others.

A month later, he informed me that he would be joining the State Department with responsibility for the UN portfolio, ironically replacing a man who had earlier worked for Thornburgh in Pennsylvania. We didn't see much of each other for the next few years.

In February of 1982, President Bush asked (now ex-AG) Thornburgh to go to the United Nations in NYC as Undersecretary General of the UN. When the AG called me to ask for my advice, his first words were "I will call Jim Baker, you call John Bolton and find out what this is all about." And that began a transition process that had John and me communicating on a daily basis and as always with John, professional and making sure that our activities would be consistent and aligned with US Government policy if there was one.

As part of the transition, I met at John's office in Feb 1992 at a SCIF in a sub-basement at State) where he and his colleagues shared CIA, FBI, State Dept material relevant to our duties ..especially about our new international "colleagues" and their backgrounds. And as usual, professional and relevant and a cautionary note about the UN and its "civil service" employees.

As the meeting was about to end, John said " I have to leave and attend a farewell party for another about- to- be UN employee" and then smilingly said "Its for our mutual friend Catherine Bertini who is becoming the CEO of the UN World Food Program in Rome." We then drove to the reception and on the way, explained to me that he had successfully convinced 65 other countries and the UN Secretary General to make her the CEO which he did.

When we arrived, Catherine–only expecting to see John– said "what are you doing here and what are you doing next."..and six months later, joined her at WFP as her financial and "ethics/accountability" advisor adhering to the stated policies of the US (under John's direction) to make the UN more accountable and transparent in a fastly changing world.

When President Bush (the second) asked John to become the US representative to the UN, I volunteered to help John in any way I could, and wrote a letter (publlshed on April 29, 2005 ) to the NYTImes recommending John's appointment and why he was exactly what the United Nations AND the USA needed at that time–a strong advocate for the US as well as a "reformer" who recognized that the potential of the UN could only be realized if it adopted better accountability and transparency. John is an effective change maker and gets things done.

And lastly and relevant to John's sentencing case in front of you, but without commenting on his specifics, I should mention that when at DOJ, I was asked to review and comment on intelligence and national security matters that were in the public domain. While I don't remember the specifics of most, I DO remember Israel asking the US to –once again–release Jonathon Pollard and reviewed the material before his release was once again denied. The charges against John–as I understand them from the public record- do not remotely rise to the level as any of those that I reviewed from 1988-1991.

I don't always agree with John's foreign policy views–including the Middle East today–and have told him so . But he has always respected and defended the official position of our leaders–and has done so with vigor, enthusiasm, intellectual honesty and can be trusted to support and defend the US interest, regardless of his personal views.

He is a good man and I would hope you will show him leniency at sentencing, in the form of a non-custodial sentence, for a man who deserves to live out the rest of his life surrounded by his family and supportive community.

Murray Dickman

Your Name

**B-40**

August 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to provide a point of reference regarding Ambassador Bolton. I have not known or collaborated with Ambassador Bolton in any professional capacity or on a recurring basis, but I have spent time with him and his family as his daughter is one of my closest friends from Yale College. Jennifer Sarah Bolton (his daughter) and I were randomly assigned to share a suite during our freshman year at Yale in 2004 and continued to share a suite during our sophomore and junior years. We have remained close friends since our graduation in 2008.

While my specific memories of Ambassador Bolton are few and consist largely of a dinner during college and a handful of visits during college breaks to the Boltons' home in Bethesda and their Ambassadorial residence in New York, he has always been courteous and welcoming to me and any of our friends.

The most profound thing I can say about Ambassador Bolton is that he has helped to raise a daughter of exceptional service and character. Jennifer Sarah Bolton, since I met her at age 17, has always been incredibly intelligent, service-oriented, and kind with her friends. She has built her life around serving others, including through her many leadership roles in her community, and has consistently been a friend that is counted on by many. She has committed herself to servant leadership roles in all elements of her life. While this is primarily a testament to *her* character, it is also a testament to the familial influences around her.

Thank you for your review of this letter.

Andriana Diez

**B-41**

The Honorable Theodore D. Chuang

United States District Court

District of Maryland

6500 Cherrywood Lane

Greenbelt, Maryland 20770

Dear Judge Chuang:

I am writing to you on behalf of my friend and colleague, Ambassador John Bolton. I have known John personally and professionally for over 50 years. I know firsthand his devotion to America, to America's standing in the world, and to the many public policy issues that he has worked on for these many years.

I first met John in the mid-1970s, at a time when we both came to Washington after finishing law school. I was in charge of a yearly policy conference in Washington where individuals came to our Nation's Capital to hear and participate in discussions about important economic, foreign policy and judicial topics. John was a speaker at several of these conferences and his thoughts on these topics always contributed mightily to the success of the conferences.

Later in the decade, I was running a statewide campaign in Texas. We again called upon John for assistance as we ferreted out a number of difficult ballot access issues. The goal was to guarantee a ballot that would be easily understandable to the voters and one that would accurately capture the public's ultimate electoral judgment.

During the Reagan Administration in the 1980s, I had the opportunity to work with John on two separate occasions. First, we were colleagues at the Agency for International Development (AID) where we worked for a number of years to strengthen the Agency and helped make it more effective and responsive to key US foreign policy interests. Among the ideas we implemented included introducing policy reform and market economics as part of America's economic assistance programs. We also focused on strengthening the administration and implementation of the many AID programs. John always felt that while foreign assistance programs were important as part of America's foreign policy, he

also felt that taxpayers were entitled to feel confident that monies spent were used in the most effective manner possible.

Later in the 1980s, John was an Assistant Attorney General in the Reagan Justice Department. He again worked on a variety of initiatives with the common goal of improving the administration of justice and helping President Reagan to achieve his DOJ objectives.

One issue John and I worked on was the selection of federal judges. Reagan always discarded politics when it came to judicial selections. However, he was clear that judges needed to show reverence for the Constitution and embrace the judiciary's role as part of the separation of powers in our federal system. John worked with these principles in mind. I was at the White House at that time and also had a role in judicial selection. It is one of the things that I am most proud of. We were able to nominate and confirm an absolutely outstanding array of federal judges.

Later on during the first Bush Administration, I had some interaction with John as he worked at the Department of State where he assisted Secretary James Baker on so many important topics including the first Gulf War and managing the end of the Cold War. These were critically important issues for our country and we were lucky to have people like John assisting Secretary Baker and President Bush.

I have stayed friends with John over the decades as I have followed his career, especially the serious books he has written and lectures he has given on a variety of foreign policy topics. His key insights on so many important topics has always enriched the public dialogue and contributed to the public .understanding of important matters.

Thank you for allowing me to offer these observations.

Sincerely,

Frank J. Donatelli

**The Rt Hon Sir Iain Duncan Smith MP**

**B-42**

House of Commons
London SW1A 0AA

The Honourable Theodore D. Chuang

United States District Court

District of Maryland

6500 Cherrywood Lane Greenbelt, MD 20770

3rd August 2026

Dear Sir,

I am writing concerning my friend of many years, Ambassador John Bolton.

I have known John for 34 years. During that time as a member of Parliament in the United Kingdom, I have served as leader of the Conservative Party and in 2010 as Secretary of State for Work and Pensions. Throughout that time, whether either of us was in government, we met regularly, either when I was visiting the United States or when John was visiting the United Kingdom. I write this letter in the respectful hope that John, a faithful servant of the United States, the country he loves be, in this matter, shown leniency.

I have throughout the 34 years of our friendship, found John to be honest and direct. His belief in his country and the importance of the alliance with the UK is profound and always strongly expressed in our meetings with many of my parliamentary colleagues throughout that time. John always took a great interest in the political ups and downs in the UK and was always well informed about the nature of our political system and the key characters in it. John was particularly helpful when it came to understanding the nature of decision making in the US, a very important reference point in times of disagreement between us. John's calm explanations informed by his periods of service and work in policy formation were hugely helpful. I also found his deep knowledge of international affairs, particularly with problems in the Middle East and the threats posed to the NATO Alliance, an asset.

John's wise and balanced views were always helpful in understanding the nature of the UK/US relationship, which is particularly critical at this time of growing threats from totalitarianism in so many critical areas. Such calm council has been much needed in the US/UK relationship over the years, given our propensity to misinterpret each other's motivations at critical moments. I never once heard him talk his country down in discussion or make personal attacks against those holding the reins of power.

On a wider note, during my time in politics I have set up the Centre for Social Justice, which seeks to find solutions to the drivers of poverty, and the Inter Parliamentary Alliance on China (IPAC), concerned with the growing power of China. In both cases John has shown great interest and has helped in establishing links with Think Tanks in Washington.

John's writings on international affairs are always a must read, particularly I believe here in the UK. His ability to get to the nub of the problem and explain it in simple terms has helped many of us understand American thinking at critical points, thus helping debate her in the UK parliament as well as abroad.

In conclusion, as a son of a highly decorated fighter pilot during World War 2 and having served as well in the British Army on the front line in Germany during the Cold War, I have as a result developed a strong belief in the honourable nature of service to one's country. From the very beginning of our relationship, I saw that same belief in John. I have rarely met someone who has so impressed me with that belief of how their country can be a force for good in the world. That is why I believe that Ambassador Bolton puts honourable service to country above all else and as such is the epitome of an honourable man.

That is why, in the circumstances of this case I ask that leniency be shown to this decent and honourable man who's first and last thought is for the benefit of his country.

Yours faithfully,

**The Rt Hon Sir Iain Duncan Smith MP**

[redacted]



ERIC S. EDELMAN

B-43

[redacted]

August 4, 2026

**The Honorable Theodore D. Chuang**
**United States District Court District of Maryland**
**6500 Cherrywood Lane, Greenbelt, MD 20770**

Dear Judge Chuang,

I am writing to urge leniency in sentencing Ambassador John Bolton rather than incarceration. I have known and worked with Ambassador Bolton for over thirty years in a variety of capacities. We first met and worked together when I was a Special Assistant to then Under Secretary of State for Political Affairs Robert Kimmitt and John was Assistant Secretary of State for International Organizations. At that time (1989) I got to see his commitment to protecting and defending the United States personally as we worked on the invocation of Article 51 of the UN Charter and Article 21 of the Charter of the Organization of American States to defend US actions against Manuel Noriega in the United Nations on a lawful basis.

In 1990 I became an Assistant Deputy Under Secretary of Defense for the Soviet Union and Eastern Europe and in 1990-1991 I continued to work with John as he put together much of the multilateral diplomacy that enabled Secretary Baker to successfully build an international coalition to reverse Saddam Hussein's aggression against the backdrop of a collapsing Soviet Union. I well recall his indefatigable work in that effort and the degree to which Secretary Baker appeared to be relying heavily on him (as well as my former boss Bob Kimmitt).

In 2001, I was working at the Whtie House as Principal Deputy National Security Advisor to Vice President Dick Cheney and John was Under Secretary of State for Arms Control and International Security. In that capacity we labored together to successfully withdraw the United States from the ABM Treaty of 1972 that enabled the deployment of the missile



[redacted]

[redacted]



defense architecture that currently provides a limited defense against ballistic missile attack and to reach an arms control agreement with Russia that would dramatically reduce the level of nuclear weapons deployed by each side – The Strategic Offensive Reductions Treaty (SORT) that cut the number of warheads on each side by the largest percentage of any treaty in the arms control era. John's determination, intelligence and underrated skill as a negotiator managed to accomplish this in a shorter period than any other arms control treaty and at shorter length. It was and remains one of the most underappreciated accomplishments of arms control.

I could go at length to discuss work John did at the United Nations when I was Under Secretary of Defense for Policy and we worked together on UN Security Resolution 1701 that brought about a ceasefire between Israel and Hezbollah on better terms than might have been expected given the pressures to reach an early truce at the time.

In all of these episodes I saw a man driven by patriotism, upstanding character, an ability to resist lazy conventional wisdom to get to the best solution to a problem and a desire to secure peace and safety for the American people who he always reminded us we were privileged to serve in government. His long years of public service have demonstrated his fidelity to basic convictions, reverence for the Constitution, and devotion to the security of the American people. I urge his sentence reflect that service to our country.

Sincerely,

*Eric S. Edelman*



[redacted]

**B-44**

July 29, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

I write in support of Ambassador John Bolton, a longtime professional colleague and friend, to ask that you show him leniency in the form of a sentence other than incarceration given his long and creditable service to the United States.

I have known John professionally for over twenty years, beginning with our service together in the first term of President George W. Bush. During that time, John worked at the State Department where he was the undersecretary responsible for nonproliferation, arms control, and a host of other international issues, organizations, and agreements. I served as his Department of Defense counterpart between 2002 and 2004, where I had the opportunity to work with him closely in the advancement of core American interests and policy goals. From my routine interactions with him in Washington to long trips abroad on behalf of the U.S. government, I observed John working assiduously to safeguard U.S. political leaders and military personnel from the International Criminal Court; to shut down the international trafficking of Weapons of Mass Destruction between states hostile to the U.S., such as Iran and North Korea; to preserve American military capabilities, freedom of action, and sovereignty in a wide range of global arms control negotiations; and to labor on numerous other issues to advance U.S. security interests with our allies and partners and abroad. It is fair to say that John's dedication, initiative, and hard work during those years materially advanced the interests of the United States in a manner that protected the nation and the American people in numerous ways.

Following our time together in the Bush administration, John and I remained in touch, often discussing the top foreign policy issues of the day and various ways to resolve them. I always found my conversations with John insightful and helpful. I know that many others also appreciated his perspectives as they were so often shared in opinion pieces and interviews. Importantly, John never hesitated to pick up the phone, to engage others, and to discuss policy matters regardless of political party, if doing so would advance America's interests.

Years later, John and I found ourselves working together once again during the first term of President Donald J. Trump. John served as National Security Advisor during my tenure as Secretary of the Army, and eventually when I served as Secretary of Defense. Once again, I witnessed the same tenacity and commitment he had shown years earlier to advance U.S. interests abroad, to address threats to the country head on, and to formulate policy recommendations that would safeguard the United States, the American people, and the

collective interests of our nation's allies. During our brief time working together directly in the Trump Administration, I saw him take important stands and advance well developed recommendations on issues ranging from North Korea's nuclear program and Iran's use of foreign proxies to threaten U.S. friends and interests, to China's illicit activities against the U.S. and Russia's aggressions against American allies in Europe, and from U.S. policies and programs in Afghanistan to defeat the Taliban to similar types of efforts against terrorist groups in Africa and the Mid-East. On more than one occasion, I observed John arguing his views against a majority in the White House who disagreed, and sometimes in opposition to the president, in order to present more options and different ways to think about solving a problem. I believe that his dogged advancement of critical policy views and ideas, coupled with his hard work and steadfastness, promoted vital U.S. interests and protected American lives.

In over two decades of knowing John, and in working with him twice in two separate and very different presidential administrations at the highest levels of the federal government, I saw John put the security of the United States, the advancement of our country's interests, and the protection of the American people first and foremost; that he pursued these noble aims with a principled and consistent steadfastness and moral courage that is quite uncommon; that he likely sacrificed a less demanding and more lucrative professional path in the private sector to serve the greater public good; and that his efforts clearly promoted the nation's interests and the welfare of the American people.

Considering the great and material service that Ambassador John Bolton has given to the country and the American people over many years and multiple administrations, I reiterate my request that you show John leniency in the form of a sentence other than incarceration.

Respectfully,

Mark T. Esper

Mark T. Esper
27th Secretary of Defense

B-45

August 4, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane Greenbelt, MD 20770

Dear Judge Chuang:

I am writing as a former colleague of Ambassador John Bolton's to respectfully request that you consider leniency in your sentencing decision, in the form of a sentence other than incarceration.

I served as a career Coast Guard officer for 40 years, having served over 11 years at sea around the world, as a ship captain for six of those years, and eight tours of duty in Washington, DC, assigned to the National Security Council for four years, for two different Presidents, the House of Representatives as a liaison for two years, the Joint Staff, a Fellow at the Center for Strategic and International Studes for one year, and a variety of Coast Guard Headquarters assignments as a program manager and budget and program reviewer. Additionally, I served as Chief of Staff to the Coast Guard's Atlantic Area command, which is the largest command in the Coast Guard. In these positions, I have had great opportunity to observe the character of others in general, and specifically, the character of others under political and operational pressure.

I met Ambassador Bolton in the Spring of 2018, as he became the National Security Advisor to President Trump. At the time, I was the Senior Director for Resilience Policy on the National Security Council staff; I was detailed from the U.S. Coast Guard. I ultimately served as the Homeland Security and Counterterrorism Advisor, and for a four-month period filled in for the duties of the vacant Deputy National Security Advisor, during which I reported to Ambassador Bolton. During this 17-month period of time, I interacted very closely with Ambassador Bolton. While overseeing the federal responses to a variety of natural and manmade disasters, and my Resilience Directorate team had been operation 7/24 for over a month, I asked for Ambassador Bolton's support to have the President visit my team for a morale boost. Over the next two days, he arranged for both the President and Vice President to visit, which was generally unprecedented—these visits greatly boosted our weary morale. Additionally, Ambassador Bolton visited with my team as well, reminding my team of the importance of their work. In late 2018, in the absence of a Deputy National Security Advisor, I stepped in to support Ambassador Bolton as the Deputies Committee Chair, to weigh some very significant issues with Iran. During this intense period, we discussed the development of diplomatic, economic and military options for the President that represented the best ways to achieve our desired national outcome. I also worked closely with Coast Guard leadership to invite Ambassador Bolton to be the Commencement speaker at my alma mater, the United States Coast Guard Academy, where he very capably addressed the graduating class about the challenges and opportunities of public leadership, and he also cast a vision for re-asserting American dominance as an Arctic nation. In our myriad situations where we had overlapping interests, I always found him to be approachable, objective, well-grounded and fair. And while not material to your judgment, he has a fantastic sense of humor. In each of these high visibility and high consequence circumstances, I would characterize his conduct as persistently honorable, lawful, ethical and patriotic. The gravity of his position was a noteworthy stressor, and I was a daily eyewitness to him maintaining his strong character under these stressors.

I consider him to be a mentor and a friend. He is a wonderfully decent person who has served our country at the highest levels, and has done so under tremendous pressure and in admirable fashion.

Thank you, Judge Chuang, for considering my request to show Ambassador Bolton leniency in your sentencing judgment.

Very respectfully yours,

Douglas M. Fears
Rear Admiral (Retired)

**B-46**

**Douglas J. Feith**
**Hudson Institute**
[redacted]

July 20, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Re: Ambassador John Bolton

Dear Judge Chuang,

John Bolton and I have known each other and worked together for nearly fifty years, since the Reagan administration. I write to help the court weigh his character.

First, a word on my background. I am a lawyer and was in private practice from 1978 to 1981 and from 1986 to 2001. I have also been a national security policy official. In the Reagan administration, I worked on the National Security Council staff and later served as a deputy assistant secretary of defense. In the G.W. Bush administration, I served as the undersecretary of defense for policy, generally described as the number-three civilian position in the Defense Department. I now work as a senior fellow at Hudson Institute.

During both of my times in the government, and occasionally in the periods between and after, I interacted fairly extensively with Mr. Bolton. We have never been social friends, but we know each professionally and I feel competent to comment on him as a person and on his contributions to our country.

It is clear that one of the principal motives in Mr. Bolton's life is the desire to serve the United States and to protect it, as the oath says, from all enemies foreign and domestic. He has always spoken of our republic with love and admiration and of our Constitution with thoughtful reverence. He has consistently expressed staunchly conservative views, but I have always been impressed by the way I have heard him speak respectfully of fellow citizens who do not share his politics.

The matters on which we collaborated are too numerous to catalog, so I shall mention only a few. Our closest cooperation was during the G.W. Bush administration, especially after 9/11. We both negotiated with Russia regarding missile defenses and strategic offensive arms. We worked together on protecting U.S. service members from improper foreign legal prosecutions, on opposing the nuclear weapons programs of Iran and North Korea and on keeping the U.S. nuclear arsenal safe and effective. When our government was devising its responses to 9/11, Mr. Bolton and I worked together on important initiatives relating to maritime security and the interdiction of al-Qaeda operatives attempting to flee from Afghanistan to Africa and elsewhere.

When Mr. Bolton was national security advisor, I worked as a private citizen with a small number of former senior military and civilian officials on security challenges in the Eastern Mediterranean and, in that connection, I met with Mr. Bolton at the White House to share proposals for U.S. action.

I have worked with many U.S. officials over many decades, but I have known very few who have shown Mr. Bolton's principled, disinterested commitment to serve what they studiously judged to be the U.S. national interest. I have known even fewer who, as a result of that service, have had to endure for years threats to themselves and their families from foreign enemies. Iran has tormented Mr. Bolton with such threats and our government recently increased the danger by withdrawing personal protection for him.

We are all flawed human beings and Mr. Bolton has undoubtedly made errors, as have we all, but I have no doubt as to his love of our country, the high value of his service and the gratitude that all Americans owe him for that service.

I hope the court will take all this duly into account.

With respect, I am

Yours truly,

Douglas J. Feith
Senior Fellow

Edward J. Forand Jr.
[redacted]

B-47

July 25, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Dear Judge Chuang:

I am writing on behalf of my longtime friend John R. Bolton as you consider his sentence. I respectfully ask that you show John leniency and impose a sentence that does not include incarceration.

John and I were roommates at Yale University for three years during the late 1960s. Living together for that length of time gave me the opportunity to know him closely—not only as an exceptionally bright and dedicated student, but also as a friend. In fact, I do not believe I have ever known anyone more devoted to learning.

John held strong and deeply considered conservative views, while I was equally opinionated on the liberal side. We were living through a period of tremendous political upheaval, including the civil rights movement and the Vietnam War. When it came to politics, John and I agreed on next to nothing, and neither of us was reluctant to say so.

I remember one occasion when we were sharing a pizza at our favorite spot and became so absorbed in arguing about the political crisis of the day that we could barely pause long enough to eat. Yet when the argument was over, we walked back to campus together, joking and enjoying each other's company. Our disagreements could be intense, but John never allowed them to diminish our friendship or his respect for me as a person.

One particular experience has remained with me for nearly six decades because it so clearly exemplifies the humanity, loyalty, and sensitivity I have known in John throughout our friendship.

In 1968, I was working for Senator Robert F. Kennedy's presidential campaign in Connecticut and was deeply committed to his candidacy. John, as one might expect, was no admirer of Senator Kennedy's politics. Nevertheless, the day after Senator Kennedy was assassinated, John called me from Baltimore. He expressed his condolences, asked how I was doing, and offered words of comfort and encouragement.

That call was not the only reason I came to understand John as a caring and loyal person. Rather, it was one especially memorable example of the qualities I had seen in him during the years we lived together. John understood what Senator Kennedy and the campaign meant to me. At a

moment when I was shocked and grieving, he put aside every political difference between us and reached out simply as my friend.

The gesture has stayed with me because it revealed something fundamental about John—qualities that have shaped my view of him ever since. He could be intellectually forceful and unwavering in his beliefs, but he could also recognize and respond to another person's pain. He understood that political differences did not have to stand in the way of friendship, compassion, or human connection. That is who I have always known John to be: loyal, caring, thoughtful, and deeply human.

John went on to an extraordinarily accomplished public life. Others can speak more fully about his many years of service to the country. What I can offer the Court is a more personal view of the man behind that public career—the friend I have known since our youth and whose humanity made a lasting impression on me.

The examples and qualities I personally experienced and have enumerated here form the basis for my respectful request that John not be sentenced to prison. I believe he remains capable of contributing to his country and to the lives of others and that he should be given the opportunity to continue doing so.

Thank you for considering my perspective and my request for leniency.

Respectfully,

Edward J. Forand Jr.

**B-48**

Louis Freeh
[redacted]

Robert Torricelli
[redacted]

August 6, 2026

To: Honorable Theodore D. Chuang
U.S. District Court Greenbelt Division
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Re: Ambassador John Bolton

Dear Judge Chuang

This letter is respectfully submitted for your consideration in the sentencing of John Bolton.

During our decades of service within the United States government, both directly and indirectly, we have witnessed John Bolton's outstanding national service.

Concurrent with earning his Juris Doctor from Yale University, John served as a member of the Maryland National Guard and later the U.S. Army Reserve. This combination certainly contributed to his long-term determination to combine his then developing legal skills with a commitment to the security of our country. That commitment continues to this day.

Concluding his service within the Executive Branch as National Security Advisor in 2019, John spent nearly four decades alternating between the private sector and positions of rising influence within the public sector. Other government sector positions included: General Counsel, USAID; Assistant Administrator for Program and Policy Coordination, USAID; U.S. Assistant Attorney General for the Office of Legislative Affairs; U.S. Assistant Attorney General for the Civil Division; Assistant Secretary of State for Arms Control and International Security Affairs; Commissioner, U.S. Commission on International Religious Freedom; and U.S. Ambassador to the United Nations.

Even when he was working in the private sector, John Bolton's commitment to national security remained firm. A prime example of this was when President George W. Bush had just identified Iraq, Iran, and North Korea as the "Axis of Evil". Recognizing a serious shortfall, John Bolton correctly added Syria, Libya, and Cuba when he published *Beyond the Axis of Evil* in 2002. President G. W. Bush recognized the value of having someone ready to speak up when needed. This is exactly the type of leader President Bush needed to serve as U.S. Ambassador to the United Nations.

John Bolton served as President Trump's National Security Advisor alongside Michael Pompeo as Secretary of State, General (Retired) James Mattis as Secretary of Defense, and General (Retired) John Kelly as White House Chief of Staff. The service and dedication of these career public servants to the United States have been significant and sustained.

Of all senior members of President Trump's staff, John Bolton perhaps had the best understanding of Iran and the entire Middle East situation. As evidenced then and now in his writings, John understands and provides continuing public analyses of America's international policies.

Among the most angered by his view is the Islamic Republic of Iran and its main sponsor of international terrorism, the IRGC. The Federal Bureau of Investigation fortunately stopped an IRGC plan to murder John Bolton, which resulted in round-the-clock U.S. Secret Service protection for him and his family.

Being the victim of a foreign planned assassination attempt, which resulted in full-time executive protection, is an example of John Bolton's sacrifice and service to the Nation. In January 2024, the U.S. Department of State placed a $20M bounty on the IRGC-Qods Force member-still believed to be in Iran-who had recruited an assassin to kill Mr. Bolton in the Washington, D.C. area. This failed assassination attempt serves as a red flag to the danger that Mr. Bolton would face if incarcerated. It is not beyond the reach of the IRGC to hire a federal inmate to execute the assassination. Prison security operations are not designed to prevent such a threat and would inevitably prove to be inadequate because there is no chance for adaptability or response.

John Bolton's experience, leadership, service and sacrifice to the United States of America over four decades should be favorably weighed as the Court considers its sentence.

Honorable Louis J. Freeh
Former Director, Federal Bureau of Investigation

Robert G Torricelli
Honorable Robert Torricelli
Former U.S. Senator, New Jersey

Christopher J. Fussner

Email: [redacted]
SG Mobile: [redacted]
US Mobile: [redacted]

22 June 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

I am writing to respectfully request you show my friend, Ambassador John Bolton, mercy in the form of a sentence other than incarceration.

John has served in various capacities in the Republican Party from the 1980s to present. Despite the circumstances he is in, John is a person of impeccable character and deserves respect for working tirelessly and standing up for the things he believes in.

I am based in Singapore and founded Transtechnology Pte Ltd in 1988. A major distributor of surface mount technology and semiconductor capital equipment, Trans-tec now has 195 employees with offices around the world.

I have served on a variety of non-profit boards and organizations. This includes International Republican Institute (IRI) as Board of Directors and the International Democracy Union (IDU) as a representative and Treasurer. IRI and IDU both work worldwide to advance and strengthen democracy. They collaborate with governments, civil society groups, and political parties to enhance transparency, support free elections, and promote the inclusion of marginalized groups like youth and women. Through these platforms, I have traveled to many countries over the years for Board Meetings and as an Election Observer.

Since the Russian invasion of Ukraine, I have been volunteering by driving/delivering ambulances from 2023 to 2026. I have also attended 3 editions of the Black Sea Security Forum in Odessa, Ukraine, from 2024 to 2026. I am also particularly interested in aiding Ukraine's defense against Russia with drones.

SINGAPORE Residence: The Ocean Front @ Sentosa Cove, [redacted]
Office: Transtechnology Pte Ltd | [redacted]

USA Mail: USA - Spring Creek Ranch, [redacted]
Courier: [redacted]

Christopher J. Fussner

Email: [redacted]
SG Mobile: [redacted]
US Mobile: [redacted]

My interests and objectives align with Ambassador Bolton. He seeks to restore Ronald Reagan's commitment to 'peace through strength'. With advanced technologies, increasing global uncertainties and emerging threats from Russia, China, Iran, Ambassador Bolton aims to raise national security by strengthening military and intelligence capabilities for America as well as that of her allies and friends. Through collaborating with different leaders on our foreign and defense policies, we can further this vision.

I have personally known John for 6 years and he is a gentleman and a well learned scholar. He is and can continue to be an invaluable asset to the country and any organization.

Once again, I implore you to show leniency at sentencing Ambassador Bolton. Thank you for your kind consideration.

Sincerely Yours,

Christopher Fussner

SINGAPORE Residence: The Ocean Front @ Sentosa Cove, [redacted]
Office: Transtechnology Pte Ltd | [redacted]

USA Mail: USA - Spring Creek Ranch, [redacted]
Courier: [redacted]

B-50

**Ambassador Peter W. Galbraith**
[redacted]

July 29, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

**In the matter of John Bolton**

Your Honor:

I write this as someone whose career in public life has overlapped with John Bolton's. I began my government career in 1979 on the Democratic staff of the Senate Foreign Relations Committee which is where I first encountered John Bolton. I went on to serve as the first US Ambassador to Croatia, a country just emerging from Communism.

Part of my job was to support Croatia's transition to democracy. Among other actions, I had to explain to Croatia's ultranationalist leaders that it was unacceptable to use the judicial process against their political enemies and to warn that there would be consequences if they did so.

Later I served with the United Nations in East Timor and Afghanistan. These were also places where democracy, human rights and justice were central to my job.

John Bolton and I interacted occasionally during our times in government and thereafter. We have also debated each other in a public forum. It is fair to say that we disagree strongly on most matters of politics and policy.

Because of my background with the United Nations and in the US government, I was asked to join a list of former high level UN officials and a list of former high

level US national security officials in opposition to Bolton's nomination as US ambassador to the United Nations. I declined to do so.

I felt then, as I feel now, that the President is entitled to his choice of representative to carry put his policies (much as I disagreed with those policies). I also believed then—as I do now—that John Bolton is a man with integrity who is deeply devoted to our country, even if he chooses policies different from mine.

Most fundamentally, I have never believed that political disagreement should make the other person an enemy.

I have worked extensively in places in conflict or just emerging from conflict. I have come to believe that justice and fairness are essential for the success of any government or society. In considering an appropriate sentence for John Bolton, I hope you will take into account not only the actions to which he has pled guilty but also his devotion to our country. Also, there would be an obvious injustice if John Bolton goes to jail for having done essentially the same thing as Donald Trump.

Finally, I am concerned as to what will happen to John Bolton if he is given a custodial sentence. President Trump has made clear he wants bad things to happen to John Bolton. On his first day in office, Trump removed Bolton's secret service protection that the Biden Administration ordered after a credible threat of an Iranian assassination plot was discovered. When Bolton entered his guilty plea, Trump said that he hopes he suffers. All this, of course, is completely inappropriate for a President to say. But, more concerning is that Trump controls both the Justice Department and the Bureau of Prisons and therefore is in a position to make sure that Bolton suffers.

For reasons related to his character, patriotism, safety, age and also to fairness, I hope you will consider leniency for John Bolton.

Peter Galbraith
US Ambassador (ret)

**B-51**

July 15, 2026

The Honorable Judge Theodore D. Chuang
6500 Cherrywood Lane
Suite 245
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to provide a character reference for Ambassador John Bolton. I've known Ambassador Bolton as a professional colleague for at least three decades. I know him as a loyal American, a tremendously helpful colleague, and a public servant of highest integrity.

John and I first worked together as colleagues at American Enterprise Institute (AEI) in the 1990s. I'm an early bird and would arrive to my office by 6:30 am. John's door was already open, coffee on. We would frequently compare notes on the news of the day.

At AEI, John was a perfect illustration of someone who genuinely speaks truth to power. He was a vice president. I was a resident scholar. John always spoke up for staff in event of a conflict with any part of the administration when John felt that staff was in the right. In one case pertaining to me, he defended funding for work abroad arguing that overseas research and international conferences were

indispensable to AEI's mission — and to the U.S. national interest.

In my early dealings with John, I saw him as a tireless colleague with a strong ethical and moral compass. Ask his opinion, he would always tell you exactly what he thought. Ask John for help, he was always there. And he did his homework. John was always through and conscientious in his research, writing, and public speaking. In AEI days, he regularly expressed interest in my work on Germany and Europe. John was eager for the insights of others.

John and I stayed in touch as I took on assignments abroad in the 2000s, running think tanks in London and Berlin, and in the role as president/CEO of U.S.-funded Radio Free Europe/Radio Liberty headquartered in Prague. We're still in contact today in my current role as president/CEO of U.S.-funded Middle East Broadcasting Networks.

I've hosted John as a speaker a number of times both here and abroad. Anytime I have needed a high level U.S. representative for a conference, John has always done his best to be available. Audiences have found him consistently accessible, candid, and refreshing.

I recall on one occasion after a speech in Berlin, an audience member approached me in amazement. She told me that, while on a number of issues she did not share Ambassador

Bolton's view, his directness and openness to debate were admirable and inspiring. Indeed.

I have always found Ambassador John Bolton inspiring as a statesman, scholar, public servant, and representative of the United States.

For the reasons cited above, I am urging you to consider leniency and no term of incarceration at sentencing. I am grateful for your consideration.

Sincerely,

Dr. Jeffrey Gedmin

**B-52**

**Ambassador Dan Gillerman**

FILED
RECEIVED
AUG 06 2026
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY DEPUTY

The Honorable Theodore D. Chuang,
United States District Court
District of Maryland
6500 Cerrywood Lane
Greenbelt,MD 20770
USA

July 17th 2026

Your Honor,

I am writing to respectfully ask that you take into consideration the character, integrity, patriotism, and lifelong public service of Ambassador John R. Bolton when determining an appropriate sentence in his case.

I had the privilege of serving alongside Ambassador Bolton at the United Nations when he was the Permanent Representative of the United States and I served as Israel's Ambassador to the United Nations. During that period, I came to know him not only as a distinguished public servant but also as a man of deep conviction, unwavering dedication, and profound commitment to his country.

In particular, during the Second Lebanon War in 2006, Ambassador Bolton went out of his way to be helpful to Israel while guarding the interests of the United States, and played a significant role in the diplomatic efforts that ultimately led to the ceasefire agreement between Israel and Lebanon. Throughout those difficult days, I witnessed firsthand his professionalism, determination, and willingness to work tirelessly in pursuit of peace and stability.

Our relationship did not end with our diplomatic service. Over the years, I have remained in close contact with Ambassador Bolton and have had many opportunities to observe his conduct, character, and dedication.

Time and again, I have been impressed by his devotion to the United States, his patriotism, and his steadfast commitment to the principles he believes serve his country best.

While I fully respect the judicial process and the responsibilities before the Court, I believe it is important that Your Honor be aware of the many positive qualities that have defined Ambassador Bolton's life and career. He has devoted decades of service to the United States and has consistently demonstrated courage, integrity, and a profound sense of duty.

I have great respect for Ambassador Bolton's character and dedication, and I respectfully ask that these qualities be taken into account in determining an appropriate and lenient sentence.

Thank you for your time and consideration of this request.

Respectfully,

Ambassador Dan Gillerman
Former Permanent Representative of Israel to the United Nations

**Ambassador Dan Gillerman**
[redacted]
T [redacted] F [redacted] M [redacted]

HARVARD LAW SCHOOL

[redacted]

**B-53**

TEL: [redacted]
FAX:
E-MAIL: [redacted]

JACK GOLDSMITH
*Learned Hand Professor of Law*

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane Greenbelt, MD
20770

August 1, 2026

Dear Judge Chuang:

I write to ask that you show Ambassador John Bolton leniency in the form of a sentence that does not include incarceration.

I have known Mr. Bolton since the late 1990s, when I was a law professor at the University of Chicago and he was a Senior Vice-President for Public Policy Research at the American Enterprise Institute. We worked together then on an AEI project on Global Governance, which had a focus on protecting United States sovereignty from the growing reach of international institutions. This was a very serious issue at the time, during the era of the "new world order" of global governance through institutions like the WTO, the Law of the Sea, the International Criminal Court (ICC), and robust human rights bodies.

The AEI project, and Mr. Bolton in particular, saw these institutions as transferring authorities away from accountable national institutions such as Congress, the president, and the American voter toward international bodies, foreign officials, and treaty bodies unaccountable to any American person or institution. The aim of the project and the conference was to present another side to the widespread consensus in favor of such institutions so that there would be more robust debate on the issues—a debate that has, in the intervening years, come down largely against the consensus of the time. One fruit of my collaboration with Mr. Bolton on these issues was a conference in Washington, D.C., the papers of which were published in Volume 1 of the *Chicago Journal of International Law*, to which Mr. Bolton and I both contributed essays.

Mr. Bolton and I later served together in the George W. Bush administration. When he was Under Secretary of State for Arms Control and International Security and I served as Special Counsel to the General Counsel of the Department of Defense, we had dealings on issues of law and policy related to the Bush administration's efforts to protect U.S. persons—especially U.S. servicemembers, intelligence officers, and senior administration figures—from prosecution at the ICC.

Mr. Bolton in this capacity was instrumental in the United States "unsigning" the ICC treaty that President Clinton had signed; in helping to secure so-called Article 98 agreements, which ensured that participating nations would not turn over U.S. citizens to the ICC; and in the Bush administration's efforts to enact the American Servicemembers' Protection Act (ASPA), which aimed to provide additional protections and disincentives for handover of U.S. citizens to the ICC. All three of these achievements have persisted through subsequent administrations: The United States remains outside the Rome Statute, numerous Article 98 agreements remain in force, and the core of ASPA remains law.

In the last two decades since our time in government, I have followed Mr. Bolton's work closely and we have stayed in touch on matters of mutual interest.

I have admired Mr. Bolton unwaveringly since I met him almost three decades ago.

First, he has devoted most of his adult life to the public service of American interests and American sovereignty. He served in the Reagan administration (General Counsel and then Assistant Administrator at USAID, then Assistant Attorney General heading the Justice Department's Civil Division); the George H.W. Bush administration (Assistant Secretary of State for International Organization Affairs); in the George W. Bush administration, not only as Under Secretary of State for Arms Control and International Security, but also as U.S. Representative to the United Nations; and finally as President Trump's National Security Advisor. The through-line across four decades is that Mr. Bolton has worked hard to ensure that American sovereignty, and the interests of the American people, be preserved.

Second, Mr. Bolton has also sought to serve American interests and protect American sovereignty as a productive author and commentator when he was not in government. He is the author of three important books on U.S. foreign policy and sovereignty and a steady stream of informed commentary on these topics, both written and on television. Bolton has sharp views with which many people do not agree. But his arguments are invariably informed, insightful, and on the merits.

Third, Mr. Bolton is a man of extraordinary principle. In a town where intellectual and political integrity are rare commodities, he has held the same core views about the primacy of national sovereignty and the dangers of multinational institutions for four decades—when they were in favor, and when they out of in favor.

Thank you for considering my views, which I respectfully ask that you take into account in your deliberations.

Sincerely,

Jack Goldsmith

Jack L. Goldsmith

B-54

**Harvey Golub**
Chairman and Chief Executive,
Retired
[redacted]

July 16, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

My name is Harvey Golub, and I am writing to provide a character reference for Ambassador John Bolton.

I have known John for over twenty-five years. We first met when he was a senior fellow at the American Enterprise Institute, and we continue to meet and talk several times a year on foreign policy matters.

During the time I have known John, I have found him to be a person of integrity, responsibility, and respect for others. In my experience, John has consistently conducted himself in a thoughtful and dependable manner. I have personally observed qualities of honesty and discipline which I believe reflect his true character. He is an American patriot and cares deeply about our country and position in the world.

I understand that this letter is being submitted for the Court's consideration, and I offer it with full respect for the seriousness of the matter before you. Based on my personal experience with John, I believe the conduct at issue is not representative of the person I have known. I respectfully ask that you consider leniency when evaluating the sentencing.

Thank you for your time and consideration.

Respectfully yours,

Harvey Golub



American Express Travel Related
Services Company, Inc.

Brooklyn Law School
ESTABLISHED 1901

Joel M. Gora
*Emeritus Professor of Law*

**B-55**

July 30, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

My name is Joel M Gora and I have just recently become an emeritus professor at Brooklyn Law School, where I just finished a 48-year law teaching career. My representations to this Court, however, are solely my own. It is my submission that John Bolton's long, distinguished and exceptional career in federal public service at the highest levels warrants this Court's careful and positive consideration of leniency in the form of a sentence other than incarceration.

I have been privileged to have worked in the fields of the first amendment for 60 years, starting as a summer intern at the ACLU and finishing earlier this year when I taught my final class at Brooklyn Law School, a first amendment seminar. In that same period of time I have also been privileged to work on some of the most important Supreme Court cases of our time and to work with and appear before some of the best lawyers and judges in our country.

One of those lawyers is John Bolton. John and I met working together on the landmark 1976 Supreme Court case of *Buckley v. Valeo*. The case involved an unprecedented First Amendment challenge to the unprecedented Federal Election Campaign Act Amendments of 1974. The lead counsel for the challengers in the case was then Yale Law School professor Ralph K. Winter, who later would go on to an illustrious career as a Second Circuit judge and then Chief Judge, and who was a jurist of national renown and respect in the legal community. Professor Winter assembled a team consisting of a major litigation partner at Covington & Burling, two associates from the firm and myself representing the ACLU. One of the associates was John Bolton, a Yale Law graduate who had worked with Professor Winter on the new questions of the relationship between campaign finance restrictions and first amendment rights. It was a natural segway for John to become part of the litigation team that argued for the first amendment in the *Buckley* case.

I came to know John well during the year that we worked on the case intensely. I found him to be exceptionally smart, thoughtful, respectful, and the epitome of a careful, conscientious lawyer. He provided so much of the analytical and editorial glue that held our arguments together. He made an enormous contribution to our victories in the case. And the case has become a First Amendment landmark for these 50 years.

We worked extremely well together on that case and occasionally met in the years since then at events celebrating the first amendment or Judge Winter. I also kept a distant eye on the

[redacted] • [redacted]

extraordinary career of public service John has given to our nation in his life. As his biography indicates he has held a remarkable number of extremely high government posts in four different presidential administrations. Among the most significant of those positions are the following: Assistant Attorney General for the Office of Legislative Affairs, Assistant Attorney General for the Civil Division, Assistant Secretary of State for International Organization Affairs, Under Secretary of State, Ambassador to the United Nations, National Security Advisor. In the annals of American history there have been few individuals who have served so well and with such distinction in so many critical high level positions. In addition to being an extraordinary public servant, he has also performed a critical societal role as a public intellectual, not shrinking from sharing his views and concerns as widely as possible to enhance the public debate and help the people determine the best course of democratic action.

Of course he has now pleaded guilty to a federal offense, and he is now before this court for sentencing. It is not my place to advise the court on the proper sentencing guidelines approach in this case. It would be presumptuous of me to do so. All I can offer is my suggestion that when I spent that intense year with John Bolton working on a landmark Supreme Court decision. I found him to be the epitome of what I thought a lawyer should be: brilliant, thoughtful, diligent and conscientious. I think he carried those traits throughout his exemplary public career. I think w**hen the court weighs all of the pros of John Bolton's life against the cons** reflected in this current proceeding, the great value that his life has had for our country is worth fair, substantial and dispositive consideration.

Thank you for the opportunity to present my perspective on John Bolton to the court.

Respectfully submitted,

Joel M. Gora
Emeritus Professor of Law

**B-56**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

July 10, 2026

Dear Judge Chuang:

By way of introduction, I have been involved with the national security of the United States continuously since my service as an Air Force Officer beginning in 1962. I served as the Chairman of the President's General Advisory Committee on Arms Control (1981-1985), the Deputy Administrator of NASA (1985-1986), the President's Science Advisor and Director of the White House Office of Science and Technology Policy (1986-1989), and was a member of the U.S. Arms Control Negotiating Team (1987-1989) through two Summits with the Soviet Union.

I have closely followed the contributions of Ambassador John Bolton to U.S. national security for forty years. During that time, while he was working in the challenging environments of the State Department, the White House, and the United Nations, Amb. Bolton provided four Presidents with well-developed options intended to strengthen our country's national security.

His work included nuclear, chemical, and biological arms control as Ambassador to the United Nations. He called for verifiable arms control compliance, continuing and strengthening the work I carried out as Chairman of the President's statutory General Advisory Committee on Arms Control and Disarmament and as a member of the U.S. Arms Control Negotiating Team that negotiated with the Soviet Union Team both before and during the 1987 and 1988 US-USSR Summits.

His work at the U.N. demonstrated moral courage and determination even though his positions on arms control were not always popular with other nations, some members of the U.S. Administration, and some members of the Congress.

Overall, I know from first-hand experience in the White House that Amb. Bolton has performed with clarity, insight, and depth of knowledge in managing the daily challenges of developing and implementing national security policies and the competing interests and complexities of the inter-agency process, while making sure the Presidents he served were presented with policy options that served our national interest and were not confronted with international surprises. In short, his work proved fundamental to an effective White House National Security Council.

I believe that Ambassador Bolton would do nothing intentionally to harm the interests of the United States and would protect and strengthen those interests to the greatest extent possible. He deserves our thanks for his contributions during his long career, and lenience and mercy in sentencing.

Respectfully,

*William R. Graham*

The Honorable
William R. Graham, PhD
Chairman, President's General Advisory Committee on Arms Control (1981-1985)
Deputy Administrator, NASA (1985-1986)
Science Advisor to the President, (1986-1989)
Director, Office of Science and Technology Policy, Executive Office of the President, (1986-1989)
Member, US Arms Control Negotiating Team (1987-1989)

wsb



July 28, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to respectfully ask that you take into consideration Ambassador John Bolton's longstanding character, integrity, and lifetime of public service. Having worked closely with Ambassador Bolton for nearly twenty years, I have had the opportunity to observe him not only as a distinguished public servant, but as a professional whose actions have consistently reflected honesty, reliability, and respect for others.

I serve as Managing Director of Global Services at Washington Speakers Bureau, where I have represented Ambassador Bolton since 2007, following his service as the United States Ambassador to the United Nations, with the exception of the period during which he served as National Security Advisor. During that time, I have arranged dozens of speaking engagements for him throughout the United States and around the world.

Throughout my career, I have represented prominent leaders from across the political spectrum. My observations of Ambassador Bolton are not based on political agreement or disagreement, but on nearly two decades of working with him firsthand. In my profession, trust is built over time through consistent actions. Ambassador Bolton has earned the trust of my colleagues, our clients, and me because he does exactly what he says he will do.

Over the course of dozens of engagements, Ambassador Bolton has never cancelled an engagement that I have managed or failed to fulfill his professional commitments exactly as promised. He prepares meticulously for every presentation, remaining a constant student of world affairs so that audiences receive thoughtful, informed, and current insights. Throughout my career, I have seen organizations with a wide range of political and ideological viewpoints invite Ambassador Bolton to speak. They do so not because they necessarily agree with every position he has taken, but because they value hearing from someone with deep experience, intellectual rigor, and a unique perspective on international affairs.

What has impressed me most, however, is his willingness to put the client's needs first. I recall a recent international speaking engagement that had already been arranged when the client requested that Ambassador Bolton extend his time on site and participate in additional media interviews. Without hesitation, he agreed because his priority was ensuring the organization received the greatest possible value and that its audience had the best possible experience. That response was entirely consistent with the professionalism, flexibility, and consideration I have witnessed throughout our relationship.



[redacted]

wsb

I respectfully ask the Court to consider Ambassador Bolton's decades of public service, his exemplary professional character, and the integrity he has demonstrated throughout the many years I have known him. Thank you for your time and thoughtful consideration of my perspective.

Respectfully,

Meredith Graham
Managing Director, Global Services
Washington Speakers Bureau



[redacted]

**B-58**

**Lakewood Advisors, LLC**

[redacted]

July 28, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing on behalf of Ambassador John R. Bolton. I recognize that the responsibility for determining an appropriate sentence rests solely with the Court. My purpose is simply to share my personal observations of John's character, integrity, and judgment based upon nearly a decade of serving with him on the Board of Directors of Diamond Offshore Drilling, Inc.

By way of background, my career has been spent in positions where integrity and sound judgment were essential. I have served as Executive Vice President and head of operations of CBS Corporation, President of Amalgamated Bank, President of Sony Corporation's North American Electronics Business, and later as an investment banker advising corporations, boards of directors, financial institutions, and government officials through complex financial and operational matters. I have also served on numerous public and private company Boards of directors and audit committees and have evaluated senior executives, worked with countless directors, and been responsible for corporate governance, risk management, legal compliance, and ethical oversight.

I joined the Board of Directors of Diamond Offshore Drilling and became Chairman of its Audit Committee in 2018. John served with me on that Committee throughout most of my tenure.

Diamond Offshore was one of the world's leading offshore drilling companies, conducting business in numerous countries where political instability, government ownership of energy assets, and corruption created significant legal and ethical risks. The work of the Audit Committee extended well beyond reviewing financial statements. We regularly considered international compliance issues, litigation, internal controls, tax matters, and the Company's obligations under the Foreign Corrupt Practices Act and other U.S. and foreign laws.

It was in that environment that I came to know John well as he became my trusted advisors on complex international legal and regulatory issues.

One matter that particularly stands out involved the Company's operations in Brazil. During that period Brazil was experiencing extraordinary political corruption, much of it involving Petrobras, the government-controlled oil company. Diamond Offshore's relationship with Petrobras became increasingly complicated, culminating in disputes over the termination of the

Ocean Valor drilling contract and related legal and tax issues. Those matters presented significant legal, financial, and ethical challenges for the Company and demanded careful oversight by the Audit Committee.

As Chairman of the Audit Committee, I was deeply concerned about the Company's obligations under both U.S. law and Brazilian law and about ensuring that Diamond Offshore maintained the highest ethical standards in an environment where those standards were not always observed by others. I frequently sought John's judgment on these matters because of his extensive international experience and his exceptional understanding of government, international affairs, and legal compliance.

What impressed me most was not simply his knowledge, but his unwavering integrity. John never suggested taking shortcuts, exploiting ambiguities, or compromising ethical principles in order to achieve a business objective. On the contrary, he consistently urged that the Company follow both the letter and the spirit of the law, even when doing so imposed additional costs or made our business more difficult. His concern was always that Diamond Offshore conduct itself in a manner that would withstand the closest legal and ethical scrutiny.

The same was true with respect to the Company's international tax matters. Our operations in numerous jurisdictions inevitably produced complicated tax questions. John's advice was consistently that we should comply fully with both United States and foreign tax laws, regardless of the financial consequences. He viewed ethical conduct and legal compliance not as business obstacles but as fundamental obligations of a public company and its directors.

Perhaps the most meaningful aspect of my relationship with John is that it was never political. In fact, our political views are quite different. I am a Democrat and have served as an officer of several labor union-affiliated organizations. John, of course, is one of the country's best-known conservative Republicans. Yet politics never entered into our work together. I did not know John as a political advisor or government official. I knew him as a fellow director confronting difficult business decisions under demanding circumstances.

Our political differences make my assessment of his character all the more meaningful. Throughout the years we served together, I never once saw John allow ideology or personal interest to interfere with his judgment. His advice was consistently thoughtful, objective, careful, and guided by what he believed was legally and ethically correct. Even outside Diamond Offshore, when I faced complicated international business questions, I sought his perspective. While I reached my own conclusions, I valued his judgment because I knew it would be honest, balanced, confidential, and free of personal agenda.

We also discussed domestic economic and public policy issues from time to time. Although those conversations often ended with us disagreeing on policy, I always found his opinions to be carefully reasoned and intellectually honest. One could disagree with John's conclusions, but I never questioned the sincerity or integrity with which he reached them.

After spending nearly ten years working alongside John in one of the most demanding governance environments I have experienced during my career, I came to regard him as a highly

principled public servant and corporate director. My opinion is based not upon politics or ideology, but upon years of observing him make difficult decisions involving legal compliance, corporate governance, and ethical responsibility. I never saw him place personal advantage above his duty. I always saw him insist that we do the right thing, even when it was the harder course.

During my nearly ten years of working beside John in situations where integrity mattered, I can say without hesitation that I trusted his judgment completely. I would do so again today. For those reasons, I respectfully ask the Court to consider John Boltons long history of integrity, public service, and ethical leadership in determining an appropriate sentence.

Respectfully,

Edward Grebow

Anne Campbell Gruner
[redacted]

**B-59**

July 5, 2026

The Honorable Theordore D. Chuang
United Staes District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to ask you to please consider the totality of Ambassador John Bolton's public service and his extensive contribution to his country over many years to grant him leniency when you consider his sentencing later this year.

I had the honor of working closely with Amb. Bolton in the years 2000-2002 when he was Under Secretary of State for Arms Control and International Security. At that time, I was the Deputy Director of the Weapons Intelligence, Non-Proliferation, and Arms Control Center (WINPAC), an Intelligence Community staff led by the Central Intelligence Agency. As a Senior Executive Intelligence Officer (SIS-4) with the rank equivalent to a Lieutenant General, I represented some 13 agencies of the Intelligence Community in interagency meetings, with senior officials, and in international arms control negotiations. All intelligence information, policy positions, and analysis given to Amb. Bolton were coordinated and generally agreed upon by all agencies so that he received the best our government could provide, including agency disagreements and alternative views.

It was in this period that Amb. Bolton negotiated the Strategic Offensive Reductions Treaty (SORT), also known as "The Moscow Treaty." Negotiations began in Moscow in January 2002 and the treaty was signed by Presidents George W. Bush and Vladimir Putin in Moscow on May 24, 2002. I served as the senior intelligence advisor to Amb. Bolton during these talks held in Moscow on multiple occasions along with other senior representatives from U.S. policy agencies. We met with the Russian delegation headed by Deputy Foreign Minister Georgy Mamedov. I previously had served as a junior intelligence advisor to Ambassador Paul Nitze in the Intermediate-Range Nuclear Forces (INF) Treaty negotiations in the 1980s.

The atmosphere of the SORT negotiations was intense because Moscow, displeased with US plans to withdraw from the 1972 Anti-Ballistic Missile (ABM) Treaty, refused to implement the agreed nuclear reductions in the 1993 START II Treaty. Putin had only been inaugurated as President for a brief time. In short, it was a period of great uncertainty in our dealings with Russia and there was considerable concern on our part about the need to continue restraining Russian nuclear forces. American and Russian objectives did not at all align, with Moscow trying to drastically cut U.S. strategic forces and impose a complex verification regime while Washington sought to preserve maximum force flexibility without complicated new verification.

Anne Campbell Gruner

[redacted]

My job was to provide Amb. Bolton daily intelligence briefings and any other intelligence he needed or requested with regard to Russian military forces, negotiating strategy, or anticipated Russian reactions. Naturally, much of the intelligence came from highly sensitive sources and analysis. Throughout this period, and in negotiations with the Russians, I never saw Amb. Bolton "slip up" with respect to accidently revealing anything that compromised intelligence sources or methods. It is easy for this to occur in vigorous debates with diplomatic adversaries, especially regarding numbers. capabilities, or intentions of opposing military forces. In my view. Amb. Bolton spoke carefully but forcefully, making America's case and pressuring the Russians to agree to U.S. terms without putting them on the defensive or slighting them. Minister Mamedov appeared to genuinely respect Amb. Bolton as they disagreed and engaged in productive and polite dialogue outlining different positions. Also in dealing with me and other members of the U.S. delegation, I found him to be respectful in every way, even as he demanded high standards of performance from all of us. I heard no complaints about Amb. Bolton.

In the end, the Russians said they would take the U.S. proposal back to their leadership for consideration. It was unclear what the result would be. The American proposal was daring in the extent of its reductions of both sides' forces but favorable to the U.S. in imposing no new verification provisions beyond those of START I. Many doubted Putin would agree to it. But in the end, he did, and Presidents Bush and Putin signed the Treaty in Moscow in May 2002.

The Moscow Treaty was stunning not only in the size of reductions agreed to but in the amazingly short period of time in which it was negotiated, mere months. Most such treaties literally take years to negotiate. Moreover, with the Russians refusing to implement START II. the Moscow Treaty was effectively the bridge between the old Start I Treaty and yet-to-be-negotiated "New Start" which would not come into force until February 2011. The Moscow Treaty ensured nuclear stability in this volatile time, a critical factor for America and the world.

I personally believe the negotiation succeeded due to Amb. Bolton's mastery of detail and diplomatic skill in presenting a tough but persuasive position. I would describe him as a hardworking, principled, highly intelligent and dedicated civil servant who cares deeply for his country and its security. I witnessed this personally as he accomplished a significant and difficult goal for our country and the world. In this process, I perceived nothing in any way inappropriate or concerning, but felt I had been part of making history by a true and brilliant patriot.

I served with Amb. Bolton for a mere sliver of his distinguished public service career that included, in addition to Under Secretary of State and Ambassador to the United Nations, Assistant Secretary of State for International Organization Affairs, Assistant Attorney General. Assistant Administrator and General Counsel at USAID. and Commissioner. US Commission on International Religious Freedom. My duties and responsibility as a Senior Executive and center-level manager at CIA pale in comparison to those entailed in his assignments. Amb. Bolton surely spent a majority of his time away from his family and friends, working and traveling extensively, with hundreds of hours of overtime, and dealing with the continuous pressure and

**Anne Campbell Gruner**
[redacted]

stress that come with such jobs. He continued to move up in his public service under multiple presidents, a testament to his competence, hard work, dedication, and sacrifice for his country.

I am aware that many, including myself, do not always share Amb. Bolton's policy views. But having worked directly with him, I believe they are held by a man of great integrity, expertise, and experience who has unfailingly served his country for many years regardless of the cost to himself and his family.

Given the totality of Amb. Bolton's public service and the contribution he has made, including the rapid conclusion of the 1992 Moscow Treaty which I witnessed personally, I feel he has earned leniency in the matter of his handling of classified information. I am most grateful for your taking this into account in your deliberations.

Respectfully,

Anne C. Gruner

Anne C. Gruner

Stephen J. Hadley
[redacted]

**B-60**

July 20, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

This letter concerns the case of John Bolton which I believe is pending before you for sentencing. Based on my firsthand knowledge of John's character, his commitment to country, and his long and exemplary record of public service, I write to urge leniency in this case and in particular that any sentence you impose not include incarceration.

John has served this country in important positions throughout his distinguished career. These have included service in the U.S. Army Reserve and the Maryland Army National Guard, and positions of significant responsibility in the Department of Justice, Department of State, National Security Council, and at the United Nations. As is often the case with public service, this work was not without personal sacrifice on the part of John and his family.

During my time as Deputy National Security Advisor and then National Security Advisor during the eight years of the George W. Bush administration, I worked with John and witnessed firsthand his dedication and commitment to advancing the interests of our nation and his effectiveness in doing so.

For example, while he served as Under Secretary of State for Arms Control and International Security Affairs, John undertook to negotiate so-called Article 98 agreements in which countries agreed not to turn over Americans to the International Criminal Court. These agreements were critical because of the real risk of politically motivated criminal prosecutions of our men and women in uniform by an institution to which the United States was not a member and whose authority it did not recognize. Many people in the State Department were skeptical of this effort and offered little support, but John doggedly persevered and almost single-handedly negotiated dozens of these agreements. Americans serving in our military were safer in performing what our nation asked of them as a result of John's efforts.

As Under Secretary, John also was instrumental in creating the Proliferation Security Initiative (PSI). Under this innovative arrangement, nations agreed to coordinate their efforts to interdict the flow of technology and materials for making weapons of mass destruction — including especially nuclear weapons — to states of concern and terrorists. Through the effort of John and others, ultimately over 100 nations agreed to join PSI.

As Ambassador to the United Nations, John led the effort to reform the United Nations Human Rights Commission, which had fallen under the control of some of the world's most human rights-abusing nations. While initially controversial, ultimately both Republicans and Democrats came to share John's view and support his efforts.

My respectful hope, your Honor, is that you will take this record of service and accomplishment into account in your sentencing decision. I hope you will find that incarceration would be inappropriate in this case — especially given the precedents set in cases involving public figures such as David Petraeus, John Deutch, and Sandy Berger.

Thank you for your consideration.

Respectfully,

Stephen J. Hadley

**B-61**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing in advance of Ambassador John Bolton's hearing to request that you show leniency in the form of a sentence not requiring incarceration. I know John to have been one of America's most stalwart defenders and public servants of the past several decades and fervently hope that his relentless dedication to our nation's security and a more stable and peaceful world can be appropriately weighed in the balance as you determine his (and his family's) fate.

I have known John personally since we worked together during the presidency of George W. Bush. I served on Vice President Cheney's national security staff—as his deputy national security advisor from 2001-2005 and then as his national security advisor from 2005-2009. This overlapped with John's tenure as Undersecretary of State for Arms Control and, subsequently, as President Bush's Ambassador to the United Nations.

I should note that, even before meeting John, I was a first-hand witness to what I consider one of his most admirable accomplishments: leading the US government's efforts to rescind the scurrilous 1975 United Nations General Assembly resolution declaring "Zionism is racism." I was at the time a relatively new member of the State Department's Policy Planning Staff and enjoyed a front row seat watching John, President George H.W. Bush's Assistant Secretary of State for International Organization Affairs, tirelessly and brilliantly engineer the diplomatic strategy that in 1991 reversed that notorious stain on the UN's reputation. John's work was an enormous inspiration to many young US officials, such as myself, who sincerely believed in America's ability to use principled diplomacy to advance a foreign policy grounded in morality and common decency.

More than a decade later, it was a great privilege to work alongside John as a colleague in support of many of the critical diplomatic initiatives that he spearheaded on behalf of the United States. There are too many to mention, but among the greatest hits were his negotiation of scores of bilateral agreements to protect US military personnel from spurious prosecution by the International Criminal Court, his high stakes diplomacy with Russia to reduce strategic nuclear warheads and preserve America's ability to protect the Homeland from missile attack, and his successful work as UN ambassador to rally a global consensus against the illicit nuclear weapons programs of both North Korea and Iran. John's efforts to advance US interests were simply herculean. His combination of brilliant strategizing, real-world execution, and sheer doggedness were a true force of nature that delivered major benefits for the country. Whether you found yourself opposed to or in agreement with John's substantive viewpoint on any particular issue, there was one thing that none of his colleagues that I served with ever doubted: his single-minded dedication to the country's safety and security, the defense of America's

allies, and the values of liberty, the rule of law, and democratic governance, Service to the United States and the American people were, unfailingly, John's north star throughout a truly distinguished and remarkable career.

Your Honor, I deeply appreciate your willingness to take into consideration my request for leniency for a man I know to have been a deeply loyal and committed public servant to the country we all love. I wish you the best in making such a momentous decision and thank you for your own service.

With great respect,

8-11-2026

John Hannah

B-62

**Princeton University**

DEPARTMENT OF PHYSICS: JOSEPH HENRY LABORATORIES
JADWIN HALL
[redacted]

July 22, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

I am writng to urge you to show maximum leniency to Ambassador John Bolton, who will appear before you for sentencing in the coming months. I expect you will receive many letters like mine, so I will be brief.

Let me begin with a few words about myself to help you assess my remarks. Both Ambassador Bolton and I came from families with limited financial means, and we had to work hard to win scholarships to get through college. But aside from that, our backgrounds could hardly be more different. I am an emeritus professor of physics from Princeton University. Throughout my life I have focussed on hard facts of nature, on experiments, on instrument calibrations, on differential equations, etc. I do speak several foreign languages, including Russian and German, but mostly to access untranslated scientific literature. I am the quintessential nerd.

Ambassador Bolton asked me to join the National Security Council (NSC) in the year 2018 to serve as Deputy Assistant to the President and Senior Director for Emerging Technologies. My job was to help the National Security Council deal with issues that involved lots of science and technology. For example, one of my first assigments was to find ways to make the electrical grid of the United States less vulnerable to EMPs – electromagnetic pulses. These can cause serious damage to large transformers and other power transmission equipment. Without proper protection of the grid, electrical power to large sections of the country can be interrupted for long periods of time. Both naturally occuring large solar flares and high altitude nuclear explosions can produce EMPs.

During my year at the NSC I attended regular staff meetings with Ambassador Bolton and I got to know him pretty well. It was clear that the Ambassador had a firm belief in right and wrong. If some issue appeared wrong to him, he would say so, without euphemisms. I was impressed by how well he treated me and other members of his staff and by how willing he was to help us do our jobs, while coping with the complicated personalities of our nation's capitol, including President Trump. I don't remember a single occasion where Ambassador Bolton unfairly criticized any member of his own staff.

**Telephone:** [redacted] **E-mail:** [redacted]

Ambassador Bolton has always been a fierce defender of the United States of America and its citizens. But he is concerned about the people of the world too. During my year at the NSC, the political situation in Venezuela was particularly troubling. I remember that Ambassador Bolton frequently expressed sympathy for the people of Venzeuela, and he was constantly looking for ways to help them.

Since I returned to Princeton, I have stayed in touch with Ambassador Bolton. As a member of the board of some high-tech companies, Ambassador Bolton sometimes asks me for advice on scientific or engineering projects. He listens carefully to my responses, whether they reinforce his own views or not. Whatever the Ambassador does, it is always with due diligence.

Thank you for considering my request for leniency to Ambassador Bolton. He has devoted his life to serving our country. I hope he is fairly treated in return.

Sincerely,

William Happer

William Happer
Cyrus Fogg Brackett
Professor of Physics
Emeritus

**B-63**

July 21, 2026

The Honorable Theodore D. Chuang

United States District Court

District of Maryland

6500 Cherrywood Lane

Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to you as someone who has known Ambassador John Bolton for several decades.

His distinguished career in public service and my own five decades of service in the American Jewish community intersected on numerous occasions. Specifically, I served as the Chief Executive Officer of the American Jewish Committee, the nation's oldest human relations agency, from 1990 to 2022 and, before that, most recently as the organization's Washington-based Director of Government and International Affairs.

I met with Ambassador Bolton numerous times to discuss issues related to his various government posts, whether in Washington at the Department of State or in New York at the United States Mission to the United Nations. There were also occasions when we exchanged phone calls or when he was invited to address larger forums.

Without hesitation, I found Ambassador Bolton to be an individual of strong principles, steadfast dedication to public service, unwavering pride in our country, unflinching commitment to American national security, and remarkable moral courage. His job titles may have changed over the years, with ever greater responsibility, but, in my experience, his core values never did.

I will never forget, for example, his leadership role in the repeal of UN General Assembly Resolution 3379, one of only a handful of occasions in the history of the United Nations when a General Assembly resolution has been rescinded.

At the time of its adoption in 1975, libelously declaring Zionism, the national liberation movement of the Jewish people, to be a form of "racism," the United States vigorously opposed it. Yet few imagined it could ever be reversed. Ambassador Bolton proved the skeptics wrong sixteen years later. He spearheaded the effort, secured broad international support, and achieved what had previously seemed unimaginable.

I saw the process up close, including Ambassador Bolton's central role. Like Daniel Patrick Moynihan, America's Ambassador to the United Nations in 1975, he understood the catastrophic implications of this resolution for the United States, the Jewish people, and the credibility of the United Nations. Backed by the full diplomatic support of the United States, Ambassador Bolton played a decisive role in bringing about the historic 1991 decision of the UN General Assembly.

There were other such examples of Ambassador Bolton's efforts that I witnessed, whether up close or from a distance, when they involved threats to the American homeland from nuclear proliferation, terrorist networks, or malign, anti-American forces in the Middle East and elsewhere.

Throughout my interactions with Ambassador Bolton, it always seemed to me that his first concern—whether he found himself in the majority or the minority on any particular issue—was the protection of the American homeland, America's allies, and America's role as a champion of freedom and democracy.

I respectfully request that the Court take into consideration Ambassador Bolton's many contributions to our country's well-being as it considers the next phase of these proceedings. I remain grateful for all that he has accomplished, and I consider myself fortunate to have had numerous opportunities to interact with him throughout his distinguished career.

Thank you for your consideration of this letter.

Respectfully,

David Harris

Roger Hertog
[redacted]

**B-64**

July 31, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, ND 20770

Dear Judge Chuang,

I have known John Bolton for nearly 30 years, during which he served President H.W. Bush, 1989-1996, for the final three years of his administration as his Assistant Secretary for International Organization Affairs, President George W. Bush, 2001-2009, for his first term as his Undersecretary of State for Arms Control and later as his United National Ambassador for one year. And in 2018-19, he was President Donald J. Trump's National Security Advisor.

By any standard, Mr. Bolton's achievements and responsibilities have been extraordinary. But among these, it was his post as U.N. Ambassador that revealed both the depth of his character, and his resolute commitment to government service. Despite the incessant controversy concerning the legitimacy of Mr. Bolton's recess appointment to the U.N., he neither lost his temper nor did less than his best under the most difficult circumstances.

An op-ed written by James A. Baker III, who served in the Reagan and George H. Bush administrations, and Edwin Meese III, who served alongside Mr. Baker during the Reagan years, corroborates Mr. Bolton's character and patriotism. They wrote: "During our time with Mr. Bolton at the Justice and State Departments, we never knew of any instance in which he abused or berated anyone he worked with. Nor was his loyalty to us or the presidents we served ever questioned. And we never knew of an instance in which he distorted factual evidence to make it fit political ends." (*NY Times*, May 11, 2005)

The following month, on September 17, 2005, Bret Stephens, a Pulitzer Prize winning journalist, wrote in his column in the *Wall Street Journal*: "In person, the 56-year-old diplomat (John Bolton) does not come across as the pit-bull of leftist caricature. He is neither brash nor pompous, and not remotely oily."

Perhaps what makes Mr. Bolton's achievements even more remarkable is that he is what we might call "a self-made man." Born into a working-class family, his father was a firefighter for the city of Baltimore, and his mother, Virginia, was a homemaker. To his credit, Mr. Bolton's academic aptitude and hard work earned him admittance to Yale University, where he was awarded his B.A. in 1970, and his Jurist Doctor degree by its law school in 1974.

Roger Hertog
[redacted]

For clarity, I am both a friend and admirer of Mr. Bolton, but I have never served in any political or governmental position. My career has been in finance, as a founder, in 1968, of the investment, research, and management company, S.C. Bernstein and Co. I retired in 2006 after 38 years with the firm to devote my full-time efforts to philanthropy. I have served as Chairman of the Manhattan Institute, Chairman of the New York Historical Society, Chairman of The Tikvah Fund, Boad Member of the American Enterprise Institute, and as a member of the Council on Foreign Relations. In recognition of these contributions, I was granted the National Endowment for Humanities Award by President George W. Bush.

As his friend, I ask you, Judge Chuang, to take Mr. Bolton's extraordinary achievements as a public servant, as well as his character and patriotism into consideration upon sentencing him.

Thank you,

Roger Hertog

Roger Hertog

**B-65**

The Honorable Theodore D. Chuang July 31, 2026
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to provide a character reference for John Bolton. While I have not known him in a professional capacity or seen him on a daily basis, I have known him for many years as the father of one of my closest college friends.

During college, I had the opportunity to spend meaningful time with him on several occasions, including sharing meals with the Bolton family and staying at their home over a Thanksgiving weekend. My interactions with him continued periodically after college. Throughout each interaction, he was consistently warm and welcoming. He made me feel at home, extending kindness and hospitality.

During these interactions, it was clear how much he cared for his daughter, and took pride in supporting her. He has that same love and dedication in his role as a grandfather to his beautiful granddaughter.

I appreciate your consideration of my perspective and respectfully offer this letter in support of John Bolton.

Respectfully,

Elisabeth Hill

# Larry Hogan

**B-66**

August 1, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Dear Judge Chuang:

I am writing to respectfully ask the Court to consider Ambassador John Bolton's character and record of honorable public service in determining an appropriate sentence.

Ambassador Bolton is a lifelong Marylander. Born and raised in Baltimore County, he went to the McDonough School before getting his undergraduate and law degrees from Yale. He served honorably in the Maryland National Guard, and throughout his public career, has called Maryland his home.

While I served as Governor of Maryland from 2015 to 2023, I got to know Ambassador Bolton through our shared involvement in public service and public affairs. In my personal interactions with him, I have found him to be thoughtful, serious, and deeply committed to the United States. Our conversations have revolved around the issues facing our nation and I have found Ambassador Bolton's demeanor and character to be steadfastly rooted in personal conviction, duty, and commitment to American values.

Ambassador Bolton has devoted much of his professional life to public service. He has served in several senior positions in the federal government and has spent decades devoted to issues involving national security and foreign policy. His clear patriotism is undeniable and shows a deeply held personal integrity.

I offer this letter to provide my personal positive assessment of Ambassador Bolton's character and record of honorable service, both to Maryland and to the nation. I understand that the Court must consider all of the relevant circumstances in determining a sentence.

It is my hope that Ambassador Bolton's strong history of public service and personal integrity will, on balance, prompt the Court to mitigate the sentence that the Court ultimately imposes.

Thank you for your consideration.

Sincerely,

Lawrence J. Hogan, Jr.
62nd Governor of Maryland

[redacted]

**B-67**

The Honorable Theordore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

Ambassador John Bolton recently agreed to settle the case against him in the District of Maryland, pleading guilty to one of the 18 counts brought against him. Since an important factor in sentencing is the character of the Defendant, I am reaching out to you to provide my personal experiences and assessment of John Bolton's character and commitment to this country.

I have known John for thirty-five years both in a professional and personal capacity. I first met him when he was Assistant Secretary of State for International Organizations in the administration of President George Herbert Walker Bush. I knew him in the intervening years not only when he was a resident scholar at the American Enterprise Institute, but when he was an Under Secretary of State and I was Assistant Secretary for International Organizations in the administration of President George W. Bush.

We worked closely together in many capacities during those years, not only as colleagues while at State but on numerous collaborative projects while he was at AEI and I was at The Heritage Foundation. I arranged opportunities for him to speak at Heritage, and we would often be together in making public appearances in the US and Europe commenting on US foreign policy. For example, I once arranged for him to speak at Heritage on the International Criminal Court, and we appeared together at a conference on US foreign policy in Venice, Italy. We also became good friends, frequently having lunch or dinner together and staying in touch to confer on American foreign policy.

I have always known John to be a man of honesty and high personal integrity. I always knew that his word could be trusted. I worked in Washington, D.C., for almost four decades, and John's integrity on this point stands out. For example, during the early days of the Bush administration, John was the most important person I relied on in navigating the personnel process of the Bush administration. John was always generous with his time and advice, and he became a close friend in these years. When the time came to swear me in as Assistant Secretary of State, it was John Bolton who presided over the ceremony.

There are few people I know who more strongly stand up for their convictions, even to the point where it costs them personally. Many times, while at State I personally witnessed instances where he refused to go along with an action or policy that he thought was wrong. His actions

later while in public office also attest to this fact. Most people would simply go along despite personal qualms, but not John. What was sometimes misconstrued as stubbornness was steadfastness. It required moral courage. While others would succumb to political expedience when their personal interests were adversely affected, John stood firm, even when it cost him personally.

Above all, I know John Bolton to be someone fiercely dedicated to the safety and security of the United States. Whether it was his positions on arms negotiations with the Russians or Iranians, his concern first and foremost was the security of the United States. I saw this personally when I was Assistant Secretary of State, but also when observing and working with him in later years.

In addition, over the years I had the opportunity to work with people who once worked for John at the State Department. My two deputies while at State were once former employees of John, and after I left the State Department, I hired one of his associates at The Heritage Foundation. Hiring his associates attests to the trust I had in his professional judgement. During this time these associates always spoke highly of John, and there was nothing I learned that would cast doubt on his personal integrity.

Lastly, John Bolton has had a personal impact on my life. He has been a good friend who was always generous with his time and assistance. Most importantly, it was his example of steadfastness in the face of adversity that impressed me the most. I would sometimes ask myself, "what would John say" when considering a policy. That is not something I would do often with other people.

I, therefore, respectfully request leniency at sentencing for Ambassador John Bolton. It is mainly his willingness to sacrifice on behalf of principle that I believe should be considered during sentencing. He is not a man who takes the easy way out or carelessly pursues personal gain. Whatever mistakes he admits to making, they do not, in my view, reflect a broader carelessness or deficiency of character. I ask you to consider his long years of service to this country, his standing up for his convictions despite the personal cost, and the positive impact he has had on me and other Americans who wish to serve their country.

Respectfully,

Kim R. Holmes

**From: Sir Gerald Howarth**

[redacted]

**T:** [redacted] **M:** [redacted]

B-68

24th July 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang

I write in support of Ambassador John Bolton whom I have known for over 20 years and respectfully request that he be dealt with leniently.

It might help if I were to set out my own background. I was a Member of Parliament for about 30 years during which time I served as Parliamentary Private Secretary to former Prime Minister Margaret Thatcher, Vice-Chairman of the House of Commons Defence Committee, Opposition Defence Spokesman (a 'Shadow Minister' in our terminology) and then, from 2010-12 I served as Minister for International Security Strategy at the Ministry of Defence.

If it is with some hesitation that I write this letter, that is because I am acutely aware of concerns on both sides of the Atlantic about foreign interference in our respective democracies. However, without in any way seeking to interfere, I though it might help the court to know of the contribution which I believe Ambassador Bolton has made to the enhancement of Anglo-American relations, something which is very important for both international security and for the security of the United States of America as well.

We first met in London when John was Under Secretary of State for Arms Control and International Security and I was a Member of Parliament serving as a Shadow Defence Minister. We shared a similar political philosophy and had both worked for, and remained friends with, our respective leaders, Mrs Thatcher and President Reagan who had themselves become close personal friends.

Our contact resumed following the Russian invasion of Ukraine 4 years ago. I had been Chairman of the Parliamentary Committee for Ukraine and feel passionately that the three nations whose leaders signed the 1995 Budapest Memorandum, Boris Yeltsin for Russia, Bill Clinton for the United States, and John Major for the United Kingdom, need to stand by an international agreement under which the sovereignty, independence and existing borders of Ukraine were to be 'respected'. John shares that view, as a result of which we have corresponded regularly and met up in London.

In recent years, John has become a regular and widely-recognised columnist for the influential newspaper, The Daily Telegraph. At a time when relations between our two countries are undergoing quite serious strains, John's voice has served to reassure us that there is at least one 'across the Pond' who understands us. Furthermore, when he spoke at a meeting which I attended in London late last year, his commentary on critical international issues was both measured and courteous. John has won many friends here - an Ambassador in fact as well as name - a factor which I firmly believe is of value to the United States.

In conclusion, I do very much hope that you will be able to appreciate the contribution to Anglo-American relations made by Ambassador Bolton and will, in consequence, feel able to treat him leniently.

Thank you for taking the time to read this letter.

Yours sincerely

Gerald Howarth

SIR GERALD HOWARTH

B-69

**Sir Bernard Jenkin MP**

**Member of Parliament for Harwich and North Essex**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770
C/O the Legal Representatives of Amb. John Bolton

29th July 2026

Dear Judge Chuang

I have served as a Member of the House of Commons since 1992, including roles in the Shadow Cabinet, and as Chair of various House of Commons Committees. Throughout my career, I have taken a close interest in US-UK relations, in the defence policy of both nations, and in the importance of the Nato alliance.

I am writing through the legal representative to Ambassador John Bolton to request that you show leniency and understanding in the matter of your sentencing of Ambassador John Bolton. Despite that the court has found against him, this does not diminish my respect and admiration for him, both as a friend, as a trusted colleague in the field of international relations, and as staunch representative of the United States around the world.

I first met John when he was Under Secretary of State for Arms Control and International Security. I was visiting Washington as Shadow Defence Secretary of the United Kingdom in 2002. He struck me then as a man of principle and courage. Over our 24 years' acquaintance, we have talked and met regularly. His clarity of understanding of the US national interest in the context of the international issues is awesome. We do not always agree by any means, but he has always been frank and informative. It is rare to find someone in politics who you can trust absolutely, but he is that rare commodity.

He has endlessly agreed to speak and brief UK politicians at my request, recently briefing at my request the Leader of His Majesty's Official Opposition and Leader of the Conservative Party, Ms Kemi Badenoch. He is a political and personal friend you can rely on.

**WORKING FOR HARWICH & NORTH ESSEX**

**TEL:** [redacted] **e-mail:** [redacted] **website: www.bernardjenkinmp.com**

**Sir Bernard Jenkin MP**

**Member of Parliament for Harwich and North Essex**

I particularly recall one occasion when he spoke at the Royal Institute of International Affairs at Chatham House in London, as US Ambassador to the United Nations. After delivering his address, he was asked what he regards as the highest legal authority in the world. Without hesitation, he said, "The Constitution of the United States of America". Chatham House is not the kind of audience that necessarily would agree with that answer, but he nevertheless commanded the respect of the room, by his courage, clarity and patriotism.

John is no threat to US national security, or to the people of the United States. Whatever sentence you hand down, I beg you to leave him free to to carry on serving his country and the cause of democracy and security in the world.

With all best wishes

Respectfully,

**Sir Bernard Jenkin MP**

**WORKING FOR HARWICH & NORTH ESSEX**

**TEL:** [redacted] **e-mail:** [redacted] **website: www.bernardjenkinmp.com**

**B-70**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

12 July 2026

Dear Judge Chuang:

Thank you for the opportunity to provide you with my personal perspectives on the contributions made by Ambassador John Bolton to our nation's security, as well as his character during the six years we served together during the presidency of George W. Bush. As a career civil servant, I had the honor and privilege of serving on the National Security Staff from January 2001 until November 2004 and then at the State Department from 2005 until 2007. During my years at the White House, John was Under Secretary of State for Arms Control and International Security, the same position that I held following my Senate confirmation after John became our UN Ambassador. Throughout this period John and I worked very closely together, often on a day-to-day basis, on some of the most pressing challenges that faced our nation.

President Bush assumed office committed to protecting our country from the emerging threats, especially rouge states seeking increasingly longer-range ballistic missiles and weapons of mass destruction, primarily nuclear arms that could allow them to dominate their regions and deter the United States from coming to the assistance of our friends and allies. Prior to the 9-11 attacks, the President's top priority was clearing the path to allow us to protect against the ballistic missile threat to our nation. I was assigned the task of coordinating the interagency effort to withdraw from the Cold War Anti-Ballistic Missile Treaty. John, at the State Department, played a critical role in our success that culminated in the formal withdrawal in June 2002. The ABM Treaty had dominated U.S. strategic doctrine for 30 years. The concept was that, by prohibiting any and all defense of our territory and population centers against missile attack, we would avoid a buildup of offensive weapons by the Soviet Union. While its logic proved counter factual, the treaty was nevertheless ingrained in our national security institutions and in the minds of many strategic analysts. Only with John's persuasiveness and persistence were we able to convince our allies, and even the top leaders at the Department of State, to support the President's objective. As a consequence, today we have deployed missile defenses that are assessed to be effective against the nuclear-armed North Korea missile force.

Ambassador Bolton also played a key role in advancing the President's international initiatives to dissuade and deter proliferators from continuing their WMD programs. In 2003, he was the chief diplomat leading and chairing the negotiations with the initial members of the Proliferation Security Initiative. He received compliments and commendations from the President and from the leaders of the other involved nations for

his skillful and principled effort to develop a means to work together to stop and interdict the trafficking in technologies and materials involved in proliferation programs. The initiative has now expanded to well over 100 members and can be credited with interdicting multiple key shipments of sensitive items. Personally, I give John the lion's share of credit for this success, including the interdiction of a large shipment of centrifuge parts that was being sent to Libya by the A Q Khan network. This resulted in the end of that network and the Libyan nuclear program

Other non- and counterproliferation initiatives also benefited directly from Ambassador Bolton's involvement and leadership both at State and at the United Nations. These included the Global Initiative to Combat Nuclear Terrorism, the G8 Kananaskis Global Partnership, and the UN Security Council resolution requiring all member states to establish effective export controls and to protect sensitive technologies and materials that could be used in WMD programs. These were extraordinarily successful initiatives with truly impressive achievements. John's contributions were unique, and proved vital to strengthening our nation's security,

For almost 6 full years, I had the good fortune to work in partnership with Ambassador Bolton to advance the President's goal to protect our nation from the world's most dangerous weapons in the possession of adversaries, both states and terrorists. In doing so we dealt with the most sensitive issues at the highest level of classified intelligence. Never during this entire time did I ever doubt John's complete dedication to our nation's interests. Like others, he put in enormous effort under pressure, often 7 days a week. He was an exemplary professional in every way, placing our nation's interests above his own. As I look back on those years, I am proud to have served with him as a friend and partner.

To conclude, I know John to be a patriot who has dedicated his life to promoting the common defense of our great nation. Thank you for your consideration.

Respectfully,

Robert Joseph

Robert Joseph