# Exhibit B, Part 2

[B-71 through B-140]

## Exhibit B – Part 2 Index


| Exhibit No. | Description | Page |
|---|---|---|
| **Exhibit B-71** | Juster, Kenneth I. Letter | 153 |
| **Exhibit B-72** | Kasparov, Garry Letter | 155 |
| **Exhibit B-73** | Keating, Frank Letter | 156 |
| **Exhibit B-74** | Kemp, Richard Letter | 157 |
| **Exhibit B-75** | Kim, Sang Joo Letter | 159 |
| **Exhibit B-76** | Kinzinger, Adam Letter | 160 |
| **Exhibit B-77** | Kirkpatrick, Melanie Letter | 162 |
| **Exhibit B-78** | Kohr, Howard A. Letter | 164 |
| **Exhibit B-79** | Kololyan, Marisa Letter | 166 |
| **Exhibit B-80** | Kovner, Bruce Letter | 167 |
| **Exhibit B-81** | Kristol, William Letter | 169 |
| **Exhibit B-82** | Krueger, Bruce K. Letter | 170 |
| **Exhibit B-83** | Kupperman, Charles M. Letter | 172 |
| **Exhibit B-84** | Landry, Brock R. Letter | 175 |
| **Exhibit B-85** | Langman, Steven Letter | 177 |
| **Exhibit B-86** | Larson, Mark Letter | 179 |
| **Exhibit B-87** | Lavin, Franklin L. Letter | 180 |
| **Exhibit B-88** | Lawless, Richard P. Letter | 182 |
| **Exhibit B-89** | Laxalt, Adam P. Letter | 184 |
| **Exhibit B-90** | Levy, Michael Letter | 186 |
| **Exhibit B-91** | Levy, Paul S. Letter | 188 |
| **Exhibit B-92** | Lowry, Rich Letter | 190 |
| **Exhibit B-93** | Lufkin, Dan Letter | 192 |

| Exhibit No. | Description | Page |
|---|---|---|
| **Exhibit B-94** | Lynes, Sara Letter | 193 |
| **Exhibit B-95** | Lytton, William B. Letter | 194 |
| **Exhibit B-96** | Mariaschin, Daniel S. Letter | 197 |
| **Exhibit B-97** | Martin, Wesley M. Letter | 198 |
| **Exhibit B-98** | May, Clifford D. Letter | 201 |
| **Exhibit B-99** | Miller, Judith Letter | 203 |
| **Exhibit B-100** | Nordlinger, Jay Letter | 205 |
| **Exhibit B-101** | Osborne, Eric G. Letter | 207 |
| **Exhibit B-102** | Pence, Robert Frank Letter | 209 |
| **Exhibit B-103** | Pence, Michael R. Letter | 211 |
| **Exhibit B-104** | Pipes, Daniel Letter | 212 |
| **Exhibit B-105** | Rao, Rohini Letter | 213 |
| **Exhibit B-106** | Ream, Roger Letter | 214 |
| **Exhibit B-107** | Reich, Otto J. Letter | 216 |
| **Exhibit B-108** | Rhoads, Harry, Jr. Letter | 219 |
| **Exhibit B-109** | Roberts, James C. Letter | 220 |
| **Exhibit B-110** | Rogers, Ed Letter | 222 |
| **Exhibit B-111** | Romney, Mitt Letter | 223 |
| **Exhibit B-112** | Rooney, Francis Letter | 224 |
| **Exhibit B-113** | Rosen, James Letter | 225 |
| **Exhibit B-114** | Ros-Lehtinen, Ileana Letter | 228 |
| **Exhibit B-115** | Rostow, Nicholas Letter | 229 |
| **Exhibit B-116** | Rove, Karl Letter | 230 |

| Exhibit No. | Description | Page |
|---|---|---|
| **Exhibit B-117** | Samuelian, Christine Letter | 231 |
| **Exhibit B-118** | Semerad, Kate Letter | 234 |
| **Exhibit B-119** | Shaheen, Therese Letter | 235 |
| **Exhibit B-120** | Shelby, Richard D. Letter | 237 |
| **Exhibit B-121** | Spitzer, Arther B. Letter | 238 |
| **Exhibit B-122** | Strong, William H. Letter | 240 |
| **Exhibit B-123** | Switzer, Tom Letter | 242 |
| **Exhibit B-124** | Taylor, Miles Letter | 244 |
| **Exhibit B-125** | Terwilliger, George J., III | 247 |
| **Exhibit B-126** | Tigay, Eytan Letter | 250 |
| **Exhibit B-127** | Tinsley, Sarah Letter | 252 |
| **Exhibit B-128** | Tisch, James S. Letter | 257 |
| **Exhibit B-129** | Untermeyer, Chase Letter | 260 |
| **Exhibit B-130** | Volker, Kurt Letter | 262 |
| **Exhibit B-131** | Wagner, Abraham R. Letter | 265 |
| **Exhibit B-132** | Wallace, Mark D. Letter | 266 |
| **Exhibit B-133** | Wallison, Peter J. Letter | 269 |
| **Exhibit B-134** | Williamson, Edwin D. Letter | 271 |
| **Exhibit B-135** | Wolcott, Jackie Letter | 273 |
| **Exhibit B-136** | Wolff, Alejandro Letter | 276 |
| **Exhibit B-137** | Wolfowitz, Paul D. Letter | 278 |
| **Exhibit B-138** | Wrenn, Carter Letter | 281 |
| **Exhibit B-139** | Yoo, John C. Letter | 284 |

| Exhibit No. | Description | Page |
|---|---|---|
| **Exhibit B-140** | Zeidman, Fred S. Letter | 287 |

**B - 71**

July 13, 2026

The Honorable Theodore D. Chuang

United States District Court

District of Maryland

6500 Cherrywood Lane

Greenbelt, MD 20770

Dear Judge Chuang:

I am writing in support of John Bolton, who has been a professional colleague in three different U.S. administrations. While John and I have not always agreed on every substantive issue, I have great respect for his integrity, his unwavering dedication to his work, his love for and devotion to the United States of America, and his perseverance in seeking to advance U.S. national interests.

I first met John in 1989 during the George H.W. Bush Administration. I was the Senior Advisor to Deputy Secretary of State Lawrence Eagleburger and John was the Assistant Secretary for International Organizations. I would interact with John from time to time and was always impressed by his intellect and sense of purpose. In John's position, he oversaw the U.S. government's participation in the United Nations. The end of the Cold War had revitalized activity at the United Nations. Among the various initiatives that John undertook during his tenure as Assistant Secretary, one stands out for me.

In 1991, when the Administration was launching a new effort to promote peace in the Middle East, it decided to try to repeal the 1975 UN General Assembly resolution that equated Zionism with racism. John led this effort for the State Department, along with the U.S. Permanent Representative to the UN. John was relentless and successful in this admirable task. His work helped pave the way for the Madrid Peace Conference of 1991, which was aimed at reviving the Israeli-Palestinian peace process. The leadership of the State Department widely admired John for what he had accomplished.

I next worked with John from 2001-2005 during the first term of the George W. Bush Administration. I was the Under Secretary of Commerce for Industry and Security and John was the Under Secretary of State for Arms Control and International Security. Because we both oversaw security issues, including export controls, for our respective departments, we periodically got together, along with the Under Secretary of Defense for Policy, to discuss and coordinate our policy views.

John was a respectful and collegial colleague. I especially remember that John conceived and developed the Proliferation Security Initiative (PSI) after 15 Scud missiles were found on board an unflagged North Korean freighter, but they could not be confiscated under international law. The PSI is a global effort aimed at stopping the trafficking of weapons of mass destruction, their delivery systems, and related materials to and from states and non-state actors of proliferation concern. While the PSI began with 11 core countries, my understanding is that it now includes the endorsement of over 100 nations around the world and plays a significant role in protecting America and its allies and partners. Few people can claim credit for conceptualizing and successfully launching a significant and impactful international initiative. Due to his intellectual creativity and diplomatic persistence, John Bolton can do so.

My last working relationship with John came in the first Trump Administration, when I was the U.S. Ambassador to India and John was the National Security Advisor. John and I both viewed China as the primary strategic challenge facing the United States and worked together on U.S. policy toward India and the Indo-Pacific region with that challenge in mind. John was always appreciative of my views and expertise on India and thoughtful in his policy decisions. Once again, I admired his hard work, long hours at the office, and the intellectual framework that he tried to put on the Administration's foreign policy.

In short, John Bolton is someone who has been a dedicated and longstanding public servant, working hard to protect the security and welfare of the American people and that of our allies and partners. He has done this at great sacrifice to his personal life, indicated in part by the fact that the Iranian government has allegedly plotted to assassinate him.

I appreciate the Court taking my views on John Bolton into consideration. Based on my experience with John, I hope the Court will be lenient in the form of a sentence for him other than incarceration.

Respectfully yours,

Kenneth I. Juster

[redacted]

B - 72

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Judge Chuang:

My name is Garry Kasparov. I have had the honor of being acquainted with Ambassador John Bolton for many years. We have shared many lively debates; we agree on many things and disagree on others, but what has come through in all of our conversations is his commitment to keeping his fellow Americans safe.

I moved to the United States from Russia over a decade ago facing threats to my life. It is men like John Bolton who inspired me to make this country my adoptive home. I am not an American, but my *Americanism* has been strengthened and shaped by people like the ambassador. People like him made me believe in great American ideals.

Last year, I had the opportunity to interview Ambassador Bolton with *The Atlantic*. I pressed him on many controversial policy topics, and I criticized the presidents under whom he served. What impressed me in his answers was his humility and discretion. This was strength of character from a man whom I'd watched navigate the most difficult crises in American history since the Second World War.

Those characteristics inspired me to invite Ambassador Bolton to two events hosted by the organization I founded, Renew Democracy Initiative (RDI): first, as a speaker at our annual conference in Washington, DC, and second, as an honoree at our yearly gala in New York.

RDI draws supporters from across the aisle, so I was especially moved by the unanimous applause Ambassador Bolton received when he took the stage at our gala. It is clear to me that he is an increasingly rare breed: a public servant who commands the respect of his fellow Americans, regardless of partisan allegiance. In our personal conversations, he professes a deep respect for his nation and his community along with a quiet confidence in his beliefs.

It is clear to me from firsthand experience that the good man that America knows from the podium of the United Nations General Assembly, from press conferences at the State Department, and from many, many interviews, is the same good man in his private life.

Thank you for your consideration.

Respectfully,

Garry Kasparov

Francis Anthony Keating, II

**B - 73**

June 24, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

During my service tour in Washington, DC and as a four-time senate confirmed official in the Department of Justice, the Department of the Treasury and the Department of Housing and Urban Development, I have had occasion to know, admire and learn from John Bolton. As a former FBI agent, United States Attorney and the Associate Attorney General of the United States, John was a go-to guy for me and others for knowledge on a host of subjects that required strong intellect, integrity, an open mind and an unhesitant patriotism. John also has good sense and courage, both required for the positions he held.

I ask that his long and superb service to his Country be considered as the unfortunate case against him is resolved. One thank-you should be appreciation for his life by not requiring jail time of him.

As the former two term governor of Oklahoma, I know who needs to go to jail. It is not John Bolton.

Thank you for listening

Frank Keating
Governor of Oklahoma 1995-2003
Confirmed by the Senate four times in the service of Ronald Reagan and George HW Bush

cc: Becca Howlett
Office of Amb. John Bolton
Foundation for American Security & Freedom
[redacted]

[redacted]

B - 74

COLONEL RICHARD KEMP CBE
[redacted]

30 June 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

**AMBASSADOR JOHN BOLTON**

I am writing to urge you to show leniency in sentencing Ambassador John Bolton by ordering a sentence other than imprisonment.

I am a former British Army commander who has served alongside US forces including in Iraq, Afghanistan and the Balkans. I have known John personally for around 20 years as a friend and colleague in non-government political activities.

I imagine others will be writing to you about his long career and achievements in public service in the US; I want to provide a perspective from across the Atlantic. John has had a major impact on European politics. Over the years he skilfully forged political alliances across Europe and indeed in the Middle East and elsewhere, predominantly in the American interest but also in the interests of foreign countries where they overlap with those of the US. He has done this by official diplomatic action on behalf of the US government but also by establishing personal relationships as well as speeches, broadcasts and newspaper articles.

He is a very powerful and persuasive figure who can and does change the minds of ordinary people and political figures alike. Unlike many leaders, John is appropriately blunt and forthright and has no interest in mollification or appeasement. His approach has been the embodiment of "telling truth to power". Whether or not it makes him popular he will always take the position that he considers to be right and to serve the US national interest to which he has devoted his life.

John's force of character, principled stance and strong personal integrity have inspired many people including in Europe and the Middle East. The examples of honesty and truth that he

has consistently set have, to my personal knowledge, encouraged political leaders to do the right thing even when this has been personally and politically challenging for them.

I know too that John's charismatic character, invariably nuanced and sophisticated approach as well as his very evident moral courage has inspired many young people on both sides of the Atlantic and further afield to themselves take up a life of public service. His generosity of spirit has frequently led him to reach out to many such people with a helping hand.

To summarise, John has long understood the dangerous and growing weakness inside Europe and the harm it could do to the transatlantic alliance, and has made significant efforts to help European countries to address this. There is still a long way to go but I believe he has made a major difference to the benefit of both Europe and the US.

John is the quintessential American patriot. I understand that the Court's responsibility is to consider the facts of the case and to impose a sentence that reflects the seriousness of any wrongdoing. I do not seek to minimize the importance of those considerations. However I respectfully submit that the transgressions that have brought him before you should be viewed in the context of his long and courageous service to his country and to the free world.

Thank you for your consideration.

Yours sincerely,



Colonel Richard Kemp CBE

ICAS

B - 75

icas@icasinc.org www.icasinc.org
[redacted]

July 22, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

We are writing to ask you to show Ambassador John Bolton leniency in the form of a sentence other than incarceration. Despite his current circumstances, we continue to care for and respect him.

We have had first-hand experience with John through his engagement with our organization, the Institute for Corean-American Studies (ICAS). We are a non-profit, non-partisan educational and research organization that promotes cooperation, peace, and prosperity with a special emphasis on relations between the United States and Asia-Pacific rim nations.

Over many years we have read many of John's commentaries and writings on US national security, international affairs, and foreign policies relevant to Asia and Indo-Pacific nations. We were therefore very pleased when John agreed to speak at ICAS events. He spoke virtually before our group on February 4, 2022, November 26, 2024, and August 26, 2025. Each time, he addressed significant security challenges taking place on the Korean Peninsula and Northeast Asia and enriched us with his insights and extraordinary expertise. Throughout these first-hand experiences with John, we have come to feel deeply appreciative of his candor and intellectual honesty. We have developed an opinion of his character and our feelings of respect and admiration.

Obviously, John is a dedicated and well known public servant in various government positions, i.e., USAID, the State Department, the Justice Department, and has had long years of service to his country, standing up for his convictions, and being above all a good friend. It seems apparent that John operates with a singular focus on American safety and security. He acts as a man of principle in the most challenging and high-stakes environments. We have no doubt that John is a man of strong moral character, kind, and generous.

Moreover, John was candid in admitting his mistakes when he pleaded guilty before your Honor. He took responsibility for his actions by explicitly apologizing and expressing his remorse before the Court. Based our observations of John's dedication to our national security, and his respect for the law, we believe that John fully and sincerely acknowledges the seriousness of his actions, and has learned from the past. Thus, a prison sentence is not a necessary deterrent to prevent a repeat offense in this case.

We deeply appreciate your reading this letter.

As appropriate, we request for your leniency and consideration.

Respectfully,

Sang Joo Kim
Senior Fellow & Executive Vice President

**B - 76**

Dear Judge Chuang:

I write in support of Ambassador John Bolton and respectfully ask the Court to consider his lifetime of service to the United States and his character as it determines an appropriate sentence.

I served for twelve years in the United States House of Representatives, including on the House Foreign Affairs Committee, and I also served for many years as an officer in the United States Air Force and Air National Guard. Over the course of my public service, I had the opportunity to work with and interact with Ambassador Bolton on issues involving American foreign policy and national security. We have shared a deep concern for the security of the United States and for America's role in the world.

My interactions with John left me with a clear impression of a man whose views are rooted in a genuine love of country and a sincere belief in the importance of American leadership.

John is well known for holding strong opinions. What is sometimes lost in the public persona, however, is the seriousness with which he approaches questions of national security. In my experience, his positions were not driven by political convenience or a desire to determine which argument would be most popular at a particular moment. He thought deeply about America's interests, our adversaries, and our obligations to our allies, and he was willing to defend his conclusions even when doing so came at a personal or professional cost.

That willingness to stand on principle is something I particularly respect.

Public service inevitably presents moments when loyalty to a person, a political party, or one's own career can conflict with what an individual believes is right for the country. I have had my own experience with those choices. I therefore understand something about the consequences that can accompany taking an unpopular position. Whatever disagreements John and others may have over policy, they have respected his willingness to say what he believes and to accept the consequences of doing so.

I also believe it is important for the Court to consider the totality of John's service to this country. His career in American government and foreign policy spans decades and multiple presidential administrations. Few Americans devote such a substantial portion of their professional lives to questions of how to protect the United States, strengthen its alliances, and confront threats to its security. A man only in this business for his own interests would have left long ago and cashed out.

I saw firsthand the seriousness with which John approached those issues. I also saw someone who understood that America's security is closely connected to the strength and credibility of our relationships with allies. Those relationships require consistency, candor, and a willingness to defend American interests even when doing so is difficult. John brought those qualities to his work.

There is another reason I felt compelled to write. Our country is deeply polarized, and it has become increasingly easy to reduce public figures to a single controversy or moment in their

lives. I do not believe that is a fair way to judge a human being, particularly someone who has accumulated decades of service to his country.

I recognize the seriousness of the matter before the Court, and I do not write to address the legal merits of this case. I write only about the John Bolton I came to know through our work on issues of consequence to the United States. From that experience, I can attest that his patriotism is genuine, his commitment to America's security is deeply held, and his years of public service reflect a profound devotion to this country.

John has spent much of his adult life trying, according to his convictions, to make the United States safer and stronger. That service does not erase the circumstances that bring him before the Court, but I respectfully submit that it should be an important part of the Court's consideration of the man who stands before it.

For these reasons, I respectfully ask the Court to show John leniency and to impose a sentence that does not include incarceration.

Thank you for considering my perspective and for your service to our country and our system of justice.

Respectfully,

Adam Kinzinger
Former Member of Congress
Lieutenant Colonel, U.S. Air Force/Air National Guard (Ret.)

**B - 77**

Melanie Kirkpatrick
[redacted]

June 22, 2026

Honorable Theodore D. Chuang
United States District Court
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

As I begin this letter, I am reminded of President Lincoln's famous remark that "I have always found that mercy bears richer fruits than strict justice." I write today to respectfully request that you consider Lincoln's words as you decide on a sentence for John Bolton for the serious offence to which he has pleaded guilty. I devoutly hope that in sentencing John you will spare him from incarceration.

John and I go back 30 or so years. As The Wall Street Journal's op-ed editor and then deputy editor of the newspaper's editorial page, I often published John's articles on national security issues. He also was a valued source for the editorials and op-eds I wrote. He never – not once – shared classified information with me. On no occasion did he ask me not to publish information that he had given me.

After my retirement from the Journal in 2009, John advised me on my research for my subsequently published book "Escape From North Korea: The Untold Story of Asia's Underground Railroad." It was during that period that I saw another side of John. The tough-minded national security expert demonstrated deep compassion for the oppressed people of North Korea. It wasn't merely pity for the 26 million men, women and children of that sad country or rage at their tormentors. John was deeply affected by the personal tragedies of individual North Koreans and sickened at the dictatorship's disregard for the basic human rights of its subjects.

John is a man of prodigious knowledge and intelligence. He has devoted his life to public service. Our country is safer because of him. He is also a man of high integrity and strong moral fiber. I admire him for many reasons, including his decision to plead guilty. We all make mistakes, and his plea indicates that he is

prepared to pay for his– even though, I will add, other government officials have made mistakes without penalty.

I urge you to consider Lincoln's example of mercy in your sentencing of John. Thank you very much.

Sincerely,

July 2, 2026

The Honorable Theodore D. Chuang,
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

**B - 78**

Dear Judge Chuang,

I am writing to respectfully request leniency for Ambassador John Bolton's sentencing, advocating for a sentence other than incarceration.

I have known Ambassador Bolton for nearly forty years. My interactions with him have spanned his tenure at the State Department, as America's representative to the United Nations, and as National Security Advisor to the President. Throughout these roles, I have come to know him as a keen observer and practitioner of American foreign policy and national security. He is a man of unwavering conviction who consistently frames his policy ideas and our conversations in terms of what is in the American interest.

Ambassador Bolton was among the first American national security experts to recognize the threat posed by the Iranian regime to America and its allies. He advocated for a tough policy towards Iran both during and after his government service, as evidenced by his writings. His efforts to mobilize American policy in that direction resulted in threats against his life from the Iranians, which continue to necessitate his personal security round the clock. Despite these threats, he remains steadfast in his convictions about the need to confront the Iran threat.

As a leader in the American Jewish community, I have witnessed Ambassador Bolton stand with the community and for its rights when it has been targeted by both domestic and foreign adversaries. He has consistently supported our ally Israel and the relationship between the United States and Israel.

Ambassador Bolton is a patriot, a man of conviction, and a dedicated public servant throughout his career.

Thank you for considering my request for leniency at his sentencing.

Respectfully,

Howard A. Kohr

CEO (retired), American Israel Public Affairs Committee

**B - 79**

August 1, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to share a personal perspective on Ambassador Bolton's character, in the hope that it is helpful to the Court as you consider his sentencing. I do not know Ambassador Bolton professionally or on a regular basis, but I have known him personally for over two decades through his daughter, Jennifer Sarah Bolton, who has been one of my closest friends since we were assigned to be freshman year suitemates at Yale in 2004. We remained suitemates through junior year, and have stayed in close touch throughout our adult lives. Jennifer Sarah was a bridesmaid at my wedding, and I still see her several times a year despite living in different cities.

Over the years, I had the chance to see Ambassador Bolton in a more personal light than most. He came to Yale for parents' weekend on several occasions and, knowing my own parents couldn't always make the trip from California, he and his wife Gretchen made a point of including me in parents weekend dinners. I also visited the Bolton family's home a number of times over the years, and he was consistently warm and hospitable, making our whole group of friends feel welcome in his house.

What has stayed with me most, though, is what kind of person he raised. Jennifer Sarah is brilliant, capable, curious, and kind. I've watched her navigate the world with such integrity for over twenty years now, and I've always understood that character to be, in real part, a reflection of her upbringing. Ambassador Bolton was deeply invested in Jennifer Sarah's education, especially their shared connection of Yale. It was clear to those of us close to her that he was a real intellectual inspiration in her life - someone whose own rigor and engagement with ideas shaped how she thought and how seriously she took her own education.

I recognize this is a small window into a long public life, but it is the one I know firsthand, and I wanted to share it with the Court.

Respectfully,

Marisa Kololyan
Yale College, Class of 2009

**B - 80**

6/29/26

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write to respectfully ask that you show John Bolton leniency at his sentencing, in the form of a sentence other than incarceration. I have known John for more than twenty-five years, and in the last decade I have come to count him a close personal friend. Whatever the circumstances that bring this matter before you, my respect and affection for him are undiminished, and I hope an account of the man I have known over so long a span may be of use to the Court.

I first met John in 1997, when he joined the American Enterprise Institute as senior vice president. I was then a member of AEI's board, on which I had served since 1988, and I became its chairman in 2001. What struck me at once was the sincerity of his patriotism. John had come to AEI rather than return to the private practice of law, where his abilities would have commanded substantially greater compensation. He chose instead to devote himself to understanding and clarifying public policy—work he pursued out of genuine public spirit rather than private gain or personal ambition.

During those years I watched John take up questions that much of the foreign-policy establishment preferred to leave unasked. At a time when it was fashionable to assume that new international institutions were self-evidently benign, he pressed harder questions: who, exactly, had conferred authority on international prosecutors and tribunals; whether such bodies were accountable to any democratic electorate; and whether the language of treaties and consensus was concealing political conflicts that remained unresolved. He developed these arguments carefully and at length—in his writing on the proposed International Criminal Court, in his examination of the legal claims advanced for the NATO action in Kosovo, and in a broader critique of what was then called "global governance." His positions were controversial and often sharply expressed; colleagues sometimes disagreed with him. But they were never opportunistic. What I observed, over years and across many subjects, was a remarkably consistent concern for constitutional accountability and for candor about the real sources and limits of international authority. He would not pretend a question was settled merely because saying so was easier.

John's subsequent return to government service was, to my mind, a further expression of the same character: a readiness to set aside his own comfort and interests for his country. Two episodes from his public career illustrate a quality I had already seen in him at AEI and have observed privately as well—a willingness to accept isolation, criticism, and personal cost rather than give his assent to something he believed wrong.

The first came in 2006, during the negotiations that produced the United Nations Human Rights Council. John judged that the proposed Council lacked the membership standards needed to keep governments responsible for grave abuses from sitting in judgment of others. The pressure to join the international consensus was immense, and it came not only from adversaries but from allied governments and advocates who feared that objection would doom the reform. John did not soften or conceal his judgment. The United States became one of only four nations to vote against the resolution, and he delivered the explanation of that vote himself. Whether or not one shares every element of his view, it was a striking demonstration of his readiness to stand nearly alone rather than lend his name to an arrangement he believed would betray its own stated purpose.

The second came years later, while John served as National Security Adviser, when he opposed the proposed agreement with the Taliban and, in particular, the contemplated invitation of Taliban leaders to Camp David near the anniversary of September 11. In doing so he set himself directly against the President he served, on a matter in which the President was personally invested. John understood that pressing his objections could cost him one of the highest offices in the national-security establishment—and ultimately it did contribute to his departure. He gave his unvarnished judgment anyway and accepted the consequences. The virtue here is not that he was certain to be right on every question of Afghan policy; it is that he would not tell a President what the President wished to hear in order to keep his position.

In the years after 2005 I also came to know his wife, Gretchen, well, and counted her a good friend. Her steadfast support made possible the long hours and personal cost that John's service demanded; the sacrifices of public life were borne by the family as well as the man. The qualities I admired in John the colleague I have found equally in John the friend, and in John the husband and father. He and Gretchen are devoted parents, and they have time and again gone out of their way to extend a hand to friends in need. I think in particular of a young immigrant who came to this country without money or connections, and whom John and Gretchen helped, quietly and consistently, over many years—asking nothing in return. In every personal dealing I have had with them, across more than a decade, they have been unfailingly considerate and generous. The integrity, constancy, and sincere love of country I saw in John's public life are, I can attest, the same qualities he shows in private.

I am grateful for the Court's consideration of what I have offered. I believe that John's selfless public service has made a remarkable contribution to our country; and that, along with his sterling personal character, these should be given weight in the consideration of his sentence.

I respectfully renew my request that he be shown leniency at sentencing.

I thank you for your time and attention.

Respectfully,

Bruce Kovner

**B - 81**

July 31, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I'm writing to request that you consider for John Bolton a sentence other than incarceration.

I've known John for forty years, since I came to Washington in 1985. We served together in the administration I came to D.C. to work in, that of President Reagan. We worked closely together in the administration of President George H. W. Bush. We've been friendly acquaintances ever since. And while John has and I have sometimes been allies in various public policy disputes, sometimes on opposing sides, I've always respected his integrity and admired his patriotism.

From our first interactions, I saw in John an integrity and steadfastness that is not always evident among prominent people in or around government. We knew each other a bit in the Reagan years, but worked more closely together in the Bush administration, when he was a senior official in the State Department and I was the Vice President's chief of staff. Some of the matters we worked on were sensitive, and our bosses were not always perfectly aligned. But it was always a pleasure to work with John, and he stood out then–as he has since–to me for his integrity and honesty, as well of course for his competence.

Since then, I've interacted with John often on various public policy matters. Even when we differed, I always respected John for his unwavering commitment to what he thought best for the country, and for working toward that goal tirelessly and often selflessly.

John has always stood out for me not just for his hard work but for his integrity, his courage, and his commitment to principle and to public service.

And so I sincerely ask that John's lifetime of admirable public service should be taken into account at his sentencing. I think leniency in this case would be well-deserved and would produce a just outcome.

Thank you, Judge Chuang, for your consideration.

Respectfully,

William Kristol

William Kristol
[redacted]

B - 82

**Bruce K. Krueger**
[redacted]

July 31, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to express my unqualified support for Ambassador John R. Bolton as he approaches sentencing. I first met John in 1966 when we began our freshman year at Yale College. At the time everyone called him "JB". As freshmen, JB and I lived in adjacent suites, but we roomed together with two others for our remaining three undergraduate years. By our senior year, our suite had grown to six, all of whom remained close friends. In fact, for the last two years, this group of roommates, including JB, has been meeting regularly for a video "reunion" to catch up.

In addition to being roommates for the last three undergraduate years, JB and I shared an apartment for two years while he attended Yale Law School and I was pursuing my PhD in molecular biophysics and biochemistry. Consequently, we were roommates for 5 consecutive years during which time we became close friends. Our shared living experience ended in the summer of 1972 when we both got married.

In some respects, JB and I were an odd couple; he was politically conservative whereas I leaned in the liberal direction. I have to confess, JB's rhetorical skills and exhaustive command of the facts underlying his arguments made it challenging to debate with him, but I always felt that our discussions were conducted with mutual respect. Interestingly, we drew closest during our post-graduate years, having dinner together almost every night. Despite the fact that the Vietnam war provided plenty of fodder for political debate, most of our discussions centered not on girlfriends, politics or his law school classes, but on my dissertation research. JB was intensely interested in a wide range of topics beyond politics and the law. Specifically, he was curious about the research I was conducting and knowledgeable about basic scientific principles. Even decades later he would remember details of my research and ask how it turned out.

I would like to point out that, behind the formal exterior, JB was (and continues to be) considered to be a "mensch". During our senior year at Yale, I was dating my future wife, Lin, (a keen judge of character) and Lin and JB seemed to develop a special bond. When Lin and I married in 1972, we asked JB to be an usher. A few weeks later, Lin and I attended his wedding. After law and graduate school, JB and I were in only limited contact although I closely followed his extensive government service in Republican administrations.

During the 2000's, our lives intersected in a curious way. My son, Michael, and his wife, Rachel, (both Yale alums) got to know JB when they were invited to his home in Maryland by his daughter, JS, who was a close friend of Rachel's at Yale. In fact, JS attended Michael and Rachel's wedding.

Tragically, Lin succumbed to cancer in 2016. Out of the blue, I received a call from JB expressing his shock; it was clear that he was shaken by the news. Talking about old times was very therapeutic for me and I will always be grateful that he reached out. JB intended to come to Connecticut for the interment service but couldn't make it despite trying mightily to reschedule a longstanding commitment.

I apologize for this long-winded testimonial, but I wanted to emphasize the extent of my relationship with JB, which has lasted six decades. I some respects, I think I know him better than do many of his contemporary associates. I know firsthand his drive, starting in high school, to engage in our political system, not via electoral politics, but in unelected positions such as a presidential advisor, cabinet secretary, and ambassador. To this day, his insight into domestic and international affairs is respected and sought by leaders of all political stripes as well as by the general public. I look forward to his regular op-ed pieces and television interviews, which provide insight into current affairs available nowhere else.

In conclusion, I have the utmost respect for JB's honesty, integrity, patriotism, and unwavering commitment to serving our country. Based on my experiences as his close friend and roommate for many years, I am confident that he has always acted solely in the interests of the country and its citizens, never for his own enrichment.

I respectfully ask that you consider showing leniency in the form of a sentence other than incarceration.

Thank you for your consideration.

Sincerely yours,

Bruce K. Krueger

Bruce K. Krueger

**B - 83**

June 22, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing as a friend and longtime colleague of Ambassador Bolton and ask for leniency and mercy in the form of a sentence other than incarceration.

John is a patriot and has been a staunch advocate for national security and foreign policy for more than 40 years both in and out of government, defending America from the full spectrum of international threats. His service to four U.S. Presidents has followed his consistent commitment to providing national security and foreign policy analysis that is anchored to his ability to integrate the complexities of international relations, defense policy and strategy, and the historical record of America's relationships with both Allies and adversaries. John says what he means and means what he says.

The clarity of his views has been a consistent feature of his professional career. His government service has been based on his unswerving commitment to developing strategies and programs that strengthen America's global leadership. He doesn't pull punches when it comes to what our country needs to do in the international arena.

John's government service is one of the most unique and durable examples of public service to our country. I have known John for more than 40 years and we have been professional colleagues and friends throughout this time. He is a man of great character, intellect, integrity, and ethics. The depth of his experience serving Presidents at the Department of Justice, USAID, the Department of State, the United Nations, and the White House, makes him one of the most accomplished public servants over his lifetime. We became friends and colleagues before the 1980 Presidential campaign and during the first Reagan Administration, his USAID office was down the hall from my General Advisory Committee on Arms Control and Disarmament Office at the Department of State. As "Reaganauts" we compared notes about the progress being made to restore American defense capabilities, blunt the Soviet Union's aggressive policies against the West, and lay the groundwork to win the Cold War. As President Reagan said, "WE WIN, THEY LOSE" was the rallying cry for his administration. John throughout his government service played to win for America.

I retired from the aerospace industry in 2006. Twelve years later, John was named the National Security Advisor and he asked me for assistance in his transition to the NSC. We had remained in close touch over those 12 years and I came up to DC from Florida to assist John and later, became his Deputy. We were connected 24/7 during this time. John's leadership of the NSC was based on developing national security options to respond to and get ahead of national security threats. He managed the NSC process with professionalism and each component of the NSC delivered its analysis and policy recommendations forthrightly. A White House surprised by global developments is not a situation conducive to steady policy development and policy implementation. Maintaining a calm and steady approach was very challenging at

times and John had a steady hand in guiding the NSC process. Consistency in policy development and its implementation was not always a given.

His educational and military background and decades of experience have provided him with the intellectual capability to integrate the complexities of the national security, foreign policy, and intelligence process. John has been a prolific author and public commentator throughout his distinguished career. His books, articles, and media appearances are key elements of understanding Presidential decisions, the pressures of real time decision making at the highest levels of government, the multiplicity of threats facing America and its allies, and what actions America must take to safeguard our security.

John's commitment to public policy also includes the establishment of the Foundation for American Security and Freedom (FASF). I serve on its Board. We advocate for a strong national defense and a robust national security and foreign policy. It has a very active website and a full library of his articles publicly available.

As another example of his commitment to good government, John established political action committees (PACs) to support candidates who support a strong national security posture. A previous PAC, Bolton for New Hampshire, was very active in the "First in the Nation State". I served as its Treasurer while it was operating. John also had strong ties to the New Hampshire Institute of Politics, located on the campus of Saint Anselm College. The Institute is a "must visit" location for every Presidential candidate. New Hampshire's unique political culture is legendary in presidential elections. John spoke many times at the Institute and set the tone for national security dialog during several New Hampshire presidential primaries.

On a more personal note, one of my cousins was very active in a speakers group focused on national security and foreign policy at Johns Hopkins University. She asked me for assistance in inviting Ambassador Bolton to speak to a group of students. John appeared pro bono and the Johns Hopkins students experienced a very special event with lively discussion across the political spectrum. It was just one of countless times that he shared his insights and knowledge with students and young people across this country.

My wife, Judie, First Vice President/Programs for the Women's Republican Club Naples Federated invited John to speak at one of their monthly luncheons. John graciously agreed to speak, again, pro bono, to a ballroom full of political activists. His presentation was a world tour of the international arena—how we were doing with allies and what our enemies were up to. Following his presentation, there was a long line of guests who had their picture taken with John.

As parents of three boys and grandparents of six grandchildren, Judie and I were delighted to have been guests at the wedding of John and Gretchen's daughter, J.S. A proud father walking his daughter down the aisle is a true gift later followed by the birth of their first grandchild, one of the greatest of life's blessings.

In closing, please consider the full measure of John's public service to America and his unwavering dedication to family, colleagues, and friends. I am proud to call John a friend and I stand firmly with him.

Respectfully,

Dr. Charles M. Kupperman

[redacted]

**B - 84**

**Brock R. Landry**
[redacted]

July 2, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Dear Judge Chuang:

I am writing in regard to the pending case against John R. Bolton, whom I have known since 1966, first as classmates and roommates at Yale College. I view this matter not only as a friend of John, but also as a colleague at the bar, most recently for twenty years at Venable, where I served as Chair of the Government Division and member of its Executive Committee. Prior to that I was a partner in the D.C. office of Jenner & Block.

From our earliest times together, I developed a deep respect for John in no small measure based on an admiration of his deeply held principles, dedication, and character. Even in the late '60's, he consistently aspired to public service, an aspiration to which he has been committed for the majority of his adult life, serving in numerous capacities – General Counsel and Assistant Administrator of AID, Assistant Attorney General and head of the Civil Division of the Justice Department, official at the State Department responsible for International Organization Affairs and Arms Control and International Security, Ambassador to the United Nations, and most recently as National Security Advisor. Another role to be respected is his service as an infantryman in the Maryland National Guard. The commitment to serving this country, already well developed in his teens, has continued through the many years since.

During our lunches, discussions about family and college days quickly turned to foreign affairs, not unlike our talks over a beer in 1970. He had a consistent passion for the role of the United States in the world, and he worked tirelessly to that end, often at great sacrifice to his legal career and, indeed, even for his personal safety in the face of an Iranian fatwa for his life.

Living with that cloud over him and his family was truly punishing. Despite this everyday threat to his and his family's safety, John did not relent in speaking out about critical issues of national and international security and continued to add meaningfully to the nation's public discourse. Our lunch meetings unfortunately often had to be overseen by Secret Service officers and later private security personnel.

I am proud to call John my friend. Personally and professionally, I can attest to his high character, love of family, and dedicated service. I respectfully ask you to consider his many contributions to our country in your resolution of his case.

Very truly yours.

Brock R. Landry

RHÔNE

B - 85

July 28, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to respectfully ask the Court to show Ambassador John Bolton leniency at sentencing and to consider a sentence other than incarceration.

I have known John for almost 20 years. We met at a dinner held in his honor a few months after leaving his post as U.S. Ambassador to the United Nations. I am a Co-founder of a private equity firm, Rhône Group LLC, and after hearing him speak my co-founder and I approached John to work with us. He became a Senior Advisor to the Firm, in which capacity he gave advice and counsel to my partners and I, our investors, and our portfolio companies. He held this post since early 2007 until the week before his indictment, with the exception of the period during which he served President Trump as National Security Advisor.

During this time, we have become friends and I have had the honor and pleasure of traveling extensively with him, serving on corporate boards with him, and benefiting from his sage council and advice on wide range of topics. I have come to know John as a person with extraordinary intellect; of deep convictions and unwavering commitment to public service and the greater interests of the United States of America; and a truly caring and thoughtful human being. I will share with you some observations of these traits to give you a sense of the character and contributions of this incredible man.

Fitting that we start with his intellect and knowledge. I have witnessed John being asked a multitude of questions across politics, geopolitics, economics, etc.... and whatever the forum and whatever the question he is able to answer off the top of his head with swift, articulate and clear responses often with historical facts and anecdotes that the best AI large language models could not replicate. It is extraordinary and I have often commented to people that he is truly a "national treasure." We are fortunate as a nation to have had him in our service over many decades and in four presidential administrations.

As for his deep convictions and unwavering commitment to public service and the greater interests of the U.S.A. – the best demonstration of this is what I have I have witnessed in my travels abroad with John. As a private equity firm that invests in international business, our companies have operations across the world and we as a firm have investors from many parts of the world. John and I have traveled multiple times together across Asia, the Middle East, and Europe on business...and wherever we go he is a Statesman and Ambassador for the U.S.A., advocating for their partnership with America and making them feel secure in that partnership. The influence and impact of this sentiment was most powerful in the Gulf States of the Middle East, South Korea, and Taiwan, places we visited on multiple occasions. John's deep conviction on protecting these countries from existential threats from Iran, North Korea and China respectively fostered respect and admiration for America with all that we met – primarily business people – but inevitably wherever we were – politicians

[redacted]

would seek him out, and it made me proud to be an American to see how John treated them with respect and reassured them of the loyalty and backing of the United States regardless of who was in office at the time.

Finaly, a glimpse of his humanity – as I mentioned he is a truly caring and thoughtful person. In June of 2008, just one year after John started working with us, we held our annual meeting for our investors in Paris. During the meeting one of my co-founder's sons died in a tragic accident in the Himalayan mountains. When John was told he went without asking or discussion to our Paris office and spent the entire evening calling people in the India and U.S. governments to help extricate the body swiftly to have a funeral. The body was recovered and moved in less than five days – due solely to his tireless efforts over a 48 hour period. Again, no one asked him – he just did it because he cared.

Few individuals have devoted as much of their professional life to serving the United States as John Bolton. Across multiple administrations and over several decades, he accepted demanding and highly consequential responsibilities in the pursuit of what he believed to be in the best interests of the country. Whether one agreed with every policy position he advanced, there was never any doubt in my mind about the sincerity of his commitment to the safety, security, and well-being of the United States.

What has always stood out to me is his willingness to speak candidly and stand by his principles, even when doing so was unpopular or personally costly. In many environments, it is easier to remain silent or conform to prevailing views. John consistently demonstrated the courage to express his views honestly and accept the consequences of doing so. That quality reflects not only conviction but also integrity.

I have also seen firsthand that behind his public reputation is a person who has been generous with his time and advice to colleagues, friends, and those seeking guidance. He has willingly shared his knowledge and experience with others and has inspired many people to pursue careers in public service and policy. His impact extends well beyond the formal positions he has held.

Moreover, his decades of service have contributed meaningfully to the conduct of American foreign policy and to strengthening relationships between the United States and its allies. Whatever one thinks of particular policy debates, his dedication to advancing American interests has been both genuine and substantial.

Judge Chuang, no single letter can fully capture a lifetime of public service. I can only offer my personal experience and observation: Ambassador Bolton is a man of character who has spent much of his life serving causes larger than himself. I respectfully ask the Court to consider his lifelong contributions, his character, and the many positive ways he has affected the lives of others when determining an appropriate sentence.

Thank you for your time and consideration.

Respectfully,

M. Steven Langman
Chief Executive Officer

**B - 86**

July 30, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing this letter to you in the hope that you will demonstrate leniency to Ambassador John Bolton in the form of a sentence other than incarceration. He and I have been friends for nearly 20 years, and I know him to be genuine, thoughtful and professional in every way.

John's character has always been consistent and trustworthy, whether joining me as a guest on my radio shows or speaking to some of my client groups at business functions around the United States. He's always been careful to only speak to topics we discussed.

In one instance I was hosting a business group in Washington, DC and a speaker cancelled at the last minute. I called John and he came over to fill in, saving the day.

Another memorable time was when I had him speaking at an evening event in the U.S. Capitol and were having trouble finding a particular meeting room in the building. I suggested a shortcut through a hallway that might get us there faster, and he clearly only wanted to follow the rules or protocol.

I know him to be a dedicated public servant who has always been seen as someone who is highly regarded in the nation and in his community. He is an American patriot who is steadfast in his work, for family and for our nation.

Over the years he has become a good friend, too. In my experience, whether on the public stage or personally, John has always been worthy of our trust. I believe he still is.

Thank for your consideration.

Mark Larson

Mark Larson
President
Mark Larson Media Services, Inc.
[redacted]

**B - 87**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

June 25, 2026

Dear Judge Chuang:

I am writing concerning the case of Ambassador John Bolton, with the respectful request that you show him mercy during sentencing. I do not believe incarceration would serve a useful purpose in this case.

I have worked with Ambassador Bolton over several decades, beginning in the 1980s when we both served at the U.S. Agency for International Development, which administers the United States Government's foreign assistance programs. During our work together at AID, John often argued for economic engagement with countries that were making genuine efforts toward greater democracy, while cautioning against assistance that might strengthen governments hostile to American interests and values.

This position required both integrity and independence of judgment. At times, it was easier simply to support established programs and funding streams. John was willing to question whether expenditures were achieving their intended objectives and whether they ultimately served the people they were designed to help. In doing so, he brought a strong sense of principle to the foreign assistance process.

We had the chance to work together again when I served as U.S. Ambassador to Singapore and John was Undersecretary of State. He was able to visit Singapore, and I was struck with his ability to reach out and work with Singapore counterparts based on mutual respect and mutual benefit. Singapore has never been a formal treaty ally of the U.S. but there is a wide range of cooperative activity. John built on the trust and respect of this relationship and was able to cultivate stronger ties in the name of friendship and collaboration.

Similarly, we had the opportunity to work together when John went on to the U.N. as Ambassador and I had returned to the U.S. to serve as Undersecretary of Commerce. Although there are considerable differences in those two roles, each of us was seeking to advance U.S. foreign policy interests through forging win-win relationship with other nations and it was useful to be able to coordinate my efforts with John's, reminding our trading partners that any improvement in a relationship tends to have a ripple effect that can positively affect other aspects as well. John showed he had a keen sense of U.S. security requirements and national interest and could work with a range of political systems and personalities to advance U.S. interests.

Throughout our work together, John Bolton demonstrated he is a thoughtful and substantive policy professional. In an era often dominated by emotion and invective, John stands out as someone who frames his arguments on their merits and with a focus on the national interests of

the United States. He does not reflexively denigrate those who disagree with him; rather, he seeks to build his case through logic, analysis, and facts.

John's approach to foreign policy is grounded in alliance leadership and confidence in the strengths of free societies. He believes that the United States is better served when it works closely with like-minded democracies and constructive international partners.

I have long admired John Bolton for his intellect, integrity, and dedication to public service. I respectfully hope that the Court will take these qualities into account and act with compassion and wisdom in determining an appropriate sentence.

Sincerely,

Franklin L. Lavin

[redacted]

B - 88

The Honorable Theodore D. Chuang

United States District Court

District of Maryland

6500 Cherrywood Lane

Greenbelt, MD 20770

Dear Judge Chuang,

I would like to take this opportunity to comment on the person and character of Ambassador John Bolton as I have come to know him in the course of my service to our nation. I know John Bolton as a public servant and wish to assess, from that perspective, the value he has brought to the public good in his service to date and the value I believe he will bring in the future.

I am a veteran of service to our country during the Vietnam conflict, having served in the U.S. Army during the period 1967-1970, served in the Central Intelligence Agency for fifteen years where I was a career operations officer with multiple tours overseas, receiving in that capacity two Intelligence Medals of Merit, and after some years in the private sector, I was asked to serve again in the wake of the events of 9/11. During the period 2002-2008, I was the Deputy Secretary of Defense for Asian and Pacific Security Affairs in the Office of the Secretary of Defense during the period of Secretaries Donald Rumsfeld and Robert Gates. Among my duties in policy development and execution in greater Asia I was responsible for China, Japan and the Korean Peninsula. In this last capacity I had extensive interactions with counterparts in the United States National Security Council and the Department of State, and it was in that role that I experienced sustained contact over several years with Ambassador Bolton.

My personal experience during this rather intense period of U.S. diplomacy and policy execution was that John Bolton delivered, consistently, forcefully and fairly, the most dedicated individual performance I witnessed during those six years of government service. When others drifted from the substance of decisions and directives made at the highest levels of government, including the Office of the President of the United States, John Bolton was there to set the ship right, call the course correction and stand his ground in the best interests of the nation.

I witnessed this first hand as John Bolton often found himself as the single senior U.S. policy maker, serving both as our Ambassador to the United Nations but also, perhaps more importantly, as a de facto advisor to the President, bringing national security policy back to fundamentals. He often did this in a manner which invited criticism from other senior officials who had less principled motivations or were inclined to compromise for the sake of a getting a

deal done or an issue removed from our national agenda. In every case, without exception, John Bolton delineated and defined in detail the rationale of a given national security policy or tactical position underlined by that decided policy, as directed by the President of the United States. Ambassador Bolton was not about achieving "diplomatic progress" negotiated behind closed doors and only vaguely revealed, but rather he focused on principled declarations and arguments that clarified policy decisions made by our national leadership. As I and others collaborated among the NSC, State Department, Treasury Department and other federal agencies, we were confident that, once a policy was decided, at least one senior official who had the responsibility to adhere to the line and verse of that policy, would not deviate and defect. John Bolton was not dogmatic; rather, he was highly principled.

Finally, it has been said that John Bolton was perhaps too forceful, or too opinionated, or too expressive in his interactions with foreign leaders with whom he was tasked to interact. To those of us who worked hard to develop and curate policy decisions for approval by the senior-most levels of the U.S. Government, John Bolton was strong personality with whom others would be compelled to reckon, particularly senior representatives of governments which bore ill will towards the United States. With Ambassador Bolton at the table, we knew America would be well-represented by an articulate, fair and decisive official. Such a personality was, and remains today, too much of a rarity and the United States is less for the absence of such an individual.

I strongly believe John Bolton's stellular service to his nation should be taken into consideration.
With profound respect,

Richard P. Lawless Jr.

Cooper & Kirk
Lawyers
A Professional Limited Liability Company
[redacted]

B - 89

Adam P. Laxalt
[redacted]

[redacted]

July 23, 2026

Dear Judge Chuang:

I am writing on behalf of Ambassador Bolton. I understand that he has recently agreed to a plea bargain in his case before you. I am writing to testify as to his character and public service.

After graduating from Georgetown Law School, I went on active duty to serve in the Unites States Navy. While in the Navy, I volunteered for a deployment with the US Army to Baghdad, Iraq, was a regional prosecutor, and a Professor of Leadership, Ethics, and the Law at the US Naval Academy. I went on to eventually become the 33rd Attorney General of the State of Nevada.

I give this background for a few reasons. One, I worked directly for then Under Secretary Bolton at the State Department as my last job prior to entering active service. Two, I have been entrusted throughout my career to uphold the public trust and defend the Constitution. With both of these things in mind I can safely say that John Bolton is one of the most honorable and hard-working public servants I have ever known or worked with. He has been on my short list for mentorship and advice for almost three decades now.

I first met John Bolton when I was a child. He knew my grandfather, Senator Paul Laxalt, from the Reagan era and served in his administration. He became very close to my mother, Michelle Laxalt, when she worked with him at USAID. Both of them are no longer with us, but I can assure you that they always both spoke highly of him with great respect for his character and work ethic. In my early twenties, I started developing my own professional relationship with him first, while finishing my undergraduate degree at Georgetown University, and then also when obtaining my law degree at the Georgetown University Law Center. It was during law school that I worked directly for Ambassador Bolton in the Bush Administration. He was a remarkable leader, mentor, and boss.

Even though I had been blessed to meet multiple talented US public servants up to that point, I had never before worked directly for someone like John Bolton.

During my first weeks at the State Department, I would get to work at 8am and find scores of emails from the boss that started in the 4AM hour. I was shocked that he was up and working at that hour. Needless to say, that did not just last for my first few weeks. The man worked tirelessly around the clock to keep America safe from the likes of Iran and North Korea. As I am sure you will hear from others who worked on his personal staff there, he was an absolute master of foreign policy and completely steered a dedicated office during those years. We all looked to him to answer any challenging diplomatic or policy issues, and he never failed to have the answer at his fingertips.

Ambassador Bolton was extremely supportive of me during my time in public service. Public service can be a thankless and difficult business these days, but he was incredibly encouraging and always available if I called on him for advice. With many subject matter experts and senior public officials available to advise me at that time, I still considered Bolton to be the top of the top. Indeed, his example and leadership is one of the reasons I chose the public service path, and remained upon it for many years.

I understand that this is a complex case with a variety of extenuating circumstances, but I humbly request that you to consider the totality of his life when deciding his sentence. There are few living Americans that have spent their lives more dedicated to public service and to the national security of this nation than Ambassador Bolton. It is my hope that his lifetime of high character and the repeated sacrifices he and his family have made in service to our country will weigh against this single transgression.

Sincerely,

Adam P. Laxalt
Fmr. Nevada Attorney General
Cooper & Kirk, PLLC

**B - 90**

July 31, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

My name is Michael Levy. I practiced law at the firm of Covington & Burling for 37 years. John Bolton and I were associates in the same "class" at C&B, and we both became partners.

My area of practice was tax; John was in litigation. Thus we did not have occasion to work on cases together. Rather, I knew John as a close friend while he was at C&B. After he left C&B for government service and other pursuits, we gradually lost touch with one another.

By any account, John was an outstanding lawyer. Suffice it to refer to the fact that John, as a young associate, initiated, took the lead, and prevailed in the ground-breaking Supreme Court case of Buckley v. Valeo. However, my predominant interactions with John were social. While John was relentlessly serious about political matters, that never prevented him from sharing a drink and laughs with the likes of a liberal like me. Our offices at the time were next to the Hay Adams Hotel. We often met there on Fridays after work with a small group of friends, where John would regale us with his take on in-office events and personalities over the past week.

John has a well-documented history of public service. When John was the U.S. Ambassador to the United Nations, he earned the deep respect and gratitude of the worldwide Jewish community when he orchestrated the repeal of the infamous "Zionism is racism" resolution. As anyone with even modest awareness of the politics of the UN knows, John's victory in that matter was a feat of extraordinary negotiating skill. More generally, John distinguished himself at the UN by his unflinching defense of American interests and resistance to third-world attempts to bully and ostracize Israel.

John also served for a period as head of USAID. Although I am not familiar with the specific issues that John encountered during his tenure there, I think that USAID provided great benefits to economically and socially deprived people around the world. Although heading USAID was not a position that John had been seeking, I felt then (and now) that his willingness to assume that role was an act of dedication and commitment to public service.

In conclusion, I know John to be a man of great intellect and integrity with abiding respect for the law and a life-long engagement in public service.

Respectfully submitted,

Michael Levy

**B - 91**

June 24, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I understand that you will be sentencing Ambassador John Bolton in the near future for his violation of certain laws protecting secret documents, to which he has plead guilty. I submit this letter in support of John and ask that, to the fullest extent possible, your decision reflect his many years of impeccable service, with the highest integrity, to America and the Presidents under whom he has served flawlessly, across several administrations and in diverse roles as well. His education is of the highest quality, and so is his integrity. This unfortunate turn of events has not diminished one iota my admiration and respect for him, nor my friendship. John's intellect, wisdom and practical, realistic understanding of all aspects of international law and power politics have been to our collective advantage. That service, and that experience, in my humble view, deserves to be reflected in his sentence.

I hope and expect you will be receiving many letters of this sort from the many people who know and admire him, as I do. Before relating my relationship with John, please permit me to introduce myself as it may bear upon my standing and credibility in this instance. I am a lawyer by training (UPenn Law '72), practiced law for seven years at Stroock & Stroock & Lavan, went into business and then founded my own private equity firm, JLL Partners, in 1988 and worked there until my so-called "retirement" around 2020. Throughout my career, I have devoted significant time and resources to philanthropic efforts, from becoming Chairman of the Board of Overseers of the University of Pennsylvania Law School, serving the University as a university Trustee, to chairing (and I am told rescuing)  George Jackson Academy in NYC, a school for gifted young minority boys, to serving on the board of trustees of the Whitney Museum, and now serving as a Trustee of the American Council of Trustees and Alumni (D.C. based), to funding programs through Tikvah, a Jewish teaching endeavor with wide reach, for the defense and teaching of Judeo-Christian values, Western Civilization and Civics writ large, at the University of Florida-Gainesville (Hamilton School), the University of Texas-Austin and Hillsdale College. My wife, Karen, has been a trustee of Rockefeller University for nearly 15 years, served of the Juilliard School board for around 15 years and also the Brown University board. She served on the Law Review at NYU School of Law.

I have known John for around five or six years now and along with many friends and colleagues have enjoyed greatly our relationship. We have met often, dined together often, he has been at my home for dinner; we have certainly talked extensively about the world's most compelling problems. John has spoken at my annual conference in Palm Beach, The Levy Forum for Open Discourse, to rave reviews, and been extraordinarily helpful to me and friends in trying to understand our complicated world, and yes, indeed, President Trump too. In all of our interactions, his private comments have been wise and insightful and I should add totally respectful of all those for whom he has served, and those comments have not only reflected the very difficult circumstances our leaders encounter in dealing with, may I say, difficult people at home and abroad. His intelligence is beyond gainsay and his ability—indeed, his desire and compulsion—to "tell it as it is" without all sorts of varnish and spin, has made him an invaluable resource, and I think the kind of public intellectual and public servant we need more of here in America in these difficult times. I pray that his voice is not silenced, and, indeed, admire his courage in continuing to contribute to the public dialogue with this situation hanging over his head for two years now, including right now with his plea and your forthcoming sentencing looming.

John is a fine person, plain and simple. He has served his country for decades with distinction and neither to nor for personal gain. I understand that people who step forward to serve either enjoy or benefit from the limelight and attention, but by my reckoning from my first meeting with John that has seemed to be of no interest to John. Service came first. He had and still has something to offer us and that he has shared himself as he has should be acknowledged and appreciated.

I submit this letter respectfully and in the hope that my comments resonate with you.

Sincerely,

Paul S. Levy
[redacted]

**B - 92**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I'm writing to request leniency on behalf of John Bolton, and in particular, that he not be sentenced to incarceration given his extraordinary character and contributions to this country.

I'm Rich Lowry and I've been editor of National Review, a widely respected conservative media outlet, since the late 1990s. I've known John Bolton for roughly thirty years, and he is among the most hard-working, committed people I've ever met.

We got to know each other through our mutual interest in foreign policy and politics. He's contributed pieces often over the years to National Review, and we've discussed national affairs regularly for decades now.

I won't relate here John's long history of public service spanning four presidential administrations, which is well documented. Rather, I'd like to share what I've learned about him as a person from our long association.

One of the first things you realize about John is that he is genuinely devoted to his convictions. His views are well-thought out and deeply held, and he will fiercely defend them in any forum. Agree with him or not, there's never any doubt that he is mustering the best possible case for his position, always based on facts and logic.

If everyone argued for their point of view the way John does, there'd still be plenty of disagreement in this country, but it'd be more honest, civil, and edifying.

Another thing about John that's evident immediately is that he's a Stakhanovite worker. The early bird is supposed to get the worm, but John probably gets there first. He does more by 10 a.m. than most of us do by 5 p.m., and is incredibly diligent and disciplined. (At Yale Law School, he befriended Clarence Thomas after finding and returning Thomas's lost wallet and shared his study method with him—steadily condense your notes until they fit on a single note card.)

Finally, anyone who knows John knows that he's a profound patriot. He argues his positions so vigorously because he believes that they are best for America and its security—that liberty, the

Constitution, and strength abroad make us prosperous, free, and safe. He has devoted his life to public service because he considers it his obligation to do all he can to advance the interests of the country.

Again, agree with him or not, no one can question his passion or sincerity.

One acid test of intellectual integrity in our national debate is whether you are willing to upset both sides, and John has passed it with flying colors (to his own personal detriment, it must be added). There are times over the last ten years when he's been celebrated by President Trump and his supporters and when he's been vilified by them, and the same is true of the other side in an exact mirror image—but, all the while, John has advocated for the same set of positions and values.

I should also mention his genuine personal courage. If partisans in our domestic political debate sometimes like what John says and sometimes hate it, our enemies abroad are unwaveringly hostile. Iran has actively sought to assassinate him. John has faced this threat with aplomb, and when the current administration pulled his security, he treated it like he does so many other things—as a problem to be worked through, in the course of carrying on with his work.

I've learned much from John over the years, not just about specific issues (e.g., what are the intricacies of 1951 Denmark-U.S. Greenland agreement?), but also how to stick to your guns through thick and thin and what determination and hard work really look like.

I humbly submit that the totality of his admirable life and consequential career should be considered in his case and, if they are, the sentencing should be lenient.

Thank you for considering my views and for your own contributions to our country and the rule of law.

Sincerely,
Rich Lowry
Editor-in-chief
National Review

DAN W. LUFKIN
[redacted]

B - 93

July 6, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing today to respectfully ask for leniency in Ambassador John Bolton's upcoming sentencing.

I have known John for many years, both professionally and personally, and I consider him a friend. He is a man of conviction, integrity, and deep patriotism. In countless conversations, his first thought has always reflected, "How does this affect our country, our principles upon which we stand, and beliefs?" I hold him in the highest regard.

John has always demonstrated genuine dedication of his time and energy to causes he believes will strengthen our communities and our nation. He did so in this case. Those who know him well understand that his motivations have never been rooted in personal gain, but rather in a sincere desire to serve and contribute positively and to deal in the truth.

While I fully recognize the seriousness of these proceedings, I respectfully ask the Court to consider the totality of John's character (and the circumstances of this case), his longstanding commitment to others, and our nation.

I whole-heartedly believe he deserves compassion and leniency, and I hope these factors will be taken into account during sentencing.

Respectfully,

Dan W. Lufkin

[redacted]

**B - 94**

July 26, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

My name is Sara Lynes, and I am a close friend of Ambassador Bolton's daughter. I currently serve as the President-Elect of the Junior League of Nashville. I have had the privilege of knowing Ambassador Bolton as a devoted husband, father, grandfather, and father-in-law. Ambassador Bolton's wife has been known to accurately describe their family as "intellectuals," and while Ambassador Bolton certainly values education, what stands out most is his character. At his core, he is a family-centered, genuine, and deeply caring person.

One moment that reflects his true nature occurred during his granddaughter's baptism. Ambassador Bolton made a point to attend the service at the Presbyterian church where his daughter, son-in-law, and granddaughter worship regularly. At brunch afterward, he quietly ensured everyone's water was refilled — a small but telling gesture of thoughtfulness. When the meal ended, he played with his granddaughter and her stuffed animal, fully present and engaged, both laughing. As naptime approached and she grew fussy, he comforted her with the patience, warmth, and steadiness that define him as a grandfather. This single moment is just one example, but it is representative of the authenticity, kindness, and genuine care he consistently demonstrates.

Ambassador Bolton has also dedicated many years to public service. During his time at the United Nations, he was a committed advocate for human rights and for creating a more equitable world. That same sense of responsibility is evident in his role as a devoted and engaged father, consistently offering guidance, support, and encouragement to his daughter. His commitment to service is something he has clearly passed on to his daughter, who now serves as the President of the Junior League of Nashville, leading an organization of more than 1,400 women. The Junior League of Nashville has a long history of meaningful community impact, including founding what ultimately became Monroe Carell Jr. Children's Hospital at Vanderbilt — a legacy of service that aligns with the values Ambassador Bolton has modeled throughout his life.

Respectfully,

Sara Lynes

B - 95

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood
Lane Greenbelt, MD 20770

August 5, 2026

Dear Judge Chuang:

I write this letter to assist the Court in determining the appropriate sentence to impose on John Bolton.

I served as an Assistant United States Attorney for nine years, serving under both Republican and Democratic presidents and Attorneys General. I served for a little over three years in the Northern District of Illinois in Chicago, and then for over five years in the Eastern District of Pennsylvania in Philadelphia where I held various supervisory positions including Chief of the Criminal Division and First Assistant U. S. Attorney. Thereafter, I was a trial attorney in Philadelphia handling both civil and criminal matters. In 1985, as the lead attorney of the Philadelphia Special Investigations Committee I conducted five weeks of televised hearings into the police confrontation with a group known as MOVE that resulted in a C4 bomb being dropped from a police helicopter on a row house that resulted in the deaths of eleven people, including five children and the destruction of over 60 row homes. In 1987, I was appointed by President Ronald Reagan to lead the White House efforts to respond to the Congressional and Independent Counsel investigations into what was known as Iran Contra. I also served President George H. W. Bush in a similar but limited manner. I served as General Counsel to public corporations and I was brought in by the new management team at Tyco to help rebuild the company and its reputation after the scandal that resulted from the crimes committed by its former CEO and CFO. I also served for eight years on the Board of Governors of the Vermont Law School. I am now retired from the active practice of law.

In my career, I have observed almost every type of human conduct that can bring a person to an event such as now faces John Bolton – and this Court.

I provide this background as context for my thoughts expressed in this letter. Since leaving the Department of Justice, I have never written a letter to a court for its consideration on the issue of the appropriate sentence to impose in a criminal case.

I first recall meeting John Bolton in 1987. When I was brought into the White House Counsel's office, Chief of Staff Howard Baker made it very clear to me that our efforts on behalf of the President should be to coordinate all of the responses of the various offices of the Executive Branch to fulfill the President's goal of fully cooperating with the investigations. At that time, John was the Legislative Liaison with the Department of Justice. I met and spoke with him many times to help coordinate DOJ's efforts and to establish an efficient and reliable process to achieve the President's goal. John was always professional, focused, and demonstrated an absolute commitment to getting the job done with integrity. He was instrumental in making sure

the process worked and I do not recall ever hearing any complaints from anyone from Congress or the Independent Counsel's Office that was critical of his and DOJ's efforts to respond to their numerous and often onerous demands for information and documents. What I observed in those early interactions with John was consistent with what I have observed over the many years that followed. He was committed to honorable public service.

In the years that followed, my contact with John was more limited as I progressed with my career and he with his. But as I observed his many accomplishments, I continued to be impressed by his absolute commitment to serving this country. In the past few years, we have enjoyed a closer relationship. He has visited with me and allowed me to interview him at a public meeting as part of a program that I chair. We usually have the chance to talk on the phone every month or so. In all of these interactions, the one thing that has always struck me is John's integrity and his absolute commitment to serving this nation, using his expertise to alert our citizens, our leaders and indeed the world to the opportunities and threats that we face.

As a federal prosecutor for almost ten years, it was frequently my responsibility to determine and inform judges of the position of the United States with regard to what would be an appropriate sentence. I always tried to approach that duty with a balance of the public interest, the offense involved, and the background of the defendant. I am using that same template in this letter.

I do not believe that John would ever intentionally do anything that would compromise the security of this nation or that would violate the oath of office that he took many times as part of his public service career. I do not believe that when I was a federal prosecutor I would have recommended a sentence that would include incarceration for an offense such as is now before the court for a defendant with his record of unselfish public service. Given all of the circumstances, in my opinion it would not be warranted or in the interest of justice to put John Bolton in prison.

He of course is already under a sentence far more frightening and life threatening than any this court could impose. Iran has sentenced him to death in retaliation for faithfully performing his official government duties. It has offered money to have him murdered. In the summer of 2022, the FBI uncovered a plot that resulted in the Department of Justice initiating a criminal prosecution that charged that

> "beginning in October 2021, Shahram Poursafi, aka Mehdi Rezayi, 45, of Tehran, Iran, attempted to arrange the murder of former National Security Advisor John Bolton, likely in retaliation for the January 2020 death of Iran's Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) commander Qasem Soleimani. Poursafi, working on behalf of the IRGC-QF, attempted to pay individuals in the United States $300,000 to carry out the murder in Washington, D.C. or Maryland."

John was given 24 hour protection by the Secret Service until that protection was terminated by President Trump. The threat on his life is real and continues, requiring John to obtain, and pay for, his own private security simply to avoid being assassinated in retaliation for his service to this country.

This absolutely relevant fact is as compelling a mitigating factor concerning a defendant about to be sentenced as I have ever experienced.

In 1777, John Adams wrote to his wife, "Public service has caused us to grow old and ill. But I do not regret it. I would do it all over again, if it were to be done." That commitment to public service is consistent with everything I know about John Bolton.

I am aware of no fact or legitimate public interest that would be served by imposing a sentence of incarceration on John. I hope and trust that this Court will agree.

Respectfully submitted,

William B. Lytton

William B. Lytton

B - 96

# B'NAI B'RITH INTERNATIONAL

DANIEL S. MARIASCHIN, CHIEF EXECUTIVE OFFICER

July 20, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to request leniency, other than incarceration, for John Bolton.

I have known Ambassador Bolton for over 35 years. In 1991, he played the central role, when serving as Assistant Secretary of State for International Organization Affairs, in rescinding the odious Zionism=Racism resolution enacted by the United Nations General Assembly in 1975. That resolution caused immeasurable harm to Jewish communities around the world, resulting in a tremendous increase in anti-Semitism globally.

For his principled determination in turning back this resolution, Ambassador Bolton earned the eternal gratitude of Jewish people everywhere. In the run-up to the repeal of this measure, Ambassador Bolton met frequently with the leaders of our community. His sensitivity and concern for us, and for the injustice of the act itself, brought great comfort to us.

John Bolton is an honorable man, who has served our country and its people in countless ways so admirably over the decades. He is a man of high principle and conviction, as we learned early on in his vitally important efforts at the United Nations.

In light of this, and all of the good work he has done throughout his career as a public servant, I do hope you will grant leniency to Ambassador Bolton at sentencing.

Respectfully,

Daniel S. Mariaschin
Honorary CEO
B'nai B'rith International

[redacted]

B - 97

June 21, 2026

From: Colonel Wesley Martin, USA (Retired)
[redacted]

To: Honorable Theodore D. Chuang
U.S. District Court Greenbelt Division
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Re: Ambassador John Bolton

Your Honor,

I, Wesley Martin, am a retired Active Component Colonel, United States Army Military Police. I graduated Summa Cum Laude from Northeast Missouri State University earning a Bachelor's in Law Enforcement and Corrections. I also hold a Master's Degree in International Relations and Business and a Master's Degree in Business Administration, both from Webster University. More recently I served as an Adjunct Professor at the University of Pitt-Bradford instructing "Terrorism in a Post 9-11 World"; "Global Security"; "Crisis Intervention"; and "Introduction to Law Enforcement".

My active duty assignments as a United States Army Colonel included: Senior Antiterrorism Officer for all Coalition Forces in Iraq; Senior Operations Officer for Task Force 134 Detention Operations-Iraq; Base Commander of Camp Ashraf, Iraq; Information Operations Chief for Headquarters, Department of the Army; and Information Operations Chief for U.S. Forces Korea.

Long before I met Ambassador Bolton, I was familiar with his dedication to, and service for, our nation during the Bush 43 administration. Our professional association with each other began in 2012 when Ambassador Bolton was a member of American Enterprise Institute and I was addressing Middle East issues. Ambassador Bolton was a recipient of my weekly reports, and I followed his published articles. During his time as National Security Advisor during the first Trump administration, I dealt with Ambassador Bolton both inside the West Wing and through continuing correspondence. The correspondence I forwarded to Ambassador Bolton were unpolished reports I received from Iraqi parliamentarian and Kurdish Peshmerga sources.

Ambassador Bolton's service as National Security Advisor resulted in my appreciating him even further. He was one of the few who thoroughly understood the Middle East and all the conflicting undercurrents within the region. He especially understood and

stood his ground on the religious extremists who had hijacked the Iranian democratic movement in 1979 while terrorizing its own population and the world ever since.

Ambassador Bolton's knowledge of Iran aligned with my personal experiences. As Senior Antiterrorism Officer for all Coalition Forces in Iraq, I personally dealt with the consequences of Iran's Islamic Revolutionary Guard Forces (IRGC) and Quds Force (translated "Jerusalem Force") endeavors to maximize the wounding and killing of Coalition Forces, especially Americans. While assigned to Detention Operations-Iraq, I had face-to-face discussions with al Qaeda membership. In these discussions, I was informed about al Qaeda receiving highly effective explosive devices and rocket-propelled grenades from Iran. In 2019, the Department of Defense released a report directly linking the deaths of 608 American service members to the IRGC. This report did not identify the number of Americans maimed and crippled for life due to IRGC involvement.

Quds Force Commander Major General Qassim Suleimani was the brains and organizer behind hostile Iranian activities against the coalition forces. General Suleimani was the principal coordinator of the joint IRGC/Iraqi military/Shia militia forces that removed the Islamic State from Iraq. With these same forces, Suleimani turned on the same Sunni population that had just survived Islamic State occupation. For these unfortunate people, one reign of terror was followed by another.

Although General Suleimani was eliminated by an American drone after Ambassador Bolton finished his tenure as National Security Advisor, there is no doubt that his guidance to President Trump played a critical role in the strike. Knowing this, the Iranian government vowed to kill Ambassador Bolton. Fortunately, Tehran's $300,000 contract was intercepted by the Federal Bureau of Investigation. Under normal circumstances, it would seem contradictory for President Trump to order the U.S. Secret Service to cease providing protection to Ambassador Bolton. However, even to the most casual observer, it is clear our nation is not passing through normal times.

After his tenure as National Security Advisor, Kurdish political leaders relayed an invite through me for Ambassador Bolton to be a keynote speaker at a conference in northern Erbil Province. Adamant assurances were received from Peshmerga officers that Ambassador Bolton would be well protected. I warned both Ambassador Bolton and the Peshmerga that this promise could not be fulfilled. The route of land travel would be within fifty miles of the Iranian border. Sleeper cells were everywhere. Ambassador Bolton came to the same conclusion and turned down participation in the event.

It is unfortunate that today's major threat to Ambassador Bolton's future is not from a religious extremist government that he worked hard to control. It's now from an American administration that has weaponized its law enforcement community to silence critics and perceived political adversaries. Fortunately, America's founding fathers

constructed a Federal Constitution based on the separation of powers between Legislative, Executive, and Judicial Branches of government. Ambassador Bolton's future now rests with the Judicial Branch.

Wesley M. Martin

Wesley M. Martin
Colonel (Retired), U.S. Army Military Police

B - 98

Clifford D. May
President, Foundation for Defense of Democracies
[redacted]

The Honorable Theodore D. Chuang
United States District Court
District of Maryland

Dear Judge Chuang:

I write to you as someone who has had the privilege of knowing Ambassador John Bolton in the national security and foreign policy community. Though my interactions with him have been limited in number, they were significant enough over several decades that I feel compelled to offer my perspective on his character and his contributions to this country.

Throughout my time in the policy community, I have encountered many individuals who speak passionately about national security in formal settings and then retreat to safe, consensus positions when the stakes are real. Ambassador Bolton is not such a person.

What struck me most, consistently, was his willingness — indeed, his insistence — on pushing people to think more rigorously and honestly about the threats facing the United States. He did not allow comfortable assumptions to go unchallenged. He pressed colleagues, analysts, reporters, and counterparts alike to confront hard questions that others preferred to defer or soften.

In my experience, this quality extended to both parties equally. For example, on my "Foreign Podicy" podcast, he held to account thirty years of bipartisan diplomatic failure on North Korea, and acknowledged candidly that the Trump administration had not done enough on Venezuela — a rare admission of strategic shortcoming that put honest analysis above political loyalty.

It is worth noting that Ambassador Bolton has drawn respect and criticism from both sides of the aisle throughout his career — those who have disagreed with him on specific policies have nonetheless consistently recognized his seriousness, his preparation, and his commitment to what he believed was in America's best interest.

When he left the White House in 2019, I wrote at the time in my "Foreign Desk" column for *The Washington Times* that I would "sleep better" with him still on the job, because he would be the most vehement voice against both appeasement and isolationism — not because he was a partisan, but because he was serious.

This quality, which some might find uncomfortable, is exactly what effective policymaking demands.

Over the years, it became clear to me that John's strategic thinking is grounded in a serious reading of our adversaries' histories, ideologies, intentions and capabilities.

The history of American national security is littered with the consequences of groupthink, of institutions that rewarded consensus over clarity. Ambassador Bolton understood this.

He brought a discipline to the question of keeping America safe that I found rare and genuinely valuable — not because he was always right, but because his intellectual seriousness forced better thinking.

Ambassador Bolton's career has spanned four presidential administrations of both parties. That kind of sustained public service reflects a commitment that goes well beyond personal ambition.

The sacrifices it requires — of privacy, of family time, of the financial rewards available to those who take their talents to the private sector — are real, and I have seen those costs reflected in the lives of people who choose this path. Ambassador Bolton chose it anyway, and repeatedly.

I do not write this letter to minimize the gravity of the proceedings before Your Honor. I write it because I believe the record of Ambassador Bolton's life and service is a meaningful part of who he is, and I hope the Court will take it into account. The man I have been privileged to know and learn from is serious, principled, and genuinely devoted to the security and well-being of the United States.

Thank you for your consideration of this letter.

Respectfully submitted,

Clifford D. May
President, Foundation for Defense of Democracies

B - 99

The Honorable Theodore D. Chuang

United States District Court

District of Maryland

6500 Cherrywood Lane

Greenbelt, MD. 207770

Dear Judge Chuang:

I am writing to seek leniency for my friend, John Bolton in the form of a sentence other than incarceration.

John and I met in the mid-1980's in Washington D.C. when he was in government and I had recently become the news editor and deputy bureau chief of The New York Times' Washington bureau. He was then at the Justice Department, having served previously at the Agency for International Development. Prior to the Times, I had been working for a small progressive magazine that few read in the nation's capital. I knew John was more conservative than I and had strong views that, at the time, disagreed with mine. But when I called him for an interview on a foreign policy topic about which my bureau was writing, he, unlike so many other public servants, agreed to talk to me. When we met, he told me that he thought it was vital for journalists to be well informed. He couldn't have been more helpful, or patient in offering his own views and insights. At the end of that conversation, he not only helped educate me about the strengths and weaknesses of the policy under consideration, he changed my mind about how I viewed the issue. That was the beginning of what began as a fairly typical Washington relationship, but over the years, blossomed into a friendship. When you are young and embarking on a challenging new job, you never forget those willing to help you. That was John.

Over the years, I stayed in touch, whether I was in Washington, or New York, overseas as the paper's Cairo Bureau chief and then Paris correspondent or back in New York City. Over time, I grew to admire increasingly John's devotion to public service and his conviction that making people understand foreign policy and national security was essential to an informed electorate and the preservation of democracy.

I personally saw him make, with rarely a complaint, the many sacrifices that such work demands — the long hours during seemingly endless policy crises, the missed family birthday celebrations and vacations, the lack of public and often internal recognition or thanks for a crisis averted or a job well done, the modest compensation compared to what

he had earned at his law firm and could have earned if he had cashed in on his experience and contacts in government service.

"It goes with the territory," John once told me as I learned that he had skipped an important dinner with his wife and worked all night on a thorny crisis which he had helped resolve.

Because of his extensive travel and decades of study of foreign affairs, John has not only an extremely nuanced grasp of the complex nature of U.S. policy, he understands far better than many colleagues the impact that American policy decisions can have on a country and its people. He never lost sight of that in his work. Tough but compassionate, John was scrupulous in attempting to evaluate the impact of U.S. policy, and the potentially catastrophic cost of bad policy.

Above and beyond his analytical skills, I admired his devotion to America and his personal integrity. I always knew that John would leave a job he loved if he felt that his principles and values would be compromised. That is not something I would say of many officials I have known and interviewed in New York and Washington.

Judge Chuang, unlike most of my journalism colleagues, I know first-hand what incarceration would mean for John. In 2005, I spent almost three months at the Alexandria Detention Center in Virginia for refusing to testify before a grand jury to protect my sources in a Federal investigation into the unauthorized leak of classified information. I was well treated, but I still lost 30 pounds in 87 days. Reading and writing — the life's blood of John's life — were virtually impossible given the prison's constant noise and harsh fluorescent lighting. I was unable to see my own family for weeks on end. I shudder at the thought of what a prison sentence would do to my friend.

As you know well, our nation's prisons are filled with people who deserve to be there. But I grieve at the thought of John Bolton being among them. I'm seeking your compassion for a man who has devoted his professional life to serving our country. I hope you will agree.

Best wishes,

Judith Miller

**B - 100**

July 23, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Dear Judge Chuang,

My name is Jay Nordlinger, and I'm writing about John Bolton. I would like to ask the Court for leniency in the imposition of any sentence in his case.

I have known John since the mid-1990s. I believe he was working at the American Enterprise Institute at the time (having served in the Reagan and Bush 41 administrations).

I happened to be working in the same building, in Washington. I am a journalist, and I was working for The Weekly Standard magazine.

Today, I work for the Renew Democracy Initiative, an organization founded by Garry Kasparov, the chess champion and Russian dissident. Earlier this year, we honored John with our Hero of Democracy award.

When I think of John Bolton, I think of an old-fashioned word: "straight." I mean, the word is not old-fashioned, but this particular sense of it is: "direct," "honest," "no-nonsense."

If you ask John a question, he'll answer it. If he doesn't know the answer, he'll say so. If he doesn't want to answer, he'll tell you that—he won't dance around.

In my experience as a journalist, this is rare.

John has been called "impolitic." Maybe he is, on occasion. But what others construe as "impolitic," I might call "straight."

In his career as a diplomat, he was sometimes called "undiplomatic"—but this was not necessarily so. Diplomacy is more than artful dodging. Sometimes, bluntness, even tartness, is called for.

I know for a fact—from my reporting—that other diplomats at the United Nations appreciated Bolton precisely on these grounds of straightness: you knew where he, and the administration, stood.

I smile at the memory of an exchange between President Bush (43) and Kofi Annan, the secretary-general of the U.N. This was at the White House, I believe. With Bolton standing nearby, Bush said to Annan, “Is he giving you fits up there?”

Earlier this month, I had occasion to write the following:

“For many years, I asked Republicans, ‘What would you do to keep Iran from acquiring the Bomb? You opposed Obama’s deal, as did I. But what would you do, specifically?’ They coughed, obfuscated, or looked at their shoes.

“Only one of them gave me a straight answer. Unsurprisingly, it was Bolton. He said, ‘Regime change—not imposed by us, but brought about by Iranians, with our support.’

“You may not like what John says, and you may think it’s wrong. But, by golly, he gives you an answer.”

On the subject of Iran: Until last year, John was protected by the Secret Service, owing to threats against him from the Iranian dictatorship. That was removed, immediately after Donald Trump’s second inauguration. I thought this was pretty low—very low.

I will wind down, but I’d like to say one more thing: Yes, Bolton has been an advocate of American power and influence—even American primacy. But not out of nationalism, not for the sake of national power, influence, and primacy. No, for the sake of freedom, democracy, and human rights. For all.

John is a “conservative Republican,” but he’s also an ardent liberal democrat, which goes a long way with me.

I consider him one of the most valuable players in our general foreign-policy world. Thank you for considering all this, and all the best—

Jay Nordlinger

[redacted]

[redacted]

[redacted]

**B - 101**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write this character letter in support of Ambassador John Bolton and to ask for leniency in his upcoming sentencing. I first met Ambassador Bolton at a conference in 2013 and have seen him from time-to-time since then, but my relationship with him is primarily through his daughter, whom I have known for seventeen years. I was present at two of the most important days of his life – his only daughter's wedding, and his grand-daughter's baptism – and therefore have a unique perspective about the man Ambassador Bolton is, his character, and his love for his country based on the family man I have observed.

I first met Ambassador Bolton's daughter, Jennifer Sarah ("JS"), in August of 2009. I saw her again at a conference in September of 2013, which is when I first met Ambassador and Mrs. Bolton. JS and I then became reacquainted in 2017, around the time we both moved to Nashville, Tennessee, and since then we have become good friends. We see each other regularly and attend the same church. I met JS's now-husband early in their relationship, attended their wedding, and then was the presiding elder at the baptism of their daughter (Ambassador's Bolton's grand-daughter).

Here are some observations about Ambassador Bolton that I have observed from his family and church life:

- The person JS has become is a reflection of the man Ambassador Bolton is. His daughter's life speaks loudly about his character. Ambassador Bolton raised a daughter who passionately loves her country, is intellectually curious, and more than anything is humble. I brag about JS more than any friend I have because I so admire her character. Despite attending Yale and MIT, with an interlude in New York investment-banking, JS chose the unheralded path of manufacturing, spent years in Mississippi and the UK, and now runs one of the largest car manufacturing-plants in this country, which employs thousands of people.
    - In my opinion, leaving the east coast for manufacturing in Mississippi is so rare, and cuts so much against the expectations of elite schools, that it demonstrates an incredible strength of character, a certainty about one's values and ideals, and genuine humility. Ambassador Bolton raised a daughter who is comfortable at Yale or in Mississippi.

That he did so is a testament to his own character and openness to others.

- Ambassador Bolton's faith life is also a testament to his character. The Ambassador is most known as a political conservative, but people would be surprised to learn that he is a long-time devoted member of politically liberal denomination, the Presbyterian Church (U.S.A.). I too am a conservative in the PC-USA.
    - To be a conservative in the PC-USA means several things. It means that one places faith above politics. It means one interacts intimately with others who have different viewpoints because you share the things that are ultimately most important. It means one can get along with people across the aisle and from different perspectives.
    - In our partisan age, the fact that Ambassador Bolton works across the aisle in the most intimate and sacred parts of his life speaks volumes about his character and how he places love of faith and country above partisan interests. Again, I have observed that personally at his daughter's wedding and grand-daughter's baptism, including especially through the people I met at both events who came from a variety of perspectives and backgrounds.
- My final perspective is that Ambassador Bolton is a kind and gentle man, not at all the caricature painted of him in the media. The man I have observed talks openly with all people, is generous with his time and treasure, and smiles and laughs as he spends time with family and friends.

Simply stated, Ambassador Bolton is a good man. I have seen that directly in his family life and his faith life, which I have been privileged to be involved with in a close manner. I am sad that this letter is necessary, but I am happy that I can to speak of his great character and do what I can to help him and his wonderful family.

I hope and pray that your honor will show leniency to Ambassador Bolton.

Respectfully,

Eric G. Osborne
Nashville, Tennessee

**B - 102**

September 17, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

RE: *United States v. John R. Bolton, II*

Dear Judge Chuang:

That day, and that phone call, changed my life forever. It was about 5:30 pm on Wednesday, June 27, 2018. I had just returned to my residence when I received a call from my assistant. She told me to stand by and that I would be receiving a phone call in about one-half hour from John Bolton, the National Security Advisor, and John Huntsman, the Ambassador of the United States to Russia. I walked back into the living room and sat down next to my wife, Suzy. I looked at her, smiled, and said "he is coming to Helsinki." John Bolton and Ambassador Huntsman told me that President Trump would, indeed, arrive on July 15 for a summit meeting which would take place the next day. "Do what you have to do and spend what you have to spend," they said. "And, by the way, Secretary Pompeo will call you tomorrow night to discuss the matter further."

Cicero wrote that a man should not write/talk about himself except in two instances: to defend himself or to say something that only he can say. So I, a kid who grew up in Takoma Park and College Park Estates and attended High Point High School, was about to receive a call in which the callers, I was sure, were going to tell me that the President of the United States was coming to Helsinki for a summit meeting with the President of Russia. It is a very long way from Beltsville, Maryland to the capital of Finland. And almost half a world apart. I am an 81 year old lifelong resident of the Washington DC Metropolitan area. I have been involved for most of my adult life with youth organizations in northern Virginia, local boards (American University, PACA/International Board, Kennedy Center, Wolf Trap, Yale Development Committee, George Mason University, The Gary Sinise Foundation, and many others). I have been an active member of the DC Bar since graduation from law school in 1971 but I "never heard the call." Instead, I have devoted my business life to building shopping centers, hotels, a few office buildings, and the Dulles Expo Center. I have also written many recommendations for prospective students to universities and to the American University Law School. I have never written a letter that I did not believe in with all my heart. I write this letter to ask you to show John Bolton leniency and impose a sentence less than incarceration.

I met John during the term of President George W. Bush; John served as the United States Ambassador to the United Nations. He was, and remains an honest, forthright man, a man of

principles, a family man, a man to be trusted and competent for the jobs he has undertaken. My opinion has not changed. I know this man. He now stands before you having pled guilty to a felony. I rise to speak on his behalf, for a man who has dedicated his life in service to America.

If I may implead a famous literary reference on John's behalf. It comes from the great "court" scene in Act 4 of Shakespeare's The Merchant of Venice: "The Quality of mercy is not strain'd/ It droppeth as the gentle rain from heaven/ Upon the place beneath: it is twice blest. It blesseth him that gives and him that takes. 'Tis mightiest in the mightiest, it becomes the throned monarch better than his crown."

St. Jerome wrote that, to know a person, you need to look into his heart. Your Honor, please try to look into John Bolton's heart. You will see a radiance that vastly transcends this one act for which I believe he has already paid a much greater price than any additional penalty that you could impose upon him. In this case there is no need for general or specific deterrence, retribution, rehabilitation, or incarceration. I hope that Your Honor will conclude that the fine itself, along with the financial penalty attached to his act and his own guilty plea, will be determined to have served the needs and ends of justice.

I close with this thought. It is chilling. Bone chilling.

In January, 2020 the United States killed Qasem Soleimani. Iran responded by issuing a fatwa, a kill order on John Bolton and Mike Pompeo [John Bolton had already resigned his position in September, 2019]. Within days of Soleimani's death, the U.S. began to provide 24 hour armed guards to the few U.S. ambassadors who had not already had such protection. One of the embassies was Finland. The United States charged at least one man with attempting to hire someone to carry out the fatwa on Mr. Bolton. The fatwa is still alive.

I respectfully ask that your Honor not sentence John Bolton to the one place wherein reside such dangers to his life, and ask that he be allowed to live out the remaining days with his family.

Thank you for considering my words. I hope that they may make your decision easier.

Respectfully submitted,

Robert Frank Pence

B - 103

# MIKE PENCE

August 31, 2026

The Honorable Theodore D. Chuang
United States District Court District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

I am pleased to write to you on behalf of John Bolton. Thank you for your service on our Federal judiciary. I am grateful that you take seriously the awesome responsibility of determining the sentences of those who come before you and I hope that my comments about Mr. Bolton, who I have known for decades, will benefit the Court.

Over the past forty years, Mr. Bolton served in some of our Nation's most influential national security positions. During the Cold War, John Bolton served dutifully as Assistant Attorney General in President Ronald Reagan's Department of Justice. President George W. Bush appointed John to represent the United States as our Ambassador to the United Nations. I first became acquainted with Ambassador John Bolton during my time in the Congress and came to know him personally when he was appointed National Security Advisor to President Donald Trump.

It is my hope that his years of distinguished service to the United States in several positions of great responsibility and vital importance—often at great personal risk to himself and presumably his family as well—will weigh heavily in favor of leniency.

During our time together at the White House, I saw firsthand his patriotism, loyalty to this country, and his fierce commitment to our national security.

Together, we advocated for maximum pressure on the world's largest state sponsor of terrorism, supported the President's decision to direct our Armed Forces to take down the ISIS caliphate, and coordinated on many other issues to defend the American people and our national interests at home and abroad.

During our time serving together, I witnessed Ambassador Bolton's willingness to stand on his principles, even when those views drew criticism from the public or those in power.

I will always believe that John Bolton's counsel during the years of the first Trump Administration played an important role in advancing policies that made the American people safer and more secure.

Your Honor, it is my fervent hope that you will see John Bolton as a patriot who has lived a life dedicated to our country and that the conduct for which Mr. Bolton has taken responsibility will be significantly outweighed by a life of unwavering loyalty to the United States of America.

In that spirit, I would respectfully encourage his Honor to show leniency at sentencing so that John may live out his remaining days surrounded by family and friends and in continued service to the vital national interests and values of the United States. I hope these reflections are helpful to the Court.

Respectfully submitted,

Mike Pence
48th Vice President of the United States

July 3, 2026

**B - 104**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write as witness to the character of Ambassador John Robert Bolton in an effort to convince you to view him with mercy.

My name is Daniel Pipes and am a historian who has spent most of his career interpreting current events, especially those in the Middle East. In particular, I founded the Middle East Forum think tank.

I met John about 35 years ago in the course of our sharing common interests. We talked many times, attended conferences together, and jointly traveled to the Middle East. I have publicly introduced him on several occasions and he has spoken for my organization. In addition to my personal knowledge of his character, I have closely followed his career and read many of his writings.

Through hard work and principled endeavor, John has raised himself from humble beginnings in 1948 to become an outstanding analyst and practitioner of foreign policy. A couple of career highlights illustrate for me his sterling character.

As assistant secretary of state in the George H.W. Bush administration, he had an instrumental role in obtaining UN resolutions endorsing the use of force to remove Iraqi forces from Kuwait; plus, he led the successful effort to rescind the infamous 1975 UN resolution equating Zionism with racism.

As ambassador to the United Nations under George W. Bush, John used his brief but memorable tenure unapologetically to stand up for the United States, for democratic values, and for freedom. Waves of dismay rolled through the institution as he insistently articulated American positions at odds with the UN spirit and outlook.

In reviewing a government career spanning almost 40 years, 1981-2019, John Bolton has shown conspicuous energy in word and deed, an adhesion to morals, and strength of character. He is a theorist who understands the need for American sovereignty and for promoting American interests even as he is a practitioner active in the formulation of specific U.S. foreign and security policy. His voice is especially needed in these turbulent times.

Sincerely,

Daniel Pipes

Daniel Pipes

Rohini Rao, MD
[redacted]

**B - 105**

September 28, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing in support of Mr. John Bolton, whom I have known since I was six years old. His daughter, JS, and I were best friends throughout our childhood and through high school, and I spent countless hours in the Bolton household. Although I did not know Mr. Bolton professionally, I came to know him over many years as a father, a friend to my family, and someone whose presence left a lasting impression on me.

One of my earliest memories of Mr. Bolton is also one of the simplest. I used to call the Bolton house almost every day to ask for JS. The conversation was nearly always the same:

"Hi, Mr. Bolton, this is Rohan. Is JS there?"

And he would politely respond, "Hello," and then get JS for me.

It may seem like a small thing, but to me as a child, these interactions mattered. He was always gracious and respectful with me, treating me with the same courtesy every time. That consistency became part of my impression of him: a serious and accomplished person who was also a kind and present father.

Through my friendship with JS, I also understood from a young age how deeply dedicated Mr. Bolton was to his work and to public service. His commitment reminded me of my own father, who was similarly devoted to his profession. I could see that his work was an important responsibility to him, while at the same time he remained deeply devoted to his family. I came to appreciate that a life of public service involves sacrifices not only for the person serving, but also for the family around them.

Mr. Bolton also had an impact on my own family. My parents are immigrants, and I remember how warmly and respectfully he treated them. He never made us feel like outsiders, and that meant a great deal to my family.

I am grateful to have known Mr. Bolton and his family since childhood, and I hope my perspective provides the Court with a small but genuine window into his character.

Respectfully,

Rohini Rao, MD

The FUND for AMERICAN STUDIES

B - 106

July 27, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to express my support and admiration for Ambassador John Bolton and to ask that you show leniency when he is before your Court in October.

I have known Ambassador Bolton for more than three decades, primarily through my capacity leading a non-profit educational organization, The Fund for American Studies (TFAS). We organize programs for college students interested in careers in foreign service, national security, and diplomacy, among other professions.

Ambassador Bolton is a person of the highest integrity and good character. His commitment to the security of our country is without question. He also understands the importance of preparing the rising generation for careers in public service and leadership. This is evident given his willingness to volunteer his time to speak whenever we ask and his schedule permits, to audiences of students, TFAS alumni, friends and supporters.

In 2019, on the occasion of the 70th anniversary of the formation of NATO, we hosted a meeting for representatives of all the signatories to the treaty. At the suggestion of the European guests, we invited Ambassador Bolton to address the group on themes of security at a time when the purpose of NATO was being questioned by some. Ambassador Bolton readily accepted our invitation and discussed themes of friendship, mutual cooperation and national security.

On other occasions, he has spoken for us in Washington, DC, Charleston, SC, and Palm Beach, Florida, to audiences of our alumni, supporters and friends.

In 2009, Ambassador Bolton was selected to receive our annual Walter Judd Freedom Award. The Judd Award recognizes individuals who have advanced the cause of freedom in the US and abroad, are devoted to the preservation and expansion of freedom,

are influential in world and national affairs, and are outspoken voices against tyranny and oppression, while embodying the characteristics of self-sacrifice and patriotism. Other recipients of included Sen. John McCain, U.S. Rep. Frank Wolf, and Ambassador Jeane Kirkpatrick.

Ambassador Bolton has also signed fundraising letters for us in the past when not in government service to help us secure money for scholarships for students seeking to attend our programs but lacking the means to do so.

Ambassador Bolton is someone we hold out to college students attending our programs as an example of dedication to public service and his country. He is generous with his time, often remaining after a lecture to engage informally with students.

I have the highest admiration for Ambassador Bolton as someone who is of strong moral character and has a deep commitment to his country and its security. I urge you to show leniency at the sentencing hearing given his record of public service and commitment to American values.

Respectfully,

Roger Ream
President & CEO

B - 107

OTTO J REICH
AMBASSADOR OF THE UNITED STATES OF AMERICA (RETIRED)
[redacted]

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane Greenbelt, MD 20770

July 24, 2026

Dear Judge Chuang:

Please accept this letter as my personal and professional plea on the eve of the sentencing of John Bolton. I have known John for 45 years and can testify to his unswerving character and intellectual honesty.

I first met John in 1981, when President Reagan's Administration selected me for the position of Assistant Administrator of the US Agency for International Development, in charge of Latin America and the Caribbean. John had already begun working at USAID as the General Counsel. The position for which I had been selected required Senate confirmation, and that process is how I came to know John.

Without knowing me, he had the power to make a decision that could either allow my career to advance, or to be unfairly derailed: on one hand, he could take a politically safe decision and end my nomination on the basis of distortion and inuendo aimed at me or, on the other, risk making powerful enemies by objectively analyzing the evidence and concluding that the allegations against me were one more example of the "politics of personal destruction" so common in Washington, DC.

As this was my first presidential appointment, I was about to personally find out just how quickly one's reputation can be battered by fictions. My credentials and experience had not been questioned. By age 35, I held both Undergraduate and Graduate degrees, from the University of North Carolina and Georgetown University, respectively, where I had concentrated my studies in the Latin America/Caribbean region and on economic development. I had worked 5 years as the head of the Washington Office of the Council of the Americas, the association of the 200-plus largest US corporations with investments in, and trade with, the Americas. I had earlier worked for 3 years on international trade and economic development projects at the State of Florida Department of Commerce and later at the City of Miami, Florida.

I spoke Spanish fluently, having been born in Cuba, from where my family had fled in 1960, after being granted Legal Permanent Residence in the United States. I was 14 years old when we arrived in this country, the country I love and whose military uniform I have worn with pride and respect. By 1981, I had also served in the US Army for 3 years and had been Honorably Discharged with the rank of First Lieutenant.

I was shocked when I was informed that my nomination was being questioned, not for lack of experience, but because of the personal opinions of one or more detractors, including “anonymous sources,” with whom I had disagreed in an earlier State job in Florida and who decided to impede my nomination.

The allegations included that I was “too liberal” to work for the “conservative Reagan Administration” because I had supported the passage of the Panama Canal Treaty, which had been approved by the Senate a few years before. The fact that Dr. Jeane Kirkpatrick, later US Ambassador to the United Nations, supported my nomination because she was a friend and mentor, did help undermine the charges.

It was further “charged” that I was a Democrat and should therefore be ineligible. I had made no secret of having been a previous supporter of that party, years before changing my preference when I became disillusioned by Democratic Party positions and found myself in agreement with Republican policy, especially in foreign and national security matters. Notably, another prominent former Democrat in the Administration was Ronald Reagan himself.

The Administrator of USAID at the time, Peter McPherson, asked his legal advisor, John Bolton, to investigate the allegations, which seriously threatened to end my nomination. I do not have the details of John’s investigation, but I do know it was professional and thorough.

I had indeed supported the passage of the Panama Canal Treaty, mainly because of my military service in Panama as one of the anonymous thousands of US soldiers who were prepared to lay down our lives if necessary to protect US interests in the crucial waterway. I saw the Treaty as the best future option for the US to maintain the Canal open, operational and neutral, while removing an unnecessary irritant in US-Panama and US-Latin American relations. With Marxist guerrillas running roughshod in many hemispheric nations, and Russians utilizing Cuba as a cat’s paw of communist subversion, I felt we could win one of the battles of global hearts and minds while keeping the Canal safe.

After concluding his investigation, John recommended to the Administrator that my nomination go forward. I was then confirmed by the Senate in 1982, and by 2004 I permanently left government service having had 6 more Presidential appointments some requiring Senate confirmation, including US Ambassador to Venezuela; Assistant Secretary of State for Western Hemisphere Affairs; The President’s Special Envoy to the Western Hemisphere; Senior Staff Member of the National Security Council, and others. All those subsequent positions rested on the first one, the USAID job, the one made possible by one man’s honest investigation and fearless decision.

This episode in putting principle before political pressure, unknown to most but crucial to me, defined my view of John Bolton from that moment on. For 45 years I watched John work tirelessly to advance the interests of the United States, sometimes taking unpopular policy positions but always making a cogent case that often proved to be visionary. I will conclude by mentioning one of many as an example: the International Criminal Court.

In 2002, as Under Secretary of State, John strongly urged that the United States "unsign" the treaty creating the International Criminal Court, arguing correctly, as history would prove, that such an international bureaucracy would soon, like so many others, become a platform for condemnations of the United States, its elected officials, military, and allies. President George W. Bush agreed.

On July 13 of this year, 2026, the US State Department issued a strongly critical statement that could have been written by John Bolton in 2002, and begins thusly: "Today, Secretary of State Marco Rubio announced a sweeping campaign to dismantle the threat posed by the International Criminal Court to U.S. sovereignty. The campaign will feature a whole-of-government response to systematically disable the ICC's ability to operate, target American servicemen or officials, or otherwise threaten American sovereignty."

Your Honor: With all due respect for the high office you hold and the heavy responsibility you bear, as a former fellow public servant, I ask that in the sentencing process, you take into consideration John Bolton's half century of service to our country. He may have been controversial at times, but so were our most outstanding patriots. He came from humble beginnings and never forgot wherefrom he came. His controversies were often caused because his adversaries did not understand John's erudite positions.

John was not always right; none of us are. By his plea, he has admitted to a mistake. Is there a human who has not made a mistake? Not one exists. Please compare John's mistake to his myriad contributions to our country, at USAID, the State Department, the United Nations, the Justice Department and, yes, the National Security Council. Our nation is better off because of his work on its behalf.

In those 45 years, I have met and worked with patriotic and selfless Americans who realize that "Freedom isn't free," and that that saying is not a cliché. As a descendant of a long line of refugees from totalitarian ideologies, including Nazism and Communism, and as refugee from communism myself, I know that statement is a fact, and that many Americans – and legal residents – of all races and backgrounds have dedicated their lives to the defense and protection of our country, .

For a half century of untiring, patriotic, principled duty, John deserves commendation, not condemnation. He certainly does not deserve a prison sentence. Having worked many years for our country overseas, I can tell you that the most satisfaction of a Bolton jail sentence will be enjoyed by the bloody tyrants of the world that John confronted: Russia's Putin, North Korea's Kim; China's Xi; Cuba's remaining Castro's; and all those who hate the United States because we have people who stand and work for freedom at all costs, like John Bolton.

Thank you for your patience and courtesy in reading this letter.

Respectfully yours,

Otto J. Reich

**B - 108**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

My name is Harry Rhoads and I'm the Co-founder of The Washington Speakers Bureau. During the 46 years that I've led the company, I've had the good fortune to exclusively represent many distinguished figures including three former US Presidents; six British Prime Ministers; three chairs of the US Federal Reserve; multiple US Secretaries of State and Defense….and former National Security Advisor John Bolton. In this role I have worked closely with all of them, including Ambassador Bolton……and have seen "up close" what an upstanding, honorable man that Ambassador Bolton has been since we first began working together in 2007 (minus the years he served as National Security Director).

From the beginning of our relationship, it was very evident that John was a man of exceptional integrity. He always approached his work (speaking engagements) with the utmost determination to exceed customer satisfaction. He did all that was asked of him….and more. This is a man who did not cut corners in completing his assignments.

I've had many conversations with him over the years. They never focused on "more money or more opportunities." They were always about what else could he do to insure that his customer interactions led to customer satisfaction. He cared deeply about serving others.

In addition to his professional accomplishments, I have witnessed John's deep commitment to serving his community and advocating for important causes. He has always sought ways to contribute positively, whether through mentoring young professionals or engaging in public service initiatives. His dedication to making a difference has always been inspiring.

John Bolton is a good man, a dedicated public servant who chose service over self. The man who helped keep America safe. The man who ultimately took the biggest risk of his life….by telling truth to power.

Thank you for the opportunity to share my views of a dedicated public servant.

Yours truly,

Harry Rhoads, Jr.
Co-founder
Washington Speakers Bureau

B - 109

AMERICAN VETERANS CENTER

WORLD WAR II VETERANS COMMITTEE · NATIONAL MEMORIAL DAY PARADE · THE WOUNDED WARRIOR EXPERIENCE · AMERICAN VALOR

July 30, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to express my earnest hope that you will show leniency in your sentencing of former ambassador John Bolton. I first met John in 1974 when the non- profit organization for which I was working was a co-plaintiff in the bipartisan lawsuit Buckley v. Valeo, brought by senators James Buckley and Eugene McCarthy. John was then a young attorney working for the law firm Covington and Burling and was doing *pro bono* work on the court filing.

The coalition in Buckley v. Valeo was very diverse, comprising organizations and individuals from across the political and ideological spectrum. As Covington and Burling's point man on the suit, John was responsible for working with all of the plaintiffs. It was a difficult task, especially for one so young as John was then, but he carried it out successfully, with patience and great tact and managed to hold this fractious coalition together through long months of filings, depositions, appeals and oral argument before the Supreme Court.

It was my first encounter with what became John's lifelong record of public service, botb in the public and private sectors.

Having known John for more than 50 years, I can attest that he is a man of courage, unimpeachable character, generosity, love of country and loyalty to his friends.

When I founded a non-profit news and commentary network in 1985, John was encouraging and helpful. In more recent years, he has been a stalwart supporter of the American Veterans Center, of which I am chairman, participating in numerous events to honor those who have served our country in uniform.

Had John pursued a career in the law, for which he showed extraordinary talent, he would be a wealthy man today. Instead, he has chosen to serve his country in numerous positions in the public sector.

I hope and pray, Your Honor, that you will bear this record of public service in mind and show leniency in the sentencing of John Bolton.

Respectfully,

James C. Roberts
Executive Chairman
American Veterans Center

**B - 110**

September 26, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write in support of Ambassador John Bolton and respectfully ask that you show him leniency by imposing a sentence other than incarceration.

I have known John for more than forty years. I served with him in the Reagan administration beginning in 1985 and again in the George H.W. Bush administration. Those shared years of service, and our relationship since, have given me a lasting appreciation for his character, his convictions, and his commitment to our country.

John is a great patriot and a relentless advocate for America. His dedication to the country and its security has been a constant throughout the time I have known him. He is intellectually honest and candid to a fault. He says what he believes, including when doing so is uncomfortable or unpopular. Whether or not one agrees with his positions, there is never much doubt about where John stands or why.

Based on more than forty years of knowing and working with John, I cannot imagine him acting with criminal intent. That would be wholly inconsistent with the man I know and his lifelong dedication to serving and protecting this country.

His advocacy can be loud, yet he is effective. He brings conviction, rigor, and deep experience to the issues he cares about. American public debate needs more people like John, not fewer: people willing to speak plainly, defend their views, and subject those views to scrutiny.

Beyond his public persona, John is a good person. He is loyal to those who have worked for him and with him over the years. That loyalty is an important part of the man I know, and it deserves consideration alongside his long record of public service. My respect and affection for him endure despite the circumstances that bring him before the Court.

I respectfully ask that you consider John's character, his service to America, and the contributions he can continue to make in determining his sentence. Thank you for considering my perspective and my request for leniency.

Respectfully,

Ed Rogers

Ed Rogers
Founding Partner
BGR Group

**B - 111**

July 13, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I met John Bolton during foreign policy briefings associated with my political campaigns of 2008, 2012 and 2018. I found him to be extremely well informed and forthright with his observations and opinions. He spoke with candor and directness. In no circumstance did he shade his opinion with self-interest or guile.

My interactions with Mr. Bolton have convinced me that he is a person of unusual knowledge and expertise. His service and writings on matters of foreign affairs have provided important and substantial benefits to the country—and continue to do so today.

I believe that he is a man of uncommon character who has served his country with honor and distinction.

Sincerely,



W. Mitt Romney

**B - 112**

FRANCIS ROONEY

AMBASSADOR OF THE UNITED STATES OF AMERICA, RETIRED

June 24, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I have known John for over 25 years, working with him at the Department of State when I was the US ambassador to the Holy See and later when he was at the UN. I also have long term as a personal friendship with him.

When I was in Congress he regularly spoke with our Foreign Relations Committee, of which I was Vice-Chairman, and came to Southwest Florida to speak to our Lee County Lincoln Day dinner.

I have deep respect and appreciation for his professionalism and personal integrity. He has had an unblemished career and has made many important contributions to our diplomacy around the world. He understands the challenges to our national security well and has the courage to express his views in circumstances of difficulty and opposition from others in government.

He continues to contribute meaningfully to our national security and diplomatic position in the world by writing numerous op ed's and articles. I can personally attest to how much his opinions have been eagerly received and relied upon by elected officials of all parties. He certainly has positively impacted the public aspects of my career, and I am deeply thankful for that. I have learned a great deal from him.

It is easy to speak up when everyone around is of a similar opinion, but Ambassador Bolton has shown great courage in speaking up in circumstances of strong opposition and strongly felt opinions.

Thank you for your consideration.

Respectfully,

Francis Rooney
U.S. Ambassador, Retired

B - 113

**JAMES ROSEN**
[redacted]

July 15, 2026

The Honorable Theodore D. Chuang
United States District Court,
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

Please accept this letter as part of the corpus of materials on which you will rely in your sentencing of former Ambassador John Bolton in Case No. 8:25-cr-00314 on October 28.

I have known Ambassador Bolton for roughly a quarter of a century, since shortly after the terrorist attacks of September 11, 2001. Across those years, I have been a leading reporter in Washington and the author of five non-fiction books.

My relationship with John began in a professional capacity, as a reporter and senior official, but came over time to encompass a warm personal friendship. This relationship has enabled me—above and beyond John's long record of innovative and unimpeachable service as a high-ranking federal official, often carried out in the public eye—to gain firsthand knowledge of the man's character, in and beyond public service, and the many fine qualities that form it.

As a reporter, my interactions with John were focused initially, and on countless occasions thereafter, on the agenda that informs the work of all good and honest reporters and public servants: a working collaboration, in a responsible way, to adduce new facts to the record of our times. Since it is generally improper for any reporter to reveal the details of his or her interactions with sources, I will say here only that it is also true that a "source," from the point of view of the reporter, is properly defined as anyone who gives you information. That can be a frontline intern answering the phones, a senior official, or anyone in-between.

What came through to me in our interactions were two qualities of John's: his concern for the accuracy of the historical record and his respect for the law. As a high-profile official in numerous presidential administrations, and as a widely published commentator in periods where he was not in office, John has long been a subject of commentary, public and private; and it was always my experience that everyone who knew John or followed his career closely, whether or not they aligned with his views or actions, regarded him as brilliant, scrupulously honest, devoid of material motivation, and—a phrase that recurred—*a lawyer's lawyer*.

Those opposed to John's views and actions conveyed to me many times over the years that love him or hate him, as the phrase goes, he was never less than a formidable figure, gifted with intellect and a command of the law, committed to fashioning cutting-edge policies within its defined boundaries. Even global audiences could observe these qualities in the way John spoke publicly: his lawyerly attention to detail, his restraint in public give-and-take.

John's concern for the accuracy of the record was manifest in the guidance he provided on current events and the subjects of my reporting; the materials he recommended I consult; the subject-matter experts he commended to my attention. Also, unlike many in government, John never tried to oversell what the facts supported; he was always *a straight shooter*.

Animating that commitment to honorable conduct, I think, was John's innate character, of course, his fine upbringing; but also, I think, his love for the law, and his legal training at Yale. These qualities combined to make John care deeply that the record should always be made fuller, more accurate—not least when, as was so often the case in coverage of him and the administrations he served, the existing record was biased, misleading, or factually wrong.

Few public officials have been subjected to more unfounded vilification, a condition that owes chiefly to ideological animus and has extended to the worst kind of caricature. The sacrifices for the public good that John and his family have made include their quiet endurance of that vilification; their bravery in the face of credible assassination threats from the Iranian regime; and the more modest lifestyle they experienced because John so often forswore opportunities for lucrative private-practice work to serve in the federal government.

In policy terms, the legacy of Ambassador Bolton's career in government was nothing less than to make America, both before and after the intelligence failures that enabled the September 11 attacks, safer. At the State Department, for example, where John served as an undersecretary, he pioneered the Proliferation Security Initiative (PSI), a multinational coalition, launched in 2003, that pooled economic, military, intelligence, and diplomatic resources to interdict weapons of mass destruction, their delivery systems, and related materiel. PSI remains a vital element in U.S. national security to this day, with the State Department's Bureau of Arms Control and Nonproliferation touting enhanced PSI engagement between the U.S. and Argentina just last month.[1] This is just one of many policy accomplishments that John captained across the decades of his public service.

In personal terms, I know John to be a tender, caring, and loyal friend, supportive and cheerful in times good and bad. I am blessed to know him.

---

[1] Media Note, Bureau of Arms Control and Nonproliferation, U.S. Department of State, "United States and Argentina Co-Host 2026 Proliferation Security Initiative Western Hemisphere Engagement," June 25, 2026, *at* https://www.state.gov/releases/bureau-of-arms-control-and-nonproliferation/2026/06/united-states-and-argentina-co-host-2026-proliferation-security-initiative-western-hemisphere-engagement/ accessed July 15, 2026.

In sentencing Ambassador Bolton, you will of course be guided by the law. To the extent, however, that judicial discretion comes into play, I most respectfully urge the court to take stock of John's character, his long and selfless devotion to public service. With the same care and concern for the accuracy of the record that I have always observed in him, he has forthrightly pleaded guilty to a single count in his indictment. For his otherwise unblemished record in personal and professional terms, for everything he has done for his country's national security and the record of our times, and for his manful acknowledgment of wrongdoing in this case, John is eminently worthy of the court's mercy.

Please, Your Honor, allow this good and accomplished man an opportunity to spend his remaining days harnessing his formidable mind and talents to the service of the public good, as he has done so often for so long, instead of sentencing him to incarceration. He and his family have suffered enough.

Thank you for your time and consideration of the foregoing.

Yours respectfully,

James Rosen

JSR/jsr

B - 114

**Ileana Ros-Lehtinen**
**Former Member of Congress**

August 1, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

As a former Member of Congress for almost 30 years and Chair of the House Committee on Foreign Affairs, as well as a former Member of the House Permanent Committee on Intelligence, I am personally and professionally aware of the sterling character and admirable public service record of Ambassador Bolton.

I believe that the public interest would be best served by a sentence other than incarceration.

I frequently interacted with Ambassador Bolton when he served as National Security Advisor under President Trump, and as US Ambassador to the United Nations, Under Secretary of State, and Assistant Secretary of State under President George W. Bush. He testified on numerous occasions before the House Committee on Foreign Affairs and in briefings to Congress. I also interacted with him during the years when he was not in office, seeking his advice and counsel.

In his frequent testimony before Congress, he contributed significantly to positive relations between the United States and our allies. His record of service demonstrates his commitment to our country, to our country's security, and to the security of our allies. His positive influence on our nation's foreign policy is attributable to a significant extent due to the uniformly-held positive view of Ambassador Bolton's character and integrity among his colleagues and foreign officials.

My husband, Dexter Lehtinen, served as the United States Attorney for the Southern District of Florida for more than 3-1/2 years, when it was the largest U. S. Attorney's Office in the country. My husband, Dexter, developed a close personal relationship with John, often discussing matters of public interest. Dexter strongly believes that incarceration would serve no public interest.

Judge Chuang, I conclude by respectfully requesting leniency at the sentencing of Ambassador Bolton.

Sincerely,

Ileana Ros-Lehtinen

Ileana Ros-Lehtinen
Member of Congress
(1989 – 2019)

[redacted]

**B - 115**

September 14, 2026

The Honorable Theodore D. Chuang
United States District Court District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing on behalf of John Bolton as you consider his potential sentence.

I have known Ambassador Bolton for more than 40 years—since 1985, in fact, when I first went to work in the State Department Legal Adviser's Office. I have observed him in many settings, especially in regard to the conduct of U.S. diplomacy and the formation and execution of U.S. foreign and national security policy. I have observed first-hand his devotion to the national security of the United States and the preservation of our country's national security secrets.

I served as Special Assistant to Presidents Reagan and George H.W. Bush and Legal Adviser to the National Security Council, 1987-93, under National Security Advisers Colin Powell and Brent Scowcroft. In that role, I also served as Designated Agency Ethics Officer. In addition, I held the positions of Staff Director, Senate Select Committee on Intelligence, 1999-2000, Stockton Chair of International Law at the Naval War College, Senior Policy Adviser and General Counsel to the U.S. Ambassador to the United Nations, 2001-05 (including when Ambassador Bolton served as U.S. Ambassador to the United Nations), and University Professor and Senior Director of the Center for Strategic Research at the National Defense University from 2010 until my retirement from Federal service at the end of 2015. I am familiar with the legal and ethical obligation to preserve the nation's secrets that attend on obtaining security clearances.

I first met Ambassador Bolton in 1985 when he worked at the Justice Department as Assistant Attorney General for the Office of Legislative Affairs. We became good colleagues with a respectful professional relationship that grew into friendship in the following years.

Ambassador Bolton's many positions in the U.S. government have included those of the greatest sensitivity at the highest level of decision-making in domestic and foreign and national security policy. As a result, he has been entrusted with knowledge and care for the protection of the nation's most important national security information. In my many years' experience working with Ambassador Bolton, I knew him to care about preserving the country's secrets. And in his many books and articles on foreign and national security subjects, he has showed the utmost fidelity to his oaths to protect national security information from unauthorized disclosure. The actions to which he has pled guilty, to accept responsibility for his lapse, do not represent who Ambassador Bolton is and all that he has done. Please take this fact into consideration and find a course to a non-custodial sentence.

I hope this information and opinion is useful to you as consider any sentence to impose on Ambassador Bolton.

Sincerely,

Nicholas Rostow

# Karl Rove

July 27, 2026

The Honorable Thedore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Dear Judge Chuang,

I met John Bolton when we were both in our early 20's, working at the Republican National Committee. He as the research director, I executive director of the College Republicans.

He was smart, focused and hard-working. I wasn't drawn to him because he was a fun guy to hit the bar scene with or talk over the weekend's sporting events. It was because he was always trying to get a handle on the big picture. Yes, he was kind. Yes, like me he had an insatiable interest in the minutiae of politics.

However, it was his innate intelligence and desire to understand how the world and country worked that I liked most in John. He wanted to serve a cause bigger than himself and to do that, he studied, wrote and thought about big questions and important ideas.

We stayed in touch through the decades that followed. He continued to show love of country and a commitment to public service I found admirable. He could have led a far more comfortable life if he spent less time serving country and more time taking advantage in the private sector of the reputation and respect he acquired in his public service.

So it was easy as Deputy White House Chief of Staff to join others in recommending him for service as the U.S. Ambassador to the United Nations. Our country deserved a thoughtful, tough, straight-talking advocate for our values and interests. I knew he would be the best possible voice in a difficult moment for our nation and world.

It is my prayerful hope that his many years of service and sacrifice will enter into your sentencing deliberations. Thank-you for your consideration and for your service.

Respectfully,

Karl Rove

KARL ROVE & CO • [redacted]

**B - 117**

September 30, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

My name is Christine Samuelian. I have been Ambassador Bolton's Executive Assistant on and off for 37 years. I started working for him in 1989 under the George H.W. Bush administration when he served as Assistant Secretary of State for International Organization Affairs. We were at the State Department until 1993, after which I returned to Los Angeles. I spent 5 years working for the California Trade and Commerce Agency doing Economic Development, followed by 5 years with Southern California Edison, also doing economic development. During my 10 years in Los Angeles, my heart really wanted to be back in Washington working for Amb. Bolton. I had stayed in contact with Amb. Bolton and our State Department team over the years and knew that I had an open invitation to return to government should I want to. I never wanted to be so committed to Los Angeles or any place else because I knew in my heart that one day Amb. Bolton would be back in government in some position where I could help, and I wanted to make sure I could pick up easily and move back to Washington and didn't want anything to stand in my way for that opportunity. That was my life dream and I wasn't going to miss it.

In 2004, I got that chance. Amb. Bolton requested my help and I moved back to Washington to join him at State Department when he served as Under Secretary of State for Arms Control and International Security. In 2005, he was appointed as U.S. Ambassador to the United Nations and I accompanied him to New York where he served until his resignation in December 2016. At that time, we both returned to Washington and he took a position as a Senior Fellow at American Enterprise Institute (AEI) and I continued working with him as his Executive Assistant. We were at AEI until April 9, 2018 when he was appointed as National Security Advisor under President Trump and served until his resignation on September 10, 2019. Today, I continue to work for Amb. Bolton at the Foundation for

American Security & Freedom, an organization that he founded in 2013 and continues to serve as its Chairman.

I share the details of my background with you so you can see that I chose to devote my life to working with him because I have known him to be an exceptional person with an exceptional mind and would be a very significant figure in making and influencing policy in the United States. I believe that every decision he makes, and the advice he has provided to at least four U.S. Presidents, is based on "what is best for the United States." That is the compass by which he is guided and that informs every decision that he makes. Amb. Bolton is deeply committed to this country, and is someone who I believe would never do anything, to compromise the security of the United States of America.

In my years working with Amb. Bolton at State Department and at the White House, he was always adamant that we follow the rules and instructions concerning policies that involved security and protecting classified information. There was no higher priority in our day to day operations than to protect intelligence and classified documents so our country was not compromised.

I also want to add that in July 2021, Amb. Bolton's e-mail account was hacked by someone posing as our office assistant, asking if Amb. Bolton had changed his password and asking me to give that unknown hacker the new one. Shortly thereafter is when we realized that his account had been hacked and we notified the FBI immediately. Starting in or around August 2021, we were in regular contact with the FBI concerning the hack since at this same time they were also tracking Iranian efforts to assassinate Amb. Bolton in retaliation for the death of Qasem Soleimani. We were in close contact with the FBI before and after that plot was intercepted by them. They said the reason for the hack was to get information on Amb. Bolton's whereabouts to carry out a plan to kill him. As I recall, there were at least ten different instances when the FBI asked to come to our office and speak with us about the case and look at our computers to make sure we had sufficient security measures in place to prevent any further hack of our computers or Amb. Bolton's calendar or other personal information. I recall Amb. Bolton asked the FBI agents we spoke with what he should do, and one agent suggested he delete all AOL e-mails during his time as National Security Advisor in case the hacker had not yet downloaded those items. Thereafter, I communicated

to the FBI that Amb. Bolton would be deleting those emails as suggested by the agent.

I recall members of the FBI even sitting down at both my and Amb. Bolton's computers to check to see if anything looked suspicious and to make sure we had sufficient security measures installed on our system. It is my view that we cooperated fully with the FBI's requests then and that we did everything possible on our end to make sure his and our office's computer and other systems were secure. We did then and continue to retain an outside IT and security firm who regularly looks for any sort of breaches in our accounts and notifies us if it appears as if someone is trying to improperly or unlawfully access our system.

Amb. Bolton is someone I have long admired and respected, both for his service to this country and for speaking truth to power no matter the personal cost. I have only ever known him to be an honest, humble and gracious colleague and family man, and know firsthand the personal toll that this case, and the penalties he faces and has already faced, has taken on him and his family. Those penalties are not insignificant and are ones for which he is already paying the price. On this basis, I conclude by pleading with the court to show leniency and compassion for Amb. Bolton at sentencing so he may enjoy his later years together with his beloved wife, daughter and granddaughter.

Thank you very much for your consideration,

Sincerely,

Christine Samuelian

Christine Samuelian
Assistant to Amb. John Bolton

**B - 118**

July 14, 2026

The Honorable Theodore D. Chuang
United District court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write to express my full confidence in the integrity and professionalism of Ambassador John R. Bolton and in light of his public service, and his lifetime devotion to the legal institutions that govern our democracy, I request leniency at the sentencing of the Ambassador.

Ambassador Bolton and I served together as Senate confirmed appointees of President Ronald Reagan at the United States Agency for International Development (USAID), as Assistant Administrator for Policy, and Assistant Administrator for External Relations respectively. In those capacities between 1981 and 1983, we worked on numerous policy issues, first in defining them, and then making them known to the public.

From this personal work experience with Ambassador Bolton, I know him to be of excellent character, with an exceptionally sharp intellect. John is an academic at heart. He studies everything that crosses his desk, he is disciplined in knowing the details of an issue while retaining the ability to have the broader perspective of a policy leader. Because of this, he was both challenging and fun to work with.

Ambassador Bolton is a forceful policy advocate, yet a man of balanced judgement. And, I know him to have a sense of humor, even about himself.

As a team leader, I saw Ambassador Bolton to be tough but fair. He did not abuse power or people. He is direct yet thoughtful in his communication. He has been a highly dedicated public servant who has demanded only personal honesty and intellectual clarity from staff.

Throughout his long government service, Ambassador Bolton has demonstrated his deep belief in the rule of law, starting with his academic training and going through his lifetime career in government service as a legal and policy advisor.

In light of all of the above, I kindly request leniency at the sentencing of Ambassador Bolton, and thank you very much for your consideration.

Respectfully,

Kate Semerad

Former Assistant Administrator for External Relations,
United States Agency for International Development

**B - 119**

July 4, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write in the case of Ambassador John Bolton to respectfully ask the Court to show mercy and leniency. I have known Ambassador Bolton for many years, including during a shared period of service in the U.S. government. My experience with him leaves me with certainty as to his character and integrity, exemplified in his devotion to our country in a life of public service.

My association with Ambassador Bolton stems from our overlapping interests in U.S. national security and foreign policy, specifically the U.S.-Taiwan-China relationship. While our association extends back many years and continues to today, I had the opportunity to work with him for a couple of years in government when I served as Chairman and Managing Director of the American Institute in Taiwan, overseen by the U.S. Department of State. My role placed me in regular contact with senior government officials working on matters of importance to the United States. My primary area of focus involved areas U.S. foreign policy that were quite nuanced, governed by a range of statutory obligations as well as formal understandings and declarations over many years between the U.S. and other governments. Ambassador Bolton is known as a policymaker who brings his views to each issue, articulating and defending them in a conscientious fashion, welcoming the same from others whose views diverge from his own. Beyond this, though, I have known him to be a stickler for detail and precision. In my area of responsibility, it has been common for policymakers over the years to re-interpret or otherwise nudge U.S. policy in their preferred direction through creative interpretative of the statues and protocols; kind of cutting corners to favor a given point of view. I intend no judgment as to the veracity of those doing so; it is a common approach to policymaking I am pretty sure. In contrast, though, John typically brought rigor and discipline in his attention to the details of the statutes and the precedence. I have observed that he is not casual in his professional demeanor and in his analysis and decision-making involving these issues, around which there is a lot of grey area. These are vital qualities in someone entrusted with as much responsibility and accountability as he has been. I admire them and have learned a great deal from him.

On a personal level, too, I have benefited from Ambassador Bolton's spirit of generosity and collegiality. While he has spent a career in high government service, my appointment at AIT was a short period of my professional life, which has been mostly in the private sector. While it is a privilege to serve in government, it can be quite challenging. Professional and institutional rivalries can create a complicated operating environment. It is often difficult to ascertain in whom one can confide or rely upon for support and guidance. During the period in which I served, policy issues involving my area of responsibility within the U.S. government were often contentious between the departments and between individual offices and officials.

During that period and since, John has been a gracious and supportive colleague who helped me navigate an operating environment in which I was a relative novice. He was and remains generous with his time and his counsel. He has stood by me during difficult times, and I've always felt it was simply because he thinks it is the right thing to do. I doubt I am alone in having experienced this. He is a careful listener and objective in his assessments, whether it is what I want to hear or not. In all my observations and experiences with Ambassador Bolton, his integrity is unquestioned.

From my vantage point, Ambassador Bolton is a man of principle, a disciplined thinker and operator, and without question a patriot and public servant. It has always been clear to me that his positions are rooted in love of country grounded on careful deliberation and attention to detail. Apart from these admirable traits, though, and perhaps more importantly perhaps, John Bolton is a good person.

I respectfully ask the Court to consider these core qualities and the many years Ambassador Bolton devoted to his country. I know the Court must weigh all relevant circumstances, and I do not presume to tell the Court how to do so. I simply ask that, in exercising its judgment, the Court extend mercy and impose a sentence that truly balances all the factors under consideration.

Thank you for the opportunity to share my views about a fine colleague and friend.

Respectfully,

Thérèse Shaheen

Therese Shaheen

**B - 120**

Dear Judge Chuang -

I am writing to provide the court with a character reference for John Bolton in advance of his sentencing. I have known John for 45 years since we met at the outset of the Reagan Administration, and I ask that the court consider the man that I have known for almost half a century as it determines and appropriate and just sentence.

Throughout our friendship, John has consistently chosen public service over personal gain. Given his education and his high innate intelligence, he could have easily pursued a far more lucrative career in the private sector, but instead chose to devote himself to the service of his country, most notably as the National Security Advisor to the President and Ambassador to the United Nations. That choice clearly speaks to who he is at his core.

What has always distinguished John in his private service career has been his willingness to speak truth to power, even when doing so came at real personal cost, such as when he chose to continue to advocate support for the country of Ukraine even though the administration in which he served had adopted a position of neutrality. That strain of courage is truly rare and is not the mark of a man who is inclined to take the easy path.

I have always known John to be a man of compassion, courage and great integrity - someone others look to as an example of how to live a principled life of honor. He loves our country deeply and has demonstrated that love through earnest commitment, resolve and action rather than words. I am proud to call him my friend, and obviously, don't make that statement lightly after 45 years.

I understand the seriousness of the matter before the court, and I do not write to minimize it. Rather I write because I believe that the court should know the full measure of the man that is being judged - not only the chapter currently before you, but the half century that has preceded it. I respectfully ask that the court consider Ambassador Bolton's character and lifetime of service in determining a just and deservedly merciful sentence.

Thank you for your time and thoughtful consideration.

Respectfully submitted,

Richard D. Shelby

**B - 121**

ARTHUR B. SPITZER
[redacted]

July 20, 2026

Hon. Theodore D. Chuang
United States District Judge
United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770

Re: John Bolton

Dear Judge Chuang:

John Bolton and I were law school classmates, so I have known him for about 55 years. Back then, people felt free to express their views on all topics in thoughtful ways and to expect thoughtful responses, rather than attacks, from those who disagreed. I took a constitutional law course co-taught by Walt Rostow and Lou Pollak, who disagreed about so many things, and no one thought that was weird. It was an excellent course. John and I both took advantage of that atmosphere, and he stood out at law school as one of the few students who were willing to express and cogently defend conservative views. I respected him for that.

We never became real friends, but we've been in occasional touch. I have pursued a public interest career at an organization that is generally viewed as being on the other side of the political spectrum from John, which has allowed me to advance the values that are important to me; I've appreciated John's choice to largely pursue a public service career in which he has been able to advance the policies that are important to him. Although our views are often different, we have each sought to make our nation a better place by our respective lights, rather than pursuing private advantage.

While I've followed John's career only from across town, it has been obvious that he's a man of conviction and principle. One evident example was his steadfastness in publishing *The Room Where It Happened* despite the White House's extraordinary attempt to prevent it and despite knowing that it would make the President of the United States his implacable enemy, with all the consequences that might entail. I've spent much of my career defending freedom of speech, and I know

that having freedom of speech would mean little unless there were people willing to exercise that freedom, sometimes—as here—at personal risk and expense.

Given John's long history of distinguished public service and his upstanding character, I hope you will agree that any sentence involving incarceration would be unjustified.

Thank you for your consideration of my submission.

Respectfully,



*William H. Strong*

B - 122

[redacted]

June 25, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

My purpose in writing this letter is to ask you to be lenient in your sentence of Ambassador John Bolton. Specifically, I respectfully ask that Ambassador Bolton not be subject to incarceration as part of his sentence. Ambassador Bolton has ably served the United States for over forty years. Given this record of service and his advanced age of 77, I am hopeful that you will conclude that incarceration is overly harsh.

I was first introduced to Ambassador Bolton in 2011. At the time, I was based in Hong Kong serving as Co-Chief Executive Officer of Morgan Stanley's businesses in the Asia Pacific Region. The Ambassador's daughter, Jennifer, who was also based in Hong Kong for Morgan Stanley, was assigned to a client project that I was leading. After a few work sessions, I discovered that Ambassador Bolton was her father. Jennifer's introduction of me to her father was the start of what is now a fifteen-year relationship between the Ambassador and me. Throughout these past fifteen years, I have had frequent conversations with the Ambassador and have met with him on numerous occasions. I have also hosted him in front of various groups.

Ambassador Bolton has held significant roles over the course of his career in the United States Department of State, the United States Department of Justice, the United States Agency for International Development as well as the United States Commission on International Religious Freedom, among others. His commitment to protecting our long-term best interests and upholding the rule of law has been the central tenet of his career. Throughout this extensive tenure, he has consistently been known for his intellectual rigor, his work ethic, and a fierce unyielding advocacy of the United States. I have learned over the past fifteen years that the Ambassador always provides his best advice even if such advice is not popular. That attribute defines what it means to be a valuable and respected political leader. We have been fortunate to have him in our Nation's service.

Beyond his public service as a sharp diplomat and strategic thinker, those of us who know Ambassador Bolton personally and professionally can attest to his integrity, his mentorship of young public servants and his deep devotion to his family and our country. The weight of these legal proceedings, the accompanying public scrutiny and the potential impact on his legacy already constitute a profound consequence for a man who has dedicated his life to our Nation's service.

While acknowledging the seriousness of the Court's findings, I believe that a sentence that excludes incarceration would appropriately balance the scales of justice by taking into account a lifetime of extraordinary, high-level service to the United States. Ambassador Bolton does not pose a risk to society and his capacity to continue contributing meaningfully to public discourse and scholarship remains significant.

Judge Chuang, I ask that you consider his decades of service, his personal character and his advanced age when determining a just sentence.

Judge Chuang, thank you for your time and consideration.

Respectfully,

William H. Strong

**B - 123**

June 30, 2025

Dear Judge Chuang:

I have known Ambassador John Bolton for almost thirty years and have had the opportunity to observe him in both professional and personal settings over that time. Throughout those years, I have come to regard him as a man of exceptional intellectual seriousness, integrity and commitment to public service.

I first met John in 1997 when we were both at the American Enterprise Institute in Washington, D.C., and we have remained friends and professional colleagues ever since. As an Australian journalist, broadcaster and public-policy scholar, I have had the unusual privilege of observing John over nearly three decades from outside the United States. Few international observers have enjoyed such a long and sustained association with him, and it is from that perspective that I offer this assessment of his character.

After I returned to Sydney, Australia in 1998 to become Opinion Editor of the *Australian Financial Review*, I regularly commissioned articles from him on subjects ranging from Australia's place in the world to international law and American foreign policy. Throughout those years, and since when I was affiliated with other media and academic organisations, John was unfailingly generous with his time.

John invariably accepted my commissions, always met my deadlines, and, despite his stature and expertise, never once sought payment for his work. Many people in his position would quite reasonably have expected to be remunerated for such contributions. John never did. I regarded this not as an isolated act of generosity, but as a reflection of the seriousness with which he viewed the exchange of ideas and his longstanding commitment to public service rather than personal gain.

What has struck me most over nearly three decades is John's intellectual honesty and seriousness of purpose. He approaches difficult questions with exceptional preparation and a willingness to engage respectfully with those who disagree with him.

In my experience, he never caricatures opposing arguments. Rather, he understands them thoroughly before explaining why he reaches a different conclusion. Having interviewed and worked with senior political leaders and policymakers across the United States and around the world, I regard this as an unusually valuable quality.

John has also long understood the importance of the alliance between the United States and my country, a relationship that has underpinned Australia's security for generations. In 2022, I invited him to Australia as the keynote speaker at the annual conference of the Centre for Independent Studies, the public-policy institute that I then led. He delivered a thoughtful and substantive address on the strategic challenges posed by Russia, China and Iran, which was

exceptionally well received by a distinguished audience of policymakers, business leaders and academics.

During that visit, John devoted several days to meeting former Australian prime ministers, senior public servants, newspaper editors and journalists and policy specialists. Despite his considerable experience and international reputation, he approached every discussion with courtesy, patience and genuine intellectual curiosity. He was generous with his time, answered questions candidly, and engaged seriously with those who held different views. Those qualities reinforced what I had come to know over many years: that he is a man of integrity, sound judgment and personal loyalty. I am proud to count him as a friend.

Finally, having known John for almost thirty years, I can say without hesitation that I have never seen him tailor his views to suit political fashion or personal advancement. Whether others have agreed with him or disagreed with him, he has consistently expressed what he genuinely believes to be in the best interests of his country.

In an age when conviction is often subordinated to convenience, I have always regarded that intellectual independence as one of his defining qualities. Having spent my professional life covering international affairs and interviewing political leaders and policymakers around the world, I regard John as one of the most intellectually serious and principled public servants I have encountered.

For all of these reasons, I respectfully ask the Court to take John's long record of public service, his personal integrity, and the character I have witnessed over nearly three decades into account when determining an appropriate sentence. He has devoted much of his adult life to serving his country, often at considerable personal sacrifice -- including very early morning starts to the day!

Nothing in my long association with him has diminished my respect for him as a man of principle, generosity and decency. I respectfully ask the Court to extend every appropriate measure of leniency consistent with the interests of justice.

Thank you for your consideration.

Respectfully,

Tom Switzer

PS: During my three decades of knowing John, I have worked at the American Enterprise Institute in Washington (1995-98), the *Australian Financial Review* (1998-01), *The Australian* (2001-08), *The Spectator* in London (2009-14), the Australian Broadcasting Corporation (2014-23) and the Centre for Independent Studies in Sydney (2017-25).

**B - 124**

July 22, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write to respectfully ask that you show Ambassador John Bolton leniency at sentencing, in the form of a sentence other than incarceration.

I should say at the outset how I come to this letter. John Bolton and I have agreed on a great deal over the years, and we have butted heads on plenty. Our differences were real, occasionally sharp, and sometimes public. So this letter is not the product of political alignment or personal loyalty. It is the testimony of someone who watched him work at close range and found that, whatever our disagreements, two things about the man were never in dispute, namely, his devotion to this country and his normal care in protecting its secrets, far beyond what will ever be known to this court or the country. The mistake he made in this case ought to be viewed that way – against all the other "right" doing he has done for decades.

During the first Trump administration, I served at the U.S. Department of Homeland Security, ultimately as its Chief of Staff. In that role, I worked with Ambassador Bolton and his National Security Council staff on some of the most sensitive national and homeland security matters facing the country. I saw him operate in the settings where character is hardest to fake, including closed rooms, without devices and with few witnesses, and where there is no one to perform for and no record to capture courage, cowardice, or callousness. In those rooms, there's only the outcome that matters. And in the national security world, outcomes are often measured in lives.

Ambassador Bolton was not among those who would rush to disclose publicly private and sensitive matters to influence a policy decision or prove he was right. I know firsthand his intent is, was, and has always been to safeguard our nation.

One episode has stayed with me. In October 2018, in the days after the killing of the journalist Jamal Khashoggi, I was meeting with Ambassador Bolton on an unrelated matter when the White House Press Secretary knocked on his door. She reported that, during a lengthy session with reporters in the Oval Office, the President had held up a fistful of classified documents from his desk, waved them at the room, and remarked that many countries had provided intelligence on the matter. None of the reporters was cleared to see that information. This wasn't the first time the President had flaunted classified information or threatened to reveal sensitive source and methods

Ambassador Bolton's reaction was immediate and unguarded. Within seconds, he was asking the questions that mattered: Had that portion been on the record? Were cameras present? Could the reporters have read the documents' text from where they sat? Afterward, he took steps to confirm the information had not, in fact, been exposed to anyone uncleared to see it, knowing that a lapse could jeopardize sensitive programs and human lives. No one was watching him perform in that moment, and there was nothing in it for him but the risk of being seen restraining his own principal.

What I can tell you (and what it is my place to say) is that almost no one in America knows the true extent of Ambassador Bolton's commitment to our national security. There are programs, policies, and activities to which he has been privy that will remain unknown to Americans for decades, if not forever. You have *not* read about them in indictments, newspapers, or gossip, because Ambassador Bolton has been among the central figures protecting them — and, in turn, protecting the United States from its adversaries.

I want to impress upon the Court the scale of what this man has given up. Some of his most consequential service is invisible by design. I have personally witnessed him make decisions, known even now to only a handful of people, that saved thousands of American lives. He took no credit for them; he could not. I have known others in our recent history who did noble things and could not bear the world's ignorance of their bravery, and who found ways to let it be known.

Ambassador Bolton sits on a mountain of them, but like an iceberg, you've only been allowed to see the piece that floats at the surface. He was a decisive figure in moments of extraordinary gravity; he gave years of his life and considerable fortune to carry burdens most Americans will never learn of; and he let far more of those stories die in the vault than be discussed in the public domain. He did what was right when almost no one was looking,. which is when doing right counts most.

Every generation of this republic has depended on such people. These are the patriots who do their jobs without boast, who accept that their finest hours will never be recorded, and whose only monument is the catastrophe that never came. They spend their lives keeping the rest of us from becoming ash, and then they become ash themselves, uncredited. The law rightly demands much of those entrusted with our secrets. It should also be capable of recognizing a man who carried that trust, faithfully, for half a century and whose honor can never be fully compared against transgressions because most Americans are not "read in" to that honor.

Across four presidential administrations (at the Department of Justice, the Department of State, USAID, the United Nations, and the White House), Ambassador Bolton devoted his life to the security of the United States, at real cost and actual risks (which continue today) to his safety and that of his family. People of good faith can differ with his policies or recommendations, but no fair observer can doubt he acted on conviction at great personal expense. That is the truest measure of character, i.e. what a person is willing to lose for what he believes.

Again, I do not write to comment on the case itself. Ambassador Bolton has accepted responsibility, and the legal questions belong to others. I write to tell you about the man I observed at close range. He is a patriot of genuine conviction who has served this country for most of his life and who has already borne heavy and career-ending consequences. What is ironic is that he continues to carry — silently and without complaint — the weight of unseen decisions that will never be attributed to him. He is sanguine about that. And it's something to admire.

I respectfully ask the Court to conclude that a sentence other than incarceration is sufficient and just. Thank you for your consideration.

Respectfully,

Miles Taylor
Former Chief of Staff, U.S. Department of Homeland Security

**B - 125**


TERWILLIGER LAW PLLC

DELAPLANE, VIRGINIA

*George J. Terwilliger III*

[redacted]


July 6, 2026

Hon. Theodore D. Chuang

United States District Judge

United States District Court, District of Maryland

Greenbelt, MD 20770

*Via Counsel for Mr. Bolton*

Re: Sentencing of Amb. John Bolton

Dear Judge Chuang,

Thank you for this opportunity to make a submission for your consideration in connection with the sentencing of John Bolton. Please know this letter was written only by me and was unsolicited by Mr. Bolton, anyone involved in his representation or any mutual acquaintances.

I have known John over four decades. We met when we were both Department of Justice presidential appointees in the 1980s. We have stayed in touch over time, and our paths have crossed in various professional and social circles since then. We have been professional colleagues and friends, but not close personal friends.

My perspective offered here is informed also by my own background. My 16 plus years at the Justice Department began while in law school in 1977 when I was a law clerk in the Civil Division Appellate Section and ended when I left as Acting Attorney General in January 1993. In that span I was privileged to serve as an Assistant U.S. Attorney for 8 years, a presidentially appointed U.S. Attorney for 4 years and Deputy Attorney General for 2 years. In private practice since 1993, I have represented a president of the United States, several cabinet officials, senior White House staff members, several members of Congress and many other ranking business officials and major corporations. As would be expected, I have on many occasions both been exposed to and provided counsel on matters involving national security considerations and materials.

I express no judgment about Mr. Bolton's relevant conduct in this matter because I am not privy to the information necessary to any such judgment. Rather, I offer first a view from my experience on the uneven enforcement surrounding individual handling of classified information. Second, I offer the Court my perspective on John as an individual who has, without exception to my knowledge, served his country and his clients with dedication and distinction over a professional lifetime.

Both in public service and private practice, I was exposed to and handled classified materials personally. My legal representation also has included senior federal officials in matters where the handling of classified information was in issue or questioned. It has been my experience that outside the contemptable circumstances of intentional disclosure of classified information to hostile forces, enforcement for the handling of classified materials has been extremely fuzzy in its boundaries where discerning certainty in standards for handling classified information is a difficult line-drawing exercise. Without comment on or reference to Mr. Bolton's specific conduct, I have seen in my experience this uncertainty result in seemingly uneven enforcement where like cases are not even fundamentally treated alike for enforcement purposes.

Turning to Mr. Bolton's character and conduct as I have known it, there is absolutely nothing in my exposure to him that would allow me to conclude that he would be capable

of disclosure of confidential information with any intent act against the best interests of the United States. On the contrary, dedication to his country's best interests, as he saw them, has been to me an animating purpose of Mr. Bolton's professional life. I have seen on too many occasions John's dedication to patriotism and his counseling the necessity of maintaining standards as prescribed by law and adherence to constitutional principles to conclude otherwise.

One very specific incident comes to mind that I believe is illustrative of John's fundamental character. During the Florida presidential election recount in 2000, I was privileged to serve for the Bush team directly under former Secretary James Baker. Among my responsibilities was managing the lawyers providing senior leadership on the innumerable litigation matters that quickly ensued. We had many who arrived anxious to be chieftains, seeking facetime with those likely to be in senior positions in a Bush administration. John, despite his having been a presidential appointee, was not one of those. Instead, he stood out for arriving in Tallahassee, coming directly to me and volunteering to go anywhere his help might be needed. I asked him to get on a plane and go take over managing the contentious legal and administrative wrangling over the so-called "butterfly ballot" in Palm Beach County. He left with dispatch and sought no credit with the powers that be in our senior ranks. John was the consummate professional who came to do a job and performed it with characteristic skill, dedication and perseverance.

I hope my perspective on these matters will be helpful to the Court as it performs the difficult tasks that all just sentencing requires.

Sincerely yours,

*George J. Terwilliger III*

George J. Terwilliger III

**B - 126**

Eytan Tigay
[redacted]

July 6, 2026

Dear Judge Chuang,

I am writing to request that you show mercy to John Bolton in his upcoming sentencing, and specifically that you not impose any period of incarceration.

I have known John since 2007 in a business context. John served as a Senior Advisor to the investment firm of which I was a partner from 2007 through 2023, and he and I also served together on two boards of directors of companies in which my firm had invested.

I had extensive interaction with John over that time frame. Although John's background over decades was in public service, I found that his ability to add practical insight in a very different, business-specific milieu came easily and to great advantage. This may be relevant to your consideration in two respects. First, many of his insights owed to his being a canny judge of people, which on more than a few occasions led him to offer candid input that some might consider undiplomatic. Second, he always showed absolute loyalty to my firm and to the investors we served, which may partly explain that willingness to be undiplomatic when warranted.

More specifically, I have seen John publicly contradict and debate chief executive officers, other board members, and me, always with a view to what was right and what was best. He did so politely, but without compromising objectivity for the sake of diplomacy.

Of course, John being John, it was hard not to have numerous conversations with him over the years about national security, economics, and trade policy. One thing I learned about John is that it is impossible to characterize or stereotype his views in any narrow political sense, other than as being about what he believes is good for America and what is principled. That motivation, above all else, is what I found to be the through line across any perspective he shared.

I mention his analogous behavior in a business setting to emphasize the point: John is above all else demonstrably loyal to his country and singularly focused on what is principled. And, as I believe is clear to all who know him, or know of him, this remains true notwithstanding whatever the personal cost may be. Indeed, the notion of speaking without fear or favor could have been coined for John.

I also want to express my profound personal respect for the role John played in the early 1990s in the repeal of the former United Nations "Zionism is racism" resolution. There is no question John was willing to lead the charge to do what he felt was right, for no personal gain and with no personal motive beyond doing what he believed was moral and in America's and the United Nations' interest. It is for that reason I grew up in a household that knew of and respected John

years before I first met him. For an entire nation to feel that one man has its back is no small thing.

On a more personal level, it should not go unsaid that John has been a loyal and trustworthy friend, is a true family man in the most traditional sense of the term, and above all is a good person. I am as proud today as ever to testify to his character.

It is my strongly held view, even if as a layperson, based on my long-term understanding of John and my sense of the broader context, that equity and mercy should weigh heavily here. John has been controversial in large part because of the force, content, and subjects of his criticisms. It is in that context that I believe the appropriate response to the aspects of his conduct rooted in speech and criticism should be to subject his arguments to robust public debate.

In conclusion, I'd like to reiterate my request that you show mercy in John's sentencing, and to avoid incarceration. I can say unreservedly that there are few people who through a lifetime of integrity and uncompromising service to his country have earned mercy more than John.

Respectfully,



Eytan Tigay

July 30, 2026.

B - 127

The Honorable Theodore D. Chung
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Dear Judge Chuang,

I am writing to respectfully ask you to review the lifetime public service contributions of Ambassador John R. Bolton as you consider his request for leniency.

I began working for John shortly after my 28th birthday. I'm now 72.

I would argue that working for John Bolton for four decades is ample time to observe and vouch for his life long commitment to working tirelessly for sound USG policies, particularly economic development policies beginning with his tenure at USAID and fighting for strong national security policies during his tenures at the State Department, the United Nations and at the National Security Council.

And forty years of working for John Bolton has allowed me to witness daily the values and the principles by which he lives and works.

I first worked for John beginning in 1982 at the Agency for International Development (USAID) following his confirmation as Assistant Administrator for Policy and Planning. I rejoined his staff again in 2002 at the Department of State, first when he was the under secretary for Arms Control, and through his 2005-2006 tenure as the U.S. Representative to the United Nations.

In 2013, I joined his non-profit effort to support federal congressional candidates who, if elected, vowed to support strong, national security policies. John recognized there were fewer former U.S. service members serving in Congress than anytime in our history. In the congressional elections of 2014, John's support for these federal candidates significantly increased the number of Members who had previously served overseas with the U.S. military. These new Members brought first hand overseas experiences from the countries where they had served as well as a heightened awareness of the critical need for robust national security policies that protected the U.S.

I continue to serve as a board member of his two non-profits - the Foundation for American Security and Freedom (FASF) and the Institute for a Secure America (ISA) and Freedom - both institutions dedicated to advancing strong, national security policies for the protection of our country.

And finally, at John's request I joined the NSC staff in April 2018 as the Senior Director for Strategic Communications.

The common thread of John's forty years of public service has been his dogged effort to draft and support policies to support the safety and freedom of the United States.

Others can and have written extensively about John's policy battles and accomplishments at State, at the UN and most recently at the NSC. There are articles and books and thousands of video clips documenting John's fight against Iran and North Korea, nuclear proliferation, UN reform and the very real threat of China.

I want to share my memory of an important USAID policy intervention John initiated - a policy change that didn't get the headlines or a spot on CNN, but in my opinion, a policy that revamped how we spend our foreign assistance dollars and impacted the lives of women across the developing world.

As soon as John was confirmed in 1982 as USAID Assistant Administrator for Program and Policy Coordination he was directed by the USAID Administrator to conduct a comprehensive review of all USAID'S development assistance policies. These new policies would determine how foreign aid dollars appropriated by Congress would be spent. This exhaustive policy included all foreign assistance sectors - agricultural assistance, health priorities, small business development, the role of women in development and many, many more. John understood the critical role of sound policies if our development assistance dollars were to be spent effectively and if USAID's presence and programs overseas were going to be an effective tool for keeping our country safe.

One of those policy reviews was the role of women in foreign assistance. In response to a 1973 Congressional mandate, USAID had established the Office of Women in Development (WID), an advocacy office with a program budget of a few hundred thousand dollars. But in ten years that followed, few policymakers, including USAID personnel, truly understood the role women played - or their potential economic inputs - and how they might factor in the ultimate success of USAID's development assistance programs.

John recognized that an advocacy office was insufficient to have any significant impact on the larger, more important development assistance projects the Agency was funding, for example, those designed to increase crop yields, provide access to clean water, expand vaccinations for diseases the U.S. wanted eradicated, projects to support small businesses with micro-loans (women are the entrepreneurs in the LDCs) or strengthen the emerging private sector. The Agency needed data, disaggregated data by gender, to understand the roles women played in all of these sectors. And that data needed to be considered in any development assistance program paid for by the American taxpayer.

When John began his review of the Agency's policies toward women, the Agency did not have a policy recognizing the contributions of women nor were policy planners and project designers required to collect data, and disaggregate that data by gender - prior to the design or the execution of its larger, well-funded worldwide programs.

Under John's direction, a new policy was drafted and issued that instructed that the WID concepts be integrated into "... all AID's offices and programs, at all levels of decision-making." This new WID policy elevated women from being more than recipients of foreign aid, and for the first time, offered women as potential *agents* of economic change.

What John recognized from the research was that "in much of the developing world, the small farmer is a woman. USAID was a leader in identifying socioeconomic factors for project design, such as the prevalence of female-headed households, women's farming systems and crops, and their impacts on food and nutrition within families. It was recognized that certain cultural norms affect how men and women gain access to productive resources, how they face different constraints, and how they respond to incentives."

The new WID policy paper "provided country-by-country examples of women's roles in planting, harvesting, processing, and trading agricultural products, demonstrating the critical contribution women make to food and nutrition. Increased understanding of the intra-household distribution of labor and income would influence project design to account for gender differences in access to and control over land and capital." In the new WID policy, project activities were proposed to ensure rural women's access to credit, extension services, and emerging technology.

The new WID policy paper ultimately concluded that 'the pace of development and the quality of its outcomes depended whether the roles of women and girls were considered. While previous USAID policy guidance referred to women in their family roles in health, household production of food, and the gathering of fuel and water, the new 1982 WID policy focused on women in their productive roles."

This new policy made clear that the economic participation of women was key to the development itself and stated that "...gender roles constitute a key variable in the socio-economic condition of any country - one that can be decisive in the success or failure of development plans."

And most significantly, it mandated that the USAID project planning process would require going forward that all data be *disaggregated by gender.*

This new policy directive, for the first time, called for the use of analysis and other tools to facilitate a full understanding of how men and women each function in their societies. This new policy paper made clear that the economic participation of women was key to development itself and stated that "...gender roles constitute a key variable in the socio-

economic condition of any country – one that can be decisive in the success or failure of development plans."

And it must be noted that in subsequent project evaluations that followed, USAID's projects "were more likely" to meet their stated goals and the "return on development dollars spent...were maximized" when women's productive roles were considered and project and program data was disaggregate by gender.

Later as the new director of the WID office, I was heartened when the World Bank and other European foreign assistance agencies adopted critical parts of the new USAID WID policy and included the requirement for disaggregating by gender all program and project data.

Advocating for good, sound (but not always popular) policy changes doesn't get you headlines, and certainly no recognition for his effort at USAID was ever given to John Bolton.

But John listened to the experts in that tiny USAID WID office, and promoted this new WID policy through the Agency's rigorous review process. He understood the economic contributions of women and he wanted to improve the overall success of USAID's projects. He continued for his entire USAID tenure to champion the WID office and the new 1982 Women in Development Policy Paper in Washington and in our U.S. Missions abroad.

On a final and personal note, I am the very proud daughter of a U.S. Marine Corps officer. I was born on a Marine airbase and spent my early childhood on bases around the country. My father interrupted his law school education at the University of Virginia to go active duty in 1941, later being among the first Marines to land on the outer islands of Guadalcanal. He was injured, recovered and returned to the intense fighting in that region for many, many months.

My father rarely spoke of the war, his injuries, or the men he lost under his command. But he often referenced the Marine Corps motto, not by name, Semper Fidelis, but by what it meant to him and what he expected of his children: Live honorably, act with courage and stay committed to serving and protecting the United States.

John Bolton never served in the Marines. But he has lived - for the forty years I have had the honor to serve under his leadership - just as my father demanded of his children. I am proud to have called John my boss, my mentor, and my friend.

His commitment to the safety and security of our country, his intellectual discipline to advocate for good USG policy and most importantly, his personal ethics and moral courage have never wavered since that first meeting in early 1982.

Respectfully,

Sarah Tinsley

[redacted]

B - 128

LOEWS
CORPORATION

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang,

I am writing to respectfully ask that you show Ambassador John Bolton leniency at sentencing and consider imposing a sentence other than incarceration. While I fully appreciate the seriousness of the circumstances that bring Ambassador Bolton before the Court, I believe it is important that Your Honor hear from those who have known him well over many years and have observed both his character and his contributions to our country.

I have known John Bolton for more than three decades. During much of that time, I served as Chief Executive Officer of Loews Corporation, a diversified public company with interests in property and casualty insurance, natural gas pipeline transmission, hotels, shipping, and offshore drilling. I have also held numerous leadership positions in the Jewish community, including serving as Chairman of the Conference of Presidents of Major American Jewish Organizations. Through both my business activities and my community leadership, I had the opportunity to work closely with Ambassador Bolton and develop a deep appreciation for his intellect, integrity, and commitment to public service.

I first met John in the early 1990s when he was serving as Assistant Secretary of State in the administration of President George H.W. Bush. We came to know one another much better during his tenure as United States Ambassador to the United Nations in 2005 and 2006. During that period, we communicated frequently regarding matters affecting Israel and American Jewry, including the challenges surrounding the transfer of control of Gaza to the Palestinian Authority in 2005.

In all of those interactions, I found John to be thoughtful, candid, and deeply focused on what he believed would best serve the interests of the United States. He was never guided by expediency or popularity. Rather, he approached difficult issues with intellectual rigor and a willingness to defend positions that he believed were correct, even when they were controversial or unpopular. Whether one agreed with his views or not, it was always clear that his motivation was the welfare and security of our nation.

[redacted] | WWW.LOEWS.COM

At the conclusion of his service at the United Nations in 2006, I was sufficiently impressed by John's judgment and character that I invited him to join the Board of Directors of Diamond Offshore Drilling, Inc., our publicly traded offshore drilling subsidiary. Loews owned approximately fifty-five percent of the company, with the balance held by public shareholders and traded on the New York Stock Exchange.

Service on the board of a major public company was a relatively new endeavor for John, whose career had been devoted largely to public service. Nevertheless, he quickly became one of the most effective directors on the board. He prepared diligently, read every document thoroughly, asked insightful questions, and consistently focused on what was right for the company and all its shareholders. He brought a seriousness of purpose and an unwavering commitment to ethical decision-making that earned him the respect of management, fellow directors, and shareholders alike.

John served on the Diamond Offshore board for twelve years. Throughout that period, I observed him closely and repeatedly witnessed the same qualities: intelligence, honesty, diligence, independence, and a proclivity to place principle above personal convenience. I never saw him pursue personal advantage at the expense of duty. Instead, he consistently sought to do what he believed was best for the shareholders.

In 2018, John left the Diamond Offshore board to become National Security Advisor to President Donald Trump. Early in his tenure, I visited him in his White House office. During our conversation there, he spoke passionately about his desire to serve the country responsibly and to advance what he believed were the nation's long-term security interests. He understood the pressures that accompanied such a position and acknowledged that there would be circumstances in which standing by his convictions would be difficult. Yet he remained steadfast in his commitment to doing what he believed was best for the nation.

Whatever disagreements may exist regarding particular policies, I have no doubt that John served in that role out of a sincere sense of patriotism and duty. He endured extraordinary demands and scrutiny because he believed he could make a contribution to the safety and security of the United States. In my experience, his commitment to the country has always come before personal comfort, financial gain, or political calculation.

I have continued to be in regular contact with Ambassador Bolton since the end of his government service. Over the past seven years, we have met frequently when he has been in New York. Our conversations invariably focus on public affairs, international developments, and the challenges facing the United States in an increasingly dangerous and complex world. He continues to devote tremendous time and energy to analyzing foreign policy issues and participating in public debate through articles and opinion pieces that appear regularly in respected newspapers and journals.

The John Bolton I know is open, honest, intellectually curious, and deeply devoted to his country. He has devoted much of his professional life to public service, accepting compensation far below what a lawyer of his talents could have earned in private practice. He chose instead to serve in demanding government positions because he believed he could contribute to the security and strength of the United States. In doing so, he made significant personal and financial sacrifices over many years.

No individual is defined solely by the worst moment of his life. In evaluating Ambassador Bolton's character, I respectfully ask the Court to consider the entirety of his record: decades of distinguished public service, his unwavering patriotism, his contributions to American national security, and the countless people who have benefited from his wisdom, guidance, and friendship. Having known him closely for more than thirty years, I can state without hesitation that he is a man of substantial integrity who has dedicated himself to causes larger than his own interests.

For these reasons, I respectfully ask that Your Honor extend mercy and leniency at sentencing and impose a sentence that does not include incarceration. I appreciate the difficult responsibility before the Court and thank you for considering my perspective regarding the character and life of Ambassador Bolton.

Supportively yours,

James S. Tisch
Chairman of the Board of Directors
Retired Chief Executive Officer
Loews Corporation

CHASE UNTERMEYER
[redacted]

B - 129

26 June 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Dear Judge Chuang:

I write in support of maximum leniency in the case of Ambassador John Bolton, my friend and associate of more than 40 years.

I first got to know John during the Reagan Administration, when he was at the Justice Department and I was an assistant secretary of the Navy. When I was personnel director for the first President Bush, he and I worked to get more Americans on the staff of the United Nations. In the second Bush Administration, as US ambassador to the UN, John came to Qatar (where I was serving as ambassador) to encourage it to embrace a global perspective during its term on the Security Council. All these challenges John handled with his usual mix of knowledge, principle, and hard work.

From earliest days to now, I have been impressed by John's unchanging dedication to the country and his lack (quite rare for Washington) of personal desire for status or wealth. He also impressed my fellow Houstonian James A. Baker III – a man known for assembling the ablest of men and women for his team -- who put John to work on sensitive diplomatic and legal matters.

When higher office came John's way, it was not due to ambition and design but because presidents recognized his ability and his potential value to the country. This was all that motivated John. It led him to accept the call from President Trump to be national security advisor, knowing quite well the difficulty of working for that individual and the possibility (even likelihood) of falling afoul of him, as he did.

Once again, it was John's dedication to country – not a desire for a prestigious job – that caused him to undertake that task, which he performed under extremely trying circumstances. It is clear to me that he could have escaped his current legal difficulty had he let someone else with the same unflinching candor advise President Trump.

Everything John has spoken and written since that experience has not been to enrich or glorify himself but to alert the country and the world to the danger of a president possessed of slogans and not a substantive knowledge of national and global affairs. He knew this could only cause himself trouble, as it has, yet with typical fearlessness he has resolutely continued to raise such alarms.

As someone who agrees with John on much national policy, I greatly admire his courage and wonder whether I would be as brave were I in his position. No doubt there are many others, especially honorable members of Congress, who feel the same way as he but have kept silent. Accordingly, I am confident that when the history of these times is written, John Bolton will be seen as a hero and a sage, a man unafraid to tell the truth. Such true patriots should (and will) be honored, regardless what his foes throw at him today.

I thank Your Honor for considering these thoughts, which I hope will result in John Bolton's remaining free to serve the nation in whatever capacity he can.

Sincerely,

CHASE UNTERMEYER

Alliance Strategic Advisors

**B - 130**

August 3, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane Greenbelt, MD 20770

Dear Judge Chuang,

I am writing to ask for your leniency in sentencing Ambassador John Bolton with respect to his recent guilty plea for improper handling of classified material. Specifically, I would urge you to consider an appropriate sentence other than incarceration.

For background, I have known John for 25 years. I first met him during in 2001, when I was a Foreign Service Officer serving as Director for NATO and Western European policies at the National Security Council, and John was serving as Under Secretary of State for International Security affairs.

I later kept in touch with John occasionally when he returned to the American Enterprise Institute, but then we ended up working together again in 2018 and 2019, when he served as National Security Advisor, and I was the U.S. Special Representative for Ukraine Negotiations.

John has always been a dedicated public servant, always focused on advancing the best interests of the United States, even when it was controversial or difficult.

I remember in particular, when I was serving at the National Security Council in the early 2000's, John spearheaded an effort to ensure that U.S. service men and women and intelligence officers would not be subject to politically motivated prosecutions under the International Criminal Court (ICC). Even though the United States was not itself a party to the ICC, there remained a risk that other countries could claim that the United States had committed war crimes and then seek to prosecute American personnel.

In the face of significant public criticism and diplomatic push-back from European Allies for supposedly undermining the ICC, John determinedly sought to negotiate bilateral agreements with all other countries in the world to protect American personnel. Having little background in the matter myself, I initially was inclined to believe the criticism of John's effort. But after

[redacted]

reading the ICC Charter, seeing the risk it entailed, and also seeing that the Charter itself in Article 98 recognizes the primacy of bilateral agreements concerning jurisdiction, I understood the wisdom of John's approach and admired his tenacity in pursuing it despite the criticism.

I remember well another example of John's dedication in putting America's interests first during his tenure as National Security Advisor. Having served as U.S. Ambassador to NATO, I have always believed that a strong North Atlantic Alliance is vital to the interests of the United States. In 2017 and 2018, however, the U.S. President had several times disparaged European Allies for failing to spend sufficiently on defense and mused publicly that he might not support defending Allies under attack if they had not paid enough for their own defense.

John understood immediately that while the funding issue was real, this kind of public threat not to defend Allies risked undermining the Alliance itself – something which would do great damage to America's interests in the world.

Working behind the scenes, John did everything he could to modulate the President's rhetoric, to confer with Allies, to steer discussions at NATO, and prevent real damage to the Alliance. This all came to a head at a meeting of NATO Heads of State and Government in 2018, where John's involvement was instrumental in avoiding a major blow-up at the summit itself. It is never easy or comfortable to stand up to the President, but John was willing to do so when it mattered.

A third example was John's unwavering support for providing military assistance to Ukraine in 2018 and 2019. If Ukraine were to fall to Russia in a future war, it would be devastating for America's interests in Europe. These were difficult times in getting Ukraine the means to defend itself against a potential Russian attack – which indeed came in 2022. John was instrumental in keeping our assistance on track.

You may recall that at the time, the U.S. President held a number of beliefs about Ukraine, Russia, interference in the 2016 elections, and corruption during the prior administration which combined to make him wary of assistance to Ukraine, and to see Ukraine mainly through a domestic political prism. A phone call to the Ukrainian president in July 2019, where these issues were discussed, ultimately led to the President's impeachment in the House of Representatives. Standing up for America's long-term strategic interests in the face of all these headwinds was not for the faint of heart. John persisted and held off resigning from his post until he had ensured that U.S. assistance to Ukraine would not be disrupted any further.

These are just three examples that I know personally, but they are emblematic of John's dedication to American national interests throughout his career.

[redacted]

Alliance Strategic Advisors

Your honor, I would urge you to keep examples like this in mind and to be lenient as possible in your sentencing decision.

Sincerely,

Amb. Kurt Volker

[redacted]

**Dr. Abraham R. Wagner**
[redacted]

**B - 131**

July 21, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

As a lifelong member of the national security community and longtime friend and associate of Amb. John Bolton I am writing to join those urging that you show any appropriate leniency in the sentencing for John, possibly in the form of a sentence other than incarceration. Despite the specific circumstances in the case, I still have great respect for John, who has devoted virtually his entire life to the security of the nation, holding a series of high level positions where he always placed the security and well-being of the nation above all.

It has been my personal honor to assist the Trump administration with some staffing and policy tasks in the national security area. When President Trump encountered some issues with his National Security Advisor I was among those who recommended John for this position, which he accepted and executed to the best of his ability.

As is well documented now, John did not always agree with the President, but he always gave the President his thoughts about what would be the very best path for the nation and its security in the most challenging of times. In this post he was at the President's side, both in the White House as well as on foreign trips engaged with a multitude of foreign leaders.

He was never a "yes man" and remains a person who cares deeply about the nation. He is indeed a man of principle who has long operated in the most challenging environments, at the NSC as well as at the United Nations and elsewhere. I firmly believe that he remains a man of strong moral character, committed to the safety and security of the nation,

Accordingly, I thank you for your consideration urge that you take this into account in the sentencing process and give John whatever leniency may be possible.

Respectfully,

*Abraham R. Wagner*

Dr. Abraham R. Wagner

ARW:jdr

B - 132

Mark Wallace
[redacted]

July 21, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

re: Ambassador John Bolton

Dear Judge Chuang,

I am writing to respectfully ask that you extend leniency to Ambassador John Bolton in your sentencing. I make this request based on my long friendship and close working relationship with him over the course of over 25 years. It is appropriate that I write this letter (in part) on July 4, 2026, as I hope to relay a few examples of the John Bolton that I know as a devoted public servant, and a man that cares deeply about the United States of America.

Over several decades in public life, including work in presidential politics, service in government, and the founding and running of several national security-focused nonprofit organizations, I have had the privilege of working alongside and getting to know thousands of individuals from every walk of life. Among those thousands, Ambassador John Bolton stands out as one of the most principled and honorable people I have ever known. I regard his integrity as absolutely unwavering. Without exception, I have known him only as someone who strives for the very highest standards of honesty and dedication.

While there are many examples of John's service to America, I hope to convey a few personal stories that demonstrate John's commitment to Americans and the deep respect he has for American allies and friends. To be clear, these are personal stories that have never previously been shared publicly. Indeed, John would almost certainly not wish for them to be told, given the quiet humility and restraint that have always characterised his approach to public service. With respect to him and for the benefit of this Court's consideration I describe them below to help convey my understanding of John as the incredibly fine man that I have known for a long time.

I served alongside John at the United Nations (UN) when he was the U.S. Ambassador to the United Nations. During that time, I served as the U.S. Ambassador for Management and Reform at the U.S. Mission to the UN ("USUN"). Our responsibilities required us to work together on matters of significant importance to the effectiveness of the UN and the advancement of American interests. After I left the UN, it was an honor for me that John kindly served the organization I co-founded in 2008, United Against Nuclear Iran (UANI), as a senior advisor. UANI is a bipartisan group dedicated to combating the threats of the Islamic Republic of Iran. John has been an incredible source of wisdom and unbelievably generous with his time.

In the few examples below I hope to convey a more intimate portrait of John that isn't as well known as his public persona as a foreign policy expert.

During my time at USUN after the 2004 Presidential Election, I had the privilege to work with many of the fine and committed public servants in the Mission and at the State Department. Notably, a close relative of then Senator John Kerry (the Democratic nominee for President in 2004) worked at USUN. In the growing heat at the time of partisan politics, there was regrettable political discourse about Senator Kerry's relative. That relative was a fine person and committed civil servant that I had the opportunity to work with on several occasions. My conversations with John during that time about that political discourse in the wake of the 2004 presidential campaign reveal a great deal about him. In my private discussions with John, he conveyed in the strongest possible terms that Senator Kerry's relative was "one of us," part of our team at USUN, and that the heat of presidential politics should be kept well outside the doors at the Mission. I remember him saying to me: "Mark, she is an American. We have a duty to protect her." John understood that the patriotism of service to our country was underpinned by service to Americans - all Americans. Certainly, this was the right thing to do, but nonetheless in the intense heat of American political discourse, it said much about John that he impressed upon me – in private and without grandstanding – how important this matter was to him. That personal devotion and commitment to his fellow Americans – as Americans – runs throughout John's career.

While John's public reputation is as a strong defender of American interests around the world, John also sought to show the best of what being an American is about. The UN can at times be quite hierarchical, with the larger countries and Security Council members, in particular, garnering more attention than other, smaller member-states. Without fanfare John tried to show by his actions what America stood for. Upon his arrival at USUN, John made a commitment to meet all 192-member state Permanent Representatives at their individual missions to the UN (with the exception of the few countries that did not maintain diplomatic relations with the U.S.) I remember John saying to me: "We can't just invite them over to coffee. We have to go see them at their Missions as a sign of respect." It's relevant to this anecdote to understand that many smaller country missions had at best tiny offices with few staff and were unaccustomed to the visit of any Ambassador, much less the Permanent Representative of the United States. That small gesture ensured that whenever we walked through the halls of the UN, John was greeted warmly. While I am sure others will speak to John's upbringing and values, John's devotion to America included showing that America would show respect and common courtesy to all.

For many years, John has warned about the danger of the Islamic Republic of Iran. While reported somewhat in the public domain, Iran has engaged in extensive "transnational repression" – a classic euphemism for Iran's attempts to terrorize, kill and kidnap Americans including on American soil. As the founder and CEO of the NGO United Against Nuclear Iran, I can attest personally to the nature of these threats. Without going into detail because of the sensitive nature of these matters, the threats from the Ayatollah's regimes are real and destabilizing to the personal lives and the family members of those targeted by the regime. It has been reported that John has been a primary target of Iran's regime. John and his family have for many years dealt with the expense, worry and stress of these threats. I have talked with several times about Iran's "transnational repression," including about the personal toll it can take on family. Perhaps in dark humor, John has said to me: "Mark, it comes with the territory. If we don't do it, how can we expect others to speak up." John and his family have

made great personal sacrifice in this regard because of John's commitment to public service and to America.

John has never hesitated to take a principled stand on politically sensitive issues, irrespective of political or personal expedience. For example, the issue of gay rights, now widely embraced in the United States, was not always viewed so favourably. As long as I have known John, he has been a consistent supporter of gay rights. At a time when much of the politics was regrettably charged around the legalization of gay marriage, John did not hesitate to express his unequivocal support of gay marriage at the state and federal levels. I remember discussions with him, when he had prominent gay staff members on his team. John said to me, "how can we look (name withheld) in the eye and tell them they cannot marry whomever they want? How could we look any American in the eye and tell them that." While thankfully commonplace today, John's early principled support was part of the growing wave that made gay marriage broadly accepted today.

In all my time working with him and knowing him, I have never observed John compromise his commitment to what he believed was in the best interest of the United States and importantly, in service to all Americans. John has devoted his life to serving our nation in positions of huge responsibility. His record reflects a lifetime of dedication to the security of America and the faithful execution of his public responsibilities for the benefit of all Americans. My experience working alongside him confirmed that these commitments were deeply held. He is first and foremost an American patriot and devoted to all Americans.

In view of the foregoing, it is with utmost respect that I ask the Court to consider John's lifetime of public service, his exceptional character, the huge array of contributions that he has made to our country and John's deeply held personal convictions to serve all Americans when determining an appropriate sentence. I truly believe the interests of justice would be best served by a sentence that excludes incarceration.

Thank you for your consideration of this matter.

Respectfully,

Ambassador Mark D. Wallace
Former United States Ambassador for Management Reform
United States Mission to the United Nations

B - 133

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write this letter in support of John R. Bolton, a person I have known and admired since I met him about 30 years ago, when he and I were both senior fellows at the American Enterprise Institute in Washington, DC.

Even before AEI, I had worked with John, but not met him, on several matters while I was White House Counsel for President Reagan in 1986 and 1987, and he was a senior lawyer at the Justice Department.

One matter that stands out during this period was our work on the Senate confirmation hearings for Justices Rehnquist and Scalia. John was then at the Justice Department, and he and I were in regular telephone communication about the hearings and the confirmation process, although (as happens in the government) we had not met.

At one point, an executive privilege issue arose in the Senate hearings on both nominees, and John called me to determine whether the Justice Department could get President Reagan's approval to assert the privilege. I spoke to the President about it and conveyed to John the President's willingness to assert the privilege, if necessary. As it happened, the privilege was never asserted; a compromise between the Justice Department and the Senate Committee allowed the hearing to continue to its eventual success.

I left the White House in early 1987, and went back to the American Enterprise Institute, and was there when John arrived. I was happy to see him, but immediately impressed with his writings on political and legal matters that began to appear in my inbox. I must say that that I had no idea when he was at the Justice Department—when our communications were by telephone—that he was such a prolific writer, and so adept on a large number of legal and other policy matters.

I thought I was doing a lot of writing at the time, but it seemed as though every day there was another excellent piece from John in my inbox. His knowledge of the public policy issues he was writing about at the time was impressive, because his work covered so many subjects with such detail.

These pieces were a frequent source of discussion between us, and the beginning of a lasting friendship. Since then, I have come to know him as a completely honest and highly intelligent person who cares deeply about public policy issues, as I do, and someone I will always be honored to call a friend.

In my view, after knowing and working with him, John is an unusually gifted intellect, with a greater than imaginable work ethic, who should have many years ahead of him to benefit this country.

Respectfully,

Peter J. Wallison

**EDWIN D. WILLIAMSON**

[redacted]

[redacted]

B - 134

July 2, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing to urge you to impose the most lenient sentence possible in respect of Ambassador John Bolton's guilty plea regarding a single count of willfully retaining national security materials. While we all must do our best to comply with the laws and regulations regarding national security material, I maintain my respect for John.

I have known John for over 35 years. We served together at the State Department under President George H.W. Bush and Secretaries of State Jim Baker and Larry Eagleburger. During my entire term as the State Department's Legal Adviser from September 1990 until January 1993, John was the Assistant Secretary for International Organizations. Subsequent to our State Department stints, we continued to stay in touch periodically and co-authored at least one op-ed. Because I thought very highly of John, I did what I could to try to get President Trump in his first term to appoint John Deputy Secretary of State.

During our close work together at the State Department or thereafter, I never saw anything that would in the slightest way impugn John's character. Rather, I observed someone who wore his strong views on his sleeves. There was nothing tricky or devious about John. He freely and frankly made his views known. Obviously, he did not always get his way, and when that happened, he moved on to the next matter. (Some of those he worked with or supervised did not always behave that way!)

As the Assistant Secretary for IO, John's role was crucial in the uncertain days of the Persian Gulf war. Secretary Baker's strategy required getting the UN Security Council to back the US' (and others') use of force to oust Iraq from Kuwait. The Secretary showed great confidence in John's handling of our relations with the UN.

After leaving the State Department, Secretary Baker called on John for help on highly important matters. He assigned John to key roles in the Florida recount in the 2000 Presidential election and later when Secretary Baker served as UN Special Envoy for Western Sahara.

EDWIN D. WILLIAMSON
[redacted]

[redacted]

I think the extent to which Secretary Baker showed his confidence in John in picking him for these key roles is further evidence of John's high character. Believe me, the "man who ran Washington" would never entrust key roles to someone whom he could not trust.

I see in John Bolton a bright, candid person with no character flaws. I am sure he regrets overstepping the line on what information he was entitled to retain and in what form after leaving his position of National Security Advisor. From media reports, very substantial financial penalties are being imposed on him (someone, I would add, who could have, with his Yale Law School diploma, made a lot more money practicing law than he made from his public service to our country).

I do not see what would be added by a prison sentence. I plead for your leniency and mercy, Judge Chuang. We do not need to punish John Bolton any more.

Yours respectfully,

Edwin D. Williamson

**B - 135**

June 22, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write to you with deep respect for the decisions you have before you in the case of Ambassador John Bolton, who I have known for 37 years. I worked directly for John in several senior government positions for more than 10 years, and he is one of the brightest and most dedicated public servants I have ever known during my own 35-year government career. Because I consider him my most valued mentor and a friend, someone to whom I have turned over many years for advice and counsel, I hope my heartfelt observations will be of value to you in your consideration of his sentencing.

When I met John for the first time, in 1989, he had already served in high level positions at the Justice Department and the Agency for International Development, and had moved to the State Department as Assistant Secretary for International Organization Affairs. John interviewed me personally and then hired me as Deputy Assistant Secretary, the first of many career opportunities he gave me. I served three years with him there, including during the Persian Gulf War and Operation Desert Storm. Our Bureau was on the front lines of diplomatic efforts and as the senior official for UN matters, John worked closely with Secretary James Baker to secure passage of critical UN Security Council resolutions including to authorize the use of force to liberate Kuwait. I worked most closely with him on the humanitarian aspects of the war, including addressing the unfolding crisis of refugees and displaced people who were overwhelming the UN's ability to adequately feed and house them. I saw that John had a real heart for these vulnerable populations and was as focused on solving this issue as he was on the political affairs of the Security Council.

During the George W. Bush administration, when John was Under Secretary of State for Arms Control and International Security Affairs, with his endorsement I became Ambassador to the Conference on Disarmament in Geneva, Switzerland. Under his leadership we worked to protect U.S. interests confronting the proliferation of weapons of mass destruction, including Iran and North Korean nuclear weapons programs. He was the chief architect of the global voluntary effort, the Proliferation Security Initiative (PSI), to

stop the trafficking of WMD. As its driving force, John championed this coalition of the willing and more than 100 countries participated. Building this network of allies to address growing threats after 9/11, John was able to establish long lasting partnerships in this field that made our country and our allies demonstrably safer and more secure from these dangerous networks.

In 2005, when John became UN Ambassador, I joined him in NY to help with the early work, accompanying him to many of his initial courtesy meetings with each of his ambassadorial counterparts. He was determined to meet one on one with as many of his foreign colleagues as possible, so there were dozens of such meetings to attend. John had a reputation as a tough negotiator on behalf of the U.S., so when he went round to each mission and gave each ambassador generous time and a willing ear, countries large and small welcomed his genial and collaborative attitude. These meetings intentionally laid the foundation for important support we would need going forward, especially in the Security Council.

I was there in 2006, having moved to New York full-time as Ambassador for Security Council affairs, when John personally negotiated resolutions on Iran, North Korea, and the unanimous Resolution 1701 ending the Lebanon War. As his Deputy, I joined him at all UN Security Council meetings and countless lengthy negotiations where his skills, intellect and persuasion as a staunch defender of American interests delivered and earned him respect and admiration from numerous diplomatic colleagues.

When John was National Security Advisor from 2018 to 2019, I was Ambassador to the UN and International Atomic Energy Agency in Vienna, so our paths crossed again, on many fronts. During this time, I deeply appreciated John's concern for my personal security as an American ambassador working overseas on the Iran portfolio at a particularly contentious time after our withdrawal from the Iran deal. The then-Director General of the IAEA, who had previously served as John's Japanese counterpart during PSI's creation, considered John a rock star in the world of diplomacy, a fact that provided me a special relationship dealing with him in my job representing the the U.S. at the IAEA Board of Governors. One of his last travels as Director General before he died while in office was to meet with John in Washington at the NSC, which I joined as well. Their genuine friendship, based on shared work and mutual respect, was another example of the invaluable alliances John fostered over many years.

Judge, I catalogue this overlapping work history with the hope that my firsthand experience over three plus decades conveys to you the courage, integrity, relentless work, and love of country John Bolton always displayed in his many high-stakes and challenging roles. I would also like to share on a more personal note that Ambassador Bolton was

always respectful, supportive and kind to me in my many years working for him. He was an inspiration to many colleagues and helped us develop our own careers, expecting the best while supporting us unfailingly, even if we sometimes fell short. He was indeed hard charging when it came to defending the United States yet still maintained a generous spirit and wonderful sense of humor with colleagues and staff. I have always admired him as a principled man of the greatest character and was honored and proud to be affiliated with him, as I still am today.

I also have great respect for John's family, with whom I have shared much over the years, including his father's funeral, his daughter's wedding, and a close, personal friendship with Gretchen Bolton, who was my trusted financial advisor for many years until she retired.

Regarding Ambassador Bolton's future, I respectfully ask that you consider the many years of distinguished public service and lasting contributions John gave to this country, and that leniency will prevail. Thank you for your consideration.

Sincerely,

Ambassador Jackie Wolcott

B - 136

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

July 13, 2026

Dear Judge Chuang:

I respectfully request your consideration of John Bolton's upstanding character, dedication to public service, and deep loyalty to our country when determining his sentence and sincerely hope you will exercise the leniency within your authority to avoid his incarceration.

I am not familiar with the specifics of this case, other than what has been publicly reported. But I have known John for over 35 years across our respective careers -- mine as a career Foreign Service Officer serving in the State Department and at our diplomatic Missions across Democratic and Republican Administrations, and John's as a dedicated political appointee for every Republican President since Ronald Reagan. Throughout that time, I have known John to have a deep respect for our laws and institutions. My esteem for him has not diminished despite his circumstances.

John has loyally served his country for the larger part of his professional career. I witnessed on many occasions in meetings I attended his reference to our laws, separation of powers, treaty obligations, and abiding national interests when arguing for policy positions. Similarly, I saw first-hand while serving as his Deputy at the United Nations his unwavering defense of the United States and its core values when negotiating and debating policy options within our Government and advocating for those policies with foreign officials. His principled support for our positions at the UN and beyond to set back North Korean and Iranian nuclear and missile programs that posed a threat to peace and stability were typical examples.

The firmness of U.S. policy on national security issues sometimes pitted our country against allies and enemies alike when negotiating Security Council Resolutions. John's adherence to principle and steadfast defense of our positions did not always earn him friends, yet he did not shy away from advocating continuously on behalf of our country when others might have buckled. This approach generated respect for our policies, our country, and often increased support for our position.

John is a patriot in the truest sense, showing deep devotion and love for the United States. His defense of American interests, values, traditions and institutions has been a constant feature in his public statements and writings. The clarity and force of his convictions have not wavered in the numerous opinion pieces he continues to publish globally, as the court is aware, despite the legal charges hanging over him that would have led others of lesser character to keep their heads down to avoid additional scrutiny or criticism.

On a more personal level, I know that John sacrificed a more lucrative private sector career in law to serve in Government and had to live away from his family when appointed to serve in New York as the U.S. Permanent Representative to the UN.

John's interactions with his peers and subordinates in my experience were marked by candor and shaped by his respect for professional competency and a strong work ethic. This left him open to criticism that he was difficult to work for by a few whose work did not live up to his high standards. Nonetheless, he exhibited loyalty to his subordinates by supporting them for onward assignments, writing performance reports to help them get promoted, and helping them with letters of reference. I know this to be true since I served as his Deputy and was directly involved in many of those efforts on behalf of staff members who worked for us during our time at the U.S. Mission to the UN.

In sum, a patriot such as John without any record of prior wrongdoing who faces in the extreme possible incarceration deserves all favorable consideration for his many years of outstanding citizenship, dedication to the public good, defense of our national interests, and generosity to others. I respectfully urge that you weigh John's laudable personal and professional history as you consider his sentence and will exercise all the appropriate leniency and mercy within your authority.

I thank you for your consideration.

Respectfully,

Ambassador (Ret.) Alejandro Wolff

September 30, 2026 **B - 137**

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I am writing in support of John Bolton and to respectfully ask that the Court consider a sentence that does not involve incarceration.

I have known John for more than three decades, and I had the opportunity to work alongside him in two presidential administrations. During the administration of George H.W. Bush, I served as Under Secretary of Defense for Policy while John was Assistant Secretary of State for International Organization Affairs. We served together again under President George W. Bush, when I was Deputy Secretary of Defense and John was Under Secretary of State for Arms Control and International Security.

Government is full of people who are very good at figuring out what their superiors want to hear. John has never been one of them. That does not mean that John was always right, nor would he claim to have been. It means that when he reached a conclusion about an important question, particularly one involving American security, he was prepared to argue for it even when the argument was inconvenient, unpopular, or likely to make his own life more difficult. I saw that quality in John during both Bush administrations.

One example goes back to the first Bush administration. In those years, the United States was trying to construct an extraordinary degree of international cooperation, first as the Cold War ended and then in confronting Saddam Hussein's invasion of Kuwait. There were understandable reasons to avoid unnecessary fights at the United Nations. One issue many people would have been content to leave alone was the General Assembly resolution equating Zionism with racism. It had stood for sixteen years. Within the bureaucracy, there were people who saw little advantage in spending American diplomatic capital trying to repeal a General Assembly resolution that everyone already knew the United States rejected.

John did not see it that way. He believed that leaving a falsehood unchallenged simply because challenging it was difficult was itself a mistake. He was persistent enough that, when President Bush decided to make repeal a priority, John drove the effort inside the State Department, including with regional bureaus that initially did not regard it as particularly important. The resolution was ultimately repealed overwhelmingly. What stayed with me was less the vote than John's instinct. He did not begin by asking whether an argument would be popular inside the building. He began by asking whether it was right.

I saw the same quality again under George W. Bush. In 2003, at a particularly sensitive moment in our dealings with North Korea, John gave a speech in Seoul that spoke in unusually

direct terms about Kim Jong Il's regime and its nuclear ambitions. Some senior officials at State were unhappy with the speech, including Deputy Secretary Richard Armitage. John knew perfectly well that a softer formulation would have created fewer problems for him personally. He gave the speech anyway. Importantly, this was not an act of insubordination. The speech had gone through the interagency clearance process, including State, Defense and the National Security Council. What John had refused to do was obscure the substance simply because stating it plainly was uncomfortable.

The Proliferation Security Initiative is another example, not because I want to catalogue John's accomplishments, but because it illustrates how he approached a problem. In late 2002, the interception of the *So San*, carrying North Korean missiles to Yemen, exposed a gap between what the United States knew was dangerous and what the existing international system actually allowed us to stop. The conventional response could have been another negotiation over another formal agreement. John argued for something much more practical: countries that shared the concern should begin working together, using existing authorities, intelligence, military capabilities and law enforcement tools to stop dangerous shipments.

There was considerable skepticism about that approach because it did not fit comfortably into the traditional arms-control model. John pressed it nevertheless. By the end of 2003, I was addressing military and other officials from participating countries at the National Defense University as they worked through how interdictions would actually be carried out. I remember being struck by the fact that what had begun as an unconventional idea was becoming an operational capability. John had helped force the government to move from saying that proliferation was dangerous to asking what, concretely, we were prepared to do about it. That was very much John.

John went on to serve President George W. Bush as United States Ambassador to the United Nations from August 2005 through the end of 2006. He did so under unusual circumstances. After his nomination had been blocked from receiving an up-or-down vote in the Senate, President Bush appointed him during a Senate recess.

That put John in an intrinsically weak position. He was serving without Senate confirmation and under constant scrutiny from many of the same critics who had opposed his nomination. Many people in his position might have gone out of their way to appease those critics, soften their positions, or avoid controversy in the hope of eventually securing confirmation. John did not.

He continued to take strong positions on issues he believed mattered to American interests, even when doing so could only make his own political position more difficult. Whatever one thinks of any particular position John took, I believe it required real courage to serve that way when the easiest course personally would have been accommodation. It was another example of a quality I had seen in John for years: he was more concerned with saying what he thought needed to be said than with protecting his own position.

I saw that quality demonstrated again, under very different circumstances, when John served as National Security Advisor to President Trump. John had serious disagreements with the

President's approach to several of America's adversaries. The clearest public example concerned North Korea. In May 2019, John stated publicly that North Korea's recent short-range ballistic missile tests had "no doubt" violated United Nations Security Council resolutions. President Trump shortly afterward said publicly that he was not bothered by the tests.

That disagreement was not an isolated one. John was deeply skeptical of what I regarded as the President's misplaced confidence in Kim Jong Un. He also argued against relaxing pressure on Iran and took a harder position toward Russia. Those disagreements, along with others over Afghanistan, eventually contributed to his resignation as National Security Advisor in September 2019.

I was impressed by John's conduct for the same reason I had been impressed by him in the two Bush administrations. There are powerful incentives for a presidential adviser to tell the President what he wants to hear, particularly when disagreeing may cost that adviser his position. John was unwilling to do that. He chose instead to give the President his unvarnished judgment on matters he regarded as fundamental to American security.

I believe John's departure was a loss for our country, not merely a loss for John. His example of speaking truth to power is one that others in public service should be encouraged to follow.

John could be blunt. He could be persistent. Anyone who worked with him for long knew that he was not inclined to abandon an argument simply because the room had turned against him. Those qualities could undoubtedly make meetings more difficult. But in national security, there are moments when making a meeting more difficult is exactly what public service requires.

I have spent much of my professional life around people responsible for advising Presidents and making decisions involving war and peace. Intelligence is important. Experience is important. Judgment is indispensable. But so is moral courage: the willingness to put an unwelcome assessment on the table and accept the consequences of having done so. For more than thirty years, that is one of the qualities I have associated with John Bolton.

I know the Court must consider matters far beyond the experiences I can describe here. I offer these recollections because I believe the Court should also know the man I knew in government: a devoted public servant who took the security of this country extremely seriously and who was willing, sometimes at considerable personal cost, to tell people in positions of power what he believed they needed to hear.

I respectfully ask the Court to take John's character and his many years of public service into account and to show him leniency by imposing a sentence that does not include incarceration.

Respectfully,

Paul D. Wolfowitz

CARTER WRENN

B - 138

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

July 28, 2026

Dear Judge Chuang,

John Bolton and I have been friends for almost fifty years. Back in the 1977, studying reams of new election laws, I called a friend in Washington, told him, "I need a lawyer." He said one name: John Bolton.

I walked into a Washington office expecting to meet a grey-haired lawyer; surprised sat down facing a slender young man of reddish-brown hair; most lawyers meander, talking in legal circles – I asked questions, not beating around the bush, John gave clear concise answers that, over time, proved to be right.

The new election laws were not simple. During campaigns John spent hours explaining laws to me like the limits on how much each person could give, that corporate contributions, prohibited, had to be returned, that every expenditure – no matter how large or small – had to be reported, that every debt had to be reported.

John also had rare virtues: He put doing what was right ahead of what was politically popular, respected people on the other side, treating them as fellow Americans, and defended ideas, like the Separation of Power Doctrine, that are cornerstones of our republic.

In 1981 John decided to leave his law practice to serve in President Ronald Reagan's administration. He later worked with President George H. W. Bush, President George W. Bush and, briefly, President Donald Trump. He served in the Justice Department, the Agency for International Development, the State Department, and the White House.

It's an old flaw of human nature – that you often see in politics – that ambitious people see it as wise to tell a president what he wants to hear. John refused to play that political game. With rare honesty, he put doing what was right – for the good of our country – ahead of politics. That was rare in politics then and, unfortunately, it's even rarer today.

[redacted]

When you decide John's case please consider that it would not serve justice to put more burdens on a man who served his country with rare honesty and integrity for years. The road that best serves justice is the old virtue of mercy.

Thank you and best wishes.

Yours,

Carter Wrenn

Carter Wrenn

UNIVERSITY OF CALIFORNIA

**B - 139**

BERKELEY • DAVIS • IRVINE • MERCED • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO

SANTA BARBARA • SANTA CRUZ

JOHN C. YOO
EMANUEL S. HELLER PROFESSOR OF LAW
Director, Public Law and Policy Program

SCHOOL OF LAW
BERKELEY, CA 94720-7200

September 10, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane Greenbelt, MD 20770

Dear Judge Chuang:

I write to urge the Court to set a sentence for John R. Bolton that does not require incarceration. I believe that the Court should exercise its discretion with mercy not just because of John's advancing age (soon to be 78 years old), but because of his devoted service to our Nation. The United States is safer because of John's life-long work on American foreign policy and national security as a scholar, lawyer, and government official. He has accepted responsibility for mishandling classified information, but, from everything I know of the man, he would never have intentionally harmed the security of the nation to which he has devoted his life.

Sentencing John to prison, where he may well die due to Iranian efforts to assassinate him for his service as National Security Advisor from 2018-19, not only would amount to a disproportionate punishment, but it would also deter others from stepping forward to protect the Nation in the future.
I first read John's work before meeting him. After leaving the first Bush administration, where he had held the important positions of assistant secretary of state for international organizations and assistant attorney general for the civil division, John joined the American Enterprise Institute to head its department of foreign policy and national security studies. It was at this time that I first read John's articles on the foundational importance of American sovereignty to our understanding of U.S. national interests. He started a series of research projects and conferences devoted to defining sovereignty and understanding how it should guide American foreign policy. This idea may seem commonplace now, but it was a new and ambitious undertaking that has had a profound, long-term impact on foreign policy thinking, both inside and outside the government.

I first met John at one of his 1990s AEI conferences on sovereignty in international affairs. John called me out of the blue – we had never met – and invited me to participate on a panel on the U.S. intervention in Serbia. At the time, I was arguing that President Clinton had the constitutional authority to wage the air war. John urged me to take up the question of whether the conflict was legitimate under international law. We had an engaging and challenging discussion at the panel, and it caused me to further explore the relationship between U.S. Constitutional war powers and international law. He encouraged me to publish my arguments and took the time to critique my draft. This was an example not just of John's generosity of thought and spirit, but also of his style of intellectual leadership. He caused me and other academics at the time to think about foreign policy from a fresh perspective, not in a didactic way, but by raising questions, making his own case, and bringing thinkers together to discuss in a spirit of free inquiry and rational discussion.

Commentators sometimes label John a "hawk" who favors war for its own sake, but that caricature grossly misrepresents his thought. John was thinking about sovereignty before it was cool and was raising questions about unlimited globalization long before it appeared on today's political agendas. In fact, John's interest in sovereignty was bravely counter-intuitive in the 1990s. The United States had just won the Cold War and was considered by many to be the sole superpower in the world. John worried, as did I, that the rise of theories of international governance that sought to submerge national sovereignty would not produce the permanent peace sought by Immanuel Kant and his heirs, but instead would sap the democracies of their will to defend what was once known as the free world. Whether one agrees or not with John's views, he should be respected for devoting his career to advancing ideas that he believed would protect the United States and lead to a more stable, secure peace for the world.

During the second Bush administration, our paths crossed occasionally. While at the U.S. Justice Department's office of legal counsel, I worked with him on important foreign affairs policies, such as U.S. withdrawal from the Anti-Ballistic Missile Treaty and the making of a new strategic arms agreement with Russia. I had not worked with him previously until that point. He properly and carefully handled the most important and sensitive information – that related to our nuclear weapons arsenal and our national missile defense – with the utmost integrity. I thought that he was remarkably clear and direct for a government official: he allowed agency representatives to have their full say, encouraged debate, and then reached a considered, balanced decision. John had a reputation for being a tough, blunt negotiator, but always in the national interest. He did not pursue purely unilateral means – one of his achievements was the creation of the proliferation security initiative, which

created a voluntary association of nations that cooperated to stop the proliferation of weapons of mass destruction. I believe he was one of the most consequential undersecretaries of state to have ever held the position.

John could have left the Bush administrations to practice law and become rich. Many former officials do exactly that. John instead devoted his career outside of government to developing his ideas on sovereignty, debating foreign policy, and advancing the national interest. He returned to AEI, where he invited me on a few occasions to write opinion pieces on foreign policy, sovereignty, and the U.S. Constitution. We argued in defense of the Senate's role in the making of treaties, which we argued was one of the principal protections for federalism and the separation of powers in the conduct of U.S. foreign policies. Our pieces appeared in high-profile outlets, such as the New York Times, the Wall Street Journal, the Los Angeles Times, and National Review. John did not have to invite me to join him – he possesses deep knowledge on these issues and he certainly has no difficulty in writing. He invited me instead as a mentor who taught me a greater fluency in foreign policy discussions.

In working on these pieces with John, I found the caricature of him as a war-mongering neo-conservative to be far off the mark. I found him instead as concerned about international peace and stability as the official of a European body or human rights lawyer. Where John disagrees with others is about the best means to produce peace. He believes that the United Nations and other supranational bodies did not produce the victory over the Soviet Union or the global order and prosperity that followed. Instead, he believes that it was the United States and its European and Asian allies that successfully defended the free world and that only a loose alliance of democracies could continue to maintain the peace against a rising axis of China, Russia, and Iran. But throughout, John wanted to spread the blessings of freedom and democracy to more people; his disagreement is whether strong nations, rather than international bodies, were the means.

It would be a loss for the country for John to be sent to prison, where he could no longer participate in our nation's discussions on foreign policy. John is not a touchy-feely school counselor, but a thinker with high standards who gets right to the point, exchanges ideas and arguments with rigor, and seeks to gain knowledge and understanding from every encounter. He reminds me of the best old masters of the Socratic method who still populated the senior ranks of the Berkeley Law faculty when I joined three decades ago. His many writings in the popular media similarly remain clear, direct, and rigorous. I admire his ability to continue to play a significant role in U.S. debates over our foreign policy, which has continued even while he has undergone the ordeal of federal prosecution. A prison sentence would silence John at a time, with the

many disruptions in our international relations, that we need his voice more than ever.

The John I know, who has devoted his life to defending America's national security, would not casually mishandle America's dearest secrets. Sentencing John to prison will only harm the nation. Jailing John will deter figures of experience, wisdom, and high intellect from serving future presidents and giving them the benefit of all arguments and options.

I respectfully ask the Court to impose a sentence without any time in jail.

Best wishes,

John Yoo

B - 140

**Fred S. Zeidman**
[redacted]

July 7, 2026

The Honorable Theodore D. Chuang
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Dear Judge Chuang:

I write respectfully to ask that you consider showing Ambassador John Bolton leniency at sentencing, in the form of a sentence other than incarceration. I understand that he has accepted responsibility before this Court, and I do not write about the case itself. I write about the man, whom I have known and admired for well over twenty years.

By way of background, I am a Houston businessman who has spent much of my life in public service, including my service as Chairman of the United States Holocaust Memorial Council, to which I was appointed by President George W. Bush. It was during the Bush Administration that I first came to know Ambassador Bolton, and in the more than two decades since, my respect for him has only deepened. I am an ardent admirer of his, and I know him well enough to have formed a firm and considered opinion of his character.

John Bolton has given his working life to this country. Across four presidential administrations, in senior roles at the Department of State, the Department of Justice, USAID, and the White House, he has served with a seriousness of purpose that is increasingly rare. In all the years I have known him, he has been exactly the same man in private that he is in public: direct, principled, and unwavering in his commitment to the security of the United States. He says what he believes and stands on his convictions even when doing so has come at real personal and professional cost, and I have watched people across the political spectrum, including many who disagreed with him sharply, acknowledge his ability, his integrity, and his devotion to this country.

I hold him in enormous respect. In my experience, a person's character is revealed over time and under pressure, and over more than twenty years I have never seen his waver.

I know this Court must weigh many considerations, and I do not presume to suggest what justice requires. I ask only that a lifetime of service, and the character reflected in it, be part of that weighing, and that you consider a sentence other than incarceration. Despite the circumstances that bring him before you, I continue to respect and care for him deeply.

Thank you, Your Honor, for your consideration.

Respectfully,

The Honorable Fred S. Zeidman
Houston, Texas