# Exhibit I

[PDFs of Internet Citations in Ambassador Bolton's Unclassified Sentencing Memorandum]

# Footnote 1

BILLIONAIRE BOOM

# *A Look Inside the Case That Enshrined Political Power for Billionaires*

After Watergate, Congress tried to curtail the role of money in politics. But a pivotal Supreme Court case nipped it in the bud. Years later, new details are emerging on how wealthy Americans were conferred with a "right to spend" on elections.

Listen · 21:06 min



**By Danny Hakim**

Published May 6, 2026 Updated May 7, 2026

For a brief moment in American history, the rich didn't control politics.

Back in 1974, in the wake of the Watergate scandal, Congress passed new campaign finance restrictions that would have largely eliminated the ability of wealthy people to buy elections. In addition to donor disclosure rules and contribution limits, the new legislation capped so-called "independent expenditures" on behalf of political candidates at $1,000 a year. There were even curbs on what rich people could spend to get themselves elected.

David Koch, a wealthy industrialist, was enraged.

"I have the right to spend whatever I choose to promote what I believe," he later wrote, adding that the law "makes my blood boil."

Flash forward to the 2024 presidential campaign. Six of the nation's wealthiest billionaires spent more than $100 million apiece to help get another billionaire, Donald J. Trump, elected president. Independent expenditures by wealthy outsiders for the first time in history exceeded what the candidates' own campaign committees spent, a New York Times analysis showed. Mr. Koch's brother Charles was among 300 billionaires and their families who accounted for 19 percent of all contributions in federal elections, either directly or through affiliated groups.

So what happened?

A Supreme Court decision that most Americans probably never heard of. Fifty years ago, in a case called Buckley v. Valeo, the court upheld many aspects of the post-Watergate campaign finance law, clearing the way for public financing of presidential elections and empowering the new Federal Election Commission.

But it eviscerated other parts of the law, leaving the rich with their own set of rules. The court ruled that wealthy Americans could spend unlimited amounts of money to independently support candidates and causes they favored.

Later cases, like the better-known Citizens United decision, opened the doors even further. But it was Buckley that established the nation's modern, muddled campaign finance system, and Buckley that allowed the Koch brothers to build a right-wing political money machine that rivaled that of the Republican Party itself.

The case is as relevant as ever. Since taking office, Mr. Trump has celebrated billionaire donors at a White House dinner and raised unprecedented sums for a lame-duck president.

Interviews with surviving Buckley combatants and a review of archival records from the Library of Congress, the National Archives and three universities, as well as other available documents and research, explain how post-Watergate legal and political currents upended a momentary defeat for the wealthy, creating an environment where a single donor can spend hundreds of millions of dollars on a favored candidate.



Senator James L. Buckley of New York at a news conference in 1975. George Tames/The New York Times

What it shows is that the legal assault on the most expansive campaign finance legislation in the nation's history was engineered not just by well-funded right-wing activists, including the Koch-backed Libertarian Party. It was also pushed by some liberals and the American Civil Liberties Union, who agreed with conservatives that the right to spend money on behalf of candidates and causes was an essential element of free speech.

Gerald R. Ford, who had inherited the presidency after Richard M. Nixon resigned, had felt obliged to sign the legislation. But documents show that his administration nonetheless worked to undermine the law. One midlevel State Department official, Francis L. Kellogg, was even among a small group of people who financed the litigation against it, archival records show.

Robert Bork, the Ford administration's hard-line conservative solicitor general charged with defending the law in court, privately referred to the statute, the Federal Election Campaign Act, known as FECA, as "fecal matter." Records have shown that Mr. Bork helped devise an unorthodox strategy that allowed the administration to submit dueling briefs, both supporting and undercutting the 1974 amendments to the law that were at issue.

The Washington law firm of Covington & Burling took the case pro bono. But expenses were also covered by a small group of bankers, oilmen and industrialists who appear in the archives of the lead plaintiff, Senator James L. Buckley of New York, who was a standard-bearer of the Conservative Party in New York, founded in the 1960s amid dissatisfaction with the G.O.P.

Senator Buckley's private files, at St. John's University in Queens, include copies of thank-you notes to moneyed donors to the litigation effort, including Boeing and G.D. Searle, the pharmaceutical company that developed the first birth control pill. Individual contributors whose names appear in fund-raising ledgers include the Texas oilman Perry Bass; John C. Whitehead, who would soon become co-chairman of Goldman Sachs; and Thomas S. Murphy, who once controlled ABC.

The Libertarian Party joined Senator Buckley as a litigant; Charles Koch cut a $10,000 check to the party right before it paid its share of legal expenses, and included checks from his brother David and their mother as well. He was regularly kept apprised of developments in the case by the party's leadership, archival records show — though in a statement, a spokesperson said that Mr. Koch "was not involved in this litigation" and his contribution had been directed generally to the party.



President Gerald R. Ford after signing the campaign reform bill at the White House in October 1974. UPI

One of the most instrumental supporters of the legal challenge was John Bolton, who would have a long history in politics and diplomacy and went on to become President Trump's national security adviser, and, after he was ousted, one of his critics. He was subsequently indicted by the Trump Justice Department and has pleaded not guilty.

At the time, Mr. Bolton was only recently out of Yale Law School, and pushed Covington & Burling, where he'd joined as a new associate, to take on the Buckley case.

Today, Mr. Bolton concedes that campaign finance is as deep a problem as ever.

"The system now is such a wreck that nobody would have put it in place," he said in an interview. "In fact, that was one of our thoughts. If we could blow enough holes in it, the whole thing would have to come down."

But that is not what happened.

## 'Post-Watergate Morality'

The Watergate scandal emerged after operatives of Mr. Nixon's re-election campaign were caught breaking into Democratic Party headquarters in 1972. Revelations followed about secret Oval Office tapes and funds laundered by the Nixon campaign through a Mexican bank.

Then came a "spasm of post-Watergate morality," as the Washington Post columnist David Broder put it.

But not long after President Ford signed the campaign finance legislation, Mr. Bolton, new to Covington, received a call from David Keene, an aide to Senator Buckley and a future president of the National Rifle Association.

Mr. Bolton learned during the call that Senator Buckley had taken an interest in potential litigation over the new law.

"I consider this challenge to be one of the most important projects I have undertaken since coming to Washington," the senator wrote in a 1975 letter to potential donors.

The new campaign finance law limited House candidates to expenditures of $140,000 for both the primary and general elections, about $900,000 in today's dollars, which is less than half of the average spent by winning congressional candidates today.

It also limited independent expenditures: Even interest groups could not spend more than $1,000 promoting a specific candidate, at a time when a full-page ad in The Washington Post cost $6,971.04. That raised hackles on both the right and the left.

"A thousand dollars may well have been too low," said Fred Wertheimer, who was legal counsel for Common Cause when it intervened in the case, in a recent interview. But on the other hand, he said, "a system of unlimited contributions is

inherently corrupt."




David Koch, at the time a Libertarian Party vice-presidential candidate, at the party's state headquarters in Columbus, Ohio, in 1980. UPI

For the Koch brothers, the issue at hand was their inability to continue infusing large amounts of money into the Libertarian Party, which favored an end to most government regulation.

They and many other hard-line conservatives had felt betrayed after the Nixon administration imposed wage and price controls and abandoned the gold standard, leading them to back third parties. In a 1975 letter to fellow oil executives, Charles Koch lamented that Republicans "were no better allies in the fight for free enterprise than the Democratic Party."

Third-party supporters believed the new legislation favored the two large parties and their extensive donor networks. David Koch, who died in 2019, called the new law “an act to preserve the two-party monopoly.”




David Keene, then a law student at the University of Wisconsin and national chairman of Young Americans for Freedom, in 1970. UPI

Mr. Bolton volunteered to join the Buckley legal team, successfully pitching it to Covington. Mr. Keene worked on assembling a coalition. He reached across the aisle, recruiting Eugene McCarthy, an anti-Vietnam War Democrat who later ran for president. But his biggest get was the New York branch of the American Civil Liberties Union. The A.C.L.U. had already been skirmishing in court over Nixon administration attempts to use campaign finance laws to block the A.C.L.U. and other groups from running advertisements on the Vietnam War and other issues.

“Keene was the guy who at some point calls me and says, ‘Well, we’re thinking of challenging the whole ’74 amendments. You guys want to?’” recalled Ira Glasser, the former head of the A.C.L.U. “I loved the whole idea, because my position was: It had to be made clear that this was not a liberal versus conservative issue, that this is an issue of speech that affected everybody.”

The case was the first of the year to be filed in the Federal District Court in Washington, in January 1975.

Mr. Bolton likened the motley assemblage of plaintiffs to “the bar scene in Star Wars.” Joel Gora, an A.C.L.U. lawyer who worked on the case, recalled that “every time we met they would razz me about the A.C.L.U. position on affirmative action.”

The opposing lawyers were even more unlikely bedfellows. One of Mr. Nixon’s most bungled acts was known as the Saturday Night Massacre, on Oct. 20, 1973, when he ordered the firing of Archibald Cox, the special Watergate prosecutor. The attorney general and his top deputy refused, resigning in protest. That left Mr. Bork to carry out the order.



From left, Archibald Cox, the former special prosecutor, and his wife; Senator Hugh Scott, Republican of Pennsylvania; and Senator Edward Kennedy, Democrat of Massachusetts, entering the Supreme Court in November 1975, to hear arguments on the Federal Election Campaign Act. Associated Press

Mr. Bork and Mr. Cox now found themselves on the same side of the Buckley case. But only technically. Mr. Bork loathed the campaign finance legislation. But because the president had signed it, the Justice Department released a supportive brief. However, the department also filed an unusual second brief raising constitutional concerns about contribution and spending limits, reflecting Mr. Bork's view.

The chairman of the F.E.C., Thomas B. Curtis, whose agency was created by the law, was not pleased.

"Where is the vigorous defense when the chief defense counsel seeks to carry water on both shoulders?" he wrote in an October 1975 letter to the Justice Department.

Other lawyers took the lead in defending the law, including Mr. Cox, who intervened on behalf of Senator Edward Kennedy, a proponent of the campaign finance legislation, and Lloyd Cutler, a future White House counsel

Mr. Bolton credited Ralph K. Winter Jr., the lead lawyer and one of Mr. Bolton's former professors at Yale, with developing the case's main legal theory, an argument that became known as "money is speech." It held that preventing people from spending money to express their political views violated their constitutional rights.

In August 1975, a ruling came down in the U.S. Court of Appeals for the District of Columbia largely upholding the legislation; an appeal was quickly lodged with the Supreme Court, which heard oral arguments in November.



In 1976, the Supreme Court upheld many aspects of the post-Watergate campaign finance law but eviscerated others, leaving the rich with their own set of rules. UPI

The justices' views did not track along simple ideological lines. Justice Byron White, a Kennedy appointee, felt that limiting spending was critical; otherwise, "you can get and spend all the money you want," according to notes kept by Justice William J. Brennan Jr.

But five other justices were First Amendment hard-liners, from William Rehnquist, a conservative future chief justice, to Harry Blackmun, a liberal stalwart. Mr. Brennan and Thurgood Marshall, both liberals, contemplated supporting Justice White, and Congress, in curbing spending. But the archives show that both feared giving the government the ability to silence groups like the NAACP, where Justice Marshall, the first Black justice, had served as lead counsel.

"On the one hand, there's this huge concern about corruption in government," said Rick Hasen, a law professor at the University of California, Los Angeles. "On the other hand, there are these very powerful First Amendment arguments that had not ever been really considered by the court."

## 'The Current World'

Even as the justices were deliberating, the Libertarian Party was exploring whether the Kochs could test the new campaign finance limits by donating $25,000 to the party itself, rather than to a specific candidate. Mr. Bolton, who also did legal work for the Libertarian Party, helped devise a plan to put a $25,000 contribution from the Kochs in escrow while they awaited word on whether it would be legal, a gambit ultimately rejected by Charles Koch.

On Jan. 30, 1976, the court handed down its decision, a 6-to-2 ruling that upheld the law's limits on contributions to political campaigns, its disclosure requirements and the new program for public financing of campaigns. But the justices ruled 7 to 1 against limits on how much people could spend on their own campaigns, or on independent expenditures on behalf of other politicians they hoped to see elected.

Three years later, David Koch seized on what he called, in a letter to fellow Libertarian Party members, “the best loophole the Supreme Court gave us.” The rich could spend on their own campaigns without limit. He offered himself as running mate to the party’s 1980 presidential candidate, Ed Clark.

“I have no particular expertise in politics, campaigning or running a campaign,” he explained in the letter. But he did have a very large wallet.

The Libertarians — who were calling for abolishing the minimum wage, Social Security, Medicare, Medicaid and all income taxes — captured just over 1 percent of the vote. The Reagan campaign took advantage of the new loopholes and organized independent campaign committees, including one led by Mr. Keene that ran a $1 million campaign to persuade Southerners to abandon Jimmy Carter, who was soundly defeated.



The Libertarian presidential candidate Ed Clark, center, and his running mate, David Koch, during a rally and telethon in Los Angeles in September 1980. Randy Rasmussen/Associated Press

The Kochs pivoted in the years that followed, reimagining political power as a vertically integrated business, leveraging all that was made possible by Buckley. They began underwriting favored professors and university programs as test wells for ideas like climate change skepticism and hostility to regulation. They backed think tanks like the Cato Institute to refine those ideas, and interest groups to spread them.

They pioneered efforts to overhaul the judiciary and, finally, anointed certain politicians to advance their ideas, including candidates like Mike Pence and the former Wisconsin governor, Scott Walker. In the 2024 election cycle, the Koch political influence machine spent nearly $550 million.

But it was Elon Musk, the founder of Tesla and SpaceX, who officially spent about $300 million on a single candidate, Donald Trump — not counting the “dark money” donations that the Supreme Court’s later decisions did not require him to disclose. “Without me, Trump would have lost the election,” Mr. Musk boasted.

It was the culmination of the court’s half-century of reshaping of the nation’s campaign finance system. Few are pleased with the situation as it stands.

“Sure, it bothers me to see these half a dozen people giving a ton of money,” Mr. Gora, the former A.C.L.U. lawyer, said, reflecting on his group’s role in Buckley. But spending limits don’t prevent billionaires from pushing their agendas, he added. They can just buy newspapers or social media platforms.

Some who backed Buckley find themselves on the wrong side of a billionaire president, including Mr. Bolton. Covington & Burling has been targeted by the Trump administration for its work with Jack Smith, the former special prosecutor who twice indicted Mr. Trump.

Mr. Bolton’s position on Buckley has not changed. No one side of the nation’s political divide benefits more than the other from the ability of wealthy donors to move elections, he said.

"We've never had anything like Trump, that's for sure, but the fact is that big money is more evenly divided than people think, and I think it's especially true now," he said.

Campaign finance records back Mr. Bolton up. A Times analysis showed a vigorous foray by Democrats into anonymous big-money donations in 2024, helping give former Vice President Kamala Harris a financial edge over Mr. Trump.

But if billionaires are not necessarily tilting power to one party or another, they do hold enormous sway over the two-party system in general. And that goes back to Buckley.

"If those justices had been aware then of what we now face, my guess is that we would have had the opposite result," said Geoffrey Stone, a law professor at the University of Chicago and co-editor of a new book of Buckley scholarship. "They weren't imagining the current world."

Steven Rich contributed reporting.

**Danny Hakim** is a reporter on the Investigations team at The Times, focused primarily on politics.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: How One Case Gave the Rich A Power Boost

# Footnote 3

The New York Times | https://www.nytimes.com/2005/04/11/politics/senate-committee-hearing-on-the-nomination-of-john-bolton-to-be-un.html

TRANSCRIPT

# *Senate Committee Hearing on the Nomination of John Bolton to Be U.N. Ambassador*

April 11, 2005

>

*Following is a transcript of the early session of Monday's hearing by the Senate Committee on Foreign Relations on the nomination of John Bolton to be the United States' representative to the United Nations, as recorded by FDCH Inc.*

U.S. SENATE COMMITTEE ON FOREIGN RELATIONS HOLDS A HEARING ON THE NOMINATION OF JOHN BOLTON TO BE U.S. REPRESENTATIVE TO THE UNITED NATIONS

SPEAKERS:

U.S. SENATOR RICHARD G. LUGAR (R-IN) CHAIRMAN

U.S. SENATOR CHARLES HAGEL (R-NE)

U.S. SENATOR LINCOLN D. CHAFEE (R-RI)

U.S. SENATOR GEORGE ALLEN (R-VA)

U.S. SENATOR NORM COLEMAN (R-MN)

U.S. SENATOR GEORGE V. VOINOVICH (R-OH)

U.S. SENATOR LAMAR ALEXANDER (R-TN)

U.S. SENATOR JOHN E. SUNUNU (R-NH)

U.S. SENATOR LISA MURKOWSKI (R-AK)

U.S. SENATOR MEL MARTINEZ (R-FL)

U.S. SENATOR JOSEPH R. BIDEN JR. (D-DE) RANKING MEMBER

U.S. SENATOR PAUL S. SARBANES (D-MD)

U.S. SENATOR CHRISTOPHER J. DODD (D-CT)

U.S. SENATOR JOHN F. KERRY (D-MA)

U.S. SENATOR RUSSELL D. FEINGOLD (D-WI)

U.S. SENATOR BARBARA BOXER (D-CA)

U.S. SENATOR BILL NELSON (D-FL)

U.S. SENATOR BARACK OBAMA (D-IL)

WITNESSES:

JOHN BOLTON,

NOMINATED TO BE U.S. REPRESENTATIVE TO THE U.N.

[*]

LUGAR: This hearing of the Senate Foreign Relations Committee is called to order. The Foreign Relations Committee meets today to consider President George W. Bush's nomination of John Bolton to be United States ambassador to the United Nations.

Mr. Bolton has served the last four years as the undersecretary of state for arms control and international security affairs. In this capacity, he's played an important role in several of the Bush administration's most notable diplomatic successes, including the president's Proliferation Security Initiative, the Moscow Treaty, the G-8 global partnership against the proliferation of weapons of mass destruction, and the opening of Libya's WMD program.

Secretary Bolton also served for four years in the administration of George H.W. Bush, as the assistant secretary of state for international organizations. In this position, he was heavily involved in matters related to the United Nations, including United Nations financing and reform proposals.

He also assisted former Secretary of State James Baker in his role as the secretary general's personal envoy for the Western Sahara.

In announcing this nomination, Secretary of State Condoleezza Rice stated, and I quote, "John Bolton is personally committed to the future success of the United Nations, and he will be a strong voice for reform at a time when the United Nations has begun to reform itself to help meet the challenging agenda before the international community," end of quote from Dr. Rice.

Perhaps no organization is so frequently oversimplified by both its proponents and its detractors as the United Nations.

LUGAR: The United Nations is not a monolithic entity controlled by a secretary general. Rather, it's a complex collection of agencies, programs, diplomatic venues, traditions and agreements that depend on the actions of the individual member states.

As such, the various parts of the U.N. often work independently from one another with little coordination or oversight.

The U.N. has produced great accomplishments, even as some of its structures have experienced episodes of corruption, mismanagement, contentiousness or timidity.

Some agencies and programs, like the World Health Organization, the World Food Programme and UNICEF, have a proven record of achievement and are trusted by people and nations around the world.

Other endeavors, like the oil-for-food program or the U.N. Commission on Human Rights, have been gravely flawed and suffer from severe organizational deficiencies.

The Foreign Relations Committee held the first congressional hearing on the U.N.'s oil-for-food scandal a year ago with month.

At that hearing, I said -- and I quote -- "Billions of dollars that should have been spent on humanitarian needs in Iraq were siphoned off by Saddam Hussein's regime through a system of surcharges, bribes and kickbacks.

"This corruption was not solely a product of Saddam Hussein's machinations. He depended upon members of the U.N. Security Council, who were willing to be complicit in his activities and they needed U.N. officials and contractors who were dishonest, inattentive or willing to make damaging compromises in pursuit of a compassionate mission," end of quote.

During the last year, we have learned much more about the extent of that corruption and mismanagement involved, and this knowledge has supported the case for reform.

United Nations reform is not a new issue. The structure and role of the United Nations has been debated in our country almost continuously since the U.N. was established in 1945.

But in 2005, we may have a unique opportunity to improve the operations of the U.N. The revelations of the oil-for-food scandal and the urgency of strengthening global cooperation to address terrorism, the AIDS crisis, nuclear proliferation, and many other international problems have created momentum in favor of constructive reform at the U.N.

Secretary General Annan has proposed a substantial reform plan that will provide a platform for further reform initiatives and discussions.

And the United States must be a leader in the effort to improve the United Nations, particularly its accountability.

LUGAR: At a time when the United Nations is appealing for greater international help in Iraq, in Afghanistan, in trouble spots around the world, a diminishment of U.N. credibility because of scandal reduces U.S. options and increases our burdens.

Secretary Bolton has thought a great deal about this subject, and we are anxious to listen to his ideas for reform, as well as his evaluation of the secretary general's plan. We want to know what specific parts of that plan deserve United States support.

Beyond substantive evaluations, we want to know how the nominee intends to pursue these reform ideas. What strategies does he propose for making constructive changes a reality? How will he apply his substantial experience in this area?

Even as reform must be a priority, the world will not stop while we attempt to improve the structures of the U.N. The next U.S. ambassador to the U.N. must pursue reform without diminishing the effectiveness of his core diplomatic mission: namely, securing greater international support for the national security and foreign policy objectives of the United States.

During the last several months, President Bush and Secretary Rice have undertaken important missions designed to reinvigorate relationships with allies and partners. This is an urgent national security imperative that cannot be neglected by the next ambassador to the U.N.

The United States does not possess infinite financial and military resources.

LUGAR: We need help to advance security, democracy and human rights.

This fact should not preclude us from taking unilateral action when it's in our interest, but it does require that we be persistent and imaginative in our pursuit of international support.

The nomination of Secretary Bolton to be ambassador to the United Nations has generated public debate on U.S. policies toward the United Nations and on the degree to which the United States should embrace multilateralism.

In this context, opponents of Mr. Bolton have criticized some statements of the nominee as abrasive, confrontational and insensitive. Some of these same statements have been celebrated by supporters of the nominee, as demonstrating a

tough-minded, refreshingly blunt approach to diplomacy.

But in the diplomatic world, neither bluntness nor rhetorical sensitivity is a virtue in itself. There are times when blunt talk serves a policy purpose; other times it does not.

When President Ronald Reagan stood before the Brandenburg Gate in 1987 and said, "Mr. Gorbachev, tear down that wall," blunt speech was serving a carefully planned diplomatic purpose. It reflected broader themes of democracy that had been nurtured for years by the Reagan administration.

It reaffirmed to Germany, on both sides of the wall, the United States would have staying power in Europe. It underscored to the Kremlin, in a personal, tangible way, that the United States and its allies were intent on achieving the peaceful transformation of Eastern Europe.

Blunt as it was, there was nothing gratuitous about President Reagan's statement.

Diplomatic speech by any high-ranking administration official has policy consequences. It should never be undertaken simply to score international debating points to appeal to segments of the U.S. public opinion or to validate a personal point of view.

As President John Kennedy once said, and I quote, "The purpose of foreign policy is not to provide an outlet for our own sentiments of hope or of indignation. It is to save real events in a real world," end of quote.

LUGAR: I believe the diplomats serving under the president and secretary of state can apply a basic three-part test to almost anything they utter in a diplomatic context.

First, is the statement true?

Second, is the statement consistent with the policies and directives of the president and the secretary of state?

And third, is there a rational expectation that the statement will advance or support U.S. interests?

It is particularly important that the statements of our ambassadors to the U.N. meet this test, because more so than any other American ambassadors, they are perceived as speaking directly for the president of the United States.

President Bush has selected John Bolton, a nominee of experience and accomplishment, to be his spokesman and representative at the United Nations. Given the importance of the position, it is vital that we act both expeditiously and thoroughly in evaluating the nominee.

We look forward to hearing the nominee's insights and learning how he will work on behalf of the president and the secretary of state in fulfilling this duty.

I would like to turn now to the distinguished ranking member of the committee, Senator Biden, for his opening statement.

BIDEN: Thank you very much, Mr. Chairman.

Welcome, Mr. Secretary.

Let me say at the outset I'm probably -- of all the people up here, I'm going to be the least critical of anyone who's blunt. I don't like to indict myself publicly.

But I hadn't planned on starting this way, but I think that, to state my grave concern with this appointment, Mr. Chairman, I think that the test you set out for diplomacy is the accurate one: true, consistent with the policy of an administration, and a rational expectation that it will be in U.S. interests.

Obviously, all of this is subject to explanation and rebuttal by our friend, Mr. Bolton, but I think that my problem with your statements about the U.N. is I don't think they're true, I don't think they're consistent with U.S. policy, and I don't think -- I clearly believe they do not advance U.S. interests.

And, you know, you can be blunt -- President Reagan was blunt about the Berlin Wall because it was, in fact, clear to the whole world that it was an odious thing. I think his statements, which I'll go into in a minute, about the U.N. are a little bit like being blunt about NATO.

BIDEN: If you had said -- which you haven't, to the best of my knowledge -- "NATO forces can't keep up with us. The French air force can't fly on our wing" -- et cetera, et cetera, et cetera. That would be blunt. That would be also clearly against U.S. interests to say those things, but it would be blunt.

And I would think that's more akin to my criticism of which you'll soon hear of your statements about the U.N. than the Berlin Wall.

I should point out at the outset, Mr. Chairman; and I want to thank you for your cooperation. You have been, as always, straightforward and honorable and fair to both the witness and to the minority.

I don't believe this hearing, quite frankly, is ready to be conducted today because we've not completed the review of certain allegations: none of which go the integrity, the honesty, the personal conduct of the nominee.

When I say allegations, I'll get into what I mean by that -- allegations involving the nominee.

They all relate to whether or not he attempted to use his influence unfairly to get certain analysts fired because they didn't agree with his assessments. That's what I mean at the outset, so that the press doesn't think there's anything nefarious about this. That's the issue that's going to be discussed here, among others.

On March 21st, I asked the State Department for access to certain individuals and documents related to an incident involving the nominee and a State Department employee relating to whether or not that person should or should not have been fired.

For two weeks, the department stonewalled. It was only after you, Mr. Chairman, intervened last Thursday -- and we sent repeated letters to the State Department -- last Thursday that you intervened that we received some cooperation.

On Thursday last, at 1:45 p.m., the Democratic staff was informed that two individuals -- we asked for four -- would be made available that afternoon, starting at 3 p.m.

On Friday morning, some of the documents we requested began to arrive, but the committee was not allowed to retain them or make copies of them but only take notes, further handicapping our ability to review the materials.

BIDEN: Since Thursday afternoon, staff on both sides -- and this has been on both sides; I'll ask my chief of staff to correct me -- on every interview there's been a majority member staff person there. So this isn't -- the Democrats are asking for it, but none of this has been done absent a majority staff person being present.

Since Thursday afternoon, staff on both sides have worked diligently to interview the witnesses and review materials. And so I'm grateful for your intervention at the time that you intervened, because I was having no success with Secretary Rice.

But the committee's work to investigate this matter, which would have proceeded over the past two-week period, was compressed into 90 hours. The staff still has at least two more interviews to conduct, and I don't believe that all documents responsive to the request have been provided.

And because many of the documents are classified, they could not be made available to senators to review unless they happened to be in Washington during this period.

And many of us were -- the reason it was initially postponed was that many of us were in Rome at the president's funeral -- excuse me, Freudian slip, I beg your pardon -- at the pope's funeral that the president attended.

This is not a way that we should do business. The department's lack of cooperation -- this is not Mr. Bolton; he did not fail to cooperate, the department did not cooperate until the last possible minute -- stands in marked contrast to the nomination four years ago for this same position.

In that case, involving John Negroponte, the committee reviewed with full cooperation and obtained hundreds of pages of documents without delay or resistance. And my friend from Connecticut was a prime mover in dealing with that nomination.

The fact is that, unlike four years ago, Undersecretary Bolton, when he came before this committee, had little background in arms control, and we confirmed him.

BIDEN: But there's no question that he comes before us today with extensive experience in U.N. affairs. He served as the assistant secretary of state during the first Bush administration, supervising policy regarding the United Nations. And he has written and testified frequently about the subject. And it's precisely the record in the first part of this -- the first Bush term that concerns me.

I believe the president is entitled to significant deference in his appointment of senior personnel. But I have opposed nominees, however, who I believe were hostile to the mission to which they were assigned.

For example, I voted against one secretary of the interior who clearly had an animus toward that department under the Reagan administration. And I voted against secretaries of education appointed by Reagan because he said he was appointing them for the express purpose of doing away with the Department of Education.

And so not the first time I have voted against a -- if I vote against John, it would not be the first time that I voted against a nominee that the president has put forward that's not a member of the judiciary.

And quite frankly, I'm surprised that the nominee wants the job that he's been nominated for, given the many negative things he had to say about the U.N., international institutions, international law.

Now, you're going to have an opportunity to respond to all these kinds of things that are taken -- that are attempted to be in context, but I'm just going to cite some of the things you said and they'll be put in context during the question-and-answer period.

You said there's no such thing as the United Nations. Quote, "There's no such thing as the United Nations." You said, and I quote, that -- excuse me -- you said that if you removed 10 stories from the 38-story U.N. headquarters, quote, "it wouldn't make a bit of difference," end of quote.

You said that if the Security Council were remade today, that you would have only one permanent member, the United States. You said that international law really isn't, quote -- that really isn't law and that, quote, "while treaties may well be politically or even morally binding, they are not legally obligatory," end of quote.

BIDEN: You said the International Court of Justice, a body created under the U.N. Charter, is a, quote, "travesty and a pretend court," end of quote.

You said that the peace enforcement operations and nation building should, quote, "be relegated to history's junk pile at the first opportunity," end of quote, because they result in, as you said, quote, "American personnel and resources being committed to U.N. operations far removed from America's vital interests," end of quote, even though they wouldn't be there unless we -- if we didn't want them there, we could veto the effort.

I want to give you a chance to explain, clarify and possibly, hopefully, repudiate these and other statements you've made over the years.

But for now, let me point to two things.

First, the logical conclusion of your views, in my view, is if the U.S. Embassy is sacked by a foreign state, or a U.S. soldier tortured, then this country and its citizens have no recourse under international law, because in your view there's no such thing as international law.

How can that possibly be in America's interests?

Second, it seems to me your views about the U.N. treaty and international law are out of sync with those of the president of the United States and Secretary Rice.

Soon after his election, the president stated that one of his priorities for the second term was, quote, "to defend our security and spread freedom by building effective multinational and multilateral institutions and supporting effective multilateral action," end of quote.

The president right now is demanding, to his great credit, Syria's full withdrawal from Lebanon under the authority of a U.N. Security Council resolution.

The administration has finally joined the European effort to convince Iran to forego nuclear weapons. Quote, "We're working closely with Britain, France and Germany," the president said, continuing the quote, "as they insist that Tehran comply with international law."

The president recently decided the United States, quote, "will discharge its international obligations," end of quote, under decisions of the International Court of Justice by having several state courts, including courts in Texas, give effect to the decision of that court in certain death penalty cases.

BIDEN: Does he know that he's implementing an order that is from a pretend court?

The administration strongly endorses the U.N. decision to send 10,000 peacekeepers to Sudan to help secure a north-south peace agreement; a mission your statement about peacekeeping suggest that you'd have trouble supporting.

During a confirmation hearing, Secretary Rice told this committee, quote, "that the time for diplomacy is now," end of quote.

This month, speaking before the American Society of International Law, she said -- and I quote -- "One of the pillars of that diplomacy is our strong belief that international law is a vital and powerful force in the search for freedom," end of quote.

I suspect that if President Clinton's secretary of state had made that same statement, you might have been leading the charge that this was an ill-founded statement -- I could be wrong. I'm anxious to hear what you have to say.

In the past two months, the president and the secretary have had clear that there is a new-found commitment to work closely with others, including the United Nations. And I'm hopeful that they're trying to return America to its historic role in building a strong international system that serves our interests rather than running roughshod over it.

Your views seem, based on what you've said in the past, John, to be contradictory and contrary to the direction the president and the secretary now want to take this administration. Which leads me to believe that it must mean that you no longer agree with those statements because they appointed you.

I wonder, as I did in 2001, about your diplomatic temperament. You have a habit of belittling your opposition, and even some of your friends.

You said that, quote, "Republicans are adults on foreign policy questions and we define what we're willing to do militarily and politically by what is in the best interests of the United States."

I wonder what you think the motives of some of us who aren't Republicans.

BIDEN: You once quoted the head of the International Law Commission as evidence of the grandiose ambitions of supporters of the International Criminal Court by saying, quote, "That's not some knuckle-dragging Republican from some Southern state. It's the head of the International Law Commission," end of quote.

I don't think this is the kind of attitude that is going to serve us very well in the United Nations if it continues.

The U.N. needs reform. Lots of it. I worked with former Chairman Jesse Helms to promote such reforms. The Helms-Biden legislation was part of that reform.

That work's not finished. We need a strong voice in New York who knows the U.N. and who can advance our reform agenda. But we don't need a voice which people may not be inclined to listen to. And I fear that, knowing your reputation -- and your reputation known well at the U.N. -- people will be inclined to tune you out.

Above all, we need an able diplomat skilled at working the corridors of a complex international institution.

Some have said that sending you to New York would be like sending Nixon to China. I'm concerned it will be more like sending the bull into a China shop.

Ambassador Kirkpatrick, who served at the U.N. under President Reagan and strongly supports you, may have summed it up best in describing you in the New York Times. He said, "He may do diplomatic jobs for the U.S. government, but John is not a diplomat," end of quote.

So we'll want to spend some more time exploring your views in the United Nations and how you approach the job if confirmed.

BIDEN: We also have an obligation to assess your performance in your current job, undersecretary of state for arms control and international security.

The fact is that on your watch in areas which you were responsible the world has gotten more, not less, dangerous. That's not your fault, but that's a fact.

We didn't create these threats, but it's our responsibility to contend with them wisely and effectively. In my judgment, your judgment about how to deal with the emerging threats have not been particularly useful.

Over the past four years, Korea has increased its nuclear weapons capacity by as much as 400 percent. It may now have as many as eight nuclear weapons, which it could test, hide or sell to the highest bidder.

During your 2001 confirmation hearing, you highlighted the danger posed by North Korea 27 times, and you were right. But the record suggests that your approach has undermined the efforts to address the growing threat posed by Pyongyang.

Over the past four years, Iran has accelerated its own nuclear program. It's much closer to the bomb than when the president took office.

The record suggests you opposed the president's policy, the one finally adopted by President Bush -- he's come around to after several years -- a coordinated strategy of carrot and sticks of our European partners.

No one can guarantee it will work; we do know that the approach you apparently advocated has not worked.

Over the past four years, the invaluable program Chairman Lugar started to help Russia account and destroy for excess nuclear weapons and complementary programs that deal with its chemical arsenal has to withstand efforts by some in this administration to cut it.

Now these programs have become mired in red tape. And despite the fact that loose Russian weapons pose one of the greatest potential threats to our security, we still haven't cut through that red tape.

BIDEN: The administration did succeed in convincing Libya to give up its weapons of mass destruction. But according to press accounts -- and I'd like to hear what your view is -- that only happened after you were taken off the case. And that success was the result of a policy begun by the previous administration that you roundly disparaged.

Finally, a serious concern has been raised about your attitude toward dissenting views. Specifically, it has been alleged that on at least two occasions you sought to have removed from their positions officials who disagreed with your assessment of critical intelligence matters.

After all this country has been through with Iraq and faulty intelligence, if that's true, that's not the approach we should be rewarding. And you'll have a full opportunity to address these complaints.

John, I have great respect for your abilities and your intellectual capacity. It's your judgment and temperament, as well as your approach to many of these issues, that give me great pause.

Let me conclude with this: After a necessary war in Afghanistan and an optional war in Iraq, Americans are rightly confident in the example of our power. But I've been concerned that many in this administration have forgotten the power of our example.

Foreign policy is not a popularity contest. We must confront hard issues. Sometimes they require hard choices that other countries don't like. But above all, they require American leadership. That's the kind that persuades others to follow.

And I'm not convinced this nominee has that as his strongest suit.

I thank the chair and I yield back to the chair.

LUGAR: I thank the distinguished ranking member.

I would mention that when the hearing was originally scheduled for Thursday of last week, our distinguished colleague Senator Warner had planned to join us to introduce Secretary Bolton. But the rescheduling of the hearing for this morning, Senator Warner is unable to attend because of commitments in his state.

LUGAR: He's asked me to convey to the committee his strong support for the nominee.

And I would unanimous consent that Senator Warner's statement be included in the record.

BIDEN: Mr. Chairman, may I clarify a point I made?

I said every witness has been interviewed jointly. Three weeks ago, the Democratic staff interviewed one witness alone, and then, I believe -- am I correct? -- notified the majority staff who then interviewed that nominee, which began this ball rolling.

So there was one interview that I'm aware of that the initial interview did not take place with both majority and minority in the room. That was the only one. I just want him to clarify the record.

LUGAR: I thank the senator for the clarification.

Let me say at the outset that we have good attendance this morning, of which the chair is grateful.

And I would ask that members limit their questions to 10 minutes. We will have a 10-minute round, followed by an additional 10-minute round.

I would just simply announce my willingness to preside over the committee throughout the afternoon and into an evening session, if that is required for members to have opportunity to ask all the questions that they wish to ask.

I want to make that clear at the outset that members will have that opportunity throughout the morning, the afternoon and the evening.

But I would ask members to respect the 10-minute time limit.

Now, the chair will not stop the witness from responding when the 10 minutes comes to a conclusion, but I will ask that the senator involved to refrain from doing business during that period until another turn comes around, in fairness to most members who have changed their plans in order to be here today, and have come at least to do this business, to participate in the hearing.

LUGAR: Having mentioned that, I will ask the clerk to start the clock on my questioning, and I will ask the first 10 minutes of questions and then yield to my distinguished colleague Senator Biden, and we will go back and forth then with our questions for the nominee.

Excuse me, I jumped the gun.

We have not heard from the nominee...

(LAUGHTER)

... and we do want to hear from the nominee.

(LAUGHTER)

We're so excited about asking you questions, Secretary Bolton...

(LAUGHTER)

... that we just want to get right into it.

But nevertheless, we do look forward to your statement. Please take the time that is required, really, to fully express your views and then I'll start the clock on my 10 minutes of questioning.

Secretary Bolton?

BOLTON: Thank you, Chairman Lugar, Senator Biden. I am honored to appear before you today as President Bush's nominee to be U.S. permanent representative to the United Nations.

I'm grateful for your consideration and I look forward to discussing the critical leadership role that the United States plays in the United Nations.

I'd like to thank Senator Warner, who would have been here, as you suggested, had the schedule not changed; my wife Gretchen, who is here with me today.

I do have a longer statement, Senator, if I could, I'd submit for the record and I'll just read a shorter version of it.

LUGAR: It will be published in the record in full.

BOLTON: Mr. Chairman, I am grateful for the opportunities that I've had to work with this committee over the years.

This is the fourth time I have appeared before this committee in a confirmation hearing. If confirmed, I pledge to fulfill the president's vision of working in close partnership with the United Nations.

The United States is committed to the success of the United Nations, and we view the U.N. as an important component of our diplomacy. As the president stated before the U.N. General Assembly last September, "Let history show that in a decisive decade, members of the United Nations did not grow weary in our duties or waver in meeting them."

The secretary has made this a top priority as well. She was unequivocal in her remarks, and I quote, "The American people respect the idealism that sparked the creation of the United Nations, and we share the U.N.'s unshakable support for human dignity."

BOLTON: At this time of great opportunity and great promise, the charge to the international community is clear: We who are on the right side of freedom's divide have an obligation to help those who are unlucky enough to be born on the wrong side of that divide.

The hard work of freedom is a task of generations. Yet it is also urgent work that cannot be deferred. Now more than ever, the U.N. must play a critical role as it strives to fulfill the dreams and hopes and aspirations of its original promise: to save succeeding generations from the scourge of war, to reaffirm faith in fundamental human rights and to promote social progress and better standards of life in larger freedom.

If confirmed, I look forward to working closely with this committee to forge a stronger relationship between the United States and the United Nations, which depends critically on American leadership.

Such leadership, in turn, must rest on broad, bipartisan support in Congress. It must be earned by putting to rest skepticisms that so many feel about the U.N. system.

Through the course of three decades of public service, both in and out of government, I have learned that this consensus is not only essential, but possible. Working together in a spirit of bipartisan cooperation, I believe we can take important steps to restore confidence in the United Nations.

Mr. Chairman, we are at a critical juncture, and I fully share the sentiments that you expressed in 1997, when you remarked, and I quote, "It is time to decide if we want a strong and viable United Nations that can serve the United States interests, or a United Nations that is crippled by insolvency and hobbled by controversy and uncertainty."

Mr. Chairman, there are four priorities that I believe are important to pursue if confirmed as the U.S. representative to the U.N.

One priority is to strengthen and build institutions that serve as the cornerstone of freedom in nascent democracies. Mr. Chairman, we should never underestimate the impact of free and fair elections on a country.

I look forward, if confirmed, to working with relevant U.N. agencies to enable them to contribute further to the growth of democratic institutions in countries freed from the bonds of oppression.

BOLTON: I also look forward to working with you on President Bush's request for $10 million in the fiscal year 2006 budget to set up a democracy fund within the United Nations. I'm grateful to Secretary General Annan for endorsing the president's proposal in his new report on U.N. reform.

While the U.N. has had its successes in the human rights field, there have been problems as well, such as the United Nations Commission on Human Rights. For too long, some of the most egregious violators of human rights have undercut UNHRC's principles and its effectiveness.

The consequence, as Secretary General Annan has said, is that the commission's important work has, and I quote, "been increasingly undermined by its declining credibility and professionalism," close quote.

We must work with our friends and allies to keep those who would usurp the moral authority of this commission off of it, and to send clear and strong signals that we will not shy away from naming human rights violators.

We must work to galvanize the General Assembly to focus its attention on issues of true importance.

Sadly, there have been times when the General Assembly has gone off track, such as with the abominable Resolution 3379 equating Zionism with racism. I'm proud to have been an active player in getting this resolution repealed.

Mr. Chairman, a second priority, should I be confirmed, will be stemming the proliferation of weapons of mass destruction to ensure that terrorist organizations and the world's most dangerous regimes are unable to threaten the United States, our friends and our allies.

As undersecretary of state for arms control and international security, I have worked hard to promote effective multilateral action to curb the flow of dangerous weapons. As you know, I served as the lead U.S. negotiator in the creation of the G-8 Global Partnership Against the Proliferation of Weapons and Materials of Mass Destruction, which will add an additional $10 billion over 10 years in Nunn-Lugar-type programs.

BOLTON: In the case of Libya, I had the opportunity to work in close consultation with our British colleagues in diplomatic efforts to secure the verifiable elimination of Libyan weapons of mass destruction.

I also helped build a coalition of more than 60 countries to help combat the spread of dangerous weapons through President Bush's Proliferation Security Initiative.

I have no doubt that these efforts played a critical role in enabling the United States to lead the Security Council to pass Resolution 1540, first suggested by President Bush in his speech to the General Assembly in September 2003.

This resolution calls upon all member states to fulfill their obligations in relation to arms control and disarmament and to prevent proliferation in all its aspects of all weapons of mass destruction.

Resolution 1540 was the first of its kind focusing on WMD proliferation. I am proud that our strong leadership contributed to its unanimous adoption.

I am happy to report that, as of March 15, over 80 countries have submitted reports required by the resolution, outlining their plans to enact and implement measures to stop WMD proliferation. I look forward to working with Security Council members to achieve 100 percent compliance with the resolution.

A third priority that I would pursue, if confirmed, is supporting the global war on terror. As we all learned on September the 11th, 2001, no one is safe from the devastating effects of terrorists intent on harming innocent people.

Confronting and triumphing in the global war on terror remains the central priority of the Bush administration. To win this war requires long-term cooperation with all like-minded nations.

The president is firmly committed to working with the United Nations to make this shared goal of the civilized world a reality. As he noted in his speech to the U.N. General Assembly in September 2003, "All governments that support terror are complicit in a war against civilization. No government should ignore the threat of terror, because to look the other way gives terrorists the chance to regroup, recruit and prepare. And all nations that fight terror, as if the lives of their own people depend on it, will earn the favorable judgment of history."

The United Nations has taken positive steps to support the war on terror, but more, of course, remains to be done. In the wake of September the 11th, we have been actively encouraging member states to become parties to the U.N. conventions on terrorism.

I have been personally involved, in the past four years as well, in working to complete negotiations on a Nuclear Terrorism Convention. We must build upon Security Council Resolution 1368, passed one day after the tragic events of

September 11th, and which for the first time classified every act of international terrorism as a threat to international peace and security.

We must also work together to help member states build capacities to combat terrorism, as outlined in Resolution 1373, passed on September 28th, 2001.

BOLTON: This resolution obligates all U.N. member states to use their domestic laws and courts to keep terrorists from sheltering resources or finding safe havens anywhere in the world and to cooperate in investigating, prosecuting and preventing terrorism wherever it may spring up.

The U.N. Security Council is monitoring compliance with the requirements of this resolution with impressive results.

To date, 142 countries have issued orders freezing the assets of suspected terrorists and terrorist organizations. Accounts totalling almost $105 million have been blocked: $34 million in the U.S. and over twice that amount in other countries.

Overall, Resolution 1373 has been the framework for unprecedented international consultation and coordination against terrorism, including the provision of technical assistance to governments that want to do the right thing but may not have the specialized expertise necessary.

Mr. Chairman, a fourth priority is addressing humanitarian crises. It is not just the scourge of war we must confront. We must confront the scourge of disease and affliction such as HIV/AIDS through strong U.S. leadership in the United Nations system.

Along with the president's Emergency Plan for AIDS Relief, a five-year $15 billion investment, we are strong supporters of the U.N. Declaration of Commitment on HIV/AIDS and are working to ensure resources from the Global Fund for AIDS, Malaria and Tuberculosis are available to countries most severely affected by the disease.

I will make it a key priority as well to improve programs that have been involved in the tsunami relief effort so that we can enhance and build upon structures and institutions already in place.

More broadly, we must confront the scourge of poverty, which leaves hundreds of millions on the margins of societies scrambling for food or shelter with little opportunity to improve their lives or those of their children.

We must also make sure that the U.N. acts effectively in promoting the economic and social advancement of all people. Policy reform, institution building, appropriate technology transfer, and private sector involvement are critical for sustained economic growth.

We will continue to support the contributions of women to economic growth and development, as well as their critical role in the growth of democratic institutions worldwide.

The U.N., in conjunction with U.S. leadership, has recognized that the traditional models of development have been insufficient to achieve development objectives and better the lives of people around the world.

BOLTON: The Partnership for Maternal, Newborn and Child Health, the Global Alliance for Vaccinations and Immunizations and Roll Back Malaria are all examples of how U.N. agencies, such as UNICEF, are working alongside the private sector, charitable organizations and foundations, such as the Gates Foundation, to leverage resources, generate new activities and impact the lives of millions in developing countries.

We support these new and innovative structures that rely less on bureaucracy and more on putting resources into the field, meeting results-based performance standards.

This bring me to the issue of accountability and reform. The administration welcomes the secretary general's new report on U.N. reform and we are examining carefully its many recommendations.

I hope to work closely with the secretary general and my colleagues to bring greater accountability and transparency to the United Nations.

On a personal note, I should mention that Secretary General Kofi Annan and I have had a relationship that goes back 16 years, based on mutual respect and friendship. And I was pleased to receive a call from him last week.

The key is to implement changes to the U.N. structure and management, including budget, personnel and oversight reforms.

Scandals, such as those we have witnessed with the oil-for-food program, undermine not only America's confidence in the United Nations, but the confidence of the international community, as well. They must not recur.

And we must never lose sight of the reality, that ultimately it is member governments that must take responsibility for the U.N.'s actions, whether be successes or failures.

Mr. Chairman, let me close by reiterating what I said at the beginning. If confirmed, I will work closely and effectively with this committee and both houses of Congress.

The president and Secretary Rice are committed to building a strong, effective United Nations. The United Nations affords us an opportunity to move our policies forward together with unity of purpose.

BOLTON: Now more than ever the U.N. must play a critical role as it strives to fulfill the dreams and hopes and aspirations of its original promise: to save succeeding generations from the scourge of war, to reaffirm faith in fundamental human rights, and to promote social progress and better standards of life in larger freedom.

This effort demands decisive American leadership, broad bipartisan support and the backing of the American public.

I will undertake to do my utmost to uphold the confidence that the president, Secretary Rice and the Senate will have placed in me.

Thank you. And I would welcome the opportunity to answer your questions.

LUGAR: Thank you very much, Secretary Bolton, for your opening statement.

I'd like to mention that Mrs. Bolton is with us today, on the front row.

And we're delighted that you are here, and we appreciate your coming to the hearing.

Now, as I mentioned earlier and prematurely, we'll have a 10- minute round of questioning. And we'll begin the clock now as I commence my 10 minutes of questioning. Then I will yield to Senator Biden.

Secretary Bolton, as Senator Biden has mentioned in his opening statement, prior to this hearing, staff on both sides of the aisle had visited with Mr. Carl Ford. Carl Ford was the supervisor for Christian Westerman, who was an INR biological warfare analyst.

I mention this because the allegation has been made that in a speech that you were preparing for the AEI on Cuba -- and which I might mention was on television this morning in its entirety -- that you wished to change some language. Christian Westerman, the analyst, refused to change the language. You were severe in your criticism of him. And so herein lies at least what appears to be a major flap for the last 90 hours, as Senator Biden has pointed out.

Now, staff has in fact interviewed Mr. Westerman; Carl Ford, who will be appearing before the committee, as I understand, tomorrow morning at our hearing at 9:30; Mr. Fred Flights (ph), the Bolton special assistant who might know something about this; Tom Fingar, the INR principal deputy assistant secretary at the time; Fulton Armstrong, national intelligence officer for Latin America at the NIC at the time; Stuart Cohen, Mr. Armstrong's supervisor at the NIC at that time.

These interviews took place -- aside from the Carl Ford interview, which Senator Biden has pointed out occurred earlier, on April 5. The others interviews on April 7 and April 8. And lasted, in most cases, for two hours, although the Fingar interview

was only an hour and a quarter, and 30 minutes devoted to Stuart Cohen.

LUGAR: I mention all of this because, very clearly, there has been at least an allegation that pressure was applied. And Senator Biden suggested making a transfer that I think is a stretch, but we are very sensitive in this country about the reports given on Iraq intelligence and how accurate or how comprehensive our intelligence agencies were, whether anyone distorted that or misused that or went beyond that intelligence which regarded public policy.

In other words, you were talking about biological warfare in Cuba. Your suggestions for change were not accepted. The speech therefore did not have the words that you wanted, but it had the official interpretation. And as a matter of fact, no one was discharged, although feelings may have been hurt.

I raise all of this in this context, simply to give you an opportunity to explain, if you can, what the flap is about. In essence: Who said what to whom and for what reason? And if you had to do it all over again, would you do it the same way?

In essence, give your side of the story.

BOLTON: Well, thank you, Mr. Chairman.

I think that the couple of points I'd want to stress from the outset is that all of these allegations have been reviewed in the past by the Senate Select Committee on Intelligence. And the committee found that there was no evidence of any indication of an attempt to influence or pressure analysts in their professional conclusions.

Second, with respect to the speech which was in May of 2002 and was entitled "Beyond the Axis of Evil" -- it was a discussion of WMD efforts in a number of countries; really preparation had begun earlier in the year, just a few months after September the 11th, when I think we all concluded that, however horrible September the 11th was, it could have been far worse had the terrorists had access to chemical, biological or nuclear weapons.

BOLTON: And it was our feeling in the administration that we wanted to talk seriously to the American public about these kinds of threats.

The intelligence community gave appropriate clearance to declassify language and to the text of the speech itself. The speech was cleared throughout the State Department, including the Office of the Deputy Secretary, and throughout the interagency.

Assistant Secretaries Ford and Otto Reich used essentially the same declassified language in testimony in March before the speech and in June after the speech and elsewhere.

And I want to say, also, Mr. Chairman, as you say, there's been a lot of interviews, transcripts and documents produced. I haven't seen all of them.

But I want to say to the committee right here, unequivocally, I'd be happy if all of that were made public right now. There are problems with classification of some of it. I think we need to be concerned about privacy for people who are, sort of, collaterally involved. These would be issues that have to be worked out.

But, Mr. Chairman, there is nothing there there, and I would put it all out on the public record -- all of it.

LUGAR: I would indicate, Secretary Bolton, that State Department and CIA representatives stayed with the materials as they were made available in the Senate Foreign Relations Committee offices. There were a number of pages that were classified and that, I think, is an important point.

LUGAR: But at the same time, I appreciate your forthcoming desire that all of this be made public, and I suspect that that can be accommodated.

I simply want to know -- the specific allegation of pressure and discharge and those specific thoughts surrounding Mr. Westerman, specifically, what is the case? What happened?

BOLTON: I never sought to have Mr. Westerman fired at all. And in fact, you have e-mail from the principal deputy assistant secretary of state for the Intelligence Research Bureau the day of the conversation, Tom Fingar. His e-mail to me that

day said that Mr. Westerman's behavior was, and I quote, "entirely inappropriate," close quote.

Mr. Fingar said, referring to INR, quote, "We screwed up," close quote. And he said twice in a relatively short e-mail, quote, "It won't happen again," close quote.

LUGAR: Well, I thank you for that clarification. I suspect that we will hear more about it throughout the hearing.

But at the outset I wanted to raise it, because it appears to me to have been the source really of almost half of the controversy about your nomination thus far.

Now let me get into the second half.

What are you going to do about reform at the U.N.?

You've mentioned specific desirable aspects, but clearly one of the rationales given by the president -- and even more emphatically by the secretary of state -- is that you are a person who is going to be able to bring about reform at the institution so it will be strengthened.

The United Nations is important for our foreign policy. It's more important if, in fact, it's a strong organization with greater integrity in terms of its activities.

What do you have in mind as you approach this task?

BOLTON: I think analytically there are basically two categories of reform that one can consider.

The first category is the reform of governing structures in the U.N.: how the member governments of the U.N. carry out their business.

BOLTON: The second analytical category I would call management, budget and personnel: actual operation, actual delivery of a product from U.N. agencies. And I think there's a lot of work to be done in both categories.

I mentioned in my prepared remarks, the widespread feeling, including as shared by Secretary General Kofi Annan himself, that the U.N. Human Rights Commission had come close to completely crashing. That definitely needs to be fixed.

We must address I think the most important governance question in the U.N. system: the composition of the permanent membership of the Security Council. This is an issue that I faced myself, going back to the first Bush administration, when Japan made a very strong case for its becoming a permanent member, a case which has grown even stronger over the years and which Secretary Rice commented on during her recent trip.

There are a lot of very complex and competing claims for changing the composition of the Security Council. It's going to take time to work that out.

I think one rule I hope we can all agree on, one objective to achieve in working on that structure, is that we not make the council less effective than it is now. And that's going to be I think a very arduous task.

I think, just quickly, on the management side, back in the first Bush administration I developed a concept called the Unitary U.N., which was a way of trying to look at the U.N. system as a whole, not bits and pieces, not loosely structured, unconnected specialized agencies, but looking at the system as a whole to try and rationalize its delivery of services, the research that it carries out, the work of the various specialized agencies and funds and programs that, on an organizational chart, are really quite complex.

BOLTON: These are some of the things that I hope to get into, if confirmed. And I think I've had the benefit of, as you mentioned, four years of service as assistant secretary for international organizations and the chance to work for the U.N. on a pro bono basis myself.

LUGAR: Thank you for those responses. My time is up.

And I recognize the distinguished senator from Delaware, Senator Biden.

BIDEN: Thank you very much, Mr. Chairman.

There's a number of things, Mr. Secretary, I'd like to discuss with you. I'm going to try to do it, sort of, in an orderly way.

I will be asking you a number of questions this afternoon and as long as we go about the issue of -- I'm trying to have professionals removed from -- I don't think anybody's ever said you tried to have them fired -- have them removed from your portfolio, I think is the term of art.

Did you ever ask anyone to remove Mr. Westerman from your portfolio?

BOLTON: I think as the interviews that your staff conducted show -- and that's one reason why I want to get them all out in public -- we believe Mr. Westerman had behaved in an underhanded fashion.

And I think I -- as my assistant mentioned to you staff, I said to him at the time, "I don't care if you disagree with me. Just don't do it behind my back."

I mentioned it...

BIDEN: But that's not my question. I only have 10 minutes, so I don't want you to be a senator and filibuster me.

Did you attempt to have him removed from your portfolio?

BOLTON: I mentioned it to Mr. Fingar. I may have mentioned it to one or two other people. But then I shrugged my shoulders and I moved on. He was...

BIDEN: So the answer is yes, you did.

BOLTON: And he was not moved and I did not...

BIDEN: OK, that's all -- I just want to make sure we're talking about the same thing.

Let me talk about the U.N. I'll go back...

BOLTON: I in no sense sought to have any discipline imposed on Mr. Westerman.

BIDEN: Other than removed from your portfolio?

BOLTON: No, I said to at least one of his supervisors that I specifically had no intention whatever to cause him any ill will.

BIDEN: I'm not suggesting that...

BOLTON: But I'd lost trust and confidence in him. And I think in any professional relationship, you need trust and confidence.

BIDEN: No, I got that. I just want to make sure our terminologies -- we're all using the same terminology when I talk about this with you this afternoon.

But let me speak about the U.N. if I may for a moment.

As you know, Chairman Lugar and I have been working to improve the federal civilian response to post-conflict reconstruction stabilization crises that we now face and we'll face in the future. And we strongly support the new Office of the Coordinator for Reconstruction and Stabilization in the State Department, which really the overwhelming credit should go to my colleague from Indiana.

The mission statement of that office outlines, and I quote, "failing and post-conflict states pose one of the greatest national and international security challenges of our day. Struggling states can provide breeding grounds for terrorism, crime, trafficking and human catastrophes and can destabilize an entire region."

Now, that's the mission statement of the office.

You have stated on the record, unrelated to that office, before -- and as a matter of fact, in your capacity -- well, I believe the date was in '97, you said, quote, "What should be relegated to history's junk pile at the first opportunity is this chimerical Clinton notion of U.N.," quote, "peaceful enforcement in nation- building and enlargement. Those unworldly concepts have resulted in American personnel and resources being committed to U.N. operations far removed from vital American interests."

And that was in "The Creation, Rise and Fall of the United Nations," a speech I believe you delivered.

How do you define, in that context, America's vital interests?

BOLTON: Well, I don't think you have that quote accurately, Senator, but I won't...

(CROSSTALK)

BIDEN: Well, no, that's very important. I do not want to in any way misrepresent what you say. Let's get everything really straight.

BOLTON: And I would say...

BIDEN: With all due respect, I don't want to put you in a spot, say something you didn't say.

"Creation, Fall and Rise of the United Nations," John R. Bolton, when was the speech made?

(CROSSTALK)

BIDEN: And what's the name of the book?

Chapter three of a book entitled, "Delusions of Grandeur." And I want to read it again.

It says, "Traditional peacekeeping, together with the often important role of agencies of the U.N. system, play in international delivery of humanitarian assistance can work and should be continued. Although peacekeeping has had only limited use throughout much of the U.N. history, it is an option that we should preserve for appropriate use, such as the U.N. disengagement observer force along the Golan Heights between Israel and Syria.

"What should be relegated to history's junk pile at the first opportunity, however, are chimerical Clinton notions of U.N." -- internal quotes -- "'peace enforcement, nation building and enlargement.' Those unworldly concepts have resulted in American personnel and resources being committed to U.N. operations far removed from vital American interest. These concepts are based on misreadings of what happened in the world and in the U.N. in the late '80s and early '90s," end of quote.

Now, my question to you is -- here's the cover title of the book, "Delusions of Grandeur: The United Nations and Global Intervention," edited by Ted Galen Carpenter, "Why We Shouldn't Give the U.N. More Power," Cato, 1997.

BIDEN: Now, my question is to you -- and I'm going to run out of time very quickly obviously -- and let me be more precise.

The United States strongly endorses the recent U.N. Security Council resolution to send 10,000 U.N. peacekeepers to Sudan to support north-south peace agreement. Is this an example of an operation far removed from the vital interests of the United States?

BOLTON: Absolutely not.

And in fact, in the passage you read, the second time you read, you referred -- you read what I had written about the historical effectiveness of U.N. peacekeeping operations, citing the example of the U.N. disengagement observer force along the Golan Heights.

At least part of the distinction I was making there was between peacekeeping, as that term has been historically defined in U.N. operations, and peace enforcement.

Traditionally, peacekeeping relies on the consent of the parties to the conflict, the consent to U.N. involvement and U.N. neutrality as between the parties, and the very limited rules of engagement for the peacekeepers: essentially being authorized to use force only as a means of self-defense.

By contrast, peace enforcement, as envisioned conceptually, would give U.N. forces a role without the consent of the parties; the U.N. would not act in a neutral fashion; and the U.N.'s rules of engagement would be much more robust.

BIDEN: Which is the situation...

BOLTON: The situation in the Sudan is a peacekeeping role as traditionally defined.

We have a historic agreement between the government in Khartoum and the rebels in the south that Senator Danforth and many others worked on. The force to be deployed pursuant to the recently adopted resolution, I would say is clearly a traditional U.N. peacekeeping operation.

BIDEN: Now, is that -- do you support it or not?

I thought you said peacekeeping and peace -- what's the other alternative?

BOLTON: The analytical terms that are...

BIDEN: Enforcement, right?

BOLTON: ... implied are...

BIDEN: Keeping and enforcing.

BOLTON: ... peacekeeping versus peace enforcement, and those imply separate kinds of operations.

The force to be deployed in Sudan is a peacekeeping force.

BIDEN: And do you support the peacekeepers?

BOLTON: Absolutely.

BIDEN: If it had been a peace enforcement operation?

BOLTON: Well, I think that's a hypothetical, because...

BIDEN: OK, let's take Kosovo.

(CROSSTALK)

BIDEN: Let's take Kosovo.

Now, it didn't involve the U.N.; it involved NATO in terms of Kosovo. That was a -- would that be -- if that had been a U.N. operation, would that have been called a peace enforcement operation?

BOLTON: That would have been called peace enforcement, I think. That's correct. And I think that's one reason why it never achieved the approval of the Security Council.

BIDEN: That's true. Now, would you not have supported that?

BOLTON: I did not feel at the time that that was an appropriate action.

BIDEN: What was the U.N. role in Korea? Was that peace enforcement or peacekeeping?

BOLTON: Well, that was very definitely a kind of peace enforcement, but one that the U.N. has only engaged in, essentially, twice in its history. Once in Korea, when the authorization to use force was adopted because the Soviet Union was boycotting the Security Council in protest of the continued presence of the Republic of China holding the Chinese permanent seat.

When the Russian Soviets realized that their absence from the council and their inability to veto resolutions was allowing coalition resistance to the North Korean invasion, they returned, and that ended the effectiveness of the Security Council in the Korean incident.

The second, of course, was in the first President Bush's administration, and the immediate aftermath of the Iraqi invasion of Kuwait, when President Bush and Secretary Baker led the successful effort, through a series of Security Council resolutions ultimately resulting in Resolution 678, which was only the second authorization to use force in U.N. Security Council history.

BIDEN: So when you say that -- is peace enforcement associated with nation-building?

BOLTON: No, I think it's a very separate concept.

BIDEN: And so the peace enforcement and nation-building and enlargement are things we should stay out of -- not be involved with at the United Nations, is that right?

BOLTON: I think they're very separate contexts. I was writing, at that point, specifically critiquing the Clinton administration policy, yes, sir.

BIDEN: I'll come back to that. Thank you very much.

LUGAR: I thank you, Senator Biden.

Senator Hagel?

HAGEL: Mr. Chairman, thank you.

Secretary Bolton, welcome. Thank you for agreeing to take on a big job, if this committee and the United States Senate work its will and send you to that big job.

HAGEL: We appreciate what you're doing.

I have been a United States senator who has strongly supported the United Nations. It's an imperfect institution, like all institutions are, but if the world had not had this body over the last almost 60 years, I don't think we would have seen the kind of progress in the world that we've seen that's occurred in a complicated post- World War II community.

Much yet to be accomplished. And you noted some of those challenges in your statement.

But the entire purpose, the focus on the United Nations, as you have also alluded to, was to bring the world community together in common purpose to deal with common challenges in a common-interest way. Hasn't always worked. Been difficulties.

Obviously, reform is a dimension of institutions -- every institution -- that is always in play.

And I want to start with the reform part of this, and then work our way down into a couple of specific questions I have for you.

You noted in your four principles -- which I agree with -- where you would focus your priorities, where America should focus its priorities, working with our allies at the United Nations. And you talk about reform, you talk about the secretary general, who you have a relationship with.

Give me some sense of the larger context of reforming that institution, without getting into a lot of the specifics, because I suspect we will get into those when Senator Coleman's time is here.

HAGEL: We will talk about oil-for-food and other issues.

But I'm interested in your philosophy about the future of the United Nations. How should it be reformed? Less power? More power? More engagement? Less engagement?

Give this committee some sense of your own feeling about that issue.

BOLTON: Well, I think that there's enormous potential in the institution that is often not allowed to be developed, in part because of the attitude of member governments.

And this is one of the points, I suppose, will come a little bit later in some statements I've made over the years. But I alluded t

BIDEN: And Tom Fingar is boss on Westerman, he has quoted to you -- the assistant secretary of state did this morning. Let me read for the record what Mr. Fingar says about Mr. Westerman:

"Question of staff: Did INR keep Mr. Westerman on the account because you had confidence in his ability to perform the job?

"Fingar: Yes.

"Staff: So there was nothing about the incident in February when Bolton tried to have Westerman removed from his job that caused INR management to lose confidence in Mr. Westerman as an analyst or in his integrity as an employee of the State Department?

"Fingar: None, whatsoever.

"Staff: Do you have the impression of how Mr. Westerman is regarded both by his colleagues at INR and by his colleagues in the larger intelligence community with whom he interacts?

"Fingar: By everything I know, he's highly regarded. Certainly the NIO" -- National Intelligence Officer -- "for strategic systems who then picked up the WMD account, Bob Walpole (ph), pled with me, twisted my arm over an extended period, for me to persuade Christian" -- that's Westerman -- "to accept the invitation that had been extended to Westerman to become the deputy national intelligence officer for CWBW.

"Staff: Is it fair to say that it was an offer that would be made only to someone who is held in high esteem by the national intelligence officer?

"Fingar: Absolutely. The position would have been the intelligence community's ranking analyst on CBW."

I realize my time is up, but I'm going to come back at the appropriate time, Mr. Chairman, and to into some considerable detail as to what appear to be differing interpretations and differing assertions relative to what Mr. Westerman did and whether the reason asserted by Mr. Bolton as to why he lost confidence is accurate, and what he did or didn't do after he reached the conclusion he no longer had confidence in Mr. Westerman and the NIO officer, whose name we cannot reveal -- because he is in a covered position right now -- is also -- I'm going to speak to that as well.

I'm sorry to take this preliminary time to lay this out, but I want to make it clear that two men of three that we are talking about here are men who have impeccable reputations and have made assertions fundamentally at odds with what Mr. Bolton is saying, based upon the testimony taken by staff, to the best of my knowledge and recollection, as made available to me by staff.

BIDEN: And I thank you.

LUGAR: I thank the senator.

Senator Chafee?

CHAFEE: Well thank you, Mr. Chairman. Maybe I'll yield some of my time to have Mr. Bolton at least respond in some way to Senator Biden before I ask a question.

BOLTON: Thank you, Senator. Go ahead. I'd try to respond to your questions, and I'm sure Senator Biden will ask me again.

CHAFEE: I give you the opportunity one more time.

BOLTON: OK. Well, then I'll just say one thing -- thank you, by the way -- the report from the Senate Select Committee on Intelligence, on pages 277 to 279, covers the Westerman question.

And I'll just quote from the conclusion of the Senate Select Committee on Intelligence, in dealing with stories about five individuals, one of whom was Mr. Westerman, and the SSCI said, "None of these individuals provided any information to the committee that showed that policy-makers had attempted to coerce, influence or pressure analysts to change their analysis or that any intelligence analysts changed their intelligence judgments as a result of political pressure."

BIDEN: Will the senator yield for a brief comment?

CHAFEE: Brief comment, yes.

BIDEN: The Select Committee on Intelligence possesses only a handful of documents. They interviewed only the INR analyst, Mr. Westerman.

The Select Committee did not interview the analyst's supervisor or people under the secretary's office. They did not review any original documents from the department except two electronic messages sent to the Select Committee by a member of Undersecretary Bolton's staff as part of a process for a fact-checking of a draft report.

And the staff of the SSCI itself agrees that their review is limited for the simple reason that the main focus of their effort was pre-war intelligence about Iraq.

BOLTON: If you give me one more chance to respond...

CHAFEE: That's why I said this morning, let's make this all public. Let's put all these interviews, let's put everything out.

BIDEN: I agree. I'd ask unanimous consent we do that.

LUGAR: Well, unanimous consent is granted. Given the fact that, obviously, the committee would not wish to declassify material, we would exempt those persons and those documents that have classification.

BOXER: Mr. Chairman?

LUGAR: But those things that are part of the open period...

BOXER: Mr. Chairman, on this point...

BIDEN: Mr. Chairman, one of the problems with that, some of those documents that came up here unclassified have now been stamped classified. So some of the very -- we're going to have to go back -- you're going to have to look at some of these things and go back and trace this a little bit to make sure we're not excluding documents from being on the record that would otherwise have been allowed to been on a few days ago.

LUGAR: Well, I'd respond to the senator by saying, clearly members who are cleared, and we all are, staff who are cleared, will have an opportunity to examine those documents. But the request was for general public publication, and I'm indicating those documents that are not classified would be published.

CHAFEE: Maybe I could go beyond that, because I think there are some of the classified documents I would seek to have declassified, frankly.

BIDEN: Well, they're State Department documents. You could help us in that regard by contacting State Department. We have no authority to declassify documents they sent to us classified.

We can immediately, with your permission, Mr. Chairman, release the transcript of and the notes on all the interviews conducted by each of the individuals we have interviewed. We can do that. But we cannot declassify memos sent to us or documents sent to us by the State Department that they mark classified.

LUGAR: And let the record show, these were unclassified documents until we made the request.

BOXER: Mr. Chairman, parliamentary inquiry, if I might.

LUGAR: Yes.

BOXER: I'm just trying to get a word in because Mr. Bolton, to his credit, says he wants everything on the table. That means we need some time here to interview some of the folks that are deeply involved before we have a vote on this nominee.

And I'm just saying, I hope that, as you work with our ranking member here, you will allow us that opportunity, because there's a couple of people that -- one is in New York, it's hard to get to these people.

But since Mr. Bolton himself says it all should be on the table, and I think we all agree, we're going to need a little time to -- not a lot of time -- find a couple of these people who feel that they have been in a situation where pressure was put upon them by Mr. Bolton. And we need to question them.

LUGAR: Well, the senator makes an excellent point.

Let me just say from the standpoint of the chair that we have attempted to move as expeditiously as possible, to make available, not only to senators and senators' staffs -- and that would be members of staffs who are not part of the official Senate Foreign Relations Committee, Republicans, Democrats. Mr. Bolton has been available.

LUGAR: I'm hopeful that senators have some sense of reason about this, because we clearly could get into a study period that was extensive. And I think in fairness to the president, who needs to have an ambassador at the U.N., and to our witness

today, who aspires to that position, and to the American people who anticipate, we ought to be doing our job.

I appreciate there have been extenuating circumstances of the very important funeral services for John Paul II, which has led to our initial postponement of the hearing which would have occurred last Thursday until today.

We have another hearing tomorrow for Carl Ford, which I gather, because of the nature of the witness, will be back into these issues that are circulating today.

So I would hope that members would avail themselves, at least to the calendar day today and tomorrow to exhaust whatever their curiosity might be.

But I'm hopeful we can pursue, at least, a decision. I think that's very important. And I think most of the American public anticipates that we will do that.

BIDEN: On that point, Mr. Chairman, I want to make it clear.

To the best of our knowledge, there's only two witnesses we have to interview. They're both in the employ of the State Department. They're both able to be made available by the State Department. My staff just told me the one, Mr. Silver, whose name has already been invoked, is not available until tomorrow afternoon.

We had been under the assumption we were prepared to -- I'm not taking issue with that, but just so you know it's not us delaying that, we thought it would be today. It won't be until tomorrow.

And there is one other witness, whom I'd rather not name at the moment. We'd let Mr. Bolton and everybody and you know. I'm not sure whether he is undercover or not. I don't think he is, but I don't want to make a mistake. He's a State Department employee as well.

They're the only two witnesses at this moment, to the best of my knowledge, that the minority is seeking to interview. And they're both within the employ of the State Department. I think both are in- country, if I'm not mistaken.

DODD: Just one caveat, again. There's a third one, Mr. Chairman, who would be someone who is undercover, and it would be highly inappropriate for that individual to testify in a public setting, but has expressed a willingness to testify if he's so directed in a closed session. And I think it might be worthwhile.

BIDEN: Two different issues -- I don't want to confuse this, Mr. Chairman -- one is interviews that have not taken place yet; two is additional witnesses, among those who are interviewed, who may or may not be asked to call or the -- Secretary Bolton may or may not wish to have called.

The State Department may conclude they want Mr. Silver called, because he corroborates what Mr. Bolton said. We may ask Mr. Silver to be called if in fact he says what we think he is going to say but don't know.

But right now, the only two additional witnesses seeking to be interviewed by the minority are both State Department employees.

And among those who have been interviewed, it is possible, although there is no plan at this moment, to ask that one of them testify as Mr. Ford is testifying.

That could all be done immediately. It could be done quickly. This is not next week or two weeks or three weeks down the road. This is all able to be wrapped up very clearly.

And Mr. Bolton's answer to much of what we have when we get a chance to go through it, may satisfy us so there's need to call anymore witnesses.

LUGAR: Well, everyone has had a discussion for the moment of the situation. And let me just indicate that I think we'll want to consult with all members of the committee. I have attempted to be as accommodated as I could for requests that are coming.

But I would just have to say to the senators -- and I am one of these senators -- having read all of the material that has thus far been exhumed, 150 pages in the State Department, an additional measure from the CIA, the interviews with these

five people and maybe six, that I am not impressed with the gravity that is being suggested.

I appreciate an important argument is being made, namely the Iraqi failure of intelligence, and the question of whether this activity by Mr. Bolton, a while back, shows some manifestations of something that was very, very serious: Iraq.

LUGAR: But that is a matter of judgment of senators. So we will all read everything. We will try to get the people as rapidly as possible.

But at some point, we're going to try to bring this to conclusion. And so I hope the members understand that, that there is a disagreement over how grave the alleged offense may have been, and finally, even if it was substantial, whether that would influence a senator's vote for or against Mr. Bolton.

But still, we will try to make available all of the records that are not classified. We will try to make available the classified persons and/or materials as rapidly as possible.

I know Mr. Bolton and the State Department will cooperate in attempting to expedite that situation. And we know we have ahead of us still questioning this afternoon, and then another hearing tomorrow.

But having said this, we're back to Senator Chafee, to reclaim his time.

CHAFEE: Thank you, Mr. Chairman.

Continuing on the same theme, maybe if you could detach yourself, if possible, from this furor about influence over individuals and the threatening of their positions -- if you could detach yourself, how seriously are these accusations, what do you think, in the abstract?

BOLTON: Well I think, fundamentally, there's nothing there.

The issue here has nothing to do with intelligence analysis, has nothing to do with the substantive positions taken by either of the two individuals in question, has nothing to do with whether they agree or disagree with me on what I said about

Cuba's B.W. efforts.

It has nothing to do with the political construct about the allegations about political pressure on analysts dealing with Iraq. It has nothing to do with that at all.

It has to do with a question of straightforward behavior and open and honest dealings.

And, you know, as I said earlier this morning, when you lose trust and confidence in somebody, in a professional environment, it's a problem -- and especially when it's in the intelligence area.

I didn't seek to have these people fired. I didn't seek to have discipline imposed on them. I said, "I've lost trust in them."

BOLTON: And other portfolios they could follow -- it wasn't anything to me that I followed at great length. I made my point and I moved on.

If I could just address one thing that we referred to this other analyst at the CIA -- whom I'll try and call Mr. Smith here, I hope I can keep that straight -- you know, the other analyst, Mr. Smith, I'd never even heard of him. I didn't know who he was until after the Heritage speech.

When I heard that somehow he was saying he hadn't been involved in the clearance process, as a member of the National Intelligence Council, I said I'd never heard of this individual; I didn't know his name. I frankly didn't understand what the National Intelligence Council did.

I checked with the CIA and they said, indeed, they had cleared the speech with the national intelligence officer for science and technology, who has cognizance over biological warfare issues and therefore was the right NIO to clear.

But I heard all these things and I said, I'm a State Department person, I don't fully understand. I want to go out and talk to the gentleman who at that point was the chairman, or maybe he was the acting chairman, of the National Intelligence Council and find out what this instrument was.

So I went out basically to pay a courtesy call on Mr. Cohen, and it's true, as Senator Biden has found out, that I drove my own car out there. I have to make a confession here, the CIA is sort of more or less on the way home for me.

And from time to time, when I've gone out there I have driven my own car, I've had my meetings, and then I hate to say this, but I left and went home. I didn't go back to my office.

I went out to pay a courtesy call. And my recollection is the bulk of the meeting was composed of Mr. Cohen explaining to me what the NIC did and told me what their publications were and how it had been created and gave me some background on it.

I also knew that, really, in the weeks and months previous there, too, dealing with this Mr. Smith, Otto Reich, who was the assistant secretary of state for Western Hemisphere affairs, had told me and told others he had very grave problems with Mr. Smith on a range of issues -- Cuba B.W. being one of the least of his concerns -- and dealing not just with Cuba but with other matters, and that he had told Mr. Cohen he thought that he was not satisfied with Mr. Smith's performance.

BOLTON: And I think I said to Mr. Cohen, Stuart Cohen, in the course of the conversation, that based on what I had seen in my limited area, that I agreed with that.

And then that was it. I had one part of one conversation with one person one time on Mr. Smith, and that was it. I let it go.

CHAFEE: I'll try and rephrase my question.

If you remove yourself, the personal involvement, and the facts of personally being involved in this incident -- incidents -- I think the accusation from your opponents is that trying to influence people to change their assessments, which they didn't believe, to change their assessments, essentially falsifying evidence, with the threat to their job, do you see it that way?

And how serious do you feel these accusations are, not to you personally, but just as someone that's applying to be the ambassador do whatever, in this case the United Nations, but it could be for any promotion?

BOLTON: I think that is part of the allegation. It's false. I have never tried...

CHAFEE: But it's serious, if it were true.

BOLTON: ... to do that. I think intelligence analysts should give their honest assessment. I have tried in four years in this job -- in fact, that's something that I've seen in the press -- to get as much intelligence as I could from as many different sources as I could.

I brought in from the CIA and put on my staff an intelligence analyst, precisely so that I would have better access to the broader intelligence community.

I've probably met dozens, scores, maybe hundreds of intelligence analysts in the course of my four years. I've gone out to NSA. I've gone out to CIA. I've met with people involved in intelligence activities at the Los Alamos and Sandia and Lawrence Livermore Laboratories. I've talked to them in my office.

I welcome the interchange. I respect the positions they take. I think it's critically important to the formation of American foreign policy. And I've never tried to change anybody's position through any kind of improper influence or pressure.

BOLTON: It's not my style. My style is to say, "Here's what I think. What do you think?"

CHAFEE: Very good. Thank you.

I'll change tacks a little bit. In the morning session, you, I believe, correct me if I'm wrong, said you don't necessarily criticize the United Nations through the years. It's been our role -- the United States' role. Do I have that right?

BOLTON: Yes, that's correct.

CHAFEE: And then said we did not exhibit good leadership in the '90s. Do I have that right?

BOLTON: That's correct.

CHAFEE: Can you be more specific of our failure through the '90s?

BOLTON: Senator, through roughly the late 1980s, I think it is fair to say that the Security Council was gridlocked by the Cold War, in fact, gridlocked almost from its formation in 1945.

In the mid- and late-1980s as what was called, "new thinking" developed in Soviet foreign policy, the possibilities that that gridlock could be broken in the Security Council began to be apparent.

And it was, as was almost always the case in the Security Council, what became possible there was a reflection of changes in the larger geostrategic environment.

So that in the Soviet Union, as I say, new thinking was beginning to play out, and policy-makers began to look at their foreign policy through the interests of the Soviet Union, as opposed to the prism of Communists philosophy.

And they began to say, "What exactly are our interests from a Soviet point of view in Angola? Why exactly are we subsidizing Cuba through the barter of oil at well below market prices?" And to be candid, "What is this from a Russian point of view that's really involved here?"

So that in the late 1980s a number of new peacekeeping operations became possible in areas that had been cockpits of Cold War conflict.

And I can think specifically of the case of the link between Namibia and Angola, whereby very effective diplomacy on the part of the United States and others -- myself not involved, I should say -- we were able to work out in Angola, the withdrawal of Cuban forces, and the first free and fair election in Namibia on a multiracial basis.

BOLTON: This was an example of the Soviet Union, as it was still then, through Russia, playing out a normal nation's foreign policy. And the real test of that occurred at the time of the Iraq invasion of Kuwait when -- I remember distinctly,

Jim Baker, I think, was hunting in Mongolia, and instead of coming home he went to Moscow.

And he and Shevardnadze worked out a very important statement in opposition to Iraq's invasion of Kuwait that was the fundamental basis for the cooperation between the Soviet Union, as it was still then, and the United States in the Security Council, that was the first really major manifestation of the end of Security Council gridlock after the Cold War and the whole series of Iraq-related resolutions in the Council.

It was a very optimistic time. And I think I mentioned earlier, we set up other peacekeeping operations, MINERSO in the Western Sahara in the late spring or early summer of 1991.

And I think this optimism was misread by many people, unfortunately, to believe that somehow the United Nations was back in 1945 and that a lot of the constraints that unfortunately still existed had disappeared. And that led to the United Nations being put into a lot of situations where, frankly, there was no clear political resolution in sight. Member governments didn't provide adequate support. The United Nations didn't have adequate guidance. And it did not contribute to a resolution of threats to international peace and security.

In many respects, the handing over of these kinds of disputes to the U.N. was a way for some policy-makers to say, "That's off my plate."

And I think it was dereliction in the responsibility of member governments to do that. And it led to what many people called failures by the United Nations.

That's why I come back to my point about false concreteness. Those are failures by member governments, not directly due to mistakes by the secretariat, but by policies that the members governments have created.

I think now we've got both the opportunity and the responsibility -- in a way, I can see almost going back to the days right after the successful resolutions in Iraq in the early 1990s and seeing if we can't avoid the mistakes that were made.

BOLTON: It's always easy in hindsight to see the mistakes. We should at least try to benefit from them. That, I think, is the attitude that President Bush brings to this question about how to move the U.N. forward.

CHAFEE: Great, thank you very much.

LUGAR: Thank you very much, Senator Chafee.

Senator Dodd?

DODD: Thank you, Mr. Chairman.

And let me begin, if I can -- I want to, first of all, thank you for your comments this afternoon on how we ought to proceed. And I think all of us here have no problem with that whatsoever. This is not a delaying tactic at all, but rally trying to get to the bottom of the issues.

And I -- by the way, if we wish to delay, under Senate rules, we could call for the hearing to end right now. Because the Senate's in sessions, and you can't go two hours beyond a senate that's in session.

I offer that as evidence of the fact that we have no desire to delay.

So I thank you for that. And you all agree with that.

Secondly, I want to thank you for your statement this morning. Your opening statement, Mr. Chairman, as always, are just excellent and ones that I couldn't agree with more, particularly some of your closing words here, because I think they, in a sense, go to the heart of what our colleague from Illinois raised with his questions at the end of the session this morning about this particular point that's causing some of us to have some real concerns about, and that is the -- as I quote from your opening comments here this morning -- "diplomatic speech by any high-ranking administration official has policy consequences. It should never be undertaken simply to score some international debating points to appeal to segments of U.S. public opinion or to validate a personal point of view."

And you quoted President Kenned who once said, and you quoted him: "The purpose of foreign policy is not to provide an outlet for our own sentiments or hopes or indignations it is to shape events in the real world," end of quote. It's an excellent statement to have as we talk about the subject matter.

So I want to make that statement again.

The point is, there's nothing at all wrong for any official, Mr. Bolton or anyone else for that matter, to stand up and give a speech and say what they believe to be the case.

I believe, in this particular case -- the issue was about Cuba at the time. I believe that Cuba has biological weapons. He has every right in the work to do that, though you may disagree with him.

The problem occurs when a Mr. Bolton or anyone else in the government gets up and says what the U.S. believes. And you go to the intelligence community to get corroboration. And that's what this is really all about.

DODD: Just so it's on the record, I'll ask unanimous consent that this language be included in the record.

What Mr. Bolton wanted to say in February of 2002 is the following, quote: "The analyst" -- where is it here? That's the...

BIDEN: Senate Intelligence Committee report.

(CROSSTALK)

DODD: This is the proposed cleared text from the Senate Intelligence Committee.

BIDEN: That's the actual language from the -- the Senate Intelligence Committee looked into this matter. In their report, this is what they said.

DODD: Here's the sentence, the sentence which said: "The United States believes that Cuba has a developmental offensive biological warfare program and is providing assistance to other rogue state programs." The text also called for international observers.

What was approved, what Mr. Westerman suggested, he said, is the United States believes that Cuba...

(CROSSTALK)

DODD: That was the ultimate approved.

(UNKNOWN): Yes, but that was not Mr. Westerman's language.

DODD: All right. But this is what was ultimately approved.

(UNKNOWN): Right.

DODD: What was ultimately approved was that, "Cuba has at least a limited offensive biological warfare research and development effort.

"Cuba has provided dual-use biotechnology to other rogue states. We're concerned that such technology could support B.W. programs in those states. We call on Cuba to cease all biological applicable cooperation with rogue states and to comply fully with all of its obligations under the Biological Weapons Convention," end of quote.

Now, it may not sound like a big difference to those who have just heard this. There are significant differences. One is, of course, what the U.S. believes, and that's the important point here.

Now, the salient differences are, one, "limited," the word "limited," which is not insignificant; "Research and development" instead of "developmental program," which have implied a far more structured activity; "Cuba has provided dual-use technology that could support B.W. programs." That's a carefully caveated phrase, obviously, rather than, "is providing assistance to other rogue states." And it deleted any reference to inspections if the U.S. government believes it would be ineffective and does not warrant or create a precedent for inspections there.

So there is a difference, a significant difference that's important to note.

Let me state also -- I think some of my colleagues may have made this point as well -- if this were a one-time event, you might be upset about it, but I don't think it would warrant necessarily taking the time of this committee or the confirmation

process.

DODD: All of us have been in situations where staffs or others have said or done things that we disagreed with, that we might have said or done things that in retrospect were probably not terribly wise.

The question is: Is there a pattern here, Mr. Bolton? And that's what's worried many of us here. And so that's why we raise these issues.

Again, this morning, we're quoting here -- I'm quoting from these interviews that occurred just a few days ago. Mr. Flights (ph): "All I can remember," and this is from Mr. Bolton, I'm quoting him now, "is that he spoke to Mr. Fingar to express his concern over what happened and said that Mr. Westerman has lost his confidence and he should have been given a new portfolio."

Mr. Thalis (ph) again, "When Silver was there, Bolton relayed the fact that he had lost confidence in Mr. Westerman and asked that he be given a different portfolio." That's in September.

Mr. Fingar, who I mentioned this morning, is the assistant secretary of state for INR, again, being interviewed, "Bolton said that he wanted Westerman taken off his accounts." He said -- that is, Fingar said -- "he's our chemical weapons-biological weapons specialist. That is what he does."

"He expressed again," Mr. Fingar speaking -- Mr. Bolton said -- "he expressed again, as I remember it, that he was the president's appointee and he could say what he wanted," end of quote, Mr. Fingar.

Let me add here, and I'm going to ask you whether or not you recall saying this at all, but when asked Mr. Fingar what Mr. Bolton had to say about Westerman, Mr. Fingar said, and I quote him again, in the interview several days ago, quote that, "He was the president's" -- talking about you -- "appointee, that he had every right to say what he believed, that he wasn't going to be told what he could say by a mid-level INR munchkin analyst," end of quote.

Then there's several others here, but it just seems to be here you've got a number of people now who believe that you were so upset with what Mr. Westerman was doing that you wanted him removed. And that's my concern.

Even if you were right about the substance, in this case -- it's not the case, I think it ultimately proved that the INR's assessment was a more appropriate assessment on what Cuba's situation was -- but even if you were right and they were wrong, the point that Senator Obama made this morning, the point the chairman made in his opening comments: It is deeply disturbing to me, in the environment we're in, where it is so important for those of us who sit on this side of the table, for those of you who sit on the side of the table you're on, that we have factual information coming from out intelligence community.

And if at any point we begin to suspect that that information is being tailored to serve what Senator Lugar talked about this morning, a personal point of view, then I think it's dangerous. And that's why we're spending so much time on this.

BOLTON: May I respond?

DODD: Absolutely.

BOLTON: Senator, he wasn't straight with me. And that's what I...

(CROSSTALK)

DODD: This is a good one. Tell me about the process in this.

As I understand the process, you tell me where I'm wrong -- that your office says to them, "This is what we want to say," the three sentences. And that they then -- it would come back to Mr. Westerman anyway at some point, to make a determination as to whether or not that was right or not.

Where's the backstabbing here -- if in fact he sends the language he would suggest to you? How is that backstabbing you?

BOLTON: Senator, I don't know the ins and outs of the process. I don't pretend to. It is what staff does. I'm not an expert on it.

That's why, as I said this morning, and I don't really have anything to add to what I said this morning, but it's why I went to Mr. Fingar and said, "What's going on here?"

And at the time, the day of the incident, Mr. Fingar said that Westerman's behavior was, quote, "entirely inappropriate," close quote. He said, quote, "We screwed up," close quote. And he said twice, "It won't happen again."

I didn't try to have...

DODD: Would you recall...

BOLTON: ... Mr. Westerman removed.

DODD: Do you recall saying to Mr. Fingar that you were the president's appointee and you had every right to say what you wanted to.

BOLTON: No, I don't recall the conversation in any substance. What I wanted to know was what exactly had happened. I wanted to know why this process was happening the way it was. I wanted to hear from somebody at the top of INR. And that's what Mr. Fingar said back to me.

But I did not -- look, I didn't try to have disciplinary action imposed on Westerman.

BOLTON: I just didn't feel that he had been straight with me.

And I don't know what INR did. Apparently, they didn't do anything. I haven't complained about it since then. I made my point.

(CROSSTALK)

BIDEN: Will the senator yield?

DODD: (OFF-MIKE)

BIDEN: Mr. Secretary, you say you don't know this clearance process for a speech, after all of the years.

BOLTON: No. No. What I said was -- I thought what Senator Dodd was asking was: Who had done what to whom at the staff level? And I don't know...

(CROSSTALK)

BIDEN: I didn't think that -- I thought you were asking how something gets cleared in a speech. You send it to your guy at INR. The INR guy then sends it to the CIA. The CIA then circulates it throughout the entire intelligence community. Each of those people, including the guy who heads up INR, get back to them and say, this is good or bad or indifferent. Then it gets back to you. That's the process, right?

BOLTON; Well, I think, as I've learned now, that's what the process is. It's also possible, because INR is part of the State Department, that INR could have, at a staff level, come to us first before they had done that.

I thought that he had gone behind my back. That's why I asked Mr. Fingar. And I thought Mr. Fingar's response, that the behavior was entirely inappropriate supported...

(CROSSTALK)

DODD: You know what Mr. Fingar said today.

BOLTON: I knew what he said at the time.

(CROSSTALK)

DODD: Most recently, you know what he said. I went over that this morning.

But let me tell you what Mr. Westerman said, because he was asked by the committee the last couple of days. He's quoting again. He said, "He," speaking about you, Mr. Bolton, "was quite upset that I had objected. And he wanted to know what right I had trying to change an undersecretary's language and what he would say or not say on something like that.

"And I tried to explain to him a little bit of the same thing about the process and how we clear language, and I guess wasn't really in a mood to listen. And he was quite angry and basically told me that I had no right to do that.

"And he got very red in the face. And shaking his finger at me and explained to me that I was acting way beyond my position and for someone who worked for him.

"I told him, 'I didn't work for him.'"

He goes on to talk about waving your finger at him and so forth.

His recollection is not you saying that, "You went around my back. You should have come to me," and so forth, which I think they did in the e-mails exchanged. But his point is you didn't say that. You said he had no right to correct your language. You were the undersecretary. He's just a mid-level analyst. Who is he to be telling a presidential appointee what to say?

BOLTON: That's why I called Mr. Fingar.

DODD: But did you say this or not?

BOLTON: I don't recall saying that. What I recall saying was that he was out of line and that he had gone behind my back. And I said, "I don't care if you disagree with me. I just think you shouldn't do it behind my back."

DODD: Let me ask you again about the -- because I say, if this were one event -- and I'll be the first to tell you, you probably shouldn't have done this. But I wouldn't spend 30 seconds on this issue.

But what concerns me is there's the second incident that we have involving Mr. Smith, as you've called him, our unnamed intelligence officer.

LUGAR: Christopher, would you summarize this?

DODD: Oh, I'm sorry. I apologize.

(CROSSTALK)

DODD: Well, just there, again, the question arises because, again, we've had testimony from this individual, from people at the agency that in fact you and Otto Reich both went out to the agency and raised the issue about whether or not this individual is going to be removed as an intelligence officer for Latin America?

DODD: Did that or not happen?

BOLTON: I went out to the agency to meet with Mr. Cohen to get an understanding of what the NIC was and to follow up on trying to get a better understanding of how the clearance process was.

And I mentioned, as I said before, that I had lost confidence in Mr. Smith and that I knew Otto Reich had been out there before on a much larger series of concerns.

I can't really speak to those concerns because they weren't in my area of responsibility.

LUGAR: Thank you very much.

DODD: Mr. Chairman, just so the record is clear, Mr. Cohen was visited by Otto Reich at the office on Friday afternoon in 2002. Reich wanted to make the case for moving the NIO for Latin America from his position. He presented two lines of arguments and said he was speaking not only on his own behalf, but on behalf of Mr. Bolton. Otto Reich has said this again in public publications, that that's what he was there for.

A week later, Mr. Bolton called and asked to meet Mr. Cohen as well, traveled to the agency on his way home or whatever. The case is here. Cohen did not recall specifics, but believed his intent was clear. This is Mr. Cohen now, this is another -- I mean, there's all these people lining up here.

I mean, at some point you got to say, these are not enemies of yours that are doing this. Mr. Cohen said intent was clear: namely, he wanted the NIO removed. Cohen described both meetings as amicable, but you wanted him removed.

That's what worries me: Exactly the point Barack Obama made about credible intelligence, the point the chairman made in his opening comments. It's a significant issue.

With all due respect to the chairman, I think this is the most profound question.

I, frankly, kind of agree with a lot of your statements about the United Nations, candidly. I think you've been on the mark in many of them. I might disagree with some of the rhetoric you've used, but I don't have a substantive with that.

My problem is this: We're suffering terribly. We're going to send to the U.N. -- we sent the secretary of state to the United Nations to make a case for the presence of weapons of mass destruction.

It was wrong, terrible information. We were damaged terribly by that.

DODD: And if this is true, that you tried to remove an analyst because you disagreed with their conclusions about this, that is going to hurt us further at the United Nations. That's my concern.

BOLTON: If I could just say, I have never done anything in connection with any analyst's views. Nothing.

DODD: Thank you.

LUGAR: Thank you, Senator Dodd.

Senator Allen?

ALLEN: Thank you, Mr. Chairman.

Mr. Bolton, a lot of this has gotten off onto this tangent of this speech. And I find it interesting, this fascination with the process of speech composition.

But I did like to have it somehow relevant to the major issues that you will address as ambassador to the United Nations. And I have a hard time determining how this has anything to do with advancing freedom and democracy.

Senator Dodd mentioned he agreed with all your statements -- your advocacy, your characterization. Maybe he doesn't like some of the adjectives. I like adjectives, and I like your adjectives as well, that you use.

But regardless, the issue is stopping proliferation of weapons of mass destruction. The issues are reducing Russian nuclear warheads, advancing freedom and of course efficiency and accountability at the United Nations.

And trying to figure out -- and I'm glad to hear that we're going to read all this testimony. And I hope it's done quickly, so that we're not off on too long of a detour off the main track here.

And I think that we shouldn't be slowing up a vote on a tangential issue at best.

I'm trying to discern the essence of this concern. And it seems to me, at the end of the day, it's going to come down to Senator Biden, who I have a great deal of respect for, is talking about whether it clouds your judgment or not and the question of credibility, and I think it's probably going to come down to differing interpretations of your loss of confidence or trust in some of these individuals.

And you're saying you never tried to have them change positions. But you do lose confidence in people.

I think all of us from time to time may have that over our lives with some people who are advising us. And you say, "Wait a second. This isn't researched properly." And that's normal. I'm wondering how much it really matters.

Now, it all has gotten down to -- and I hate to get into it, but seeing how this tangent or this issue is important to some members on this committee -- the issue was Cuba's biological capabilities and how they might be transferring it to rogue states. It would be helpful to say which rogue states these are, because I remember we had a briefing on it. And it wasn't absolutely clear, but we knew they had biological weapon capability and they have actually a fairly good biotech infrastructure in Cuba.

And then the question wasn't just the biological and the pharmaceuticals, but which ones of those could be dual-use and which countries -- which were also countries which are on the State Department's list of those that are sponsors of state terrorism -- were involved.

Now, so you could go through all of that and what states we're concerned about, but ultimately would you characterize, in your view, the difference between what you were proferring, as to whether or not that could be stated, versus what was an approved statement. And granted, there were some qualifications.

ALLEN: Senator Dodd said there's a qualification here or there. But in essence, was there all that much of a difference from what you wanted to say?

I know there's a lot of questions in there, but I just wanted to allow you to give your point of view of this particular detour.

BOLTON: I think the main point was that we realized in late 2001 -- that is to say within a couple of months after September the 11th -- that the United States government had not said anything publicly about Cuba's B.W. effort in some time, and that in the wake of September the 11th, where the terrorist attacks had awakened all of us, unfortunately, to how much danger we were in and how much it would have been worse had the terrorists used biological, chemical or nuclear weapons, we had to have a public discussion in the United States about the nature of the threat that we faced.

And I wouldn't have been surprised, frankly, if the intelligence community had said, "We're not going to agree to declassify anything about Cuba," because the nature of the sources and methods was potentially so sensitive that it was simply too risky to do.

This was all in the context of the arrest and then confession and conviction of Ana Belen Mantes as a Cuban spy, who had been the senior Cuba analyst in the Defense Intelligence Agency.

And it's a frightening thing, when you think about it, what she could have been transmitting back to Cuba and what -- I'll just say this in an abstract sense -- if some other country knows a little bit about what we know, their ability to conduct denial and deception activities increases remarkably.

So I felt it was important to discuss this issue and, based on what the intelligence community had already written, we started a process to see what would come out. And I was satisfied with the end result.

Senator Dodd quoted a series of differences. I don't recall those -- I didn't really, frankly, get into the back and forth that was done at the staff level. But I felt the language I used on the Cuba B.W. effort was about right.

And it turned out that...

ALLEN: Are you talking about the -- Senator Dodd quoted the language which was approved, which I assume that you espoused in the speech. Is that right?

BOLTON: That's correct.

ALLEN: Yes.

(CROSSTALK)

DODD: ... review. I quoted the language that Mr. Bolton wanted to use...

ALLEN: And then...

(CROSSTALK)

DODD: ... that was approved.

DODD: And what the differences were between what he wanted to say and what was actually approved to be said -- and the difference is significant.

BOLTON: And I used...

ALLEN: I'm going to ask Mr. Bolton to see -- and there may be, whether you want to call them nuanced differences or qualitative differences of significance, I would like you to share with us whether or not you think that what was ultimately approved, which I assume is what you said in your speech -- I don't think there's any question in that regard -- but how would you characterize the differences in what was approved versus what you had proferred as a general concept to include as part of the speech?

BOLTON: This is sort of a moving process. I'm not sure exactly where it was.

But I was content to have -- I wanted to say what was accurate. I didn't want to go through what we're going through now, and that's why we went through this extensive clearance process.

And I'll tell you, the thing that probably I'll never forget of all this -- when I gave this speech at the Heritage Foundation and it got attention the next day. I talked about a lot of other countries. Cuba was what got attention.

But I was sitting, reading the morning Washington Post the day after the speech, reading through this story about the speech. And I came to the very last paragraph. And what it says is, "As it happens, Bolton was not the first official to make a public statement on the subject. Carl W. Ford, Jr., assistant secretary of state for intelligence and research, used identical language in March 19 congressional testimony that largely went unnoticed."

So that's the language we're talking about. It was used several times by a number of different people. Assistant Secretary Reich, I think, used it. I used it. Assistant Secretary Ford.

DODD: Which language? Can we get that clarified?

ALLEN: Fair enough. The language that we're referring to is again similar to what Senator Dodd...

BOLTON: It's essentially the same. It's essentially the same.

ALLEN: And do you find that to be -- how would you describe the difference between what you said in that speech, which apparently was the same as what others have said in previous speeches.

Folks just pay attention. When you speak, folks listen, which is good. We expect them to in the United Nations, especially when you're representing Americans.

But how would you characterize the difference from what your inquiry was, or your proferred language, versus what was approved?

BOLTON: I think that there were some language changes, but that basically what was eventually cleared was to make the point that Cuba had a research and development effort. And I think that was the point to be made, and I was happy to be able to make it.

ALLEN: Do you see any reason why this discussion on crafting speeches and the process of speeches will have any impact on your ability to assist and lead the United Nations to greater reforms and efficiency or stopping the proliferation of weapons of mass destruction?

BOLTON: I don't think it will have any impact one way or the other, to tell you the truth.

BOLTON: The process of clearances is an important process, and I think when you're speaking on behalf of the United States, you should speak with all of the equities in the government covered. That's what we tried to do in the speech. That's what I've tried to do in all my speeches.

ALLEN: Well, I think we all will. And in fact any intelligence we receive, regardless of party, in the future, we're going to all look at it with greater scrutiny after the information and decisions made on evidence before the military action in Iraq.

But I agree with you, I don't see where this nuanced difference in crafting a speech, stating the same things that have been stated by others, will have any impact whatsoever on your ability to lead this country, and lead also the United Nations toward greater reforms while representing our values and principles.

Thank you, Mr. Chairman.

LUGAR: Thank you very much, Senator Allen.

Senator Kerry?

KERRY: Thank you, Mr. Chairman.

Let me make it clear that this language that's being referred to that other people have said is the approved language. That's what Carl Ford said, the approved language. Carl Ford did not say what you were proposing to say, which was corrected by the review process.

Now, a moment ago you said that the reason that you did the corrective process was to avoid all of this.

That's not accurate. The reason you did the corrective process is because it's standard operating procedure that anything that involves intelligence that is to be spoken by a national public official goes to the intelligence community for review. Correct?

It's normal procedure. Correct?

BOLTON: If it involves intelligence, yes.

KERRY: Correct. Now, let me just...

BOLTON: The clearance procedure is much broader than just clearance in the intelligence community.

KERRY: I understand that. But this paragraph, by normal operational procedure of the department, had to go and be cleared. Correct?

BOLTON: Let me try and separate. We've got two different things that are being talked about here. The first was that the language that we talked about had to be declassified.

BOLTON: Now, once declassified...

KERRY: What I'm getting to is the judgment, the substance, the assessment.

You were proposing to say the words, "developmental offensive biological warfare program" and "is providing assistance to other rogue state programs," implying that the developmental offensive biological warfare program was developmental, not research, but developmental and being provided to other rogue state programs.

Now, substantively, the analyst who worked for you disagreed with you. And you knew that. You knew that ahead of time.

In fact, your own staff chief, Flights (ph), in the interview with the committee said very clearly that -- I think I have it here -- right here -- you summoned Mr. Westerman to your office on February 12th, after you'd learned that he'd expressed INR's objections to parts of what you wanted to say.

And Mr. Flights (ph), who was your chief of staff, requested that Mr. Westerman bring his comment, along with the original language that you proposed, up to your office. And he did so.

And Flights said, I quote Flights, "Well, I sent and e-mail to Mr. Westerman, as I had said. And when he came up to the front office, I had instructions from Mr. Bolton to bring him into Mr. Bolton's office.

"And Christian went into Mr. Bolton's office. And I accompanied him. And Mr. Bolton looked at the e-mail or the document. And he said something like, 'What gives? What did you do?'

"But he didn't defend what he did. He argued on the substance of what we had asked to be declassified."

So it was not procedural, as you said this morning. He disagreed with you on the substance of what you were saying.

Correct?

BOLTON: Let me just say, I had not...

KERRY: Is that correct, or isn't it?

BOLTON: I don't remember the conversation. What I remember was...

KERRY: You don't remember whether he disagreed with you on the substance?

BOLTON: I don't remember enough about the conversation.

KERRY: Well, how can you say that it wasn't substantive the, that it was procedural, if you don't remember.

BOLTON: To me it was procedural. For me he had...

KERRY: What do you mean for you it was procedural. Either it involved substance or it doesn't.

BOLTON: For me it was procedural.

KERRY: I see. The substance of whether or not Cuba had a developmental program versus the substance of whether it's research and how they're helping rogue states is procedural, not substantive?

BOLTON: The process that I was concerned about was to get an honest assessment within the intelligence community of what could be declassified. And I felt that by the method that Westerman had used, he was not being straightforward with me.

(CROSSTALK)

KERRY: Let me go to that right now.

BOLTON: That's why I called Mr. Fingar.

KERRY: Well, it's really at the heart of this. You're smarter than that. And you know what substance is and you know what process is.

What you didn't like was the fact that he disagreed with you.

BOLTON: That's simply not true, Senator.

KERRY: Well, let's get to that.

On February 10th, this is when this took place. And your chief of staff is the one who asked him to go get the clearance. He was following the normal standard procedure, as requested by your chief of staff. And you already knew he disagreed with you.

BOLTON: I did not. I knew...

KERRY: Well, he'd expressed that.

BOLTON: I had no idea.

KERRY: Well, he then followed the instructions of your chief of staff.

Now, your chief of staff said it was necessary to do it in a hurry.

Now, if he follows procedure, he sends it over to the CIA for clearance, and they're going to come back to him and request his opinion. He simply sent his opinion along at the same time, knowing they would come back to him, in order to expedite your request.

Now, he did nothing that was outside of the normal procedures of the State Department in the clearance process.

BOLTON: Mr. Fingar, at the time, said what he had done was entirely inappropriate.

KERRY: Why was it inappropriate?

BOLTON: I went to Tom -- first, I called Carl Ford, the assistant secretary, and...

KERRY: What was inappropriate about putting his opinion that he was going to be asked for anyway?

BOLTON: Then I called Mr. Fingar to say, "What is going on here? Can you explain this to me?"

And I recall Tom saying, "I don't know anything about it," basically, "I'll check and get back to you."

And later in the day, he sent me an e-mail that said, "We screwed up. Westerman's behavior was entirely inappropriate." And he said twice, "It won't happen again."

KERRY: Well, let me just say that the formal process at the State Department is that when there is a proposed text, if it is derived from intelligence information, it's submitted to the State INR bureau. And that was done.

The INR then sends the proposed text to the demarche coordinator in WINPAC, which is the DCI's Weapons Intelligence Nonproliferation and Arms Control Intelligence Center.

KERRY: That's what he did.

WINPAC then sends the proposed text to over a dozen intelligence community offices, one of which would have been Mr. Westerman for his opinion, only he sent it right up front, including any relevant national intelligence officers, for their review and clearance.

The intelligence community considered whether the proposed text would expose sensitive intelligence sources and methods and whether if it cites U.S. intelligence, it is consistent with U.S. intelligence analysis.

Now, this is not a one-time incident, which is what disturbs us.

BIDEN: Will the senator yield?

The whole intelligence community reached the same conclusion. Correct?

KERRY: Correct. The whole intelligence community came to the same conclusion as Mr. Westerman, a 23-year veteran of the Navy, who had no other purpose here except to be accurate.

And you -- and this will come out more -- were not in accord with his judgment.

Now, subsequent to that, you said this morning that you had this one confrontation with him and you dropped the matter. This was February.

But in fact, with Mr. Smith, NIO officer, you had another confrontation on this issue of intelligence. Why? Because the speech that you wound up giving to the Heritage Foundation caused a stir. Senator Dodd was going to have a hearing.

In the process, you sent that speech around -- or you were planning a statement that was going to be made to the committee. You sent that statement around to the various intelligence community entities to get it cleared. And it couldn't get cleared, because you were making statements in that testimony that were not in accord with the judgments of the intelligence community.

In the end, you didn't appear and the hearing didn't take place, because the secretary didn't allow your appearance, I believe.

And subsequent to that, in July, you didn't let it drop. You in fact went out there in your own car and expressed your displeasure with the intelligence community that wouldn't ratify your judgments which were, in effect, wrong.

Now that's an accurate reflection of the timetable and the sequence of events here, is it not?

BOLTON: It is not.

KERRY: Well, tell me where we're wrong.

You didn't go out in July?

Let's just review it. Did you go out in July in your car?

BOLTON: I don't recall when I met with Mr. Cohen.

KERRY: If I tell you if was in fact in July, would you accept that?

BOLTON: I don't have any reasons to accept it or reject it. I just don't know.

KERRY: Maybe you could check your calendar. But for the purposes of this, we'll say it is July. And I believe the record will show it is July.

Now, the purpose of going out there was to complain, as you did, did you not?

BOLTON: That was not the purpose.

KERRY: Well, it's what you did.

BOLTON: The purpose of the meeting with Mr. Cohen was a courtesy call on him in his capacity as chairman.

KERRY: But you hadn't let the matter drop. It was in your head. And you raised your displeasure with the intelligence judgments. Correct?

BOLTON: I wanted to find out more about what the NIC was, because I had never encountered it before.

KERRY: Well, could you tell me and the committee what the process issue was then that you were unhappy with, particularly with the NIO officer? What was his process violation?

BOLTON: Mr. Smith had said that the speech was not cleared by him. And I didn't know who Mr. Smith was.

So I talked to the person who is the head of WINPAC, and I said, probably something like, "What's the National Intelligence Council?"

And he said, "That's who it is. You ought to come out and talk to him."

I said, "Did you clear the speech with the National Intelligence Council?"

And he said, "Yes, in fact, we did". We cleared it with the National Intelligence officer who has cognizance over B.W. programs worldwide, the national intelligence officer for science and technology.

And this is a case where we sent this thing out to INR and out to the intelligence community. I didn't ask anybody in particular to clear. I didn't know who was supposed to clear.

We wanted INR to perform its function of liaison with the intelligence community. And we thought they had, and then somebody else raises his hand and said, "Hey, I didn't clear that speech." So I wanted to find out what the purpose was.

If I could just mention one other point here on Senator Dodd's hearing and the question of whether or not I testified. I'd like to -- I think you got this -- I'd offer it for the record if you don't have it, a letter to Senator Dodd from Secretary Powell dated July 23, 2002.

BOLTON: It says, "Dear Senator Dodd, this is a follow-up to our conversation after a June 5 briefing on my recently completed Moscow trip. At that time, I acknowledged your concerns on Cuba and bioterrorism.

"My decision to send Assistant Secretary Ford to testify was based on the purpose of the hearing as expressed in your letter and on my judgment regarding the most appropriate witness for the purposes of your hearing, which focused on intelligence findings.

"At that time, I agreed to make Undersecretary Bolton available to discuss separately the policy implications behind Cuba's biological capabilities. Undersecretary Bolton stands ready to appear before Foreign Relations Committee for this purpose.

"The department puts a high value on its relationship with the committee and will work to accommodate your oversight responsibilities.

"We look forward to working with you and other members of the committee. Sincerely, Colin L. Powell."

KERRY: I respect the letter, but it doesn't do anything to address the fact that the intelligence community did not and would not clear the testimony that you proposed.

BOLTON: May I then quote Assistant Secretary Ford's testimony at the June hearing?

And he is addressing a question of how is it that he used the words that turned out to be in my speech.

So I will quote Assistant Secretary Ford...

KERRY: But that doesn't...

BOLTON: This goes directly to your question, Senator.

Mr. Ford: "The history of the words on B.W. in that speech were, as I understand it -- Secretary Bolton invited the intelligence community to provide him with some words that he could use in a speech on B.W.

"He was very careful, I think, not to suggest words to the community for clearance. He asked them, 'What do you think? What do you say?' So they came up with the lines in the speech and presented those back to INR to take back to Secretary Bolton for his use.

"As I understand it, his speech was postponed. I wasn't aware of this. I had a requirement on short notice to come up and brief the committee on C.W., B.W. worldwide.

"Apparently, those words that had been approved for Mr. Bolton were picked up by my staff to insert in my presentation to the full committee, and so that I then presented that information that had been cleared by the I.C.

"When it came time for Mr. Bolton to give his speech a month or two later, he then took the same language that had been approved earlier by the community and stuck it into his Heritage Speech.

"But those words were our words -- the intelligence community's words, not his."

KERRY: There's no question about that.

Mr. Chairman, nobody even questions that. That is one of the great sidesteps of all time.

I asked you about your testimony before Senator Dodd that was proposed -- whether or not it was cleared. You still haven't answered it. It was not cleared, was it?

BOLTON: The testimony was never finished, I...

KERRY: It was never cleared.

(CROSSTALK)

KERRY: That's why it wasn't finished.

BOLTON: I'm not sure I ever saw a draft of it.

LUGAR: Well, thank you very much, Senator Kerry.

KERRY: Oh, what about Cohen -- what did you say to Mr. Cohen?

BOLTON: I said, as I testified earlier, that I went out to see Mr. Cohen to pay a courtesy call on him to get a better understanding of the National Intelligence Council. I won't...

KERRY: What did you say to him about the personnel that you wanted removed?

BOLTON: I said I was aware that Assistant Secretary Reich had been out to see him a short period before that, and that Assistant Secretary Reich had very substantial concerns with Mr. Smith.

And what I said was that, in my dealings with him, his behavior was unprofessional and that I'd lost confidence in him and supported Mr. Reich.

KERRY: Well, let me just say this from my -- yes, Mr. Cohen says he didn't recall many of the specifics of the Bolton meeting, but believed his intent was clear, namely, that he wanted the NIO removed. That's Mr. Cohen's recollection.

BOLTON: My recollection is that...

KERRY: And your chief of staff said the same thing.

BOLTON: ... as I've just said, that his behavior had been unprofessional and that I had lost confidence in him.

KERRY: Let me just say that...

(CROSSTALK)

KERRY: Could I just take one moment? Thirty second, Mr. Chairman.

This is reading from Mr. Flights' (ph) interview, where he says, "Did Otto Reich share his belief that Fulton Armstrong should be removed from his position? The answer is yes. Did John Bolton share that view? Mr. Flights (ph) said yes."

BOLTON: As I said, I had lost confidence in Mr. Smith, and I conveyed that. I thought that was the honest thing to do.

KERRY: Confidence because he didn't agree with you?

BOLTON: No. Absolutely not, Senator. Confidence because he was claiming the process failed, that was inaccurate and untrue.

# Footnote 4

ADVERTISEMENT

CNN Politics Subscribe

POLITICS • 3 MIN READ

# Trump terminates John Bolton's security detail within hours of taking office

UPDATED JAN 21, 2025

By  Kaitlan Collins

ADVERTISEMENT



See more videos

Washington — Within hours of taking office, President Donald Trump terminated the Secret Service detail that was assigned to his former national security adviser John Bolton, Bolton confirmed to CNN on Tuesday.

Bolton, who left the Trump White House in November 2019, has required ongoing US Secret Service protection because of threats against him from Iran. Trump initially terminated his protection after he left his administration in the first term, but President Joe Biden restored it once he took office.

“I am disappointed but not surprised that President Trump has made this decision,” Bolton said in a statement to CNN. “Notwithstanding my criticisms of President Biden’s national-security policies, he nonetheless made the decision to once again extend Secret Service protection to me in 2021.”

“The Justice Department filed criminal charges against an Iranian Revolutionary Guard official in 2022 for attempting to hire a hit man to target me. That threat remains today, as also demonstrated by the recent arrest of someone trying to arrange for President Trump’s own assassination. The American people can judge for themselves which President made the right call.”

ADVERTISEMENT

ADVERTISEMENT

Bolton, who served in senior national security positions in the Bush administration, has long been known for his hawkish position against Iran. He strongly opposed the 2015 nuclear deal that placed significant restrictions on Iran's nuclear program in exchange for relief from US sanctions, and he called on Trump to withdraw from the deal after he took office.

Trump withdrew the US from the deal in May 2018, about a month after Bolton was hired as his national security adviser. Trump fired Bolton in September 2019 after saying he "strongly disagreed with many" of Bolton's positions.

Bolton published a book in 2020 in which he claimed the president was woefully under informed on matters of foreign policy, obsessed with shaping his media legacy, and that Trump asked the leaders of Ukraine and China to help him win the 2020 election. Trump responded by threatening to jail Bolton, repeating a threat he makes routinely about people who cross him.

After Iranian military officer Qasem Soleimani was assassinated on Trump's orders in early 2020, the Justice Department said the Iranian government sought revenge against senior Trump officials who were involved in the killing, which included Bolton, even though he was not in the administration at the time of the fatal strike.

ADVERTISEMENT

ADVERTISEMENT

In August 2022, the Justice Department charged an Iranian national and member of Iran's Islamic Revolutionary Guard Corps, accusing them of attempting to arrange the murder of Bolton. Prosecutors said the plot against Bolton was "likely in retaliation" for Soleimani's assassination.

On Monday, as one of his first acts in office, Trump revoked Bolton's security clearance – one of scores of former national security officials who lost their clearances with a signature of the new president.

*This is a breaking story and will be updated.*

CNN's Michael Williams contributed to this report.

## Up next



Trump upends careful compromise on intel chief, plunging GOP into disarray

5 MIN READ



Russia's security service detains a teenager planning a 'terror attack' after a US tip-off

3 MIN READ



How Trump has deceived himself on Iran

ADVERTISEMENT





Kennedy Center says it has fully removed Trump’s name from its building

6 MIN READ

Search CNN...

Subscribe

Sign in

Listen

Watch

ADVERTISEMENT

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

About CNN

Politics

FOLLOW CNN POLITICS

ADVERTISEMENT

Download on the App Store
GET IT ON Google Play



© 2026 Cable News Network. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

# Footnote 5

FREE EXPRESSION
A Daily Newsletter From WSJ Opinion
ABOUT FREE EXPRESSION | SIGN-UP FOR THE FREE NEWSLETTER | 'NAZA' HAS NADA ON ISI

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/opinion/john-bolton-donald-trump-iran-list-security-secret-service-5294ef4c

OPINION REVIEW & OUTLOOK Follow

# Trump, Iran's Assassins and John Bolton

The President has the Secret Service, but his targeted former advisers don't.

By The Editorial Board
July 19, 2026 4:14 pm ET



President Donald Trump and National security advisor John Bolton in 2018. OLIVER CONTRERAS-POOL/ZUMA PRESS

President Trump is taking Iran's threats to assassinate him seriously, as well he should. He reportedly switched Air Force One from the new Qatar version on his return from the recent NATO summit on the advice of the Secret Service. How about a little concern, then, about Iran's threats to kill his former national security adviser, John Bolton?

The White House hasn't confirmed the Air Force One switch, but it hasn't denied the story either. Notably, the Justice Department has subpoenaed New York Times writers who reported the story to disclose their sources. That's harassment against the press that won't make the U.S. safer. The

story arguably did Mr. Trump a favor by reminding the public that Iran's regime hasn't turned over a "new leaf," to borrow Vice President JD Vance's term.

"They want to take out the U.S. leader—me," Mr. Trump told reporters in Turkey. "I'm on every list. I saw this morning, I'm on every single one of their lists. And so far, I guess I've been a little bit lucky, but that maybe doesn't last very long."

Mr. Trump said he has given orders for the U.S. military for a massive military assault on Iran if he is assassinated. By that time the orders would have to come from new President Vance, and we'd like to think he'd unleash hell as well.

Iran has long wanted to kill American officials, as well as anti-regime exiles in the U.S. It targeted Brooklyn, N.Y., based Iranian dissident Masih Alinejad, according to a federal case against would-be assassins. Two men have been convicted in the foiled plot.

Which brings us to Mr. Bolton, who has been targeted by Iran along with Mr. Trump's first-term Secretary of State Mike Pompeo and State's main deputy for Iran policy in the first term, Brian Hook. The Biden Administration was concerned enough that it provided the trio with protection details.

But after taking office a second time, Mr. Trump pulled that protection from all three. This was raw vindictiveness, since we doubt Iran has given up on killing them. Iran blames all three for the 2020 assassination of Qassem Soleimani, who ran Iran's network of terror proxies for the Islamic Revolutionary Guard Corps. These Americans are targets because of a decision the President rightly made.

The danger for Mr. Bolton in particular has increased because the Trump Administration is prosecuting him for mishandling classified documents. Mr. Bolton pleaded guilty last month to avoid the threat of additional charges against him or his family. The plea deal stipulates a fine of $2.25 million, which is an effort to strip Mr. Bolton of the income from his 2020 book that was critical of Mr. Trump.

But far worse, the Justice Department has insisted on seeking a prison term of up to five years. This is a penalty far beyond what other officials have received for similar or greater classification offenses. John Deutch, David Petraeus and Sandy Berger never served jail time and none pleaded guilty to felonies. Mr. Bolton was treated more harshly.

Federal Judge Theodore Chuang has scheduled sentencing for Mr. Bolton for Oct. 28. But a jail term of any length runs the risk of assassination. It wouldn't take much for Iranians to bribe an inmate, or threaten relatives of an inmate or guard, to have Mr. Bolton killed while he's in custody. Prisons are notoriously insecure.

By the way, Iran hacked Mr. Bolton's personal AOL account after he left office, in what he thinks was an attempt to get hold of his calendar for a potential murder hit. Mr. Bolton contacted the Biden Administration in 2021, though he wasn't obliged to. Mr. Bolton's reward for assisting the FBI counterterrorism division is to have Mr. Trump unleash the bureau and prosecutors on him.

***

Mr. Trump has the Secret Service to protect him, but these other public servants don't. They have to do without security or pay for it themselves, as Mr. Bolton has. Let's hope Judge Chuang dispenses with the Justice Department's unjust prison demand and issues a suspended sentence.

As for Mr. Trump, he's already exacted revenge against his former adviser with the prosecution and fine. He knows Iran has a kill "list" that includes him and his advisers. If Mr. Bolton is killed in prison, the President and his Justice Department will be partly responsible.

*Appeared in the July 20, 2026, print edition as 'Trump, Iran's Assassins and John Bolton'.*

---

The Editorial Board speaks for free markets and free people, the principles, if you will, marked in the watershed year of 1776 by Thomas Jefferson's Declaration of Independence and Adam Smith's "Wealth of Nations." So over the past century and into the next, the Journal stands for free trade and...

## Further Reading

**Trump Administration, States Harden Battle Lines Ahead of Election Day**

**Justice Department Sends New Subpoenas in Alaska Election Probe**

**Justice Department Push Against Trump's Foes Reaches Higher Gear**

**Grand Jury Declines to Indict Former White House Aide Cassidy Hutchinson**

**Court Rejects Trump Administration Bid to Set Aside California Mail-in Ballots**

## Videos

# Footnote 6

THE HILL






INTERNATIONAL

# Bolton says US strikes on Iran ‘justifiable and necessary’

BY SARAH DAVIS - 02/28/26 12:09 PM ET

2



THE HILL

Instaread




Former national security adviser John Bolton defended the Trump administration's decision to launch preemptive strikes on Iran over its continued nuclear program.

"Trump has every right to eliminate threats from the ayatollahs, the IRGC, and Iran's nuclear-weapons program," Bolton wrote Saturday in a post on social platform X.

ADVERTISEMENT

"This mission is completely justifiable and necessary," he continued. "The regime must fall, and the opposition needs the support of the West."

In an earlier post, the former Trump official called the operation "the most consequential decision of Donald Trump's presidency."

Bolton previously urged the Trump administration to pursue regime change in the Middle Eastern nation.

ADVERTISEMENT

THE HILL




"I think he should have done that a long time ago and indeed I think the U.S. has watched Iran sustain its regime, oppress its people, engage in supporting the world's worst terrorists, and actively pursue a nuclear weapons program for a long, long time, and we've let it happen, and Israel and others have paid the consequences for it," Bolton said during an appearance on NewsNation's "On Balance" earlier this month.

Trump, in a Truth Social video announcing the strikes, said his administration aims to "defend the American people by eliminating imminent threats from the Iranian regime."

"Bombs will be dropping everywhere. When we are finished, take over your government. It will be yours to take; this will be probably your only chance for generations," he said in the video, which was posted at 2:30 a.m. EST. "America is backing you with overwhelming strength and devastating force. Now is the time to seize control of your destiny."

ADVERTISEMENT

THE HILL

The president has consistently threatened “unfortunate” consequences for Iran if their regime refused to agree to a new nuclear deal with the U.S.

Republicans in Congress have lauded the president’s decision to militarily intervene in the country, with Sen. Lindsey Graham (R-S.C.) also backing Trump’s calls for regime change.

“His speech will go down in history as the catalyst for the most historic change in the Middle East in a thousand years. I echo President Trump’s call to the Iranian military, IRGC and security forces to lay down their arms,” he wrote on X. “I echo his call to the Iranian people to take back their government.”

ADVERTISEMENT




However, the move has drawn opposition from several foreign countries, including the leaders of France, Germany and the United Kingdom.

THE HILL

negotiated solution.

"Ultimately, the Iranian people must be allowed to determine their future," the leaders wrote.

ADD AS PREFERRED SOURCE ON GOOGLE

TAGS DEFENSE DEPARTMENT DONALD TRUMP IRAN IRAN NUCLEAR PROGRAM ISRAEL JOHN BOLTON LINDSEY GRAHAM TRUMP ADMINISTRATION U.S. STRIKES IN IRAN U.S.-IRAN NUCLEAR TALKS

Copyright 2026 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

SPONSORED CONTENT

Privacy Policy

**Who Charges The Most For Car Insurance in District Of Columbia? (Check Zip Code)**

OTTO Insurance | Sponsored

Click Here

**Squirt Some Honey On Your Dog's Tongue, Here's What Happens**

Daily Pets Health | Sponsored



HOURLY NEWS
WAMU 88.5
LISTEN LIVE
On Air Now
MY PLAYLIST

npr WAMU 88.5

DONATE

MIDDLE EAST

# Former national security adviser John Bolton talks about the goals of the Iran war

MARCH 31, 2026 · 6:51 AM ET

HEARD ON MORNING EDITION

Leila Fadel

7-Minute Listen

+ PLAYLIST TRANSCRIPT ···

NPR's Leila Fadel asks John Bolton, President Trump's former national security adviser and a long-time advocate of regime change in Iran, whether that goal is being met in the war.

Sponsor Message




## Transcript

LEILA FADEL, HOST:

For more on President Trump's war objectives, I'm joined by Ambassador John Bolton. He has long called for military intervention and regime change in Iran. He served as ambassador to the United Nations under former President George W. Bush and as national security adviser during the first Trump administration. He was also a key architect of the war in Iraq. Bolton is now a prolific critic of the second Trump administration, including a critic of this war. Ambassador Bolton joins me now. Good morning.

JOHN BOLTON: Good morning.

FADEL: So President Trump posted on social media on Monday to say that he's negotiating with a, quote, "new and more reasonable regime" to end the war. And here's what he told reporters on Air Force One.

(SOUNDBITE OF ARCHIVED RECORDING)

DONALD TRUMP: We've had regime change - if you look - already because the one regime was decimated, destroyed. They're all dead. The next regime is mostly dead. And the third regime, we're dealing with different people than anybody's dealt with before. It's a whole different group of people. So I would consider that regime change.

FADEL: Ambassador, what is he talking about here? Has this war actually achieved regime change?

BOLTON: No, certainly not. I mean, I think Trump is looking for a way out, and this is a way of declaring victory regardless of the actual facts. He - Trump doesn't have a philosophy, so he certainly doesn't understand people with the kind of ideology that the ayatollahs and the Revolutionary Guard leaders have in Iran. It's been - their leadership has been purified year after year to make sure that they adhere to the precepts of the Islamic Revolution. You can take out the top 500 leaders and the ones below them are almost certain to be exactly in the same ideological mold, and maybe even tougher. So I think this is a pretext. The president's looking for a way out. There has not been regime change, and there will not be until the ayatollahs and the Revolutionary Guard are swept away.

FADEL: You've said that stopping Iran from getting a nuclear weapon should be the main goal. There are now more than 50,000 U.S. troops massed in the region. Do you want to see ground troops deployed under this administration to seize Iran's uranium?

BOLTON: Well, I don't think that's necessary at this stage. I would contemplate if the regime does begin to collapse. And, you know, yesterday, Secretary of State Rubio basically said there were a lot of fractures at the top of the regime, which is exactly what we should be hoping for and expecting by the destabilizing effect of our military strikes. But I don't see the need to actually get hold of the enriched uranium or other equipment or other sensitive materials associated with the program just yet. I think if the regime were actually in collapse, it would be a different story because we don't want those materials falling into the hands of terrorists or other rogue actors.

FADEL: Do you believe there are actually fractures internally that will lead to a power struggle that could see the collapse?

BOLTON: Well, I think you can see already reporting in a lot of places in the Middle East that the nominal president, Pezeshkian, has been pushed aside by the Revolutionary Guard, that there are internal conflicts. I think Rubio's remarks confirm that. We obviously don't know the details. But this is why assisting the opponents to the regime, helping them get communicate - better communications, better organization, more resources, weapons, if they want it, and being able to work with potential defectors from the regime, maybe from the regular army that see the ship going down and don't want to go down with it.

FADEL: But do you think that is something that this administration is planning on doing? I mean, we hear very mixed messaging - there's a deal. If there isn't a deal, we'll strike more. No, we're very close to a deal, and there are negotiations.

BOLTON: Well, I don't see any evidence that the administration is working with the opposition. They - there were reports at the beginning of the war they declined to help the Kurds in Iran. I think we should have been doing this for a long time. I think it's one of the key failures if, in fact, we're not working to help the opposition. We should have been doing it before the military attacks began, and we certainly should be doing it now. And if we're not, we're not facilitating what I think the circumstances mean - indicate could be regime change.

FADEL: What do you make of Trump's latest threat to hit desalinization plants and electric plants, which intentionally targeting this type of infrastructure would be considered war crimes?

BOLTON: Well, I think the Iranians have hit desalinization plants. I don't think that's the way to go. I think another where - place where we've been failing here is, up until recently, we didn't really coordinate with the Gulf Arab states, certainly not before the hostilities began. And they've had concerns about what targets to hit in Iran for a long time because they fear retaliation. So I would work with them. I do think it's legitimate to take down the military industrial complex in Iran, and I think we've got a lot of targets on that list still to go after.

FADEL: Do you think the lack of coordination with these allies who have bore the brunt of the retaliation has impacted the relationship between the United States and its Arab allies in the region?

BOLTON: Well, I think they are less trusting of the Trump administration, that's for sure, but they have also, according to reports and indeed op-eds that have been written now strongly publicly calling for regime change because they don't want to be left in the Gulf with Iran conceivably dominant, able to open and close the Strait of Hormuz as it chooses, which if another report this morning is true, that Trump is considering declaring victory and leaving before the Strait of Hormuz is opened would be a catastrophic mistake.

The idea of regime change is to remove the threat of the Tehran regime, the ayatollahs and the Revolutionary Guard so they can't keep doing this, so they can't threaten the rest of the world with their nuclear weapon program and their support for terrorism. And now this - clearly this third obvious reality of shutting down the transit in the Gulf and through the strait and its effect on the world economy. You leave a damaged, wounded regime in Tehran, it will build back as quickly as it's able and it will resume all three threats over again.

FADEL: Ambassador, what would you say to Americans listening to you and thinking, well, Ambassador Bolton pushed for regime change in Iraq, a war that cost many lives, American and Iraqi, cost a lot of money, was based on intelligence of weapons of mass destruction that were not found. I mean, when you think about how military invention (ph) in Iran could go right, do you want it to go the way of Iraq?

BOLTON: I don't think there's any circumstance where the Trump administration is going to put substantial boots on the ground as happened twice against Iraq previously. If we're going to get regime change, it's going to be because we destabilized the regime by our military action, aided the opposition inside Iran and caused the regime to collapse because of internal disputes, which I think are already building. I think that is a reasonable way to do it, and people should ask how - what your tolerance is for a regime led by religious fanatics who chant death to America with nuclear weapons. My tolerance to that kind of regime is zero.

FADEL: John Bolton is a longtime U.S. diplomat who served as national security adviser in the first Trump administration. Thank you for your time, as always, Ambassador Bolton.

BOLTON: Well, thank you again.

*Copyright © 2026 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*Accuracy and availability of transcripts for NPR programming may vary. Transcript text may also be revised to correct errors or match updates to audio. Audio may be edited after its original broadcast or publication. The authoritative record of NPR's programming is the audio record.*

—

*Please note that NPR platforms and products also include some programming produced by third parties; NPR cannot guarantee transcripts for that content and some transcripts may be produced using automated or other tools.*

***NPR does not offer or accept money for coverage or interviews.***
*Anyone who makes such an offer or request is not an NPR employee and does not represent NPR.*

**Reporting for the public, funded by the public.**

The NPR Network is free from special interests and political influence. We deliver the facts — because you deserve to know.

With you by our side, we are building what comes next. Can you fuel this public service today?

DONATE NOW ➔

**More Stories From NPR**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/opinion/iran-is-too-weak-to-make-peace-4aabb236

OPINION COMMENTARY Follow

# Iran Is Too Weak to Make Peace

The U.S.-Israel strikes so successfully decapitated the leadership that no one has authority to negotiate.

By John Bolton
July 12, 2026 1:45 pm ET



Iranian leaders during a ceremony at the coffins of Iran's slain supreme leader Ali Khamenei and his family members in Tehran, July 3. PARSPIX/ABACA/ZUMA PRESS

The U.S.-Iran memorandum of understanding and its cease-fire were effectively dead-on-arrival. Donald Trump and his top advisers now acknowledge their demise, but the agreement was never viable, ironically, because the U.S.-Israel military effort was so successful. Tehran doesn't have a government in any coherent sense. In national-security affairs, it has no authoritative decision maker or process that produces binding governmentwide decisions. In Iran, the answer to Robert Dahl's famous question, "Who governs?," is: We don't know, and neither do the Iranians.

The strikes decimated Iran's highest government levels. Civilian leadership is in tatters. Even the Islamic Revolutionary Guards Corps' command and control over its components is uncertain, due in part to Iran's longstanding defensive strategy to decentralize authority, which it executed at the war's outset. Among the clerics and their oligarchical families, there is discord over what comes next after Supreme Leader Ali Khamenei's killing.

What exists instead of a government is "heads of authority" with various kinds of clout and vulnerability. They compete for power, but none can consistently dominate, today or in the foreseeable future. This disarray explains why some in Iran are again reportedly plotting to murder Mr. Trump, while others are still negotiating with his representatives.

Iran's governmental disaggregation has enormous implications for how Washington deals with Tehran. It is precisely our success in so effectively shattering its leadership and destroying instruments of its state power that precludes the current "regime" from functioning cohesively. This conclusion (or hypothesis, if you prefer) is unpalatable to those who are determined to play down the damage caused by our attacks out of either sympathy for Iran or antipathy toward the U.S. or the administration. They fear admitting the devastation of authority in Iran, with the attendant repercussion that regime change might be near. Considering Iran's behavior, however, certainly on national-security issues, regime disintegration is the only consistent explanation for its erratic post-strike actions.

The civilian officials running Iran's negotiations are among the weakest surviving actors. President Masoud Pezeshkian is a functionary, selected in haste in 2024 to replace Ebrahim Raisi, whose helicopter crashed into a mountain. Raisi was once a potential successor to Khamenei, whereas Mr. Pezeshkian was merely a safe pair of hands. His position is so tenuous that he is reported to have been physically attacked during Khamenei's funeral, a lengthy ritual of mourning and anti-U.S. propaganda that likely strengthened the IRGC.

Parliament Speaker Mohammad Ghalibaf is a repeatedly failed presidential candidate who heads a body that has had almost no impact on Iran's

governance since its establishment in 1980. Foreign Minister Abbas Aragchi runs a department with almost no role in domestic politics and is among the last to know what the IRGC is doing.

The problem is evident: U.S. negotiators are talking to people who can't deliver. On July 8, after calling Iran's team "scum," Mr. Trump said his representatives could continue talking if they desired, but he saw no value in it. This could indicate that our representatives have fallen prey to the twin maladies of moral equivalence (seeing the disputed positions as equally justifiable) and mirror imaging (thinking their interlocutors are also looking for a fair, reasonable solution). Even Iran's "moderate" diplomats don't suffer these frailties.

Washington also ignored or misread current Supreme Leader Mojtaba Khamenei's comment that while he would allow the memorandum of understanding, he opposed it "as a matter of principle." His father often made similar statements, saying it was "not smart, wise or honorable to deal with Washington." U.S. administrations have repeatedly failed to grasp that the Iranians mean it when they call their leader "supreme." To be sure, we can't know how much of any given day the young Mr. Khamenei is compos mentis.

In the meantime, the IRGC is firing missiles at American bases and other targets in the Middle East, attacking ships in the Gulf and the Strait of Hormuz, and attempting to rebuild Iran's nuclear program and terrorist proxies like Hamas and Hezbollah. This should surprise no one. It was critics of the U.S-Israeli strikes who were loudest voicing their fears that the war would strengthen IRGC power. The cease-fire experience proves the futility of negotiating with authorities who can't change this reality. Mr. Trump will have either to accept indefinite frustration and uncertainty or to resume large-scale offensive operations, not merely tit-for-tat reprisals. Reimposing sanctions on Iran was correct, but is at best a partial fix.

America should stop looking for "moderates" to bolster and "hard liners" to isolate. In Iran, we are dealing with civilians whose predecessors have patiently sweet-talked successive U.S. administrations into acquiescing to

Iran's nuclear-weapons project. Those who want to defy us militarily simply ignore what is negotiated. The sweet-talking civilians don't have weapons or control over the nuclear program, but the others do. Hence the chaos in the Gulf.

We can face this reality now or after November's elections. The right course is to act swiftly, reimpose the blockade and choke off Iran's oil revenues. Continued uncertainty in the Gulf could well keep oil prices elevated before November regardless of negotiations or cease-fires. If we delay, Tehran's hand will be stronger, having gained more time and billions of dollars in new revenue. Even if the president punts until after the elections, this remains the only intelligible path forward.

In international affairs, Iran has no real government. This is a good thing. We caused it, and we should finish it. The first step is to reopen the Strait of Hormuz, by force if need be. NATO Secretary General Mark Rutte supports U.S. strikes against Iran and predicts European allies would also agree in time. The next move is Mr. Trump's.

*Mr. Bolton served as White House national security adviser, 2018-19, and is author of "The Room Where It Happened: A White House Memoir."*

*Appeared in the July 13, 2026, print edition as 'Iran Is Too Weak to Make Peace'.*

---

**Further Reading**

**Top Military Admiral Briefs Trump on Iran Options**

**Vance Reaches Out to Iranian Hard-Liner in Bid to Restart Peace Talks**

Vance Engaged Iran to Revive Peace Talks

U.S. Warns Gulf of Possible Short, Intense Renewal of Iran War After Midterms

OPINION Slow and Steady Can Defeat Iran

---

## Videos

*Democracy Dies in Darkness*

**Opinion**

# John Bolton: Trump's tit-for-tat with Iran ignores the larger reality

The Iran and Ukraine wars were never separate.

August 4, 2026

By John Bolton

*John Bolton was White House national security adviser from 2018 to 2019.*

The Trump administration's latest U-turn on Iran came not 36 hours after reports that major new strikes were imminent. Instead, the president stepped back, heralding "the perimeters of a deal" between Iran and the United States. Iranian sources promptly disputed that.

Saturday's swerve showed that White House "strategy" on Iran had all but evaporated. Just last week, responding to Iranian strikes on U.S. bases in Jordan, Trump said, "We're going to be hitting them very hard because it's our turn to hit them." This is not strategy; it barely qualifies as tactics.

While the U.S. flounders, some observers are scaremongering about a “wider war.” In the Middle East, Bahrain and Kuwait reportedly hit targets in Iran, joining Saudi Arabia and the United Arab Emirates in the U.S.-led coalition. For the first time, the Saudis and the U.S. together attacked Iraqi Shiite militias. On July 20, Yemen’s Houthis declared a blockade against Saudi commerce in the Red Sea, leading Riyadh to announce an international coalition to keep it open. With the Red Sea’s southern exit threatened, a July 29 drone attack on Damietta, an Egyptian port, endangered the Suez Canal’s northern terminus.

Just days before, in the Caspian Sea, Ukraine attacked an Iranian ship, believing it carried military equipment. Did this mean the Ukraine and Middle East wars were merging, producing possibly “cataclysmic … open warfare spanning Eurasia and the Middle East”?

No. But between tit-for-tat retaliation on one hand and cataclysm on the other, does Washington have alternatives? Yes, but only if it seriously engages in strategic analysis, hardly the Trump team's métier. Nonetheless, fundamental international realities, particularly the emerging Beijing-Moscow axis — the Xi-Putin "partnership without limits" — are critical. Iran, Belarus and North Korea are axis outriders. In 1998, former national security adviser Zbigniew Brzezinski described a future China-Russia-Iran alliance as "potentially the most dangerous scenario."

Unsurprisingly, therefore, the Ukraine and Iran conflicts were always intertwined, with complex linkages existing long before the past few weeks. Among many connections, Tehran has for years provided Moscow drones and other military capabilities. The Kremlin has reciprocated, including by supplying critical military intelligence against U.S. forces, as has China. North Korea provides Russia with troops and weapons.

Moreover, tensions in Asia, while short of open warfare, must also weigh heavily in American decisions regarding the two conflicts. Russia, remember, is an East Asia power. China poses several substantial threats: in the East China Sea against Taiwan and Japan (including the Senkaku/Diaoyu islands and others); in the South China Sea, which it has largely declared to be Chinese territorial waters; and in simmering animosities along land borders with India and Vietnam.

With all this in mind, the administration's main strategic focus should be prioritizing U.S. national security interests and capabilities. That does not mean waging all-out war on all fronts. The White House must prioritize in ways the U.S. has been unwilling to do since Hamas attacked Israel on Oct. 7, 2023. Playing down the interconnections, a favorite Trump trope, doesn't disappear them or lessen their materiality to U.S. strategy. America is more likely to succeed if it acknowledges that the "wider war" has long been underway and will be for the foreseeable future. It should also emphatically acknowledge that decades of underspending on defense since the Cold War's end is what could be truly "cataclysmic."

Abstract prioritizing is just an academic exercise, so take the Trump team as it is. It should focus on destroying (or at least paralyzing) Tehran's regime; holding Russia in check in Ukraine; and sharply increasing deterrence against China. Iran's government is fractured, as Trump recently admitted, distinguishing those who struck U.S. bases in Jordan from the regime's impotent civilian negotiators: "There's very little they can do about it. It was a different group than we're dealing with." If Trump fails to open the Strait of Hormuz, he will significantly compound his November election problems. He would be best advised to continue what he started in February.

In Ukraine, Washington should accelerate licensing Patriot missile-defense technology; squeeze Russia harder economically; and forgo any reduction in America's NATO presence. Keeping all Russian oil off international markets should be the objective, which reinforces the urgency of increasing Gulf Arab oil exports to prewar levels, or close to them. Ukraine today is Europe's greatest military power, facing little prospect Russia can achieve what more than four years of combat have failed to. Unfortunately, Trump is unlikely to provide what Ukraine needs to defeat Russia, so at least stabilize that front. For now.

The U.S. is racing against time on China's Indo-Pacific periphery, particularly concerning Taiwan. The pending $14 billion in arms sales to Taipei is not a "bargaining chip," and should be completed forthwith. Trump should enhance the Asian Quad (with India, Japan and Australia), and strongly support Japan's efforts to enhance its conventional military forces, as Tokyo's defense-spending increases foreshadow. Flattening Tehran's regime would be the clearest signal to Beijing that it should not risk military adventurism.

## What readers are saying

The conversation explores a range of perspectives on the opinion piece, with many participants expressing criticism of Trump's foreign policy, particularly regarding Iran. Several comments highlight the perceived lack of strategy and the administration's reliance on military... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# Footnote 11

# Archives at Yale

## Henry Lewis Stimson papers

**Collection** **Call Number: MS 465**

PDF Finding Aid Citation Ask a Question

Manuscripts and Archives | Henry Lewis Stimson papers

## Scope and Contents

The papers consist of correspondence, letter books, speeches, articles, letters to the editor, statements prepared for presentation to Congress and substantial subject files with clippings, printed matter, reports, memoranda and photographs related to Henry Stimson's various public offices. While the official records of Stimson's service (as Secretary of War under President Taft, Secretary of State under Herbert Hoover and as Secretary of War in the...

See more

## Dates

1846-1966

### Creator

- Stimson, Henry L. (Henry Lewis), 1867-1950

## Conditions Governing Access

The materials are open for research.

## Existence and Location of Copies

Series I-IX are available on microfilm from Manuscripts and Archives, Yale University Library (HM 52)

Series XIV is available on microfilm from Manuscripts and Archives, Yale University Library (HM 51).

Diaries of Henry L. Stimson are available on microfilm (10 reels, 35mm) from Scholarly Resources, Inc., Wilmington, Delaware.

Papers of Henry Lewis Stimson are available on microfilm (169 reels, 35mm) from Scholarly Resources, Inc., Wilmington, Delaware....

See more

## Conditions Governing Use

Copyright for unpublished materials authored or otherwise produced by Henry Lewis Stimson has been transferred to Yale University. These materials may be used for non-commercial purposes without seeking permission from Yale University as the copyright holder. For other uses of these materials, please contact beinecke.library@yale.edu.

Copyright status for other collection materials is unknown. Transmission or reproduction of materials protected by U.S. Copyright Law (Title 17, U.S.C.) beyond that allowed by fair use requires the written permission of the copyright owners. Works not in the public domain cannot be commercially exploited without permission of the copyright owners. Responsibility for any use rests exclusively with the user.

## Immediate Source of Acquisition

Gift of Henry L. Stimson, 1948. Gift of the John F. Kennedy Presidential Library and Museum, 2009. Gift of Marcia Lahner-Lafemina, 2019.

## Arrangement

Arranged in fourteen series and two additions: I. Correspondence. II. Memoranda, Minutes of Meetings. III. Speeches, Writings, Statements. IV. Special Subjects. V. Family Papers. VI. Selected Documents of the State Department. VII. Trips to Europe. VIII. Correspondence, Speeches, and Writings of Others. IX. Office of the Secretary of War. X. Printed Matter. XI. Newspaper Clippings. XII. Business, Financial, and Legal Papers. XIII. Photographs. XIV....

See more ›

## Extent

148.75 Linear Feet (368 boxes)

## Language of Materials

English

## Persistent URL

https://hdl.handle.net/10079/fa/mssa.ms.0465

Expand All

### + Additional Description »

## Abstract

The papers consist of correspondence, letter books, speeches, articles, letters to the editor, statements prepared for presentation to Congress and substantial subject files with clippings, printed matter, reports, memoranda and photographs related to Henry Stimson's various public offices. While the official records of Stimson's service (as Secretary of War under President Taft,

Secretary of State under Herbert Hoover and as Secretary of War in the cabinets of Presidents Roosevelt and Truman) are all in the National Archives, the substantial correspondence, as well as other papers, in this collection provide important records of his activities as a private citizen and in office and on special missions. His work in Latin America in helping to settle a dispute between Chile and Peru in 1926, and as the United States representative seeking to bring an end to a civil war in Nicaragua in 1927 is shown in the papers with first-hand reports and background material. His service as Secretary of State under Hoover (1929-1933) is particularly well documented with memoranda of conversations with foreign diplomatic representatives, and briefing books presenting background information on foreign affairs for the period. Of major importance are Stimson's diaries which span the years 1904-1945, covering the entire period of his public career and including references to the early stages of the development of the atom bomb.
Extensive family papers include the correspondence (1846-1966) of Stimson's parents, sister, and other relatives. In his father's papers are a series of diaries (1864-1916). There is also a collection of letters by Stimson to his wife and to other family members.

# Biographical / Historical

Henry L. Stimson was the first child of Candace Wheeler and Lewis Atterbury Stimson. Lewis Stimson, a graduate of Yale, served in the Union Army in the Civil War and then joined his father's banking firm in New York. He married “Cannie” Wheeler in Paris in 1866 and Henry, nicknamed Harry or Hal, was born on September 21, 1867. Two years later a sister Candace, called Nan, was born.

In 1871 Lewis A. Stimson moved his wife and young family to Berlin, Zurich, and then to Paris where he commenced studying medicine. In Paris the family enjoyed the friendships of James Russell Lowell and George Eliot. In 1873 the family returned to New York to allow Lewis to obtain a medical degree at the Bellevue Hospital Medical School.

In June, 1876, Candace W. Stimson died. Overwhelmed by the loss of his wife Lewis Stimson absorbed himself in his surgical practice and teaching, leaving the children at the home of his parents in the care of his sister Mary Stimson, "Aunt Minnie.” The family was extremely close, and Stimson grew up surrounded by a wide circle of aunts, uncles, cousins, grandparents, and a great-grandmother who told him stories of her childhood talks with George Washington. His uncle, Henry A. Stimson, was a well-known clergyman and founder of Carlton College in Minnesota and his grandmother, Candace Thurber Wheeler, gained recognition as a poet, artist, and skilled craftswoman. Visits to Grandmother Wheeler were frequent and it was through her that young Harry developed his love of nature and the wilderness.

Until he was thirteen Stimson attended New York schools and was tutored by his father. Then, dissatisfied with the conditions of life in the city, his father entered him in Phillips Academy, Andover, Massachusetts. In later years Stimson grew to appreciate fully the experience at Andover, noting in his autobiography, “It opened a new world of effort and competition. It also opened to me a new world of democracy and of companionship with boys from all portions of the United States.”[2] In 1905 Stimson was elected a member of Andover’s board of trustees and subsequently served as president of the board until 1947.

Stimson graduated from Andover in 1883 at the age of fifteen, too young to be admitted to Yale. He did a year's additional preparation at Andover and entered Yale’s class of ‘88 in the fall of 1884. Stimson later criticized Yale’s academic program, its system of rote learning and the lack of

opportunity for individual thinking but praised the school for its "potent democratic spirit". The friendships he formed there were lasting ones and included Amos Alonzo Stagg, Fred Solly, Irving Fisher, Morison Waite, and Gifford Pinchot. Stimson won many prizes for oratory and literary work, was elected to Phi Beta Kappa, was tapped for Skull and Bones, and graduated third in his class of 124.

At one time Stimson had seriously considered studying for the ministry but decided on a legal career instead. In the fall of 1888 he entered Harvard Law School The training received at Harvard with its stress on individual thinking and a broad philosophical outlook offered a remarkable contrast to Yale. “Harvard Law School,” Stimson said, "created a greater revolution in my power of thinking” while the faith in mankind that I learned on the campus at New Haven was greater and stronger than any such faith I achieved at Harvard.”[3]

He left Harvard in the spring of 1890 with a Master of Arts degree. In the fall he returned to New York City to serve a clerkship in the office of Sherman Evarts, a prerequisite to taking the bar examination. After passing the examination in June, 1891, Stimson was eager for challenging work. Through his father’s Yale classmates he was introduced to Elihu Root and was offered a clerkship in his firm. After a year with Root and Clarke, Stimson accepted a junior partnership. He was admitted to the firm on January 1, 1893, together with Bronson Winthrop who was to become his lifelong partner.

In 1893 Stimson married Mabel Wellington White, the daughter of Mr. and Mrs. Charles White of New Haven and a direct descendant of Roger Sherman. Although Stimson had proposed to Miss White during his senior year at Yale, his father made the couple promise to wait until Henry was established in his profession before announcing the engagement. Five years after graduating from Yale Stimson was earning $2,000 a year. The wedding on July 6, 1894, began fifty-seven years of what he later called "perfect companionship."

His experience during the decade of the 1890's was important for the future of Stimson's career. The most important influence was Elihu Root himself from whom Stimson learned politics as well as law. Stimson appeared in court with Root and learned the evolving legal practices relating to the Sherman Anti-Trust Act from America's leading corporation lawyer.

In the mid-1890's Stimson, with other civic-minded citizens had joined in the formation of Good Government Clubs to arouse the public conscience to problems of corruption in government. Though successful in increasing the public awareness these groups found themselves powerless to change the entrenched political system. In 1892 Stimson had voted as a Cleveland Democrat though he had no use for Tammany Hall. He thought the local Republican organization was not much better, but since change had to be effected through the existing party system, Stimson decided to follow Root’s example and join the Republican party. Stimson worked first in his own assembly district to register Republicans and make sure that they voted on election day. Stimson’s efforts in the party between 1895 and 1901 brought him state prominence and notice from Theodore Roosevelt.

The Spanish-American War also changed Stimson’s thinking. When war broke out in April, 1898, Stimson, though without military training, enlisted in Squadron A of the New York National Guard, but did not see service outside of the United States. The memory of America ‘s unpreparedness for this war in later years made Stimson an advocate of universal military training and an early supporter of United States preparation for combat in World Wars I and II.

In 1899 President McKinley made Elihu Root secretary of war in his new cabinet. When Root went to Washington he left his lucrative law practice in the hands of Winthrop and Stimson. By 1903 Stimson was able to afford a country residence, which he established in West Hills, Long Island, and called Highhold. By the end of 1905 Stimson's annual earnings from his law firm amounted to $20,000.

In 1906 President Roosevelt offered Stimson the position of United States attorney for the Southern District of New York. Roosevelt was out to make war on corporate transgressions and bust the trusts. The New York Southern Judicial District as the seat of much corporate activity needed a competent, intelligent, loyal man for the job. Even though it meant a 50 percent loss in income Stimson was ready to serve. In reorganizing his office so as to try all important cases himself, he drafted young talent and numbered Felix Frankfurter, Thomas D. Thacher, Henry A. Wise, and Goldthwaite Dorr among his protégés. In his term of service from 1906-1909 he prosecuted the New York Central Railroad for rebating, the American Sugar Refining Company for weighing frauds, Charles W. Morse for misappropriating funds from the Bank of North America, and James Gordon Bennett of the *Herald* for indecency in his personal columns. He had tried to indict Joseph Pulitzer for criminal libel at Roosevelt's request, and had defended the president's action in connection with the dishonorable discharge of black soldiers after the Brownsville incident. Speaking extemporaneously at a Yale reunion in 1908 Stimson said of this work, "The profession of the law has never been thoroughly satisfactory to me, simply because the life of an ordinary New York lawyer is primarily one essentially devoted to making money." Referring specifically to the job of a United States attorney he continued, "There has been an ethical side of it which has been more of an interest to me, and I have felt that I could get a good deal closer to the problems of life than I ever did before, and felt that the work was a good deal more worth while." After resigning from the United States attorney's office in 1909 Stimson returned to his law practice. In 1909 he was given serious consideration as a possible candidate on the fusion ticket for mayor of New York. At this same time, as a friend of Gifford Pinchot, Stimson was drawn into the Ballinger-Pinchot controversy, a dispute dividing progressives from Taft Republicans.

In 1910, as the choice of Theodore Roosevelt and the progressive element of the Republican party, Stimson ran unsuccessfully for governor of New York against John A. Dix. Stimson did not have a politician's zest for campaigning, and the press referred to him as a "human icicle." The importance of the 1910 campaign for Stimson's career was that he did not win. He never ran for a major elective office again, but the campaign marked him as Roosevelt's man.

In the spring of 1911 when President Taft was searching for a new secretary of war henry Stimson made a promising candidate. In order to unify the Republican party Taft wanted an appointee who would be acceptable to Roosevelt. Stimson fitted that description and was, in fact, encouraged by Roosevelt to accept the post. On entering office Stimson found himself in the midst of a power struggle between Chief of Staff Leonard Wood and Adjutant General Fred Ainsworth. Stimson was eventually compelled to defend the prestige of the chief of staff against the adjutant general's insubordination. In February, 1912, he forced the resignation of the politically powerful Ainsworth. Subsequent Congressional backlash against Wood and Stimson's support for him cemented a lasting bond of friendship between the two. As secretary of war, Stimson also accomplished a reorganization of the nation's small military force, oversaw the construction of the Panama Canal, and familiarized himself with the administration of colonial possessions, including the Philippines.

Unfortunately, in the election of 1912 Stimson was caught in the middle of the rift between

Roosevelt and Taft. Balancing his friendship and debt to Roosevelt against loyalty to Taft and the Republican party, Stimson chose to support Taft. Roosevelt did not soon forgive him, and it was not until the United States was threatened by war in Europe that the two men spoke to each other again.

After leaving the cabinet in March, 1913, Stimson returned to New York and Winthrop and Stimson. He remained active in the New York Republican party, trying to keep progressive ideals alive and at the same time engineer a partial reconciliation between Bull Moosers and Taft-Root Republicans. In 1914 he was elected as a delegate-at-large to the New York Constitutional Convention of 1915 and again left his law practice in April of 1915 to participate in the proceedings at Albany. Stimson's plan for reorganization of the state government revealed his own brand of progressivism which called for a powerful, efficient, centralized system headed by a strong executive. His program showed less concern for social reform. One can see in his support for such measures as the shortened slate of elective offices and the lengthened list of gubernatorial appointees his belief in a strong executive and, perhaps, too, his distrust of the mass of voters. Root, as president of the convention, had appointed Stimson to chair the Committee on State Finances and serve on the Committees on State Officers and on Judiciary. Proposals from these three committees embraced many of Stimson's ideas on "responsible government" and included an amendment outlining an executive budget plan. Though the new constitution was rejected by the voters of New York, many of Stimson's ideas were implemented later.

All through 1915 Stimson had stressed preparedness in speeches for the National Security League, convinced that the United States would soon be forced to enter the war in Europe. Following his own advice, in the fall of 1916, he enrolled for training under Leonard Wood at Plattsburgh Training Camp and was pronounced fit for service. After the United States' declaration of war Stimson accepted a commission in the Reserve as a judge advocate, but in September, 1917, was appointed a lieutenant colonel in the 305th Regiment, Feld Artillery of which he was second in command. In December he went overseas, spending nine months in France, most of it at the American General Staff College in Langres. He returned to the United States in August, 1918, and was discharged in December. The title "Colonel" continued to be used by his friends.

Although his law practice was his primary concern between 1918 and 1926, Stimson retained his interest in public affairs. He was vocal in his objections to some features of Wilson's peace plan and the League of Nations, but urged Republican senators to vote for the treaty. He supported Leonard Wood for the Republican presidential nomination in 1920. He continued to lobby for the executive budget, opposed the veterans' bonus, protested when the New York Assembly refused to seat duly elected Socialist members, and served with Charles Evans Hughes in 1925 on a commission to advise Governor Alfred Smith on the reorganization of state departments.

In 1926 the perennial dispute between Chile and Peru over the provinces of Tacna and Arica re-emerged. In an attempt to resolve the dispute Secretary of State Kellogg sought out Stimson as someone with a "detached mind" to provide an analysis of the situation. Stimson's actual contribution to the settlement of this issue was minor but his advisory brief brought him recognition from the Coolidge administration.

Later in 1926 Stimson traveled as a semiofficial representative of the president to the Philippines where he was the guest of his old friends Governor General and Mrs. Leonard Wood. Wood had aroused antagonism among the Filipino leaders and his administration had been experiencing difficulties. During his stay Stimson talked with Manuel Quezon and Sergio Osmena and

culminated his visit by presenting a memorandum of a plan to achieve better relations between branches of the Philippine government. The plan recognized the need for effective executive authority but combined it with responsible cabinet government. On his return he reported directly to President Coolidge.

In the spring of 1927 Coolidge appointed Stimson a special emissary to Nicaragua and granted him power to act for the government in seeking a solution to the civil war in that country between liberals and conservatives. In April Stimson sailed for Managua. He conducted talks with President Diaz and other conservatives and with General Moncada, the liberal leader. Eventually a settlement providing for a national election under American supervision was agreed to, known as the Peace of Tipitapa. By the time he left Nicaragua in May Stimson had succeeded in restoring a general peace. Stimson believed that a major lesson had been learned from these negotiations, that friendly, frank discussions and an attitude of impartiality toward all participants could achieve constructive results in Latin American relations. He recorded his impressions of his work later in 1927 in *American Policy in Nicaragua*.

When Governor General Leonard Wood died in the summer of 1927 Quezon and Osmena urged President Coolidge to appoint Stimson in his place. Guaranteed the support of these two leaders, Stimson accepted and sailed for Manila in February, 1928, for his "last short adventure before old age." Stimson's program included the clarification of the position of governor general in the executive department, establishment of a working relationship with the legislature, and progress in industrial and economic development by attracting foreign capital. These policies especially the last, were not unanimously supported by all Filipinos. Stimson asserted that individual freedom and self-government would come more quickly for the Philippines if they had a more highly developed commerce and industry. Filipino leaders continued to fear that independence would not be granted and the extensive foreign investment would lead to economic dependence and exploitation.

The Stimsons found life agreeable in the Philippines-living in the Malacanan Palace, traveling through the islands, and enjoying the viceregal privileges of the office of governor general. But, Hoover, on being elected president, offered Stimson a cabinet post, and Stimson agreed to accept the portfolio of the State Department. The Stimsons returned to Washington, and Stimson took the oath of office on March 28, 1929.

One of Stimson "s first tasks was finding a place to live in Washington. In midsummer the Stimsons finally settled on a large and lavish Southern colonial style mansion in the heart of northwest Washington called Woodley. The grounds were extensive and in later years Cordell Hull found them to be ideal for his croquet matches.

Stimson entered his new office as a recognized believer in international cooperation. In October, 1929, British Prime Minister Ramsay MacDonald met with Hoover and Stimson at Rapidan in the Virginia mountains, a meeting which opened the way to a general conference of major naval powers on limiting fleet strengths. Representatives of the United Kingdom, United States, France, Italy, and Japan met in London in January, 1930, with Stimson as head of the United States delegation. The final results of this conference were disappointing and the build-up of naval armaments continued.

The Hoover administration also made new overtures of good will toward Latin American nations and raised once again the hopes for American participation in the World Court. In 1929 a serious conflict between the Soviet Union and China was averted. Stimson later looked back at his first two

years in office as a period of peace and trust.

Almost overnight, however, the weaknesses of the post-World War I economic and political arrangements became startlingly apparent. By the spring of 1931 an international economic depression had produced a major political crisis. In May the Credit Anstalt, the largest bank in Austria, collapsed and financial panic swept Europe. Continuing monetary chaos in Central Europe meant that a political upheaval was certain along with the repudiation of all foreign debts. To meet this crisis Hoover proposed a one year moratorium on all intergovernmental debts, including German reparations payments to the Allied powers and all war debts owed by the Allies to the United States. After the moratorium was announced Stimson departed for Europe to meet with leaders and attend the conference on intergovernmental debts.

In September, 1931, when Stimson was still deeply concerned over the world financial crisis, cables from the Far East indicated that Japan had invaded Manchuria in flagrant violation of the Kellogg Pact, the Nine Power Treaty, and the Covenant of the League of Nations. For three months Stimson continued to communicate with Kijuro Shidehara, Japan's foreign secretary. He hoped that the Japanese government could control the leaders of its armed forces, but Japanese aggression continued. By January 3, 1932, all of Manchuria was in Japanese hands. In reaction, Stimson decided to use moral sanctions. In a note to both China and Japan on January 7 he invoked the nonrecognition doctrine which was designed to reinforce the Kellogg Pact. If the fruits of aggression were recognized, Stimson believed, war would again be sanctioned as a legitimate instrument of national policy.

But this message did not deter the Japanese, who proceeded to attack Shanghai. Stimson, voicing United States policy, insisted on the maintenance of China’s independence and territorial integrity. The Japanese refused to concur in the definition of China as an "organized people” and continued their advance. Stimson saw a sharp difference between the views of the East and West on these matters and predicted that if the friction between them continued it would be almost impossible to prevent an armed clash.

In the spring of 1932 Stimson attended the disarmament conference held in Geneva. In the summer he campaigned for the re-election of Hoover. After Hoover’s defeat Stimson met with President--elect Roosevelt and Cordell Hull to discuss problems in foreign affairs, meanwhile preparing the way for conversations which he hoped to arrange between Roosevelt and the bitter Herbert Hoover, a plan which was never consummated.

In the interval between 1933 and 1940 Stimson divided his time between Washington and New York. Almost every summer he vacationed in Scotland. In 1936 he published a book about Japanese aggression titled *The Far Eastern Crisis*. In 1937 he was elected to serve a two-year term as president of the New York City Bar Association. He supported Roosevelt's basic views of foreign policy but was deeply skeptical of New Deal domestic legislation and vigorously denounced the administration's attempt to reorganize the Supreme Court. Stimson kept a watchful eye on the developing drama in foreign affairs. He wrote letters to the *New York Times* demanding action against Mussolini’s invasion of Ethiopia, deploring the Ludlow amendment, and favoring an embargo on arms to Spain and Japan. Stimson made himself a champion of China's cause and favored a "get tough" policy toward the Japanese. When the American Committee for Non-Participation in Japanese Aggression was formed in the summer of 1938 Stimson agreed to serve as its honorary chairman.

Stimson had continued to visit Roosevelt at the White House through October, 1934. Then, a misunderstanding occurred and though they corresponded occasionally Stimson's direct access to the president was gone. Stimson was greatly surprised, therefore, when Roosevelt offered him the post of Secretary of War in June, 1940. Stimson accepted, seeing the invitation as a call to duty. Stimson's frequent outspoken remarks about the need for United States aid to help Europe fight fascism had no doubt impressed the president. But, the appointment was also a political stroke. Roosevelt on the eve of his campaign for a third term had hoped to confound his critics by creating a "cabinet of national unity." When the announcement was made at the Republican National Convention then meeting in Philadelphia, Stimson and the new Secretary of the Navy Frank Knox, another Republican, were both read out of the party. His nomination confirmed by the Senate, Stimson was sworn in on July 10.

At first Stimson had doubts as to the permanence of his position in the Roosevelt cabinet. He thought he might be cast out after the November election. At most he foresaw eighteen months preparing the War Department to cope with its increasing responsibilities. One of Stimson's first urgent tasks was the enlarging of the Army. From two hundred thousand in1940 it eventually reached a peak of eight million. Stimson supported enactment of selective service legislation. When the lottery was begun Stimson was the blindfolded man who drew the first capsule. Stimson also advocated support for Britain and worked for the passage of Lend-Lease. The Japanese attack on Pearl Harbor in December, 1941, came almost as a relief to Stimson. The uneasy wait between peace and war was over. Mobilization began in earnest and Stimson took part in strategy sessions between the United States and Britain. He always believed that the European front should take precedence over the Pacific theater and he urged an early cross channel invasion of Europe instead of campaigns in the Mediterranean and Middle East.

During the progress of the war Stimson had to fight continual battles over mobilization of industry and the procurement of supplies and manpower, deal with questions affecting black troops, justify the forced removal and incarceration of West Coast Japanese-American citizens, and develop plans for the postwar government of Germany. He made several inspection tours of army bases in the United States, visited Britain in I943, and joined Omar Bradley and George Patton in France after the invasion of Normandy. His devotion to his work won him the deep friendship of General George Marshal.

The work was rigorous for a man Stimson's age and he continued to amaze the nation with his stamina. His regime called for him to rise at 6:30 for work at the department. After a full day's work he would return to Woodley for a vigorous game of deck tennis. He continued also to enjoy the pleasures of horseback riding. Social engagements were cut to a minimum; he and Mrs. Stimson would spend quiet evenings at home. Almost every weekend they would escape to Highhold to confront the more enjoyable problems of running that household and farm.

As the war in Europe was coming to a conclusion in the spring of 1945 Stimson was beginning to suffer from coronary heart disease. But when President Roosevelt died suddenly in April and an inexperienced Harry Truman came into office Stimson promised Truman that he would remain on the job until the end of war with Japan was in sight.

In the fall of 1941 Stimson had been named by Roosevelt to a committee along with Vannevar Bush and James B. Conant to advise him on nuclear fission policy. When Truman became president, it was Stimson, as senior advisor on the military employment of atomic energy, who first informed him of the existence of the Manhattan project. News of the successful detonation of an

atomic bomb was relayed to Stimson at Potsdam on July 16, 1945, where plans for postwar Europe were being discussed. Stimson conveyed the information to Truman and a decision, since the subject of much debate, was made to use the bomb if Japan refused surrender terms. Stimson selected the targets of Hiroshima and Nagasaki.

Stimson's last cabinet debate was on the future uses of atomic energy. He insisted that the United States and the Soviets be brought into equal partnership on this subject in an effort to confine the use of atomic energy to peaceful purposes. He felt that for the United States to negotiate with the Soviets with the bomb "on our hip" would "irretrievably embitter," future relations with Russia. He was voicing once again his faith that the best way to make a person or nation trustworthy was to trust them.

The war officially ended on September 2, and Stimson, then 78, weakened by his heart condition, retired from the War Department three weeks later. The years following retirement were not active ones. Stimson returned to Highhold to recuperate, but was plagued by painful attacks of arthritis. Much of his tune was occupied in writing. He wrote articles defending the decision to drop the bomb, justifying the legality of the Nuremburg war crimes trials, and supporting the Marshall plan. In 1948 be completed his autobiography, written with McGeorge Bundy, *On Active Service in Peace and War*. His last letter to the New York Times was written on March 27, 1950, and decried the attacks by Senator Joseph McCarthy on the State Department. Six months later he died at Highhold.

1. Henry Lewis Stimson and McGeorge Bundy. On Active Service in Peace and War (New York, 1947, 1948), xii. 2. On Active Service, xiii. 3.On Active Service, xv-xvi.

## Processing Information

This finding aid was revised in 2021 to address outdated or harmful descriptive language. During that revision, description was changed in the biographical/historical note and in a folder title in Series III. References to Japanese American “relocation” during World War II were removed and replaced with community recommended/currently accepted terminology in 2020, such as “the forced removal of Japanese Americans.” Previous versions of this finding aid may be available. Please contact Manuscripts and Archives for details. If you have questions or comments about these revisions, please contact Manuscripts and Archives or the Reparative Archival Description Working Group. For more information on reparative archival description at Yale, see Yale’s Statement on Harmful Language in Archival Description.

**+ Subjects »**

**+ Finding Aid & Administrative Information »**

**+ Repository Details »**

Suggest a Correction

Search Collection

From year

To year

Search

## Navigate the collection

Henry Lewis Stimson papers

- Series I: Correspondence, 1884-1955
- Series II: Memoranda, Minutes of Meetings
- Series III: Speeches, Writings, Statements, 1888-1975
- Series IV: Special Subjects
- Series V: Family Papers
- Series VI: Selected Documents of the State Department
- Series VII: Trips to Europe, 1930-1932
- Series VIII: Correspondence, Speeches, and Writings of Others
- Series IX: The Office of the Secretary of War Under H.L. Stimson
- Series X: Printed Material, 1884-1949
- Series XI: Newspaper Clippings
- Series XII: Business, Financial and Legal Papers, 1893-1950
- Series XIII: Photographs
- Series XIV: Diaries, 1909-1945
- Series Accession 2010-M-033: Additional Material, 1910
- Series Accession 2019-M-0025: Additional Material, 1905-1937

Yale System Status Privacy Policy Data Use Accessibility

# Footnote 14

*Democracy Dies in Darkness*

# An insider's view of Ronald Reagan's dysfunctional foreign policy team

Secretary of State George P. Shultz called it 'the worst organization I've ever seen,' according to Philip Taubman's new book, 'In the Nation's Service'

January 11, 2023 More than **3 years ago**



Review by David E. Hoffman

President Ronald Reagan declared "Tear down this wall" more than two years before the Berlin Wall fell in November 1989. He predicted in a speech at Westminster in 1982 that democracy would leave Marxism on the "ash heap of history." Reagan stood fast for a military buildup and a ballistic missile defense system. By some accounts, he led the United States to triumph in the Cold War. What's often left out of this narrative is the essential role of Mikhail Gorbachev in loosening forces within the Soviet Union that caused it to collapse of its own weakness. To this day, historians debate both arguments.

Philip Taubman's "In the Nation's Service: The Life and Times of George P. Shultz" adds a surprising new dimension to the Reagan saga. Through the eyes of Shultz, the secretary of state, Taubman portrays the Reagan administration as swamped and nearly paralyzed by disorganization and infighting. Cabinet members and White House aides were constantly at each other's throats. This will come as no surprise to students of the Reagan presidency, but Taubman, a longtime reporter and editor at the New York Times, introduces a new and highly credible source.

On becoming secretary of state in July 1982, Shultz selected as his executive secretary a veteran diplomat, Raymond Seitz, who had served at embassies in Canada, Kenya, Zaire and Britain, and in senior staff posts at Foggy Bottom. Seitz was "a shrewd student of foreign policy making" with "a fine feel for the flow of power in Washington," Taubman says, and "once installed in a small office immediately adjacent to Shultz's, Seitz started keeping detailed notes of daily developments and meetings, beginning a confidential chronicle of Shultz's work." Eventually it turned into "a full-scale journal filled with unvarnished accounts of successes and setbacks."

Seitz's journal, from 1982 to 1984, provides stark, contemporaneous evidence of the administration's dysfunction. In one of the first crises he faced, an Israeli escalation in Lebanon in August 1982, United Nations Ambassador Jeane Kirkpatrick went behind Shultz's back to the White House for a key decision. Seitz recalls seeing Shultz as he "stared wearily out the window for a long time as it dawned on him" what she had done.

Shultz constantly felt distant from Reagan. "The problem is I don't know exactly what Reagan thinks," he told Seitz. Another time, in early 1983, Seitz noted, "This is all very confusing — what's the real Ronald Reagan?" When Shultz finally secured a meeting with the president to discuss Soviet policy on March 10, 1983, he found the room packed with people he didn't know. Shultz looked at one man and said, "For example, sir, I don't even know who you are." It was Richard Pipes, the hawkish Harvard University historian of Russia and the Soviet Union, who was then running Soviet policy on the National Security Council staff. The meeting was a "fiasco," Taubman says.

Shultz told Seitz at one point: "There is a management crisis in foreign affairs here. . . . It's the worst organization I've ever seen." In 1983, other administration officials persuaded Reagan to approve a plan to escalate pressure on the leftist government of Nicaragua. Shultz was not told. "The end run staggered, humiliated and infuriated Shultz," Taubman says. When Reagan decided to send a personal, handwritten letter to Soviet leader Yuri Andropov, Shultz was not informed. Then Shultz discovered that his recommendations for personnel were being undermined. Seitz recorded a furious Shultz calling the White House personnel director, John Herrington: "I consider this intolerable. . . . Apparently there has been a meeting with the president that I didn't even know about. . . . I didn't even get to have a say. That's what really gets to me!" Shultz was not informed that Robert C. McFarlane, then deputy national security adviser, made a trip to the Middle East in July 1983. "There is utter confusion everywhere," Seitz noted. "Apparently there has been a disastrous failure in coordination and discipline."

Shultz, however, was a devoted team player. In February 1983, he clashed with national security adviser William P. Clark, an old Reagan hand, but instead of asserting himself, he worried about upsetting White House staff operations. Shultz told Seitz one evening, "A president needs his staff." Taubman says that Shultz "seemed seized by good governance practices and a surprising degree of timidity."

Shultz was "not in the loop" of planning for Reagan's March 23, 1983, speech announcing research on a space-based missile defense plan, the Strategic Defense Initiative (SDI). When he learned of it just days before the announcement, he tried to dissuade Reagan, and failed. Shultz then "reversed course" and enthusiastically backed the program, Taubman reports. He privately told Seitz that Reagan's ideas about eliminating nuclear weapons were a "pipe dream," but soon thereafter he demanded that State Department subordinates support SDI because "we work for the president of the United States." Shultz pondered resigning more than once but never did, although he felt deflated. "There isn't any joy in anything these days," he told Seitz in 1984. "Doesn't anything good happen? I'm sick of it."

Reagan was reelected in a landslide in 1984. Behind the scenes, his leading Cabinet members were at loggerheads. The most serious collisions were between Shultz and Defense Secretary Caspar Weinberger over Soviet policy. Weinberger, an architect of the military buildup and strategy of confrontation during Reagan's first term, remained intransigent and distrustful of the Kremlin. Shultz, a pragmatist and problem-solver, urged Reagan to pivot to negotiation in his second term. To calm the waters, Reagan agreed to a weekly lunch at the White House. The first one, on Dec. 1, 1984, quickly fell apart. "Cap was impossible," Shultz complained. "When I spoke, he half closed his eyes. Nothing was accomplished."

In March 1985, Gorbachev became Soviet leader. He set out to save the Soviet Union from the punishing drain of the Cold War arms race and to open up its calcified, dysfunctional economic and political systems. He became the partner Reagan needed. The pace of negotiation picked up with summits in Geneva; Reykjavik, Iceland; Washington; Moscow; and New York. Shultz was more in the driver's seat than previously, although the infighting persisted. At a critical moment during the Reykjavik summit in October 1986, as Reagan and Gorbachev stood on the threshold of an agreement to eliminate all nuclear weapons, Shultz provided the needed push, saying to them both: "Then let's do it." Although the summit collapsed over Reagan's refusal to give up SDI, it laid the groundwork for future arms-control deals. By the end of his presidency, Reagan had negotiated a treaty with Gorbachev to get rid of an entire class of nuclear-armed intermediate-range missiles in Europe, and he'd gone to Moscow, walking in Red Square and declaring that the Cold War was over.

Reagan's foreign policy machinery was ramshackle, improvised and at war with itself. One wonders upon reading this account how his subordinates managed to get anything done at all, much less attempt to engineer the end of the Cold War. Taubman's use of the Seitz material provides valuable new insight into the Reagan years, and he gives Shultz credit for holding things together. "Absent Shultz's patience and resilience, it seems unlikely that Reagan could ever have overcome the chaotic conflict within his national security team," he writes.

But the other indispensable figure was Gorbachev. Without him, Reagan would have ended his presidency with little more than a sheaf of anti-communist speeches. Shultz played a prominent role in helping Reagan get results, but it was Gorbachev, first and foremost, who was key to ending the Cold War, struggling in vain to reform and save a doddering, decaying superpower.

*David E. Hoffman is a member of The Washington Post's editorial board and the author, most recently, of "Give Me Liberty: The True Story of Oswaldo Payá and his Daring Quest for a Free Cuba."*

In the Nation's Service

**The Life and Times of George P. Shultz**

By Philip Taubman

Stanford. 456 pp. $35

**A NOTE TO OUR READERS**

We are a participant in the Amazon Services LLC Associates Program, an affiliate advertising program designed to provide a means for us to earn fees by linking to Amazon.com and affiliated sites.

# Footnote 23

INTELLIGENCE COMMUNITY DIRECTIVE

191

21 July 2015

# (U) Duty to Warn

**A. (U) AUTHORITY:** The National Security Act of 1947, as amended; Executive Order (EO) 12333, as amended; and other applicable provisions of law.

**B. (U) PURPOSE**

1. (U) This Directive establishes in policy a consistent, coordinated approach for how the Intelligence Community (IC) will provide warning regarding threats to specific individuals or groups of intentional killing, serious bodily injury, and kidnapping.

2. (U) This Directive is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States (U.S.), its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**C. (U) APPLICABILITY**

1. (U) This Directive applies to the IC as defined by the National Security Act of 1947, as amended; and to such elements of any other department or agency as may be designated an element of the IC by the President, or jointly by the Director of National Intelligence (DNI) and the head of the department or agency concerned.

2. (U) This Directive, for IC elements located within departments, is intended to complement, to the greatest extent possible, departmental policies, including policies that address threats that apply both to official and non-official U.S. citizens and nationals. Any perceived inconsistencies between this Directive and departmental policies shall be resolved in consultations between the Office of the DNI (ODNI) and the department.

**D. (U) DEFINITIONS**

1. (U) ***Duty to Warn*** means a requirement to warn U.S. and non-U.S. persons of impending threats of intentional killing, serious bodily injury, or kidnapping.

2. (U) ***Intentional Killing*** means the deliberate killing of a specific individual or group of individuals.

3. (U) ***Serious Bodily Injury*** means an injury which creates a substantial risk of death or which causes serious, permanent disfigurement or impairment.

4. (U) ***Kidnapping*** means the intentional taking of an individual or group through force or threat of force.

**E. (U) POLICY**

1. (U) An IC element that collects or acquires credible and specific information indicating an impending threat of intentional killing, serious bodily injury, or kidnapping directed at a person or group of people (hereafter referred to as intended victim) shall have a duty to warn the intended victim or those responsible for protecting the intended victim, as appropriate. This includes threats where the target is an institution, place of business, structure, or location. The term *intended victim* includes both U.S. persons, as defined in EO 12333, Section 3.5(k), and non-U.S. persons.

**F. (U) IMPLEMENTATION**

1. (U) IC elements shall establish internal procedures for making duty to warn determinations based on information they acquire, and for delivering threat information in a timely manner while protecting sources and methods.

2. (U) IC elements shall designate senior officers responsible for reviewing threat information initially determined to meet duty to warn requirements to affirm whether the information is credible and specific, so as to permit a meaningful warning. IC elements shall also designate senior officers responsible for making waiver determinations based on criteria identified in this Directive. The senior officers designated for affirming that duty to warn information is sufficient for a meaningful warning and for making waiver determinations should not be the same individual.

3. (U) Each IC element's duty to warn procedures shall include a provision whereby the duty to warn may be waived. An IC element's internal procedures shall include all justifications appropriate for the IC element. The following are examples of appropriate justifications that should be included in an element's procedures:

a. (U) The intended victim, or those responsible for ensuring the intended victim's safety, is already aware of the specific threat;

b. (U) The intended victim is at risk only as a result of the intended victim's participation in an insurgency, insurrection, or other armed conflict;

c. (U) There is a reasonable basis for believing that the intended victim is a terrorist, a direct supporter of terrorists, an assassin, a drug trafficker, or involved in violent crimes;

d. (U) Any attempt to warn the intended victim would unduly endanger U.S. government personnel, sources, methods, intelligence operations, or defense operations;

e. (U//[redacted]The information resulting in the duty to warn determination was acquired from a foreign government with whom the U.S. has formal agreements or liaison relationships, and any attempt to warn the intended victim would unduly endanger the personnel, sources, methods, intelligence operations, or defense operations of that foreign government; or

f. (U) There is no reasonable way to warn the intended victim.

4. (U) Issues concerning whether threat information meets the duty to warn threshold should be resolved in favor of informing the intended victim if none of the justifications in Section F.3 are present.

5. (U) Upon determination by an IC element that a duty to warn exists and will not be waived that IC element shall generate statements documenting the threat information and the basis for the duty to warn determination, and include an unclassified tear line, where possible, for use in delivering the threat information to the intended victim.

6. (U) Tearlines for delivery to the intended victim should be devoid of information that identifies sources and methods involved in acquiring the information, and consistent with IC Directive 209, *Tearline Production and Dissemination.*

7. (U) Communication of threat information to the intended victim may be delivered in person, or through other verifiable means of communication.

8. (U//[redacted] Communication of threat information to the intended victim may be delivered anonymously if that is the only method available to ensure protection of U.S. government personnel, sources, methods, intelligence operations, or defense operations.

9. (U) If the intended victim is located in the U.S. and its territories, IC elements shall consult with the Federal Bureau of Investigation (FBI) to determine how best to communicate threat information to the intended victim.

10. [redacted]

11. (U) When an IC element identifies a duty to warn in information originated by another IC element, the IC element shall notify the originating IC element, which will make a determination if a duty to warn exists and, if so, shall provide the warning and take other appropriate action in compliance with this policy. The originating element also shall inform the notifying element of its determination and the course of action taken.

12. (U//[redacted]When a threat is so imminent as to render consultation or notification infeasible, an IC element may deliver threat information to an intended victim in an expeditious manner without prior consultation or notification. Notification of the delivery of the threat information shall be made to the FBI or the CIA, as appropriate, and to the originating IC element expeditiously and no later than five days after informing the intended victim.

13. (U) IC elements shall document and maintain records on the following duty to warn actions:

a. (U) The method, means, and substance of any warning given by the IC element;

b. (U) Senior officer reviews of threat information and determinations;

c. (U) Justifications not to warn an intended victim based on waiver criteria identified in this Directive;

d. (U//[redacted] Coordination with the FBI, or CIA, consistent with Sections F.9 and F.10, to determine how best to pass threat information to the intended victim;

e. (U) Decisions to inform the intended victim in light of exigent circumstances that preclude prior consultation;

f. (U) Communication of threat information to another IC element or U.S. government agency for delivery to the intended victim; and

g. (U) Notification to the originating IC element of how and when threat information was delivered to the intended victim.

14. (U) IC elements that receive threat information from another IC element or a U.S. government agency outside the IC for the purpose of delivering the information to an intended victim shall document the steps taken to deliver the threat information to the intended victim and notify the originating IC element or U.S. government agency of the steps taken.

**G. (U) DISPUTE RESOLUTION**

1. (U) If an issue arises among IC elements regarding a determination to warn an intended victim or waive the duty to warn requirement, or regarding the method for communicating the threat information to the intended victim, resolution of the issue shall occur at the lowest practical and authorized level.

2. (U) If an issue in dispute has been elevated to the heads of the involved IC elements and attempts at resolution remain at an impasse, the heads of the IC elements shall notify the DNI. The DNI will facilitate resolution of issues that have been referred.

3. (U) Dispute resolution shall occur in a manner that does not unnecessarily delay the timely notification of threat information to the intended victim.

**H. (U) ROLES AND RESPONSIBILITIES**

1. (U) The DNI will oversee and facilitate resolution of disputes referred by heads of IC elements.

2. (U) The heads of IC elements shall:

a. (U) Establish an internal duty to warn process consistent with this Directive;

b. (U) Maintain records on duty to warn determinations, including decisions to waive the requirement and any actions taken to warn the intended victim; and

c. (U) Provide information to the DNI, upon request, regarding duty to warn procedures and actions.

3. (U) IC employees who identify credible and specific information indicating an impending threat of intentional killing, serious bodily injury, or kidnapping of an individual or group shall immediately report this information to their IC element for a determination by the element whether to warn the intended victim.

**I. (U) EFFECTIVE DATE:** This Directive becomes effective on the date of signature.

//SIGNED//
James R. Clapper — Director of National Intelligence

21 July 2015 — Date

FAS

# Intelligence Agencies Have A "Duty To Warn" Endangered Persons

08.24.15 | 3 MIN READ | TEXT BY STEVEN AFTERGOOD

Intelligence agencies that discover a threat to a person's life or safety are obliged to alert the intended target in most cases as long as they can do so without compromising intelligence sources and methods, a new intelligence community directive instructs.

A U.S. intelligence agency "that collects or acquires credible and specific information indicating an impending threat of intentional killing, serious bodily injury, or kidnapping directed at a person or group of people shall have a duty to warn the intended victim or those responsible for protecting the intended victim, as appropriate," the new directive states. "This includes threats where the target is an institution, place of business, structure, or location."

Remarkably, "the term *intended victim* includes both U.S. persons… and non-U.S. persons."

The "duty to warn" obligation, which in principle dates back at least several decades, was formally established last month by Director of National Intelligence James R. Clapper in Intelligence Community Directive 191, July 21, 2015.

It is not binding in all circumstances, however. Notification of the target would be waived if it "would unduly endanger U.S. government personnel, sources, methods, intelligence operations, or defense operations."

The notification requirement also does not apply in cases where the threat emanates from the U.S. government itself, whether in combat operations or in "covert" targeted killing programs. Thus, the directive states that the requirement would be appropriately waived when "There is a reasonable basis for believing that the intended victim is a terrorist, a direct supporter of terrorists, an assassin, a drug trafficker, or involved in violent crimes."

Likewise, no notification would be required in cases where "The intended victim is at risk only as a result of the intended victim's participation in an insurgency, insurrection, or other armed conflict." Nor is notice needed when the intended victim "is already aware of the specific threat."

The "duty to warn" requirement seems to be an obligation that has been voluntarily assumed by the U.S. intelligence community, perhaps for moral or prudential reasons. In other contexts where there are similar requirements for professionals to breach confidentiality and to warn of credible threats (most notably mental health care), they are rooted in case law. But no comparable legal precedent or statutory requirement appears to exist in the intelligence context that would compel agencies to act in this way. The legal authorities cited in the new DNI directive — the National Security Act and executive order 12333 — do not specifically mention the duty to warn.

If necessary to protect sources and methods, "communication of threat information to the intended victim may be delivered anonymously," the new DNI directive says.

Former U.S. intelligence officer Rick Francona recalled being part of a CIA covert action team in northern Iraq in 1995 that was tasked one day to warn an American living there that he had been targeted for death by Iranian Revolutionary Guards because of his Christian missionary activity.

Francona and his heavily armed CIA team knocked on the incredulous American's door and introduced themselves: "We're from the State Department."

---

PUBLICATIONS

SEE ALL PUBLICATIONS

GOVERNMENT CAPACITY

BLOG

**Why America Needs To Grow The Field Of Data Policy**

The strength of our nation's data policy isn't just in the rules we write, but in how effectively we translate those rules into a system that prioritizes the public good. Join us in this movement to design and build more resilient national data policies.

11.02.26 | 5 MIN READ

READ MORE

GOVERNMENT CAPACITY

BLOG

**Following The Data Can Save Thousands Of Lives On The Organ Waiting List And Billions Of Dollars For Taxpayers**

The human cost is measured in deaths. The financial cost is measured in the $52 billion taxpayers pay annually end stage renal disease – double NASA's budget.

10.30.26 | 8 MIN READ

READ MORE

FAS

PRESS RELEASE

### Gilman Louie, Longest Serving Board Chair Of The Federation Of American Scientists, Named Chair Emeritus

Gilman Louie, Longest Serving Board Chair of the Federation of American Scientists, Named Chair Emeritus

10.30.26 | 3 MIN READ

READ MORE

FAS

POLICY STATEMENT

### FAS Supports The Congressional Office Of Technology Improvement And Enhancement Act

The proposed Office will resurrect the long-closed Office of Technology Assessment (OTA), the archive of which has been maintained by FAS for decades at https://ota.fas.org/.

10.29.26 | 2 MIN READ

READ MORE

CAREERS

JOIN TEAM FAS

## We believe in embracing a growth oriented and entrepreneurial mindset to drive impact for our colleagues, our customers and the world.

SEE OPEN POSITIONS

STAY INFORMED

Sign up for newsletter to receive the latest news and announcements

YOUR EMAIL ADDRESS SUBMIT

CONTACT CONNECT WITH US

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 155 of 363

fas@fas.org

Twitter

LinkedIn

PRIVACY POLICY

COOKIE POLICY

DESIGNED BY AND-NOW

FEDERATION OF AMERICAN SCIENTISTS © 2026

# Footnote 24

PRESS RELEASE

# Member of Iran's Islamic Revolutionary Guard Corps (IRGC) Charged with Plot to Murder the Former National Security Advisor

Wednesday, August 10, 2022

**For Immediate Release**

Office of Public Affairs

## Defendant Worked on Behalf of the IRGC to Hire Persons in the United States to Carry Out the Murder, Likely in Retaliation for the January 2020 Death of Qasem Soleimani

**Note:** A video statement from Department officials is available here.

An Iranian national and member of Iran's Islamic Revolutionary Guard Corps (IRGC) was charged by complaint, unsealed today in the District of Columbia, with use of interstate commerce facilities in the commission of murder-for-hire and with providing and attempting to provide material support to a transnational murder plot.

According to court documents, beginning in October 2021, Shahram Poursafi, aka Mehdi Rezayi, 45, of Tehran, Iran, attempted to arrange the murder of former National Security Advisor John Bolton, likely in retaliation for the January 2020 death of Iran's Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) commander Qasem Soleimani. Poursafi, working on behalf of the

IRGC-QF, attempted to pay individuals in the United States $300,000 to carry out the murder in Washington, D.C. or Maryland.

"The Justice Department has the solemn duty to defend our citizens from hostile governments who seek to hurt or kill them," said Assistant Attorney General Matthew G. Olsen of the Justice Department's National Security Division. "This is not the first time we have uncovered Iranian plots to exact revenge against individuals on U.S. soil and we will work tirelessly to expose and disrupt every one of these efforts."

"Iran has a history of plotting to assassinate individuals in the U.S. it deems a threat, but the U.S. Government has a longer history of holding accountable those who threaten the safety of our citizens," said Executive Assistant Director Larissa L. Knapp of the FBI's National Security Branch. "Let there be no doubt: The FBI, the U.S. government, and our partners remain vigilant in the fight against such threats here in the U.S. and overseas."

"Iran's Islamic Revolutionary Guard Corps, through the Defendant, tried to hatch a brazen plot: assassinate a former U.S. official on U.S. soil in retaliation for U.S. actions," said U.S. Attorney Matthew M. Graves for the District of Columbia. "Iran and other hostile governments should understand that the U.S. Attorney's Office and our law enforcement partners will do everything in our power to thwart their violent plots and bring those responsible to justice."

"An attempted assassination of a former U.S. Government official on U.S. soil is completely unacceptable and will not be tolerated," said Assistant Director in Charge Steven M. D'Antuono of the FBI Washington Field Office. "The FBI will continue to identify and disrupt any efforts by Iran or any hostile government seeking to bring harm or death to U.S. persons at home or abroad. This should serve as a warning to any others attempting to do the same – the FBI will be relentless in our efforts to identify, stop, and bring to justice those who would threaten our people and violate our laws."

According to court documents, on Oct. 22, 2021, Poursafi asked Individual A, a U.S. resident whom Poursafi previously met online, to take photographs of the former National Security Advisor, claiming the photographs were for a book Poursafi was writing. Individual A told Poursafi that he/she could introduce Poursafi to another person who would take the pictures for $5,000-$10,000. Individual A later introduced Poursafi to an associate (referred to in court documents as the confidential human source or CHS).

On Nov. 9, 2021, Poursafi contacted the CHS on an encrypted messaging application, and then directed the CHS to a second encrypted messaging application for further communications. Poursafi offered the CHS $250,000 to hire someone to "eliminate" the former National Security Advisor. This amount would later be negotiated up to $300,000. Poursafi added that he had an additional "job," for which he would pay $1 million.

Poursafi directed the CHS to open a cryptocurrency account to facilitate payment, but stipulated that the CHS would likely have to carry out the murder before he/she could be paid. He further explained to the CHS that if he/she was paid and the murder was not completed, Poursafi's "group" would be angry. A later search of one of Poursafi's online accounts revealed pictures of Poursafi wearing a uniform with an IRGC patch. During their communications, the CHS made several references to Poursafi being associated with IRGC-QF. Poursafi never denied his involvement with IRGC-QF.

On Nov. 14, 2021, the CHS asked Poursafi for help locating the former National Security Advisor. Poursafi subsequently provided the CHS with the target's work address in Washington, D.C. According to results from the search of one of Poursafi's online accounts, on Nov. 25, 2021, Poursafi took screenshots of a map application showing a street view of the former National Security Advisor's office. One screenshot noted that the address was "10,162 km away," which is the approximate distance between Washington, D.C. and Tehran, Iran.

On Nov. 19, 2021, Poursafi told the CHS that it did not matter how the murder was carried out, but his "group" would require video confirmation of the target's death. The CHS asked Poursafi what would happen if the killing was attributed to Iran. Poursafi told the CHS not to worry and that Poursafi's "group" would take care of it.

Poursafi also advised the CHS to communicate about the plot in construction and building terms. For example, when the CHS asked Poursafi to specify how the murder was to be carried out, Poursafi told the CHS that he only asked the CHS to build a structure, but the method of construction was up to the CHS.

On Dec. 22, 2021, Poursafi sent the CHS a photograph of two plastic bags, each of which appeared to contain bound stacks of U.S. currency and a handwritten note beneath them that said, "[CHS's name] 22.12.2021".

On Dec. 29, 2021, Poursafi asked the CHS when the murder would be carried out and informed the CHS that his "group" wanted it done quickly.

On Jan. 3, 2022, Poursafi noted he was under pressure from "his people" to complete the murder and that Poursafi had to report any delays. The CHS asked Poursafi how many people were involved. Poursafi told the CHS that he only had to report to one person, but that there was a chain of command to whom his superior reported. That same day, Poursafi expressed regret that the murder would not be conducted by the anniversary of Qasem Soleimani's death. He stated he was concerned that if it was not carried out soon, the job would be taken from Poursafi and the CHS. Poursafi counseled the CHS that if he/she used a "small weapon," he/she would have to get close to the target, but if he/she used a "larger weapon," he/she could stay farther away.

On Jan. 18, 2022, the CHS sent Poursafi publicly available information that suggested the former National Security Advisor might be travelling out of the Washington, D.C., area during the time Poursafi indicated he would like the CHS to carry out the murder. Poursafi told the CHS that he needed to "check something." Within an hour, he told the CHS that the target was, in fact, not travelling. He then provided the CHS with specifics regarding the former National Security Advisor's schedule that do not appear to have been publicly available.

On Jan. 21, 2022, Poursafi told the CHS that after successful completion of the first "job," he had a second "job" for the CHS and informed the CHS that surveillance of the second target was complete. Poursafi said the information was gathered "from the United States," not "via Google," indicating someone working on behalf of the IRGC-QF had already conducted pre-operational surveillance on the second target in the United States.

On Feb. 1, 2022, Poursafi told the CHS that if he/she did not eliminate the target within two weeks, the job would be taken from the CHS. He also informed the CHS that someone checked the area around the former National Security Advisor's home, and he believed there was not a security presence, so the CHS should be able to "finish the job."

On March 10, 2022, Poursafi told the CHS he had another assassination job for the CHS in the United States, but to "keep [the former National Security Advisor] in the back of your mind." Approximately one month later, Poursafi encouraged the CHS to accept this offer, explaining that if it was done successfully, Poursafi would be able to ingratiate himself with his "group" and regain the tasking to murder the former National Security Advisor.

On April 28, 2022, the CHS told Poursafi that he/she would not continue to work without being paid. Poursafi agreed to send the CHS $100 in cryptocurrency to a virtual wallet the CHS created earlier that day, to prove payment could be made. Later that day, the cryptocurrency wallet received two payments totaling $100.

If convicted, Poursafi faces up to 10 years imprisonment and a fine up to $250,000 for the use of interstate commerce facilities in the commission of murder-for-hire, and up to 15 years imprisonment and a fine up to $250,000 for providing and attempting to provide material support to a transnational murder plot. Poursafi remains at large abroad.

This case was investigated by the FBI Washington Field Office. It is being prosecuted by Assistant U.S. Attorney Christopher Tortorice for the District of Columbia and Trial Attorney Joshua Champagne of the National Security Division's Counterterrorism Section. Assistant U.S. Attorney Jason McCullough provided assistance in the case.

*Updated February 6, 2025*

**Topic**

**NATIONAL SECURITY**

**Components**

Federal Bureau of Investigation (FBI) | National Security Division (NSD) | USAO - District of Columbia

Press Release Number: 22-860

**Office of Public Affairs**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

# Footnote 25

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/opinion/the-brits-foil-a-possible-terror-attack-f1c2d043

OPINION REVIEW & OUTLOOK Follow

# The Brits Foil a Possible Terror Attack

Police are investigating if the five suspects have ties to Iran's IRGC.

By The Editorial Board
Sept. 27, 2026 4:06 pm ET



A B-52 Stratofortress long-range subsonic bomber aircraft at Royal Air Force Fairford, Gloucestershire, England, Sept. 19, 2025. BEN BIRCHALL/ZUMA PRESS

Congratulations to the British police for stopping what appears to have been a terrorist plot against a military facility in the United Kingdom. Details are rolling out as we write this, but a key question is whether the suspects are linked to Iran's Islamic Revolutionary Guard Corps (IRGC).

The suspects were stopped by police as they headed in three vehicles in the wee hours of Sunday to the U.K's Royal Air Force Fairford base in Gloucestershire. Police arrested five men on suspicion of planning to commit terrorist acts.

American B-52 and B-1 bombers are based in Fairford and have been spotted flying toward the Middle East since the latest hostilities with Iran began this year. Fairford has been used by the U.S. military going back to preparations for D-Day in 1944.

“They were looking to do big damage to our fort, and working with the British worked out great,” President Trump said on Sunday morning. “We had them [the suspects] under view for a long time, and we got them.” The U.S. and British intelligence services work closely together, and Mr. Trump’s comments suggest the motives of the suspects may go beyond a British domestic act of terror.

Iran’s Revolutionary Guard has to be a prime suspect after it warned the British government this summer not to let U.K bases be used in connection with the war. “Any base used to launch attacks on Iranian territory is a legitimate target for our forces,” the IRGC said.

The episode is a reminder that today’s conflicts aren’t limited to the immediate battlefield. Adversaries will use asymmetric means to inflict damage, if they can, on the U.S. homeland, its troops and diplomats abroad, and American allies. The Islamic Revolutionary Guard and its Quds force specialize in terrorist attacks abroad.

They have plotted to kill former U.S. officials John Bolton and Mike Pompeo from Mr. Trump’s first term, and probably Mr. Trump himself. The Tehran regime won’t stop these attacks even if it signs a cease-fire deal to open the Strait of Hormuz. This is what a revolutionary regime does.

*Appeared in the September 28, 2026, print edition as 'The Brits Foil a Possible Terror Attack'.*

---

The Editorial Board speaks for free markets and free people, the principles, if you will, marked in the watershed year of 1776 by Thomas Jefferson’s Declaration of Independence and Adam Smith’s “Wealth of Nations.” So over the past century and into the next, the Journal stands for free trade and...

## Further Reading

OPINION **Trump's Failed Lawsuit Lesson**

OPINION **Notable &Quotable: 3 Pens**

OPINION **Warning the International Court of Justice**

OPINION **To Brazil's Victor Goes Political Revenge**

OPINION **A Cuba Showdown at the U.N.**

## Videos

# Footnote 26

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 167 of 363
ADVERTISEMENT

CNN Politics Subscribe

POLITICS • 3 MIN READ

# Trump terminates John Bolton's security detail within hours of taking office

UPDATED JAN 21, 2025

By  Kaitlan Collins



See more videos

ADVERTISEMENT

**Washington —** Within hours of taking office, President Donald Trump terminated the Secret Service detail that was assigned to his former national security adviser John Bolton, Bolton confirmed to CNN on Tuesday.

Bolton, who left the Trump White House in November 2019, has required ongoing US Secret Service protection because of threats against him from Iran. Trump initially terminated his protection after he left his administration in the first term, but President Joe Biden restored it once he took office.

"I am disappointed but not surprised that President Trump has made this decision," Bolton said in a statement to CNN. "Notwithstanding my criticisms of President Biden's national-security policies, he nonetheless made the decision to once again extend Secret Service protection to me in 2021."

"The Justice Department filed criminal charges against an Iranian Revolutionary Guard official in 2022 for attempting to hire a hit man to target me. That threat remains today, as also demonstrated by the recent arrest of someone trying to arrange for President Trump's own assassination. The American people can judge for themselves which President made the right call."

Bolton, who served in senior national security positions in the Bush administration, has long been known for his hawkish position against Iran. He strongly opposed the 2015 nuclear deal that placed significant restrictions on Iran's nuclear program in exchange for relief from US sanctions, and he called on Trump to withdraw from the deal after he took office.

Trump withdrew the US from the deal in May 2018, about a month after Bolton was hired as his national security adviser. Trump fired Bolton in September 2019 after saying he "strongly disagreed with many" of Bolton's positions.

ADVERTISEMENT

informed on matters of foreign policy, obsessed with shaping his media legacy, and that Trump asked the leaders of Ukraine and China to help him win the 2020 election. Trump responded by threatening to jail Bolton, repeating a threat he makes routinely about people who cross him.

After Iranian military officer Qasem Soleimani was assassinated on Trump's orders in early 2020, the Justice Department said the Iranian government sought revenge against senior Trump officials who were involved in the killing, which included Bolton, even though he was not in the administration at the time of the fatal strike.

In August 2022, the Justice Department charged an Iranian national and member of Iran's Islamic Revolutionary Guard Corps, accusing them of attempting to arrange the murder of Bolton. Prosecutors said the plot against Bolton was "likely in retaliation" for Soleimani's assassination.

On Monday, as one of his first acts in office, Trump revoked Bolton's security clearance – one of scores of former national security officials who lost their clearances with a signature of the new president.

*This is a breaking story and will be updated.*

CNN's Michael Williams contributed to this report.

## Up next

Trump upends careful compromise on intel chief, plunging GOP into disarray
5 MIN READ

Russia's security service detains a teenager planning a 'terror attack' after a US tip-off

ADVERTISEMENT

How Trump has deceived himself on Iran

5 MIN READ

Kennedy Center says it has fully removed Trump's name from its building

6 MIN READ

Search CNN...

Subscribe

Sign in

Listen

Watch

ADVERTISEMENT

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

About CNN

Politics

FOLLOW CNN POLITICS

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 172 of 363
ADVERTISEMENT

Download on the App Store

GET IT ON Google Play

Terms of Use Privacy Policy Manage Cookies Ad Choices Advertise With Us Accessibility & CC About Subscribe
Newsletters Transcripts Help Center Sitemap

© 2026 Cable News Network. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

# Footnote 27

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/opinion/john-bolton-donald-trump-iran-list-security-secret-service-5294ef4c

OPINION REVIEW & OUTLOOK Follow

# Trump, Iran's Assassins and John Bolton

The President has the Secret Service, but his targeted former advisers don't.

By The Editorial Board
July 19, 2026 4:14 pm ET



President Donald Trump and National security advisor John Bolton in 2018. OLIVER CONTRERAS-POOL/ ZUMA PRESS

President Trump is taking Iran's threats to assassinate him seriously, as well he should. He reportedly switched Air Force One from the new Qatar version on his return from the recent NATO summit on the advice of the Secret Service. How about a little concern, then, about Iran's threats to kill his former national security adviser, John Bolton?

The White House hasn't confirmed the Air Force One switch, but it hasn't denied the story either. Notably, the Justice Department has subpoenaed New York Times writers who reported the story to disclose their sources. That's harassment against the press that won't make the U.S. safer. The

story arguably did Mr. Trump a favor by reminding the public that Iran's regime hasn't turned over a "new leaf," to borrow Vice President JD Vance's term.

"They want to take out the U.S. leader—me," Mr. Trump told reporters in Turkey. "I'm on every list. I saw this morning, I'm on every single one of their lists. And so far, I guess I've been a little bit lucky, but that maybe doesn't last very long."

Mr. Trump said he has given orders for the U.S. military for a massive military assault on Iran if he is assassinated. By that time the orders would have to come from new President Vance, and we'd like to think he'd unleash hell as well.

Iran has long wanted to kill American officials, as well as anti-regime exiles in the U.S. It targeted Brooklyn, N.Y., based Iranian dissident Masih Alinejad, according to a federal case against would-be assassins. Two men have been convicted in the foiled plot.

Which brings us to Mr. Bolton, who has been targeted by Iran along with Mr. Trump's first-term Secretary of State Mike Pompeo and State's main deputy for Iran policy in the first term, Brian Hook. The Biden Administration was concerned enough that it provided the trio with protection details.

But after taking office a second time, Mr. Trump pulled that protection from all three. This was raw vindictiveness, since we doubt Iran has given up on killing them. Iran blames all three for the 2020 assassination of Qassem Soleimani, who ran Iran's network of terror proxies for the Islamic Revolutionary Guard Corps. These Americans are targets because of a decision the President rightly made.

The danger for Mr. Bolton in particular has increased because the Trump Administration is prosecuting him for mishandling classified documents. Mr. Bolton pleaded guilty last month to avoid the threat of additional charges against him or his family. The plea deal stipulates a fine of $2.25 million, which is an effort to strip Mr. Bolton of the income from his 2020 book that was critical of Mr. Trump.

But far worse, the Justice Department has insisted on seeking a prison term of up to five years. This is a penalty far beyond what other officials have received for similar or greater classification offenses. John Deutch, David Petraeus and Sandy Berger never served jail time and none pleaded guilty to felonies. Mr. Bolton was treated more harshly.

Federal Judge Theodore Chuang has scheduled sentencing for Mr. Bolton for Oct. 28. But a jail term of any length runs the risk of assassination. It wouldn't take much for Iranians to bribe an inmate, or threaten relatives of an inmate or guard, to have Mr. Bolton killed while he's in custody. Prisons are notoriously insecure.

By the way, Iran hacked Mr. Bolton's personal AOL account after he left office, in what he thinks was an attempt to get hold of his calendar for a potential murder hit. Mr. Bolton contacted the Biden Administration in 2021, though he wasn't obliged to. Mr. Bolton's reward for assisting the FBI counterterrorism division is to have Mr. Trump unleash the bureau and prosecutors on him.

***

Mr. Trump has the Secret Service to protect him, but these other public servants don't. They have to do without security or pay for it themselves, as Mr. Bolton has. Let's hope Judge Chuang dispenses with the Justice Department's unjust prison demand and issues a suspended sentence.

As for Mr. Trump, he's already exacted revenge against his former adviser with the prosecution and fine. He knows Iran has a kill "list" that includes him and his advisers. If Mr. Bolton is killed in prison, the President and his Justice Department will be partly responsible.

*Appeared in the July 20, 2026, print edition as 'Trump, Iran's Assassins and John Bolton'.*

---

The Editorial Board speaks for free markets and free people, the principles, if you will, marked in the watershed year of 1776 by Thomas Jefferson's Declaration of Independence and Adam Smith's "Wealth of Nations." So over the past century and into the next, the Journal stands for free trade and...

## Further Reading

**Trump Administration, States Harden Battle Lines Ahead of Election Day**

**Justice Department Sends New Subpoenas in Alaska Election Probe**

**Justice Department Push Against Trump's Foes Reaches Higher Gear**

**Grand Jury Declines to Indict Former White House Aide Cassidy Hutchinson**

**Court Rejects Trump Administration Bid to Set Aside California Mail-in Ballots**

## Videos

# Footnote 28

POLITICS

# The Trump Administration Accidentally Texted Me Its War Plans

U.S. national-security leaders included me in a group chat about upcoming military strikes in Yemen. I didn't think it could be real. Then the bombs started falling.

By Jeffrey Goldberg



Andrew Harnik / Getty

MARCH 24, 2025

SHARE AS GIFT SAVE

***Editor's Note:*** *This article is the first in a series about the Trump administration's use of Signal group chatting. Read the next story in the series here.*

The world found out shortly before 2 p.m. eastern time on March 15 that the United States was bombing Houthi targets across Yemen.

I, however, knew two hours before the first bombs exploded that the attack might be coming. The reason I knew this is that Pete Hegseth, the secretary of defense, had texted me the war plan at 11:44 a.m. The plan included precise information about weapons packages, targets, and timing.

This is going to require some explaining.

ADVERTISEMENT



The 29 Coolest Gifts of 2026

29+ Coolest Gifts Nobody Would Think Of

Consumerbags

Open

*This article was featured in the One Story to Read Today newsletter. Sign up for it here.*

The story technically begins shortly after the Hamas invasion of southern Israel, in October 2023. The Houthis—an Iran-backed terrorist organization whose motto is "God is great, death to America, death to Israel, curse on the Jews, victory to Islam"—soon launched attacks on Israel and on international shipping, creating havoc for global trade. Throughout 2024, the Biden administration was ineffective in countering these Houthi attacks; the incoming Trump administration promised a tougher response.

This is where Pete Hegseth and I come in.

On Tuesday, March 11, I received a connection request on Signal from a user identified as Michael Waltz. Signal is an open-source encrypted messaging service popular with journalists and others who seek more privacy than other text-messaging services are capable of delivering. I assumed that the Michael Waltz in question was President Donald Trump's national security adviser. I did not assume, however, that the request was from the actual Michael Waltz. I have met him in the past, and though I didn't find it particularly strange that he might be reaching out to me, I did think it somewhat unusual, given the Trump administration's contentious relationship with journalists—and Trump's periodic fixation on me specifically. It immediately crossed my mind that someone could be masquerading as Waltz in order to somehow

entrap me. It is not at all uncommon these days for nefarious actors to try to induce journalists to share information that could be used against them.

I accepted the connection request, hoping that this was the actual national security adviser, and that he wanted to chat about Ukraine, or Iran, or some other important matter.

Two days later—Thursday—at 4:28 p.m., I received a notice that I was to be included in a Signal chat group. It was called the "Houthi PC small group."

A message to the group, from "Michael Waltz," read as follows: "Team – establishing a principles [*sic*] group for coordination on Houthis, particularly for over the next 72 hours. My deputy Alex Wong is pulling together a tiger team at deputies/agency Chief of Staff level following up from the meeting in the Sit Room this morning for action items and will be sending that out later this evening."

The message continued, "Pls provide the best staff POC from your team for us to coordinate with over the next couple days and over the weekend. Thx."

Read: Here are the attack plans that Trump's advisers shared on Signal

The term *principals committee* generally refers to a group of the senior-most national-security officials, including the secretaries of defense, state, and the treasury, as well as the director of the CIA. It should go without saying—but I'll say it anyway—that I have never been invited to a White House principals-committee meeting, and that, in my many years of reporting on national-security matters, I had never heard of one being convened over a commercial messaging app.

One minute later, a person identified only as "MAR"—the secretary of state is Marco Antonio Rubio—wrote, "Mike Needham for State," apparently designating the current counselor of the State Department as his representative. At that same moment, a Signal user identified as "JD Vance" wrote, "Andy baker for VP." One minute after that, "TG" (presumably Tulsi Gabbard, the director of national intelligence, or someone masquerading as her) wrote, "Joe Kent for DNI." Nine minutes later, "Scott B"—apparently Treasury Secretary Scott Bessent, or someone spoofing his identity, wrote, "Dan Katz for Treasury." At 4:53 p.m., a user called "Pete Hegseth" wrote, "Dan Caldwell for DoD." And at 6:34 p.m., "Brian" wrote "Brian McCormack for NSC." One more person responded: "John Ratcliffe" wrote at 5:24 p.m. with the name of a CIA official to be included in the group. I am not publishing that name, because that person is an active intelligence officer.

The principals had apparently assembled. In all, 18 individuals were listed as members of this group, including various National Security Council officials; Steve Witkoff, President Trump's Middle East and Ukraine negotiator; Susie Wiles, the White House

chief of staff; and someone identified only as "S M," which I took to stand for Stephen Miller. I appeared on my own screen only as "JG."

That was the end of the Thursday text chain.

After receiving the Waltz text related to the "Houthi PC small group," I consulted a number of colleagues. We discussed the possibility that these texts were part of a disinformation campaign, initiated by either a foreign intelligence service or, more likely, a media-gadfly organization, the sort of group that attempts to place journalists in embarrassing positions, and sometimes succeeds. I had very strong doubts that this text group was real, because I could not believe that the national-security leadership of the United States would communicate on Signal about imminent war plans. I also could not believe that the national security adviser to the president would be so reckless as to include the editor in chief of *The Atlantic* in such discussions with senior U.S. officials, up to and including the vice president.

---

The next day, things got even stranger.

At 8:05 a.m. on Friday, March 14, "Michael Waltz" texted the group: "Team, you should have a statement of conclusions with taskings per the Presidents guidance this morning in your high side inboxes." (*High side*, in government parlance, refers to classified computer and communications systems.) "State and DOD, we developed suggested notification lists for regional Allies and partners. Joint Staff is sending this am a more specific sequence of events in the coming days and we will work w DOD to ensure COS, OVP and POTUS are briefed."

At this point, a fascinating policy discussion commenced. The account labeled "JD Vance" responded at 8:16: "Team, I am out for the day doing an economic event in Michigan. But I think we are making a mistake." (Vance was indeed in Michigan that day.) The Vance account goes on to state, "3 percent of US trade runs through the suez. 40 percent of European trade does. There is a real risk that the public doesn't understand this or why it's necessary. The strongest reason to do this is, as POTUS said, to send a message."

The Vance account then goes on to make a noteworthy statement, considering that the vice president has not deviated publicly from Trump's position on virtually any issue. "I am not sure the president is aware how inconsistent this is with his message on Europe right now. There's a further risk that we see a moderate to severe spike in oil prices. I am willing to support the consensus of the team and keep these concerns to myself. But there is a strong argument for delaying this a month, doing the messaging work on why this matters, seeing where the economy is, etc."

A person identified in Signal as "Joe Kent" (Trump's nominee to run the National Counterterrorism Center is named Joe Kent) wrote at 8:22, "There is nothing time sensitive driving the time line. We'll have the exact same options in a month."

Then, at 8:26 a.m., a message landed in my Signal app from the user "John Ratcliffe." The message contained information that might be interpreted as related to actual and current intelligence operations.

At 8:27, a message arrived from the "Pete Hegseth" account. "VP: I understand your concerns – and fully support you raising w/ POTUS. Important considerations, most of which are tough to know how they play out (economy, Ukraine peace, Gaza, etc). I think messaging is going to be tough no matter what – nobody knows who the Houthis are – which is why we would need to stay focused on: 1) Biden failed & 2) Iran funded."

The Hegseth message goes on to state, "Waiting a few weeks or a month does not fundamentally change the calculus. 2 immediate risks on waiting: 1) this leaks, and we look indecisive; 2) Israel takes an action first – or Gaza cease fire falls apart – and we don't get to start this on our own terms. We can manage both. We are prepared to execute, and if I had final go or no go vote, I believe we should. This [is] not about the Houthis. I see it as two things: 1) Restoring Freedom of Navigation, a core national interest; and 2) Reestablish deterrence, which Biden cratered. But, we can easily pause. And if we do, I will do all we can to enforce 100% OPSEC"—operations security. "I welcome other thoughts."

A few minutes later, the "Michael Waltz" account posted a lengthy note about trade figures, and the limited capabilities of European navies. "Whether it's now or several weeks from now, it will have to be the United States that reopens these shipping lanes. Per the president's request we are working with DOD and State to determine how to compile the cost associated and levy them on the Europeans."

The account identified as "JD Vance" addressed a message at 8:45 to @Pete Hegseth: "if you think we should do it let's go. I just hate bailing Europe out again." (The administration has argued that America's European allies benefit economically from the U.S. Navy's protection of international shipping lanes.)

The user identified as Hegseth responded three minutes later: "VP: I fully share your loathing of European free-loading. It's PATHETIC. But Mike is correct, we are the only ones on the planet (on our side of the ledger) who can do this. Nobody else even close. Question is timing. I feel like now is as good a time as any, given POTUS directive to reopen shipping lanes. I think we should go; but POTUS still retains 24 hours of decision space."

At this point, the previously silent "S M" joined the conversation. "As I heard it, the president was clear: green light, but we soon make clear to Egypt and Europe what we

expect in return. We also need to figure out how to enforce such a requirement. EG, if Europe doesn't remunerate, then what? If the US successfully restores freedom of navigation at great cost there needs to be some further economic gain extracted in return."




That message from "S M"—presumably President Trump's confidant Stephen Miller, the deputy White House chief of staff, or someone playing Stephen Miller—effectively shut down the conversation. The last text of the day came from "Pete Hegseth," who wrote at 9:46 a.m., "Agree."

After reading this chain, I recognized that this conversation possessed a high degree of verisimilitude. The texts, in their word choice and arguments, sounded as if they were written by the people who purportedly sent them, or by a particularly adept AI text generator. I was still concerned that this could be a disinformation operation, or a simulation of some sort. And I remained mystified that no one in the group seemed to have noticed my presence. But if it was a hoax, the quality of mimicry and the level of foreign-policy insight were impressive.

---

It was the next morning, Saturday, March 15, when this story became truly bizarre.

At 11:44 a.m., the account labeled "Pete Hegseth" posted in Signal a "TEAM UPDATE." I will not quote from this update, or from certain other subsequent texts. The information contained in them, if they had been read by an adversary of the United States, could conceivably have been used to harm American military and intelligence personnel, particularly in the broader Middle East, Central Command's




A screenshot from the Signal group shows debate over the president's views ahead of the attack.

area of responsibility. What I will say, in order to illustrate the shocking recklessness of this Signal conversation, is that the Hegseth post contained operational details of forthcoming strikes on Yemen, including information about targets, weapons the U.S. would be deploying, and attack sequencing.

The only person to reply to the update from Hegseth was the person identified as the vice president. "I will say a prayer for victory," Vance wrote. (Two other users

subsequently added prayer emoji.)

According to the lengthy Hegseth text, the first detonations in Yemen would be felt two hours hence, at 1:45 p.m. eastern time. So I waited in my car in a supermarket parking lot. If this Signal chat was real, I reasoned, Houthi targets would soon be bombed. At about 1:55, I checked X and searched *Yemen*. Explosions were then being heard across Sanaa, the capital city.

I went back to the Signal channel. At 1:48, "Michael Waltz" had provided the group an update. Again, I won't quote from this text, except to note that he described the operation as an "amazing job." A few minutes later, "John Ratcliffe" wrote, "A good start." Not long after, Waltz responded with three emoji: a fist, an American flag, and fire. Others soon joined in, including "MAR," who wrote, "Good Job Pete and your team!!," and "Susie Wiles," who texted, "Kudos to all – most particularly those in theater and CENTCOM! Really great. God bless." "Steve Witkoff" responded with five emoji: two hands-praying, a flexed bicep, and two American flags. "TG" responded, "Great work and effects!" The after-action discussion included assessments of damage done, including the likely death of a specific individual. The Houthi-run Yemeni health ministry reported that at least 53 people were killed in the strikes, a number that has not been independently verified.

On Sunday, Waltz appeared on ABC's *This Week* and contrasted the strikes with the Biden administration's more hesitant approach. "These were not kind of pinprick, back-and-forth—what ultimately proved to be feckless attacks," he said. "This was an overwhelming response that actually targeted multiple Houthi leaders and took them out."

The Signal chat group, I concluded, was almost certainly real. Having come to this realization, one that seemed nearly impossible only hours before, I removed myself from the Signal group, understanding that this would trigger an automatic notification to the group's creator, "Michael Waltz," that I had left. No one in the chat had seemed to notice that I was there. And I received no subsequent questions about why I left—or, more to the point, who I was.

Earlier today, I emailed Waltz and sent him a message on his Signal account. I also wrote to Pete Hegseth, John Ratcliffe, Tulsi Gabbard, and other officials. In an email, I outlined some of my questions: Is the "Houthi PC small group" a genuine Signal thread? Did they know that I was included in this group? Was I (on the off chance) included on purpose? If not, who did they think I was? Did anyone realize who I was when I was added, or when I removed myself from the group? Do senior Trump-administration officials use Signal regularly for sensitive discussions? Do the officials believe that the use of such a channel could endanger American personnel?




A screenshot from the Signal group shows reactions to the strikes.

Brian Hughes, the spokesman for the National Security Council, responded two hours later, confirming the veracity of the Signal group. “This appears to be an authentic message chain, and we are reviewing how an inadvertent number was added to the chain,” Hughes wrote. “The thread is a demonstration of the deep and thoughtful policy coordination between senior officials. The ongoing success of the Houthi operation demonstrates that there were no threats to troops or national security.”

William Martin, a spokesperson for Vance, said that despite the impression created by the texts, the vice president is fully aligned with the president. “The Vice President’s first priority is always making sure that the President’s advisers are adequately briefing him on the substance of their internal deliberations,” he said. “Vice President Vance unequivocally supports this administration’s foreign policy. The President and the Vice President have had subsequent conversations about this matter and are in complete agreement.”

I have never seen a breach quite like this. It is not uncommon for national-security officials to communicate on Signal. But the app is used primarily for meeting planning and other logistical matters—not for detailed and highly confidential discussions of a pending military action. And, of course, I've never heard of an instance in which a journalist has been invited to such a discussion.

Read: A conversation with Jeffrey Goldberg about his extraordinary scoop

Conceivably, Waltz, by coordinating a national-security-related action over Signal, may have violated several provisions of the Espionage Act, which governs the handling of "national defense" information, according to several national-security lawyers interviewed by my colleague Shane Harris for this story. Harris asked them to consider a hypothetical scenario in which a senior U.S. official creates a Signal thread for the express purpose of sharing information with Cabinet officials about an active military operation. He did not show them the actual Signal messages or tell them specifically what had occurred.

All of these lawyers said that a U.S. official should not establish a Signal thread in the first place. Information about an active operation would presumably fit the law's definition of "national defense" information. The Signal app is not approved by the government for sharing classified information. The government has its own systems for that purpose. If officials want to discuss military activity, they should go into a specially designed space known as a sensitive compartmented information facility, or SCIF—most Cabinet-level national-security officials have one installed in their home—or communicate only on approved government equipment, the lawyers said. Normally, cellphones are not permitted inside a SCIF, which suggests that as these officials were sharing information about an active military operation, they could have been moving around in public. Had they lost their phones, or had they been stolen, the potential risk to national security would have been severe.

Hegseth, Ratcliffe, and other Cabinet-level officials presumably would have the authority to declassify information, and several of the national-security lawyers noted that the hypothetical officials on the Signal chain might claim that they had declassified the information they shared. But this argument rings hollow, they cautioned, because Signal is not an authorized venue for sharing information of such a sensitive nature, regardless of whether it has been stamped "top secret" or not.

There was another potential problem: Waltz set some of the messages in the Signal group to disappear after one week, and some after four. That raises questions about whether the officials may have violated federal records law: Text messages about official acts are considered records that should be preserved.

"Under the records laws applicable to the White House and federal agencies, all government employees are prohibited from using electronic-messaging applications such as Signal for official business, unless those messages are promptly forwarded or copied to an official government account," Jason R. Baron, a professor at the University of Maryland and the former director of litigation at the National Archives and Records Administration, told Harris.

"Intentional violations of these requirements are a basis for disciplinary action. Additionally, agencies such as the Department of Defense restrict electronic messaging containing classified information to classified government networks and/or networks with government-approved encrypted features," Baron said.

Several former U.S. officials told Harris and me that they had used Signal to share unclassified information and to discuss routine matters, particularly when traveling overseas without access to U.S. government systems. But they knew never to share classified or sensitive information on the app, because their phones could have been hacked by a foreign intelligence service, which would have been able to read the messages on the devices. It is worth noting that Donald Trump, as a candidate for president (and as president), repeatedly and vociferously demanded that Hillary Clinton be imprisoned for using a private email server for official business when she was secretary of state. (It is also worth noting that Trump was indicted in 2023 for mishandling classified documents, but the charges were dropped after his election.)

Waltz and the other Cabinet-level officials were already potentially violating government policy and the law simply by texting one another about the operation. But when Waltz added a journalist—presumably by mistake—to his principals committee, he created new security and legal issues. Now the group was transmitting information to someone not authorized to receive it. That is the classic definition of a leak, even if it was unintentional, and even if the recipient of the leak did not actually believe it was a leak until Yemen came under American attack.

All along, members of the Signal group were aware of the need for secrecy and operations security. In his text detailing aspects of the forthcoming attack on Houthi targets, Hegseth wrote to the group—which, at the time, included me—"We are currently clean on OPSEC."

*Shane Harris contributed reporting.*

## ABOUT THE AUTHOR



**Jeffrey Goldberg**

⊕ Follow

Jeffrey Goldberg is the editor in chief of *The Atlantic* and the moderator of *Washington Week With The Atlantic*.

---

**Explore More Topics**

Donald Trump, J. D. Vance, John Ratcliffe, Marco Rubio, Pete Hegseth, Stephen Miller, Tulsi Gabbard

Podcasts

Subscription

Follow

Privacy Policy | Your Privacy Choices | Advertising Guidelines | Terms & Conditions | Terms of Sale | Responsible Disclosure | Site Map

TheAtlantic.com © 2026 The Atlantic Monthly Group. All Rights Reserved.
This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply

The Atlantic

# *Hegseth Said to Have Shared Attack Details in Second Signal Chat*

The defense secretary sent sensitive information about strikes in Yemen to an encrypted group chat that included his wife and brother, people familiar with the matter said.

Listen · 11:13 min

**By Greg Jaffe, Eric Schmitt and Maggie Haberman**
April 20, 2025

**See more of our coverage in your search results.**
Add The New York Times as a preferred source on Google ›

Defense Secretary Pete Hegseth shared detailed information about forthcoming strikes in Yemen on March 15 in a private Signal group chat that included his wife, brother and personal lawyer, according to four people with knowledge of the chat.

Some of those people said that the information Mr. Hegseth shared on the Signal chat included the flight schedules for the F/A-18 Hornets targeting the Houthis in Yemen — essentially the same attack plans that he shared on a separate Signal chat the same day that mistakenly included the editor of The Atlantic.

Mr. Hegseth's wife, Jennifer, a former Fox News producer, is not a Defense Department employee, but she has traveled with him overseas and drawn criticism for accompanying her husband to sensitive meetings with foreign leaders.

Mr. Hegseth's brother Phil and Tim Parlatore, who continues to serve as his personal lawyer, both have jobs in the Pentagon, but it is not clear why either would need to know about upcoming military strikes aimed at the Houthis in

Yemen.

The previously unreported existence of a second Signal chat in which Mr. Hegseth shared highly sensitive military information is the latest in a series of developments that have put his management and judgment under scrutiny.

Unlike the chat in which The Atlantic was mistakenly included, the newly revealed one was created by Mr. Hegseth. It included his wife and about a dozen other people from his personal and professional inner circle in January, before his confirmation as defense secretary, and was named "Defense | Team Huddle," the people familiar with the chat said. He used his private phone, rather than his government one, to access the Signal chat.

The continued inclusion following Mr. Hegseth's confirmation of his wife, brother and personal lawyer, none of whom had any apparent reason to be briefed on operational details of a military operation as it was getting underway, is sure to raise further questions about his adherence to security protocols.

The chat revealed by The Atlantic in March was created by President Trump's national security adviser, Mike Waltz, so that the most senior national security officials across the executive branch, such as the vice president, the director of national intelligence and Mr. Hegseth, could coordinate among themselves and their deputies ahead of the U.S. attacks.

Mr. Waltz took responsibility for inadvertently adding Jeffrey Goldberg, the editor of The Atlantic, to the chat. He called it "Houthi PC small group" to reflect the presence of members of the administration's "principals committee," who come together to discuss the most sensitive and important national security issues.

Mr. Hegseth created the separate Signal group initially as a forum for discussing routine administrative or scheduling information, two of the people familiar with the chat said. The people said Mr. Hegseth typically did not use the chat to discuss sensitive military operations and said it did not include other cabinet-level officials.

**Sign up to get Maggie Haberman's articles emailed to you.** Maggie Haberman is a White House correspondent reporting on President Trump. Get it sent to your inbox.

Mr. Hegseth shared information about the Yemen strikes in the "Defense | Team Huddle" chat at roughly the same time he was putting the same details in the other Signal chat group that included senior U.S. officials and The Atlantic, the people familiar with Mr. Hegseth's chat group said.

The Yemen strikes, designed to punish Houthi fighters for attacking international cargo ships passing through the Red Sea, were among the first big military strikes of Mr. Hegseth's tenure.

After The Atlantic disclosed that Mr. Hegseth had used Mr. Waltz's Signal group to communicate details of the strikes as they were being launched, the Trump administration said he had not shared "war plans" or any classified information, an assertion that was viewed with tremendous skepticism by national security experts.

In the case of Mr. Hegseth's Signal group, a U.S. official declined to comment on whether Mr. Hegseth shared detailed targeting information but maintained that there was no national security breach.

"The truth is that there is an informal group chat that started before confirmation of his closest advisers," the official said. "Nothing classified was ever discussed on that chat."

Sean Parnell, the chief Pentagon spokesman, did not respond to several requests for comment before this article was published.

After it was published, Mr. Parnell responded on social media. "Another day, another old story — back from the dead," he wrote. "There was no classified information in any Signal chat, no matter how many ways they try to write the story."

The "Defense | Team Huddle" Signal chat until recently included about a dozen of Mr. Hegseth's top aides, including Joe Kasper, Mr. Hegseth's chief of staff, and Mr. Parnell.

The chat also included two senior advisers to Mr. Hegseth — Dan Caldwell and Darin Selnick — who were accused of leaking unauthorized information last week and were fired.

Mr. Caldwell and Mr. Selnick were among three former top Pentagon officials who proclaimed their innocence in a public statement on Saturday in response to the leak inquiry that led to their dismissals.

On Sunday, another former Defense Department official, John Ullyot, who left the department last week, said in an opinion essay for Politico that the Pentagon "is in disarray under Hegseth's leadership" and suggested that Mr. Trump should remove him.

When Mr. Goldberg released details of what Mr. Hegseth put into the Signal chat created by Mr. Waltz regarding the upcoming strikes in Yemen, Mr. Trump defended him and said he had done nothing wrong.

In a statement, Anna Kelly, a White House spokeswoman, did the same after the latest revelation. "No matter how many times the legacy media tries to resurrect the same nonstory, they can't change the fact that no classified information was shared," Ms. Kelly said.

Some congressional Democrats said it was fresh proof that Mr. Hegseth should be removed.

"Every day he stays in his job is another day our troops' lives are endangered by his singular stupidity," said Senator Tammy Duckworth, Democrat of Illinois and a combat veteran.

Senator Jack Reed of Rhode Island, the senior Democrat on the Armed Services Committee, added: "If true, this incident is another troubling example of Secretary Hegseth's reckless disregard for the laws and protocols that every other military

service member is required to follow."

While the Signal chat created by Mr. Waltz for senior officials was criticized for sharing details of a military operation on an encrypted but unclassified app, the participants — other than Mr. Goldberg of The Atlantic, who appears to have been added accidentally — were senior government officials with reason to track the progress of the attack.

But some of the participants in the group chat created by Mr. Hegseth were not officials with any apparent need to be given real-time information on details of the operation.

Jennifer Hegseth has drawn attention for the access her husband has given her. Mr. Hegseth brought her into two meetings with foreign military counterparts in February and early March where sensitive information was discussed, a development first reported by The Wall Street Journal.

Mr. Parlatore, who has been Mr. Hegseth's personal lawyer for the last eight years, was commissioned as a Navy commander in the Judge Advocate General's Corps about a week before the Yemen strikes were initiated.

In an interview before rejoining the military, Mr. Parlatore told The New York Times that he would work with Mr. Hegseth's office to improve training for the military's uniformed lawyers.

Mr. Hegseth's brother Phil works inside the Pentagon as a liaison to the Department of Homeland Security and as a senior adviser to the defense secretary.

One person familiar with the chat said Mr. Hegseth's aides had warned him a day or two before the Yemen strikes not to discuss such sensitive operational details in his Signal group chat, which, while encrypted, is not considered as secure as government channels typically used for discussing highly sensitive war planning and combat operations.

It was unclear how Mr. Hegseth, a veteran and former Fox News host who before his confirmation in January had never previously served in a high-level government position, responded to those warnings.

Many of those in Mr. Hegseth's inner circle during his first months in the Pentagon were combat veterans with deep experience in the military but little firsthand knowledge of how the government operates at the highest levels.

Several of these staff members encouraged Mr. Hegseth to move the work-related matters in the "Defense | Team Huddle" chat to his government phone. But Mr. Hegseth never made the transition, according to some of the people familiar with the chat who spoke on condition of anonymity to discuss internal deliberations.

The Pentagon's acting inspector general announced earlier this month that he would review Mr. Hegseth's Yemen strike disclosures on the Signal chat that included top Trump aides.

"The objective of this evaluation is to determine the extent to which the secretary of defense and other DoD personnel complied with DoD policies and procedures for the use of a commercial messaging application for official business," the acting inspector general, Steven Stebbins, said in a notification letter to Mr. Hegseth.

It's not clear whether Mr. Stebbins's review has uncovered the Signal chat that included Mr. Hegseth's wife and other advisers.

Mr. Stebbins started the review in response to a joint bipartisan request from Senator Roger Wicker of Mississippi, the Republican chairman of the Armed Services Committee, and Mr. Reed.

Beyond the controversy of the Signal chat, Mr. Hegseth's office has been shaken by the sudden firings of Mr. Caldwell, Mr. Selnick and Colin Carroll, all top advisers to the defense secretary. They were escorted from the Pentagon last week after being accused of leaking sensitive information.

The dismissals and turmoil around the inspector general's investigation have raised tensions and prompted talk of more resignations, according to current and former defense officials.

Among those considering leaving are Mr. Kasper, Mr. Hegseth's chief of staff, who helped lead the leak investigation that resulted in his colleagues' dismissal but has not been implicated in wrongdoing, according to senior defense officials.

In the wake of the report in The Atlantic disclosing the first Signal chat, Mr. Hegseth and other senior administration officials repeatedly denied that any classified information was shared among the participants.

"Nobody was texting war plans, and that's all I have to say about that," Mr. Hegseth told reporters. At a Senate hearing, Tulsi Gabbard, the director of national intelligence, echoed Mr. Hegseth's assertion that no classified information was shared.

But other former senior defense officials said texts describing launch times and the type of aircraft being employed before a strike would be classified information that, if leaked to the enemy, could have jeopardized pilots' lives.

**Eric Schmitt** is a national security correspondent for The Times, focusing on U.S. military affairs and counterterrorism issues overseas, topics he has reported on for more than three decades.

**Maggie Haberman** is a White House correspondent for The Times, reporting on President Trump.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Defense Head Said To Send War Plan To Second Group

# Footnote 30

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/opinion/john-bolton-donald-trump-iran-list-security-secret-service-5294ef4c

OPINION REVIEW & OUTLOOK Follow

# Trump, Iran's Assassins and John Bolton

The President has the Secret Service, but his targeted former advisers don't.

By The Editorial Board
July 19, 2026 4:14 pm ET



President Donald Trump and National security advisor John Bolton in 2018. OLIVER CONTRERAS-POOL/ ZUMA PRESS

President Trump is taking Iran's threats to assassinate him seriously, as well he should. He reportedly switched Air Force One from the new Qatar version on his return from the recent NATO summit on the advice of the Secret Service. How about a little concern, then, about Iran's threats to kill his former national security adviser, John Bolton?

The White House hasn't confirmed the Air Force One switch, but it hasn't denied the story either. Notably, the Justice Department has subpoenaed New York Times writers who reported the story to disclose their sources. That's harassment against the press that won't make the U.S. safer. The

story arguably did Mr. Trump a favor by reminding the public that Iran's regime hasn't turned over a "new leaf," to borrow Vice President JD Vance's term.

"They want to take out the U.S. leader—me," Mr. Trump told reporters in Turkey. "I'm on every list. I saw this morning, I'm on every single one of their lists. And so far, I guess I've been a little bit lucky, but that maybe doesn't last very long."

Mr. Trump said he has given orders for the U.S. military for a massive military assault on Iran if he is assassinated. By that time the orders would have to come from new President Vance, and we'd like to think he'd unleash hell as well.

Iran has long wanted to kill American officials, as well as anti-regime exiles in the U.S. It targeted Brooklyn, N.Y., based Iranian dissident Masih Alinejad, according to a federal case against would-be assassins. Two men have been convicted in the foiled plot.

Which brings us to Mr. Bolton, who has been targeted by Iran along with Mr. Trump's first-term Secretary of State Mike Pompeo and State's main deputy for Iran policy in the first term, Brian Hook. The Biden Administration was concerned enough that it provided the trio with protection details.

But after taking office a second time, Mr. Trump pulled that protection from all three. This was raw vindictiveness, since we doubt Iran has given up on killing them. Iran blames all three for the 2020 assassination of Qassem Soleimani, who ran Iran's network of terror proxies for the Islamic Revolutionary Guard Corps. These Americans are targets because of a decision the President rightly made.

The danger for Mr. Bolton in particular has increased because the Trump Administration is prosecuting him for mishandling classified documents. Mr. Bolton pleaded guilty last month to avoid the threat of additional charges against him or his family. The plea deal stipulates a fine of $2.25 million, which is an effort to strip Mr. Bolton of the income from his 2020 book that was critical of Mr. Trump.

But far worse, the Justice Department has insisted on seeking a prison term of up to five years. This is a penalty far beyond what other officials have received for similar or greater classification offenses. John Deutch, David Petraeus and Sandy Berger never served jail time and none pleaded guilty to felonies. Mr. Bolton was treated more harshly.

Federal Judge Theodore Chuang has scheduled sentencing for Mr. Bolton for Oct. 28. But a jail term of any length runs the risk of assassination. It wouldn't take much for Iranians to bribe an inmate, or threaten relatives of an inmate or guard, to have Mr. Bolton killed while he's in custody. Prisons are notoriously insecure.

By the way, Iran hacked Mr. Bolton's personal AOL account after he left office, in what he thinks was an attempt to get hold of his calendar for a potential murder hit. Mr. Bolton contacted the Biden Administration in 2021, though he wasn't obliged to. Mr. Bolton's reward for assisting the FBI counterterrorism division is to have Mr. Trump unleash the bureau and prosecutors on him.

***

Mr. Trump has the Secret Service to protect him, but these other public servants don't. They have to do without security or pay for it themselves, as Mr. Bolton has. Let's hope Judge Chuang dispenses with the Justice Department's unjust prison demand and issues a suspended sentence.

As for Mr. Trump, he's already exacted revenge against his former adviser with the prosecution and fine. He knows Iran has a kill "list" that includes him and his advisers. If Mr. Bolton is killed in prison, the President and his Justice Department will be partly responsible.

*Appeared in the July 20, 2026, print edition as 'Trump, Iran's Assassins and John Bolton'.*

---

The Editorial Board speaks for free markets and free people, the principles, if you will, marked in the watershed year of 1776 by Thomas Jefferson's Declaration of Independence and Adam Smith's "Wealth of Nations." So over the past century and into the next, the Journal stands for free trade and...

## Further Reading

**Trump Administration, States Harden Battle Lines Ahead of Election Day**

**Justice Department Sends New Subpoenas in Alaska Election Probe**

**Justice Department Push Against Trump's Foes Reaches Higher Gear**

**Grand Jury Declines to Indict Former White House Aide Cassidy Hutchinson**

**Court Rejects Trump Administration Bid to Set Aside California Mail-in Ballots**

## Videos

# Footnote 34

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/opinion/john-bolton-plea-deal-classified-documents-donald-trump-0a24f831

OPINION REVIEW & OUTLOOK Follow

# The John Bolton Plea Deal

The Justice Department wants prison time for the former Trump adviser for a single count of retaining classified information.

By The Editorial Board
June 4, 2026 5:41 pm ET




Former National Security Advisor John R. Bolton in 2019 BRENDAN SMIALOWSKI/AGENCE FRANCE-PRESSE/GETTY IMAGES

President Trump may hate being the target of lawfare, but he sure knows how to wield it against anyone who crosses him. That's the story of John Bolton, his former national security adviser, who is agreeing to a plea deal essentially for the sin of writing a critical book about his time advising Mr. Trump.

The President has been determined to seek revenge against Mr. Bolton, who wrote his well-regarded memoir, "The Room Where It Happened," based on his 17 months running the National Security Council in Mr. Trump's first

term. Mr. Trump first tried and failed to block publication, then went to court to confiscate the royalties. He lost that fight too. But on Mr. Trump's return to office, his Justice Department charged Mr. Bolton with a coercive 18-count indictment for keeping diary notes on a home computer that included "national defense information."

Mr. Bolton has now decided to plead guilty to a single felony count for retaining classified information. He will pay a $2.5 million fine, which is best understood as an attempt to deny Mr. Bolton the earnings from the book.

Like most similar defendants, Mr. Bolton had little choice other than to negotiate a plea. A trial could cost as much as $3 million in legal fees and run the risk of greater punishment. He is 77 years old, and a guilty verdict could have meant a de facto life sentence. Mr. Trump's prosecutors threatened more charges if Mr. Bolton didn't submit to a plea. After a life devoted to public service or writing for think tanks, he isn't a wealthy man.

Especially troubling and truly vindictive, therefore, is that Justice is still insisting that Mr. Bolton go to prison. The concession prosecutors have made is that they won't ask for a sentence longer than five years. Mr. Bolton will instead ask the court for probation, which is far more suitable for the single offense, but a judge will decide.

Mr. Bolton isn't pleading to transmitting classified information, and he didn't bring documents home. He wrote diary notes based on his memory that informed his book. He submitted the book draft to the White House for vetting for classified material, and it was cleared for publication by Ellen Knight, the senior director at the time for pre-publication review.

Many officials have kept diaries or journals that they later used to inform their books, including Carter-era NSC adviser Zbigniew Brzezinski. The law expressly anticipates that pre-publication review could discover classified information. But under this Bolton standard, anyone who submits a book or article draft that contains classified material could potentially be charged with a crime.

Prison time would be especially unjust given the punishments for others who admitted to offenses dealing with classified information. Sandy Berger, Bill Clinton's NSC adviser, hid documents from the National Archives in his socks but paid only a $50,000 fine and received two years of probation.

CIA director John Deutch had classified documents on his home computer. Mr. Clinton pardoned him before Justice could finalize an agreement in which he would plead guilty to a misdemeanor and pay a $5,000 fine. CIA director David Petraeus, who shared defense information with his biographer, received two years probation and a $100,000 fine. He pleaded guilty to a misdemeanor under the same provision, Section 793, that Mr. Bolton is pleading under as a felony.

Mr. Bolton continues to be under a death threat from Iran, and he must pay for his own security after Mr. Trump removed his government protection at the start of his second term. Iran hacked his AOL account in 2021, after he had left government, and Mr. Bolton voluntarily reported that to the FBI. Iran could have him killed by criminal mercenaries in prison for as little as a pack of cigarettes.

These pages have gladly published Mr. Bolton's writing over the years, and we will again. As we said at the time of its publication, it was bad political form to publish his book while Mr. Trump was still in office.

But no one outside the Trump acclamation chorus believes that John Bolton would have been prosecuted had he written a book that was favorable to Donald Trump.

*Appeared in the June 5, 2026, print edition as 'The John Bolton Plea Deal'.*

The Editorial Board speaks for free markets and free people, the principles, if you will, marked in the watershed year of 1776 by Thomas Jefferson's Declaration of Independence and Adam Smith's "Wealth of Nations." So over the past century and into the next, the Journal stands for free trade and...

## Videos

# Footnote 35

INSIDE POLITICS

# Sandy Berger fined $50,000 for taking documents

## Must perform 100 hours of community service

Thursday, September 8, 2005; Posted: 5:16 p.m. EDT (21:16 GMT)

vert.berger.jpg

Sandy Berger, President Clinton's national security adviser, leaving federal court Thursday..

## RELATED

• Berger to plead guilty
• Federal probe targets Berger

## YOUR E-MAIL ALERTS

**WASHINGTON (CNN) -- Former National Security Adviser Sandy Berger was sentenced Thursday to community service and probation and fined $50,000 for illegally removing highly classified documents from the National Archives and intentionally destroying some of them.**

Berger must perform 100 hours of community service and pay the fine as well as $6,905 for the administrative costs of his two-year probation, a district court judge ruled.

"I deeply regret the actions that I took at the National Archives two years ago, and I accept the judgment of the court," Berger said outside the courthouse after his sentencing.

"I'm glad that the 9/11 commission has made clear that it received all the documents that it sought, all the documents that it needed, and I'm pleased to finally have this matter resolved," he added.

Berger reached a plea deal with federal prosecutors in April to avoid a jail sentence.

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 210 of 363

At that time, he said the reason he took the documents was so he could prepare himself and others to assist the 9/11 commission, which investigated the circumstances surrounding the 2001 terrorist attacks and published a report of its findings last year.

The documents taken by Berger dealt with the terror threats during the 2000 millennium celebration, according to parties in the case.

According to the charges, Berger -- between September 2 and October 2, 2003 -- "knowingly removed classified documents from the National Archives and Records Administration and stored and retained such documents at places," such as his private Washington office.

Berger's associates admit he took five copies of an after-action report detailing the 2000 millennium terror plot from the Archives. The aides say Berger returned to his office, discovered that three of the copies appeared to be duplicates and cut them up with scissors.

The revelations were a dramatic change from Berger's claim last year that he had made an "honest mistake" and either misplaced or unintentionally threw the documents away.

When Archives officials contacted him after they realized documents were missing, Berger told them about the two copies he had, and returned them, along with his handwritten notes, officials said.

*CNN Producer Paul Courson and Justice Department Producer Terry Frieden contributed to this report*

Story Tools

# Footnote 36

• Live Video Local Shows Good Morning America ShopGMA Stream on

# Congress Probes Pardon of Ex-CIA Chief

By Carter M. Yang
February 16, 2001, 6:29 PM

Share

W A S H I N G T O N, Feb. 16 -- Congress is putting another of former President Clinton's pardons under the microscope. This time it's the eleventh-hour clemency grant for ex-CIA Director John Deutch.

Deutch had been under investigation for mishandling classified government files, but Clinton freed him from prosecution on Jan. 20, his final day in office. The Senate Select Intelligence Committee has opened an investigation into Clinton's decision, ABCNEWS has confirmed.

Eleventh-Hour Surprise

Clinton's grant of clemency apparently came as a surprise to the Department of Justice. Although it is customary for presidential pardon applications to be submitted to the department, sources tell ABCNEWS the federal prosecutors who built the case against Deutch were stunned when they learned of the pardon through press reports.

The pardon was apparently so surprising that even Deutch's own lawyers had not expected it the night before it was granted. In an agreement signed by Deutch and his attorneys on Jan. 19, the former CIA chief was set to plead guilty to a single misdemeanor charge of mishandling classified government information. Then Attorney General Janet Reno approved the deal and the official paperwork, a charging document called an "information."

It was set to be filed in court the following Monday, Jan. 22. But the pardon made the agreement a nullity.

Neither Reno nor Deutch's lawyers would have likely agreed to a plea bargain if they had believed a presidential pardon was forthcoming.

Of the 141 people pardoned by Clinton on Jan. 20, 140 were listed on a "master warrant" submitted by the White House to the Justice Department's pardon office. Deutch, however, was named on a separate warrant — a possible indication of the last-minute nature of the decision.

It is not known whether Deutch's legal team formally applied for the reprieve with the White House counsel's office.

Source: Tenet Denies Knowledge

It was revealed in 1999 that Deutch mishandled classified materials while at the CIA by placing them on an unsecured computer.

abc NEWS

## Sponsored Content by Taboola

christmas
**Best Christmas Gift: The Winter Cardinals Light**

**Flying Car Startup Is Now Open to Investors - $1 per/share**
**Sponsored** / AirCar
Learn More

**Memory Experts Have Now Tied This 1 Boxed Cereal to 89% of Forgetfulness Cases**
**Sponsored** / Cognitive Wellness Journal
Learn More

**These Are the Coolest Gifts on Everyone's Wishlist in 2026**
**Sponsored** / Gadget Trend

**Hiroshi Closes His Knife Shop After 55 Years**
**Sponsored** / Sakura Knives
Learn More

**Why Your Rotator Cuff Won't Heal (What Most Doctors Miss)**
**Sponsored** / Shoulder Relief News

**District Of Columbia: Worst Zip Codes for Overcharging Car Insurance (Is Yours On The List?)**
**Sponsored** / OTTO Insurance
Learn More

**Your Dog's Back Legs Keep Slipping Out? Do This Immediately!**
**Sponsored** / Pupsreport
Learn More

ABC News Network Privacy Policy Your US State Privacy Rights Children's Online Privacy Policy Interest-Based Ads About Nielsen Measurement Terms of Use
Do Not Sell or Share My Personal Information Contact Us
© 2026 ABC News

# Footnote 38

PRESS RELEASE

# Former Government Contractor Sentenced to Nine Years in Federal Prison for Willful Retention of National Defense Information

Friday, July 19, 2019

**For Immediate Release**

Office of Public Affairs

## Law Enforcement Recovered Classified Material, Stolen Over Two Decades, From the Defendant's Home and Car

U.S. District Judge Richard D. Bennett today sentenced Harold Thomas Martin, III, age 54, of Glen Burnie, Maryland, to nine years in federal prison, followed by three years of supervised release, for willful retention of national defense information.

The sentence was announced by Assistant Attorney General for National Security John C. Demers, U.S. Attorney for the District of Maryland Robert K. Hur, Assistant Director John Brown of the FBI's Counterintelligence Division and Special Agent in Charge Jennifer C. Boone of the FBI's Baltimore Field Office.

"Harold Martin was entrusted with some of the nation's most sensitive information," said Assistant Attorney General Demers. "Instead of respecting the trust given to him by the American people, Martin violated that trust and put our nation's security at risk. This sentence will hold Mr. Martin accountable for his dangerous and unlawful actions."

“For nearly 20 years, Harold Martin betrayed the trust placed in him by stealing and retaining a vast quantity of highly classified national defense information entrusted to him,” stated U.S. Attorney Robert K. Hur. “This sentence, which is one of the longest ever imposed in this type of case, should serve as a warning that we will find and prosecute government employees and contractors who flagrantly violate their duty to protect classified materials.”

“Whether an individual is a federal contractor or government employee, when given the privilege of holding a security clearance, the American people expect classified information to be protected,” said Assistant Director Brown. “That is essential to protecting our national security. In this case, Harold Martin was a serial offender in retaining national defense information for more than two decades. Today’s sentencing should signal that the FBI takes these violations extremely seriously and will vigorously investigate cases when people improperly handle classified information.”

“Harold Martin took an oath to preserve and protect the nation's secrets, and violated that oath repeatedly over many years, causing damage with his unlawful mishandling of classified information,” said Special Agent in Charge Jennifer C. Boone, FBI Baltimore Field Office. “Martin’s actions harmed Intelligence Community sources and methods. The vitality and integrity of the Intelligence Community requires the strictest adherence to the law for handling classified information. The FBI will be tireless in investigating cases like the Martin case.”

According to his plea agreement, from December 1993 through Aug. 27, 2016, Martin was employed by at least seven different private companies and assigned as a contractor to work at a number of government agencies. Martin was required to receive and maintain a security clearance in order to work at each of the government agencies to which he was assigned. Martin held security clearances up to Top Secret and Sensitive Compartmented Information (SCI) at various times. A Top Secret classification means that unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to the national security of the United States. An SCI designation compartmentalizes extremely sensitive information. Because of his work responsibilities and security clearance, Martin was able to access government computer systems, programs, and information in secure locations, including classified national defense information. Over his many years of holding a security clearance, Martin received training regarding classified information and his duty to protect classified materials from unauthorized disclosure.

Martin admitted that beginning in the late 1990s and continuing through Aug. 31, 2016, he stole and retained U.S. government property from secure locations and computer systems, including documents in both hard copy and digital form relating to the national defense, that bore markings indicating that they were the property of the United States and contained highly classified information of the United States, including Top Secret/SCI information.

As detailed in his plea agreement, Martin retained the stolen documents and other classified information at his residence and in his vehicle. Martin knew that the hard copy and digital documents stolen from his workplace contained classified information that related to the national defense and that he was never authorized to retain these documents at his residence or in his vehicle. Martin admitted that he also knew that the unauthorized removal of these materials risked their disclosure, which would be damaging to the national security of the United States and highly useful to its adversaries.

In court documents and at today's sentencing hearing, the government noted that crimes such as Martin's not only create a risk of unauthorized disclosure of, or access to, highly classified information, but often require the government to treat the stolen material as compromised, resulting in the government having to take remedial actions including changing or abandoning national security programs. In addition, Martin's criminal conduct caused the government to expend substantial investigative and analytical resources. The diversion of those resources resulted in significant costs.

Assistant Attorney General for National Security John C. Demers and United States Attorney Robert K. Hur commended the FBI for its work in the investigation and thanked the National Security Agency for its assistance. Mr. Hur and Mr. Demers thanked Assistant U.S. Attorneys Zachary A. Myers and Harvey E. Eisenberg, and Trial Attorney David Aaron of the National Security Division's Counterintelligence and Export Control Section, who prosecuted the case.

*Updated February 5, 2025*

## Topics

**COUNTERINTELLIGENCE** | **NATIONAL SECURITY**

## Components

Federal Bureau of Investigation (FBI) | National Security Division (NSD) | USAO - Maryland

Press Release Number: 19-788

**Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

# Footnote 39

The New York Times | https://www.nytimes.com/2016/10/20/us/harold-martin-nsa.html

# Trove of Stolen Data Is Said to Include Top-Secret U.S. Hacking Tools

**By Scott Shane, Matt Apuzzo and Jo Becker**

Oct. 19, 2016



Harold T. Martin III and his wife Deborah Shaw in an undated photo.
Deborah Shaw

WASHINGTON — Investigators pursuing what they believe to be the largest case of mishandling classified documents in United States history have found that the huge trove of stolen documents in the possession of a National Security Agency contractor included top-secret N.S.A. hacking tools that two months ago were offered for sale on the internet.

They have been hunting for electronic clues that could link those cybertools — computer code posted online for auction by an anonymous group calling itself the Shadow Brokers — to the home computers of the contractor, Harold T. Martin III, who was arrested in late August on charges of theft of government property and mishandling of classified information.

But so far, the investigators have been frustrated in their attempt to prove that Mr. Martin deliberately leaked or sold the hacking tools to the Shadow Brokers or, alternatively, that someone hacked into his computer or otherwise took them without his knowledge. While they have found some forensic clues that he might be the source, the evidence is not conclusive, according to a dozen officials who have been involved in or have been briefed on the investigation.

All spoke on condition of anonymity because they were not authorized to discuss it publicly.


range. We hack Equation Group. We find many many Equation Group cyber weapons. You see pictures. We give you some Equation Group files free, you see. This is good proof no? You enjoy!!! You break many things. You find many intrusions. You write many words. But not all, we are auction the best files.

An anonymous hacker group, calling itself the Shadow Brokers, announced in August a sale of computer codes stolen from the National Security Agency.

Mr. Martin, an enigmatic loner who according to acquaintances frequently expressed his excitement about his role in the growing realm of cyberwarfare, has insisted that he got in the habit of taking material home so he could improve his skills and be better at his job, according to these officials. He has explained how he took the classified material but denied having knowingly passed it to anyone else.

“As a contractor, he gets to see a slice of the overall picture,” said one person familiar with the exchanges, summarizing Mr. Martin’s explanation. “He wanted to see the overall picture so that he could be more effective.”

The material the F.B.I. found in his possession added up to “many terabytes” of information, according to court papers, which would make it by far the largest unauthorized leak of classified material from the classified sector. That volume dwarfs the hundreds of thousands of N.S.A. documents taken by Edward J. Snowden in 2013 and exceeds even the more voluminous Panama Papers, leaked records of offshore companies obtained by a German newspaper in 2015, which totaled 2.6 terabytes. One terabyte of data is equal to the contents of about one million books.

F.B.I. agents on the case, advised by N.S.A. technical experts, do not believe Mr. Martin is fully cooperating, the officials say. He has spoken mainly through his lawyers, James Wyda and Deborah Boardman of the federal public defender's office in Baltimore. They declined to comment before a detention hearing set for Friday in federal court.

In interviews, officials described how the Martin case has deeply shaken the secret world of intelligence, from the N.S.A.'s sprawling campus at Fort Meade, Md., to the White House. They expressed astonishment that Mr. Martin managed to take home such a vast collection of classified material over at least 16 years, undetected by security officers at his workplaces, including the N.S.A., the Office of the Director of National Intelligence and Pentagon offices. And they are deeply concerned that some of the mountain of material may, by whatever route, have reached hackers or hostile intelligence services.

Investigators discovered the hacking tools, consisting of computer code and instructions on how to use it, in the thousands of pages and dozens of computers and data storage devices that the F.B.I. seized during an Aug. 27 raid on Mr. Martin's modest house in suburban Glen Burnie, Md. More secret material was found in a shed in his yard and in his car, officials said.

The search came after the Shadow Brokers leak set off a panicked hunt at the N.S.A. Mr. Martin attracted the F.B.I.'s attention by posting something on the internet that was brought to the attention of the N.S.A. Whatever it was — officials are not saying exactly what — it finally set off an alarm.

The release of the N.S.A.'s hacking tools, even though they dated to 2013, is extraordinarily damaging, said Dave Aitel, a former agency employee who now runs Immunity Inc., an information security company.

"The damage from this release is huge, both to our ability to protect ourselves on the internet and our ability to provide intelligence to policy makers and the military," Mr. Aitel said.

The N.S.A.'s hacking into other countries' networks can be for defensive purposes: By identifying rivals' own hacking methods, the agency can recognize and defend against them, he said. And other countries, with some of the N.S.A.'s tools now in hand, can study past hacks and identify the attacker as the N.S.A., learn how to block similar intrusions, or even decide to retaliate, Mr. Aitel said.

Mr. Martin's home in Glen Burnie, Md., with car parked outside. Nate Pesce for The New York Times

Mr. Martin, 51, a Navy veteran who was completing a Ph.D. in information systems at the University of Maryland, Baltimore County, has worked for several of the contracting companies that help staff the nation's security establishment. After stints at the Computer Sciences Corporation and Tenacity Solutions, where he was assigned to the Office of the Director of National Intelligence, he joined Booz Allen Hamilton in 2009. He worked on that firm's N.S.A. contract until 2015, when he was moved to a different Pentagon contract in the area of offensive cyberwarfare.

He has long held a high-level clearance and for a time worked with the N.S.A.'s premier hacking unit, called Tailored Access Operations, which breaks into the computer networks of foreign countries and which developed the hacking tools

later obtained by the Shadow Brokers. According to one person briefed on the investigation, Mr. Martin was able to obtain some of the hacking tools by accessing a digital library of such material at the N.S.A.

One possibility investigators are considering is that Mr. Martin did not knowingly share the Shadow Brokers material but that it was physically stolen from him — conceivable given the descriptions of the chaos of his house, shed and car — or more likely, grabbed by hackers. But the forensic examination of Mr. Martin's computers has so far turned up no evidence that he was hacked, officials say.

At the core of the investigation, if Mr. Martin deliberately shared the secret N.S.A. tools, is the mystery of his motive. People who know him call him deeply patriotic and say they do not believe he would have given classified information to another country. They also say he has never been interested in politics, making unlikely a politically motivated leak like that of Mr. Snowden, who thought the N.S.A. was violating Americans' privacy.

The F.B.I. is considering whether he might have sold the hacking tools or other materials for money. His annual salary in recent years has exceeded $100,000 and he owns his house without a mortgage. But he has long bought expensive suits and Rolex watches, according to an old acquaintance, and a person familiar with his finances says he has struggled with debt. Court records show one past lien, an $8,997 state tax bill imposed in 2000 and not paid off until 2014.

Some people who know Mr. Martin favor a psychological motive for taking the documents home — one that echoes what he is himself telling investigators: a drive to distinguish himself and prove that his computer knowledge was equal to that of the N.S.A.'s top operators.

"He always thought of himself like a James Bond-type person, wanting to save the world from computer evil," said a person who knows him well but would not speak about him on the record for fear of being pulled into the criminal case.

Last year, commenting online on an article on the future of computer warfare, Mr. Martin struck a martial and patriotic tone.

"The battles ahead will require a special breed of warrior," he wrote. "It's really a calling, and something the individual has to want to do as a profession, due to the sacrifices required to be top flight in this new, electronic, version of the great game."

Mr. Martin's tone of confidence reflected his comfort in the world of computer experts. Mr. Aitel, who runs a popular email list on computer security called Daily Dave, said Mr. Martin regularly emailed the list and him privately, usually expressing his enthusiasm for a technical achievement: "Outstanding! You rock!" he wrote about one exploit, Mr. Aitel said.

But Mr. Martin's online self-assurance, people who know him say, masked a timid, introverted personality. Though he could be warm and generous, he had few friends, was socially awkward and often seemed lost in his work and doctoral studies, these people said.

For years, Mr. Martin struggled with obesity, and then had gastric bypass surgery and lost a lot of weight, according to acquaintances who did not want to be named because they also did not want to drawn into the investigation. But within a decade, he had gained most of it back, they said.

Not long before his arrest, Mr. Martin exchanged emails with Mr. Aitel about attending Mr. Aitel's annual security conference, called Infiltrate, scheduled for April in Miami.

"He sounded completely normal," Mr. Aitel said. "Making plans for the future."

Adam Goldman contributed reporting.

*Follow The New York Times's politics and Washington coverage on Facebook and Twitter, and sign up for the First Draft politics newsletter.*

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Hacking Tools Among Data Stolen From U.S.

# Footnote 40

PRESS RELEASE

# Former NSA Employee Sentenced to Prison for Willful Retention of Classified National Defense Information

Tuesday, September 25, 2018

**For Immediate Release**

Office of Public Affairs

Nghia Hoang Pho, 68, of Ellicott City, Maryland, and a naturalized U.S. citizen originally of Vietnam, was sentenced today to 66 months in prison, to be followed by three years of supervised release, for willful retention of classified national defense information. According to court documents, Pho removed massive troves of highly classified national defense information without authorization and kept it at his home.

The sentence was announced by Assistant Attorney General for National Security John C. Demers, U.S. Attorney for the District of Maryland Robert K. Hur, and Special Agent in Charge Gordon B. Johnson of the FBI's Baltimore Field Office. U.S. District Judge George L. Russell, III issued the sentence.

"Pho's intentional, reckless and illegal retention of highly classified information over the course of almost five years placed at risk our intelligence community's capabilities and methods, rendering some of them unusable," said Assistant Attorney General Demers. "Today's sentence reaffirms the expectations that the government places on those who have sworn to safeguard our nation's secrets. I would like to thank the agents, analysts and prosecutors whose hard work brought this result."

"Removing and retaining such highly classified material displays a total disregard of Pho's oath and promise to protect our nation's national security," said U.S. Attorney Hur. "As a result of his actions, Pho compromised some of our country's most closely held types of intelligence, and forced NSA to abandon important initiatives to protect itself and its operational capabilities, at great economic and operational cost."

"The privilege of working for the U.S. Intelligence Community requires strict adherence to laws governing the lawful secrecy of its work," said Special Agent in Charge Johnson. "We cannot have a functioning Intelligence Community without the protection of sources and methods, and taking classified information and placing it in a vulnerable setting has profound and often disastrous consequences. This case is a clarion call to all security clearance holders to follow the law and policy regarding classified information storage. The FBI will leave no stone unturned to investigate those who compromise or mishandle classified information."

According to his plea agreement, beginning in April 2006, Pho was employed as a developer in Tailored Access Operations (TAO) at the National Security Agency (NSA). NSA is a component of the U.S. intelligence community and the U.S. Department of Defense (DoD). The NSA's TAO involved operations and intelligence collection from foreign automated information systems or networks, as well as actions taken to prevent, detect and respond to unauthorized activity within DoD information systems and computer networks, for the United States and its allies.

Pho held various security clearances in connection with his employment, including Top Secret and Top Secret // Sensitive Compartmented Information (SCI). Pho had access to national defense and classified information and worked on highly classified, specialized projects. Over his years of holding a security clearance, Pho received training regarding the proper handling, marking, transportation and storage of classified information. Pho was also told that unauthorized removal of classified materials, and the transportation and storage of those materials in unauthorized locations, risked disclosure of the materials and could endanger the national security of the United States. Pho signed numerous non-disclosure agreements demonstrating that he understood the trust that the United States places in individuals who receive a security clearance.

According to the plea agreement, beginning in 2010 and continuing through March 2015, Pho removed and retained U.S. government property, including documents and writings that contained national defense information classified as Top Secret and SCI. This material was in both hard copy and digital form, and was kept in a number of locations in Pho's residence in Maryland. Pho knew that he was not authorized to remove the material or store it at his home.

Assistant Attorney General Demers and U.S. Attorney Hur commended the FBI and the NSA for their work in the investigation. This prosecution was handled by the District of Maryland, and the National Security Division's Counterintelligence and Export Control Section.

*Updated February 5, 2025*

**Topic**

**COUNTERINTELLIGENCE**

**Components**

National Security Division (NSD) | USAO - Maryland

Press Release Number: 18-1251

**Office of Public Affairs**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

# Footnote 42

NATIONAL SECURITY AGENCY
FORT GEORGE G. MEADE, MARYLAND 20755-6000

5 March 2018

The Honorable George L. Russell III
Federal District Court Judge
District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re: United States v. NGHIA HOANG PHO
Criminal NO. GLR-17-631

Dear Judge Russell:

Thank you for the opportunity to offer input on behalf of the National Security Agency (NSA) regarding sentencing related to the above captioned matter. I am the Director of the NSA, an intelligence agency within the Department of Defense. I have held this position since April 2, 2014. In addition to serving as the Director of the NSA, I serve as the Chief, Central Security Service, and as the Commander, U.S. Cyber Command. As the Director of the NSA, I am responsible for planning, organizing, directing, and managing all NSA-assigned missions and resources. By specific charge of the President and the Director of National Intelligence, I am ultimately responsible for protecting NSA activities and intelligence sources and methods.

Mr. Pho retained classified information outside of properly secured spaces and by doing so caused very significant and long-lasting harm to the NSA, and consequently to the national security of the United States. While criminal conduct involving matters of national security may come in different forms and some of the harms may not be immediately apparent, the retention of classified information is no less damaging to the national security of our country and our ability to protect and defend the Nation against our adversaries. Mr. Pho's illegal conduct violated the fundamental principle that classified information must be protected and maintained in properly secured spaces at all times.

The welfare of the United States, its citizens, and its allies depends upon the ability to obtain and utilize reliable, actionable intelligence from across the globe. Fundamental to this ability is the crucial need to protect our vital secrets, including those classified secrets that detail our unique capabilities and methods used to collect that intelligence. The protection of classified information is an essential responsibility of all those working within the Intelligence Community, as the exposure of the United States' classified information outside of secure spaces may result in the destruction of intelligence-gathering efforts used to protect this nation. Mr. Pho, who voluntarily assumed this responsibility, ignored his oath to his country and the NSA by taking classified information outside of secure spaces, thereby placing that information in significant jeopardy. His exposure of classified programs and information by retaining them at his residence and on personal electronic devices resulted in articulable harm to intelligence-gathering initiatives used by NSA to succeed with our mission.

The NSA is charged to acquire communications of foreign entities (signals intelligence) whose activities may pose a threat to the national security interests of the United States and its

allies. Signals intelligence is one of the most important sources of intelligence for determining the intent of our adversaries and for early detection of activities that may evolve into a threat. Signals intelligence is critical for our decision makers when deciding how best to protect us. The NSA is the most prolific source of predictive, actionable and preventive intelligence which, around the clock, provides decisive information to policymakers, diplomats and military commanders charged with defending American interests worldwide. In many cases it provides real-time, to near-real-time insight to complex, evolving threat environments like terrorist actions, kidnappings, missile launches and military engagements—closing critical gaps of uncertainty and allowing for better informed actions, which saves lives.

Every day of the year, around the world the women and men of the NSA, some operating in harm's way, dedicate their public service to gathering intelligence that is essential to the preservation of our way of life. When our ability to acquire and sustain access to this intelligence is put at risk, so too is our national security at risk.

Acquiring signals intelligence is an extraordinarily challenging undertaking. Communications options used by foreign intelligence adversaries are enormously varied and complex, and function in a volatile environment. The successful acquisition of signals intelligence requires a mastery of complex signal processing, physics, encryption, foreign languages and deep target knowledge. Our abilities to acquire signals intelligence are among the most closely guarded secrets of the United States government.

Mr. Pho's conduct in improperly and unlawfully retaining national defense information, which included highly classified information, outside of secure space had significant negative impacts on the NSA mission, the NSA workforce, and the Intelligence Community as a whole. By taking highly classified material outside of the controlled space of NSA, Mr. Pho placed at risk some of NSA's most sophisticated, hard to achieve and important techniques of collecting from sophisticated targets of the NSA, including collection that is crucial to decision makers when answering some of the Nation's highest-priority questions. The particular techniques used to obtain signal intelligence are often the most highly sensitive national defense information we protect. The type of collection techniques put at risk by Mr. Pho's conduct are especially valuable because they enable NSA to respond to changes in the communications environment that would otherwise block our insight. Techniques of the kind Mr. Pho was entrusted to protect, yet removed from secure space, are force multipliers, allowing for intelligence collection in a multitude of environments around the globe and spanning a wide range of national security topics. Compromise of one technique can place many opportunities for intelligence collection and national security insights at risk.

By removing such highly classified materials outside of secure space, Mr. Pho subjected those materials to compromise. It is a fundamental mandate in the Intelligence Community that classified material must be handled and stored in very specific and controlled ways. If classified material is not handled or stored according to strict rules, then the government cannot be certain that it remains secret. Once the government loses positive control over classified material, the government must often treat the material as compromised and take remedial actions as dictated by the particular circumstances. Depending on the type and volume of compromised classified material, such reactions can be costly, time consuming and cause a shift in or abandonment of programs. In this case, the fact that such a tremendous volume of highly classified, sophisticated collection tools was removed from secure space and left unprotected, especially in digital form

on devices connected to the Internet, left the NSA with no choice but to abandon certain important initiatives, at great economic and operational cost.

In addition, NSA was faced with the crucial and arduous task of accounting for all of the exposed classified materials, including TOP SECRET information, the unauthorized disclosure of which, by definition, reasonably could be expected to cause exceptionally grave damage to the national security. Accounting for all of the exposed classified material was necessary so that NSA could attempt to assess the damage that resulted from the classified material being stored in non-secure space. These efforts were tremendously expensive and diverted critical resources away from NSA's intelligence-gathering mission, including the development of new and innovative ways to conduct signals intelligence.

The detrimental impacts of Mr. Pho's actions are also felt in other less tangible ways, including a loss of trust among colleagues and essential partners who count on NSA to conduct its mission. NSA trusted Mr. Pho, a software developer who worked on critical intelligence-gathering tools, to protect those tools and our nation's security. Mr. Pho betrayed that trust. Trust is an essential component of all of the work that is done by NSA employees. It is affirmed by our sworn oath to uphold and defend the Constitution, sealed by our signed obligations to protect national defense information and reinforced by extensive, recurring training, awareness campaigns and security measures. There is no doubt about what is or is not permitted in our stewardship of that critical information.

That trust extends to a circle with other U.S. intelligence agencies, who share valuable intelligence insights; military personnel, who share details of their operational plans; and international partners, who share their sovereign secrets with us, all for common objectives. When a once trusted colleague of one agency, such as Mr. Pho, violates their obligation to protect national defense information, it can fracture that circle of trust. Through the unlawful actions of a single individual, precious resources at one moment focused on a common security outcome must now shift to contemplate the risk and implications of disclosure. It's like interrupting a team of surgeons in the middle of an operation to determine if the sterility of a tool used in the procedure had been compromised. Future decisions about sharing will be weighted with consideration of the breach of trust by one party. That trust is essential to enable the extensive collaboration and detailed work needed to acquire and sustain access and maintain strong partnerships against the global challenges we face.

The demands we face on behalf of the American people will not pause while we deal with this breach of trust. We have and we will continue to redouble our efforts to recover as best we can from Mr. Pho's illegal actions. Affirmation by this court of the cost to the women and men who have dedicated their lives to public service and who have maintained trusted stewardship of national defense information will send them a message of confidence and respect.

Thank you for the opportunity to offer this input.

MICHAEL S. ROGERS
Admiral, U.S. Navy
Director, NSA

# Footnote 43

PRESS RELEASE

# Former FBI Contract Linguist Pleads Guilty to Leaking Classified Information to Blogger

Thursday, December 17, 2009

**For Immediate Release**

Office of Public Affairs

A former FBI contract linguist pleaded guilty today to unlawfully providing classified documents to the host of an Internet blog who then published information derived from those documents on the blog.

Shamai Kedem Leibowitz, aka Samuel Shamai Leibowitz, 39of Silver Spring, Md., pleaded guilty in federal court in Greenbelt, Md., to a one-count information charging him with knowingly and willfully disclosing to an unauthorized person five FBI documents classified at the "secret" level that contained classified information concerning the communication intelligence activities of the United States.

Under the plea agreement, the government and Leibowitz have agreed that a term of 20 months in prison is the appropriate sentence in this case.  The court may accept or reject the plea agreement between the government and Leibowitz.  In addition, the court retains discretion to impose any lawful term of supervised release or fine, and to set any lawful conditions of supervised release.

"The willful disclosure of classified information to those not entitled to receive it is a serious crime," said David Kris, Assistant Attorney General for National Security. "Today's guilty plea should serve as a warning to anyone in government who would consider compromising our nation's secrets."

"Government employees who are given access to classified information are prohibited from disclosing the information without permission," said U.S. Attorney Rod J. Rosenstein.

"As a trusted member of the FBI ranks, Leibowitz abused the trust of the FBI and the American public by using his access to classified information for his own purposes," said Special Agent in Charge Richard A. McFeely.

According to the plea agreement, from January 2009 through August 2009, Leibowitz was employed by the FBI as a contract linguist in an office in Calverton, Md. As part of his official duties, Leibowitz held a top secret security clearance and had lawful access to classified documents and information relating to the communication intelligence activities of the United States.

In April 2009, according to the plea agreement, Leibowitz knowingly and willfully caused five documents that were classified at the secret level and which contained classified information relating to the communication intelligence activities of the United States, to be furnished to a person not entitled to receive such information.

The recipient was the host of a public blog available to anyone with access to the Internet. The recipient then published on the blog information derived from the classified documents provided by Leibowitz.

This investigation was conducted by the FBI Baltimore Field Office. The prosecution is being handled by Assistant U.S. Attorney Steven M. Dunne, of the U.S. Attorney's Office for the District of Maryland, and Trial Attorney Kathleen M. Kedian, of the Counterespionage Section of the Justice Department's National Security Division.

*Updated February 5, 2025*

**Component**

National Security Division (NSD)

Press Release Number: 09-1361

**Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

# Footnote 46

Built Around Farmers' Success.
We're investing in technology, service, support, and repair solutions designed to help farmers maximize productivity and keep equipment running when it matters most.
JOHN DEERE

# Leniency for AIPAC leaker



Judge T.S. Ellis reduced the sentence for the former defense official, Larry Franklin (pictured here), to probation plus 10 months in 'community confinement.'

By JOSH GERSTEIN
06/11/2009 10:48 PM EDT

A federal judge has virtually wiped out the prison sentence of more than 12 years he first imposed on a Pentagon analyst who pled guilty to leaking classified information to two pro-Israel lobbyists.

At a hearing Thursday evening in Alexandria, Va., Judge T.S. Ellis reduced the sentence for the former defense official, Larry Franklin, to probation plus 10 months in "community confinement," likely a halfway house.

Prosecutors had asked the judge to drop the sentence to 8 years in light of Franklin's cooperation, while a defense lawyer for Franklin, Plato Cacheris, asked for "no sentence at all."

In explaining his decision to dramatically reduce Franklin's sentence, Ellis cited the lack of punishment and light punishments imposed on other leakers, as well as Franklin's cooperation in the prosecution of the two lobbyists later fired from the American Israel Public Affairs Committee, Steven Rosen and Keith Weissman.

Last month, days before the case against the pair was set to go to trial, the government dropped the prosecution. The Justice Department said legal rulings in the case and the threat of new disclosures of classified information made a trial unadvisable.

"It's a very difficult and unusual situation," Ellis said. "This one is unique."

The judge said he did not quibble with the government's decision to drop the Rosen and Weissman prosecutions, but that the move was "significant" and had "some relevance" to what punishment Franklin should receive. He said it was "very disputable" whether some of the information at the heart of the case was actually the kind of "national defense information" it is illegal to relay outside the government.

Ellis railed Thursday against people who leak classified information, including those who leaked national intelligence estimates about Iran and revealed the

existence of the warrantless wiretapping program maintained by the National Security Agency. However, he also said he had no problem with people who disclosed such information as an act of civil disobedience and accepted what followed. “Disclosing it was okay, if a person is willing to stand up and say, ‘I did it. Give me the consequences,’” the judge said.

Ellis said he wanted Franklin’s punishment to serve as a “beacon” to other officials that they would face serious consequences if they committed similar breaches. “Secrets are important to a nation. If we couldn’t keep our secrets, we would be at great risk,” the judge said.

Franklin pled guilty in 2005 to three felony counts involving illegal distribution and possession of classified information. He had been free pending the trial for the two ex-AIPAC officials. His attorney, Plato Cacheris, said the former policy analyst had trouble finding good work.

“He’s been digging ditches. He’s been cleaning cesspools,” the attorney said.

The information that Franklin gave to the two AIPAC lobbyists has never been officially detailed, but it related to the threat Iran posed to U.S. forces in the region. He also acknowledged numerous meetings with an Israeli diplomat, Naor Gilon.

In a plea for leniency Thursday, Franklin said he was motivated solely by “love of our republic and by the safety of our military personnel that were about to go into Iraq.” He insisted he wasn’t trying to leak anything, but simply to use a back channel to alert “a particular NSC source” to the dangers in Iraq. The ex-Pentagon analyst didn’t know at the time that Rosen and Weissman worked for the pro-Israel lobbying group.

Franklin said he wanted to spend time instructing young people “about the threat that civilization faces from those who would replace us,” who he indicated were the forces of “radical Islam.”

"One object of our adversaries is to force us to change internally. What I did was playing into that objective," Franklin said. Franklin said he was "grateful to be in a country where the rule of law and a respect for human rights is vibrant."

Ellis quickly interrupted. "You believe rule of law is important? … I've lived in countries where there isn't rule of law. I was born in one," the Colombian-born jurist said. "And what really [matters] is whether government officials obey the law."

Franklin said he did believe in the rule of law and he acknowledged "serious errors in judgment."

That triggered another salvo from the judge. "An error is putting on the wrong color tie," Ellis said. "We're talking about crimes."

Earlier, Cacheris argued that the government's request of eight years imprisonment for Franklin "smacks of vengeance" stemming from the decision to abandon the prosecution against Rosen and Weissman. "It's just not justified," the defense attorney said. He insisted the decision to drop the case against the two ex-lobbyists "was not because of anything Mr. Franklin did."

Cacheris's description of Franklin's cooperation also produced some intriguing news.

"He's given them other cases involving people who cannot come into this country," the defense lawyer said cryptically.

Cacheris also suggested that Franklin was the target of witness tampering in the Aipac case. "Someone came to approach Franklin to have him, in effect, disappear," the defense attorney said. He said Franklin immediately reported the incident to authorities.

Cacheris did not elaborate on the episode, but it could help explain why the FBI sought to interview Jewish leaders several years ago about attempts to provide

financial assistance or employment to Rosen and Weissman.

Prosecutor Neil Hammerstrom suggested Franklin deserved more severe punishment than Rosen and Weissman, had they been convicted. "In many ways, he was a more significant violator than Rosen and Weissman ever were alleged to be," the prosecutor said. "If you don't have people like Mr. Franklin in government doing that, you don't have people [outside] passing classified information."

Hammerstrom also noted that Franklin took top-secret information to his home even after being disciplined for such activity.

"You have before you an individual that just can't seem to follow the law when it comes to classified information," the prosecutor said. He said Franklin deserved credit for cooperating, but that his assistance had not been "ideal."

In response to a question from Ellis Thursday, Franklin confirmed speculation that his rendezvous with Rosen and Weissman was arranged by Michael Makovsky, a former energy analyst for the Pentagon. Makovsky, who has left the government, was not charged in the case and was expected to be a witness at the trial of Rosen and Weissman

Before the main hearing Thursday, lawyers spent nearly half an hour arguing behind closed doors about whether the re-sentencing should be open to the public. The judge eventually allowed the press and public into the courtroom, though he said portions of court filings about Franklin's sentence will remain under seal.

As the hearing concluded in the case, which has been the subjected of hard-fought legal battles for nearly four years, the judge struggled to maintained his composure. He praised prosecutors and defense lawyers. "You all did a very good job," said Ellis, who is now semi-retired.

Top Stories from POLITICO

Read More

00:00

02:00

**FILED UNDER:**
LOBBYING, DEPARTMENT OF DEFENSE, PENTAGON,
AMERICAN ISRAEL PUBLIC AFFAIRS COMMITTEE, LOBBYISTS


## National Security Daily

From the SitRoom to the E-Ring, the inside scoop on defense, national security and foreign policy.

**EMAIL**

Your Email

**EMPLOYER**

Employer

* All fields must be completed to subscribe

SIGN UP

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SPONSORED CONTENT

# Footnote 47

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | |
| v. | ) | CRIMINAL ACTIONS |
| LAWRENCE ANTHONY FRANKLIN, Defendant. | ) | 1:05-cr-225<br>1:05-cr-421 |

REPORTER'S TRANSCRIPT

MOTIONS HEARING
(Reduction of Sentence)

(PROCEEDINGS HELD IN OPEN COURT)

Thursday, June 11, 2009

---

BEFORE: THE HONORABLE T.S. ELLIS, III
Presiding

APPEARANCES: OFFICE OF THE UNITED STATES ATTORNEY
BY: NEIL HAMMERSTROM, AUSA
THOMAS REILLY, AUSA

For the Government

PLATO CACHERIS, ESQ.
JOHN HUNDLEY, ESQ.

For the Defendant

---

MICHAEL A. RODRIQUEZ, RPR/CM/RMR
Official Court Reporter
USDC, Eastern District of Virginia
Alexandria, Virginia

INDEX

PRELIMINARY MATTER RE: SEALING 4
(Portion under seal under separate transcript)
RECAPITULATION BY THE COURT 8
ARGUMENT BY THE GOVERNMENT 8
ARGUMENT BY THE DEFENDANT 14
ALLOCUTION BY THE DEFENDANT 23
RULING AND IMPOSITION OF SENTENCE BY THE COURT 31

(Court adjourned)

---

PROCEEDINGS

(Court called to order at 5:45 p.m. in USA v. Franklin.)

THE COURT: All right. This is United States against Franklin.

What is the number of the case?

THE CLERK: Case number 05 criminal 225, and case number 05 criminal 421.

THE COURT: All right.

Who is here on behalf of the government?

ATTORNEY HAMMERSTROM: Good afternoon, your Honor. Neil Hammerstrom and Thomas Reilly for the United States.

THE COURT: All right. Good afternoon.

Mr. Cacheris, you are here on --

ATTORNEY CACHERIS: And John Hundley, your Honor.

THE COURT: And John Hundley, on behalf of --

ATTORNEY HUNDLEY: Good afternoon.

ATTORNEY CACHERIS: On behalf of Mr. Franklin, who is also present.

THE COURT: -- of Mr. Franklin.

Good afternoon, Mr. Franklin.

THE DEFENDANT: Good afternoon.

PRELIMINARY MATTER RE: SEALING

THE COURT: The first order of business is that I want to be sure this hearing is open. I saw everything filed under seal, but I see no reason for these pleadings to be under seal, Mr. Hammerstrom.

ATTORNEY HAMMERSTROM: There very much is a reason for ours to be under seal, your Honor.

THE COURT: All of it?

ATTORNEY HAMMERSTROM: Virtually all of it.

THE COURT: Why?

ATTORNEY HAMMERSTROM: Well, I can tell you, but I can't tell you in open court. I am happy to come up to the bench.

THE COURT: All right. We will do it in that fashion.

ATTORNEY HAMMERSTROM: And I also would like to address a few points in Mr. Cacheris' pleading, and that, of course, is under seal. And what I want to address is a sealed matter, as well.

ATTORNEY CACHERIS: Our position is it should be unsealed, and the hearing should be open, your Honor. That's our position.

THE COURT: All right.

Mr. Lowell, you are here.

ATTORNEY LOWELL: I am, sir.

THE COURT: You were counsel in this case.

ATTORNEY LOWELL: I was.

THE COURT: All right.

I will consider at the bench whether it should be closed.

I also want to hear from Mr. Hammerstrom whether you should be excluded. You will be excluded from the bench conference, but I have in mind that you are here and that you wish to be here.

And who are the other gentlemen with you?

ATTORNEY CACHERIS: David Charney (phonetics); he is a local psychiatrist that I have asked to be here, your Honor.

THE COURT: All right.

And?

The other gentlemen?

UNIDENTIFIED SPEAKER: I am a friend of Mr. Franklin.

THE COURT: All right, sir. That's fine. That's fine.

Well, let's have counsel come to the bench. I need to consider first whether it's an open or a closed hearing.

(Sidebar conference held as follows:)

THE COURT: Actually, let's exclude everybody,

so I can sit down, and do it that way.

ATTORNEY HAMMERSTROM: Okay.

THE COURT: All right.

(End of sidebar conference, open court as follows:)

THE COURT: Let me ask Mr. Lowell, would you and the other gentleman leave.

And the other two gentlemen seated here are interns in my chambers, and they may remain. And we will deal with this in open court.

We will get back to you just as quickly as we can --

ATTORNEY LOWELL: Thank you, Judge.

THE COURT: -- on the result.

(Courtroom closed in USA v Franklin.)

---

(Proceedings held under seal under separate transcript.)

---

(Proceedings resume in open court at 6:08 p.m. in USA v. Franklin.)

THE COURT: We have added a body here.

All right. The hearing is now public. It's open to the public.

For the public, I should advise the public that

the pleadings in this matter were filed under seal. I issued an order today requiring the parties, when they arrived today, to give me reasons why the pleadings should remain under seal, or why this hearing should be under seal.

We have now had a closed hearing about that. And as a result of that, I have ordered that the government file its pleading redacted for certain matters. And the redactions will be noted in the public record as to what -- where the redactions are. The rest of it will be, will be in the public record. It is important that as much as possible of anything any court does should be open to the public.

Now -- and the defendant's brief also had a short piece that I concluded, after hearing argument, should be under seal. And the defendant will file a redacted public version.

And I have also heard brief -- well, at least I have had some statement of it. It's fairly well explicated in the briefs. So I have heard information about that.

And I have also indicated that if, in the course of the argument that I hear on this matter, that it becomes necessary in either party's view to get into these sensitive matters, to let me know, and I will consider whether I agree that they are, or are not, sensitive.

So, as of now, the hearing is open.

RECAPITULATION BY THE COURT

THE COURT: This matter is before the Court on a motion for reduction of sentence pursuant to Rule 35. The parties have filed their memoranda.

And I did receive, Mr. Cacheris, the additional memorandum, which I think you sent just to include the additional letter.

ATTORNEY CACHERIS: That's correct; just one letter.

THE COURT: Yes. And I have reviewed that letter, as I have the other attachments.

None of the attachments to your memoranda are anything I have required to be sealed.

All right. Now, I am prepared to hear any argument the parties want to offer on this, legal or factual. And if you feel that you do have to get into sensitive matters, either because I ask a question or because you feel it's necessary, don't hesitates to let me know.

All right. It's your motion, Mr. Hammerstrom. You may go first.

ARGUMENT BY THE GOVERNMENT

ATTORNEY HAMMERSTROM: Your Honor, we have pretty much laid out all of the cooperation, the full extent of Mr. Franklin's cooperation. And certainly, had he not

proactively cooperated early on in the investigation, we would not have been able to go forward on another significant case.

That said, Mr. Franklin was not what you would say is an ideal cooperator. I know the Court has had hundreds and hundreds of Rule 35 motions brought before it. In many cases you see a cooperator, from day one, cooperate fully, a hundred percent, give everything they've got, and never look back.

And there were problems with Mr. Franklin. From the day that he entered his plea, we went through -- as you will recall from the extensive hearings in the Rosen and Weissman case, we had something that's called the Jakooz (phonetics) list. And that was something that was a subject of overt acts in the indictment.

And we went through that with Mr. Franklin in preparation --

THE COURT: Is that referred to by name in the indictment? I don't recall.

ATTORNEY HAMMERSTROM: I don't recall, either.

THE COURT: So I think even referring to it in that fashion probably isn't -- is that classified?

ATTORNEY HAMMERSTROM: I don't think that name is. It's certainly not going to --

THE COURT: Well, Emile Zola's use of it

probably isn't. But this was not Emile Zola that you are referring to. So -- (laughs).

And, of course, we don't reach today whether any of this should have been classified. That's not the Court's task, or it's not my prerogative to say what should be classified or not.

But go ahead.

ATTORNEY HAMMERSTROM: Well, in discussing that particular incident with Mr. Franklin in preparation for the plea, and during debriefings, we pointed out to him that of that information, some of those bullets, were classified. And, in fact, he had gotten that information over a secure system from a colleague of his in the intelligence community.

And when we told him that this classification authority had looked at this list and determined that a couple of these bullets were, in fact, classified, Mr. Franklin immediately said, "Well, if he" -- knowing this person very well -- "if he says they are classified, they are classified." And he signed a statement of facts to that effect.

And then he appeared up in open court when we entered the plea. And when I was reciting the -- or summarizing the statement of facts, when I got to that portion and I said the government would prove that this

information was classified, Mr. Franklin audibly spoke up, "Not a chance."

And then I said, trying to -- try to get him to come around, I said, "Well, the government would prove that," you know, for some reason, if he didn't agree with this.

And he said, "It's not classified."

And I went to the website the other day, to a Google website, and that statement he made and that whole recitation appeared in numerous articles around -- around that time.

That's not an ideal cooperator, to make a statement like that after he has already agreed that the information is, in fact, classified, and that he has signed a statement of facts to that -- to that effect.

My point of bringing this all up is that it's -- you have to balance those things against the good he did. And there are a number of good things he did. There is no question about it.

And you have to keep that separated from the hardships he has endured. I think the hardships, the financial strain, the condition of his wife, those are factors the Court should consider under 3553. We don't dispute that.

Our recommendation is based solely on the

extent of the cooperation, and that and other -- the factors that we outlined in the memorandum.

THE COURT: Yes.

ATTORNEY HAMMERSTROM: And I --

THE COURT: I take it, however, the Court can consider the 3553(a) factors?

ATTORNEY HAMMERSTROM: Certainly. Certainly. And we don't dispute that. And we told Mr. -- I told Mr. Cacheris that when we met, when we discussed this recommendation.

Obviously, he was very upset that our recommendation wasn't higher, and rightfully so. I can understand that, because of Mr. Franklin's background.

We have had four years of litigation, in which Mr. Franklin has worked a number of odd jobs, as Mr. Cacheris points out in his pleading.

But obviously, if he had been in jail during this time, he would have had no income coming in. And there are a lot of cooperators who wait their time sitting in jail or federal prison before any Rule 35 is filed.

I also ask the Court to keep -- to put something in perspective here, in the last four years there has been a lot of emphasis on the Rosen and Weissman case. But you have to really look at that case and look at Mr. Franklin's role to see how critical his role was in the

scheme of things.

In many ways he was a more significant violator than Rosen and Weissman ever were alleged to be, because he was the government employee who signed nondisclosure agreements, who was tasked and held responsible for keeping the secrets of the United States, or the intelligence community, and he is the one that violated it.

And if you don't have people like Mr. Franklin in government doing that, you don't have people passing classified information. It all starts with the people that have the classified information and have the responsibility to hold it secure and not reveal it to people not entitled to receive it.

And I think that's a very important factor in this case, because -- we can't lose sight of that.

Mr. Franklin doesn't come before the Court with clean hands, too. If you recall from the presentence report -- in fact, I think it was paragraph 56 -- in 1997, when he was an employee of the DIA, he was investigated and admitted approximately 16 times taking classified documents home. And he got a reprimand. He got censured, and something was put in his personnel file.

But look what happened -- fast-forward to the time he was charged in this case: He had 80-some classified documents at his home out in West Virginia, and 30-some of

those were top secret.

So, this is -- this is -- and again, we appreciate the cooperation he gave the government, but this needs to be balanced with the fact that you have before you an individual that just can't seem to follow the law when it comes to protecting classified information.

So I think the Court needs to balance that with the good that he has done and the cooperation that he has provided.

Thank you.

THE COURT: All right.

Mr. Cacheris.

ARGUMENT BY THE DEFENDANT

ATTORNEY CACHERIS: Well, your Honor, I am very surprised at the position that the government has taken on Mr. Franklin.

In their motion to reduce the sentence, they say he was, quote, "a substantial factor into bringing the case against Rosen and Weissman." That's their words.

They say that the best evidence in the case involving false statements by the other defendants came from Mr. Franklin.

He was proactive. He wore a wire. He did everything the government wanted him to do for a period of four (sic) months, from July through September '04.

Everything they wanted him to do, he did.

They didn't complain then that he had classified documents in his house, or that he had previously been reprimanded for having classified documents. No. They didn't complain then. They used him. They used him over and over and over. And he was without counsel during that period of time, your Honor.

Other cases he gave them -- and we won't go into the sensitive cases that the Court has excluded, but he has given them other cases involving people who cannot come into this country.

He has given them criminal cases. He was also approached --

THE COURT: You are referring to the West Virginia matter.

ATTORNEY CACHERIS: That's one; and another one about somebody that came to tamper with Mr. Franklin, to have him, in effect, disappear, and he immediately reported that to the government.

The complaints --

THE COURT: Let me ask, while we are on it -- I need to ask Mr. Hammerstrom.

What has come of the West Virginia one, if you know?

ATTORNEY HAMMERSTROM: Are you talking, your

Honor, about the -- when he was approached right before entering his plea?

THE COURT: No, sir.

ATTORNEY CACHERIS: No.

THE COURT: I am talking about the information he provided with respect to drug trafficking, based on people coming to him for help.

He wasn't involved in it at all, but he, in effect, was the person who managed to get somebody to pay attention to this problem, is, I think, what it was.

Is that right, Mr. Cacheris?

ATTORNEY CACHERIS: That's correct, your Honor.

ATTORNEY HAMMERSTROM: The Court's indulgence.

THE COURT: But that matter is not under seal in any way.

ATTORNEY CACHERIS: No.

ATTORNEY HAMMERSTROM: No, that is not. There was no federal involvement in that case.

THE COURT: Right.

But you may not -- and I can understand why you may not know.

Maybe Mr. Cacheris knows.

ATTORNEY CACHERIS: We just gave them the information, your Honor. We don't know what they did with it. Mr. Franklin was not involved in the case in the sense

that he was a participant. But he was a -- gave them the information.

(Counsel conferring.)

ATTORNEY CACHERIS: I am told by Mr. Hundley that he knows there were arrests, but we do not know the outcome of the case.

THE COURT: And just so that we are very clear about this, Mr. Franklin was not involved in the activity in any way.

ATTORNEY CACHERIS: That's correct.

THE COURT: It was just people who came to him and asked him for help.

ATTORNEY CACHERIS: Right.

ATTORNEY HAMMERSTROM: Your Honor, it's our understanding that a search was conducted based on the information and drugs were recovered. But we don't know what the outcome of the case was.

THE COURT: Thank you. That's helpful.

Go ahead, Mr. Cacheris.

ATTORNEY CACHERIS: So, your Honor, he has done a substantial amount of cooperation.

Now, the government has seen fit to drop the case against Rosen and Weissman, and that's their right. But it smacks of vengeance to try to ask this Court to impose an eight-year sentence on Mr. Franklin, because it's

just not justified, in my opinion.

In fact, as I say, their complaints, I think, are nit-picking: The off-the-script comment, the "no way" statement, the fact that he refused, at the end of the day, to plead to 794, having been four months without counsel, and they confronted him for the first time and said, "Now, Mr. Franklin, we are going to give you a lawyer and you're going to plead guilty to 794," the more serious of the espionage charges.

It was at that point that he decided that he should seek other counsel. And we advised him not to plead to 794, your Honor. It was our advice. And for that reason, he stopped --

THE COURT: Well, I'm not sure any of this is really important --

ATTORNEY CACHERIS: Well --

THE COURT: -- but let me be sure the facts are right.

Is that your view, Mr. Hammerstrom, as to what happened? Briefly.

ATTORNEY HAMMERSTROM: It is not, your Honor. I mean, it's close, but it's not exactly right.

THE COURT: What's the only distinction?

ATTORNEY HAMMERSTROM: The distinction is that he had previous counsel, and we he had proposed a 794 plea.

He turned that down. He retained Mr. Cacheris. We met with Mr. Cacheris. We ended up modifying our plea offer to 793, and he rejected that and took us through two indictments, a first indictment and a superseding indictment.

THE COURT: All right.

ATTORNEY HAMMERSTROM: That was after we had offered the 793 plea.

THE COURT: All right.

Go ahead, Mr. Cacheris.

ATTORNEY CACHERIS: And it was because of counsel advising Mr. Franklin what position he should take, again remembering that for four months he was without counsel and he was guideless in this whole situation.

He has had -- and, your Honor, the government has agreed that you should consider his exemplary life. He has served his country both as a civilian in the Department of Defense and as a military man, as a colonel.

He has, since 2006, when this 12-year sentence was imposed, I suggest to the Court he has been essentially under home detention. He has paid his penalty, and he has suffered greatly.

He brought the case. The government rejected the case after a while, but it was not because of anything Mr. Franklin did.

They can talk all they want to about they may

not call him as a witness, but I suspect Mr. Franklin would have been a witness, and would have been entitled to the benefits of that.

So, for four and a half years, essentially, with some modifications, he has been cooperating.

The generosity that the government has shown to Rosen and Weissman is not being shared with Mr. Franklin. And we think that's wrong. So --

THE COURT: I don't think the government would characterize what they did as an act of generosity.

ATTORNEY CACHERIS: I characterize it as an act of generosity. Whatever they did, they did. But they were the principals that they were asking Franklin to bring. Franklin brought them.

And then Franklin had nothing to do with the government's -- if I may use the word again -- generosity with regard to Rosen and Weissman. He had nothing to do with that.

So we suggest to the Court, the fact that he has lived under this eight-year -- eleven-year sentence, twelve-year sentence since January 2006, over three and a half years now, is punishment enough. We don't think any further punishment is warranted.

And for the Court -- we are beseeching the Court, asking the Court to consider giving him no sentence

at all, or at least a halfway house or something --

THE COURT: Well, let me ask you this, Mr. Cacheris. I don't usually listen to allocution by a Defendant on Rule 35 --

ATTORNEY CACHERIS: I understand.

THE COURT: -- but I would do so, if he requests it.

ATTORNEY CACHERIS: He does.

THE COURT: All right.

I want to be clear, because I have clearly in mind what he did. And I understand your argument that he did he it out of a strong feeling of patriotism for his country.

ATTORNEY CACHERIS: That's correct.

THE COURT: Namely, he had a strong view about the position that the government should take with respect to Iran, and that failure to take that position would be harmful, detrimental, dangerous to the United States; and that the essential way to do this is to leak information to individuals who would pass it on to people who could do battle with those forces within the United States Government that had a different view.

ATTORNEY CACHERIS: Correct.

THE COURT: Now, I am going to ask him in a few minutes, does he understand why that's wrong?

ATTORNEY CACHERIS: Well, that's why he entered his plea, your Honor. He does understand it's wrong.

THE COURT: Well, the fact you think you are doing the best thing for your country doesn't give you a license to violate the law.

ATTORNEY CACHERIS: That's correct. We don't disagree with that.

On the other hand, the fact that he has done so much for the United States Government should be a factor that grants him more than a mere --

THE COURT: I understand that.

ATTORNEY CACHERIS: -- 35 percent reduction. That's where we come from.

THE COURT: So, I take it when he allocutes, he would respond that however well-established some people might feel this back-channel process is, that he now understands in spades that it's a violation of the law.

ATTORNEY CACHERIS: Yes, your Honor. He will say that to you.

And of course, as you know, as a result of this conviction he will never have a security clearance again. He will never be in a position to do anything like this again, ever.

Because look at what he has been doing. He has been unable to find a meaningful job. He has been digging

ditches. He has been cleaning cesspools, et cetera, et cetera. We have detailed all that in our motion.

So if you want to hear from him, your Honor, we will have Mr. Franklin answer the question.

THE COURT: Well, that's not -- if I have a request, I will think about it. But I don't typically hear from defendants on Rule 35.

I'm going to give Mr. Hammerstrom an opportunity, of course, to respond what you and --

ATTORNEY CACHERIS: Very good.

THE COURT: -- what Mr. Franklin have said.

Mr. Franklin, do you wish to be heard? You are not required to say anything, if you don't wish to.

THE DEFENDANT: Yes, your Honor, I do.

THE COURT: All right. Come to the podium.

THE DEFENDANT: (Complied.) Okay to go?

THE COURT: Yes, you may proceed.

ALLOCUTION BY THE DEFENDANT

THE DEFENDANT: God is present in the conscience of everyone in this courtroom, and, your Honor, God is my witness that what I say here is true, is simple truth.

I want to just say that I am grateful to be in such a court in a country where the rule of law and the respect for human rights is (sic) vibrant, because I have

been in many countries around the world many needs where neither respect for law -- there is neither respect for law or rights.

I just want to express so gratitude --

THE COURT: You feel the rule of law is important.

THE DEFENDANT: Yes, sir.

THE COURT: You are right. And what follows from that?

THE DEFENDANT: Well, sir, I -- can I --

THE COURT: You want to do it in your order.

THE DEFENDANT: Is that all right?

THE COURT: That's all right. But you --

(Simultaneous discussion.)

THE DEFENDANT: I will answer --

THE COURT: -- know what --

THE DEFENDANT: -- that question.

THE COURT: -- I'm getting at. I have lived in countries where there isn't rule of law. I was born in one.

THE DEFENDANT: Okay.

THE COURT: And what really matters is that government officials obey the law.

THE DEFENDANT: That is correct, sir.

THE COURT: All right. Go on.

THE DEFENDANT: I want to just --

THE COURT: Now --

THE DEFENDANT: -- just thank --

THE COURT: -- I think this individual is a member of the press, and pretty soon I will get letters from everywhere, angry letters from several countries I have lived in, complaining --

(Laughter.)

THE COURT: -- that I have said they don't have rule of law. And I suppose that's all right. And it's true.

Go ahead.

THE DEFENDANT: I want --

THE COURT: You don't live in a country where la mordida is what really matters. That's "the bite."

Go ahead, sir.

THE DEFENDANT: I want to thank --

THE COURT: But I will get angry letters.

(Laughter.)

THE DEFENDANT: I just want to express my gratitude for the generosity that beats in the heart of Plato Cacheris. And it's through his efforts and the efforts of John Hundley and others in the firm of Trout and Cacheris, who gave me the full measure of their assistance and never asked for a dime.

His assistance and that of Dr. Charney helped

me maintain my internal equilibrium so that I could discharge, during these five years, my duties to -- as a husband and a father.

I also want to thank those who stood by me who are not here, whose strength of character and commitment to friendship and, in some cases, acts of courage, were like oxygen for me.

Now, Judge Ellis, I fully admit to serious errors in judgment, and accept full responsibility --

(Simultaneous discussion.)

THE COURT: Well, let's --

THE DEFENDANT: -- for violations --

THE COURT: -- be clear --

THE DEFENDANT: -- of the law --

THE COURT: Let's be clear, Mr. Franklin, because words are important.

THE DEFENDANT: Yes, your Honor.

THE COURT: "Errors," and "errors in judgment" are somewhat euphemistic. You know, an error is like putting on the wrong color tie. Or an error in judgment is like throwing something in the washing machine that should only be dry cleaned. Those are all within "errors" and "errors in judgment."

We are talking about crimes.

THE DEFENDANT: And I accept full

responsibility.

THE COURT: All right. I just want you to be clear. Sometimes we use euphemisms to disguise the full weight, and I don't want that to be lost on you.

THE DEFENDANT: It is not, sir.

THE COURT: All right. Go on.

THE DEFENDANT: And neither have the consequences for my action s been lost on me, sir.

I especially apologize to those colleagues who were subjected to unwarranted and unwanted scrutiny. And the fact that I acted with incredible naiveté does not negate my culpability, for which I have contrition.

However, I want to inform the Court and my fellow citizens who are not present that my intentions were always motivated by love for our republic and for the safety of our military personnel that were about to go into Iraq.

And it is because of that love of our American republic, fostered by my own upbringing and admiration for the uniqueness in the annals of history that America is, that I foolishly and wrongfully entrusted sensitive information to people who were not authorized to receive it.

Once I illegally uttered those few sentences, I lost control over where that information might go. It no longer mattered that my intentions were pure.

And ironically, I didn't know that Mr. Rosen

and Mr. Weissman were with AIPAC until I had met them. I had never been to AIPAC. I didn't even know where it was located. I thought that this information would only go to a particular NSC source, who had responsibility for that action. And I was wrong.

THE COURT: The meeting was arranged by Mr. McCoskey?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Go on.

THE DEFENDANT: And I had rationalized at that time that it was the right thing to do, even though I knew it was illegal.

Earlier, I said that I have accepted and endured the consequences of my rash actions. The most painful consequences of my behavior involve the erosion of integrity in my own family, the emotional impact on our youngest son, and the precipitous decline in my own beloved wife's health.

And there is one other consequence that I will regret until the day I die, sir, and that is my father, the hero, veteran of World War II, patriarch of the family, died perplexed as to my status. This is the most unsettling consequence of all for me.

And so I am asking you, Judge Ellis, to temper justice with mercy, and not for my sake, but for the sake of

my wife. That is why I am begging your indulgence.

In closing, I profoundly regret, every day in these past years, that I have not been permitted, because of my actions, to employ my expertise to help our country.

Even if I could have saved one life, it would have worth it. As in my study at home, all the walls are filled with the faces of our fallen. I want to help prevent other American families from enduring the loss of a loved one.

Whatever the outcome of this hearing, I am ready to contribute, and will, all my professional skills to that end.

So I am asking you, Judge Ellis, not to make my sentence too lengthy, so that I can spend the rest of my days attending to my wife's medical needs, but also to instructing our nation 's youth as to the danger that our civilization faces from those who would replace us.

THE COURT: You are no longer teaching at Shepherd, are you?

THE DEFENDANT: No, sir, I am not. But I --

THE COURT: Well, I am very interested -- go ahead.

THE DEFENDANT: I -- when -- the president of Shepherd said that upon completion of my obligation with the government, they would rehire me. And I have written a

book, which is not published yet, which is directed to the American youth, as to the threat of radical Islam and terrorism. And everything I say in there is based upon my own experience.

THE COURT: I am much more interested, Mr. Franklin, not in your views about the threat of radical Islam, but in your understanding now of the importance of the rule of law insofar as it applies to government officials obeying the law.

Don't you think that's important to tell the youth about?

THE DEFENDANT: Absolutely, sir. And I have told my class about that, the one, when I did teach at Shepherd, that what I had done was wrong.

THE COURT: All right, sir.

Do you have anything else?

THE DEFENDANT: No, sir.

THE COURT: All right.

Mr. Cacheris, do you have anything you want to add?

And I will --

ATTORNEY CACHERIS: Nothing further --

THE COURT: -- ask Mr. --

ATTORNEY CACHERIS: -- your Honor.

THE COURT: All right.

Mr. Hammerstrom?

ATTORNEY HAMMERSTROM: We will rest on the papers, your Honor.

THE COURT: I am going to take a few minutes more to reflect on this, but I want to make some remarks.

(Pause.)

RULING ON MOTION AND

IMPOSITION OF SENTENCE BY THE COURT

THE COURT: I have been reflecting on this for weeks. Indeed, I issued an order that said -- after I dismissed the charges against Rosen and Weissman, I issued an order requiring the government to let me know what -- whether there were any motions with respect to Mr. Franklin. I didn't limit it to Rule 35. I said "any motions," I think.

So this has long been in my thoughts. And when I received your briefs, I read those carefully and thought about them. And I have heard your arguments.

It's a very difficult unusual situation. Mr. Hammerstrom is absolutely right. I have seen hundreds of these things over the past 20-plus years, going into my 23rd. But this one is unique in many respects, chiefly, of course, because of the context and because of the fact that the government, for its own reasons, decided to discontinue the case against Rosen and Weissman.

It is not the judiciary's business whom to prosecute and what they should be prosecuted for. It is not the judiciary's business to decide when to proceed and to continue with a prosecution and when not to do so. Those issues are entirely up to the discretion of the Executive Branch, and I express no view about that.

The only time I have expressed views about that is when the Executive Branch makes decisions to use judicial resources in a way that, really, I cannot stand by. And that's only happened once, and that was in connection with Lorton.

If some of you may recall, I thought Lorton was a disgrace, and said so on the front page of one of these newspapers. The only solution to Lorton is what occurred: to close. It was a disgrace.

But we would receive a ton of cases over here involving assaults within Lorton, on inmate on inmate. And there is an internal grievance proceeding. So I sat on several cases, case after case after case, in which one inmate -- they would prosecute one inmate for an assault by another.

And so you had groups of inmates who would come in and testify. And the jury would scratch their heads and say: How can we determine whom to believe when they are all felons, and they don't look like very reputable folks.

And after a while, that seemed to me to be a waste of judicial resources. That's the only time that the judiciary -- that I have, as a judge, interfered with the government's decision of whom to prosecute, whom not to prosecute, when to continue or not to continue.

So I don't express any view about the discontinuing of the Rosen and Weissman case.

However, it is significant, in the context of Mr. Franklin, that it was discontinued.

Having said that, however, I don't have any doubt -- and Mr. Franklin has made clear that he doesn't doubt, and Mr. Cacheris does not contest, that Mr. Franklin, in what he did, violated the law.

Whether it was specifically 792 or something else is something maybe for dispute.

The main issue in Rosen and Weissman -- well, not the main -- we have an expert here -- or we have the experts here, Mr. Reilly, Mr. Hammerstrom, Mr. Lowell. But a principal issue in that case, and something that I don't think is well-understood, is that the information had to be national defense information. It wasn't enough that it be classified. It had to be NDI for there to be a violation. And that was a very disputable issue.

And as I said, I don't have a view on whether something should be classified or not. That's only part of

the NDI equation. That's the closely held part.

It isn't the judge, the judge's view, it isn't the judiciary's task or obligation to determine what should or shouldn't be classified. That's, again, an Executive Branch decision.

It is, however, the province of the judiciary -- and in this case it would have been the province of the jury -- to decide whether or not the information was NDI. That's really what a major dispute was about.

Am I correct, Mr. Reilly; there was a major or dispute about that?

There may have been others, but that was a major dispute.

ATTORNEY REILLY: I believe that's correct, your Honor.

THE COURT: And I see Mr. Lowell smiling, and so I think it was.

And I don't know whether that's the reason.

There were a lot of witnesses that the defense had lined up. There were rulings that I made. Those were referred to in the media.

I don't know. It doesn't matter. I don't know and don't care. That's a matter for others to write about, think about.

I do want to say that the lawyers in that case on both sides, both the government and the defendant, were exemplary and did an exemplary job.

Now -- but it has some relevance to this case, and I'll come to that in just a moment.

In deciding on a Rule 35, I do consider the 3553(a) factors, but it's not a resentencing. And I considered the factors under 5K. They are all advisory. The Guidelines are advisory. The factors there are not binding. But I consider those and 3553(a).

And my task at the end of the day is to evaluate his cooperation, to make a decision about the importance of it, the substance of it, to evaluate the other 3553(a) factors, which, of course, are his personal history characteristics, the nature of the offense, the need to insure that there -- whatever is done is just -- and I'll come back to that -- promotes respect for the law, does not involve unwarranted disparities in on sentences imposed on this defendant. In this case, it wouldn't be unwarranted disparities in the sentencing. It really would be unwarranted disparities, also, in the reductions.

And also, I have already mentioned, or should mention, deterrent effect. Mr. Hammerstrom made a very important point. He said that this case is different from Rosen and Weissman, in that Mr. Franklin was a government

official.

And I think the government's view -- correct me if I am wrong, Mr. Hammerstrom -- is that these back-channel efforts, insofar as they involve classified information, are not justified, cannot be justified. And that had to be a significant motivation in the government's originally bringing the prosecution.

Would that be reasonably accurate?

ATTORNEY HAMMERSTROM: Yes, your Honor.

THE COURT: And so what I do today has to continue to send that message. That's very important.

Now, it's true that there have been disclosures, as Mr. Cacheris points out, in which people have disclosed classified information to the press, when they shouldn't have under the law, and they haven't been pursued and prosecuted.

I don't have a problem with people doing that if they are held accountable for it. To use the Jack Bauer analogy, one might hope that, for example, someone might have the courage to do something that would break the law if it meant they're the savior of the country; but then one has to take the consequences, because the rule of law is so important.

So, if someone discloses an NIE about Iran, which happened, and a day later it appears in the newspapers

because that was a very hot topic in those days; if one discloses NSA surveillance -- that was -- because someone clearly thought that that was wrong -- and I can understand that feeling, but it was wrong to disclose it. There were other ways to go about it.

Now, disclosing it was okay if the person is willing to stand up and say, "I did it. Give me the consequences."

So, what I do today -- what has happened to Mr. Franklin and what will happen after I rule today has to stand as a beacon to government officials, because Mr. Hammerstrom is absolutely right, it is important that government officials, more than anyone else, get this message: You cannot engage in disclosure of classified information, certainly not NDI -- I mean, it may turn out in the end not to be NDI, under the statute. But you are precluded by your agreement with the government and by internal regulations from disclosing classified information, which in all likelihood might well be NDI; and that if you do so, there are consequences; and that noble motives don't erase the violation.

And it's important that what I do today reflects that.

It is also important to have what I do today reflect the very substantial amount of cooperation that he

has provided in a range of areas that we reviewed, some of which are under seal; and that I consider all of the other factors that Mr. Cacheris has brought to my attention in his submission, the bulk of which will not be under seal and be publicly available.

This case has clearly had a very severe effect on him, his family. But those -- that's a result of choices that Mr. Franklin made. Life is making choices and living with the consequences of the choices that you make.

We don't determine where we are born, to whom we are born, or whether we are born with handicaps, but we all determine how we respond to those. And what choices we make, those choices shape our lives. He made a bad choice, he made a criminal choice, and there must you be consequences for that.

I also remember and take into account that Mr. Franklin made a heartfelt, I think, sincere statement about his feelings about our country and about our warriors in uniform. I think those were sincere. And he can make those because he was a warrior. He did serve. And he also had very close friends who were killed as warriors.

This country cannot survive without its warriors. Of course, it won't survive very well unless we use our warriors well and carefully. But his heartfelt statements, I think, are genuine and they have some basis.

So I take all of that into account.

In the end, I grant the motion to reduce his sentence. And I reduce his sentence on the three counts to a sentence of probation with a special condition that he serve ten months in community confinement.

As a further special condition of his probation, I am going to require that he do a hundred hours of community serve. And I want this hundred hours of community service focused on giving talks to young people.

But I am not interested in giving -- in your giving talks to young people about the Islamist threat to our country -- not that I don't think there is one. We might not agree on precisely what it is. It doesn't matter.

What I want you to do, Mr. Franklin -- come to the podium.

THE DEFENDANT: (Complies.)

THE COURT: What I want you to do is I want you to speak to these young people about the rule of law, the importance of the rule of law insofar -- and how important it is with respect to public officials, that public officials must obey the law.

And simply because you believe that something that's going on that's classified should be revealed to the press and to the public, so that the public can know that its government is doing something you think is wrong, that

doesn't justify it.

Now, you may want to go ahead and do it, but you have to stand up and take the consequences.

And Mr. Cacheris, you asked for straight probation, and largely because of two things: one, the case against Rosen and Weissman abated, and therefore you would think nothing worse could happen to Mr. Franklin. And number two, you point out that there are other people in the government who are doing this and not being prosecuted.

I agree with you. I think that's indisputable. And it's sad.

The person who disclosed those things that you refer to and that I refer to, probably thinks he or she is a hero.

They are not a hero, not a hero at all. They were a lawbreaker. And that's the point Mr. Hammerstrom wants driven home.

Am I right, Mr. Hammerstrom?

ATTORNEY HAMMERSTROM: Yes, sir.

THE COURT: So what I want you to speak to these young people about, Mr. Franklin, is the rule of law and the obligation that public officials especially have, and the importance of classified information. Secrets are importance to a nation. If we couldn't keep our secrets, we would be at greater risk.

Don't you agree?

THE DEFENDANT: Yes, sir.

THE COURT: No, whether or not we overclassify things is certainly open to great debate. In fact, Mr. Lowell was ready to engage in that debate full bore in the case.

Am I right, Mr. Lowell?

ATTORNEY LOWELL: May I say "yes" on the record, sir?

THE COURT: (Laughs.) So, that is not something -- that's true, we may overclassify some things. But we need to protect our secrets with the law. Don't you agree?

THE DEFENDANT: Yes, sir.

THE COURT: I want you to explain to young people the importance of public service under the rule of law.

And I am going to ask that a probation officer send me copies of your lectures on this subject during the -- and you can do it in high schools, you can do it at Shepherd. You can do it at various places.

THE DEFENDANT: I would love to do it, sir.

THE COURT: Well, you will have an opportunity to do it, and time to do it. And to the extent that there are hours left over, I want you to go to veterans hospitals

and help with the veterans. And I know that is close to your heart, and you have already done some of that.

THE DEFENDANT: Yes, sir.

THE COURT: But I want you to talk to your people about that.

I am going to permit you to surrender voluntarily, of course.

The reason that have kept some element of the sentence that goes beyond what Rosen and Weissman have to endure -- and we don't know whether a jury would have found Rosen and Weissman innocent -- or not guilty or guilty. We don't know that. Because there was a clear fight about whether anything they did was illegal. We don't know why the government -- and I don't want to know why the government -- abated. It's none of my business.

The only thing I can say is that it made my trial docket easier to manage.

(Laughter.)

THE COURT: That's about all I can say.

But it's important that you have a consequence from this. It includes the papers you took home, after being told not to.

Mr. Hammerstrom was dead right on that, and I remembered it clearly. After being told not to, you did it. You can't do that as a public official. You have a higher

obligation to the rule of law, not to your own estimate of what you think is good or not.

The fact that you had these strong views about the threat of Iran, I understand that. But you had a forum in which to engage that within the Department of Defense.

THE DEFENDANT: Yes, I did.

THE COURT: And you arrogated to yourself the power to do something more about it. You know, you could have been wrong about that. Who knows? We don't. We don't.

In fact, we will never know whether one position or the other is right until one history takes care -- or we take one route, history tells us about that. But we will never know what would have happened if we had taken the other route. We do the best we can, and we will do better if we obey the rule of law.

Have I made myself clear?

THE DEFENDANT: Yes, you have, sir.

And one of the -- one of two principal objectives of our adversaries is to force us to change internally. And what I did was play into that objective by my violations.

THE COURT: All right.

Anything further in this matter today?

Let me end on a positive note.

You may be seated.

THE DEFENDANT: That you.

THE COURT: I have said this twice already today, and I will say it again. I haven't seen lawyers on the government side, and Mr. Lowell on your side -- that includes Mr. Weiss and all the other folks -- work any harder, any more diligently, any more honestly and effectively than this group here.

I know I imposed a lot of burdens on you, but I want to end on that positive note that you all did a very good job as lawyers. I appreciate it.

And I think we are fortunate to have in our Department of Justice such capable, conscientious, honest lawyers; and on the defense side, Mr. Lowell, Mr. Weiss and all of those who aren't here, such able lawyers, honest, diligent and effective lawyers on the other side.

I'll enter an order accordingly.

Court stands in recess.

(Court adjourned at 7:03 p.m.)

---

CERTIFICATE

I, MICHAEL A. RODRIQUEZ, an Official Court Reporter for the United States District Court, in the Eastern District of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the motions hearing in the case of UNITED STATES OF AMERICA v. LAWRENCE ANTHONY FRANKLIN.

I further certify that I was authorized and did report by stenotype the proceedings in said motions hearing, and that the foregoing pages, numbered 1 to 45, inclusive, constitute the official transcript, of said proceedings as taken from my machine shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this ______ day of ___________________, 2010.

________________________________
Michael A. Rodriquez, RPR/CM/RMR
Official Court Reporter

# Footnote 48

# *Iran in 'Advanced Stages' of Planning Attacks Against Americans, Officials Say*

The U.S. government has ordered diplomats and other federal employees to leave Saudi Arabia. It is also drawing down staff at other missions in the region.





**By Edward Wong, Jonathan Swan and Julian E. Barnes**

Reporting from Washington

Oct. 23, 2026

**See more of our coverage in your search results.**
Add The New York Times as a preferred source on Google ›

The U.S. government has put employees on heightened alert across the Middle East and moved to reduce personnel levels at embassies and consulates because of intelligence showing Iran is in the advanced stages of planning attacks against Americans, U.S. officials said on Friday.

Intelligence officials raised alarms to Secretary of State Marco Rubio in a memo on Friday that warned about the dangers to State Department employees in the Middle East and other regions, the officials said.

The memo, from Jay Clayton, the director of national intelligence, said that agencies had "received intelligence that Iran has substantially increased efforts to target U.S. personnel. The lethal plotting efforts by the Iranians against U.S. citizens have reached advanced stages in both the Middle East and certain other countries."



The U.S. Embassy in Riyadh, Saudi Arabia, which has been attacked by Iran. -/Agence France-Presse — Getty Images

The Trump administration confirmed the memo on Friday night through a U.S. official. The move demonstrated the seriousness with which the U.S. government is taking the threat, officials said. Axios earlier reported on the memo.

U.S. agencies assess that the threat against Americans in the Middle East and several other countries is at the highest level since the start of the war in February, U.S. officials said.

President Trump and top aides have received regular briefings on the rising threats, which go beyond the Middle East, one official said. Analysts have been examining the intelligence on the threats to U.S. officials, including ambassadors, in the past three weeks. Some material indicates Iran may have operatives in the United States, the official said. The Iranian plans also include potential targets in Europe, U.S. officials said.

**Want to stay updated on what’s happening in Iran?** Sign up for Your Places: Global Update, and we’ll send our latest coverage to your

inbox.

But another official cautioned that Iran's ability to carry out attacks in the United States and other territories overseas is limited, and its ambitions to strike are greater than its capability to do so.

The White House did not reply to a request for comment. Mr. Clayton's office and the C.I.A. declined to comment.

The State Department said through a U.S. official that "when it comes to our staffing at embassies, we constantly evaluate new information about the security environment."

The official said that the threat of attacks by Houthi forces in Yemen and of "Iranian terror plots targeting U.S. officials" were informing State Department decisions on staffing adjustments for embassies. The missions were already at reduced levels under what the department calls "restricted operating status," often invoked in conflict zones, the official said.

The State Department on Friday evening updated travel advisories for 13 countries across the Middle East. All of them are at orange level three, which means "reconsider travel," or red level four, "do not travel." In a statement on the advisories, the agency cited the potential for Houthi attacks across the region to escalate, and also underscored the persistent threat from drone and missile attacks by Iran.

The statement did not mention the increase in intelligence on Iranian assassination plots, but it had been released before the Trump administration publicized Mr. Clayton's memo and the recent internal warnings.

The alerts over the new threats come after eight months of a war against Iran started by Mr. Trump and Israel that has sent energy prices soaring, roiling economies around the world and eroding Mr. Trump's approval at home. The

United States and Israel have drawn up plans for a new wave of strikes on Iran after the U.S. midterm elections, though Mr. Trump has not made a final decision to carry them out, The New York Times reported on Wednesday.

Iran's supreme leader, Ayatollah Ali Khamenei, and other top officials were killed in the initial U.S.-Israel strikes that opened the war on Feb. 28. Mr. Trump said at the time that the two countries killed 48 Iranian officials in the attacks. Soon afterward, he boasted that the United States had killed two levels of Iranian leadership, which he said amounted to two regime changes.

He lamented on March 3 that officials whom the U.S. government had viewed as potential successors to Mr. Khamenei and his close aides had been assassinated. "Most of the people we had in mind are dead," he told reporters.

Mr. Trump has refrained from ordering large-scale attacks on Iran in recent months, but the U.S. military has carried out a blockade of Iranian ports in an effort to keep Iran from selling oil and other energy products on the global market.

Iranian officials have sought different ways to strike back at the United States and its allies, U.S. officials said. In early October, the U.S. military took the extraordinary step of withdrawing all 12 B-1 Air Force bombers from a base in southern England because commanders had received information about Iranian threats to the installation, R.A.F. Fairford.

Mr. Clayton said in his memo to Mr. Rubio on Friday that he was seeking to downgrade the classification around some intelligence so that more U.S. government employees could be informed about what the memo's subject line called the "lethal plotting against Americans in the Middle East and certain other countries."

On Wednesday, the State Department ordered the departure of nonessential employees and their families from Saudi Arabia, Tommy Pigott, a department spokesman, said in a statement.

The agency has also been quietly moving personnel in and out of many of the other diplomatic missions in the region. It has designated almost all U.S. missions in the Middle East as being on "restricted operating status," which gives the department more leeway to adjust staffing levels without putting out notifications.

The drawdown of diplomats and other U.S. government employees at the missions is a direct result of the recent intelligence about Iranian attack plans, U.S. officials said.

After the United States and Israel struck Iran on Feb. 28, the Iranian military retaliated by firing drones and missiles at Arab nations across the Middle East, as well as at Israel.

On March 2, the State Department issued a mandatory departure for nonessential employees at missions in Iraq, Jordan and Bahrain.

Around that time, the department also ordered nonessential personnel and their families in the missions in Saudi Arabia to leave the country because Iran had carried out attacks against the embassy in Riyadh, and on nearby areas.

In the run-up to the war, only two embassies said employees could go on so-called authorized departure, which meant nonessential personnel and family members could leave if they wanted to do so. Those were the embassy in Beirut, which issued the message four days before the war began, and the embassy in Jerusalem, which did so the day before the start of the war.

During periods this summer when the violence ebbed, the State Department told some diplomats they could return to their posts.

The State Department came under intense criticism for not urging the many thousands of U.S. citizens in the region to leave before the start of the war, and for providing limited help to evacuate them once the missiles began flying. The Trump administration and Israel had secretly been planning strikes for many weeks before the start of the assault.

**Edward Wong** reports on global affairs, U.S. foreign policy and the State Department for The Times.

**Jonathan Swan** is a White House reporter for The Times, covering the administration of Donald J. Trump. Contact him securely on Signal: @jonathan.941

**Julian E. Barnes** covers the U.S. intelligence agencies and international security matters for The Times. He has written about security issues for more than two decades.

---

A version of this article appears in print on , Section A, Page 9 of the New York edition with the headline: Iran Said to Be in 'Advanced Stages' Of Planning Attacks on Americans

# Footnote 49

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/opinion/john-bolton-donald-trump-iran-list-security-secret-service-5294ef4c

OPINION REVIEW & OUTLOOK Follow

# Trump, Iran's Assassins and John Bolton

The President has the Secret Service, but his targeted former advisers don't.

By The Editorial Board
July 19, 2026 4:14 pm ET



President Donald Trump and National security advisor John Bolton in 2018. OLIVER CONTRERAS-POOL/ ZUMA PRESS

President Trump is taking Iran's threats to assassinate him seriously, as well he should. He reportedly switched Air Force One from the new Qatar version on his return from the recent NATO summit on the advice of the Secret Service. How about a little concern, then, about Iran's threats to kill his former national security adviser, John Bolton?

The White House hasn't confirmed the Air Force One switch, but it hasn't denied the story either. Notably, the Justice Department has subpoenaed New York Times writers who reported the story to disclose their sources. That's harassment against the press that won't make the U.S. safer. The

story arguably did Mr. Trump a favor by reminding the public that Iran's regime hasn't turned over a "new leaf," to borrow Vice President JD Vance's term.

"They want to take out the U.S. leader—me," Mr. Trump told reporters in Turkey. "I'm on every list. I saw this morning, I'm on every single one of their lists. And so far, I guess I've been a little bit lucky, but that maybe doesn't last very long."

Mr. Trump said he has given orders for the U.S. military for a massive military assault on Iran if he is assassinated. By that time the orders would have to come from new President Vance, and we'd like to think he'd unleash hell as well.

Iran has long wanted to kill American officials, as well as anti-regime exiles in the U.S. It targeted Brooklyn, N.Y., based Iranian dissident Masih Alinejad, according to a federal case against would-be assassins. Two men have been convicted in the foiled plot.

Which brings us to Mr. Bolton, who has been targeted by Iran along with Mr. Trump's first-term Secretary of State Mike Pompeo and State's main deputy for Iran policy in the first term, Brian Hook. The Biden Administration was concerned enough that it provided the trio with protection details.

But after taking office a second time, Mr. Trump pulled that protection from all three. This was raw vindictiveness, since we doubt Iran has given up on killing them. Iran blames all three for the 2020 assassination of Qassem Soleimani, who ran Iran's network of terror proxies for the Islamic Revolutionary Guard Corps. These Americans are targets because of a decision the President rightly made.

The danger for Mr. Bolton in particular has increased because the Trump Administration is prosecuting him for mishandling classified documents. Mr. Bolton pleaded guilty last month to avoid the threat of additional charges against him or his family. The plea deal stipulates a fine of $2.25 million, which is an effort to strip Mr. Bolton of the income from his 2020 book that was critical of Mr. Trump.

But far worse, the Justice Department has insisted on seeking a prison term of up to five years. This is a penalty far beyond what other officials have received for similar or greater classification offenses. John Deutch, David Petraeus and Sandy Berger never served jail time and none pleaded guilty to felonies. Mr. Bolton was treated more harshly.

Federal Judge Theodore Chuang has scheduled sentencing for Mr. Bolton for Oct. 28. But a jail term of any length runs the risk of assassination. It wouldn't take much for Iranians to bribe an inmate, or threaten relatives of an inmate or guard, to have Mr. Bolton killed while he's in custody. Prisons are notoriously insecure.

By the way, Iran hacked Mr. Bolton's personal AOL account after he left office, in what he thinks was an attempt to get hold of his calendar for a potential murder hit. Mr. Bolton contacted the Biden Administration in 2021, though he wasn't obliged to. Mr. Bolton's reward for assisting the FBI counterterrorism division is to have Mr. Trump unleash the bureau and prosecutors on him.

***

Mr. Trump has the Secret Service to protect him, but these other public servants don't. They have to do without security or pay for it themselves, as Mr. Bolton has. Let's hope Judge Chuang dispenses with the Justice Department's unjust prison demand and issues a suspended sentence.

As for Mr. Trump, he's already exacted revenge against his former adviser with the prosecution and fine. He knows Iran has a kill "list" that includes him and his advisers. If Mr. Bolton is killed in prison, the President and his Justice Department will be partly responsible.

*Appeared in the July 20, 2026, print edition as 'Trump, Iran's Assassins and John Bolton'.*

---

The Editorial Board speaks for free markets and free people, the principles, if you will, marked in the watershed year of 1776 by Thomas Jefferson's Declaration of Independence and Adam Smith's "Wealth of Nations." So over the past century and into the next, the Journal stands for free trade and...

## Further Reading

Trump Administration, States Harden Battle Lines Ahead of Election Day

Justice Department Sends New Subpoenas in Alaska Election Probe

Justice Department Push Against Trump's Foes Reaches Higher Gear

Grand Jury Declines to Indict Former White House Aide Cassidy Hutchinson

Court Rejects Trump Administration Bid to Set Aside California Mail-in Ballots

## Videos

# Footnote 50

News

# Democrats demand answers over DOJ's prison policy change tied to Ghislaine Maxwell

Democrats are questioning the timing of a Bureau of Prisons policy change that, they say, is the Trump administration trying to "cover their tracks" with Ghislaine Maxwell.




Rep. Deborah Ross speaks during a House Judiciary Committee hearing in the Rayburn Building on March 4, 2026, in Washington, D.C. *Heather Diehl / Getty Images*

By **Kevin Frey**
June 12, 2026, 5:00 AM EDT

House Democrats want answers about a recent policy change at the Federal Bureau of Prisons, arguing leaders at the Department of Justice are trying to "cover their tracks" following the August transfer of Jeffrey Epstein associate Ghislaine Maxwell to a lower-security facility.

That new policy, which was published last month and has not been previously reported, dictates that "in certain circumstances, the Attorney General may exercise authority to designate or redesignate the place of a prisoner's imprisonment."

Democrats argue the expansion of federal authority over inmate placement is a major departure from previous policies, which they say vested more authority in the Bureau of Prisons and placed specific restrictions on where inmates could be held — including taking into account whether the prisoner is a sex offender.



Rep. Deborah Ross of North Carolina, a Democratic member of the House Judiciary Committee, said the "clear implication" is that — under the old rules — the Department of Justice violated the Bureau of Prisons own rules when it "transferred Ghislaine Maxwell to Club Fed, where sex offenders are not allowed to be."

"Since it violated the policy for who can do prison transfers, they're trying to cover their tracks retroactively," Ross alleged.

Last year, Maxwell was transferred from a low-security facility in Florida to a minimum-security camp in Texas, shortly after she met with then-Deputy Attorney General Todd Blanche, who said he wanted to talk about what she knows about Epstein.

Maxwell is serving a 20-year sentence for her role in a scheme to sexually exploit and abuse minors. She has appealed for President Donald Trump to grant her clemency.

"I don't think it takes a rocket scientist to figure out what they're doing," Ross said of the DOJ.

Amping up pressure on the Trump administration for answers, Ross sent a letter, shared first with MS NOW, to the Federal Bureau of Prisons Friday morning.

In it, Ross asks the agency to explain what prompted the policy change and how it was developed. She also asks for the bureau to detail how many times the Attorney General has intervened regarding a prison designation or redesignation decision.

"Given Congress's responsibility to oversee the federal correctional system and ensure that BOP policies are evidence-based, transparent, and consistent with statutory requirements, we require answers on how and why your Bureau decided to give the Attorney General the authority to unilaterally transfer inmates and disregard the BOP evaluation of an inmate's safety classification," Ross writes in the letter.

The letter also says the new policy "raises troubling questions about the scope of the Attorney General's asserted authority, the circumstances under which this authority may be exercised, and the potential effects on institutional operations, fairness, transparency, and consistency in federal prisoner placement decisions."

**More articles**

Judge denies Ghislaine Maxwell's petition for release from prison

Lisa Rubin, Julianne McShane



Oversight Democrat: 'Hard to believe' Ghislaine Maxwell's ex-boyfriend was unaware of crimes

Allison Detzel



"Especially in light of Maxwell's transfer," the letter continues, any policy update "warrants careful scrutiny by Congress and the public."



The letter is co-signed by Rep. Jamie Raskin of Maryland, who is poised to become the next chairman of the House Judiciary Committee if Democrats win control of the chamber in November, and Rep. Ro Khanna, D-Calif., who spearheaded the congressional effort to force the release of the Epstein files.

MS NOW separately reached out to the DOJ and the Federal Bureau of Prisons to ask for an explanation for the policy change. Neither agency responded.

The demand for answers from House Democrats comes as Blanche, Trump's pick to serve as the next Attorney General, is staring down the Senate confirmation process.

Ross told MS NOW that, provided the Bureau of Prisons does not respond to their House inquiry, Democrats will urge their Senate colleagues to ask Blanche about the prison policy change when it comes time for his confirmation hearing.

"We hope it comes up," she said.

Getting to the bottom of the policy revision, she said, will also likely be part of Democratic efforts next year to conduct oversight of the Trump White House and its handling of the Epstein case should they win control of the House and the committee gavels in November's midterms.

“You can be sure of it,” she said.



**Kevin Frey**

Kevin Frey is a congressional reporter for MS NOW.

Become a Member to join the conversation

## Comments

Join the Conversation ›

Get full access to exclusive coverage and member-only content

Join now

## White House

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 308 of 363



Trump to deliver closing midterms message in front of Lincoln Memorial Reflecting Pool

Julianne McShane & Paula Reid

DHS overpays for private prison, making a mockery of Team Trump's rhetoric about 'waste'

Steve Benen

Trump wants Michigan-born Abdul El-Sayed to go 'back to where he came from'

Steve Benen

## Congress




Monday's Campaign Round-Up, 11.2.26: Haley Stevens faces swift backlash in Michigan

Steve Benen

Judge dismisses Trump DOJ lawsuit to block certification of Alaska Senate result if Republican loses

Lisa Rubin

FBI agents visit at least 3 donors to Alaska Senate candidate Daniel J. Sullivan

David Noriega & Lisa Rubin

## Supreme Court

## Newsletters

View All >



## Meet the Team

Everything MS NOW, all together. Discover the shows everyone's talking about.

Supreme Court condones 'collusion,' asks to hear from Clinton and gets back to the bench

Trump's DOJ takes another hit. The Supreme Court could have the last word.

Hillary Clinton just shifted the Overton window on Supreme Court court packing

Explore Explore Explore Explore

SPONSORED / MEMORYHEALTHAFTER55

**MDs Say Forgetfulness Can Show Up When Seniors Often Forget These 3 Things — See Which Ones**

SPONSORED / OTTOINSURANCE

Click Here

**Who Charges The Most For Car Insurance in District Of Columbia? (Check Zip Code)**

SPONSORED / HELLOWELLNESS101
Doctors Say Mental Decline Isn't Aging: Just Stop Drinking These 3 Popular Beverages

SPONSORED / MEMORYHEALTHJOURNAL
Memory Experts Say Mental Decline Begins When Seniors Can't Pronounce These 5 Phrases. Can You?

SPONSORED / HELLOWELLNESS101
Doctors Say Forgetfulness Begins When Seniors Can't Pronounce These 3 Phrases. Can You?

SPONSORED / SMARTGADGETSELECT
These Are the Coolest Gifts on Everyone's Wishlist in 2026

SPONSORED / MEMORYHEALTHJOURNAL
Top Doctors Say Memory Decline Begins When Seniors Can't Pronounce These 3 Phrases. Can You?

SPONSORED / MEMORYHEALTHAFTER55
MDs Say Sharp Memory Shows When Seniors Can Recall These 3 Words. Can You?

SPONSORED / OTTOINSURANCE
Who Charges More For Car Insurance in District Of Columbia? (Check Zip Code)
Click Here

SPONSORED / HEARTHEALTHCARE
It's Not Salt: Doctors Now Connect High Blood Pressure to a Food Most Seniors Have Before 9AM
Learn More

SPONSORED / MENVAULT
Why Men After Prostate Surgery Quietly Made the Switch
Learn More

SPONSORED / MATUREBEAUTYJOURNAL
Aging Spots: Most People Turn to Lasers. Insiders Use This Formula Instead.

SPONSORED / SHAVER
Dad Still Using That Old Shaver? Here's a Gift Idea.

SPONSORED / HARRINGTONCO.HATTERS
Why Men Over 60 Are Ditching Their Old Baseball Caps
Learn More

## More From MS NOW

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 312 of 363

MS NOW

**Jet nosedives and erupts into fireball near busy roadway in South Florida. All 9 on board died**

MS NOW

**Opinion | What Nicki Minaj's rage against Kathy Hochul is really about**

MS NOW

**Roger Marshall pushes dubious closing message in Kansas, reportedly defying his own team**

SPONSORED / TOPTRENDINGDAILY

**Best Christmas Gift: Here Are 27+ Of The Coolest Gifts For 2026**

SPONSORED / COMFORTLIVINGTODAY

Learn More

**At 66, I Stopped Wearing Bras. Here's What I Wear Instead**

SPONSORED / ANTI-AGINGCENTER

Read More

**Dermatologists: The 1 Vitamin You Need If You Have Wrinkles**

SPONSORED / FANYILAEROGLIDE

Shop Now

**No Stand. No Strings. What's Holding This Plane Up?**

MS NOW

**Social Security Administration's latest pre-election message slammed as 'illegal'**

MS NOW

**Opinion | The mob boss president wants his cut — or else**

MS NOW

**In Alaska, the partisan response to ballot-stacking allegations is worse than ballot-stacking**

# Footnote 51 –

Video clip on file with NBC News, available at: https://www.nbcwashington.com/video/news/national-international/trump-john-bolton-indictment-reaction/4003028/

# Footnote 52

MaddowBlog

# Trump doesn't do himself any favors with new comments on John Bolton's criminal case

The president, unprompted, boasted that he "helped" with the case against his former national security adviser "from the standpoint of encouragement."

This ad will end in 3

By **Steve Benen**
June 5, 2026, 3:31 PM EDT

---

When former White House national security adviser John Bolton was first indicted last fall, he suggested not only that he planned to plead not guilty, but he also characterized the case as an "abuse of power" by Donald Trump's Justice Department, which he compared to Stalinist Russia.

This week, Bolton shifted gears: As part of plea agreement with prosecutors, he's prepared to plead guilty to a single count of retaining classified information contained in a private diary entry.

The president, who made no effort to hide his contempt for Bolton, initially had nothing to say publicly about Thursday's developments, until a reporter broached the subject Friday afternoon during a brief Q&A on Air Force One.

**The Bulwark**
@thebulwark.com · Follow

Trump: "I was never much of a fan of John Bolton… He wanted to go to war with anybody that opened their mouths, anybody that talked… but he always wanted to kill people in war and that was okay for me

"Well, I was never much of a fan of John Bolton," Trump said. "I never thought he was a smart person, that he was a radical right in terms of war, not in terms of other things. He was, he wanted to go to war with anybody that opened their mouth, anybody that talked, and I used him for a purpose, you know. He was involved with [George W. Bush], and he created a lot of problems, but he always wanted to kill people in war, and that was okay for me, as long as I didn't listen to him, which I never did."

The president quickly added, "He's a, he's a bad guy, John Bolton, he's a dirty guy, and we caught him, and then we caught him, and you know, he wrote a book. You look at all the information he took, I mean, if you look at that case, it's a great honor to have helped from the standpoint of encouragement."

There's a lot to digest in his minute-long answer, but three elements I think are especially important.

First, nine different people (and counting) have served as Trump's White House national security adviser — more than any other president since the office was created in 1955 — but Bolton had the longest tenure, lasting roughly a year and a half. If Trump "never" liked, trusted, respected or listened to his longest-serving national security adviser, that says at least as much about the president as it does about Bolton.

Second, let's not brush past the fact that Bolton is poised to plead guilty to, of all things, mishandling classified information. Trump might find that worthy of celebration, but it's worth emphasizing that the president faced plenty of allegations of mishandling classified information himself, making this a rather awkward line of attack.

---

**More articles**

John Bolton agrees to plead guilty in classified documents case

Ken Dilanian, Carol Leonnig



---

John Bolton agrees to plea deal in case over mishandling classified information: sources

Steve Benen



Finally, I couldn't help but notice that the president, unprompted, boasted that he "helped" with the Bolton case "from the standpoint of encouragement."

In other words, Trump, by his own admission, encouraged his team to go after a critic, who was ultimately charged and who will soon take a plea deal. ("We caught him," the president said.)

I'm entirely sympathetic to the observation that the Bolton case is qualitatively different from, say, the deeply silly prosecution of former FBI Director James Comey. In pursuing Bolton, the DOJ followed a normal process; there was no pushback from career prosecutors; no officials were fired or felt the need to resign; and the indictment actually included credible evidence of alleged wrongdoing. This case was not, and is not, a joke — unlike, say, the seashell case.

But to hear Trump's own assessment, there might very well have been an element of weaponization anyway, "from the standpoint" of presidential "encouragement."

In October, when Bolton was first charged, The New York Times noted, "While the Bolton indictment contains an expansive evidentiary explanation, it remains unclear if the offenses outlined would have warranted an indictment — much less fast-tracked charges — if Trump had not publicly singled out Bolton for punishment."

Eight months later, that sentence resonates for a reason.



**Steve Benen**

Steve Benen is a producer for "The Rachel Maddow Show," the editor of MaddowBlog and an MS NOW political contributor. He's also the bestselling author of "Ministry of Truth: Democracy, Reality, and the Republicans' War on the Recent Past."

Become a Member to join the conversation

## Comments

**Join the Conversation ›**

Get full access to exclusive coverage and member-only content

**Join now**

## White House



Trump to deliver closing midterms message in front of Lincoln Memorial Reflecting Pool

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 320 of 363
Julianne McShane & Paula Reid

DHS overpays for private prison, making a mockery of Team Trump's rhetoric about 'waste'

Steve Benen

Trump wants Michigan-born Abdul El-Sayed to go 'back to where he came from'

Steve Benen

## Congress




Monday's Campaign Round-Up, 11.2.26: Haley Stevens faces swift backlash in Michigan

Steve Benen

Judge dismisses Trump DOJ lawsuit to block certification of Alaska Senate result if Republican loses

Lisa Rubin

FBI agents visit at least 3 donors to Alaska Senate candidate Daniel J. Sullivan

David Noriega & Lisa Rubin

## Supreme Court



Supreme Court condones 'collusion,' asks to hear from Clinton and gets back to the bench

Jordan Rubin

Trump's DOJ takes another hit. The Supreme Court could have the last word.

Jordan Rubin

Hillary Clinton just shifted the Overton window on Supreme Court court packing

Paul Waldman

## Newsletters

View All >



### MS NOW's We The People

MS NOW's community newsletter, featuring exclusive insights from hosts and experts, delivered biweekly



### The Rachel Maddow Show

The best of Rachel, including video highlights and the latest from The MaddowBlog, delivered daily



### The Blueprint with Jen Psaki

Jen Psaki chronicles the players, issues and movements shaping the future of the Democratic Party, delivered weekly

# Meet the Team

Everything MS NOW, all together. Discover the shows everyone's talking about.

← →

Explore

Explore

Explore

Explore

SPONSORED / MEMORYHEALTHAFTER55

## MDs Say Forgetfulness Can Show Up When Seniors Often Forget These 3 Things — See Which Ones

SPONSORED / HELLOWELLNESS101

## Doctors Say Mental Decline Isn't Aging: Just Stop Drinking These 3 Popular Beverages

SPONSORED / MEMORYHEALTHJOURNAL

**Memory Experts Say Mental Decline Begins When Seniors Can't Pronounce These 5 Phrases. Can You?**

SPONSORED / GADGETTREND

**These Are the Coolest Gifts on Everyone's Wishlist in 2026**

SPONSORED / DAILYPETSHEALTH

**Squirt Some Honey On Your Dog's Tongue, Here's What Happens**

SPONSORED / MEMORY-PILLOW.COM

**Sleep Apnea Linked to This Bedroom Item (Toss It Now)**

SPONSORED / HELLOWELLNESS101

## Doctors Say Forgetfulness Begins When Seniors Can't Pronounce These 3 Phrases. Can You?

SPONSORED / COMFORTLIVINGTODAY

Learn More

At 66, I Stopped Wearing Bras. Here's What I Wear Instead

SPONSORED / MEMORYHEALTHAFTER55
MDs Say Sharp Memory Shows When Seniors Can Recall These 3 Words. Can You?

SPONSORED / MEMORYHEALTHJOURNAL
Top Doctors Say Memory Decline Begins When Seniors Can't Pronounce These 3 Phrases. Can You?

SPONSORED / OTTOINSURANCE
Click Here
Who Charges The Most For Car Insurance in District Of Columbia? (Check Zip Code)

SPONSORED / MENVAULT
Learn More
Why Men After Prostate Surgery Quietly Made the Switch

SPONSORED / HEARTHEALTHCARE
Learn More
It's Not Salt: Doctors Now Connect High Blood Pressure to a Food Most Seniors Have Before 9AM

SPONSORED / HARRINGTONCO.HATTERS
Learn More
Why Men Over 60 Are Ditching Their Old Baseball Caps

## More From MS NOW

MS NOW
**In Alaska, the partisan response to ballot-stacking allegations is worse than ballot-stacking**

MS NOW
**Roger Marshall pushes dubious closing message in Kansas, reportedly defying his own team**

MS NOW
**Social Security Administration's latest pre-election message slammed as 'illegal'**

SPONSORED / OTTOINSURANCE

Learn More

The Worst Zip Codes for Car Insurance in District Of Columbia (Is Yours on the List?)

SPONSORED / ANTI-AGING CENTER

Read More

Dermatologists: The 1 Vitamin You Need If You Have Wrinkles

SPONSORED / MATURE BEAUTY JOURNAL

Dermatologist: The #1 Formula You Need If You Have Dark Spots

SPONSORED / SAKURA KNIVES

Learn More

Hiroshi Closes His Knife Shop After 55 Years

MS NOW

Chris Hayes: Haley Stevens' 'shocking' endorsement switch could 'weirdly' unite Democrats

MS NOW

Jet nosedives and erupts into fireball near busy roadway in South Florida. All 9 on board died

MS NOW

Opinion | What Nicki Minaj's rage against Kathy Hochul is really about

# Footnote 53

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 326 of 363

# The American Presidency Project (https://www.presidency.ucsb.edu/)



## DONALD J. TRUMP (2ND TERM) (/PEOPLE/PRESIDENT/DONALD-J-TRUMP-2ND-TERM)

# Remarks and an Exchange With Reporters Aboard Air Force One En Route to Eau Claire, Wisconsin

June 05, 2026

*The President.* Hello, everybody.

So we had incredible job numbers today. You saw that. And we have good everything—good numbers. But the job numbers just came out, and they were fantastic, far better than even anticipated. They anticipated pretty good, but they had no idea it was going to be that.

And unfortunately, we're in a world where, for the last 15 years or so, when you have good numbers, the market goes down; when you have bad numbers, the market goes up because too much emphasis is placed on inflation. And you don't have to have inflation by having growth. We have great growth, and that doesn't mean inflation. In fact, it can be anti-inflation growth.

So I hope the market starts to learn that when you have good numbers, the market should go up, not down.

*Q.* Do you think——

*The President.* Question?

*Q.* Sorry. Sir——

*The President.* Go ahead.

*Federal Reserve System*

*Q.* Do—given those job numbers, do you think the Fed should cut rates at its next meeting? And do you think new Chair, Kevin Warsh, can convince the rest of the——

*The President.* Well, I'm going to let Kevin make that decision. I'd like to see lower interest rates, because each point—think of this—is $600 million. Okay? So, you know——

*Director of National Intelligence/Interest Rates*

*Q.* You said yesterday you're interviewing some candidates for a permanent Director of National Intelligence. Who's under consideration for it?

*The President.* I have five interviews, and we'll have a very good person watching things: Bill Pulte. But I have five interviews.

So cutting rates though—just getting back to your—you save hundreds of millions of dollars when you take one point off—hundreds of millions of dollars. Two points, you save double hundreds of millions of dollars. And so I, therefore—you know, from that standpoint—but someday, we're going to have to go back to the old theory, when we're—doing so good. We have more auto plants being built than we've ever had. We have more plants being built than we've ever—all these numbers are good. But when the numbers are good, we should be allowed to grow, not to stymie the growth.

[*At this point, several reporters began asking questions at once*.]

And you know, we had a—we had a Fed Chair that didn't understand that.

*Q.* Financial markets are now pricing in a cut, actually, for the October meeting.

*The President.* Well, I would like to see that, but I leave that up——

*Q.* [*Inaudible*]—a hike. A hike for the October meeting.

*The President.* Look, I have a very talented guy. I leave it up to Kevin.

But I've always said, and I've said it for years: When you have a country that's doing well, the market should go up. The market should——

[*Several reporters spoke at once*.]

And the reason they go down is, if it's doing well, people have said, "Oh, we have to stop inflation." And it doesn't mean inflation. In fact, it could be just the opposite.

*Interest Rates*

*Q.* What does a hike before the midterm elections mean, though? If they were to hike——

*The President.* Remember, that would save $600 million every point. You know?

*Federal Housing Finance Agency*

*Q.* Mr. President, why do you want Bill Pulte to cut the office——

*The President.* Say it.

*Q.* Mr.—why do you want Bill Pulte to cut the Office of the Director of National Intelligence? And how long is he going to be in that role?

*The President.* Depends on how long it takes to get somebody approved. He'll do a very good job. He'll watch it closely. But Bill Pulte is very good. He's very talented. Done a great job at Fannie Mae, Freddie Mac. We—the

value there is close to a trillion dollars. We built a value that's incredible, so he's done a very good job in that. He'll do a good job. He's watching for—you know, during this time period.

*Office of National Intelligence*

*Q.* And you want him to cut the number of people working there?

*The President.* I wouldn't mind. I've heard that's way too high for way too long. Yes, I wouldn't mind. If he cut, I wouldn't mind that.

*Artificial Intelligence*

*Q.* Sir, on artificial intelligence, are you considering the possibility of the U.S. Government taking stakes in some AI companies?

*The President.* Well, it's something—I did it with Intel.

So I made a deal on Intel. You know, we made—I made, for the country, $50 billion. We took a stake in Intel. It was given to us by our helping. I said, "Look, we'll help you, but you have to give us 10 percent of the company." That was Intel just 9 months ago.

And, as I think you know, we made about $50 billion on that deal.

*Q.* Would you want to do it for AI?

*The President.* I did a very good job. I should be a stockbroker.

*National Basketball Association Finals*

*Q.* Mr. President, yes, sir. If you don't—I'm going to change the subject, if you don't mind. Did you get a chance to watch game one of the NBA Finals? What'd you think?

*The President.* I did. Well, I'll be going to game three—I guess it's game three—on Monday. I thought it was amazing. I think that—I think the Knicks have an amazing team, the way they played. Started off slow, and they've just got stronger and stronger. Wemby looks like he's going to be a great player. But they really played well, I thought.

*Q.* Who was your favorite Knick?

*Q.* Quick follow-up: Did you see Wemby crossing his arms during the U.S. national anthem? Did you have any thoughts on that?

*The President.* I did not see that. Is that what he did?

*Q.* He did. Yes.

*The President.* What did he mean by that?

*Q.* Nobody asked him.

*The President.* Well, I guess you have to ask him.

*New York Knicks*

*Q.* Well, who's your favorite Knick?

*The President.* Well, Brunson is fantastic. Towns is fantastic. They just have a great team.

*National Basketball Association Finals*

*Q.* What do you think that the game you're going to—the cheapest price for the game three you're going to is $8,000? Everyday Americans can't afford these sporting events.

*The President.* Well, I know, but they can watch it on television. And it's sort of semi-free to watch it on television. But that's the way life goes. You know, you have some—and now, if the game wasn't a big—if the team wasn't a big success, you could go very easily. So you know, you can—you can do that too, but that's the way life is. You know, they had—they've had great success.

And don't forget, they've suffered, also, losses, and they've suffered during the bad time.

Now they have a good time. They have a team that's amazing. I—don't think they've lost a playoff game, right?

[*Several reporters spoke at once.*]

Very unusual. Has that ever happened before? Has anyone ever had this kind of a run in a playoff game? I don't think so.

*Q.* Highly unusual.

*Q.* Do you have any——

*National Mall Improvement Efforts/John F. Kennedy Center for the Performing Arts*

*Q.* On the new promenade you announced yesterday, Mr. President.

*The President.* Yes.

*Q.* Where is the funding going to come from?

*The President.* Probably—it's not a lot of money, and it's going to be beautiful.

You know, it's always been—the Lincoln Memorial has always been very tied to the Potomac River, but they built two roadways behind it, unexpectedly at the time, many years ago, but after the memorial was built. It used to have a tie to the river, and then the highways cut it off. And we have a really beautiful plan where it goes over a beautiful series of platforms that bring you right down to the river. It's beautiful.

*Q.* And the funding?

*The President.* It's called—it's a promenade. It's a beautiful promenade.

Probably—well, it can come from a lot of—we have a lot of sources of funding. We won't have to go back to Congress or anything. We have a lot of sources of funding.

And a lot of people have asked me to stay involved with the Kennedy Center. We had a judge who's totally conflicted, but that's all right. He's a totally conflicted judge. Should be ashamed of himself. But they've asked me in the strongest of language to stay involved with the Kennedy Center.

We want to see—because the building will—I mean, it's a very—it's very dangerous, number one. Number two, it was losing, for years, tremendous amounts of money.

So I'll—I'm considering that. But a lot of people have asked me to get it fixed. We have to fix the Kennedy Center, or we're in—both physically and from the standpoint of attendance.

*Oil Markets and Prices*

*Q.* Mr. President, on oil and gas prices. I know you're saying that—the oil prices and gas prices will fall after the conflict ends.

*The President.* Yes.

*Q.* Would you limit exports of gasoline if prices in the short term go up?

*The President.* I can do a lot of things. No, we have a lot of alternatives, but the beautiful thing from our standpoint is we have more oil and gas and coal and everything else than any other country on the planet. And then, when you add Venezuela to it, we're—there's—we have probably 64 percent of that type of energy. That's unbelievable.

The—Venezuela is working out very well. We're getting along incredibly. The country is happy. The people love the U.S.A., and we have a lot of—you know, the big oil companies are moving in there now as we speak, and we're going to be taking out millions of barrels of oil.

*Domestic Oil Production*

*Q.* Are U.S. oil majors doing enough to boost output in the U.S.? Are you asking them to do more?

*The President.* Yes. Oh, yes, sure they do. Well, we have everything we need. The world doesn't. But I will say, people thought it was going to be a lot worse. You know, today, I looked at $96 a barrel. People thought that was going to be $300 a barrel.

And in the meantime, we're having great success with Iran. We—they're not going to have a nuclear weapon, and they're in no position to have a nuclear weapon.

*Senator Thomas R. Tillis/Acting Attorney General Todd W. Blanche*

*Q.* Senator Tillis said he won't support Todd Blanche's confirmation unless Todd Blanche condemns January 6. Do you have a reaction to that?

*The President.* Senator Tillis is a loser. That's why he didn't run. He didn't run because I wouldn't support him, and he's just an angry man because he's not going to be a Senator any longer. He wasn't respected in the Senate. He fought a lot of people. He fought Pete Hegseth. Pete Hegseth turned out to be a gem.

No, Senator Tillis is a loser, stone-cold. And he's an angry man because I basically—he was forced to leave the Senate because I wouldn't support him, and he quit. So now he's trying to make trouble by, you know, opposing anybody.

Todd Blanche is a brilliant guy who everybody likes and everybody respects, and Tillis is always like: "I'm going to do this. I'm going to do that." He should have done it before, when he was a Senator. He would have gotten wiped out in a race, but he needed my support. And I said, "I can't give you my support." He's not qualified. He's not good for the position of Senator.

I didn't hear about what he did with Todd Blanche. Todd Blanche is fantastic.

*Artificial Intelligence*

*Q.* Sir, on the AI companies potentially taking these equity stakes. Have you spoken to Sam Altman or any of the other—Anthropic's CEO?

*The President.* No, there's a concept out there. There's so much money and it's so big that there are concepts where pieces could be given to the American public where the American public essentially becomes a partner with the company—with the companies.

And I will tell you, yes, I have—I have spoken to all of them. There's something very interesting about it where it almost becomes a partnership with the American public, and we'll look into that. We're going to—we are looking.

[*Several reporters spoke at once*.]

I actually have a meeting scheduled in the very short—very near future with —did you know that?—with all of the companies, and we're——

*Q.* Which companies?

*The President.* ——talking about it, where the American people can benefit from the success of AI. And by doing that, they're going to like it better.

*Q.* Which companies?

*The President.* Because we're leading China. We're leading everybody in the world with AI, and we want to keep it that way.

It's probably the biggest industry maybe that we've ever seen.

*Q.* Which companies in the meeting?

*The President.* All of them. All the big ones.

*Q.* Anthropic? OpenAI?

*The President.* Yes, all the big ones.

*Q.* SpaceX? Elon Musk?

*The President.* They're all coming to the White House probably next week.

*Q.* And is the idea that that would be dividends for the American people?

*The President.* I don't know. We're going to see. I mean, we're going to see. Sort of—it's like you make them a partnership in this revolution. It would be a beautiful thing, and it would make them——

*Q.* Senator Bernie——

*The President.* ——it would make them rich.

*Senator Bernard Sanders*

*Q.* Senator Bernie Sanders proposed this: 50 percent managed public-private partnership.

*The President.* Well, I've been talking about it for the last year.

*Q.* But is it odd to be kind of on the same page with Senator Sanders?

*The President.* No. No, actually, when Bernie Sanders was taken advantage of with Hillary Clinton and he lost in the primaries, a lot of people think he didn't lose. I mean, he—had two of them, right? He lost then, and he lost a second time with Biden. But when Bernie Sanders lost, you know that I got many of his people. They voted for me, because we are—on an economic plan, as far as economics is concerned, we have certain things that aren't that far apart. People are surprised.

But many of—as you—if you'll take a look, many of the people that voted for Bernie Sanders, when he was no longer there to vote for, they went to me. I picked up a lot of his—a tremendous amount of his voters.

*Commercial Transit Through the Strait of Hormuz/Gasoline Costs*

*Q.* Sir, just one more. How many—how much oil have you gotten through the Strait with the help of naval escorts? And are you asking—are you directing U.S. forces to guide those ships through the Strait, more tankers though the Strait?

*The President.* A lot. I don't want to say how many, but a lot. A lot of oil is coming into our country, and a lot of oil is coming into the world that people don't even know about, and that's why it's at $97 a barrel instead of $300 a barrel.

And when that whole thing is straightened out—it shouldn't take long. One way or the other, it's going to get done. And when it's all straightened out, you're going to have oil prices drop down to maybe even lower than they

were.

I would—and you've heard me say this: I was in Iowa, and for a gallon of gasoline, it was at $1.85, and that was 3½ months ago.

*Federal Bureau of Investigation*

*Q.* Last year, the FBI reopened—last year, the FBI reopened its investigation into the cocaine found in the White House during the Biden administration. Have you been briefed on where that investigation stands?

*The President.* No, but I might ask about it. I might ask. You mean in the shelves where they found the cocaine, actually?

No, I might—ask about it. It's very——

*Taiwan-U.S. Trade*

*Q.* Have you made a decision on the arms sales to Taiwan, that package—the $14 billion?

*The President.* We're looking at that. Yes, we're looking at that.

*Q.* Are you still planning to talk to Taiwan's President about it?

*The President.* I'll always talk to him. But we're looking at it.

*Former National Security Adviser John R. Bolton*

*Q.* What was your reaction to John Bolton agreeing to plead guilty in the classified documents?

*The President.* Well, I was never much of a fan of John Bolton. I never thought he was a smart person, and he was a radical right in terms of war, not in terms of other things. He was—he wanted to go to war with anybody that opened their mouth, anybody that talked.

And I used him for a purpose. You know, he was involved with Bush, and he created a lot of problems. But he always wanted to kill people in war. And that was okay for me as long as I didn't listen to him, which I never did.

He's a bad guy, John Bolton. He's a dirty guy, and we caught him. You know, we caught him. And you know, he wrote a book. You look at all the information he took—I mean, if you look at that case, it's a great honor to have helped from the standpoint of encouraging—and I looked at John Bolton as somebody that was a very dishonest guy and not a smart guy, and I guess he's paying the price for, certainly, being dishonest.

*John F. Kennedy Center for the Performing Arts*

*Q.* You mentioned the Kennedy Center, sir. How do you want to be involved moving forward?

*The President.* The same way it is. I'm the Chairman, so we'll just keep it going. Somebody has to do it.

It loses a lot of money. It has for years. It's lost hundreds of millions of dollars for years, and yet it's something you have to keep going. You know, it's the arts.

They all lose money. Carnegie Hall—you take a look at all of that kind of thing, it loses.

So they really—everybody, they want me to stay very badly. So we're going —we're going to take a look at it.

*Q.* Sir, you also mentioned Fannie Mae and——

*The President.* The judge really hurt the Kennedy Center because he slowed down. We were going to—you know, we're going to spend a lot of money on fixing it and making it—bringing it back to health, and the judge really made it very hard to do that. But we'll—we're going to—I'm going to look at his ruling on that.

But we have to bring it back. Physically, we have to bring it back, and we have to bring it back in other ways.

So we'll take a good look at it.

*Federal Housing Finance Agency*

*Q.* You mentioned Fannie Mae and Freddie Mac.

*The President.* Yes.

*Q.* With Pulte's move over as now acting DNI, is an IPO off the table?

*The President.* No, it's not. We're thinking about an IPO for that. We're not—it's not a rush, but we've created a—you know, I could have sold that for literally less than 10 percent in my first term. I was offered—a lot of people were offering me money to—"me" meaning the country—to buy Fannie Mae, Freddie Mac, as you know.

And it suffered tremendous hardship, and then we built it back. And I could have sold it in my first term for one-tenth of what it's worth now, and I didn't want to do it.

Now, I think, we—you know, we would consider an IPO, yes.

*Q.* And he would stay at—he would potentially see that though?

*The President.* No, he'd be there. No, he'll—he's staying there.

*Director of National Intelligence*

*Q.* So, then who are the people you're talking to for DNI? Can you give us some names?

*The President.* I'm looking at five different people—all very good, all people that you know very well, all people that do that kind of thing. And they're very respected people.

*Major League Baseball/College Sports*

*Q.* Mr. President, what do you think about Major League Baseball owners pushing for a salary cap? Do you think it's time for baseball to have a salary cap?

*The President.* Don't they sort of have one? Don't they?

*Q.* No, it's a luxury tax threshold. But the teams that have the money are willing to spend it, like the Dodgers.

*The President.* Well, if you don't have a salary cap, you don't have a sport, because they can't help themselves. You know, in sports, they can't help themselves.

Football has a salary cap.

*Q.* Every major professional league——

*The President.* Well——

*Q.* ——except Major League Baseball in America.

*The President.* They should have done it a long time ago. I—you know, I know so much about sports. They should have done it a long time ago.

We're trying to help save college sports because they got some rulings that really, essentially, destroyed college sports. And we're working with Randy Levine and Nick Saban and some great people on trying to save it because it's so horrible.

*College Athlete Salaries and Compensation Schemes/Major League Baseball*

*Q.* What do you think could happen if this NIL just gets completely out of control and nobody checks it?

*The President.* Well, I think what's going to happen, if you don't have what they're trying to do now—that's sort of a cap, in a certain way—if you don't have that, you—you really have a problem at not only college sports—colleges. Where you see where Penn State lost $500 million; where a certain school that I like very much in Florida, they lose $4- or $500—you can't—you can't have that. Nobody can afford that, because they go crazy.

That's why when you say Major League Baseball—Major League Baseball—it's shocking, frankly, that they didn't put a cap on many years ago. They had a chance to do a cap, and they blew it.

*Ukraine/Russia*

*Q.* Sir, on Ukraine, now that Zelenskyy has proposed a face-to-face meeting with Zelenskyy, do you still want them to go first before the U.S. gets involved in talks?

*The President.* Well, I don't mind. I mean, it's—let them deal. It's—I'm the one that got them to this position, and I think that's going to get worked out. I think we're getting close to where Russia-Ukraine—it should have—it's a war that should have never happened. Would have never happened if I was President. But I think—that's going to get worked out.

Yes.

*Q.* Will Secretary Rubio take a more active role, or do you expect it'll still be Jared and Steve?

*The President.* He'll be involved. They'll be involved. J.D., everybody—we'll all be involved. We want to see it done.

You know, we're not spending money. They're buying things from us, actually, at full price. With Biden—he gave them everything. It was—just gave them hundreds of billions of dollars of weapons and everything else.

But it's a war that should have never happened, and it's a war that has to be—last week, 25,000 people—over the course of the month, 25,000 people were killed. Russia-Ukraine—25,000. It's not acceptable.

*Q.* Mr. President, on——

*The President.* Not acceptable.

Thank you very much. Have a good time. See you later.

*Q.* Thank you, sir.




*NOTE: The President spoke at 1:42 p.m. in the press cabin. In his remarks, he referred to Kevin M. Warsh, Chairman, and Jerome H. Powell, member and former Chairman, Federal Reserve System Board of Governors; Federal Housing Finance Agency Director William J. Pulte, in his capacity as Acting Director of National Intelligence; Victor "Wemby" Wembanyama, forward-center, National Basketball Association's San Antonio Spurs; Jalen Brunson, point guard, NBA's New York Knicks; Christopher R. "Casey" Cooper, judge, U.S. District Court for District of Columbia; former Secretary of State Hillary Rodham Clinton, in her capacity as the 2016 Democratic Presidential nominee; President Lai Ching-te of Taiwan; former President George W. Bush; Randy Levine, president, Major League Baseball's New York Yankees; ESPN broadcaster and former University of Alabama football head coach Nick Saban; President Volodymyr Zelenskyy of Ukraine; U.S. Special Envoy For Peace Missions Steven C. Witkoff; and Vice President James D. "J.D." Vance. He also referred to his son-in-law, U.S. Special Envoy for Peace Jared C. Kushner. A reporter referred to Sam Altman, chief executive officer, OpenAI; Dario Amodei, chief executive officer, Anthropic; and Elon R. Musk, chief executive officer, SpaceX.*

---

Donald J. Trump (2nd Term), Remarks and an Exchange With Reporters Aboard Air Force One En Route to Eau Claire, Wisconsin Online by Gerhard Peters and John T. Woolley, The American Presidency Project https://www.presidency.ucsb.edu/node/396192

# Footnote 55

ADMINISTRATION

# Trump rips former national security adviser after guilty plea: "Hopefully, he will be dealt with harshly!"

BY SARAH DAVIS - 06/26/26 10:46 PM ET

41

# THE HILL




Listen to audio version of this article

Instaread

Advertisement

President Trump slammed his former national security adviser after he pleaded guilty on Friday to improperly retaining sensitive materials from his time in the White House.

"John Bolton, a very dumb, unbalanced, and unskilled former representative of the United States of America, just pleads guilty!" Trump wrote in a Truth Social post on late Friday evening.

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 345 of 363

THE HILL

"He is a terrible person, a lunatic who only wanted to start trouble and wars, and who was a needless pusher of death and destruction wherever he went," the president continued. "Hopefully, he will be dealt with harshly!"

Bolton has become an outspoken critic of the president since his time serving in the first Trump administration. He was indicted by a federal grand jury in 2025 on 18 charges related to mishandling classified documents.

These accusations against the national security adviser stem from over 1,000 pages of notes he shared through his personal email and a messaging app with family members who did not have security clearances. These notes were used for his 2020 memoir about his time in the Trump administration, entitled "The Room Where It Happened."

ADVERTISEMENT

THE HILL

The former United Nations ambassador admitted to one count of retaining national defense information during a federal court hearing on Friday in Greenbelt, Md.

When asked by the judge if he was guilty, Bolton replied, “I am, your honor.”

“I’m sorry for it,” he added.

ADVERTISEMENT

Bolton’s guilty plea marks a major victory for Trump’s Department of Justice, which has

THE HILL

“Mr. Bolton knew the damage mishandling confidential material could cause to national security, and yet he still committed this misconduct and put American lives at risk,” U.S. Attorney Kelly O’Hayes said in a statement.

ADVERTISEMENT

Abbe Lowell, Bolton’s attorney, said in a statement that the former national security adviser acted as “real leaders do” with his decision to plead guilty.

“He took responsibility for a mistake he made, thereby saving the government resources to pursue a case that could expose additional sensitive information,” Lowell said in a statement.

Lowell compared the case to the 2023 indictment against Trump, in which the president was accused of mishandling classified information by keeping classified documents at Mar-a-Lago during his first term. These charges were later dismissed.

ADVERTISEMENT

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 348 of 363

THE HILL

"Ambassador Bolton, whose offense was only keeping a diary which contained classified information, kept a record to preserve history, but Donald Trump kept secrets to serve himself," Lowell said.

ADD AS PREFERRED SOURCE ON GOOGLE

TAGS ABBE LOWELL DONALD TRUMP JOHN BOLTON

Copyright 2026 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

SPONSORED CONTENT

Privacy Policy

Memory Experts Say Mental Decline Begins When Seniors Can't Pronounce These 5 Phrases. Can You?

Memory Health Journal | Sponsored

Doctors Say Mental Decline Isn't Aging: Just Stop Drinking These 3 Popular Beverages

Hello Wellness 101 | Sponsored

Doctors Say Forgetfulness Begins When Seniors Can't Pronounce These 3

THE HILL





Flying Car Startup Is Now Open to Investors - $1 per/share

AirCar | Sponsored

Learn More

These Are the Coolest Gifts on Everyone's Wishlist in 2026

Smart Gadget Select | Sponsored

Doctor Begs Seniors: Do This to Stop Losing Muscle

Ultra Protein Secrets | Sponsored

Why Men After Prostate Surgery Quietly Made the Switch

Menvault | Sponsored

Learn More




Click Here for More Information

Don't miss this content from our sponsor

Ad by **Sponsor**

See More

It's Not Salt: Doctors Now Connect High Blood Pressure to a Food Most Seniors Have Before 9AM

Heart Health Care | Sponsored

Learn More

Top Doctors Say Memory Decline Begins When Seniors Can't Pronounce These 3 Phrases. Can You?

Memory Health Journal | Sponsored

Why Your Rotator Cuff Won't Heal (What Most Doctors Miss)

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 350 of 363

THE HILL

**No Stand. No Strings. What's Holding This Plane Up?**
Fanyil AeroGlide | Sponsored
Shop Now

**Man Who Predicted the Election Reveals His New Midterm Forecast**
Daily Stock Traders | Sponsored
Learn More

CONTENT CONTINUES BELOW SURVEY

## What Do You Think?

Loading survey...

THE HILL

## More Administration News



### Live updates: Trump to offer GOP's closing message at Reflecting Pool

ADMINISTRATION / 56 SECONDS AGO



### Kennedy Center to recognize Paul Anka, Andy Garcia, Barbara Mandrell at off-site Honors ceremony

IN THE KNOW / 12 MINUTES AGO

THE HILL



See All

## Video/Hill.TV




### Rising: November 2, 2026

**THE HILL TV** / 2 HOURS AGO




## Rising: October 30, 2026

THE HILL TV / 3 DAYS AGO



THE HILL

See all Hill.TV

See all Video

## Top Stories




### Texas, Alaska, Maine Senate races flip blue on DDHQ map

**NEWS** / 6 HOURS AGO

See All

×

THE HILL

×

THE HILL

GOP 35% DEM 65%




View Full Forecast

DDHQ | THE HILL

## House Forecast

As of Nov. 2, 2026:

GOP 16% DEM 84%




View Full Forecast

DDHQ | THE HILL

# THE HILL

## FOR HILL INSIDERS



### What happens in the lame duck? Will a November surprise sink Democrats in Michigan?

**EDITOR'S CALL** 11/02/26




### The 5 biggest questions hanging over Election Day

**CAMPAIGN** 11/02/26



### Iowa’s cancer crisis could reshape the state’s biggest midterm races

**HEALTHCARE** 11/02/26



### 5 athletes and sports figures to watch on Election Day

**KEEPING SCORE** 11/02/26

Read More

×

THE HILL

2 **Nate Silver: Latest preelection polling shows 'blue tsunami' on horizon**

3 **Jeffries: Democrats will discuss 'next steps' on Stevens when Congress ...**

4 **Stevens 'flushed herself down the toilet': Van Jones**

5 **Bill Murray crashes Kevin Hassett's CNBC interview: 'Why is that man always ...**

**What Do You Think?**

Loading survey...

Case 8:25-cr-00314-TDC Document 105 Filed 11/02/26 Page 359 of 363



Trump tests GOP resolve on Russia, Ukraine

Morning Report • 17min
5 hottest midterm battlegrounds two week...

Rising • 51min
Hasan Piker files DEFAMATION lawsuit...

Morning Report • 16min
What's next for Israel as elections leave no clear...

Morning Report • 14min
Trump takes blow in Brazil; faces new challenge in...

Powered by JAMX

THE HILL

DON'T MISS A BRIEF.
SIGN UP FOR OUR DAILY EMAIL.

THE HILL

THE HILL

## Resources

SITEMAP

THE HILL APPS

PEOPLE

RSS

PRINT EDITION

## Other Areas

MEDIA

## Contributors

SUBMIT OPINION CONTENT

## About Us

WORK FOR THE HILL

INTERNSHIPS

CONTACT SUPPORT

THE HILL

Follow Us On

Get the App

GET IT ON Google Play

Download on the App Store

PRIVACY POLICY 09/30/2025

NOTICE AT COLLECTION

TERMS & CONDITIONS

CONTACT

ADVERTISE WITH THE HILL

SUBSCRIBE TO PUSH NOTIFICATIONS

NEWSNATION

BESTREVIEWS

ADVERTISE WITH NEXSTAR

JOURNALISTIC INTEGRITY

THE HILL

×