**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL CASE NO. TDC-25-314** |
| | * | |
| **JOHN ROBERT BOLTON, II,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

*******

**<u>GOVERNMENT'S UNCLASSIFIED</u>**
**<u>RESPONSIVE SENTENCING MEMORANDUM</u>**

## I. Introduction

Mr. Bolton's actions damaged national security in a way that few, if any, others have done. Far from being "aberrational," Def's Mem. 28, Mr. Bolton's conduct over his 17 months as the National Security Advisor—and for nearly six years thereafter—was inexplicable. Mr. Bolton's explanation that time was of the essence, coupled with his misinterpretation of the Presidential Records Act, is contrary to everything he knew about national security, and it does not mitigate the damage caused to national security.

In July 2021, Mr. Bolton learned that the worst-case scenario was upon him, and the Nation: Iran had obtained one or more of Mr. Bolton's highly classified diaries. Yet Mr. Bolton made the conscious decision not to tell FBI Special Agents about the extent of the compromise. These facts, coupled with the fact that Mr. Bolton jeopardized a uniquely vast array of highly classified information due to the scope of his access as the National Security Advisor, comfortably put Mr. Bolton's case in a league of its own. The Government's below-Guidelines recommendation of 60 months of imprisonment, along with the agreed-upon fine, is the appropriate sentence. A lesser sentence is simply unwarranted, and will send the wrong message to the national security community, including to all federal employees and government contractors who must responsibly handle classified and national defense information. Finally, the Bureau of Prisons is well-equipped to handle Mr. Bolton's incarceration and has various ways for an inmate to grieve his conditions of confinement, should that become an issue, up to and including relief from the federal courts.

## II. Defendant's Character Letters, While Informative, Do Not Tell the Full Story.

The Government has acknowledged Mr. Bolton's decades-long career, both in public service and in the private sector, and his contributions to national security. As a result of that career, Mr. Bolton has had the opportunity to interact with a collection of powerful and influential

individuals, including United States Senators and Representatives, Chief Executive Officers, former military leaders, and various former White House officials. That collection, which includes foreign political and national security officials and a former Vice President, is an impressive group of individuals speaking to Mr. Bolton's public work, his character (as shown to the public), and his public persona.

Many of the character letters reference Mr. Bolton's integrity. *See generally* Def.'s Mem (ECF 100) at 19-21 (citing Exs. B-9, B-20, B-36, B-59, B-74, B-94, B-95, B-110, B-120 B-123, B-139). Mr. Bolton, understandably, uses these letters in support of the argument that his actions "demonstrate a complete lack of malicious intent or harm." Def's Mem. 22.

The Government does not argue that Mr. Bolton intentionally disclosed state secrets to foreign adversaries. But that is not the question before the Court. The Government can acknowledge Mr. Bolton's education, work, and contributions to national security and foreign policy, while still acknowledging the profound impacts of his criminal conduct. Here, Mr. Bolton flouted the rules governing the safeguarding of classified information to help write a book. The natural and foreseeable result of his conduct was that a foreign adversary, Iran, obtained extraordinarily sensitive, classified information.

## III. The Government's Sixty Month Below-Guidelines Sentencing Recommendation Falls Outside the Heartland, Given All of the Relevant Facts and Circumstances.

Without the parties' Rule 11(c)(1)(C) plea, Mr. Bolton's advisory Guidelines range would have been 120 months. *See* Presentence Investigation Report (PSR) ¶ 93. The parties' proposed plea agreement acknowledges that a below-Guidelines sentence would be sufficient, but not greater than necessary, to meet the goals of sentencing. A sentence of probation; however, would send a much different message.

A. Mr. Bolton's Actions Are Not Mitigated by the Fact That He Did Not Intentionally Disseminate Classified National Defense Information to the Press or the Public.

Mr. Bolton's argument that he did not subjectively intend to harm the national security is relevant, but not persuasive, on the issue of whether a probationary sentence is sufficient. This argument must be weighed against his actions, his mental state over 17 months at the time that he mishandled highly classified documents, the resulting harm to national security, and Mr. Bolton's decision in July 2021 not to help the FBI (and by extension, the U.S. Intelligence Community (USIC)) to mitigate that harm.

One of the purposes behind 18 U.S.C. § 793, for which Mr. Bolton stands convicted, is to prevent harm to the national security when someone willfully (knowing the conduct is wrongful, yet does it anyway) retains national defense information—here, some of the most highly classified information in the United States Government.

Mr. Bolton did not willfully retain one document, on one occasion. His actions were not the product of a short- or long-term mental lapse. Mr. Bolton did not seek to remediate the harm to national security when he knew his account was hacked by Iran, and he had dozens of other documents that were potentially at risk of exfiltration by Iran.

The argument that Mr. Bolton "immediately reported the intrusion to the FBI and proactively cooperated to mitigate any potential damage," Def's Mem. 23, does not begin to tell the entire story. When he had the opportunity to get the FBI's assistance in dealing with the hack of his electronic account, *see* PSR ¶ 22, he chose not to do so. Instead, he chose to hide the true extent of the damage. Agreeing to meet with the government six years later to assist in a post-mortem—which he did as a condition of his plea agreement—cannot undo the damage.

The argument that Mr. Bolton did not disseminate this highly classified information to a member of the news media is similarly unavailing. The fact that he did not engage in a different

manner of mishandling national defense information or risk a different type of harm does not mitigate the risks of harm that he has admitted he did create.

B. Mr. Bolton's Participation in the Pre-Publication Review Process Does Not Weigh In Favor of a Probationary Sentence.

Mr. Bolton's emphasis on the prepublication process to show his supposedly careful handling of classified information is a red herring. No one disputes that the document referenced in Count Twelve, and the other documents, contain national defense information. The fact that Mr. Bolton did not violate the law on a different occasion (when he followed the prepublication review process) says little about the nature and circumstances of the willful violation of the law for which he is to be sentenced. Indeed, the Court could surmise that Mr. Bolton followed the pre-publication review process because publishing classified information in his book (particularly, the information contained in the documents transmitted and retained by Mr. Bolton) would have been immediately apparent to an experienced government classification policy expert like Ellen Knight, whereas he had no reason to believe he would be caught for his mishandling of the classified information at issue in this case. In other words, the fact that he readily and willfully violated the law in private—but not in public—is irrelevant.

Moreover, arguments about adherence to the pre-publication review process ignore the fact that Mr. Bolton did not submit for any review (through the National Security Council, the National Archives, or otherwise) the documents he created using highly classified information and transmitted to himself, his daughter, and his wife. Those documents totaled more than a thousand pages. *See* PSR ¶ 17. The characterization of Mr. Bolton's transmission and retention as "intrafamilial," Def.'s Mem. 37, does nothing to mitigate the damage to national security, and did nothing here to avoid compromise by a foreign power.

The prepublication review process has no bearing on Mr. Bolton's retention of highly sensitive, classified national defense information—none of which was ever provided to the government for prepublication review—in his home, in his personal email account, on his electronic devices, and on the accounts and devices of his wife and daughter for five years after being alerted by FBI agents to the Iranian security breach.

Mr. Bolton is correct that none of the highly classified information identified in the Indictment or Stipulation of Facts was published in the book. But that information was also not submitted for prepublication review (or any review) before Mr. Bolton sent it to his relatives and took it home. Had Mr. Bolton submitted any one of the documents at issue for wholesale or even partial inclusion in his book, the government's criminal investigation would have started much sooner than 2022.

C. Mr. Bolton's Purported Misunderstanding of the Presidential Records Act Does Not Militate In His Favor.

Mr. Bolton's representations to the Court regarding his mental state are stunning, and border on a failure to accept responsibility. "In my haste to convey all that happened so rapidly in the seventeen months I served as National Security Advisor and in misinterpreting the provisions of the Presidential Record[s] Act, I erred palpably." Ex. A, Def.'s Mem. at 2, ECF 100-2; *see also* Def.'s Mem. 33 ("His keeping a personal diary was also informed by his misplaced view of the Presidential Records Act, 44 U.S.C. § 2201(3)(A), which expressly excludes personal 'diaries' and 'journals' from the definition of 'Presidential records' . . . ."). The claim that Mr. Bolton's mishandling of highly classified information was somehow justified by the Presidential Records Act is irreconcilable with his guilty plea.

Setting aside the argument about his purported mistake of law, Mr. Bolton's representations about his misunderstanding of the Presidential Records Act are inconsistent with his guilty plea.

As part of that plea, Mr. Bolton admitted that he was in fact guilty of violating 18 U.S.C. § 793(e) and that he "willfully" retained a document relating to the national defense and failed to deliver it to the U.S. officer entitled to receive it. Plea Agreement ¶ 1, ECF No. 81. The mental state of "willfulness" means that the defendant acted "with a 'bad purpose'" and "with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (citation omitted). Mr. Bolton cannot admit that he had the "willful" mental state required to violate § 793(e), while simultaneously claiming that he somehow believed his transmission and retention of classified information was lawful or otherwise justified under the Presidential Records Act—a claim that, if true, implies there was no § 793 violation in the first place. The Defendant skirts dangerously close to denying his criminal culpability.

The Presidential Records Act of 1978, 44 U.S.C. § 2201, *et seq*. was enacted "in the wake of controversy surrounding the disposition of President Richard M. Nixon's Presidential records." *Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 845 F. Supp. 2d 288, 291 (D.D.C. 2012). Through the PRA, Congress sought to "creat[e] the full record of a covered employee's work" and to require covered employees "to preserve Presidential records during their tenure so that they can be transferred to [the National Archives and Records Administration] at the end of an administration." *United States v. Navarro*, 664 F. Supp. 3d 48, 57 (D.D.C. 2023).

Under the Presidential Records Act, "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records[.]" 44 U.S.C. § 2202. "Presidential records" are "documentary materials,[1] or any reasonably segregable portion thereof, created or

[1] The Presidential Records Act defines the term "documentary material" in relevant part as "all books, correspondence, memoranda, papers, pamphlets, . . . including, but not limited to, . . . other electronic or mechanical recordations, whether in analog, digital, or any other form." 44 U.S.C. § 2201(1).

received by the President, the President's immediate staff, . . . in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official . . . duties of the President." 44 U.S.C. § 2201. Presidential records are the property of the United States, not the property of the meeting participant or note taker.

The Presidential Records Act distinguishes between Presidential records and personal records. The Presidential Records Act defines "personal records" as "all documentary materials, or any reasonably segregable portion thereof, <u>of a purely private or nonpublic character</u> which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(3) (emphasis added). The definition of "personal records" includes "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business." *Id.* § 3(A).

Mr. Bolton's claim that he "misinterpret[ed] the provisions of the Presidential Record[s] Act regarding diaries" appears to be an argument that he somehow thought that the documents he wrote summarizing his day-to-day activities as National Security Advisor, including classified national defense information, were "personal records" and not "Presidential records." That argument is without merit. As National Security Advisor, Mr. Bolton's activities in advising the President on national security matters obviously would have an effect on the President's carrying out of his constitutional, statutory, and official duties. It is hard to imagine how any meeting, conversation, document review, briefing, or Situation Room discussion would have been anything but in furtherance of Mr. Bolton's official duties. His summaries of those activities are thus plainly not personal records under the Presidential Records Act.

By its placement within the statute, the description of a "diary" is an example that falls within the larger definition of "personal records." Even a cursory review of the statute reveals that "diaries" are not a standalone, categorical exception to the Presidential Records Act. Descriptions of the documents that Mr. Bolton has admitted to sending to uncleared relatives and retaining in unauthorized locations confirm that they could not possibly be purely private and nonpublic and thus constitute "personal records":

a) intelligence about future attack by adversarial group in another country (Count 1);
b) liaison partner sharing sensitive information with the U.S. intelligence community (Count 2);
c) intelligence that a foreign adversary was planning a missile launch in the future; (Count 3);
d) a covert action in a foreign country related to sensitive inter-governmental actions; (Count 3);
e) sensitive sources and methods used to collect human intelligence (Count 3);
f) intelligence about an adversary's knowledge of planned U.S. actions (Count 4);
g) intelligence about adversary's plans for attack conducted against U.S. Forces in another country (Count 4);
h) human intelligence using sensitive sources and methods (Count 4);
i) intelligence collected on the leader of an adversary nation's military group. (Count 4);
j) (in quotation marks) direct statement collected via intelligence sources and methods on a foreign country (Count 6);
k) foreign country's intelligence describing an adversary's planned attack on a facility (Count 6);
l) intelligence confirming a foreign adversary was responsible for an attack (Count 7);
m) covert action planned by the U.S. Government (Count 7);
n) covert action conducted by the U.S. Government (Count 8); and
o) intelligence that a foreign country was considering specific force against another country (Count 18).

The claim that Mr. Bolton somehow misinterpreted the Presidential Records Act in this way is even more difficult to credit given his decades of experience in various positions where he handled classified information under the applicable laws, Executive Orders, and regulations governing the safeguarding of classified information. Moreover, given his decades of being responsible for properly handling classified information, Mr. Bolton offers no explanation for how

he could have believed that those carefully designated rules specific to the classified information context were somehow displaced *sub silentio* by the Presidential Records Act, a records management statute. Similarly, his citations to several examples of U.S. Presidents and other officials keeping diaries about their time in the White House are inconsistent with all available evidence about Mr. Bolton's knowledge of classified information handling rules. *See* Gov't's Mem. at Exhibits 5-10.

## IV. Similarly Situated Defendants

Mr. Bolton's arguments that sentences for other defendants warrant a noncustodial sentence here are readily distinguishable. Mr. Bolton transcribed highly classified information gleaned from classified briefings, classified intelligence, meetings with the National Security Council and Cabinet-level officials, and from intelligence products that he had the ability to obtain from anywhere in the USIC. The classified information he transcribed was unparalleled in breadth given his unique need, as National Security Advisor, to know the full array of U.S. national security secrets to be able to appropriately advise the President. Mr. Bolton took those writings out of government spaces and converted them to his own use—to the exclusion of his employer, the federal government—using an unclassified, unsecure computer. And he did all of this to aid him in writing a book, and for some purported future historical use.

Mr. Bolton's actions are qualitatively more serious than Mr. Petraeus, Mr. Berger, or any other comparator cited by either Mr. Bolton or the government. Any perceived disparities between the sentences received by these defendants, and the Government's recommended 60-month sentence, are warranted.

Title 18, United States Code, 3553(a)(6) does not prohibit any disparities in sentencing; it instructs courts to "avoid unwarranted sentence disparities among defendants with similar records

who have been found guilty of similar conduct." *Id*. The goal is to "eliminate unwarranted sentencing disparities *nationwide*." *United States v. Lawson*, 128 F.4th 243 (4th Cir. 2025)(emphasis in original) (quoting *United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996)). "Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Miller,* 450 F.3d 270, 276 (7th Cir. 2006)(quoting *United States v. Boscarino,* 437 F.3d 634, 638 (7th Cir. 2006)). "Courts have repeatedly made clear that comparisons of sentences may be treacherous because each sentencing proceeding is inescapably individualized." *United States v. Friend*, 2 F.4th 369, 382-83 (4th Cir. 2021) (quoting *United States v. Rivera-Santana*, 668 F.3d 95, 105 (4th Cir. 2012)).

For all of the reasons previously cited, the government believes that Mr. Bolton's case, given his position when he engaged in this criminal conduct, coupled with the breadth of information compromises, and the fact of the actual, known compromise, sets this case apart from almost any other comparator. That said, a review of the cited cases shows that the Government's recommendation is in line with many of the cited cases, and lower than in other cases. The government acknowledges that disparity; however, that disparity is appropriate by virtue of Mr. Bolton's government service.

A. Misdemeanor Cases

1. <u>David Petraeus</u>

Former CIA Director and U.S. Army General David Petraeus was convicted of violating 18 U.S.C. § 1924 and was sentenced to one year imprisonment and a $100,000 fine. In that case, law enforcement executed a search warrant at Petraeus's residence three months after he resigned from the CIA. During that search, law enforcement recovered notebooks that contained classified information.

Unlike Mr. Bolton's situation, Mr. Petraeus's final offense level, after acceptance of responsibility, was a level 8, resulting in an advisory Guidelines range of 0-6 months. Exhibit 1, Plea Agreement, *United States v. David Howell Petraeus*, Case No. 3:15-CR-47, at 2, ¶ 7(a).

2. Samuel Richard (Sandy) Berger

Like Director Petraeus, Mr. Berger pled guilty to the misdemeanor charge of 18 U.S.C. § 1924, and was sentenced to two years of probation, a $50,000 fine, and 100 hours community service.[2] On two occasions, Mr. Berger concealed and took a total of five documents (different versions of a single document) from the National Archives while reviewing documents in connection with requests for documents made by the 9-11 Commission.[3] Contrary to Mr. Bolton's case, there was no evidence that the classified documents removed from the National Archives fell into the hands of a foreign adversary. Mr. Berger's criminal conduct, while serious, is alleged to have occurred on two occasions, involving documents that would not have involved covert operations, or intelligence sources and methods. In contrast, Mr. Bolton's criminal conduct involved over a thousand pages of highly sensitive, classified information sent and retained by Mr. Bolton to people unauthorized to receive that information over the course of months and years.

---

[2] Exhibit 2, Department of Justice, Former National Security Advisor Samuel Berger Pleads Guilty To Knowingly Removing Classified Information From The National Archives, *available at* https://www.justice.gov/archive/opa/pr/2005/April/05_crm_155.htm (last viewed Nov. 13, 2026).
[3] *Id*.

B. Felony Cases

1. Nghia Hoang Pho

On comparing Mr. Bolton's conduct with Pho (who received a sentence of 66 months), there is the similarity that Pho's conduct allowed a foreign adversary to gain access to sensitive and classified government tools. The Government further relies on its classified memoranda, which more ably addresses this point.

2. Harold Martin

Harold Martin was convicted of Unlawful Retention of National Defense Information, in violation of 18 U.S.C. § 793(e). While the volume of information retained by Mr. Martin was a factor in the parties' Rule 11(c)(1)(C) plea to nine years of imprisonment, that volume does not take into account the fact that Mr. Bolton, as National Security Advisor, was a constant, high-priority target for nation-state counterintelligence operations. Moreover, as a result of Mr. Bolton's virtually unlimited access to classified information as the National Security Advisor, the classified information that he unlawfully transmitted and retained encompassed a far wider array of U.S. national security secrets than was at issue in the case of Martin, who as an NSA contractor had a much narrower need to know.

Mr. Bolton's decades of experience of federal service is a significant mitigating factor that partially explains the difference between these cases. However, unlike Martin, Mr. Bolton's decades of experience in national security affairs, coupled with his nearly unlimited access to classified information as National Security Advisor, made him a prime target. And an Iranian hacker proved that hypothesis.

## V. Mr. Bolton's Historical Motive

The motive to create a clear record for history (*see* Def.'s Mem. at 29-33) is not an excuse for mishandling classified information. Mr. Bolton's memorandum does not address other than in general terms the historical need to retain this information, or how he would store securely such information, or use classified information to vindicate history at some future date.[4]

Mr. Bolton's personal historical motive has been raised to justify his keeping of a personal diary. His claimed intent for his diary to be "a personal record of his time as [National Security Advisor] for history's sake," Def.'s Mem. 30, does not and cannot justify Mr. Bolton's course of conduct in which he would regularly (1) take notes about classified meeting, briefings, and intelligence; (2) transport those notes to his home, in an unsecured manner; (3) type those notes into an unsecure, nongovernment computer; (4) send the resulting documents, over a nongovernment computer application or nongovernment telephone; (5) send the classified documents to two people who had neither the clearances, nor the need to know the classified information transmitted in those documents; and (6) retain those highly classified documents on Mr. Bolton's phone and computer.

## VI. The Bureau of Prisons Can Protect Mr. Bolton

Mr. Bolton argues that he must be sentenced to probation because the Bureau of Prisons is incapable of keeping him safe. Mr. Bolton provides no evidence to support this claim. Moreover, any claim that Mr. Bolton would be in physical jeopardy, or subjected to mistreatment, could be addressed, like any other federal inmate, through the Bureau of Prison's administrative process, including an appeal to the Warden of the facility, as well as to the Regional Director in charge of

---

[4] Mr. Bolton makes related arguments in his classified sentencing submission. *See* Dkt. No. 111. The Government intends to address those arguments during the classified portion of the sentencing hearing.

that facility. The Government will also address additional factors in the sealed portion of the sentencing hearing.

The Bureau of Prisons has an Administrative Remedy Program that allow inmates to "seek formal review of an issue relating to any aspect of his/her confinement."[5] That program involves options for informal resolution;[6] an Administrative Remedy Request;[7] and an appeals process to the Warden of the facility,[8] and the BOP Regional Director.[9] These processes have required response times, ranging from 20 to 40 days or, in the case of a medical emergency, within three calendar days after filing. 28 C.F.R. 542.18.[10]

The tools available to the Bureau of Prisons also includes separation orders, protective custody, and administrative detention.[11] In an appropriate case, after exhaustion of administrative remedies, Mr. Bolton would be able to seek relief through a motion for compassionate release if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).[12] One feature of compassionate release is that "[s]ection 3582 . . . imposes no time limit or numerical cap on motions." *Fernandez v. United States*, 608 U.S. 411, 422 (2026). This Court does not need to presume that Bureau of Prisons is not equipped to handle Mr. Bolton's situation,

---

[5] Exhibit 3, BOP Program Statement No. 1330.18, Administrative Remedy Program (Jan. 6, 2014), available at https://www.bop.gov/policy/progstat/1330_018.pdf (last viewed Nov. 13, 2026).
[6] 28 C.F.R. § 542.13.
[7] *Id*. § 542.14.
[8] *Id*. § 542.15.
[9] *Id*.
[10] *Id*.
[11] Exhibit 4, BOP Program Statement No. 5270.12, Special Housing Units (Mar. 6, 2025), *available at* https://www.bop.gov/policy/progstat/5270_012_cn-1.pdf (last viewed Nov. 13, 2026).
[12] Exhibit 5, BOP Program Statement No. 5050.51, Compassionate Release/Reduction in Sentence Procedures (Sept. 3, 2026), *available at* https://www.bop.gov/policy/progstat/5050_051.pdf (last viewed Nov. 13, 2026).

but rather can address the conditions placed upon Mr. Bolton while incarcerated at a later time if such concern comes to fruition.

## VII. Conclusion

Mr. Bolton saw his work as "protecting the nation's interests." Def's Motion Ex. B-1. By virtue of his position, and his access to classified, compartmented information, Mr. Bolton's conduct jeopardized national security. On the extent of harm caused to the United States national security, the Government relies on the classified submissions.

A sentence of 60 months of imprisonment, three years of supervised release, and the agreed-upon fine of $2.25 million, is sufficient and necessary to send the message that no one—regardless of status—is above the law.

Respectfully submitted,

KELLY O. HAYES
United States Attorney

By: /s Thomas M. Sullivan
Thomas M. Sullivan
Assistant United States Attorney

CHRISTIAN J. NAUVEL
Acting Chief
Counterintelligence and Export
Control Section
National Security Division
U.S. Department of Justice

By: /s Tanner Kroeger
Tanner Kroeger
Deputy Chief
Garrett Coyle
Trial Attorney

cc: Erik Finneyfrock, U.S. Probation Officer (by email at Erik_Finneyfrock@mdp.uscourts.gov)