**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN ROBERT BOLTON, II,<br><br>Defendant. | Case No. 8:25-cr-0314-TDC |

# JOHN ROBERT BOLTON'S RESPONSE TO THE GOVERNMENT'S UNCLASSIFIED SENTENCING MEMORANDUM

Abbe David Lowell (No. 11863)
David A. Kolansky (*admitted pro hac vice*)
Isabella M. Oishi (*admitted pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005

*Counsel for Ambassador John Robert Bolton, II*

## TABLE OF CONTENTS

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. THE GOVERNMENT'S CASE COMPARISONS ARE DRASTICALLY DISSIMILAR TO AMBASSADOR BOLTON'S CONDUCT AND DO NOT JUSTIFY INCARCERATION ........ 2

II. THE GOVERNMENT'S RELIANCE ON AMBASSADOR BOLTON'S PAST PUBLIC COMMENTARY IS NOT A RELEVANT FACTOR IN THE COURT'S SENTENCING DECISION ........ 7

III. THE GOVERNMENT'S INACCURATE REFERENCES TO A CRIMINAL "SCHEME" AND A SYSTEMATIC "COURSE OF CONDUCT" DO NOT SUPPORT INCARCERATION. ........ 8

IV. GENERAL AND SPECIFIC DETERRENCE DO NOT REQUIRE IMPOSING INCARCERATION ........ 12

V. ANY SPECIAL CONDITION OF SUPERVISED RELEASE MUST BE PRECISELY TAILORED TO AMBASSADOR BOLTON'S CIRCUMSTANCES ........ 13

CONCLUSION ........ 14

# TABLE OF AUTHORITIES

## Cases

*United States v. Bolton*,
468 F. Supp. 3d 1 (D.D.C. 2020) ........ 5

*United States v. Bolton*,
No. 1:20-cv-01580-RCL (D.D.C. 2021) ........ 5

*United States v. Ford*,
No. 05-cr-235-PJM (D. Md. 2005) ........ 2, 3

*United States v. Hale*,
No. 1:19-cr-59 (E.D. Va., Mar. 31, 2021) ........ 2

*United States v. Martin*,
No. 1:17-cr-69-RDB (D. Md. Jul. 19, 2019) ........ 2

*United States v. Pho*,
No. 1:17-cr-631-GLR (D. Md. Dec. 1, 2017) ........ 2

## Statutes

18 U.S.C. § 3553 ........ 1, 7, 12

44 U.S.C. § 2201(3)(A) ........ 4

## Other Authorities

Fed. R. Crim. Proc. 11(c)(1)(C) ........ 1, 13

U.S.S.G. § 5E1.2(d) ........ 13

## INTRODUCTION

A 60-month sentence for a 78-year-old, distinguished former U.S. official, who gave his life in service to protecting this country, for the underlying conduct here for which he has accepted full responsibility, is not a just punishment to accomplish the specific goals of sentencing. It is exactly the opposite: excessive and severe considering all the sentencing factors, especially avoiding unwarranted disparities. The government's request is based on (i) a dramatic mischaracterization of the offense (e.g., "reams" of highly classified information, not one diary); (ii) exaggerating the relevant conduct (e.g., describing his act of keeping a diary as a "scheme"); (iii) discounting that the book—incorrectly asserted as the sole motivation for his diary-keeping—actually demonstrated, through its submission for pre-clearance review, Ambassador Bolton's compliance with, not disregard for, protecting sensitive information; and (iv) over-emphasizing past media comments of others' mishandling classified information without the full context. Despite acknowledging Section 3553(a)'s factors, the government ignores some (such as security concerns unique to Ambassador Bolton, including Iran's continuing assassination threat), cherry picks others (comparable cases), and places insufficient or no weight on Ambassador Bolton's acceptance of responsibility, his age, his cooperation under the plea agreement, his lack of criminal-history points, his record of public service, and other mitigating factors such as the risk of vindictive treatment in BOP custody.

The Court should impose a sentence of probation, together with the agreed-to $2,250,000 fine and other provisions in the parties' Rule 11(c)(1)(C) agreement, which would recognize the seriousness of the offense while accounting for the circumstances of this individual defendant and avoiding punishment greater than necessary.

## ARGUMENT

### I. THE GOVERNMENT'S CASE COMPARISONS ARE DRASTICALLY DISSIMILAR TO AMBASSADOR BOLTON'S CONDUCT AND DO NOT JUSTIFY INCARCERATION.

Ambassador Bolton does not dispute that his actions were serious, and he pled to a felony to accept responsibility. However, the government's cursory references to the cases of *Pho*, *Martin*, *Hale*, and *Ford* to justify a 60-month sentence are fundamentally flawed. Gov't Br. at 28–29. Those cases involved conduct demonstrably and exponentially more egregious in duration, volume, intent and public harm than Ambassador Bolton's actions. Bolton Br. at III.A.

First, the mass accumulation and hoarding of raw intelligence data in *United States v. Martin* and *United States v. Pho*, bear no factual resemblance to Ambassador Bolton's keeping his own personal diary. Martin engaged in a nearly two-decade campaign of unlawfully stockpiling marked highly classified documents from the NSA, U.S. Cyber Command, the National Reconnaissance Office, and the CIA, storing them haphazardly in his residence and vehicle. Pho similarly spent five years unlawfully removing specialized, highly classified NSA project information marked at the TS/SCI level. Ambassador Bolton did not "systematically," as the government claims (Gov't Br. at 30), loot classified U.S. Intelligence Community (IC) databases. His offense was limited to keeping his own contemporaneous diary regarding his personal White House experience, as many in similar positions have done before him. Equating the keeping and sharing of one's own diary with a decades-long, wholesale theft of marked cyber and intelligence agency files grossly misapplies the principle of comparing "similarly situated defendants" in fashioning a just sentence.

Second, unlike in *Hale* and *Ford*, Ambassador Bolton never sought to leak classified NDI to the public, nor did he actively obstruct justice. Hale deliberately transmitted eleven highly classified documents to a reporter for the express purpose of public dissemination,

resulting in their publication in the media. Ambassador Bolton's diary transmissions, even though improperly sent over an unsecure messaging application, were always intended to be and were strictly intrafamilial communications only to his wife and daughter for completely innocent purposes. And, unlike Ambassador Bolton who has pled guilty, accepted responsibility, cooperated for an IC debrief, and saved the government the time and resources of a classified trial, Ford was convicted of willfully retaining NDI *and* of making false statements *only after* taking his case to trial, for which he received a 72-month sentence.

Benchmarking Ambassador Bolton's conduct to the conduct of individuals who leaked secrets to the media, hoarded classified intelligence agency databases for decades, or lied to federal investigators as support for incarceration is totally inapposite. Simultaneously, the government completely ignores the comparable conduct in the cases of former CIA Director and Army Commander David Petraeus, former National Security Advisor Sandy Berger, as well as others who were not charged at all. In its proper context, Ambassador Bolton's diary-keeping activity was distinct from the government's suggested comparables because it was limited to the localized mishandling of his own diary, with no intent to disseminate secrets to the public or press, and without his having taken or disseminated actual, marked classified documents. Aligning him with these extreme comparators at sentencing would create, rather than eliminate, unwarranted disparities. All these cases do is reinforce the principle that tailored, individualized judgments are required in NDI cases, regardless of whether those are negligent mishandling or retention cases.

The government inaccurately paints Ambassador Bolton's charged conduct as if he kept or shared "reams" and "a thousand pages of" highly classified records marked TS/SCI. Gov't Br. at 12, 16, 18, 26. The diary was not that. First, while parts of the diary contain information

deemed classified, a much larger portion of the diary recounts Ambassador Bolton's personal reflections or observations while working as NSA or describes White House conversations more likely found in "inside-the-beltway" commentary than in classified documents. Second, as he has explained, Ambassador Bolton perceived and intended his private diary to be a record of his time as NSA for history's sake—a contemporaneous record of what actually happened during his White House tenure. In doing so, he did what many senior U.S. officials have done throughout history. *See* Bolton Br. at 30. His keeping a personal diary was also informed by his erroneous understanding of the Presidential Records Act (PRA), which excludes personal "diaries" and "journals" from the definition of "Presidential records." But the diary was not, at the time he created and shared it, "a thousand pages" of marked classified material, despite however much the government tries to characterize his conduct as such.

The government portrays Ambassador Bolton's motive for keeping a diary as solely for "personal gain" and to "publish a bestseller." Gov't Br. at 2, 10. That is simply not true. Ambassador Bolton began keeping the diary—and sharing it with his wife and daughter—shortly after the 2016 election, describing events even before he knew he would join the Trump administration. In fact, he kept a personal diary during each of his prior government jobs, as had been his practice since 1985 when he joined the Reagan Justice Department as AAG for Legislative Affairs, long before a book deal was possible. He was motivated, in no small part, by the need to preserve an accurate historical record of the Trump presidency. *See* Bolton Br. at II.C. Worse, the government improperly conflates—in order to boost its "crime does pay" theory of the case—the diary he kept with his published memoir, *The Room Where It Happened*, as though they are one. This case concerns Ambassador Bolton's keeping and sharing with his wife and daughter his private diary—later deemed to contain classified information. It is *not*

about Ambassador Bolton's "sending drafts of portions of the book" to his publisher and literary agent (Gov't Br. at 3) in his post-government life, or the published product—and the government concedes, but hardly appreciates, that *none* of the classified NDI charged in this case was published in his book. *Id.*; Plea SOF at 18; *see also* Ex. C (9/22/20 K. Wainstein Ltr.).

In fact, since the book's publication, no reviewer has identified anything in the book as classified. The whole purpose of having government officials submit their writings to prepublication review is because common sense recognizes that drafts initially may contain sensitive information that a careful review by appropriate personnel can identify and cure. Writers of such manuscripts, as far as we know, have not been prosecuted for writing such drafts for the very review which ensures there will not be improper disclosure. His manuscript went through a rigorous prepublication review, and after four months, was cleared by a career NSC official (an expert in classification matters) in Spring 2020. *See* Bolton Br. at II.B & Ex. C.[1] The contention that Ambassador Bolton kept a diary solely "in pursuit of what would become a seven-figure book deal," Gov't Br. at 24, fits the government's fanciful narrative but is incorrect. Of course, when a person writes a book, they hope it will sell, but the government's one-sided allegation here is contrary to all of Ambassador Bolton's prior work and publications. The diary was recorded in no small part to keep an accurate historical record of his time as NSA

[1] The government's quotation of Judge Lamberth's opinion in the book litigation, Gov't Br. at 30, is equally gratuitous—again conflating Ambassador Bolton's book writing with his diary keeping. Issued on June 20, 2020, that opinion followed an *ex parte* hearing with DOJ lawyers on June 19, *before* that Court received the letter from an attorney representing the career NSC official in September 2020 describing the rigorous prepublication review process conducted. *See* Ex. C (9/22/20 K. Wainstein Ltr.). *After that review*, Judge Lamberth ordered limited discovery against the government. **Ex. J** (*United States v. Bolton*, No. 1:20-cv-01580-RCL, ECF 61 (Memorandum Op.) (D.D.C. Jan. 14, 2021)) (denying DOJ's motion for summary judgment and granting Bolton the ability to conduct discovery into his allegations of bad faith); *see also United States v. Bolton*, 468 F. Supp. 3d 1, 5 (D.D.C. 2020) (on June 19, 2020, the Court held a sealed *ex parte* hearing for further *in camera* review with the government). DOJ ultimately settled the matter and dismissed the action with prejudice on June 16, 2021. *See* No. 1:20-cv-01580-RCL, ECF 72.

and because of his concerns surrounding the unique challenges of working in a Trump White House—concerns which turned out to be true. *See* Bolton Br. at II.C. But the government's contention that Ambassador Bolton engaged "in [a] course of criminal conduct" that "compromised" "highly sensitive classified [NDI]," Gov't Br. at 11, 24, purely in pursuit of greed or a "book deal" is another unsupported embellishment to argue for a sentence that the actual facts and law do not support. The Court should not allow the government's "seven-figure book deal" theory to become the tail that wags the dog in a prosecution about diary keeping.

Finally, the government acknowledges in reaching its 60-month recommendation both Ambassador Bolton's decades-long record of public service and his age. Gov't Br. at 14. Ambassador Bolton did not detail his long career to suggest to the Court that a dedicated public servant should not be held responsible for their misconduct. He did so as a mitigation factor, recognized by sentencing law, and to contextualize a lapse in judgment in his decades of service, for which he meant no harm and has accepted responsibility. Those considerations warrant substantial weight here. But, so too do the safety and security concerns raised by Ambassador Bolton, and ignored by the government, especially considering President Trump's own words on the matter in the past.[2] *See* Bolton Br. at II.D.

A public career spanning approximately four decades cannot be reduced to the charged conduct or ignored merely because Ambassador Bolton occupied positions of responsibility. His record of service, combined with his otherwise spotless record, is plainly relevant to his character, history, and the need to fashion a just punishment without incarceration.

---

[2] Asked in January 2025 if he would take responsibility if something happened to Ambassador Bolton after terminating his Secret Service protection, President Trump stated: "No. You know they all made a lot of money. *They can hire their own security too*. . . . Certainly I would not take responsibility." **Ex. K** (Nandita Bose & Susan Heavey, *Trump Ends US Security for Fauci, The Latest Ex-Official to Lose Protection*, Reuters (Jan. 24, 2025), https://www.reuters.com/world/us/trump-says-he-ended-security-former-top-covid-official-anthony-fauci-2025-01-24/) (emphasis added).

## II. THE GOVERNMENT'S RELIANCE ON AMBASSADOR BOLTON'S PAST PUBLIC COMMENTARY IS NOT A RELEVANT FACTOR IN THE COURT'S SENTENCING DECISION.

The government devotes nearly a third of its unclassified brief to Ambassador Bolton's past public comments about others' possible mishandling of classified information. Gov't Br. at 14–23. Ambassador Bolton acknowledges that he was aware of the laws, rules, and procedures governing protection of classified information and that, even with the proper context, he will be accused of hypocrisy. Ex. A (J.R. Bolton Ltr.) However, the government's repeated use of his past media statements (some a decade ago) about others' security and operational breaches fail to mention that many of those who were the subject of his comments (e.g., Secretary of War Pete Hegseth, former National Security Adviser Mike Waltz, former Secretary of State Hillary Clinton, and President Donald Trump) were *not* investigated, charged, or faced with the fate that now brings him before the Court. *See* Gov't Exs. 1, 5, 6, 7, 9, 10.

Additionally, while the extensive quotes demonstrate his strong personal opinions as a media commentator, political punditry *does not* establish a legal framework for sentencing under Section 3553(a). It actually risks shifting the sentencing inquiry from Ambassador Bolton's admitted conduct to a generalized critique of his public persona or perceived hypocrisy—something far beyond the Court's mandate under Section 3553(a) to impose a just sentence based on the actual nature and circumstances of the conduct.

The government's exhaustive reliance on a set of curated quotes ultimately serves only to prove what the defense has already conceded: Ambassador Bolton knew the rules governing classified information. Plea SOF at 12. He has explicitly acknowledged this by pleading guilty, taking responsibility, and cooperating with the IC.

## III. THE GOVERNMENT'S INACCURATE REFERENCES TO A CRIMINAL "SCHEME" AND A SYSTEMATIC "COURSE OF CONDUCT" DO NOT SUPPORT INCARCERATION.

The government relies heavily on exaggerated language to distort the reality of Ambassador Bolton's actions, treating it as if he were a person embezzling money from his company, or other illicit financial activity. By describing keeping a private diary as a nefarious "17-month scheme," "inexplicable," an aggravated "course of criminal conduct," and an instance of "brazen" misconduct, Gov't Br. at 10, 14, 24, 26, 30, 31, the government seeks to manufacture an aura of malicious, intentional leaking or public disclosure where none exists. Ambassador Bolton's actions—recording what he did, heard and saw to create a historical record and contemporaneously sharing his diary with two family members—do not constitute a "scheme" to subvert national security. A "scheme" or "course of criminal conduct" implies deceitful, coordinated, operational plotting to defraud or harm the U.S., whereas Ambassador Bolton's offense was a localized, non-malicious failure to adhere to the physical and electronic protocols for reviewing and storing classified material. To characterize his diary-keeping that recorded his discussions and experiences as a sinister plot fundamentally mischaracterizes his intent and ignores the well-documented precedent of senior officials recording their tenures for historical and biographical purposes. *See* Bolton Br. at II.C (discussing representative examples of government officials who kept diaries of their time in public office).

Furthermore, the assertion that Ambassador Bolton "systematically exposed this nation's most sensitive of secrets to cyber theft and exploitation," Gov't Br. at 30–31, is a hyperbolic distortion of the facts. It was neither his intent to nor did Ambassador Bolton "systematically expose" anything as a leaker might; he was the unwitting victim of a sophisticated, state-sponsored cyber-breach by Iranian hackers who targeted his personal email account with the

aim of *assassinating him.*[3] The government conflates the result of this Iranian cyberhack with Ambassador Bolton's intent and conduct. While he failed to use a secure device to store his personal diary later deemed to contain classified information (which, to remain private or nonpublic under the PRA, was necessarily written and stored on personal devices), Ambassador Bolton did not deliberately broadcast, publish, or "systematically" hand over "a thousand pages of documents," *id.* at 16, to an adversary. Using such inflated language seeks to equate a lapse in information security decision-making with a deliberate, methodical betrayal by espionage or purposeful public dissemination of our nation's secrets—a comparison factually unsupported and legally inappropriate for a first-of-its-kind Section 793(e) prosecution for keeping a private diary.

The government's repeated claim that Ambassador Bolton's actions "placed our nation's most sensitive secrets directly in the hands of" Iran (Gov't Br. at 2) is the kind of language used in classified information cases where a defendant purposely transmitted or disclosed information to a foreign adversary or removed marked classified documents from a secure place (e.g., Sandy Berger). *See also id.* at 26 ("directly enabled"), 31 ("giving classified [NDI]"). As it turned out, Iranian-linked hackers accessed his AOL account and its contents to trace his "pattern of life" to assassinate him.[4] Bolton Br. at 35. But Ambassador Bolton did not intend to

---

[3] As the *Wall Street Journal* recently wrote, the Iranian threats to Ambassador Bolton "are serious" and "should again flag the manifest unwisdom of seeking prison time for Mr. Bolton" here, as evidenced by DOJ's recent indictment of two IRGC operatives for allegedly directing—from inside a Brooklyn federal prison—the September 2026 plot against U.S. military aircraft at the U.K.'s RAF Fairford air base. **Ex. L** (Editorial Bd., *Iran's Assassins Are on the Loose*, WALL ST. J. (Nov. 11, 2026), https://www.wsj.com/opinion/iran-assassins-irgc-scott-bessent-john-bolton-1df4ef62) ("How would the prison system protect [Mr. Bolton] from the Iranians?").

[4] Just days ago, on November 10, the FBI added IRGC member Sharam Poursafi to its *Most Wanted Terrorists* list for, *inter alia*, arranging and soliciting a hitman to kill Ambassador Bolton in retaliation for the January 2020 death of IRGC Quds-Force commander Qasem Soleimani. The FBI also released posters seeking information on three other IRGC-QF officials for their

harm U.S. interests or "place" classified NDI directly in Iran's hands (or any other adversary) as the government suggests, nor did he intend to cause disclosure to anyone other than his two family members. The government does not distinguish between the limited material that hackers accessed in his AOL account in June 2021 with the 18 counts charged in this case (let alone the one count to which he pled guilty). The charged conduct concerns a diary retained and transmitted (in smaller segments, as it was written) over unsecured e-mail and in a family WhatsApp group chat[5]; the hacked material in Ambassador Bolton's AOL account, later deemed to contain classified information, was only a subset of the diary he had emailed himself or his family members while traveling, which remained in his sent-emails box and were later obtained by the hackers. Those portions of his diary were not "reams" of classified records or "more than a thousand pages" as the government alleges. Gov't Br. at 12, 16, 18, 26. While this correct description of the scope of material accessed by Iran in no way excuses Ambassador Bolton's conduct, it is flatly incorrect to suggest that he "placed" the entire diary "directly in the

---

alleged participation in lethal plotting. **Ex. M** (Press Release, FBI Washington, *FBI Washington Field Office Adds Islamic Revolutionary Guard Corps Member to Most Wanted Terrorists List, Releases Seeking Information Posters on Three IRGC Associates* (Nov. 10, 2026), https://www.fbi.gov/contact-us/field-offices/washingtondc/news/fbi-washington-field-office-adds-islamic-revolutionary-guard-corps-member-to-most-wanted-terrorists-list-releases-seeking-information-posters-on-three-irgc-associates); *see also* Bolton Br. at II.D (discussing *United States v. Poursafi*). The threat level against Ambassador Bolton, and other U.S. officials, from Iran remains very significant, as demonstrated publicly by the decision to move Treasury Secretary Scott Bessent from his Georgetown home to a U.S. military base because of "Iranian threats against his life." **Ex. N** (*Bessent Moved To Military Base Amid 'Growing Threats': Source*, CNBC (Nov. 10, 2026), https://www.cnbc.com/2026/11/11/us-iran-war-trump-hormuz-bessent-threats.html); **Ex. O** (*Treasury Secretary Scott Bessent Moved To A Military Base, Sources Say*, ABC NEWS (Nov. 11, 2026), https://abcnews.com/Politics/treasury-secretary-scott-bessent-moved-military-base-sources/story?id=138044885).

[5] The government asserts that the family text chain was created "[t]he day before he" became NSA on April 9, 2018. Gov't Br. at 1. Not so. Ambassador Bolton's daughter attested, "[their] family has had a group text chain" on WhatsApp ever since "[she] lived in Hong Kong" in 2010-2011. Ex. B-18 (J.S. Bolton Ltr.) Over the years, the WhatsApp chat ended and restarted at various points and was generally used to communicate "about lots of random things." *Id.*

hands of" a foreign adversary, particularly since the hack occurred some 21 months after he left government service.

The government's overstatement is an effort to justify a disproportionately harsh sentencing request by inflating an information-security protocol violation into a grand betrayal of U.S. interests. Labeling his lapse in handling and judgment as "systematic[,]" "brazen conduct" ignores the reality that he shared his diary with only two family members in a misguided but fundamentally private manner, when his years of training and experience should have counseled him otherwise. The Court should reject the government's effort to substitute sensationalism for an objective assessment of the facts.

Finally, the government minimizes Ambassador Bolton's actions when he reported the cyber hack to the FBI in 2021, asserting he "made the conscious decision *not* to tell law enforcement," "said nothing," and did not "come clean" about the classified diary. *Id.* at 26, 31 (emphasis added). As the government knows from its discovery, when his Assistant notified the FBI of the hack in July 2021,[6] *see* Plea SOF at 14, she stated that the accessed documents "might [have] sensitive information in them," and, later on, made her and Ambassador Bolton's electronic devices at the office and anything on those devices completely available to the FBI for inspection. Ex. B-117 (C. Samuelian Ltr.) FBI agents were able to examine Ambassador's Office devices and ask any questions of him they wanted during the more than five years that he

---

[6] While the government states that "when the FBI interviewed Mr. Bolton in July 2021 about the Iranian government hacker who gained access" to his AOL email, Gov't Br. at 23, the government's unclassified discovery confirms that, actually, Ambassador Bolton's *assistant* contacted the FBI, and her correspondence with the FBI was memorialized in an FD-302 dated July 20, 2021. Gov't Bates No. USA_05985. The defense was not provided independent discovery indicating Ambassador Bolton was himself "interviewed" by the FBI in July 2021, though Ambassador Bolton spoke repeatedly with FBI counterterrorism and counterintelligence agents over an extended period of time following the hack. These were more than mere "duty to warn" discussions and included the Ambassador's active cooperation with the FBI to frustrate Tehran's threat to multiple current and former U.S. officials.

communicated and cooperated with them following the Iranian hack of his account. *See* Ex. A (J.R. Bolton Ltr.).

## IV. GENERAL AND SPECIFIC DETERRENCE DO NOT REQUIRE IMPOSING INCARCERATION.

The government's emphasis that a term of imprisonment is necessary here as a general deterrent to "send the message" to "the millions of U.S. security clearance holders" is more applicable to the typical, intentional disclosure or leak cases. Gov't Br. at 25–27. Every cleared official who leaves government "retains knowledge" of classified information in their brain—but that does not in-and-of-itself make a person prone to share that material with unauthorized persons. *Id.* at 27. To claim the contrary would mean every former official who once possessed knowledge of classified information is a risk and must be deterred from disclosure by Ambassador Bolton's punishment here. Nothing could be further from the truth. As the government well knows, Ambassador Bolton—and every other cleared current or former official—remains subject to the same continuing non-disclosure agreements he signed with the federal government, whether they still work for the government and regardless of what "knowledge" they may "retain" after leaving office. A sentence short of imposing incarceration will still convey the seriousness of safeguarding classified information and meaningfully deter wrongdoing by others.[7] No security-clearance holder or government contractor is ever going to believe it is worth the risk of taking, keeping, or disclosing classified information unless Ambassador Bolton receives imprisonment.

Likewise, specific deterrence will also be achieved here without imposing incarceration. Ambassador Bolton has agreed to pay a $2.25 million penalty and is unlikely to hold a security

[7] In addition to its insistence on a sentence at the very top of the plea agreement's cap, the government also offers no real analysis of why alternatives, such as home confinement or additional probation or release conditions, would not satisfy the requirements of Section 3553.

clearance again. This prosecution, the conviction itself, the unprecedented agreed-to fine amount, and the consequences of conviction, including forfeiture of his pension and government healthcare program and that "he is unlikely to ever hold a security clearance again" (*id.* at 27), and the permanent mark on his lifetime record of service, all contribute to overall deterrence and his punishment. *See* U.S.S.G. § 5E1.2(d) (requiring the sentencing court to consider the *totality* of financial and non-financial punishment together and not view any portion of the penalty in isolation). The contention that because he "retains knowledge of a significant amount of classified national defense information," Ambassador Bolton could, in the future, repeat comparable conduct or "transmit" NDI to unauthorized persons is baseless and contradicts decades of his work. Gov't Br. at 1, 27. The government proves too much.

The government also ignores the serious impact that the financial sanction will have on Ambassador Bolton and his family and the collateral consequences he has already endured—treating them as incidental rather than part of the total punishment to be imposed. He and his family have also had to endure the enormous cost of hiring private security—"upwards of seven figures annually," Ex. B-17 (G. Bolton Ltr.)—a collateral cost to him of his government service that the government ignores. Combined with a $2.25 million fine—the highest fine ever for such an offense—and the other financial impositions, *see* Bolton Plea ¶ 14, a non-custodial sentence is sufficiently punitive to deter Ambassador Bolton from ever committing such conduct again, and also sends a strong message of general deterrence to other "high-level officials" and federal employees that crime, in fact, does *not* pay. Gov't Br. at 26.

## V. ANY SPECIAL CONDITION OF SUPERVISED RELEASE MUST BE PRECISELY TAILORED TO AMBASSADOR BOLTON'S CIRCUMSTANCES.

The government requests a special condition requiring Ambassador Bolton to comply with paragraphs 12 and 13 of the parties' Rule 11(c)(1)(C) Plea Agreement, which concern his

nondisclosure obligations and prepublication review. Gov't Br. at 30. To state the obvious, Ambassador Bolton has every intention of fully complying with the Plea Agreement. The Court need not impose *additional* requirements on Ambassador Bolton to satisfy his obligations under the Plea Agreement's terms or any special condition broader than necessary (and broader than outlined in ¶¶ 12–13 of the Plea) to address the offense conduct. Should Ambassador Bolton write an article or book or provide media commentary, so long as he complies with his existing and continuing nondisclosure and prepublication-review agreements and obligations (*see* Plea ¶ 12), he will be in compliance with the Plea Agreement.

**CONCLUSION**

For all these reasons, a sentence of probation combined with the $2.25 million fine and other financial penalties set forth in the parties' Plea Agreement is sufficient but not greater than necessary to reflect the seriousness of the offense, impose just punishment, deter wrongdoing by others, and effectuate the purposes of sentencing on a 78-year-old man still under threat of Iranian assassination.[8]

Dated: November 13, 2026

Respectfully submitted,

/s/ *Abbe David Lowell*
Abbe David Lowell (#11863)
David A. Kolansky (*admitted pro hac vice*)
Isabella M. Oishi (*admitted pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005
Tel: 202-964-6110
ALowellpublicoutreach@lowellandassociates.com
DKolansky@lowellandassociates.com
IOishi@lowellandassociates.com

*Counsel for Ambassador John Robert Bolton, II*

[8] Other than Ambassador Bolton and his counsel addressing the Court at the appropriate time, defense counsel does not anticipate calling any witnesses at the sentencing hearing.